EXHIBIT B

"review its SECA policies and take expeditious and appropriate remedial steps." However, this Order does not constitute a review of, or remedy to, our SECA policies. Additionally, this Order threatens to run counter to two other desires expressed by the conferees regarding SECA, namely that the Commission provide a "clear accounting of actual costs or proper allocation" of SECA charges and provide "proper and appropriate procedural protections to all parties" impacted by SECA. Therefore, I dissent from this Order.

SECA charges are currently being recovered from participants in the Midwest Independent Transmission System Operator (MISO) market. These charges will expire in April 2006. The instant case is merely a proceeding to account for the actual costs giving rise to these SECA charges and to provide for the proper allocation of SECA charges. The instant case does not concern itself with the Commission's SECA policies. Therefore, ordering that the decision in this case be issued two months before the date that the Chief Administrative Law Judge has determined is the appropriate procedural deadline will do nothing to "remedy" our SECA policies. On the contrary, it will cause the hearing process set for this case to be truncated.

I believe that arbitrarily interfering with the hearing process in this case runs counter to the conferees' desire that the parties have "proper and appropriate procedural protections." Shortening the hearing process in this case may also impede the ultimate goal of the hearing, *i.e.*, to arrive at a "clear accounting of actual costs [and] proper allocation" of the SECA charges. This too would run counter to the conferees' wishes. Finally, because the Commission has not even sought comment on its decision to shorten the process, the Commission risks denying the parties their due process rights. If that is the result of this Order, the decision in this case will not withstand judicial scrutiny on due process grounds. Then the Commission would have to revisit its decisions in this case, which would delay a resolution of these important issues. Such a delay would be contrary to the conferees' concern that the Commission act in an "expeditious" manner.

Accordingly, for these reasons, I respectfully dissent.

## [¶ 61,058]

## Weaver's Cove Energy, LLC, Docket No. CP04-36-001

## Mill River Pipeline, LLC, Docket Nos. CP04-41-001, CP04-42-001 and CP04-43-001

## Order on Rehearing

**(Issued January 23, 2006)**

**Before Commissioners: Joseph T. Kelliher, Chairman; Nora Mead Brownell, and Suedeen G. Kelly.**

1. On July 15, 2005, the Commission issued an order authorizing Weaver's Cove Energy, LLC (Weaver's Cove) under Section 3 of the Natural Gas Act (NGA) to site, construct and operate a liquefied natural gas (LNG) terminal in Fall River, Massachusetts.[1] Weaver's Cove's authorization is subject to a number of environmental and other conditions. The Commission also issued a certificate of public convenience and necessity to Mill River Pipeline, LLC (Mill River), an affiliate of Weaver's Cove, under Section 7 of the NGA to construct and operate two short lateral pipelines to connect the LNG terminal to the interstate pipeline system of Algonquin Gas Transmission Company (Algonquin).

2. Timely requests for rehearing and/or clarification of the July 15 Order were filed by Weaver's Cove; the City of Fall River, Massachusetts, jointly with the Attorney General of the Commonwealth of Massachusetts, the Attorney General of the State of Rhode Island, and the Massachusetts Energy Facilities Siting Board (jointly Fall River); the Conservation Law Foundation; Shell Oil Products US (Shell); KeySpan Delivery Companies (KeySpan); and Michael L. Miozza.

3. On rehearing, Fall River asserts, *inter alia*, that the Commission should deny the project based upon recent legislation that prohibits demolition of the old Brightman Street Bridge over the Taunton River. Fall River and the Conservation Law Foundation renew their arguments regarding safety and consideration of alternatives to the Weaver's Cove project, and they question whether the project would be consistent with the Wild and Scenic Rivers Act.

4. Weaver's Cove and Shell raise questions regarding several conditions the July 15 Order places on the Commission's approval of the project. Weaver's Cove argues that the billing determinants the July 15 Order requires for Mill River's rates based on theoretical capacity are too high. KeySpan, a shipper on the Algonquin system, requests the Commission to clarify that the July 15 Order does not address gas quality tariff issues

---

[1] 112 FERC ¶ 61,070 (2005) (July 15 Order).

relating to introduction of regasified LNG from Mill River into Algonquin.

5. For the reasons set forth below, we are granting Weaver's Cove's request for rehearing of the rate issue and denying the other requests for rehearing.

*Background*

6. On July 11, 2003, the Commission, at Weaver's Cove's request, initiated National Environmental Policy Act of 1969 (NEPA) review of this project under the Commission's pre-filing procedures.[2] The Commission issued a notice of intent to prepare an environmental impact statement (EIS) for this project, inviting comments on environmental aspects of the project from the public.[3]

7. The July 11, 2003 notice explained that Commission staff had already met in Fall River on May 2, 2003, with representatives of Weaver's Cove and key federal and state agencies to discuss the project and the environmental review process. These agencies included the U.S. Army Corps. of Engineers (COE), the U.S. Coast Guard, the Massachusetts Department of Environmental Protection, the Massachusetts Energy Facilities Siting Board, the Massachusetts Executive Office of Environmental Affairs, the Rhode Island Coastal Resources Management Council, and the Rhode Island Department of Environmental Management. The notice invited other federal, state, and local agencies with jurisdiction or special expertise with respect to environmental issues to cooperate in preparing the Commission's environmental impact statement. The notice was also sent to all nearby landowners, elected officials, environmental and public interest groups, and local libraries and newspapers. All interested parties were invited to submit written comments and to attend a public scoping meeting conducted jointly by staff from this Commission and the Massachusetts Executive Office of Environmental Affairs on July 29, 2003.

8. Approximately five months later, on December 19, 2003, Weaver's Cove filed an application proposing to construct an LNG terminal with a peak day sendout capacity of 800 MMcf a day on a site located on the Taunton River in the City of Fall River, Massachusetts. Notice of the proposal was issued on December 12, 2003, and published in the *Federal Register* on January 9, 2004.[4] The proposed facilities include a marine berth, an LNG storage tank, regasification facilities, and an LNG truck distribution facility. The proposed terminal will store LNG that it receives from ocean-going ships. LNG will be transferred into trucks for transportation to peak shaving storage facilities and industrial customers throughout New England, and vaporized (regasified) LNG will be delivered as pipeline quality natural gas into two pipeline laterals to be constructed by Mill River for transportation to separate interconnects with the Algonquin system for further transportation to customers.

9. On July 30, 2004, 2004, the Commission issued a draft environmental impact statement (DEIS) addressing environmental and safety matters associated with the project and invited comments from the public. In accordance with Council on Environmental Quality (CEQ) regulations, we provided a 45-day comment period.[5] In response to our invitation, the Commission received a large number of comments from local, state and federal government agencies, environmental groups, and individuals. The Commission also conducted two public comment meetings in the project area (one in Massachusetts and one in Rhode Island) on September 8 and 9, 2004.

10. On May 20, 2005, we issued a final environmental impact statement (FEIS). The FEIS addressed each comment on the DEIS. In some cases, based on the comments to the DEIS, we requested additional material from Weaver's Cove. The new material was addressed in the FEIS, and where appropriate the FEIS modified earlier recommendations for environmental conditions set forth in the DEIS. The FEIS also discusses a study of LNG safety issued after the DEIS by the U.S. Department of Energy's Sandia National Laboratories, *Guidance on Risk Analysis and Safety Implications of a Large Liquefied Natural Gas (LNG) Spill Over Water* (Sandia Report). The FEIS also discusses comments from the United States Coast Guard regarding ship transit and port security matters.[6]

11. On July 15, 2005, the Commission found that the proposed new LNG terminal will promote the public interest by increasing the availability of natural gas supplies in the New England market, and that the Mill River laterals are required by the public convenience and necessity to connect the proposed LNG facilities to the interstate pipeline system. Pursuant to the July 15 Order, before construction may begin, Weaver's Cove must sat-

---

[2] The purpose of the pre-filing process is to involve interested stakeholders early in project planning and to identify and resolve issues before an application is filed with the Commission. The NEPA pre-filing process does not necessarily shorten the time period that is required for Commission staff to complete its environmental analysis; rather, the pre-filing process allows the Commission to process the application in less time after it is filed because the environmental record is completed closer to the filing date.

[3] See Notice of Intent to Prepare an Environmental Impact Statement for the Proposed Weaver's Cove LNG Project, Request for Comments on Environment Issues, and Notice of Joint Public Scoping Meeting (NOI), 68 Fed.Reg. 42699 (July 18, 2003).

[4] 69 *Fed. Reg.* 1580.

[5] In practice, however, the Commission continued to receive and consider comments it received until it issued the final EIS in May 2005.

[6] During this period, the Coast Guard conducted a series of project-specific security workshops with port stakeholders, and federal, state, and local agencies identifying measures that would be necessary to manage risks associated with LNG vessel traffic.

isfy a number of environmental and safety conditions, including: the approval of emergency response and evacuation plans; concurrence from the states of Massachusetts and Rhode Island that the project is consistent with those states' coastal zone management programs; appropriate state or federal approvals regarding water quality, air quality, and dredging; and evidence that the proposed use of the terminal site is consistent with applicable deed provisions and the Massachusetts Contingency Plan.

*Procedural Matters*

*Filings by Towns in Rhode Island*

12. On September 26, 2005, the City of Newport and the Towns of Bristol, Tiverton, Middletown, and Portsmouth, Rhode Island (the Towns) jointly filed a pleading styled an *amicus* brief to express their opposition to the July 15 Order's authorization of the Weaver's Cove LNG project. Each of the Towns is located along the water route for LNG tankers to and from Fall River. The Towns do not seek late intervention. The Towns state that they did not intervene in the proceeding because their positions were consistent with the opposition to the project advanced by the Governors and Attorneys General of Massachusetts and Rhode Island, and other elected officials. On October 14, 2005, the Town of Jamestown, Rhode Island submitted a similar filing. On October 31, 2005, Weaver's Cove replied to the Towns' pleadings, urging that the Commission reject them because they are untimely and improperly filed by non-parties to the proceeding.

*Commission Response*

13. The Towns acknowledge that they had ample notice of the Weaver's Cove project, but state that they chose not to participate in this proceeding and participate until now because their interests were being well represented by others. The Towns now disagree with the Commission's July 15 Order approving the Weaver's Cove project, and urge that the Commission reverse that approval. The time for filing comments has long passed. Moreover, these pleadings were submitted more than two months after the Commission's July 15 Order was issued. Under Section 19(a) of the NGA and the Commission's Rules of Practice and Procedure, only parties to a proceeding may file requests for rehearing, and such requests must be filed within 30 days of the Commission's order.[7] Accepting the Towns' pleadings for consideration as *amicus* filings would allow the Towns to do indirectly what they cannot do directly in violation of our rules and the statute. Accordingly, the Towns' September 26, 2005 and October 14, 2005 filings will be rejected.[8]

*Comments Filed Prior to the July 15 Order*

*Comments on the FEIS*

14. Several parties to the proceeding submitted comments on the FEIS issued May 20, 2005 too late for us to respond to them in the July 15 Order. Specifically, we received such comments from the U.S. Department of the Interior, Office of Environmental Policy and Compliance (DOI); the U.S. Environmental Protection Agency, Region 1 (EPA); the U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Marine Fisheries Service (NOAA Fisheries); and the Massachusetts Executive Office of Environmental Affairs, Department of Environmental Protection (Mass DEP). The July 15 Order discusses many of the issues raised in these comments. We will address other issues raised in these comments in this order, as appropriate, either in this section of the order or as part of the discussion of rehearing issues raised by other parties.

*DOI*

15. DOI disagrees with the FEIS conclusion that the proposed project is compatible with potential Wild and Scenic River designation for the Taunton River, on which the LNG terminal would be located and under which the Mill River pipelines would run. DOI asserts that the FEIS does not adequately address protection of the outstanding fishery value of the Taunton River, and states that the failure to recommend dredging time-of-year restrictions to protect anadromous fish resources could result in a direct and adverse impact to the values for which any portion of the Taunton River would be designated as wild and scenic. DOI believes that the proposed enlargement of the turning basin and development of the site would result in unavoidable adverse impacts, including damage to 11 acres of winter flounder habitat and 1.15 acres of saltmarsh and intertidal/subtital habitat. DOI further indicates that development of the site appears to be inconsistent with the City of Fall River's goal of obtaining federal Wild and Scenic River designation.

16. We found in the July 15 Order that the FEIS appropriately addressed fishery resource impacts, and we concluded that Weaver's Cove's proposed mitigation and our additional required mitigation will protect fishery resources within the Taunton River. Based on the FEIS analysis of Weaver's Cove's dredging program, we found in the July 15 Order that additional dredging time-of-year restrictions to protect anadromous fish resources are not warranted.[9] It is important to recognize, however, that Weaver's Cove's dredging program falls under the jurisdiction of COE

---

[7] 15 U.S.C. §717r and 18 C.F.R. §385.713 (2005).

[8] On August 15, 2005, the Navy Undersea Warfare Center Division (Navy Center), located in Newport, Rhode Island, filed a motion for late intervention, to reopen the record, and to grant rehearing. On January 19, 2006, the Navy Center filed a motion (dated January 13, 2006) withdrawing the August 15, 2005 motion. We grant the Navy Center's request to withdraw its pleading.

[9] *See* FEIS, Section 4.6.2, *Aquatic Resources*, pages 4-97-4-107, and July 15 Order, P 108.

through its permitting process under Section 404 of the Clean Water Act.[10] It is COE that will ultimately issue any dredging permits, and, as we noted in the July 15 Order, COE could impose additional time-of-year restrictions for anadromous fish resources should it find such measures warranted.[11] The July 15 Order also included several environmental mitigation measures that will reduce unavoidable impact on saltmarsh and intertidal/subtidal habitat (Condition 19) and winter flounder habitat losses (Condition 21).

17. The site of the Weaver's Cove project is located within the area described by Massachusetts as the Fall River-Mount Hope Bay Designated Port Area for marine terminals. Further, based on our review of the existing development plans for the City of Fall River as described in the FEIS (page 4-137), we concluded that the proposed project is not inconsistent with existing and planned uses of the site, including Fall River's Harbor and Downtown Economic Development Plan. Whether or not either the state's or Fall River's plans conflict with designation of this portion of the Taunton River as wild and scenic we cannot say; however, the LNG project is not inconsistent with Fall River's existing long range development programs.

*EPA, NOAA Fisheries, and Massachusetts DEP*

18. As in their prior comments to the DEIS, the primary concern of EPA, NOAA Fisheries, and the Massachusetts DEP with the project is the proposed dredging, which they believe will result in substantial and unacceptable impacts on water quality and fisheries habitat in Narragansett Bay, Mt. Hope Bay, and the Taunton River. While these agencies generally support the dredge window condition we included in the July 15 Order to protect winter flounder spawning, they aver that the FEIS underestimates the effects of dredging activities on fishery resources and habitats. As a result, these agencies assert that a more comprehensive restriction is warranted to fully protect the anadromous fish migration within the Taunton River and Mount Hope Bay, and they recommend additional protective measures, such as the use of environmental buckets and dredge sequencing. The EPA states that the only sure way to avoid an impact to inward and outward fish migration is to expand our recommended dredge restriction window in the FEIS.

19. We continue to believe that the FEIS properly analyzed dredging related impacts and that the July 15 Order imposed appropriate conditions to protect fish resources and other potential aquatic impacts. As discussed above, however, Weaver's Cove must obtain the necessary dredging permits from COE, and COE can impose additional time-of-year restrictions for anadromous fish resources if COE finds that additional restrictions are needed.

