**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **WEAVER'S COVE ENERGY, LLC** | : | |
| | : | |
| **v.** | : | **CA. No. 07-246S** |
| | : | |
| **RHODE ISLAND COASTAL RESOURCES MANAGEMENT COUNCIL, *ET AL.*** | : | |

**ANSWER TO AMENDED COMPLAINT**

Instead of re-filing its application to the CRMC after it made substantial changes to its proposal, Weaver's Cove insists on maintaining its obsolete initial submission against the advice of both federal and state authorities. For this reason, among others, now come all Defendants and answer as follows:

1. Denied insofar as the word "securing" implies a successful outcome. Denied insofar as the phrase "a project that was approved" implies that the current proposed project is the same as what was approved. The project as approved does not conform to the proposal as currently constituted (as of the date of the instant Amended Complaint). Denied insofar as the word "approved" implies unconditionality. Otherwise, admitted.

2. Denied. Without limitation on the foregoing denial, the Natural Gas Act includes a whole panoply of 31 statutory sections, comprising an entire chapter of the U.S.C., not just the particular section cited.

3. Denied. Without limitation on the forgoing denial, made application to the Rhode Island Coastal Resources Management Council ("CRMC") for a Category B Assent.

4. Denied. On August 20, 2004, Weaver's Cove itself made application to the Rhode Island Coastal Resources Management Council ("CRMC") for a Category B Assent.

5. Defendants are without knowledge of what Weaver's Cove "seeks" and, therefore, this paragraph is denied.

6. Denied.

7. Denied.

8. Denied.

9. Admitted.

10. Admitted.

11. Admitted.

12. Admitted.

13. Admitted.

14. Admitted.

15. Admitted.

16. Admitted.

17. Admitted.

18. Admitted.

19. Admitted.

20. Admitted.

21. Admitted.

22. Admitted insofar as the import of the allegation is that the CRMC is headquartered in Wakefield, Rhode Island. Otherwise, denied.

23. Paragraph 23 contains a legal conclusion and Defendants are not required to admit or deny.

24. Paragraph 24 contains a legal conclusion and Defendants are not required to admit or deny.

25. Paragraph 25 contains a legal conclusion and Defendants are not required to admit or deny.

26. Admitted that "Weaver's Cove proposes to construct and operate an LNG marine import and storage terminal in Fall River, Massachusetts." Otherwise, denied.

27. The body of paragraph 27 is denied, without limitation, on the ground that the proposal has significantly changed since the so-called approval.

With respect to footnote 1 to paragraph 27, however, the footnote is admitted up to the phrase "another government body." The remainder of the footnote is denied.

28. Admitted upon the assumption that the paragraph is contingent upon the Plaintiff's securing the proper approvals for its current proposals. Otherwise, denied.

29. Denied.

30. Denied insofar as any implication that section 3 is the applicable section for the proposal at hand. Otherwise, admitted.

31. Paragraph 31 contains a legal conclusion and Defendants are not required to admit or deny.

32. Paragraph 32 contains a legal conclusion and Defendants are not required to admit or deny.

33. Paragraph 33 contains a legal conclusion and Defendants are not required to admit or deny.

34. Paragraph 34 contains a legal conclusion and Defendants are not required to admit or deny.

35. Paragraph 35 contains a legal conclusion and Defendants are not required to admit or deny.

36. Paragraph 36 contains a legal conclusion and Defendants are not required to admit or deny.

37. Paragraph 37 contains a legal conclusion and Defendants are not required to admit or deny.

38. Denied insofar as the paragraph omits mention of the problems of incompleteness. Otherwise, admitted.

39. Assuming that the word "window" means "time-period," the paragraph is admitted.

40. Paragraph 40 contains a legal conclusion and Defendants are not required to admit or deny.

41. Denied insofar as the word "approved" implies that the current proposed project is the same as what was approved. Otherwise, admitted.

42. Paragraph 42 contains a legal conclusion and Defendants are not required to admit or deny.

43. Denied with respect to any implication that such application or submission was complete. Denied with respect to any implication that the filing conformed to the proposal as currently constituted (as of the date of the instant Amended Complaint). Denied with respect to any negative implication that the filing was done independently of a state-law filing commonly known as a "category B," application. Denied with respect to the characterization "Federal." Otherwise, admitted.