20. The Massachusetts DEP states that there are uncertainties regarding the management of dredge spoils (on-site or offshore), which would have major consequences on the project's impacts and scheduling. The Massachusetts DEP avers that additional dredge time-of-year restrictions that it believes will ultimately be required will have a significant impact on the project's construction schedule and may necessitate offshore disposal. As noted in the July 15 Order, the FEIS found that the offshore, open water disposal alternative would be environmentally acceptable if the COE and EPA determine that a significant volume of sediments are suitable for offshore, open water disposal. The FEIS also determined that offshore disposal of suitable dredged material is not without impacts and is not clearly environmentally preferable to Weaver's Cove's proposed reuse of the dredged material as general site fill at the LNG terminal site.

21. In response to agency comments on the DEIS, Weaver's Cove Energy conducted a sediment analysis to evaluate the feasibility of disposing a portion of the dredged material at an offshore location. Although offshore disposal has not yet been proposed under its dredging plan before the Commission, Weaver's Cove initiated a Tier III analysis program in accordance with the COE and EPA approved protocols to determine the suitability of the materials for offshore disposal at the Rhode Island Sound Disposal Site (RISDS) formerly referred to as Site W or Site 69b and the Massachusetts Bay Disposal Site (MBDS).[12] Weaver's Cove filed the results of the Tier III testing with the EPA and COE on April 12, 2005. The EPA and COE subsequently reviewed the test results and found that the dredged materials would be suitable for offshore ocean disposal at the RISDS and MBDS.

22. In a letter to the Commission dated November 2, 2005, Weaver's Cove stated that it is now in the process of pursuing the offshore ocean disposal alternative for over 95 percent of the dredged material. As noted above, we have already analyzed, as part of our resource agency consultation, the offshore, open water disposal alternative in the FEIS, the potential for additional dredging restrictions, and regulatory issues associated with the proposed onshore disposal (pages 3-69 through 3-82). Offshore disposal was not previously considered a viable alternative during preparation of the FEIS until the COE and the EPA determined that the dredge sediments were

[10] COE must also issue related permits under Section 10 of the River and Harbors Act of 1899 and Section 103 of the Marine Protection, Research and Sanctuaries Act.

[11] On November 1, 2005, COE issued a public notice announcing public hearings on December 14 and 15, 2005 and inviting written comments by January 3, 2006.

[12] Tier III testing involves the assessment of contaminants in the dredged material on appropriately sensitive and benchmark organisms to determine if there is the potential for an unacceptable toxicity or bioaccumulation impact at the proposed site.

in fact suitable for ocean disposal. As stated in the FEIS, additional environmental review and Commission approval will be required if Weaver's Cove ultimately goes forward with any offshore disposal proposal or changes its proposed LNG terminal site design (page 2-29). We note, however, that the offshore ocean disposal alternative would help facilitate compliance with any further time-of-year restrictions imposed by the resource agencies for the protection of anadromous fish migration.

23. The existing plan still before the Commission for disposing of dredge materials is for depositing them on the proposed LNG terminal site. The Massachusetts DEP expresses concern with project impacts associated with the quality and volume of dredge material proposed to be deposited on the project site. The Massachusetts DEP asserts that Weaver's Cove has not demonstrated reasonably necessary on-site reuse of the total volume of dredge spoils estimated to be dredged. The Massachusetts DEP further disagrees with a statement in the FEIS that the dredge spoil processing and placement on the site as "fill material" exempts the material from the regulatory definition of solid waste. The Massachusetts DEP argues that the Commission's approval of the project on the basis that all the dredge spoil can be deposited on-site under the current proposal is misplaced.

24. The July 15 Order addressed the Massachusetts DEP's concerns and notes that there are several unresolved issues that are addressed in the FEIS but require resolution prior to any project construction. The July 15 Order acknowledges that the Massachusetts DEP has not made a final determination regarding: whether the proposed placement of the stabilized dredged sediment on the LNG terminal site complies with the anti-degradation provision of the Massachusetts Contingency Plan (MCP); whether the material could be placed on site without adversely affecting Shell's existing remediation activities; or whether all the material constitutes a beneficial reuse and is necessary for site development under the MCP. The July 15 Order further acknowledged that a negative determination on any of these issues could prohibit or affect the proposed use of the site.

25. Condition 18 of the July 15 Order requires Weaver's Cove to file documentation with the Commission prior to construction to verify that placement of the stabilized dredge material on the LNG terminal site is consistent with the MCP. If Weaver's Cove is unable to verify consistency of the proposed use of the sediment with the MCP, Condition 18 requires that Weaver's Cove file a revised sediment placement plan that identifies alternative location(s) for use of the dredged sediments. We find that the FEIS and the July 15 Order's Condition 18 adequately address the Massachusetts DEP's concerns. In addition, Weaver's Cove Energy's November 2, 2005 filing indicates that it is now pursuing the offshore disposal alternative, which will help avoid the Massachusetts DEP's concerns regarding the upland placement of stabilized dredge material on the LNG terminal site.

26. EPA comments that the FEIS water usage estimate does not include cooling water used for the ship boilers that will power the propulsion systems of vessels moving through Narragansett Bay, Mount Hope Bay and the Taunton River. While EPA acknowledges that the projected level of entrainment may be small in comparison to the current levels in the project area, ships' cooling water usage would introduce a new source of entrainment that adds to the cumulative burden on the ecosystem.

27. We note that this issue was not raised during the lengthy pre-filing process, at inter-agency meetings, public scoping meetings, nor in comments on the DEIS. Therefore, the issue was not addressed by staff in its environmental analysis. However, this issue is not the result of a new technological development, as steam powered LNG vessels, with their associated cooling water usage, have been visiting U.S. ports for more than 30 years. As noted throughout the FEIS, LNG vessel transits to the terminal site in Fall River will occur once per week and the unloading process at the site is anticipated to take about 24 hours. While the cooling water needed for the ship boilers was not specifically addressed in the FEIS, the limited LNG ship traffic at the site will not result in any appreciative impingement and entrainment impacts beyond what is described in the FEIS.

28. EPA remains concerned that Mount Hope Bay and the Taunton River may be particularly vulnerable to invasive species due to the stressed nature of both ecosystems and the low numbers of many of the resident species. In response to the FEIS statement that the risk of invasive species will not be significantly increased because Fall River is an existing port, EPA avers that receiving ships from new ports of origin increases risk at an existing port, and it remains unclear whether Fall River currently receives vessels from the origination points of LNG that will be transported by tankers to Fall River. While we do not disagree that receiving ships from additional origination ports will increase to some extent the risk of introducing invasive species, we agree with the conclusion in the FEIS that any increased risk due to LNG vessel transit will be low because ballast water will not be discharged in Mount Hope Bay or the Taunton River.

29. We do not agree with the EPA statement that the FEIS does not adequately address compensatory mitigation efforts regarding salt marsh and shellfish impacts. To ensure that these resources are adequately mitigated, the FEIS recommended, and Condition 19 in the July 15 Order requires, that Weaver's Cove consult with the COE and NOAA Fisheries to ensure that those resource agencies have an opportunity to address the adequacy of Weaver's Cove's wetland mitigation plan. In addition, Weaver's Cove has indicated in its November 2, 2005 letter noted above, that it

intends to propose minor modifications to the LNG terminal site layout to further reduce impact on salt marsh areas, shellfish habitat, and a coastal dune site.

30. The EPA remains concerned that project dredging and stormwater discharges from the construction site may not meet state water quality standards in Mount Hope Bay and the Taunton River, since those waterbodies are currently impaired. The EPA disagrees with the FEIS analysis of existing water quality conditions in the project area, and states its particular concern with elevated copper concentrations in the Taunton River. The EPA questions the FEIS' assertion that organisms have adapted to the degraded environment, and that sensitive marine organisms are already at risk of lethal and sublethal effects. The EPA further indicates that any National Pollutant Discharge Elimination System permit for dewatering discharges from onsite processing of the dredged material at the disposal site would need to contain limits which may significantly limit net increases in copper.

31. The FEIS analysis of the existing water quality conditions demonstrated that the high levels were representative of background conditions and that organisms have adapted to these levels. As indicated in the FEIS, Weaver's Cove must meet the states' water discharge requirements under Section 402 of the Clean Water Act and as specified in its forthcoming National Pollutant Discharge Elimination System permit. Weaver's Cove's analysis of the dredged sediments has undergone extensive physical, chemical, and biological testing, and the agencies, including EPA, have determined that the majority of the material is acceptable for unrestricted ocean disposal. The sediment testing results further supports our findings in the FEIS that toxicity levels should not cause undesirable environmental effects on the existing water quality conditions in the project area. For example, the Tier III chemical constituent concentration results demonstrate that copper, zinc, and silver levels were below the EPA aquatic life guidelines in both the elutriate results and background river water results. Therefore, the Tier III results further support the FEIS' conclusions that contaminants remain absorbed to the sediments with little release to the water column and that the proposed dredging program will not result in significant water quality impacts.

32. EPA states that there is not enough information in the FEIS to support a conclusion that aquatic resources will not be adversely affected by project activities. The FEIS addresses the cumulative impacts extensively[13] and concludes that while construction and operation of the Weaver's Cove LNG project could contribute cumulatively to impacts on aquatic resources and water quality in the Taunton River, Mount Hope Bay, and Narragansett Bay, these impacts would be relatively short term and/or minor in comparison to those from other sources. The FEIS explained that implementation of Weaver's Cove's proposed mitigation measures and the conditions adopted in the FEIS will reduce impacts. Further, as stated in the July 15 Order, we have determined, subject to appropriate mitigation conditions set forth in Appendix B of the July 15 Order, that the Weaver's Cove project should have limited environmental impact.

33. Regarding the general air quality conformity discussion in the FEIS, EPA states that, for a maximum of 70 ships per year, the facility's total potential to emit nitrogen oxides ($NO_x$) is only a fraction of a ton below the limit that would require a nonattainment New Source Review. EPA therefore encourages Weaver's Cove to work closely with the Massachusetts DEP to ensure the emission estimates are accurate and practically enforceable. Weaver's Cove has stated that a federally enforceable permit condition will be included in the facility's air plan approval (air permit) to confirm that the combined emissions from the facility and the tankers, are less than 50 tons per year of $NO_x$ to prevent triggering the nonattainment New Source Review.

34. The EPA also urges the implementation of additional pollution control measures on tugs, such as engine retrofitting and early engine remanufacturing. As discussed in the FEIS (see page 4-218), the tugs would either be units currently on order for tug owners/operators or they would be ordered specifically for service at the LNG terminal. For either scenario, the tugs will be subject to the International Maritime Marine Pollution (IM MARPOL) Annex VI regulation for $NO_x$ emissions and 40 C.F.R. Part 94 of the EPA regulations for criteria pollutant emissions from marine engines. Any servicing needed to maintain compliance with these regulations will be performed.

*Comments by Fall River Regarding DOT/FERC Correspondence*

*Design spills*

35. On June 23, 2005, Fall River filed comments regarding an exchange of correspondence between FERC staff and the DOT's Office of Pipeline Safety staff (dated April 19 and May 6, respectively) that was placed in the docket on June 15, 2005 regarding the application of certain DOT regulations regarding the sizing of impoundment zones for LNG spills. Fall River asserts that the correspondence reflects a significant misreading of the applicable DOT requirements and that the Commission staff has consistently erred in its interpretation and implementation of the regulations. Fall River contends that the correspondence reflects staff's understanding that there is a single "design spill" that the regulations require to be used for sizing of impoundments. Fall River contends that the regulations do not dictate that the "design spill" be used for calculating either the

[13] *See* FEIS, *Cumulative Impacts*, pages 4-297-4-305.

thermal exclusion or flammable vapor exclusion zone. Further, Fall River contends that only one paragraph of the four thermal radiation exclusion zones in the DOT regulations is based on the "design spill," while the other three refer to a fire over an impounding area containing a volume, V.

*Commission Response*

36. The correspondence reflected in the April 19, 2005 and May 6, 2005 letters concerns a single technical issue: the selection of the single accidental leakage source used to calculate spills from piping at LNG import terminals. The letters are not related to any specific project, but rather the approach staff applies to each of the proposals currently before the Commission. Although the correspondence focuses on design spills for marine transfer lines, Fall River has misinterpreted this as staff's understanding that there is a single "design spill" that the regulations require to be used for sizing of impoundments. This assertion is wrong as shown in Table 4.12.4-1 of the FEIS which presents four design spills in addition to the impoundment for the LNG storage. Further, Table 4.12.4-2 presents four thermal exclusion zone distances; one for the "design spill" and three for the LNG storage tank impoundment, *i.e.*, a fire over an impounding area containing a volume, V.

*Spill duration*

37. Fall River contends that the suggestion in DOT's response that ". . . spill duration of 30 seconds or less from leaking flanges instead of guillotine breaks may be used for spill rate criteria . . ." has the air of rulemaking by letter. It also states that although FERC has the authority to select a duration shorter than 10 minutes, any such selection must be based on a specific evaluation of a facility.

*Commission Response*

38. DOT regulations provide that design spills be evaluated on the basis of flow from any single accidental leakage source for 10 minutes, or for a shorter duration based on demonstrable surveillance and shutdown provisions acceptable to the authority having jurisdiction. While the staff recognizes that the regulations provide a means to approve spills of a shorter duration, such as 30 seconds or less, all design spills evaluated by Commission staff on pages 4-245 and 4-246 of the FEIS are based on the 10-minute duration.

*Source of Possible Leak*

39. Fall River asserts that the assumption expressed in the correspondence by both FERC and DOT staff that the only possible accidental leak from a transfer operation would involve a flange or small diameter attachment, not a full pipe rupture, ignores history.

*Commission Response*

40. Rather than ignoring history, the operational experience of LNG facilities supports this selection of spill criteria in that full pipe ruptures have not occurred at LNG facilities. Nevertheless, the Commission requires that impoundment sizing be based on full-rupture volumes as an additional measure of conservatism, while recognizing that the design spill criteria is appropriate for the exclusion zones required by 49 C.F.R. Part 193.

*Calculation of flammable vapor exclusion zones*

41. Fall River contends that the Commission has consistently misapplied the DOT regulations by applying the DEGADIS (Dense Gas Dispersion) model (to calculate flammable vapor exclusion zones) only to the calculated overflow of unmixed LNG vapor from an impounding area, rather than to the full vapor volume, including entrained air. If the effect of the impounding area is considered, it says, the Commission must then use the FEM3A or some equivalent model.

*Commission Response*

42. First it is important to note that the input to DEGADIS is neither a volume of unmixed LNG vapor nor a full vapor volume including entrained air, but rather a *mass* of LNG vapor per unit time. Although 49 C.F.R. Part 193 references the DEGADIS and FEM3A dispersion models, the mass source strength input for either model is not specified. As a result, the Commission uses commonly accepted methodology that can be applied within the limitations of the model, *i.e.*, vapor overflow occurs before the effects of warming and entrainment become significant. Second, we received similar comments on the DEIS concerning the mixing of air with LNG vapor in an impounding area and the use of FEM3A to account for these phenomenon. Based on the comments, the staff revised its calculations in the FEIS and addressed the specific issues in the document.[14]

*Brightman Street Bridge*

43. In their requests for rehearing Fall River and Mr. Miozza point out that that recently enacted federal law prohibits the use of federal funds for demolition of the existing Brightman Street Bridge across the Taunton River connecting Fall River with Somerset, Massachusetts. The law also appropriates funds for maintenance of the bridge for pedestrian and bicycle access and as an emergency service route.[15] Because the continued existence of the bridge will not permit operation of the LNG terminal, they assert, the Commission should dismiss the Weaver's Cove application as moot.

---

[14] *See* FEIS, Section 4.12.4, Siting Requirements — Thermal and Dispersion Exclusion Zones, pages 4-250-4-251.