44. Denied. Without limitation of the foregoing, denied with respect to any implication that such application or submission was complete; denied with respect to any implication that the filing conformed to the proposal as currently constituted (as of the date of the instant Amended Complaint); the proposal has changed; denied with respect to any implication that such advice was exclusive.

45. Denied.

46. Admitted.

47. Denied.

48. Denied.

49. Denied.

50. Denied with respect to any implication that such filing was complete. Denied with respect to any implication that the filing conformed to the proposal as currently constituted (as of the date of the instant Amended Complaint). The proposal has changed. Denied with respect to any negative implication that the filing was done independently of a state-law filing commonly known as a "Category B" application. Otherwise, admitted.

51. Denied.

52. Denied. Without limitation of the foregoing denial, the paragraph is specifically denied with respect to any implication that the regulatory agency actions resulted in anything other than a federal rebuff to Weaver's Cove.

53. Admitted that Weaver's Cove requested on August 15, 2005, as part of a request for rehearing of the *Initial Order*, that the FERC remove the requirement that it provide documentation of the CRMC's concurrence with the Weaver's Cove Consistency Certification. Otherwise, denied.

54. Admitted that "On September 9, 2005, the CRMC filed before the FERC a pleading." Otherwise, the document speaks for itself.

55. Admitted.

56. Admitted that on October 11, 2005, Weaver's Cove filed a notice of appeal to the Secretary of Commerce. Otherwise, denied.

57. Admitted that such a writing was made on or about such date. Otherwise, the document speaks for itself.

58. Admitted that such a writing was made on or about such date. Otherwise, the document speaks for itself.

59. Admitted that such a writing was made on or about such date. Otherwise, the document speaks for itself.

60. Denied.

61. Admitted that such a writing was made on or about such date. Otherwise, the document speaks for itself.

62. Admitted that such a writing was made on or about such date. Otherwise, the document speaks for itself.

63. Denied.

64. Denied.

65. Admitted that such a writing was made on or about such date. Otherwise, the document speaks for itself.

66. Admitted that such a writing was made on or about such date. Otherwise, the document speaks for itself.

67. Admitted that such a writing was made on or about such date. Otherwise, the document speaks for itself.

68. Reference is made to the response to paragraph 56.

69. Admitted that such a writing was made on or about such date. Otherwise, the document speaks for itself.

70. Denied.

71. Denied.

72. Denied.

73. Admitted.

74. Admitted insofar as the paragraph states "That requirement – know as the requirement of "Category B Assent," 04-000-010 R.I. Code R § 300.1 *et seq*. – requires persons undertaking certain activities (including dredging in Rhode Island waters) to submit information". Otherwise, denied.

75. Denied insofar as the paragraph overlooks that Weaver's Cove made application to the Rhode Island Coastal Resources Management Council ("CRMC") for a Category B Assent. Otherwise, admitted.

76. Denied.

77. Denied.

78. Denied.

79. Denied.

80. Defendants reallege and incorporate by reference the responses in the paragraphs above.

81. Defendants are without knowledge as to what Weaver's Cove "requests" and, therefore, this paragraph is denied. It is also denied as ungrammatical.

82. Denied. Without limitation on the foregoing, the defendants specifically assert that the word "Federal" as used in the context of the CRMP plainly refers exclusively to activities directly conducted by the Federal Government itself rather than activities conducted by federal licensees.

83. Denied. Without limitation of the foregoing, it is specifically denied that Ex. H constitutes the regulations in effect at the time of the transaction in question. Moreover, the regulations in question refer to formal agency objections on the grounds of incompleteness. They do not refer to, nor do they prohibit, non-processing on the grounds of incompleteness. The regulations do not contain any requirement that notice be in writing where the agency does not take the action of formally objecting. Here, the agency is giving the applicant an opportunity to complete its application so that it might be reviewed on the merits.