[15] *See* The Safe, Accountable, Flexible, Efficient Transportation Equity Act, Pub. L. No. 109-59 § § 1702 and 1948 (2005).

*Commission Response*

44. The site of the Weaver's Cove LNG terminal would be located on the Taunton River above the existing nearly 100-year old Brightman Street Bridge. The existing Brightman Street Bridge was, until passage of the legislation described above, scheduled for demolition upon completion of a new Brightman Street Bridge that would replace the old bridge. The existing bridge has a horizontal clearance of only 98 feet, which will not accommodate the 150-foot wide LNG tankers Weaver's Cove plans to employ to transport LNG to the new terminal. Fall River is correct that if the existing Brightman Street Bridge is not removed, as had been planned, the large LNG vessels described in the application will not be able to access the proposed upstream LNG terminal. The July 15 Order includes a condition requiring Weaver's Cove to review its waterway suitability assessment on an annual basis in consultation with the Coast Guard. This annual update to the Commission will need to address the continuing status of the Brightman Street Bridge, and thus, the viability of the Weaver's Cove project. The July 15 Order, however, did not condition approval of the project on removal of the bridge, and it would be premature at this time to find that the project is moot.

*Requests for Rehearing and/or Clarification*

A. *Evidentiary Hearing*

45. Fall River contends that the procedures the Commission followed in reaching its decision did not allow informed decision making. Fall River argues that the Commission should have conducted an oral evidentiary hearing to address disputed material facts, that the Commission arbitrarily and without notice established a cut-off date for submitting evidence, that it thus did not consider sworn testimony that Fall River submitted to the Commission as an example of the testimony it would offer at an oral evidentiary hearing, and that the Commission improperly delegated to other agencies and to its own staff judgments that are the Commission's alone to make. Fall River also requests that we schedule its rehearing request for oral argument.

46. Fall River continues to assert that there are a number of material facts in dispute that require cross examination in a trial-type, evidentiary hearing. The complexity of the issues, the importance of being able to evaluate the depth of knowledge and the credibility of those offering conflicting viewpoints, asserts Fall River, demand the fullest possible adjudicatory process. The areas alleged to require such oral testimony are the following: the threat of terrorist attack; the adequacy of the safety analysis and of safety standards; the feasibility of evacuation and emergency response; the impacts on local planning, economic well-being, and environmental justice; and environmental effects and the consideration of alternatives. Fall River contends that the Commission has not offered a reasoned explanation for its refusal to follow what Fall River claims has been a longstanding practice of holding oral evidentiary hearings.

*Commission Response*

47. As we explained in the July 15 Order, trial-type evidentiary hearings are required only where there are material issues of fact that cannot be resolved on the basis of the written record. Where the Commission provides interested parties an opportunity to participate through evidentiary submission in written form, it need not provide an opportunity for cross-examination or examination under oath of other parties who have made submissions.[16] Contrary to Fall River's assertion, the Commission routinely decides complex and controversial cases on the basis of the record in a paper hearing.[17]

48. The July 15 Order at paragraph 25 demonstrates in detail that interested parties had ample opportunity to present their views through the submission of written comments. All areas identified by Fall River as demanding evidentiary hearing were carefully discussed either in the FEIS or the July 15 Order, which adopted the analysis and recommendations contained in the FEIS. The Commission remains confident that we had ample information to make a reasoned decision resolving all issues, and that cross examination of witnesses would not have assisted our deliberations.

49. Fall River claims that the Commission arbitrarily and without notice cut off submissions by issuing the FEIS. Instead, as the facts demonstrate, the Commission analyzed the comments in a deliberate and orderly manner as it continued to consider all late-filed comments as long as physically possible until it issued the FEIS. Although comments on the DEIS were due on September 24, 2004, we continued to accept and consider all materials submitted to the Commission until we issued the FEIS in May 2005, nearly 8 months after the comment due date. Where possible, we considered comments on the FEIS in the July 15 Order. In this order we consider comments on the FEIS that we received too late to include in the July 15 Order. We are also considering in this order, either as comments on the FEIS or as rehearing argument, material Fall River submitted on June 9, 2005, which Fall River identified at that time as sample evidentiary hearing testimony Fall River would introduce at a hearing.[18]

[16] *See Moreau v. FERC*, 982 F. 2d 556, 568 (D.C. Cir. 1993); *Cascade Natural Gas Corp. v. FERC*, 955 F. 2d 1412, 1425 (10th Cir. 1992).

[17] *See Sound Energy Solutions*, 107 FERC ¶ 61,263 at P 78 (2004).

[18] We previously rejected this material in the July 15 Order because it was submitted as sample testimony as part of a request for evidentiary hearing that we denied in the July 15 Order.

50. We will likewise deny Fall River's request for oral argument of its rehearing request. As noted, Fall River has had ample opportunity to present its arguments through written submissions at public hearings. Fall River has not shown how oral argument would aid the Commission in its resolution of the issues. Based on the present record, we are able to address the issues raised from the information filed and disagree that an oral argument at this stage of the proceeding would shed light on these matters.

B. *Alternatives*

51. Fall River and the Conservation Law Foundation argue that the Commission did not give proper consideration to alternatives to the Weaver's Cove project because it unreasonably narrowed the appropriate objectives of the project and thus eliminated from consideration projects that could help satisfy New England's acknowledged need for new gas supplies. Specifically, it states that the Commission focused overly on the delivery of LNG by truck to peakshaving facilities and did not give sufficient attention to other alternatives that would help satisfy the ability of the region to meet peak gas demands. Fall River avers that while careful consideration should be given to a project sponsor's stated objective for the project, it is the Commission's responsibility to define necessary characteristics of alternatives, and that it is not necessary that any one alternative satisfy all intended objectives, particularly where in combination with other options even the objectives specified by the project sponsor may be fulfilled. The Conservation Law Foundation states that the Commission must consider alternatives that even partially meet the proposal's goal.

52. Truck delivery of LNG, Fall River states, is but one option. Fall River concedes that truck deliveries of LNG are an important component of reliable gas supply for New England, but it states that there is no suggestion that the need for truck deliveries is not currently being met or that the current supplier could not increase shipments. Expanded base load supplies and expanded pipeline capacity would clearly contribute to the ability to meet peak demand, asserts Fall River. Offshore projects proposed for New England and pipeline expansions from Canada would likewise contribute to meet this need without security and safety risks, it says. Fall River suggests also that the Commission should have looked at the capability of satellite facilities to liquefy natural gas off the pipeline system for storage, or the possibility that power plant use could not be moderated during peak demand periods through fuel switching.

53. The Conservation Law Foundation asserts that the Commission should have conducted a "programmatic" environmental analysis to address the larger context for LNG terminal siting decisions in the region in order to develop a regional strategic plan assessing the need for and siting of LNG marine terminals in the New England region, the availability of alternatives to LNG deliveries by ship, and public safety and security concerns. This wider analysis is necessary, avers the Conservation Law Foundation, because the decision to license an individual facility is in essence a siting decision for the region that will likely foreclose other potentially less environmentally harmful options for meeting the region's natural gas needs.

54. Fall River and the Conservation Law Foundation both contend that the alleged deficiencies in the Commission's alternatives analysis have led to a flawed NGA Section 3 public interest determination. Fall River maintains that the only suggested benefit of truck deliveries is the introduction of a competitive supply, but that this economic benefit should have been compared with the potential risks and economic costs of the project to the public. Where there are risks to the public from a project, argues Fall River, it is incumbent upon the Commission, as part of its NGA Section 3 analysis, to ascertain whether any alternative or combination of alternatives can satisfy the need at a lesser cost to the human and natural environment. Both Fall River and the Conservation Law Foundation allege that the Commission is deferring environmental evaluation to market forces. The Conservation Law Foundation asserts that the Section 3 public interest analysis requires that the Commission address overall power supply needs in the New England region and alternative means for addressing those needs, including analyzing the effect of energy efficiency, which, it states, could dramatically reduce the demand for natural gas.

55. Fall River also states that the Commission's analysis of alternatives is flawed because it lacked a consistent or systematic approach to analyzing different alternatives. While identifying a broad range of possible system alternatives, states Fall River, the FEIS did not evenly address the merits of all alternatives using a complete and common set of issues. Fall River argues that the FEIS should have made issue by issue findings on the merits of the proposed project and alternatives to assess whether the advantages or disadvantages of the proposed project outweighed the advantages or disadvantages of the alternatives.

*Commission Response*

56. The FEIS set forth the criteria it employed for evaluating potentially reasonable and environmentally preferable alternatives to the project proposed by Weaver's Cove. Those criteria were whether they: were technically and economically feasible, reasonable, and practical; offer significant advantage over the proposed project; and meet project objectives. The project objectives were identified as providing: (a) a new LNG import storage terminal as a new source of supply for natural gas for New England; (b) access to natural gas reserves from production areas throughout the world; the ability to deliver LNG by truck to

LNG storage facilities throughout the region.[19] The FEIS noted that not all conceivable alternatives are technically and economically feasible or practical, because, for example, they are unavailable and/or incapable of being implemented. The FEIS explained that each alternative was considered to a point at which it was clear that the alternative was not reasonable or would result in significantly greater environmental impacts or could not be readily mitigated, and that those alternatives that appeared to be the most reasonable with less than or similar levels of environmental impact were reviewed in the greatest detail.[20]

57. The FEIS evaluated a number of alternatives to the proposed project.[21] These alternatives included the no action or postponed action alternatives (including conservation and other sources of energy), system alternatives, alternative LNG sites, and LNG terminal layout alternatives. The FEIS examined existing and proposed onshore LNG facilities, including the existing Distrigas LNG terminal in Everett, Massachusetts just outside Boston, the existing and proposed expansion facilities of KeySpan in Providence, Rhode Island, and possible new LNG import facilities in Maine. The FEIS also evaluated the potential Neptune LNG and Northeast Gateway LNG facilities that would be located in the Atlantic Ocean off the coast of Massachusetts, and the Broadwater LNG project proposed for Long Island Sound between New York and Connecticut. The FEIS discussed the potential availability of additional supplies of natural gas from outside New England. Other potential locations for an LNG terminal to serve the New England market were also studied, including Boston Harbor, sites in Narragansett Bay, Rhode Island, and New London and New Haven, Connecticut.[22]

58. Fall River and the Conservation Law Foundation contend that the Commission gave improper consideration to the role of LNG transportation by truck to peakshaving facilities in considering appropriate alternatives. We disagree. In identifying and defining a project's objective and goal for NEPA purposes, the Commission generally adopts the project sponsor's proposal in the NGA application that implicates the need to conduct the environmental review.[23] A federal appellate court explained that:

> The federal government's consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor of the siting and design of the project. In formulating the EIS requirement, the Congress did not expect agencies to determine for an applicant pipeline what the goals of its proposal should be.[24]

This general principle, however, is subject to the admonition that the goals of a project may not be so narrowly defined as to preclude consideration of what may actually be reasonable choices.[25] Thus, objectives must be reasonably identified and defined.

59. In its broadest sense, the goal of the Weaver's Cove project is to provide an additional supply of natural gas to the New England region to help meet that area's increasing need for natural gas. Both the FEIS and the July 15 Order explicitly recognize that there are other potential projects, such as offshore LNG facilities, onshore LNG terminals in Canada or Maine, and/or increased pipeline infrastructure to transport natural gas from more remote locations, that can play an important role in meeting this overall need.

60. The FEIS and the July 15 Order explain, however, that New England relies heavily on the transportation of LNG by truck to above-ground peakshaving storage facilities located at nearly 50 sites across New England. The FEIS explained that LNG storage is critical to meeting New England's winter peak needs for gas because there are no underground storage facilities in the area and the pipeline system is already operating at close to capacity.[26] At the present time, these LNG storage facilities are served by truck shipments of LNG from a single source, the Distrigas LNG facility in Everett, Massachusetts. The FEIS reports that in 2003 trucks from Distrigas provided approximately 14 Bcf of LNG to these facilities, which are relied upon to supply as much as 30 percent of the region's peak day needs. The FEIS pointed out that the March 2005 Governor's Conference Report recognized the importance of stored natural gas by "allowing for an economic means to meet winter peak day requirements . . . [and] also contributes to the diversity of the regional gas portfolio and reduces our reliance on the availability and price-competitiveness of any individual supply source."[27] The FEIS also referred to the Commission's December 2003 New England Gas Infrastructure Report that concluded that additional peakshaving LNG facilities would help to ensure more reliable service until additional pipeline capacity is constructed. Based on

---

[19] FEIS, Section 3.0, *Alternatives*, page 3-1.

[20] Id.

[21] FEIS, pages 3-1-3-50.

[22] The FEIS explained at page 3-28 that, based on a separate FERC study, it considered additional alternative LNG terminal sites only south of the Massachusetts/New Hampshire border out of concern that LNG facilities outside this area could not efficiently serve the New England market.

[23] *See Independence Pipeline Company*, 91 FERC ¶ 61,102, at p. 61,345 (2000).

[24] *City of Grapevine, Texas v. DOT*, 17 F3d. 1502, 1506 (D.C. Cir. 1993).

[25] *Simmons v. U.S. Army Corps. of Engineers*, 120 F.3d 664 (7th Cir. 1997); and *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. (1991).

[26] *See* FEIS, Section 1.3, *Project Purpose and Need*, pages 1-5-1-9.

[27] The Power Planning Committee of the New England Governors' Conference, Inc., *Meeting New England's Future Gas Demands: Nine Scenarios and Their Impacts*, March 1, 2005.

this discussion, the FEIS concluded that truck service from the Weaver's Cove LNG terminal would provide a new source of supply to LNG storage facilities, which are critical to maintaining a reliable source of natural gas to the region during peak use periods and to maintaining price stability.

61. Thus, the FEIS explained that LNG truck service is more than simply an option for meeting New England's gas needs. It is, instead, a critical component in meeting those needs. Thus, the ability to provide LNG service by truck from the terminal facility is a legitimate and reasonable objective for this project. We conclude that it was reasonable to accord substantial weight to this goal of the project sponsors in considering the alternatives in the FEIS.

62. The Conservation Law Foundation renews its earlier request for a programmatic environmental analysis addressing LNG siting and other energy issues on a region-wide basis. In rejecting this request, the July 15 Order explained that, as described above, the Commission studied a number of alternative methods for satisfying the objectives to be satisfied, but found none superior to the project before us in this proceeding. Contrary to the assertion of the Conservation Law Foundation, moreover, our approval of the Weaver's Cove project does not foreclose other energy options for the region. We explained that other potential energy projects we examined, both LNG and non-LNG, were not appropriate alternatives to the Weaver's Cove proposal. We also noted that some types of projects are not within this Commission's jurisdiction, such as the offshore LNG projects which are under the regulatory controls of the Coast Guard and the Department of Transportation.[28]

63. A programmatic EIS, as the name implies, reflects the broad environmental consequences attendant upon a wide-ranging federal program.[29] Under CEQ regulations, a single EIS should be prepared if actions are "connected" to other actions, that is they closely enough related so they should be discussed together, if they are "cumulative," or if they are sufficiently "similar" to other reasonably foreseeable or proposed agency actions (such as by geography or timing) that a single EIS is the "best way" to assess the combined impacts.[30] The question of whether to prepare a programmatic EIS is initially that of the federal agency.[31] The D.C. Circuit has explained that in making this determination an agency should consider whether a programmatic EIS would contribute to the decisionmakers' basic planning of the overall program, and whether segmenting the overall program will unreasonably constrict the scope of the environmental consideration.[32]

64. The application here is not part of a coordinated federal program that will involve multiple actions with similar or cumulative environmental consequences that should be discussed together. Instead, as we noted in the July 15 Order we have before us a discrete proposal for an energy project filed under a specific federal statute, the NGA. This project is likewise not connected, within the meaning of the CEQ regulations, to other projects that may or may not be developed, or that may or may not be under this Commission's jurisdiction, except in the sense that there are projects of various kinds being contemplated or proposed that would help meet New England's need for increased energy supplies. A programmatic EIS is neither required nor useful under the circumstances existing here.