84. Denied.

85. Denied.

86. Denied.

87. Denied.

88. Admitted that there is an August 2, 2004, letter from Weaver's Cove to CRMC. Otherwise, denied.

89. Admitted that there is a letter of the dated August 24, 2004, from CRMC to Weaver's Cove. Otherwise, denied.

90. Denied.

91. Denied.

92. Denied.

93. Denied.

94. Denied.

95. Denied.

96. Defendants reallege and incorporate by reference the allegations in the paragraphs above.

97. Denied.

98. Denied.

99. Denied.

100. Denied.

101. Defendants are without knowledge of what Weaver's Cove "requests" and this allegation is, therefore, denied.

102. Defendants reallege and incorporate by reference the allegations in the paragraphs above.

103. Denied.

104. Denied.

105. Denied.

106. Denied.

107. Defendants reallege and incorporate by reference the allegations in the paragraphs above.

108. Denied.

109. Denied.

110. Defendants reallege and incorporate by reference the allegations in the paragraphs above.

111. Denied.

112. Denied.

113. Denied.

114. Denied.

115. Denied.

FIRST AFFIRMATIVE DEFENSE -- WAIVER AND ESTOPPEL ON THE GROUND OF CHANGED PROJECT

116. Weaver's Cove created the alleged "regulatory 'no man's land'," ***see*** Complt. ¶ 6, by failing to simply make a new consistency filing based upon the substantial changes in the project. The proposed project has changed in terms of impacts on the State's coastal zone (***i.e.***, now proposing a minimum of 120 roundtrip tanker transits per year vs. the maximum of 70 originally proposed; now proposing a new in-water dredge spoil location immediately off the Rhode Island coast vs. the Massachusetts upland site originally proposed; now proposing numerous transits through Rhode Island to deposit the dredge spoils vs. shipment directly out-of-state as originally proposed).

***The Changes in Proposed Shipping Patterns***

117. On August 10, 2005, President George W. Bush signed into law the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU). Section 1948 of this law expressly reflects the intent of the President and Congress of the United States that the existing Brightman Street Bridge, in Fall River, Massachusetts, shall be "maintained . . . as an emergency service route."

118. According to Congress, the bridge currently serves as a critically important transportation route for police, firefighters, and other first responders, as well as a vital link between population centers and area hospitals. In addition, it serves as an available emergency evacuation route for tens of thousands of residents of the City of Fall River, Massachusetts. Indeed, the continued existence and availability of this emergency service and evacuation route would become even more critical if the proposed Weaver's Cove LNG terminal were to become operational.

119. Thus, the Brightman Street Bridge, which was earlier slated for demolition, is now a federally-protected structure.

120. The originally-proposed ships cannot pass under that protected bridge.

121. The project the Commission approved can no longer be implemented. It depended on removal of a bridge that Congress has now decided to retain.

122. The Coast Guard and the Corps of Engineers recognize that the earlier-approved proposal is now a nullity.

123. This issue must be resolved, and the ACOE has acknowledged this fact and so stated, prior to the issuance of any permits.

124. In response to the Congressional enactment preserving the bridge, Weaver's Cove provided a "Change of Information" it filed with the United States Coast Guard on February 2, 2006, announcing an intent to use smaller vessels and a dramatically increased number of transits.

125. In other words, on February 2, 2006, following the Congressional action that precluded implementation of the project that Weaver's Cove had proposed and the Commission had approved, and following the denial of rehearing of the authorization, Weaver's Cove submitted a substantially different proposal, approximately doubling the number of trips (using smaller vessels).

126. Thus, in early February 2006, more than six months after the Commission authorized its proposal, Weaver's Cove advised certain agencies (but not the CRMC) of its intention to implement a substantially revised project that would now require a doubling of tanker transits (from 50 to 70 to a minimum of 120).

127. Weaver's Cove's own expert described newly anticipated transits as challenging and fraught with risk, including the need to maneuver for "a significant period of time when tug power is not available to control the bow" during travel through the narrow span of the Brightman Street Bridge abutments.

128. By letter of March 13, 2006, the Coast Guard responded to the project modification, concluding that "extraordinary maneuvers" would be required, leaving "no margin for navigational error, and [the transit plan] appears unsuitable in its current state, when considering the intended vessel size, cargo, and number of transits in your proposal."

129. Accordingly, the Coast Guard continued, "a revised waterway suitability assessment and environmental impact review may be required, prior to issuance of a Letter of Recommendation."

130. Independently, the Army Corps of Engineers wrote the Commission to "specifically request[]" the FERC to review the revised proposal and "determine whether the EIS addresses the effect of these changes."

131. On March 27, 2006, in response to navigational concerns raised by the Coast Guard and Weaver's Cove's own assessment that safe transit could not be assured, Weaver's Cove announced that it will be developing yet another new shipping plan.