65. Fall River and the Conservation Law Foundation's claim that the Commission has deferred environmental concerns to market forces demonstrates a misreading of the July 15 Order and a misunderstanding of the nature of and the relationship between NGA Section 3 and NEPA. Under Section 3 of the NGA the Commission is charged with authorizing the siting, construction, and operation of LNG import facilities. Section 3 provides that the Commission shall approve such a project unless it finds that the proposal will "not be consistent with the public interest." The July 15 Order explained that it has been Commission policy generally to allow the market to decide which projects are best suited to meet the infrastructure needs of an area because that approach best serves the public interest and allows for the most efficient, cost effective, and timely development of energy infrastructure. The July 15 Order found specifically under Section 3 that the LNG terminal proposed by Weaver's Cove would be in the public interest because it would enable the introduction of needed new gas supply into the New England region, because it would provide storage in an area where storage is critical for meeting peak day requirements, because the terminal will be located near major interstate pipeline facilities, and because the facility can facilitate LNG deliveries by motor carrier.

66. As we explained in the recent *KeySpan* order, however, our most important duty in determining the public interest is ensuring that the project that is authorized is safe and secure.[33] We stated that we would not authorize an LNG facility under Section 3 if we continue to have questions about safety. *KeySpan* involved a proposal to construct a new LNG facility that would incorporate an existing LNG facility, the components of which did not meet the current federal safety standards

---

[28] Deepwater Port Act of 1974, as amended, 33 U.S.C. §§1501*et seq.* (2003).

[29] *Foundation on Economic Trends v. Heckler*, 756 F.2d 143 (1985).

[30] 40 C.F.R. §1508.25(a) (2006).

[31] *Kleppe v. Sierra Club*, 427 U.S. 390 (1976).

[32] *Heckler*, 756 F.2d at 159.

[33] *KeySpan LNG, L.P.*, 112 FERC ¶61,028 at P 56 (2005).

required of all other new LNG import facilities in the United States. The Commission found that without meeting the Commission's full array of safety requirements the proposal would not be in the public interest and denied KeySpan's application. Here, in contrast, we have found that the Weaver's Cove proposal would meet all federal and state safety standards prior to construction and operation. In the July 15 Order we found that, if built according to Commission requirements, the terminal can be operated safely and that the Coast Guard security plan for LNG vessels will ensure the public's safety.

67. We did not defer environmental matters to market forces under Section 3 as Fall River and the Conservation Law Foundation contend. Rather, we evaluated them under NEPA. NEPA complements Section 3 of the NGA, but it is not a part of Section 3. NEPA is essentially procedural and it does not require the Commission to elevate environmental concerns over other appropriate considerations.[34] NEPA requires that the Commission consider and disclose all significant aspects of the environmental impact of a proposal.[35] The Commission must take a "hard look" at environmental consequences.[36] Although these procedures are almost certain to affect the agency's substantive decision, it is well-settled that NEPA itself does not mandate particular results.[37] As we explained in the July 15 Order, the Commission has conducted a comprehensive review of the project, and has imposed a number of conditions on our approval of the project under Section 3 of the NGA that will appropriately mitigate any adverse effects from the project.

68. In the July 15 Order at paragraphs 103-105 we addressed the assertion that the Commission's analysis of alternatives is deficient because it does not systematically compare all the advantages and disadvantages of the proposed project with all identified alternatives. We explained that NEPA requires us to evaluate the environmental impacts from a proposal before the Commission, including reasonable alternatives to the proposal, but that NEPA does not require a detailed analysis of every alternative proposed. We explained that pursuant to NEPA requirements all alternatives were compared with the Weaver's Cove proposal, and that once we determined that a suggested alternative was not viable, did not meet project objectives, or would result in greater environmental impacts than the proposed action, we did not review an alternative further. As we noted in the July 15 Order, the FEIS identified specific criteria and included a table comparing the relative merits of various sites.[38] The FEIS properly concluded that no alternative was clearly preferable to the proposed action and that each alternative presented its own unique set of impacts.

C. *Safety*

*Breach of Containment*

69. Fall River contends that there have been in the past, and could be in the future, accidental breaches of LNG containment at both terminals and that even a low probability of an accident dictates rejection where the resulting consequences would be highly prejudicial. Fall River states further that there is no relationship between accident experience and the threat of a terrorist attack, so that the low number of past accidents should not be used to assess the possibility of a terrorist attack.

*Commission Response*

70. We affirm our conclusion in the July 15 Order that the risk to the public from accidental causes is negligible. Pages 4-274 and 4-275 of the FEIS identify the eight significant incidents involving LNG ships since the inception of LNG maritime transportation. None of these incidents resulted in rupture of a cargo tank or a breach of containment. The FEIS explained that the only loss of containment of an LNG storage tank occurred in 1944, and was attributed to the lack of an impoundment and improper steel alloys (page 4-230). Since then, with the development and use of superior tank materials for cryogenic service, there have been no breaches of containment. Nevertheless, even though unlikely, the potential for loss of storage tank containment is considered in the design requirements for impoundments and the exclusion zone requirements for LNG storage tanks.[39] The July 15 Order explained also that, based on the extensive operational experience of LNG shipping, the structural design of an LNG vessel, and the operational controls imposed by the Coast Guard and the local pilots, a cargo containment failure and subsequent LNG spill from a vessel casualty — collision, grounding, or allision — is highly unlikely.[40]

71. Fall River's contention that ". . . it is in no way defensible to consider the threat of a terrorist attack as having any relation to measures of accident experience . . ." is not rooted in the FEIS, which states, as reaffirmed in the July 15 Order at paragraph 84, that historical experience with accidents provides little guidance in estimating the probability of a terrorist attack. The July 15 Order explains, however, that the Coast Guard security workshops fully evaluated scenarios involving possible terrorist attacks.

---

[34] *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227-28 (1980).

[35] *Baltimore Gas & Electric Co. v. NRDC*, 462 U.S. 87, 97-98 (1971);

[36] *Kleppe v. Sierra Club*, 427 U.S. 390, 409, n.21 (1976).

[37] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

[38] *See* FEIS, Table 3.2.4-1, page 3-29.

[39] *See* FEIS, Impoundment Systems and Design Spills, pages 4-245-4-251.

[40] *See* July 15 Order at P 83.

*Location of LNG Terminals and Use of Exclusion Zones*

72. Fall River restates its earlier arguments that the Pipeline Safety Act of 1979 directed DOT to consider the need to encourage siting of LNG terminals in remote locations in adopting LNG terminal siting regulations.[41] Once again, Fall River contends that the DOT afforded little attention to this concern of Congress, and instead adopted regulations that only require thermal radiation and flammable vapor exclusion zones around such terminals. Fall River argues that these zones affect the design and size of LNG facilities, but not their location. As neither DOT nor the Commission has set minimum safety standards which would exclude some locations as too dangerous, Fall River contends, the approval of the Weaver's Cove project in an urban location violates the Pipeline Safety Act. Fall River also discounts the Commission's explanation that DOT did not adopt a remote location requirement for LNG terminals because of the difficulty in predicting whether a remote site would remain remote during the operating life of the terminal. The City of Fall River, it notes, has long been an urban area.

73. Fall River contends that the Commission did not apply the same siting criteria to the Weaver's Cove proposal that it applied in evaluating alternative sites. Fall River alleges that the criteria the Commission applied in considering alternative sites are essentially the same as those described in the Pipeline Safety Act, *i.e.*, that they not be placed in close proximity to populations centers, and that they be placed where existing land use zoning, coastal zone management guidelines, or development plans are consistent with an LNG import terminal.

74. Fall River contends that while lightly populated areas beyond an exclusion zone may require no special protections or consideration, heavily populated areas need far more protection because they are more likely targets of an intentional act, and they are far more difficult for authorities to evacuate.

75. Fall River further contends that the thermal protection standards, which apply only to the terminal itself, should also apply to an LNG vessel in transit. There is a far greater probability of an accidental or intentional release relating to the vessel, it avers. If these thermal protection standards are necessary for the LNG terminals, no less is true for the LNG vessel in transit. Fall River refers to testimony from Dr. Jerry Havens alleging that the Commission's analysis of harm from a vessel incident is understated. Rather than allegedly focusing on a half-cargo tank loss of 3,000,000 gallons and an ensuing fire, Dr. Havens suggests that the Commission should have focused more on the loss and burning of an entire ship's cargo.

76. Based on testimony from Dr. Havens, Fall River also contends that the thermal standards themselves are not adequate. It alleges that the use of a thermal radiation flux level of 5 $kW/m^2$ (1,600 $Btu/ft^2$-hr), the criterion defined in the DOT exclusion zone regulations, is too high to protect the public located outdoors and unprotected. The appropriate level should instead be 1.5 $kW/m^2$ (480 $Btu/ft^2$-hr), the level at which continuous exposure results in no thermal radiation damage. Fall River also refers to the standard of 450 $Btu/ft^2$-hr used by the U.S. Department of Housing and Urban Development (HUD) for unprotected facilities or areas of congregation; a level of 800 $Btu/ft^2$-hr recommended by the Society of Fire Protection Engineers as a public tolerance limit; and a 1.5 $kW/m^2$ specified in the European code for critical areas as support for a lower level of thermal radiation.

*Commission Response*

77. Fall River appears to recognize that Congress delegated the authority to DOT to adopt minimum safety standards for siting. DOT has adopted siting standards with which Fall River disagrees, and Fall River, as noted in the July 15 Order, has filed a petition with DOT requesting that it modify its regulations. That petition is still pending before DOT.

78. As we explained in the July 15 Order, rather than requiring remote locations for all LNG facilities, DOT adopted standards that it determined would better provide safe separation distances to protect the public in the vicinity of LNG facilities in the event of a spill. DOT's regulations establish thermal and flammable vapor dispersion exclusion zones, based on standards of the National Fire Protection Association, to protect persons and property from harm caused by heat radiation from fire and by dispersion and delayed ignition of gas vapor.[42]

79. DOT's standards represent the minimum standards that must be observed in siting LNG terminal facilities. The Commission conducted an extensive independent evaluation of all safety issues relating to the Weaver's Cove project, and we adopted a number of requirements relating to construction, design, and operation of the terminal facilities. While the Commission may apply stricter siting standards than adopted by DOT, we found in the July 15 Order that application of DOT's standards was fully sufficient to protect the public. Fall River has presented nothing here that persuades us that this is not the case, and we continue to believe that the public will be well protected if the project is constructed and operated as required in the July 15 Order.

80. We did not apply different locational criteria to the Fall River site and the alternative sites considered, as Fall River alleges. The FEIS used two sets of criteria for selecting and comparing sites as alternatives to the proposed site — required criteria, and favorable criteria. *Required*

[41] *See* 49 U.S.C. § 60103 (2005).

[42] *See* July 15 order at P 38.

criteria included thermal exclusion/vapor dispersion exclusion zone values that are the same as for the proposed Fall River site. As a result of numerous comments during the pre-filing and scoping periods, issues were identified with the proposed site that could possibly be reduced or eliminated at a potential alternative site. As a result, *favorable* criteria were developed, including those identified by Fall River, to determine if an environmentally preferred alternative could be identified.

81. The FEIS discusses thermal radiation and flammable vapor exclusion zones at pages 4-247 through 4-251 of the FEIS. The very nature of the zones is to ensure that a hazard does not exist outside the zones, regardless of the population density, whether it be light, moderate or heavy. The public outside the exclusion zones is thus protected from potential harm resulting from a release of LNG from the terminal. Nevertheless, it is not correct, as Fall River asserts, that FERC inappropriately relies on exclusion zones to determine the safety of a proposal. Exclusion zones represent only one of the ten safety categories evaluated in the FEIS.[43]

82. The issue of applying exclusion zones to LNG vessel transit was addressed in the FEIS at page 4-280. As noted above, the Coast Guard is the agency responsible for vessel security, and the FEIS notes that Fall River had petitioned the Coast Guard to promulgate exclusion zone regulations for LNG vessel transits. However, the Coast Guard, in a letter dated December 27, 2005, informed Fall River that it would not be instituting the requested rulemaking proceeding, finding that a flexible approach assessing and managing specific risks is superior to the more rigid exclusion zone approach.

83. Contrary to Dr. Haven's assertions, the Commission has not underestimated the possibilities of a large breach and resulting loss of LNG. The FEIS describes the hazards from four intentional breach scenarios from a 23,000 cubic meter spill (more than 6,000,000 gallons).[44] The FEIS also addresses the potential for multiple cargo tank failures and resulting hazards, including the analysis from the U.S. Department of Energy's December 2004 Sandia Report.[45]

84. The issue of the use of the DOT-established 5 kW/m$^2$ (1,600 Btu/ft$^2$-hr) thermal radiation level was raised and addressed in the FEIS. The incident flux levels that are used to define thermal exclusion zones for onshore LNG facilities were developed by DOT through its rulemaking process and determined to be appropriate after evaluating comments on the levels of exposure. This process supports the incident flux levels for their intended purposes of determining onshore exclusion zones. Further, a 5 kW/m$^2$ thermal radiation level was also identified in the Sandia Report as a commonly used value for establishing fire protection distances for people.

*Vapor Dispersion*

85. Fall River contends that applying the DEGADIS model only to the calculated overflow of the unmixed LNG vapor from an impounding area, rather than the full vapor volume including entrained air, is not consistent with experimental tests or with regulatory requirements. It asserts that the Commission continues to ignore that the vapor coming off an LNG impoundment would mix with air within the impoundment and would not remain at 260 degrees below zero. Further, it contends that if an applicant desires to take into account the effect an impounding area may have on the calculation of flammable vapors, or to account for the additional dilution caused by complex flow patterns induced by a tank or dike structure, it must use FEM3A. Fall River states that the DOT regulation is clear that the only way to take into account the effect of the impounding area is to use FEM3A or the equivalent.

*Commission Response*

86. The DOT regulations at 49 C.F.R. § 193.2059(a) state that flammable vapor-gas dispersion distances *must* be determined using the DEGADIS model described in the Gas Research Institute (GRI) report GRI-89/0242. The regulations also state that FEM3A, as described in GRI report GRI-96/0396.5, *may* be used as an alternative method to account for additional cloud dilution caused by tank and dike structures. As stated in GRI report GRI-96/0396.5, the presence of impoundments and plant structures has been shown to reduce the downwind dispersion of flammable vapors. Conversely, modeling which does not take into account the flow-field obstacles presented by tank and dike structures would yield further dispersion distances. The dispersion modeling described in the Weaver's Cove FEIS using DEGADIS provides a more conservative assessment of the downwind dispersion than would a model which accounts for complex topography and flow-field obstacles.

87. Neither 49 C.F.R. Part 193 nor NFPA 59A references a specific method for the calculation of vapor production rates from an LNG spill into an impoundment. The original 1980 version of 49 C.F.R. § 193.2059(d) specified the method for determining vaporization rates for dispersion calculations. This method was derived by Arthur D. Little, Inc. and outlined in the report "Evaluation of LNG Vapor Control Methods (October 1974)." Subsequently, these equations were developed by GRI into a computer program called SOURCE5. Use of this methodology to calculate the vapor source strength, coupled with DEGADIS to compute dispersion distances, is the commonly-used

---

[43] *See* FEIS, Section 4.12, *Reliability and Safety*, pages 4-230 *et seq.*

[44] *See* FEIS, pages 4-277-4-279.