132. On March 28, 2006, Weaver's Cove purported to respond to the Coast Guard's concerns about navigational suitability, contending that the revised proposal incorporated a number of "conservative" assumptions, including the use of "a larger vessel in both length and beam than the LNG tankers we would propose deploying into our service."

133. Most telling, however, was Weaver's Cove's concession of its inability to establish the likelihood of safe passage: "the combination of these sets of conservative inputs, while demonstrating the maneuver is feasible, does not demonstrate it is repeatable on a safe and consistent basis."

134. The Northeast Marine Pilots have not provided documentation to the Coast Guard stating that pilots can safely take the vessels through Rhode Island and Massachusetts waters, and especially, through the bridges, with the very limited under-keel clearances that the limited dredging will provide but, instead, have provided merely an undated and undocumented report with multiple *caveats* and anonymous sources indicating that, despite the pilots' best efforts there would likely be "contacts," *i.e.*, crashes, with the bridge piers.

135. The Coast Guard intends to make further evaluation of the proposal from a navigation safety perspective. Only after it determines navigational feasibility will the Coast Guard next evaluate maritime security, and then the adequacy of the extant environmental assessments in light of the project revision.

136. In its latest statement (May 9, 2007), the Coast Guard has repeated its earlier assessment that "the transit through the new and old Brightman Street Bridges was 'an extraordinary navigational maneuver' that left 'no margin for error'." The Coast Guard then states: "it appears that the waterway may not be suitable for the type and frequency of LNG marine traffic contained in [Weaver's Cove's] smaller tanker proposal."

137. To date, the CRMC has not learned of the new shipping plan from the Weaver's Cove but, instead, has learned of it from general sources.

***The Changes in Proposed Dredge – Spoil Disposal***

138. The original proposal submitted to RICRMC, *inter alia*, proposed to deposit the dredged material/spoils at a unidentified upland site in Massachusetts.

139. This was submitted even though Weaver's Cove has not, and could not, obtain a state or local permitted dredge disposal site in Massachusetts, which is a Coastal Resources Management Program ("CRMP") prerequisite.

140. Weaver's Cove's own Exhibit C (to the instant Complaint), a letter from Weaver's Cove to CRMC dated July 16, 2004, states: "Dredged material will be used as engineered fill to create landforms on the LNG Terminal site in Fall River, Massachusetts." This is no longer true.

141. This statement was repeated by Weaver's Cove's own Exhibit D (to the instant Complaint), a letter from Weaver's Cove to CRMC dated August 2, 2004, which states: "any Assent for dredging in Rhode Island waters would be conditioned upon disposal of dredged material in an approved disposal site, which would be outside of the jurisdiction of the State of Rhode Island."

142. Throughout this process, the CRMC consistently maintained that, the identification of an approved and properly-permitted upland dredge disposal site, whether in Rhode Island or elsewhere, constituted part of the "necessary data and information" required by the CRMC's program.

143. However, recent modifications by Weaver's Cove have made clear that land-based disposal is no longer contemplated at all.

144. The CRMC has been notified by the Army Corps of Engineers ("ACOE") that Weaver's Cove has now revised its application to significantly change its proposal. Instead of disposing of dredge material on an upland site, Weaver's Cove now proposes to dispose of the extensive dredge material in an open-water site, site 69B. In fact, the ACOE felt obligated to re-notice its proceeding on Weaver's Cove's application as a result of the changes. The ACOE deemed the change to be major.

145. This modification is a "major amendment" which will cause effects on coastal uses and resources, "substantially different" than those originally proposed to CRMC, as those terms are used in the relevant regulations; hence a new consistency certification and application is required to be filed by Weaver's Cove. *See* 15 C.F.R. § 930.51(b); (e). While the determination of "substantially different coastal effects" is made on a case-by-case basis, the opinion of the CRMC shall be accorded deference and the terms "major amendment" and "substantially different" shall be construed broadly to ensure the RI CRMC has the opportunity to review activities and coastal effects not previously reviewed. 15 C.F.R. § 930.51(e).

146. Although the ACOE has notified CRMC that the proposal has substantially changed, Weaver's Cove has yet to file such a new application.

147. This new proposal for dredged material disposal is a major amendment and is substantially different than what was submitted to CRMC.