[45] U.S. Department of Energy's Sandia National Laboratories, Guidance on Risk Analysis and Safety Implications of a Large Liquefied Natural Gas (LNG) Spill Over Water).

and accepted approach by the LNG industry, while FEM3A is not. Commission staff evaluates each application to ensure that the methodology can be applied within the limitations of the model, *i.e.*, vapor overflow occurs before the effects of warming and entrainment become significant. In performing vapor dispersion analysis, the duration of the LNG spill and the time until vapor overtops the impoundment should not be disproportionate. In the analysis presented in the FEIS, the vapor calculations for a design spill from the five in-tank pumps indicated that the vapor would overtop a deepened concrete sump within the 10-minute duration of the design spill.

*Threats related to possible terrorist attack*

88. Fall River contends that the record compels the conclusion that an LNG terminal and associated traffic in an urban environment offers precisely the target that terrorists prefer. For support, Fall River once again refers to the report prepared by Richard Clarke, *LNG Facilities in Urban Areas* (Clarke Report), as well as a statement from the NATO Committee on the Challenges of Modern Society to the effect that civilian military assets are considered to be attractive targets for terrorists, and that world trade may be disrupted by attacks directed against high-value vessels such as cruise ships, oil and LNG carriers, and nuclear waste ships. As the national dependence on imported LNG grows, avers Fall River, terrorists are likely to appreciate the consequences of a single successful strike that raises the possibility of a nationwide shutdown of LNG.

89. Fall River contends that the Coast Guard workshops never achieved consensus with local safety officials. Referring to the July 2005 comments by Mr. Clarke, City of Fall River police chief John Souza, and Captain John Solomito of Somerset, Massachusetts, Fall River contends that the threat of terrorism is real and the best efforts of the Coast Guard cannot ensure success against such attacks.[46] Because of the characteristics of the shoreline, the large number of marinas and close proximity to several airfields, Clarke asserts that it would not be possible to provide for the secure transit of the LNG vessels. Chief Souza states that it would not be possible to prevent an attack simply through water-based surveillance and protection because of "pinch" points where the vessel transit is within 500 yards of shore and within the range of destructive armament. Land-based protection, Chief Souza asserts, is not feasible. Fall River claims that the Coast Guard's Vessel Transit Security Plan is flawed because it is based on the assumption that LNG vessel traffic *will occur*, not even considering *whether it should occur*.

90. Fall River states that the July 15 Order incorrectly finds that the Weaver's Cove Vessel Transit Security Plan complies with NVIC 05-05[47] in all material respects. It states that a suitability evaluation in consultation with local officials has never been undertaken. Fall River states that in a similar situation the Coast Guard recommended application of NVIC 05-05 to the already approved Cameron LNG project.[48]

*Commission Response*

91. The July 15 Order discusses these issues and the Clarke Report in detail.[49] The Commission explained that the assertion that the facilities would be an especially attractive terrorist target is based on general information in the public domain that can apply equally well to many sectors of our society, rather than identifying specific evidence of threats on LNG facilities or vessels. Moreover, the Commission to date has authorized twelve terminals or expansions, and is currently evaluating an equal number of new applications. As more LNG import terminals are placed in service, the attractiveness of any particular target and the national impact of a single plant outage, whether caused by the forces of nature or malicious intent, will be further reduced.

92. The Commission addressed the consequences of a terrorist attack in the FEIS (pages 4-276 through 4-280) based on the analyses in the Sandia Report (which is also referenced in the Clarke Report), and using its own independent calculations using the methodology set forth in ABSG Study.[50] Further, the FEIS evaluated potential consequences along the 21-mile-long LNG vessel transit through Narragansett Bay and the Taunton River, identifying areas of residential and commercial development within the transient thermal radiation hazard areas for several cargo tank breech scenarios.

93. Under the Marine Transportation Security Act of 2002, the Coast Guard exercises responsibility for the security of LNG facilities and LNG vessels. Under that authority, the Coast Guard prepared a Vessel Transit Security Plan through a series of workshops throughout the winter of 2004-2005 with port stakeholders and federal, state and local law enforcement agencies. The workshops evaluated multiple scenarios, including scenarios identified by Chief Souza, and developed procedures which were incorporated into the Vessel Transit Security Plan. The close proximity to marinas and to airfields was recognized. As explained in the FEIS, the Coast Guard will make the final determination with respect to any additional resources and security measures required to provide suitable afloat, underwater, landside, and aviation security or surveillance capabilities to

[46] Chief Souza and Captain Solito participated in the Coast Guard workshops.

[47] Navigation and Inspection Circular No. 05-05, Guidance on Assessing the Suitability of a Waterway for Liquefied Natural Gas (LNG) Marine Traffic.

[48] Docket No. CP02-374-000, *et al.*

[49] *See* July 15 Order at PP 84-94.

[50] ABSG Consultants, Consequence Assessment Methods for Incidents Involving Releases from Liquefied Natural Gas Carriers.

protect the LNG vessel and facility. The assertion in the Clarke Report, as restated in the rehearing request, that the Coast Guard cannot ensure success against terrorists was made without the benefit of the results of or reference to the Coast Guard security workshops.

94. With respect to the suggestion that the Vessel Transit Security Plan was improperly based on the assumption that LNG vessel traffic *will occur* rather than *whether it should occur*, the Coast Guard in fact developed the plan, as the Commission evaluated issues associated with this project, in the conditional sense, *i.e.*, that impacts *would* only occur if the project is authorized by the Commission and subsequently constructed and operated in accordance with all conditions in the July 15 Order.

95. As to compliance with the provisions of NVIC 05-05, the Coast Guard workshops identifying the security measures necessary to manage the risks associated with LNG vessel transits through Narragansett Bay and the Taunton River is the same process that was subsequently formalized in NVIC 05-05. The need for a waterway suitability assessment for this category of projects is determined by the Coast Guard on a case-by-case basis. In a July 27, 2005 letter to the City of Fall River, the Coast Guard stated that a waterways safety and security assessment — although not specifically titled WSA — for Weaver's Cove has already been completed and included in the FEIS. Approval of the Cameron project referred to by Fall River, on the other hand, did not include a vessel transit security review.

*Emergency Capabilities of local communities to handle the consequences of a spill*

96. Fall River asserts that local communities do not have evacuation and emergency response resources capable of dealing with an LNG spill, whether accidental or intentional. Fall River's Chief Souza states that approximately 9,000 residents live within a mile of the proposed LNG terminal site, with the closest residence only 1,200 feet away. Also in the area, he points out, is a high rise apartment occupied by elderly and disabled, business establishments. He states that the majority of the population has extremely limited escape routes, many of which are dead end side streets, or which head into the area of paramount danger. Another complexity to evacuation is the need to put on protective gear and evacuate the area in a very short time frame. Evacuation difficulties for shoreline areas along the 5-mile LNG vessel transit in Massachusetts could be even worse, it is suggested.

97. Local fire chiefs Thiboutot of Fall River, and Rivard of Somerset, state that firefighters, even with protective clothing, would be unable to get close enough for effective fire extinguishing. Chief Thiboutot avers that evacuation efforts and emergency response needs would be in conflict, that necessary equipment and protective gear is not available, and that local medical facilities would be not be able to cope with the aftermath of an LNG emergency. Chief Rivard states that the only local hospital facilities for the Town of Somerset are located across the Taunton River in Fall River. He maintains that the need to close the Braga Bridge could extend the time to transport a person from Somerset to a hospital from 5 or 10 minutes to 30 minutes or more. Dr. Bruce Auerbach, an emergency service physician and member of the Bristol County homeland security task force, states that that the ability of local hospitals to address the consequences of an LNG fire are not adequate.

*Commission Response*

98. The Commission recognized the need for evacuation route planning in the July 15 Order. Condition 34 of the order requires Weaver's Cove to develop emergency evacuation routes in conjunction with local emergency and town officials for review and approval by the Director of OEP prior to initial site preparation. Condition 67 requires Weaver's Cove to develop an initial Emergency Response Plan, also for review and approval by the Director of OEP prior to initial site preparation. Condition 42 requires Weaver's Cove to provide a comprehensive plan identifying the mechanisms for funding all project-specific security/emergency management costs imposed on state and local agencies, for our review and approval prior to initial site preparation.

99. The importance of emergency response planning was reinforced by Section 311 of the Energy Policy Act of 2005, which requires that an LNG terminal operator develop an Emergency Response Plan in consultation with the Coast Guard and state and local agencies, and that the plan be approved by the Commission prior to any final approval to begin construction. Section 311 also requires a cost-sharing plan describing any direct cost reimbursements that the applicant agrees to provide to any state and local agencies with the responsibility for security and safety at the LNG terminal and in proximity to vessels that serve the facility. Much of the speculation by Fall River about what cannot be done has been made without the benefit of a plan to evaluate. The July 15 Order requires Weaver's Cove to develop such a plan with input by state and local agencies. The issues raised by Fall River will need to be satisfactorily addressed in the Emergency Response Plan that is filed for our review and approval.

100. The Commission received extensive comments on the DEIS on the effect of bridge closures on the travel of emergency and ambulances across the Taunton River, and the ability of local hospitals to handle large numbers of casualties from an LNG incident. We addressed the issue of bridge availability in the FEIS at page 4-183 and at page 4-271. Condition 76 of the July 15 Order requires that security plans make allowance for at least one bridge (either the Braga or the Brightman Street) to remain open during the passage of an LNG vessel. The issue of hospital re-

sources was addressed in the FEIS at page 4-181. The Commission recognized that in the unlikely event of a high consequence LNG incident exceeding the capabilities of local hospitals other medical facilities throughout the region might need to be called on for assistance.

*Coast Guard Security Zone*

101. Fall River again raises the issue that the safety and security zone proposed for LNG vessels (2 miles ahead, 1 mile behind, and approximately 1,500 feet on either side of the vessel) does not comply with the Coast Guard regulation at 33 C.F.R. § 165.121, which requires a safety and security zone 2 miles ahead, 1 mile behind, and 1,000 yards (*i.e.*, 3,000 feet) on either side for high interest vessels, including LNG vessels in Narragansett Bay, the Providence River, and the Taunton River. Application of this 3,000-foot zone would place a significant number of homes and business within an area that is limited only to authorized persons, avers Fall River. Fall River contends that the FEIS mistakenly assumed that the zone would extend 1,500 feet from either side of the tanker, and suggests that the Commission "invited" the Coast Guard to relax the requirements in 33 C.F.R. § 165.121.

*Commission Response*

102. The FEIS addressed this issue in Section 4.12.5, *Marine Safety*, at page 4-270, which was prepared with the cooperation and assistance of the Coast Guard Marine Safety Office Providence to reflect the results of the Coast Guard security workshops. At no time did Commission staff invite the Coast Guard to relax any requirements. The FEIS explains that the Coast Guard's Vessel Transit Security Plan provides for a safety and security zone for LNG vessels, approximately 1,500 feet on either side of the LNG vessel, based on the Coast Guard's determination that this zone would provide the desired level of security without creating unnecessary restrictions.

103. The Coast Guard has adopted a number of specific safety, security, and regulated navigation areas in 33 C.F.R. Part 165 — *Regulated Navigation Areas and Limited Access Areas*. The regulation at 33 C.F.R. § 165.121 describes a generic-type safety and security zone for all ships of high interest vessels, transiting Narragansett Bay, or the Providence and Taunton Rivers.[51] We expect that in accordance with its usual practice, the Coast Guard will promulgate an LNG-specific regulation for the traffic involved in the Weaver's Cove project.[52]

D. *Compatibility of the Site With Local and Regional Development Plans*

104. Fall River asserts that the proposed project is inconsistent with the regional and local development plans and is incompatible with the demographic characteristics and natural physical aspects of the proposed site. Fall River contends that the Commission did not consider the socio-economic impact of placing an LNG terminal in the middle of Fall River's waterfront redevelopment area or the impacts on recreational boating access resulting from LNG vessel traffic associated with the project.

*Commission Response*

105. We disagree with Fall River. The FEIS describes at great length both the current environment in the vicinity of the LNG terminal site (pages 4-140-4-148) and the existing commercial/recreational vessel traffic in Narragansett Bay, Mount Hope Bay, and the Taunton River (pages 4-168-4-172). The FEIS further acknowledges that an LNG terminal at the proposed site and the LNG vessel transit traffic will not be without impacts. These impacts are described throughout the FEIS.

106. The FEIS also includes an analysis of the existing local and regional plans for the City of Fall River (pages 4-133-4-140). The FEIS concluded that the proposed project is generally consistent with the historical uses, current zoning, and planned marine-industrial uses at the site. As described in the FEIS, the proposed terminal site would make use of an existing industrially zoned property that was previously used as a petroleum products facility. The proposed site for the terminal is located within the Fall River-Mount Hope Bay Designated Port Area, which is designated by the state for the purposes of promoting and protecting marine industrial activities and supporting uses. The LNG vessels would transit to the site along an existing federal navigational channel. In addition, the LNG terminal is immediately across the Taunton River from the Montaup Power Plant, which currently receives coal ship deliveries.

E. *Deferring Issues to Other Agencies or to a Later Time*

107. Fall River contends that the Commission erred in finding that the project is in the public interest while important issues, such as development of security, evacuation, and emergency response plans, and responses to environmental issues (including the disposal of dredge material) remain unresolved. The Commission also erred, contends Fall River, in delegating the ultimate outcome of these matters either to other government agencies or Commission staff. As examples,

---

[51] The regulation defines high interest vessels as including barges or ships carrying LNG, LPG, chlorine, anhydrous ammonia, or any other cargo deemed to be of high interest by the Captain of the Port, Providence. 33 C.F.R. § 165.121(b) (2006).

[52] *See, e.g.*, 33 C.F.R. §§ 165.110 (Boston Harbor, Boston, Massachusetts), and 165.502 (Cove Point, Chesapeake Bay, Maryland).

Fall River argues that the Commission should have imposed more stringent safety standards than provided for in DOT regulations, and that it was improper for the Commission to defer issues relating to vessel transit to the Coast Guard. Fall River acknowledges that in a typical case it is not "unprecedented" to leave some matters for future determination and approval, but asserts that the importance of these issues is so central to this proceeding that they must be resolved before the Commission can find that the project is in the public interest. Fall River suggests that the Commission is in this proceeding permitting Weaver's Cove projected in-service date to drive the time available for the development of the necessary record, thereby making a "mockery" of informed decision-making.

*Commission Response*

108. We disagree that we acted prematurely in approving the Weaver's Cove project. As we have explained in other cases, the practical reality of large projects such as this is that they take considerable time and effort to develop. Perhaps more importantly, their development is subject to many significant variables whose outcomes cannot be predetermined. Accordingly, consistent with longstanding practice, and as authorized by NGA Section 7(e), the Commission typically issues certificates under its NGA jurisdiction subject to conditions that must be satisfied by an applicant or others before the grant of a certificate can be effectuated by constructing and operating the project.[53] As is the case in virtually every certificate issued by the Commission that authorizes construction of facilities, the approval in the July 15 Order is subject to Weaver's Cove's compliance with the environmental conditions set forth in the order. In this proceeding there are 77 such conditions.

109. We have found that the Weaver's Cove project will be in the public interest and be environmentally acceptable only if Weaver's Cove complies with the conditions set forth in the July 15 Order. We have conditioned Weaver's Cove's authorization so that it cannot commence construction until the other agencies have completed their review of matters within their particular expertise and responsibility, thereby ensuring that the project will not proceed until there is satisfactory resolution of any remaining factors that could alter our finding that the project will not have significant environmental impacts. We have before us in this proceeding sufficient information regarding the proposed action to be able to fashion adequate mitigation measures to support a determination that the Weaver's Cove project will cause no significant environmental impacts upon compliance with those mitigation measures.