148. The original proposal to CRMC proposed that the total volume of dredged material was to be disposed on the site in Massachusetts with all transport being conducted into Massachusetts waters.

149. Under that now-defunct scenario, the dredging impacts to R.I. coastal resources would have been limited to the actual dredging in R.I..

150. The new proposal provided to CRMC by the ACOE proposes that nearly all the dredge material will go to an open water site, Rhode Island Sound Disposal Site (69B). This material includes the original R.I. material and most of the Massachusetts dredge material. Under this new proposal, all the scows will transit through R.I. coastal waters and will impact R.I. coastal resources.

151. Weaver's Cove has provided no information to CRMC that details the analysis of this proposal or a discussion of the alternatives. It has, however, indicated in its ACOE filings that it proposes year-round dredging, which may well conflict with the CRMP.

152. In short, the new proposal lacks any of the necessary data and information which forms a significant part of the CRMC's analysis and review to address the impacts to R.I. coastal resources.

153. Weaver Cove's new proposal needs to be submitted to RICRMC so a new Category B and consistency review can begin, hence the instant request by Weaver's Cove has been rendered moot by its own actions.

154. If Weaver's Cove had re-filed with the CRMC, then a decision could have been obtained whereby normal appeal procedures would have been available.

155. All delays are the fault of Weaver's Cove.

156. The Weaver's Cove proposal is now substantially different than the original proposal; hence, a new application and consistency certification needs to be filed with the RICRMC.

157. The regulations state the federal policy regarding the need for a new application:

> Substantially different coastal effects are reasonably foreseeable if:
>
> > (1) The applicant makes substantial changes in the proposed activity that are relevant to management program enforceable policies; or
> >
> > (2) There are significant new circumstances or information relevant to the proposed activity and the proposed activity's effect on any coastal use or resource.
> >
> > (3) Substantial changes were made to the activity during the period of the State agency's initial review and the State agency did not receive notice of the substantial changes during its review period, and these changes are relevant to management program enforceable policies and/or affect coastal uses or resources.

15 C.F.R. § 930.66

SECOND AFFIRMATIVE DEFENSE – WAIVER AND ESTOPPEL ON THE GROUND OF SUBMISSION OF A STATE LAW APPLICATION

158. At the time of its purported CZMA submission to CRMC, August 20, 2004, Weaver's Cove made application to the Rhode Island Coastal Resources Management Council ("CRMC") for a Category B Assent.

159. A Category B Assent is, *inter alia*, a form of State license to use State-owned real estate, namely State-owned submerged lands.

160. Said application was submitted pursuant to the Rhode Island Coastal Resources Management Council Act, R.I. Gen. Laws § 46-23-1, *et. seq*.

161. Said application was to dredge bottom lands in Mount Hope Bay, Rhode Island.

162. Weaver's Cove ***does*** need a Category B Assent because the Federal Government has done nothing to alter the basic fact that Rhode Island owns the site and Weaver's Cove does not. Weaver's Cove must apply under purely state law, to the CRMC, for a license to use state land separate and apart from any Federal determination requirements.

163. Weaver's Cove, per its filing to the CRMC, acknowledged that it ***does*** need a Category B assent.

164. Thus, on the same day it sought consistency review, Weaver's Cove simultaneously submitted a Category B application to CRMC, acknowledging that it required assent other than that which could be obtained by federal consistency review.

165. Weaver's Cove never withdrew its application to CRMC for a Category B assent.

166. The State must proceed simultaneously on complete consistency and Category B applicants in order to protect its public trust rights.

167. The CRMC, in the context of a Category B application, would entertain a claim by Weaver's Cove, that CRMC should grant a site license to use state property, if Weaver's Cove were to complete its application.

THIRD AFFIRMATIVE DEFENSE – WAIVER AND ESTOPPEL ON THE GROUNDS OF INCOMPLETENESS OF APPLICATION.

168. Regarding the original filing, despite being notified by the CRMC within the 30-day notification period set forth within 15 C.F.R. § 930.60(a)(1) that its certification lacked necessary data and information sufficient to allow CRMC to begin its review, Weaver's Cove has failed to submit the necessary data and information to the RICRMC. Consequently, the CRMC's review has yet to begin and the six (6) month clock has yet to

start. Therefore, there can be no presumption or waiver of CRMC concurrence or objection.