110. This approach was approved in *City of Grapevine, Texas v. DOT*.[54] In that case, the Federal Aviation Administration (FAA) approved a proposed runway before completion of the review process required by the National Historic Preservation Act (NHPA). To ensure compliance with the NHPA, the FAA conditioned its approval of the runway upon completion of the NHPA review. The court rejected a challenge to the validity of this approach, concluding that, "because the FAA's approval of the West Runway was expressly conditioned upon completion of the Section 106 process, we find here no violation of the NHPA."[55]

111. Our approach here is also in accordance with the interagency agreement between FERC, the Coast Guard, and the DOT to coordinate the review of safety and security issues, including NEPA review.[56] The agreement clarifies that the Commission is responsible for authorizing the siting and construction of onshore LNG facilities and conducting environmental, safety, and security reviews of LNG plants and related pipeline facilities in its role as the lead agency responsible for preparation of analysis and decisions required under NEPA for the authorization of new facilities. The agreement explains that DOT regulations provide siting and safety requirements, which the Commission, as lead agency in the NEPA review process, ensures will be satisfied by any proposed project, and notes that the Commission has the authority to impose more stringent safety requirements when warranted by special circumstances. The Coast Guard, states the agreement, exercises regulatory authority over LNG facilities that affect the safety and security of port areas and navigable waterways.

112. In this proceeding, we have ensured that all DOT siting and safety regulations will apply. We have reviewed DOT's siting regulations, and for reasons spelled out in the FEIS and in our July 15 Order, as further clarified in this order, find its exclusion zone provisions sufficient to provide a high level of protection to the public. We have, however, adopted a number of conditions designed to improve the safety and reliability of the LNG terminal facility itself. Moreover, we have not improperly delegated responsibilities to the Coast Guard. We adopted several conditions ensuring the Coast Guard's adoption of security, vessel operation, and emergency operation plans, and coordination of security responsibilities relating to personnel and protecting the ships in the terminal area. This Commission gives considerable deference to the Coast Guard in vessel security matters because of its considerable expertise and given that the Coast Guard has authority over navigation

[53] *East Tennessee Natural Gas Company*, 102 FERC ¶ 61,225 at P 23 (2003), *aff'd sub nom. Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323 (D.C. Cir. 2004).

[54] 17 F.3d 1502 (D.C. Cir. 1994).

[55] *Id.* 1509.

[56] Interagency Agreement Among the Federal Energy Regulatory Commission, United States Coast Guard, and Research Programs Administration for the Safety and Security Review of Waterfront Import/Export Liquefied Natural Gas Facilities (Feb.11, 2004).

safety, vessel engineering and safety standards, and all matters pertaining to the safety of facilities or equipment located in or adjacent to navigable waters. The Weaver's Cove LNG terminal cannot be placed in service without the approval and operational oversight of the Coast Guard.

113. We do not view this approach as an impermissible delegation of our responsibilities. In a recent proceeding we explained that, contrary to Fall River's assertion here, the Commission undertakes its own independent assessment of the other agencies' studies and results prior to accepting or rejecting their recommendations.[57] To the extent any of the pending consultations or studies in this case indicate a need for further review, or indicate a potential for significant adverse environmental impacts, the Director of the Commission's Office of Energy Projects (OEP) will not provide the necessary clearances for commencement of construction.

114. Likewise, we have not improperly delegated authority to the Director of OEP to determine appropriate compliance with the conditions attached to our approval of the project. In accordance with our longstanding and usual practice in construction proceedings, the Commission has determined what conditions should apply for construction and operation of the proposed facilities, and have delegated authority in certain circumstances to determine whether those conditions have been met. The matters delegated to the Director of OEP are matters within the particular technical expertise of the Director and his staff. We have not, however, given the Director "unfettered discretion" over these matters, as Fall River asserts. Rather, determinations by the Director of OEP are subject themselves to a request for rehearing under the Commission's regulations.

115. Also, a number of permits or approvals must be obtained from other government agencies before any approval for construction can be granted. For example, as conditioned in the July 15 Order, Weaver's Cove must obtain clean water and dredging permits from the state and COE, respectively.

F. *Wild and Scenic Rivers Act*

116. Under the Wild and Scenic Rivers Act of 1968, as amended,[58] the Commission may not approve a project that would have an adverse effect on a river that is either formally designated as a wild and scenic river or has been designated for such consideration by Congress. The "upper" Taunton River north of Fall River has been designated a "study area" under Section 5 of the act[59] by Congress. Upon the request of municipalities located along the "lower" Taunton River, the National Park Service expanded its study area to include that segment of the Taunton River from Fall River (including The City of Fall River) to Mount Hope Bay. If the Department of the Interior (National Park Service or DOI) recommends the inclusion of the Taunton River in the Wild and Scenic River program, Congress would then decide whether to approve some, all, or none of the river as a component of the Wild and Scenic River system. DOI has stated that it expected to complete its study and report to Congress some time in 2005.[60] Until Congress acts on the forthcoming final report, however, the lower Taunton River in the vicinity of the proposed project is not currently a Congressionally authorized study river segment and is not under Interior's jurisdiction.

117. The FEIS addressed the Wild and Scenic River Program and the impact of the LNG terminal and the western lateral pipeline that would run beneath the Taunton River, and concluded that construction and operation of the proposed project would not have an adverse effect on the Taunton's River's potential designation as a wild and scenic river.[61] Nevertheless, recognizing DOI's primary role in this procedure, we conditioned construction of the Weaver's Cove project (Condition 25) on Weaver's Cove's filing documentation that DOI concurs that the project would not have a substantial adverse effect on the designation of the Taunton River as a wild and scenic river and that the project would be consistent with the Wild and Scenic Rivers Act.[62]

118. Both Fall River and the Conservation Law Foundation contend that the Commission did not go far enough. They point to the DOI's July 12 comments to the FEIS pointing to concerns regarding the impact on fish resources (especially with respect to impact from dredging) and the impact on waterfront development. The Conservation Law Foundation states that, given DOI's concerns, the Commission's condition cannot be met, and the Commission cannot therefore approve the project. For its part, Fall River states that, while it might be possible to address concerns regarding the impact on fish resources through the adoption of expanded restrictions on dredging, there is no way to make the project compatible with Fall River's goals for its waterfront. Fall River also argues that, regardless of whether the river receives wild and scenic river designation, the Commission must independently assess preservation as part of its Section 3 public interest analysis.

---

57 *See, Cameron LNG, LLC,* 112 FERC ¶ 61,146 (2005), *citing, e.g., Steamboaters v. FERC,* 759 F.2d 1382, 1393 (9th Cir. 1985), describing the Commission's obligation to take a hard look at the potential environment impacts of a proposed action, and to not axiomatically adopt other agencies' recommendations.

58 16 U.S.C. § § 1278*et seq.* (2005).

59 16 U.S.C. § 1276(a) (2005).

60 Thus far, however, we have received no information that DOI has completed its study.

61 *See* FEIS, Section 4.8.6.1, Designated Recreation and Public Interest Areas, pages 4-166-4-168.

62 The FEIS also noted that COE would provide the National Park Service with a draft of its dredging permits, and that if the National Park Service objected to the permits under the Wild and Scenic Rivers Act, the COE would not issue the permits.

119. Weaver's Cove requests that the Commission clarify that the DOI has no jurisdiction to review the Weaver's Cove project under the Wild and Scenic Rivers Act. Weaver's Cove asserts that DOI does not have direct jurisdiction to protect the "lower" Taunton River from potential impacts because that segment, unlike the "upper" Taunton River, has not been designated by Congress for study under the act. If a river or river segment has not been designated by Congress under Section 5(a), states Weaver's Cove, it enjoys no special protection under the Wild and Scenic Rivers Act. Weaver's Cove also contends that DOI likewise holds no indirect authority to regulate the Weaver's Cove project in order to protect the "upper" Taunton River. While acknowledging that DOI may make a determination of adverse impact with respect to a water resource project or development sited above or below a Congressionally designated river if that project will have an impact on the scenic, recreational, or fish and wildlife values of the designated study river, it argues that the Weaver's Cove project is not a "water resources project" or a "development" within the meaning of the Wild and Scenic Rivers Act because its dredging activities will not affect the free-flow characteristics of the Taunton River. For these reasons, it contends that DOI has no jurisdiction to review the impact of Weaver's Cove's dredging activities, and it requests that the Commission delete Condition 25 from the July 15 Order.

*Commission Response*

120. Congress has entrusted DOI with implementation of matters related to the Wild and Scenic Rivers Act. We recognized this in the FEIS, and in the order we conditioned our approval upon a positive determination by DOI that the Weaver's Cove project will be consistent with the objectives of the act. The issues raised by Weaver's Cove relating to the types of activities covered by the Wild and Scenic Rivers Act are within the province of DOI to resolve. DOI has the jurisdiction and the expertise to address these matters. Weaver's Cove should pursue its arguments with DOI, not this Commission. Accordingly, we will not remove Condition 25 from our approval of this project.

121. We disagree with Fall River and the Conservation Law Foundation, however, that that there is no possibility that DOI will make a positive finding regarding the impact of the Weaver's Cove project under the Wild and Scenic Rivers program. The FEIS examined this aspect of the project and found that the Weaver's Cove project should not adversely affect the free flow of the river, and that the proposed LNG terminal would be consistent with the historical industrial use of the site so that it would not impair the values of the river to any greater extent than other facilities currently located along the lower Taunton River. We remain hopeful that, in reaching its determination, DOI may well come to the same conclusions, and that dredging and other remaining issues may be successfully settled.

G. *Rhode Island CZMA Concurrence*

122. Under Section 307(c)(3)(A) of the Coastal Zone Management Act (CZMA)[63] a federal agency cannot issue a license for a project affecting any land or water use or natural resource of a state's coastal zone unless the state certifying agency concurs with the applicant's certification of the project's consistency with the state's federally approved coastal zone management program. Section 307 further provides that a state must either concur with or object within six months "after receipt of its copy of the applicant's certification" or the state's concurrence with the certification "shall be conclusively presumed." The CZMA implementing regulations provide that the six-month review period does not begin until the state has received "necessary data and information," including information identified in the state's coastal zone management program.[64] If a state notifies the applicant and this Commission within 30 days of receipt of the application that the application is incomplete, the state may toll the six-month decision period until the deficiencies are corrected.[65] What constitutes necessary data and information is set forth in the implementing regulations,[66] and a request by a state for additional, as opposed to required, information, does not stop the six-month clock.[67] If the state objects to the applicant's proposal, the applicant may appeal to the Secretary of Commerce for an override of the state's objection.[68]

123. Weaver's Cove requests that the Commission remove its condition that Weaver's Cove obtain consistency concurrence from the Rhode Island Coastal Resources Management Council (Rhode Island Council) under the CZMA (Condition 24) from the July 15 Order because the Rhode Island Council, it asserts, has failed to follow the deadlines established for review of Weaver's Cove's consistency with the Rhode Island coastal zone management plan. Weaver's Cove contends that concurrence is thus conclusively presumed as a matter of law.

124. Weaver's Cove submitted an application with the Rhode Island Council for a federal consistency certification on July 19, 2004. According to a sworn affidavit submitted by the Rhode Island Council, Weaver's Cove was informed by telephone that the application lacked certain necessary data and information required by Rhode Island's coastal zone management plan, and that

[63] 16 U.S.C. § 1456(c)(3)(A) (2005).

[64] 15 C.F.R. § 930.60 (2005).

[65] *Id.*

[66] *Id.*

[67] 15 C.F.R. § 930.60(b); and *Mountain Rhythm Resources v. FERC*, 302 F.3d 958 (9th Cir. 2002).

[68] CZMA matters are administered by NOAA, an agency of the Department of Commerce.

the state's review would not begin until all the necessary material was received by the state. Specifically, according to the affidavit, Weaver's Cove was told in the telephone conversation that the application did not include a viable disposal location for dredged materials, that the engineering plan submitted required a stamp from a Rhode Island certified professional engineer, and that Weaver's Cove must submit a water quality certificate from the Rhode Island Department of Environmental Management. Weaver's Cove states that in a letter dated August 2, 2004 it responded to the request for information regarding the disposal site, and stated that it would provide additional information and clarification found necessary by the Rhode Island Council. On August 12, Weaver's Cove resubmitted the engineering plan with a Rhode Island professional engineer's stamp. On August 26, 38 days after Weaver's Cove filed the original application, Rhode Island sent Weaver's Cove a letter stating that the application was incomplete because Weaver's Cove had not yet obtained a Clean Water Act quality certification.

125. Weaver's Cove contends that the statutory six-month review period began on July 19, 2004, when Weaver's Cove originally submitted the application. Weaver's Cove asserts that telephone notification that the application was incomplete did not toll the six-month review period because both the CZMA implementing regulations and the Rhode Island Council's own *Federal Consistency Manual* require that such notification be in writing. Weaver's Cove asserts that the August 26 letter from the state to Weaver's Cove has no legal effect because it was sent beyond the required 30-day period (computed from July 19), and thus failed to toll the six-month review period. Even if the August 26 letter is considered timely, the review period was not tolled, contends Weaver's Cove, because under the Rhode Island coastal zone management plan, an applicant for federal consistency review is not required to obtain a Section 401 water quality permit for Rhode Island's review of the project, and thus that information is not necessary data and information that would render its application incomplete. Weaver's Cove avers that the statutory six months for CZMA review has long since elapsed.

126. The Rhode Island Council disagrees that it has waived its right to assess the consistency of the Weaver's Cove project.[69] It avers that it informed Weaver's Cove within the 30 days allowed by regulation that the application was deficient, and that it informed Weaver's Cove that the application was still incomplete after it resubmitted the application with the Rhode Island professional engineer's stamp. These notifications tolled the six-month determination period, contends Rhode Island. The Rhode Island Council further states that Weaver's Cove has yet to submit the specified information necessary for evaluation of the project. The Rhode Island Council states that it has complied with the CZMA notification requirements, and that it is Weaver's Cove that is either unwilling or unable to provide the necessary information for the Rhode Island Council to begin its review. Moreover, avers the Rhode Island Council, it is the role of the Department of Commerce, not this Commission, to make determinations regarding application of CZMA requirements.

*Commission Response*

127. The Commission's CZMA role is very limited. The Commission's only responsibility under the CZMA is to withhold construction authorization for a project until the state finds that the project is consistent with the state's NOAA-approved coastal zone management plan. The Commission has found in other proceedings that CZMA consistency can be presumed because the state has not issued its consistency determination in a timely manner. In those situations, however, it was not disputed that the state did not meet the 30-day notification requirement for informing the applicant that the application was missing information, or that the state did not issue a consistency determination within six months from submission of the application.[70] Here, on the other hand, these matters are intensely disputed. Weaver's Cove argues that it did not receive proper or timely notice from the Rhode Island Council regarding any perceived deficiencies in its application, and that, in fact, some of the material the Rhode Island Council did request is not required for CZMA consistency concurrence. Rhode Island, for its part, contends that it has met all regulatory requirements and deadlines.