169. The relevant regulations promulgated pursuant to the Federal Coastal Zone Management Act ("CZMA"), 16 U.S.C. § 1451 *et seq.*, are set forth in 15 C.F.R. § 930.58 and § 930.60. Pursuant to § 930.58(a), the applicant shall furnish the State agency with all necessary data and information along with the consistency certification. Among other things, the necessary information and data shall include the following:

> 2. Information specifically identified in the management program as required necessary data and information for an applicant's consistency certification. The management program as originally approved or amended (pursuant to 15 CFR part 923, subpart H) may describe data and information necessary to assess the consistency of Federal license or permit activities. Necessary data and information may include State or local government permits or permit applications which are required for the proposed activity. Required data and information may not include confidential and proprietary material.

15 C.F.R § 930.58 (a)(2)(2005)

170. State agency review of an applicant's consistency certification begins at the time the State agency receives a copy of the consistency certification, and the information and data required pursuant to § 930.58. If an applicant fails to submit necessary data and information required pursuant to § 930.58, the State agency shall, within 30 days of receipt of the incomplete information, notify the applicant and the Federal agency of the missing information and that the State agency's review has not yet begun and that its review will commence once the necessary information deficiencies have been cured, or alternatively, that the State agency's review has begun, but the information deficiencies must be cured by the applicant during the State's review period. 15 C.F.R. § 930.58(a)(2005).

171. In the instant matter, Weaver's Cove filed both an application for State Category B Assent and a Federal consistency determination with the CRMC on or about July 19, 2004. Shortly thereafter, and during the month of July, a CRMC staff member, Danni Goulet, telephoned Weaver's Cove's agent, Epsilon Associates, and advised them that the application was incomplete because it lacked necessary data and information and that the CRMC would not begin its consistency review until these deficiencies were cured.

172. Danni Goulet, P.E., was the CRMC staff member charged with conducting the initial review of the application and to determine if all necessary data and information required by the CRMP had been provided. He notified Weaver's Cove agent Lester B. Smith the application lacked at least (3) three prerequisites to CRMC review as stated earlier in the next paragraph.

173. Specifically, Danni Goulet, P.E., was the CRMC staff member charged with conducting the initial review of the application and to determine if all necessary data and information required by the CRMP had been provided. Mr. Goulet notified Weaver's Cove agent Lester B. Smith that the application lacked at least three prerequisites to CRMC review: (1) The application did not include a viable disposal location for the dredge materials/spoils. (2) Also, the CRMP required the plans submitted to be stamped by a Rhode Island professional engineer, and (3) the CRMP required a Water Quality Certificate ("WQC") from the Rhode Island Department of Environmental Management ("RIDEM") as a prerequisite to CRMC review.

174. Rhode Island's Federally-approved CRMP section 300.9 (C) entitled "Prerequisites" requires applications for dredging or dredged material disposal to include the following:

> 3. All materials to be dredged for either open water disposal or upland disposal must be classified by the Department of Environmental Management (DEM) based upon an approved analysis process prior to the Council acting on an application of either dredging or dredged materials disposal.
>
> * * *
>
> 6. Upland disposal of dredged materials must comply with all applicable local zoning ordinances.
>
> 7. When disposal is proposed for approved upland facilities, the applicant shall provide a letter of acceptance from that facility, unless the disposal is approved for the central landfill.

*See* RICRMP Section 300.9 (C) 3, 6, 7.

175. CRMP Section 300.1 requires that all category B Assent applications are required to:

> (2) demonstrate that all applicable local zoning ordinances, building codes, flood hazard standards, and all safety codes, fire codes, and environmental requirements have or will be met; local approvals are required for activities as specifically prescribed for nontidal portions of a project in Sections 300.2, 300.3, 300.6, 300.8, 300.9, 300.11, 300.13, 300.15 and 300.17; for projects on state land, the state building official, for the purposes of this section, is the building official,

*See* RICRMP Section 300.1 (2).

176. Additionally, the CRMC Management Procedures ("Management Procedures") require that:

> (5) Applicants shall be required to obtain and certify that they have in their possession current approvals from municipal bodies which are otherwise required for the proposed action. Municipal approval shall be construed to mean compliance and conformity with all applicable comprehensive plans and zoning ordinances and/or the necessary variance, exception and other special relief therefrom (see RICRMP Section 300.1).
>
> (6) Applicants shall further be required to obtain and certify that they have in their possession current approvals from all other agencies which are otherwise required for the proposed action.
>
> (7) The above required municipal and state approvals shall be construed as a prerequisite for any application before the Council considers the application.