128. We cannot resolve on this record the complex issues raised by Weaver's Cove and the Rhode Island Council with regard to whether consistency of the Weaver's Cove project with Rhode Island's federally approved coastal zone management program should be presumed as a matter of law. To reach this determination, Weaver's Cove asks this Commission to interpret and apply regulations issued by the State of Rhode Island to find that information Rhode Island has requested from Weaver's Cove is not required under its coastal zone management program. It also asks this Commission to interpret and apply regulations issued by NOAA to determine that Rhode Island has not met the statutory and regulatory deadlines addressed in those NOAA regulations. This Commission is not in a position to interpret regulations of other agencies or otherwise to resolve the issues raised by the parties. This issue is a matter

[69] The Rhode Island Council is not a party to this proceeding. Nevertheless, it submitted what it calls a "Memorandum of Law" opposing Weaver's Cove's contention regarding the Rhode Island Council's CZMA consistency determination approach. Weaver's Cove filed a reply to the Rhode Island Council's pleading. Although our rules of procedure do not provide for either submission, we will accept them so that we may have a full understanding of their positions.

[70] *See, e.g., Georgia Strait Crossing Pipeline, LP*, 108 FERC ¶ 61,053 (2004); *International Paper Company*, 110 FERC ¶ 62,239 (2005).

for the Rhode Island Council, the NOAA, and the Department of Commerce, not this Commission.[71]

H. *Deed Restrictions on the LNG Terminal Site*

129. As discussed in the July 15 Order, Shell and Weaver's Cove have different views on the interpretation of deed provisions regarding future activities on the site of the proposed terminal, and whether the deed permits the placing of dredged material on the site without the approval of Shell and its licensed site professional. Condition 77 in the July 15 Order requires that Shell and Weaver's Cove show that they have reached agreement with regard to deed restrictions relating to future activities and use limitations on the proposed terminal site, or that deed restriction issues regarding future use of the site have been resolved in court.

130. Weavers' Cove contends that the Commission erred in imposing Condition 77 on its approval of the project by requiring Weaver's Cove to resolve what it calls a "contract dispute" with Shell before it begins any construction-related activities on the proposed LNG terminal site. Weaver's Cove asserts the dispute involves a private contractual arrangement between two private parties relating to interpretation of certain restrictive covenants in the deed conveying the site from Shell to its current owner, Jay Cashman, Inc. Weaver's Cove asserts that the Commission should remove Condition 77.

131. Shell, on the other hand, maintains that Condition 77 does not go far enough, and it seeks clarification that the Commission did not intend to limit the scope of the issues that are governed by the deed, and that must be resolved by the parties. Shell states that many matters pertaining to the site are subject to the deed, and that other parties have rights and obligations under the deed.

*Commission Response*

132. The deed conveying the property for the proposed LNG terminal from Shell to Cashman created easements allowing Shell to perform remedial environmental activities required under the MCP, and established provisions restricting future use of the site and governing the rights of Shell, Cashman, and successors to Cashman's interests. The Commission recognized that it could not resolve deed issues regarding use of the site for Weaver's Cove's proposed activity and found that the parties should resolve the disagreement between them or pursue the matter in court. The Commission's Condition 77 in the July 15 order requires resolution of these matters prior to the commencement of any construction-related activities on the proposed site.

133. What Weaver's Cove calls a contract dispute between two private parties outside the Commission's jurisdiction is in reality a threshold issue in this proceeding — whether Weaver's Cove may lawfully use the site for the purpose it intends. Until that question is answered, all other issues in this proceeding are academic. The Commission cannot determine how this matter should be resolved, and it is not attempting to do so. Instead, Condition 77 merely reminds Weaver's Cove of its responsibility to obtain undisputed right under the deed to use the property for its proposed terminal, and assures that no property will be disturbed until Weaver's Cove demonstrates that right to the Commission. Shell's concern that our condition may too narrowly limit potential issues under the deed is unfounded. If the parties cannot agree, either party may bring its particular concerns to the attention of the court in any action brought. Condition 77 is sufficiently broad to accomplish this purpose and will remain unchanged. All provisions under the deed are subject to Massachusetts law.

I. *Compliance with the Massachusetts Contingency Plan*

134. Condition 18 in the July 15 Order requires Weaver's Cove to file documentation prior to construction to verify that placement of stabilized dredged material on the proposed LNG terminal site is consistent with the MCP.[72] Shell contends that the Commission should modify Condition 18 to clarify that the placement of dredged material on the proposed site in accordance with the MCP requirements is a continuing obligation subject to the jurisdiction of the Massachusetts DEP. Because Shell's remediation of the site is governed by the MCP, Condition 18 should also make clear, asserts Shell, that development of the site by Weaver's Cove must comply in all respects with the MCP.

*Commission Response*

135. We find that the requested modifications are not necessary. The purpose of Condition 18 is to assure the Commission, before it authorizes any construction activities to begin at the site, that the Massachusetts DEP has determined that placement of dredged material at the site complies with the MCP.[73] The condition is not intended to describe Weaver's Cove's or Shell's responsibilities under the MCP, and it does not need to do so. Nevertheless, we note that the proposed site is a listed contaminated site under Massachusetts law being regulated under the MCP. Jurisdiction over the site and remediation actions on the site will continue with the Massachusetts DEP

[71] NOAA recently dismissed an appeal by Weaver's Cove that raised similar arguments to those presented here.

[72] In the July 15 Order we explained that the MCP is a comprehensive regulatory program established to implement, as pertinent, remedial actions related to a release or the threat of a release of oil and/or hazardous material. The MCP complements the EPA's National Contingency Plan under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended.

[73] *See* July 15 Order at P 110.

*J. Control of the "Wedge" Lot*

136. Weaver's Cove states that it has an option to purchase all the property within the exclusion zones provided for under DOT safety regulations[74] except for a 1.19-acre triangular shaped piece of property (referred to as the "wedge" lot) formed by its borders with the Taunton River, the proposed LNG facility, and a steep embankment to State Route 79. Weaver's Cove states that legal title to the wedge lot is unclear and may be difficult to establish. Because DOT siting regulations, however, require that the operator of an LNG facility legally control all activities within the exclusion zone,[75] Condition 40 of the July 15 Order requires Weaver's Cove to provide evidence of its ability to exercise legal control over activities on the wedge lot. Acknowledging Weaver's Cove's argument that it may have difficulty establishing title to the property, Condition 40 provides, alternatively, that Weaver's Cove would satisfy the exclusion zone control requirement by obtaining a waiver of this requirement from DOT that spells out alternative mitigation methods that would assure an equal or greater level of thermal protection within the exclusion zone.

137. Weaver's Cove asserts that Condition 40 is unwarranted and that the Commission should remove the condition from its authorization of the project. Weaver's Cove argues that, while it may not be in technical compliance with this DOT exclusion zone provision because it does not hold legal title to the wedge lot, its proposal meets the intent of that requirement because it effectively can control public access to the wedge lot. The unique location of the wedge, it states, makes it unusable as there is no public access and no structures can be built on the property.

*Commission Response*

138. Weaver's Cove is requesting that this Commission waive a safety requirement duly adopted by another federal agency. Congress delegated the responsibility for developing safety standards for the siting of LNG facilities to DOT. As discussed in the FEIS,[76] we agree that it is unlikely that prohibited activities can reasonably occur on the wedge lot; however, while this Commission may impose additional requirements more strict than those adopted by DOT if the circumstances warrant, we may not waive or apply requirements weaker than those found necessary by DOT to insure public safety. Accordingly, the July 15 Order properly requires Weaver's Cove to comply with the DOT site control requirement or obtain a waiver of that requirement from DOT. Condition 40 will remain.[77]

*K. State and Local Permits*

139. The July 15 Order stated that any state or local permits issued with respect to the jurisdictional facilities authorized must be consistent with the conditions of the certificate. It explained that the Commission encourages cooperation between interstate pipelines and local authorities. However, the Commission pointed out that state and local agencies, through application of state or local laws, may not prohibit or unreasonably delay the construction or operation of facilities approved by the Commission.

140. Fall River asserts that the Commission's statement regarding its preemption authority is overly broad. Fall River states that "to the extent that this language purports to assert sweeping and unbounded Commission jurisdiction over valid exercises of state or local authority to regulate environmental and land-use issues implicated by this project, it is legally untenable." Neither the Commission's enabling legislation nor the NGA, claims Fall River, gives the Commission jurisdiction over disputes arising from a state or local entity's exercise of its valid statutory or regulatory authority. Rather, such disputes must be resolved in accordance with standard procedures and remedies available under state law. Fall River states that approvals Weaver's Cove would need to obtain from state or local governments involve compliance with generally applicable state laws and regulations directed at the protection of the environment, natural resources, and the public health, safety, and welfare. They would not be laws or regulations directed at natural gas companies or at the siting or operation of LNG terminals, it avers.

*Commission Response*

141. In *Schneidewind v. ANR Pipeline Co.* (*Schneidewind*), the Supreme Court held that because the Commission has exclusive jurisdiction over the rates and facilities of natural gas companies, a state agency may not regulate matters directly considered by the Commission pursuant to its authority under the NGA.[78] Subsequently, in *National Fuel Gas Supply Corporation v. Public Service Commission of the State of New York* (*National Fuel*),[79] the U.S. Court of Appeals for the Second Circuit specifically addressed the issue of a state's ability to impose additional requirements on a pipeline construction project authorized by the Commission. The court held that a New York statute requiring an interstate pipeline to apply for and obtain a certificate of environmental compatibility from the New York PSC was preempted by the NGA on the grounds that either the NGA explicitly vested exclusive jurisdiction in the Commission to regulate interstate pipeline facilities or Congress had so occupied the field of regulation

---

[74] 49 C.F.R. § 193.2057 (2005).

[75] 49 C.F.R. § 193.2007 (2005).

[76] *See* FEIS, Section 4.12.4, Siting Requirements — Thermal and Dispersion Exclusion Zone, pages 4-248-4-249.

[77] The FEIS noted that Weaver's Cove requested waiver on September 20, 2004. That request is still pending.

[78] 485 U.S. 293 (1988).

[79] 894 F.2d 571 (2nd Cir. 1990).

of interstate pipelines by enactment of the NGA that there was no room for the states to regulate.[80] Accordingly, the court held that the pipeline did not have to comply with New York's regulatory scheme.

142. With regard to a local authority's denial of a permit to a pipeline to conduct regulated activities within the town because the local agency thought another route was superior to the Commission-approved route, the Commission has explained that the NGA "preempts state and local law to the extent the enforcement of such laws or regulations would conflict with the Commission's exercise of its jurisdiction under the federal statute."[81] The Commission further explained:

> [a] state or local agency may challenge a Commission decision by filing a timely request for rehearing and appealing a Commission decision to the courts. A state or local agency may not use its regulatory power to challenge a decision by this Commission.[82]

In sum, as held by the court in *National Fuel*, the NGA preempts state and local agencies from regulating the construction and operation of interstate pipeline facilities.[83]

143. Citing the Supreme Court's ruling in *Schneidewind*, the Commission for many years has included language in virtually every order in which a construction certificate is issued, including in the July 15 Order issued here at paragraph 113, explaining its policy requiring applicants to cooperate with state and local agencies, but noting that such agencies may not, through the application of state and local laws, . . . prohibit or unreasonably delay the construction of facilities approved by the Commission.

144. That a state or local authority requires something more or different from the Commission, however, does not necessarily make it unreasonable for an applicant to comply with both the Commission's and another agency's requirements. It is true that additional state and local procedures or requirements could impose more costs on an applicant or cause some delays in constructing a pipeline. However, not all additional costs or delays are unreasonable in light of the Commission's goal to include state and local authorities to the extent possible in the planning and construction activities of pipeline applicants. A rule of reason must govern both the state's and local authorities' exercise of their power and an applicant's bona fide attempts to comply with state and local requirements.[84]

145. If a conflict arises, however, between the requirements of a state or local agency and the Commission's certificate conditions, the principles of preemption will apply and the federal authorization will preempt the state or local requirements. The Commission cannot act as a referee, on an ongoing basis, between applicants and state and local authorities regarding each and every procedure or condition imposed by such agencies. In the event compliance with a state or local condition conflicts with a Commission certificate, parties may bring the matter before a federal court for resolution.[85]

L. *Environmental Justice*

146. In its comments the EPA avers that the FEIS did not sufficiently assess the potential for disproportionate impacts from the project on low income or minority communities, and suggests that the Commission should conduct additional analysis. It states that it is particularly concerned with potential impacts to air quality during construction. In its rehearing request, Fall River also alleges that the Commission did not adequately assess environmental justice issues. We disagree. The FEIS fully and appropriately addresses the environmental justice implications pertinent to this project.

*Commission Response*

147. Executive Order 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low Income Populations*,[86] requires that specified federal agencies shall make achieving environmental justice part of their missions by identifying and addressing, as appropriate, disproportionately high and adverse human or environmental health effects of their programs, policies, and activities on minorities and low income populations. Executive Order 12898 applies to the agencies specified in Section 1-102 of the order.[87] This Commission is not one of the specified agencies and the provisions of Executive Order 12898 are not binding on this Commission. Nonetheless, in accordance with our usual practice, as part of the FEIS, the Commission has examined the Weaver's Cove project to insure that it does not have disproportionately high and adverse human health or

[80] The court noted that Congress established the Commission as "a federal body that can make choices in the interests of energy consumers nationally," and reasoned that because the Commission "has authority to consider environmental issues, states may not engage in concurrent site-specific environmental review. Allowing all the sites and all the specifics to be regulated by agencies with only local constituencies would delay or prevent construction that has won approval after federal consideration of environmental factors and interstate need, with the increased costs or lack of gas to be borne by utility consumers in other states." *National Fuel*, 894 F.2d at 579.

[81] *Id.* at p. 61,360. *See also Maritimes & Northeast Pipeline, L.L.C.* (*Maritimes*), 81 FERC ¶ 61,166, at pp. 61,728-31 (1997).

[82] *Id.*

[83] 894 F.2d at 575-76 (setting forth circumstances under which the Supremacy Clause of the Constitution, Article VI, clause 2, provides for preemption of state and local law).

[84] *Maritimes*, 81 FERC at pp. 61,730-31.

[85] Id.

[86] 59 *Fed. Reg.* 7629 (Feb. 11, 1994).

[87] *See Millenium Pipeline Company, L.P.*, 97 FERC ¶ 61,292 (2001).

environmental effects on minority or low income communities.

148. Based on available data from various government sources regarding income and ethnicity of the local communities, including environmental justice maps provided by the EPA, the FEIS identified potential environmental justice areas in the vicinity of the project. The FEIS then discussed a number of potential impacts that could affect these areas during construction and operation of the project. Specifically, the FEIS discussed possible visual impacts from the LNG terminal, impacts from vehicle traffic during construction and operation of the terminal, air quality and noise impacts from operation of the terminal, and potential impacts on public safety from possible incidents at the terminal and in the navigation channel. The FEIS concluded, however, that although some of the neighborhoods near the LNG terminal have lower than average income levels, the potential impacts would affect all the communities surrounding the terminal, and not have a disproportionate impact on environmental justice areas.[88]

149. The FEIS did not specifically address the impact on air quality during construction of the project in its environmental justice analysis. Nevertheless, as the FEIS points out on page 4-195, the FEIS provides a more detailed analysis of air quality in Section 4.11 of the FEIS. The FEIS explained that while construction of the LNG terminal and the pipelines would have some adverse impacts on air quality from fugitive dust emissions and from tailpipe emission from construction vehicles, these impacts would be temporary. Furthermore, the FEIS noted that the applicant will take a number of standard steps to minimize fugitive dust emissions, such as covering trucks and spraying water over exposed soils as necessary. The FEIS found that the temporary and intermittent nature of tailpipe emissions would be minimal, but nevertheless recommended a condition requiring the applicant to use high grade diesel fuel in all construction equipment and to evaluate the feasibility of using catalysts and filters on such equipment and placing idling limits on construction vehicles. The Commission adopted this recommendation as Condition 29 in the July 15 Order.