CRMC Management Procedure § 4.2.

177. Rhode Island's CRMP also requires as a prerequisite in its "State of Rhode Island Dredging Application Checklist":

> All site plans that propose work within 25 feet of <u>ANY</u> structure, involve dredging, excavation or grading, propose new structures or are for structural rehabilitation must be prepared by a Registered Professional Engineer and must contain the stamp affixed to each sheet along with the date and the signature of the professional. All other proposals may be prepared by a Registered Land Surveyor.

178. In order for plans to be considered stamped by a "Registered Professional Engineer", Rhode Island statutes (like those of all other states) require the engineer to be licensed to practice in <u>Rhode Island</u>. The plans submitted by Weaver's Cove did not meet that requirement. Hence, the application was incomplete when it was filed in July 2004.

179. Notwithstanding the CRMC's prerequisite requirements that Weaver's Cove give detailed information, and acquire permits from relevant agencies, whether in <u>Rhode Island</u> or <u>Massachusetts</u>, that it had an approved upland disposal site, Weaver's Cove, in its CRMC filing, submitted the following statement:

> The project developer has a contractual right to purchase a Brownfield's site in Fall River, Massachusetts,

> on which dredge material will be used as engineered fill, and therefore has control over the dredge material placement site. The permitting process for handling the dredge material at the Fall River site is well under way with the relevant Massachusetts permitting agencies. Details regarding existing and proposed conditions on the Fall River site are subject to the jurisdiction of Massachusetts for review and permitting. Accordingly, no authorization for our Massachusetts activities can be sought from the RIDEM/CRMC. [1]

180. In response to Danni Goulet's notice regarding incompleteness, on or about August 12, 2004, Weaver's Cove filed a new application which included plans stamped by a Rhode Island professional engineer.[2] However, the application and consistency certification still lacked information regarding a viable disposal location for the proposed dredge material/spoils as well as the WQC, thereby continuing to be an incomplete application precluding CRMC from beginning its review.

FOURTH AFFIRMATIVE DEFENSE

181. Eleventh Amendment and Sovereign Immunity.

FIFTH AFFIRMATIVE DEFENSE

182. Failure to exhaust administrative remedies.

SIXTH AFFIRMATIVE DEFENSE

183. Abstention.

SEVENTH AFFIRMATIVE DEFENSE

184. Laches.

EIGHTH AFFIRMATIVE DEFENSE

185. Unclean hands.

NINTH AFFIRMATIVE DEFENSE

186. Lack of subject-matter jurisdiction.

---

[1] In fact, the Massachusetts permitting staff shared the skepticism of the CRMC staff that the upland site proposal was not feasible, and that a permit from any approving entity was not possible. Massachusetts permitting staff advised CRMC staff accordingly.

[2] In filings with FERC and the CRMC, Weaver's Cove acknowledged the August 12, 2004 filing was a new application.

TENTH AFFIRMATIVE DEFENSE

187. Discretionary Immunity.

ELEVENTH AFFIRMATIVE DEFENSE

188. Judicial estoppel and quasi-judicial estoppel.

TWELFTH AFFIRMATIVE DEFENSE

189. Failure to state a claim upon which relief can be granted.

Respectfully submitted,

State of Rhode Island,
By its Attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

/s/ Michael Rubin
Michael Rubin, Esq., (Bar #3656)
Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 Ext. 2116
Fax: (401) 222-3016

/s/ Paul J. Roberti
Paul J. Roberti, Esq., (Bar #4447)
Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 Ext. 2231
Fax: (401) 222-3016

/s/ Brian A. Goldman
Brian A. Goldman, Esq., (Bar #3940)
Counsel for CRMC
681 Smith Street
Providence, RI 02908
Tel: (401) 521-4100

**CERTIFICATION**

I, the undersigned, hereby certify that a true copy of this within document was served by electronic means (ECF) on this 1st day of October, 2007 to the following:

Gregory L. Benik, Esq.
Nixon Peabody LLP
One Citizens Plaza
Providence, RI 02903-1345
Gbenik@nixonpeabody.com

/s/ Michael Rubin