M. *Clarification of Certain Terms Used in Conditions*

150. Weaver's Cove requests the Commission to clarify the differences among the phrases "prior to initial site preparation," "prior to construction," and "before commencement of any construction-related activities," as used in the environmental conditions to the July 15 Order. In particular, Weaver's Cove requests clarification that activities that may be undertaken by the site's current owner prior to Weaver's Cove's obtaining ownership, such as tank clearing, will not be considered initial site preparation. Similarly, Weaver's Cove avers that demolition of existing structures on the site, site clearing or minor site grading activities associated with demolition should not be considered construction related, if they were performed by the current site owner prior to Weaver's Cove's acquiring the site.

*Commission Response*

151. The term "Before commencement of any construction-related activities . . . " is used only in Condition 77, which requires appropriate evidence that issues relating to deed restrictions on future activities on the site have been resolved. The term "prior to initial site preparation" is only used in the conditions related to the design and construction of facilities at the LNG terminal site, while "prior to construction" is used for other resources. These terms have essentially the same meaning and may be used interchangeably. With respect to demolishing existing structures on the site, and clearing or grading activities associated with demolition, the Commission has generally considered these activities to be initial site preparation activities. These conditions apply to Weaver's Cove and Mill River with respect to commencing site work on the LNG project involved in this proceeding. Conversely, the conditions do not apply to the owner of the site, which may perform any of these activities consistent with other applicable laws and regulations.

N. *Rate and Tariff Issues*

*Gas Quality*

152. KeySpan requests that the Commission clarify, (1) that the July 15 Order did not intend to make any finding regarding the impact that deliveries of regasified LNG from the Weaver's Cove and Mill River facilities into the Algonquin system may have on Algonquin's system or on Algonquin's customers, and (2) that the Commission's approval of Mill River's *pro forma* tariff, including its gas quality provisions, will not affect or influence the Commission's consideration of future proposals to modify the quality provisions of Algonquin's tariff. KeySpan argues that the Commission's Certificate Policy requires the Commission to consider the impact of proposed new pipeline projects on other affected pipelines and the captive customers they serve.[89] KeySpan argues that the information supplied by Algonquin is insufficient to support a conclusion that deliveries of regasified LNG from the Weaver's Cove facilities would not adversely affect Algonquin and its captive customers. KeySpan is concerned that the regasified LNG from the Weaver's Cove facility may not have the same quality or interchangeabil-

---

[88] *See* FEIS, Section 4.9.7, *Environmental Justice*, at pages 4-192-4-197.

[89] *Citing Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227, at p. 61,737 (1999), *order on clarification*, 90 FERC ¶ 61,128, *order on clarification*, 92 FERC ¶ 61,094 (2000).

ity of current gas supplies on Algonquin's system and will adversely affect KeySpan's delivery systems or the customers of those systems. KeySpan seeks clarification that the Commission has not made findings on these issues. In the event that the Commission does not grant the requested clarification, then KeySpan requests rehearing of the July 15 Order.

*Commission Response*

153. The Commission addressed Mill River's *pro forma* tariff in the July 15 Order, and required Mill River to make several changes where the Commission found them necessary to comply with Commission regulations. Mill River's *pro forma* tariff, however, complies with current Commission regulations regarding gas quality standards, which require that pipelines identify heat content and measurement.[90]

154. The issues raised here by KeySpan are beyond the scope of this proceeding. The July 15 Order does make any findings relative to Algonquin's tariff, and it does not address the circumstances under which gas could be introduced by Mill River into the Algonquin system. Specifications relating to gas transported on Algonquin's system are described in Algonquin's tariff. Our orders in this proceeding have no effect on Algonquin's tariff. KeySpan is a shipper on Algonquin's system, and it should pursue matters relating to the quality of the gas transported on that system with Algonquin. The Commission recognizes that there are serious industry concerns regarding the interchangeability of domestic natural gas and imported LNG and has been, along with the industry, exploring how these concerns can best be resolved.[91]

*Billing Determinants*

155. Weaver's Cove asserts that the Commission erred in requiring Mill River to base its rates upon theoretical pipeline capacity of 836,000 Dth per instead of its firm contractual commitments of 400,000 Dth per day. Weaver's Cove states that the Algonquin system, the only pipeline system downstream of the laterals, can physically receive only 400,000 Dth per day from the Mill River laterals on a firm basis at the present time, and there is no possibility that Mill River will be able to find subscribers for firm capacity anywhere near its theoretical 836,000 Dth per day capacity, absent significant new construction by Algonquin. Weaver's Cove states that the two laterals are not over-sized; rather, Mill River proposed to construct two separate laterals each with a design capacity of 400,000 Dth per day for purposes of take-away flexibility. It does not intend to sell firm capacity on both laterals equal to the combined physical capacity of the two lines. While the proposed laterals could handle the larger capacity on peak demand days, peak use would be temporary and uncertain, states Weaver's Cove.

156. The Commission, avers Weaver's Cove, generally requires pipelines to use their total physical capacity in determining their rates to guard against possible cost over-recovery or the over-sizing of facilities, but has employed a more flexible approach where, as here, that policy concern is not implicated. The fact that in the July 15 Order the Commission is requiring Mill River to submit a rate filing after three years of actual operation to justify its recourse rates will serve as an appropriate vehicle for the Commission to determine if there has been cost over-recovery. Weaver's Cove states that Mill River also agrees to credit any additional revenues from interruptible service to firm shippers. For these reasons, Mill River requests that the Commission grant rehearing and permit it to design its Rate Schedule FT reservation rate based on the actual firm capacity that it has subscribed to its shipper, and that it be permitted to design its IT rates as a100 percent load factor derivative of such firm rate.

*Commission Response*

157. Upon further consideration, we agree with Weaver's Cove that the circumstances of this case warrant a departure from the Commission's general policy of requiring a pipeline to base its rates on actual capacity. Because there are physical limitations to Mill River's transporting more than 400,000 Dth per day for a sustained period, there is little likelihood of over-recovery of the pipeline's costs. We are also persuaded that other protections against over-recovery of costs are in place. Under the July 15 Order, Mill River must, after three years of operation, submit either (a) a cost and revenue study justifying its cost-based firm and interruptible recourse rates, or (b) an NGA Section 4 filing to propose alternative rates. Mill River has also stated it will credit any revenues derived from interruptible service to firm shippers.[92] In view of these safeguards against cost over-recovery, the Commission concludes that it is appropriate to grant rehearing and permit Mill River to design its Rate Schedule FT reservation rate based on the actual firm capacity that it has subscribed to its shipper, and is permitted to

[90] 18 C.F.R. § 154.108(e) (2005).

[91] *See* Docket No. PL04-3-000, Natural Gas Interchangeability

[92] At P 62 of the July 15 Order, we directed Mill River to allocate an appropriate level of the estimated cost of service to interruptible services and recalculate its rates, or alternatively, to provide a mechanism to credit 100 percent of IT revenues to its firm and interruptible shippers. This direction was based in part on the use of 836,000 Dth as billing determinants to derive Mill River's rates. These 836,000 Dth included capacity that would be used for interruptible transportation, so any IT revenues would correctly be credited to both firm and interruptible shippers. Inasmuch as we are granting rehearing on the level of billing determinants, the IT revenue crediting must also be reconsidered. The level of 400,000 billing determinants includes only firm transportation. Since the recourse rates are now derived based only on costs allocated to firm transportation, any IT revenues should be credited only to firm shippers.

design its IT rates as a100% load factor derivative of such firm rate.

O. *Modification to Condition 11*

158. We have revised environmental Condition 11 in Appendix B of the July 15 Order pertaining to the commencement of service of the project. Modifications to the condition are necessary to clarify that in-service authorizations are required for both the LNG terminal and the pipeline facilities. Condition 11 will now read:

> 11. Weaver's Cove must receive written authorization from the Director of OEP before commencing service *from the LNG terminal and other components of the project*. Such authorization will only be granted following a determination that *the facilities have been constructed in accordance with FERC approval and applicable standards, can be expected to operate safely as designed, and the* rehabilitation and restoration of the right-of-way and *other areas affected by the project are* proceeding satisfactorily. [Changes from July 15 Order are in italics.]

*The Commission orders*:

(A) Except as described in the body of this order, the requests for rehearing are denied.

(B) Fall River's request for oral argument of its rehearing request is denied.

(C) The September 26, 2005 pleading filed by the City of Newport and the Towns of Bristol, Tiverton, Middletown, and Portsmouth, Rhode Island is rejected.

(D) The October 14, 2005 pleading by the Town of Jamestown, Rhode Island is rejected.

Commissioner Kelly dissenting with a separate statement attached.

**Suedeen G. KELLY, Commissioner,** ***dissenting***:

For the reasons detailed in my dissent from the July 15 Order,[1] I continue to believe that, under the facts and circumstances of this case, it would not be in the public interest to authorize the Weaver's Cove LNG facility under NGA Section 3. In my view, there are reasonable alternatives to this facility for meeting New England's growing demand for natural gas. Given these alternatives, I think that, on balance, the unresolved safety, environmental and socioeconomic concerns raised by this project outweigh the benefit of the additional gas supply that it would provide. In addition, I disagree with this order's failure to substantively address the argument raised on rehearing that Rhode Island failed to timely act on Weaver's Cove's Coastal Zone Management Act (CZMA) certification application.

The Weaver's Cove facility would transport up to 800 MMcf per day of natural gas to the Northeast market by 2010. As I have previously stated, I believe that there are other natural gas infrastructure projects proposed to serve the New England region that present reasonable alternatives to this facility. For example, the Canaport LNG and Bear Head LNG import terminals in Canada are currently under construction and are scheduled to be in service in 2008. The initial capacity of the Canaport LNG facility is 1 Bcf per day. The designed throughput capacity for Bear Head LNG is 1 Bcf per day. An additional storage tank could be added in the future, increasing peak send-out capacity to as much as 1.5 Bcf per day. These LNG import terminals would tie directly into the Maritimes & Northeast Pipeline, which already serves New England. On September 15, 2005, Maritimes & Northeast Pipeline submitted a pre-filing application with the Commission, proposing to expand its existing pipeline system in order to transport a total quantity of approximately 1.5 Bcf per day of gas from these two terminals. 1.5 Bcf per day of gas represents approximately 34 percent of New England's current normal peak day gas demand forecast.[2] Commission staff is currently preparing an environmental impact statement regarding the proposed expansion.

In addition, proposals by Neptune LNG and Excelerate Energy LLC to build LNG import facilities off the coast of Massachusetts are continuing to move forward in the regulatory process. The Neptune LNG facility would have an average sendout capacity of 400 MMcf per day and a peak capacity of 700 MMcf per day. Excelerate Energy L.L.C.'s Northeast Gateway Project would have a baseload capacity of 400 MMcf per day and a peak capacity of 800 MMcf per day.

In light of the reasonable alternatives to the Weaver's Cove project, such as the ones described above, I think the benefit of additional gas supply that this facility would provide does not outweigh the unresolved safety, environmental and socioeconomic concerns that it raises.

Finally, I am troubled that the Commission declined to substantively address Weaver's Cove's argument on rehearing that we determine that Rhode Island failed to timely act within the statutory deadline on Weaver's Cove's CZMA certification application, and therefore "conclusively presume" Rhode Island's concurrence with the certification. Rather than making a call either way, the Commission sidesteps the matter on the grounds that the issues raised are complex and "intensely disputed," and involve interpretation of regulations issued by the state of Rhode Island and the Department of Commerce.

---

[1] 112 FERC ¶ 61,070 (2005).

[2] This percentage is based on the total New England "normal" peak day demand forecast for 2006 of 4.4 Bcf per day. *See* The Power Planning Committee of the New England Governors' Conference, Inc., *Meeting New England's Future Gas Demands: Nine Scenarios and Their Impacts*, March 1, 2005, pp. 20-21.

CZMA Section 307 provides that a state must either concur with or object within six months after it receives its copy of the applicant's CZMA certification, or the state's concurrence with the certification "shall be conclusively presumed."[3] While Weaver's Cove and Rhode Island do indeed "intensely dispute" the facts, I believe that CZMA Section 307 requires the Commission to sort through those facts, and make a call based on the record before it. The Commission has made this type of determination several times before, and I see no reason not to do so in this order.

Accordingly, I respectfully dissent from this order.

[¶ 61,059]

## H.Q. Energy Services (U.S.), Inc. v. New York Independent System Operator, Inc., Docket No. EL01-19-007

## PSEG Energy Resources & Trade LLC v. New York Independent System Operator, Inc., Docket No. EL02-16-007

## Order Granting Clarification

(Issued January 23, 2006)

**Before Commissioners: Joseph T. Kelliher, Chairman; Nora Mead Brownell, and Suedeen G. Kelly.**

1. On November 21, 2005, the Commission issued an order setting for hearing and settlement judge proceedings questions relating to prices charged by the New York Independent System Operator (NYISO) for May 2000.[1] KeySpan-Ravenswood, Inc. (Ravenswood) seeks clarification that, pending a final Commission order in this proceeding, refunds already made by NYISO should not be returned or adjusted. The Commission grants the clarification requested by Ravenswood.

*Background*

2. On March 4, 2005, the Commission issued an order on remand, which found that the NYISO owed refunds for May 8 and 9, because it had improperly restated prices during that period of time.[2] The March 4 Order required the NYISO to file a refund report within 30 days of the order, and to pay refunds and collect surcharges designed to reinstate the original market clearing prices for energy for the real-time market determined on May 8, 2000, and May 9, 2000.[3]

3. On June 2, 2005, while rehearing of the March 4 Order was pending, NYISO filed a report setting forth the manner in which it intended to reinstate the May 8 and 9 prices, and stating that refunds could be included in the invoices that NYISO would send to its members on July 8, 2005, with transfer of any refund payments occurring on July 20, 2005.[4]

4. In the November 21Order, the Commission set for settlement judge and hearing proceedings the issues raised by the parties as to the determination of refunds.[5]

*Request for Clarification or Rehearing*

5. On November 29, 2005, Ravenswood filed a motion for clarification that the amounts previously refunded by NYISO should not be returned or adjusted until the Commission has considered the sufficiency and adequacy of the refunds proposed by NYISO and has determined the appropriate amount of refunds to be paid and surcharges to be collected.[6] Ravenswood alleges that NYISO has, in fact, already made refunds by adjusting the invoices it made to customers in July 2005, as it proposed to do in its June 5 report.[7] Ravenswood states that it understands the intent of the Commission's November 21 Rehearing Order was to preserve the *status quo* pending the outcome of the settlement and hearing process. It maintains the best way to effect that intention, considering that certain refunds have already been paid, is to wait until the conclusion of the procedures directed by the Commission in the November 21 Rehearing Order before any additional funds are transferred. While Ravenswood believes that further refunds will likely be ordered after the hearing or settlement, even if repayments are eventually required, the payment of interest should adequately compensate for the time value of money. Furthermore, Ravenswood asserts it would be inefficient and unnecessarily burdensome to require additional transfers of money at this time when further revisions will likely be required upon conclusion of the settlement and

---

[3] 16 U.S.C. § 1456(c)(3)(A).

[1] *H.Q. Energy Services (U.S.), Inc. v. New York Independent System Operator, Inc.*, 113 FERC ¶ 61,184 (2005) (November 21 Order).

[2] *H.Q. Energy Services (U.S.), Inc. v. New York Independent System Operator, Inc.*, 110 FERC ¶ 61,243 (2005) (March 4 Order).

[3] *Id.* at Ordering Paragraph B.

[4] June 2, 2005 NYISO refund report at 1.

[5] November 21 Order at P 54.

[6] Ravenswood asserts its motion was served on all parties to the proceeding.

[7] Ravenswood request for clarification or rehearing at 3. NYISO confirms that it made refunds in this fashion, *see* NYISO response to request for clarification at 1.