IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| WEAVER'S COVE ENERGY, LLC,<br><br>*Plaintiff*,<br><br>vs.<br><br>RHODE ISLAND COASTAL RESOURCES MANAGEMENT COUNCIL, *et al.*,<br><br>*Defendants*. | Case No. 07-246-S |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Weaver's Cove Energy, LLC ("Weaver's Cove"), by and through its attorneys, Bruce Kiely, Baker Botts L.L.P., and Gregory L. Benik, Benik & Associates P.C., move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment[1] and as reasons therefore say:

1. Weaver's Cove proposes to own, construct, and operate a liquefied natural gas ("LNG") terminal to be located in Fall River, Massachusetts.

2. In furtherance of the operation of said terminal, Weaver's Cove proposes to conduct certain maintenance and improvement dredging in Rhode Island waters.

[1] A Statement of Undisputed Facts is submitted herewith.

3. The Coastal Zone Management Act provides that a state's failure to concur with or object to a consistency certification within six months of the filing of that consistency certification constitutes the state's conclusively-presumed concurrence with that consistency certification. 16 U.S.C. § 1456(c)(3)(A).

4. Weaver's Cove submitted its consistency certification to Defendants Rhode Island Coastal Resources Management Council ("CRMC") *et al.* on July 19, 2004.

5. The CRMC failed to concur with or object to that consistency certification within six months of receipt thereof.

6. Therefore, the CRMC's concurrence with the consistency certification is conclusively presumed in accordance with 16 U.S.C. § 1456(c)(3)(A).

7. Section 3 of the Natural Gas Act provides that the Federal Energy Regulatory Commission has "the exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal." 15 U.S.C. § 717b(e)(1).

8. Rhode Island's Category B Assent requirements, as described in R.I. GEN. LAWS § 46-23-1 and R.I. CODE R. §§ 300.1 *et seq.*, purport to regulate the siting and operation of the proposed LNG terminal.

9. Therefore, Section 3 of the Natural Gas Act and the regulations promulgated thereunder preempt Category B Assent with respect to proposed LNG terminal.

10. The Commerce Clause of the Constitution provides that "[t]he Congress shall have . . . Power [t]o regulate Commerce with foreign Nations, and among the several States . . . ." U.S. Const. art. I, § 8, cl. 3. The Commerce Clause has an implied "dormant" aspect that restricts the power of the States to unduly burden international and interstate commerce.

11. Category B Assent requirements, as applied to block the proposed LNG terminal, would have an unduly burdensome effect on interstate and international commerce clearly in excess of the requirements' putative benefits to the local community.

12. Therefore, with respect to the proposed LNG terminal and related pipelines, Category B Assent requirements are unenforceable as violative of the U.S. Constitution's Commerce Clause, U.S. CONST. art I, § 8, cl. 3.

**WHEREFORE,** Weaver's Cove moves for this Court:

(A) to enter summary judgment in its favor;

(B) to enter an order and judgment declaring the CRMC to have concurred, as a matter of conclusive presumption under 16 U.S.C. § 1456(c)(3)(A), with the consistency certification filed by Weaver's Cove on July 19, 2004;

(C) to enter an order and judgment declaring unenforceable the requirements of Category B Assent with respect to Plaintiff's proposed LNG terminal;

(D) to enjoin Defendants, their agents and successors, and all other Rhode Island officers and officials from taking action inconsistent with such orders and judgments;

(E) to award costs and attorney's fees to plaintiffs pursuant to any applicable statute or authority;

(F) to grant any other relief that this Court deems to be just and appropriate; and

(G) to retain ongoing jurisdiction over this case, to ensure compliance with any relief afforded by this Court in this case.

Respectfully submitted,

/s/ Gregory L. Benik

Gregory L. Benik (#1515)
Benik & Associates P.C.
931 Jefferson Blvd., Suite 2008
Warwick, RI 02886
(phone) 401-454-0054
(fax) 401-732-5054
gbenik@jreri.com
*Attorney for Weaver's Cove Energy, LLC*

Dated: November 1, 2007

Of Counsel:

Bruce F. Kiely
G. Mark Cook
Adam J. White
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2400
Phone: (202) 639-7700
Fax: (202) 639-7890

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of November, 2007, the foregoing was filed electronically with the Clerk of Court and served upon the following by operation of the Court's electronic filing system:

Brian A. Goldman, Goldlaw@cox.net
Michael Rubin, mrubin@riag.ri.gov
Paul J. Roberti, proberti@riag.ri.gov

/s/ Gregory L. Benik

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| WEAVER'S COVE ENERGY, LLC, *Plaintiff*, | ) | |
| vs. | ) | Case No. 07-246-S |
| RHODE ISLAND COASTAL RESOURCES MANAGEMENT COUNCIL, *et al.*, *Defendants*. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF WEAVER'S COVE ENERGY, LLC'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ i

INTRODUCTION ........ 1

STATEMENT OF FACTS ........ 2

I. Weaver's Cove — An Overview ........ 2

II. Regulatory Background ........ 4

A. The Natural Gas Act ........ 4

B. The Coastal Zone Management Act ........ 6

C. The Rivers and Harbors Act of 1899 and Section 404 of the Clean Water Act ........ 8

D. The Public Trust Doctrine and "Category B Assent" ........ 9

III. The Present Dispute ........ 10

A. Weaver's Cove's CZMA Consistency Certification ........ 10

B. Weaver's Cove's Category B Assent Application ........ 13

ARGUMENT ........ 13

I. Because It Failed To Object To Weaver's Cove's Consistency Certification Within Six Months, The CRMC's Concurrence With The Certification Must Be Conclusively Presumed As A Matter Of Law. ........ 14

A. Because Weaver's Cove Filed Its Consistency Certification Over Three Years Ago, The CZMA's Six-Month Deadline For CRMC Action Has Expired ........ 14

B. Weaver's Cove Provided All Necessary Data And Information With Its Consistency Certification ........ 15

C. Contrary To The CRMC's Suggestion, Weaver's Cove's Consistency Certification Has Not Changed ........................... 20

II. The CRMC's Application Of Category B Assent To Block Operation Of The LNG Terminal Is Unconstitutional ....................................... 26

A. Imposition Of The Category B Assent Requirement To Block The Weaver's Cove Project Violates The Dormant Commerce Clause ........................................................................... 27

B. Rhode Island's Category B Assent Requirement Is Preempted By Section 3 Of The Natural Gas Act In This Case ................ 32

CONCLUSION ........................................................................................ 41

Plaintiff Weaver's Cove Energy, LLC ("Weaver's Cove"), by and through its attorneys, Bruce Kiely, Baker Botts L.L.P., and Gregory Benik, submits this memorandum in support of its Motion for Summary Judgment.

## INTRODUCTION

Weaver's Cove proposes to construct, own, and operate a facility for the importation and regasification of liquefied natural gas ("LNG") from overseas, for distribution to gas utilities and electric power generators throughout the New England states. The LNG import facility is to be located in Fall River, Massachusetts, on the Federal Navigation Channel in the Taunton River. The facility and related pipelines for transmission of the gas were approved by the Federal Energy Regulatory Commission ("FERC" or "Commission") in 2005, subject to the satisfaction of certain conditions; the approval was upheld on rehearing in 2006.[1] Despite the FERC's approval pursuant to its "exclusive authority" to approve the site and operation of such LNG facilities, Defendants Rhode Island Coastal Resources Management Council ("CRMC") *et al.* threaten to block that facility's operation by two means challenged in this suit:

*First*, Defendants threaten to impose upon Weaver's Cove the burdens of the Rhode Island "Coastal Resources Management Program" ("RICRMP") (*i.e.*, a

[1] The U.S. Court of Appeals for the First Circuit recently affirmed those and related orders. *Fall River v. FERC*, __ F.3d __, 2007 WL 3121568 (1st Cir. Oct. 26, 2007) (declaring various challenges to the orders unripe, and rejecting challenges to the FERC's decision not to reopen the record).

program approved by the National Oceanic and Atmospheric Administration ("NOAA") under the federal Coastal Zone Management Act ("CZMA"), 16 U.S.C. §§ 1451 *et seq.*) as a means to block the facility's construction and operation, despite the fact that the plain terms of the CZMA provide that the CRMC is time-barred from doing so.

*Second*, Defendants continue to threaten to impose upon Weaver's Cove the burdens of "Category B Assent" requirements (*i.e.*, state land use requirements), which are both preempted by federal law and are unconstitutional under the Commerce Clause of the U.S. Constitution.

Weaver's Cove respectfully requests, therefore, that this Court grant summary judgment to Weaver's Cove, declaring Defendants' actions to be contrary to the CZMA, preempted by federal law, and violative of the Commerce Clause, and to enjoin CRMC from taking any action contrary to such a declaration.

## STATEMENT OF FACTS

### I. Weaver's Cove — An Overview

Weaver's Cove seeks to build an LNG receiving terminal on the Taunton River in Fall River, Massachusetts.[2] Statement of Undisputed Facts ("SUF") ¶ 6;

---

[2] LNG is natural gas that is cooled to a liquid state at a temperature of minus 260 degrees Fahrenheit. By cooling natural gas to a liquid, its volume shrinks on a ratio of 600:1, such that it can economically and efficiently be loaded on specially-designed LNG tankers and transported from foreign sources to U.S. markets. The

Joint Appendix ("JA") Tab 25, at 1. The new facility will comprise a single LNG storage tank, a new receiving pier, various processing equipment, and several small buildings. The LNG will be delivered to the terminal in specialized vessels transiting Narragansett Bay and Mount Hope Bay,[3] and finally up the Taunton River. The LNG imported at the Weaver's Cove facility would not be produced in the United States; rather, it would be imported from foreign supply sources such as in Trinidad, Nigeria, Algeria, Norway, Egypt, Qatar, Equatorial Guinea, Abu Dhabi, Australia, Oman, Indonesia, and Malaysia. SUF ¶ 23; Gehrig Decl. ¶ 6. The proposed importation of natural gas is necessary to augment domestic supply in order to assure overall supply sufficient to satisfy domestic demand for natural gas. SUF ¶ 18; Gehrig Decl. ¶ 2. Weaver's Cove's proposed facility would provide approximately 15 percent of the region's peak day gas needs, would help to moderate prices, and would help to provide a reliable gas supply. *Id.*.

Additionally, Mill River Pipeline, LLC, an affiliate of Weaver's Cove, would build two lateral pipelines to transport the revaporized natural gas to a connection point with the existing U.S. natural gas pipeline grid for delivery to customers in a variety of states in New England and perhaps elsewhere. SUF ¶ 21; Gehrig Decl. ¶ 5. The availability of this additional gas would help to assure the

---

LNG is then warmed and returned to a gaseous state in equipment called vaporizers and injected into the U.S. natural gas pipeline grid.

[3] The Rhode Island and Massachusetts border runs through Mount Hope Bay.

certainty of natural gas supply to such regions, and also would help to put downward pressure on natural gas prices to residential and commercial consumers and gas-fired electricity-generating plants (which would itself put downward pressure on the market price of electricity). SUF ¶¶ 19-20; Gehrig Decl. ¶¶ 3-4.

As part of its proposal to construct and operate the terminal, Weaver's Cove proposes to perform a modest amount of maintenance and improvement dredging in an existing Federal Navigation Channel in Rhode Island waters. That dredging proposal is at the center of this case.

## II. Regulatory Background

### A. The Natural Gas Act

Responsibility for overseeing the importation of natural gas into the United States long has been vested in the FERC. *See* Natural Gas Act ("NGA"), 15 U.S.C. § 717 *et seq.* Section 3 of the NGA provides that "no person shall . . . import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so." 15 U.S.C. § 717b(a). The NGA grants FERC "plenary and elastic" authority to approve and regulate LNG terminals. *Distrigas v. FPC*, 495 F.2d 1057, 1064 (D.C. Cir. 1974). *See also Iroquois Gas Transmission System, L.P., et al.*, 59 FERC ¶ 61,094, at 61,349 (1992) ("the [NGA] and the regulations promulgated by the [FERC] generally preempt state and local law")."

Responding in 2005 to clashes between the FERC and certain states over jurisdiction over the siting of LNG terminals, Congress enacted the Energy Policy Act of 2005 ("EPAct 2005"), Pub. L. No. 109-58, 119 Stat. 594 (2005), which formally codified the FERC's exclusive authority over LNG terminals, *id.* § 311, 119 Stat. at 686. Specifically, Congress added to the NGA a Section 3(e)(1), which provides: "The Commission shall have the *exclusive authority* to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal." 15 U.S.C. § 717b(e)(1) (emphasis added). Congress intended that this express allocation of power to FERC would "break[] the bureaucratic logjam that ha[d] stymied work on approximately 40 liquefied natural gas facilities nationwide." 151 Cong. Rec. H6962 (July 28, 2005) (statement of Rep. Murphy).

At the same time, Congress was careful not to exclude the states from the LNG terminal-siting process altogether. To that end, Congress added provisions giving the states a voice—but no ultimate decision-making authority—in FERC's processes. In particular, EPAct 2005 added a new section, titled "State and local safety considerations," 15 U.S.C. § 717b-1, that requires FERC to "consult with . . . State agenc[ies] regarding State and local safety considerations prior to issuing an order" concerning the siting of a proposed LNG facility. Congress also provided a savings clause to preserve the states' existing "rights" under the CZMA, the Clean Water Act, and the Clean Air Act, 15 U.S.C. § 717b(d), and also gave

project applicants streamlined access to review in the federal courts of appeals, *id.* § 717r(d), under a unitary record, *id.* § 717n(d).

**B. The Coastal Zone Management Act**

The CZMA was enacted in 1972 to encourage coastal states to develop comprehensive plans for the use and development of their coastal regions, under an overarching framework of federal oversight. A state participating in the CZMA is entitled to object to certain proposed coastal development activities, subject to the superior authority of the Secretary of Commerce ("Secretary") to override any such objection.

**1.** To participate in the CZMA, a state must develop a Coastal Management Plan ("CMP") that "set[s] forth [the] objectives, policies, and standards to guide public and private uses of lands and waters in the coastal zone" of the State. 16 U.S.C. § 1453(12). The state must submit its CMP to NOAA for approval. 16 U.S.C. §§ 1454, 1455(b).[4] An essential requirement is that the state must list for NOAA review and approval those activities requiring federal permits for which the state proposes to conduct a consistency review.

**2.** Once a state's CMP has been approved, the state obtains the right to review listed activities proposed for federal approval, to determine whether the

[4] The CZMA assigns this approval authority to the Secretary, who has delegated the authority to approve or disapprove CMPs to NOAA. *See* Dep't of Commerce Org. Order 10-5 § 3.01(u) (May 28, 2004).

activities are "consistent" with the State's federally-approved CMP. That process, set forth in the CZMA at 16 U.S.C. § 1456(c)(3)(A), is known as "consistency review." In a consistency review, an applicant seeking federal permits to conduct activities listed in the state's NOAA-approved CMP must initially certify that the proposed activity is consistent with "the enforceable policies of the state's approved [CMP]." 15 C.F.R. § 930.57.

In submitting its certification that its proposed activity is consistent with the state's CMP, the federal regulations implementing the CZMA require that an applicant provide the state agency certain "necessary data and information" set forth in the NOAA-approved CMP. 15 C.F.R. § 930.58(a).

**3.** After an applicant submits its consistency certification, the CZMA provides the state six months to "concur" with the consistency certification (allowing the activity to go forward), or to "object" if it concludes that the activity is inconsistent with the state's CMP. 16 U.S.C. § 1456(c)(3)(A).

If a state objects to a consistency certification within the statutory six-month period, then the CZMA affords the applicant the right to appeal to the Secretary. Even if the objection is grounded in the requirements of the CZMA, the Secretary still can override the objection. 16 U.S.C. § 1456(c)(3)(A); 15 C.F.R. §§ 930.121, 930.122, 930.129. Thus, even when a state identifies what it perceives to be a valid objection to the consistency certification, the state may not effectively "veto"

an activity absent the Secretary's decision not to overturn the objection on appeal (a decision that is itself subject to judicial review).

**4.** The CZMA does not give the state an unlimited period of time to review the consistency certification. Instead, the CZMA sets a deadline of six months from the filing of the consistency application. 16 U.S.C. § 1456(c)(3)(A). The CZMA also sets forth the legal consequences if the state fails to act on the certification within that six-month period: Failure to act in the six-month period means that the state is "*conclusively presumed*" to have concurred with the consistency of the activity. 16 U.S.C. § 1456(c)(3)(A) (emphasis added). With the state's concurrence "conclusively presumed," the federal agency may approve the federal license/permit application. *Id.*

### C. The Rivers and Harbors Act of 1899 and Section 404 of the Clean Water Act

If, as is the case here, an applicant's project requires dredging in Federal waters, it must also comply with Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, which empowers the U.S. Army Corps of Engineers to approve proposals to dredge navigable waters. Section 404 of the Clean Water Act authorizes the U.S. Army Corps of Engineers to issue permits, after notice and opportunity for public hearings, for the discharge of dredged or fill material into waters of the United States at specified disposal sites. *Id.* § 1344.

### D. The Public Trust Doctrine and "Category B Assent"

Under the Public Trust Doctrine, a state holds the lands beneath navigable waters within its boundaries in trust for the benefit of its citizenry. *See Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 479 (1988). The states' power under the Public Trust Doctrine is not unlimited, however: As the Supreme Court long ago recognized, the States' authority under the Public Trust Doctrine is "subject to the federal navigation easement and the Power of Congress to control navigation on those streams under the Commerce Clause." *Id.* (citing *Barney v. Keokuk*, 94 U.S. 324, 338 (1877)).

Rhode Island's Public Trust Doctrine authority is reflected in a process known as "Category B Assent," which requires persons undertaking certain activities (including dredging in Rhode Island waters) to submit information regarding, *inter alia*, project need; compliance with local zoning, building, and fire code requirements; safety; and environmental impacts. R.I. GEN. LAWS § 46-23-1(f); R.I. CODE R. §§ 300.1 *et seq.* Category B Assent encompasses not merely the Public Trust Doctrine, but also a broad-based review of the environmental and safety aspects of the proposed project already considered in the FERC approval process. *See* R.I. CODE R. § 300.1.

## III. The Present Dispute

### A. Weaver's Cove's CZMA Consistency Certification

Weaver's Cove filed its application for FERC approval under Section 3 of the NGA on December 19, 2003. JA Tab 25, at 61,527.[5] Following the FERC's extensive review of the project, based on the cooperation and involvement of a number of state and federal agencies and officials (including those of Rhode Island), the FERC approved the LNG terminal and pipelines, finding that "the proposed new LNG terminal will promote the public interest by increasing the availability of natural gas supplies to the New England market and that the Mill River laterals are required by the public convenience and necessity to connect the proposed LNG facilities to the interstate pipeline system." JA Tab 25, at 61,528.[6] But among the conditions governing the effectuation of its approval, the FERC required that Weaver's Cove obtain a concurrence from the CRMC that the activity was consistent with Rhode Island's CMP, the RICRMP. *Id.* at Appx. B, P 26.

Weaver's Cove submitted its required consistency certification to the CRMC on July 19, 2004. SUF ¶ 9; JA Tab 10. On August 26, 2004, more than 30 days

---

[5] With respect to the FERC's Initial Order in the Weaver's Cove proceedings, the Joint Appendix inadvertently omits (at Tab 25) several pages, including pages cited in this Memorandum. The Initial Order was published and is therefore available to the public; nevertheless, Weaver's Cove will submit an Erratum for the Joint Appendix.

[6] As noted above, *supra* note 1, the First Circuit recently rejected challenges to those orders.

after Weaver's Cove submitted its application, the CRMC sent a written response to Weaver's Cove's consistency certification. SUF ¶ 10; JA Tab 15.[7] The response declared that Weaver's Cove's application was incomplete because it did not contain a Water Quality Certification.[8] *Id.* The CRMC's letter did not, however, mention the site of the disposal of the dredge materials (a subject of the present controversy).

As noted above, the CZMA requires a state decision within six months of the submission of a consistency certification. Failure of the state to act within that period means that the state's concurrence is "conclusively presumed." 16 U.S.C. § 1456(c)(3)(A). Here, well over three years after the filing of the consistency

[7] The CRMC's written response was preceded by an unwritten communication. In late July, Les Smith, an agent for Weaver's Cove, received a telephone call from Dan Goulet, a CRMC staff member, informing him of the CRMC's position that the application was incomplete. First, Goulet claimed that Weaver's Cove had provided insufficient information as to where the dredge materials would be deposited. Second, Mr. Goulet said that the design drawings for the project needed to be stamped by a Rhode Island engineer. On August 2, 2004, Weaver's Cove, sent a letter to the CRMC addressing CRMC's concerns. That letter explained that it was not necessary for Weaver's Cove to provide further information about the disposal of the dredge materials because disposal of the materials would occur outside of Rhode Island. JA Tab 12. On August 12, Weaver's Cove sent a letter to the CRMC enclosing a copy of the same design drawings as initially submitted but stamped by a Rhode Island engineer. JA Tab 14.

[8] A Water Quality Certification is Rhode Island's certification that the proposed activity complies with Rhode Island standards under Section 401 of the Clean Water Act, 33 U.S.C. § 1341.

certification, the CRMC has failed to concur with or object to Weaver's Cove's consistency certification.

In response to the CRMC's failure to concur with or object to the consistency certification, Weaver's Cove submitted to the FERC (JA Tab 27, at 25-30), the Secretary of Commerce (JA Tabs 30 & 48), and NOAA (JA Tab 35) separate requests for a determination that that CRMC's concurrence with its consistency certification must be conclusively presumed, but Weaver's Cove received no such relief. The FERC wholly disclaimed jurisdiction to decide the issue. JA Tab 39, at 61,182-84. The Secretary of Commerce refused to adjudicate the issue because he found that CRMC had not issued literally an "objection." JA Tabs 32 & 51. NOAA never responded to Weaver's Cove's request.

Weaver's Cove now brings its case before this Court. Because the CRMC has no valid legal basis to refuse to act and has failed to act on the consistency certification, Weaver's Cove respectfully asks this Court **(1)** to declare that under the CZMA, the CRMC's failure to act within the statutory six-month period constitutes the CRMC's conclusively-presumed concurrence with the consistency certification, and **(2)** to enjoin the CRMC from attempting to enforce the RICRMP in a manner inconsistent with that declaration.

### B. Weaver's Cove's Category B Assent Application

Simultaneously with the filing of its consistency certification, Weaver's Cove also filed its application for a Category B Assent without conceding that such an application was in fact an enforceable requirement under federal law. SUF ¶ 15; JA Tab 10, at 3. As is the case with Weaver's Cove's consistency certification, however, CRMC has taken no final action on that application for over three years. The CRMC twice wrote to Weaver's Cove to demand that Weaver's Cove acknowledge that the Category B Assent was "required" by law. JA Tabs 20 & 22. Weaver's Cove replied, and explained that Weaver's Cove had submitted the Category B Assent application. JA Tab 24. The CRMC has issued neither a completeness determination nor a final determination on Weaver's Cove's Category B Assent application, and it has given no indication that such action is imminent.

## ARGUMENT

Summary judgment should be granted "where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." *Vives v. Fajardo*, 472 F.3d 19, 21 (1st Cir. 2007). A fact is material only "if it has the potential to affect the outcome of the suit." *Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.*, 473 F.3d 11, 15 (1st Cir. 2007). Pure questions of law are appropriately resolved at the summary judgment stage. *See Blackie v. Maine*, 75

F.3d 716, 722 (1st Cir. 1996). Here, no facts material to the issues before the Court are in dispute; the case turns on pure questions of law.[9]

## I. Because It Failed To Object To Weaver's Cove's Consistency Certification Within Six Months, The CRMC's Concurrence With The Certification Must Be Conclusively Presumed As A Matter Of Law.

As noted above, the CZMA requires the CRMC to either concur with or object to Weaver's Cove's consistency certification within six months of receipt of the consistency certification, lest concurrence be "conclusively presumed." 16 U.S.C. § 1456(c)(3)(A). That six-month period began upon the CRMC's receipt of Weaver's Cove's consistency certification and all necessary data and information. 15 C.F.R. § 930.60(a). The CRMC's statutory review period promptly expired six months after receipt of the consistency certification; its concurrence must be conclusively presumed as a matter of law.

### A. Because Weaver's Cove Filed Its Consistency Certification Over Three Years Ago, The CZMA's Six-Month Deadline For CRMC Action Has Expired

As discussed above, if a state agency fails to object to an applicant's consistency certification within six months of the filing for such a certification, it is "conclusively presumed" as a matter of law to have concurred with the certification. It is factually indisputable that Weaver's Cove's consistency certification has been on file since July 2004—well over six months ago—and it is

[9] Weaver's Cove submits its Statement of Undisputed Facts herewith.

likewise factually indisputable that the CRMC has never issued an objection to it. Therefore, the CRMC must be conclusively presumed to have concurred with the certification.

### B. Weaver's Cove Provided All Necessary Data And Information With Its Consistency Certification

The state's six-month review period under the CZMA commences upon receipt of the consistency certification and "all the necessary data and information required by [15 C.F.R.] § 930.58(a)." 15 C.F.R. § 930.60(a). The CRMC suggests that Weaver's Cove has failed to submit necessary data and information, such that the six-month review period has not commenced. *See* Am. Ans. ¶ 168. The CRMC's position is untenable.

The federal regulations are clear that "necessary data and information" must be "specifically identified in the [state's] management program." 15 C.F.R. § 930.58(a)(2). Although a state may request information additional to that which is identified in the CMP, such information cannot be deemed by the agency to be "necessary data and information," and any request for it "shall not extend the date of commencement of State agency review." 15 C.F.R. § 930.60(b).

In submitting its consistency certification to the CRMC, Weaver's Cove submitted all of the "necessary data and information" required by the CRMC. The CRMC has demanded certain additional information from Weaver's Cove — namely, information pertaining to the disposal of dredge materials outside of

Rhode Island, and a "Water Quality Certification" — and has taken the position that in the absence of such information the commencement of the six-month clock is tolled. But as Weaver's Cove has demonstrated since the very outset of this dispute, *see* JA Tab 21, the information demanded by the CRMC as a prerequisite to its consistency review is excluded from the CRMC's review under the plain terms of the RICRMP: With respect to dredging information, the RICRMP specifically enumerates the circumstances in which that information must be submitted, and this case is not among them. With respect to the Water Quality Certification, the RICRMP in effect during the six-month review period for the Weaver's Cove consistency certification *categorically excluded* such information from the CRMC's review. The absence of that information, therefore, provided no legal basis for the CRMC to self-proclaim that the six-month review period was tolled.

### 1. *Disposal of Dredged Materials*

The CRMC cannot credibly argue that Weaver's Cove's application is incomplete because Weaver's Cove did not provide sufficient information about the location at which it intends to deposit the dredged materials. Such an argument is squarely disproved by reference to the RICRMP.

The RICRMP requires that, "[w]hen disposal is proposed *for approved upland facilities*, the applicant shall provide a letter of acceptance from that facility

. . . ." RICRMP § 300.9C.7 (emphasis added). This requirement refers to upland disposal facilities *in Rhode Island*. *See* R.I. Dep't of Envtl. Mgmt., *Rules and Regulations for Dredging and the Management of Dredged Material* 4.20 (defining "upland areas" as "[a]ll areas *of the state* that are not in the coastal zone" (emphasis added)), *available at* http://www.dem.ri.gov/pubs/regs/regs/water/dred0203.pdf.

There is nothing in the record that even suggests that Weaver's Cove has ever proposed to dispose of dredge materials at an "upland facility" in Rhode Island, and the RICRMP nowhere requires applicants to provide a letter of acceptance from an *out-of-state* disposal site. Because the RICRMP does not require the applicant to provide out-of-state dredge disposal information, such information, therefore, is not "necessary data and information" that is required to make the Weaver's Cove application complete for consistency review purposes.

**2. *Water Quality Certification***

The CRMC also claimed that the application was incomplete because Weaver's Cove had not included with its consistency certification a Water Quality Certification from the State of Rhode Island under the federal Clean Water Act. *See* JA Tab 20. But a Water Quality Certification does not constitute "necessary data and information" within the meaning of the federal CZMA regulations.

Those regulations, as discussed above, state that "necessary data and information" is "[i]nformation specifically identified in the management program." 15 C.F.R. § 930.58(a)(2). Rather than including a Water Quality Certification as "necessary data and information," the RICRMP *expressly excluded* federal consistency reviews from the circumstances that require a Water Quality Certification:

> *Except for federal consistency reviews*, applicants for dredging or open waters disposal of dredged materials shall be required to obtain a Section 401 (Clean Water Act) Water Quality Certification from the Department of Environmental Management (DEM) before the council can consider granting approval for the project. The application for the Section 401 Water Quality Certification will be forwarded to the DEM when all appropriate application forms have been completed.

RICRMP § 300.9C.2 (emphasis added). Because the RICRMP in effect when Weaver's Cove submitted its consistency certification *specifically excluded* such information for the consistency review, the CRMC cannot now credibly claim or legally assert that a Water Quality Certification constitutes "necessary data and information" for that consistency review under the federal CZMA regulations. Accordingly, the absence of such information provides no legal basis to excuse CRMC from failing to act, on the ground of incompleteness, within the statutory six month period prescribed for state action.

The CRMC clearly recognized that Section 401 Water Quality Certifications were not required for federal consistency reviews (such as in this case) because in

July 2005 the CRMC proposed (and later enacted) an *amendment* to Section 300.9C.2 of the RICRMP.[10] That amendment changed the phrase "Except for federal consistency reviews" to "Except for direct federal activities".[11] The amendment (including underlines and strikethroughs) was proposed as follows:

> Except for direct federal activities ~~consistency reviews~~, applicants for dredging or open waters disposal of dredged materials shall be required to obtain a Dredging Permit (which contains the Section 401 (Clean Water Act) Water Quality Certification) from the Department of Environmental Management (DEM) before the Council can consider granting approval for the project. ~~The application for the Section 401 Water Quality Certification will be forwarded to the DEM when all appropriate application forms have been completed.~~

In other words, the CRMC amended the RICRMP to *actually say now* what it claims the RICRMP had said *in 2004*, at the time of Weaver's Cove's application: namely, that Weaver's Cove's consistency review requires a Water Quality Certification.[12] The CRMC cannot take the original version of this provision,

---

[10] That amendment has not, however, received the required NOAA approval under 16 U.S.C. § 1455(e), 15 C.F.R. §§ 923.80 *et seq.* Thus, even setting aside the fact that it was enacted after the expiration of the CRMC's consistency review here, it cannot be enforced in consistency reviews until it receives specific NOAA approval.

[11] The RICRMP defines "direct federal activit[ies]" as "activities, including development projects, performed by a federal agency, or contractor on behalf of the federal agency." RICRMP § 400.B.2. It stands in contrast to "federal license or permit activities" such as Weaver's Cove's proposed activities. *See id.* § 400.B.3.

[12] The public notice of the then-proposed amendment, dated September 15, 2005, is available at the CRMC's web site, http://www.crmc.state.ri.us/calendar/agendas /semi091305.html (last visited Nov. 1, 2007).

quoted on the previous page, and suggest that it should be read as having a meaning identical to that of the quoted amendment. The meaning of the pre-amendment RICRMP, and of its post-amendment version, are clear on their faces.

### C. Contrary To The CRMC's Suggestion, Weaver's Cove's Consistency Certification Has Not Changed

#### 1. *The CRMC Reviews Consistency Certifications, Not "Projects"*

In its Answer to the Amended Complaint ("Am. Ans."), the CRMC repeatedly suggests that its failure to act on the Consistency Certification within the statutory six-month period should be excused because, in its view, "the proposal has significantly changed since the so-called approval." Am. Ans. ¶ 27 *see also*, *e.g.*, *id.* ¶¶ 41, 44, 116-167. The CRMC's statements betray its fundamental misconception of its CZMA review: Under the CZMA, the CRMC does not review "the project" *en toto*; its CZMA authority does not give it jurisdiction to review and veto all aspects of the Weaver's Cove LNG terminal "proposal" — *i.e.*, the sum of all of Weaver's Cove's submittals to myriad federal and state agencies, including the FERC, the U.S. Coast Guard, and the U.S. Army Corps of Engineers. Rather, under the CZMA the CRMC reviews only the listed activity for which consistency certification concurrence is sought from the CRMC.

On the narrow scope of the CRMC's review, the CZMA is clear: The consistency-review provision, 16 U.S.C. § 1456(c)(3)(A), makes no reference to

submitting all-encompassing LNG-facility "proposals" to the states for review. Rather, the CRMC reviews only the consistency "certification" submitted pursuant to the CZMA and pertaining to a discretely identified "activity." *Id.* (In this case, Weaver's Cove certified to the CRMC that its proposed *dredging activity* was consistent with the RICRMP.) Within six months, the state "shall notify the Federal agency concerned that the state concurs with or objects to the applicant's certification." *Id.* (emphasis added). After six months, "the state's concurrence with the certification shall be conclusively presumed." *Id.* (emphasis added). The CZMA nowhere provides for state review of matters (be they "proposals," "projects," or otherwise) that are not listed as federal permit activities subject to consistency review, or activities subject to the jurisdiction of other federal agencies under other federal statutes not encompassed by the consistency certification filed with the state agency. Thus, unlisted matters are outside of the consistency certification, and therefore outside of the CRMC's consistency review authority.

### 2. *Weaver's Cove And CRMC Are In Full Agreement: The Consistency Certification Has Not Changed*

To the extent, then, that a "change" could affect the CRMC's review of Weaver's Cove's three-year-old consistency certification, the only "changes" relevant to the CRMC's consistency review process would be changes to federal activities listed by Rhode Island in the RICRMP for consistency review. And in this case, Weaver's Cove has never, let alone within the six-month period for

action, submitted to the CRMC a modification of the consistency certification submitted to CRMC on July 14, 2004, or to the proposed dredging activity that is subject to consistency review under the RICRMP.

**a.** The CRMC's Amended Answer does not reference Weaver's Cove's submission of a change to the consistency certification — nor could it, as no such change was ever submitted. In fact, the CRMC expressly states that the consistency certification has *not* changed. The CRMC admits in the preface to its Answer to the Amended Complaint that "Weaver's Cove insists on maintaining its . . . initial submission against the advice of both federal and state authorities." Am. Ans. at 1 (emphasis added). Weaver's Cove disagrees that the consistency certification is somehow "obsolete," or that federal authorities have "advi[sed]" Weaver's Cove to change the consistency certification; but in any event, those disputes are immaterial to the issue before this Court. By contrast, on the *material* issue all parties stand in wholehearted agreement: Weaver's Cove's consistency certification has not changed since it was initially submitted to the CRMC for review.

Because the CRMC cannot dispute that plain fact, it instead attempts to obfuscate the issue, by complaining of "changes" that Weaver's Cove allegedly made to *proposals* before *other* agencies under *other* statutes. For example, the CRMC complains of alleged changes to Weaver's Cove's proposal to the U.S.

Coast Guard regarding LNG tanker traffic. *See* Am. Ans. ¶¶ 117-37. But that argument, again, misses the point. Such tanker traffic is not a listed activity subject to consistency review, and thus it is not the subject of the consistency certification before the CRMC.[13]

**b.** Similarly, the CRMC complains of a change to the proposed site for the disposal of dredge material as constituting a change to the subject matter of the consistency certification, *id.* ¶¶ 138-57, but the site of disposal of such material is outside of Rhode Island and therefore irrelevant to the CRMC's review; Weaver's Cove has *never* proposed to dispose of dredge materials in upland Rhode Island facilities, and no other disposal proposal is subject to consistency review under the RICRMP. Thus, alleged "changes" to Weaver's Cove's proposal to dispose of dredge material in one out-of-state location rather than another (and again, the CRMC's characterization of Weaver's Cove's submittal of an alternative proposal as a "change" to the original proposal is a mischaracterization), is *irrelevant* to the CRMC's review of the consistency certification. Again, on the material issue, all parties agree: the consistency certification of the same dredging activity has not changed since its initial submission.

---

[13] Even if the matter were relevant, the RICRMP nowhere lists tanker traffic among the activities for which Weaver's Cove would be subjected to consistency review. The CRMC surely does not suggest that all tanker vessels transiting Rhode Island waters are subjected to full consistency review under the CZMA.

**c.** Simply put, the reason why Weaver's Cove's consistency certification has not changed is because *the activity underlying the consistency certification has not changed.* The consistency certification pertained to an amount of dredging to be performed in Rhode Island waters. To the extent that Weaver's Cove ever has changed or supplemented its proposals before the FERC or the U.S. Coast Guard, it *never* has changed its proposal to dredge in Rhode Island waters. The CRMC's attempts to cite other "changes" as justifying its failure to object or concur to the consistency certification are *non sequiturs*: The CRMC's purported "changes" were not changes to the proposed dredging, let alone to activities listed by Rhode Island as the subject of consistency review, or to the consistency certification now before the CRMC. As such, those changes cited by the CRMC do not pertain to the CRMC's consistency review in this case.

### 3. *CRMC's Allegations As To Changes To The "Project" Are Irrelevant To The CRMC's Duty To Review The July 19, 2004 Consistency Certification Within Six Months*

If the CRMC truly believed that the consistency certification filed by Weaver's Cove was somehow "mooted" by what the CRMC alleges to be changes to the "project" such that the consistency certification was affected, then it could have utilized the CZMA-prescribed means by which to render such a verdict: The

CRMC could have objected to the consistency certification, and sent the matter to the Secretary for review on appeal. 16 U.S.C. § 1456(c)(3)(A).[14]

The CZMA expressly provides that remedy for the CRMC's perceived problems, but the CRMC did not choose it. Instead, to justify its inaction, the CRMC concocted an alternative option, one found nowhere in the CZMA: namely, to claim an implicit exception to 16 U.S.C. § 1456(c)(3)(A)'s express six-month deadline, allowing the state to avoid the effect of six months' inaction in cases where the "project" (but not the activity described in the consistency certification) has "changed." The CZMA provides no such exception, and Weaver's Cove respectfully requests that this Court reject the CRMC's attempt to rewrite the statute.

* * *

In sum, there can be no question that the CRMC received a complete consistency certification on July 19, 2004, and since its receipt the CRMC has not objected to that consistency certification. Thus, under the CZMA and the

[14] Indeed, the Commonwealth of Massachusetts took precisely that course of action with respect to Weaver's Cove's Massachusetts consistency certification relative to its proposed activities in the state. Massachusetts concluded, at the end of six months of review, that Weaver's Cove's consistency certification lacked information sufficient for a concurrence. In accordance with the statutory requirement that the state act within six months, Massachusetts objected to the consistency certification. Weaver's Cove then appealed the objection to the Secretary of Commerce. (That appeal is pending before the Secretary.)

regulations promulgated thereunder, the CRMC's concurrence with Weaver's Cove's consistency certification must be conclusively presumed as a matter of law. 16 U.S.C. § 1456(c)(3)(A).

## II. The CRMC's Application Of Category B Assent To Block Operation Of The LNG Terminal Is Unconstitutional

As described above, on July 14, 2004, Weaver's Cove submitted to CRMC its application for Category B Assent. *See* SUF ¶ 15; JA Tab 10, at 3. The Category B Assent process purports to regulate private activity on state land, pursuant to the state's police power and Public Trust Doctrine power. But, as the U.S. Supreme Court has stated, a state's police power and Public Trust authority is not unlimited; rather, like all state power, it is specifically constrained by the U.S. Constitution's Commerce Clause, which prohibits states from enacting laws that inappropriately burden the flow of interstate and international commerce. Given the burden that Category B Assent restrictions would place on interstate and international commerce in this case, its application to block the operation of the Weaver's Cove LNG terminal is unconstitutional.

Furthermore, Category B Assent is preempted by Section 3 of the NGA, which reserves to the FERC alone the "exclusive authority" to approve an application to site, construct, or operate an LNG terminal.

### A. Imposition Of The Category B Assent Requirement To Block The Weaver's Cove Project Violates The Dormant Commerce Clause

#### 1. *The Commerce Clause Prohibits State Action That Improperly Burdens Interstate and International Commerce*

The Commerce Clause of the U.S. Constitution allocates to the Congress the power to regulate interstate commerce. U.S. Const. art. I § 8. That clause does not merely empower the federal government — it *disempowers* the states as well:

> [T]he Commerce Clause's grant of affirmative authority contains a further, negative command, known as the [D]ormant Commerce Clause, that create[s] an area of trade free from interference by the States. This negative command prevents a State from jeopardizing the welfare of the Nation as a whole by plac[ing] burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear.

*Am. Trucking Ass'n v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 433 (2005) (quotation marks, citations omitted). This restriction — the "Dormant Commerce Clause" — prohibits state actions that would, *inter alia*, "impose burdens on interstate trade that are "clearly excessive in relation to the putative local benefits." *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

Thus, to determine whether the Dormant Commerce Clause bars state action, "a balancing test is applied." *Pharm. Research and Mfrs. of Am. v. Concannon*, 249 F.3d 66, 80 (1st Cir. 2001) ("*PRM*"): "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden

imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142, *quoted in PRM*, 249 F.3d at 80.

Importantly, this case involves not merely interstate commerce (because the Weaver's Cove project would involve navigation in both Rhode Island and Massachusetts, and the distribution of natural gas throughout many states), but also *international* commerce (*i.e.*, the receipt and transportation of LNG imported from foreign nations). The distinction is important, because state interference with international commerce is even *more* problematic than interference with merely interstate commerce, because it undermines the "special need for federal uniformity" in the United States' dealings with foreign countries. *Wardair Canada, Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1, 8 (1986). Thus, Rhode Island's actions — which would burden both interstate and international commerce — are subject to heightened scrutiny.

### 2. *The Public Trust Doctrine, Like Any Other State Power, Is Limited By The Commerce Clause*

From the federal Republic's beginning, the states' authority under the Public Trust Doctrine has been constrained by the U.S. Constitution's limits on state power. As the Supreme Court stated, the Public Trust Doctrine is "subject to the federal navigation easement and the Power of Congress to control navigation . . . under the Commerce Clause." *Phillips*, *supra*, 484 U.S. at 479 (citing *Barney*, *supra*, 94 U.S. 324 at 338). Or, as the Supreme Court stated well over one hundred

years ago, the Public Trust Doctrine is "subject always to the paramount right of [C]ongress to control navigation [of navigable waters] so far as may be necessary for the regulation of commerce with the foreign nations and among the states." *Illinois Cent. R. Co. v. Illinois*, 146 U.S. 387, 435 (1892).[15] Rhode Island's exercise of its Public Trust Doctrine power through Category B Assent, then, cannot exceed the Commerce Clause's limits on state power.

**3. *The CRMC's Threat To Impose The Burdens Of Category B Assent Requirements On Weaver's Cove Violates The Commerce Clause's Restrictions On Rhode Island Power***

The CRMC's imposition of Category B Assent requirements as a vehicle to block the operation of the Weaver's Cove terminal would impose a burden on interstate and international commerce that outweighs the putative local benefits. As the attached affidavit and referenced analysis make clear, Weaver's Cove would introduce into New England natural gas sufficient to satisfy approximately 15% of the region's peak day natural gas requirements. SUF ¶ 18; Gehrig Decl. ¶ 2. As studies by ISO-New England (the operator of the region's power grid) and the North American Electricity Reliability Council (the nation's FERC-certified

---

[15] *See also Weber v. Bd. of Harbor Comm'rs*, 85 U.S. 57, 66 (1873) (Public Trust Doctrine is subject to "the paramount right of navigation over the waters, so far as such navigation might be required by the necessities of commerce with foreign nations or among the several States, the regulation of which was vested in the General government"); *Pollard v. Hagan*, 44 U.S. 212, 223 (1845) (powers expressly granted to the Congress by the Constitution supercede state's control of state land).

Electric Reliability Organization) show, introduction of such added natural gas supplies would have a substantial effect in reducing the cost of electricity. SUF ¶ 19; Gehrig Decl. ¶ 3. Such added natural gas supply would reach customers not merely in Rhode Island, but also in Massachusetts, Connecticut, New York, and New Jersey. SUF ¶ 20; Gehrig Decl. ¶ 4.

By contrast to the burdens that a Category B Assent veto would impose on interstate and international commerce, the putative benefits to the Rhode Island territory surrounding the affected waters are minimal and clearly outweighed by the cost. As the FERC found in its orders approving the terminal and pipelines, the LNG terminal's operation would impose no substantial burden on the surrounding community relative to the benefit to the public at large. *See* JA Tab 25, at 61,528. That burden being small, the benefit to the immediate community from the elimination of the project is correspondingly unsubstantial.

As noted above, the proposed LNG terminal and related pipelines have been approved by FERC, subject to certain conditions. Those conditions are based first and foremost on the FERC-approved Final Environmental Impact Statement ("FEIS"), which was authored by FERC staff with the formal cooperation of a number of federal and agencies, including the U.S. Army Corps of Engineers.[16]

[16] *See* Weaver's Cove LNG Project, Final Environmental Impact Statement, FERC Docket Nos. CP04-36 *et al.* (2005), *available at* http://www.ferc.gov/industries/lng/enviro/eis/2005/05-20-05-eis.asp. FEIS excerpts are found at JA Tab 23.

The FEIS comprehensively analyzed the environmental impact of the dredging activities proposed in the consistency certification. *See* FEIS § 4.6.2, pp. 4-97 through 4-107. Based on the FEIS recommendations, the FERC imposed mitigation measures on Weaver's Cove that, when followed, "would sufficiently protect the aquatic resources . . . in the Taunton River and Mount Hope Bay." *Id.* at p. 4-106. *See also* JA Tab 25 (FERC Initial Order) at 61,540 (adopting FEIS), 61,550 (dredging conditions).

As the facts contained in the FEIS and in the record make clear, the burden imposed on Rhode Island by the proposed dredging's consequences are limited, and any such limited burden is substantially outweighed by the terminal's public benefit.[17] Indeed, the FEIS specifically responded to Rhode Island Attorney General Lynch's stated concerns regarding the environmental impact on the proposed dredging activities in Rhode Island waters. *See* FEIS at p. K-82 ("Table K"). Thus, the FERC already has found that the Weaver's Cove project as approved would have minimal and temporary adverse environmental effects, which would not outweigh the FERC determination that the project would promote the national public interest. JA Tab 25 at 61,528 (Initial Order); JA Tab 39 at 61,174 (Order on Rehearing).

---

[17] This Court can take judicial notice of the facts contained in the FEIS, a government report. FED. R. EVID. 803(8).

Taken together, then, the substantial burden imposed on interstate and international commerce by Rhode Island's threatened use of the Category B Assent process to block the operation of the LNG project, by a ban on a modest amount of dredging to be undertaken for a limited period of time in the existing Federal Navigational Channel, clearly outweighs the ban's putative benefits to Rhode Island communities. As such, CRMC's Category B Assent requirements, as applied to Weaver's Cove, violate the Commerce Clause, and must be enjoined as unconstitutional.

### B. Rhode Island's Category B Assent Requirement Is Preempted By Section 3 Of The Natural Gas Act In This Case

Rhode Island's asserted Category B Assent requirements do not merely violate the Dormant Commerce Clause — they also contravene Section 3(e)(1) of the NGA, 15 U.S.C. § 717b(e)(1), and therefore violate the Supremacy Clause, U.S. CONST. art. VI, cl. 2. In short, they are "preempted." The FERC already has decided the extent to which the NGA preempts local regulation of Weaver's Cove; because the CRMC did not seek rehearing or judicial review of that decision, it is barred from collaterally attacking that position in this case.

#### 1. *Preemption — An Overview*

Where a state law "conflict[s] with a valid federal law . . . the Framers of our Constitution provided that the federal law must prevail." *Free v. Bland*, 369 U.S. 663, 666 (1962). This, the doctrine of "preemption," is grounded in Article VI of

the U.S. Constitution, commonly known as "the Supremacy Clause."[18] As the Supreme Court succinctly summarized this doctrine in the case of *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299 (1988), federal law may preempt state law in one or more of three ways: by an express statutory provision to that effect; by implication, in light of the extent to which federal law occupies the field of regulation; or by way of a direct conflict between federal and state law. *Id.* at 299-300.

### 2. *The FERC Already Has Decided That The NGA Prohibits CRMC From Enforcing Regulations That Would Prohibit Or Unreasonably Delay Operation Of The Weaver's Cove LNG Terminal*

**a.** In this case, the NGA's preemption of state and local regulation of the proposed Weaver's Cove LNG terminal is established law, which CRMC cannot challenge before this Court, because the FERC already decided the question. In its *Initial Order* in the Weaver's Cove proceedings, the FERC squarely stated its authoritative position on federal preemption of state and local regulations affecting Weaver's Cove:

---

[18] The Supremacy Clause reads in relevant part:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof. . . shall be the supreme Law of the land; and the Judges of every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. CONST. art. VI, cl. 2.

> Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions in this order. We encourage cooperation between Weaver's Cove, Mill River, and local authorities. However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.

*Weaver's Cove Energy, LLC, et al.*, 112 FERC ¶ 61,070, at 61,546 (2005) (citing, *inter alia, Schneidewind*) (JA Tab 25).[19]

**b.** Although CRMC was a party to the FERC proceedings, it did not seek rehearing as to the FERC's order. The State of Rhode Island and others did contest the FERC's conclusion of law, disagreeing with what it characterized as the FERC's "sweeping assertions" regarding preemption, and arguing that Section 3 of the NGA could not be read to preempt "generally-applicable state laws and regulations that are directed at the protection of the environment, natural resources, and the public health, safety and welfare." Fall River *et al.*, Request for Rehearing and for Oral Argument, FERC Docket Nos. CP04-36 *et al.*, at 109 & 112 (Aug. 12, 2005). In their request for rehearing, Rhode Island and the other parties specifically identified state laws regarding dredging as a subject beyond the FERC's preemptive authority. *Id.* at 114.

---

[19] Because Congress delegated to the FERC the authority to administer the NGA, the FERC's interpretation of the statute is owed *Chevron* deference. *See, e.g.*, *Williams Gas Processing – Gulf Coast Co., L.P. v. FERC*, 331 F.3d 1011, 1016 (D.C. Cir. 2003).

The FERC rejected Rhode Island's analysis, however, and reiterated its interpretation of the preemptive effect of its decision under the NGA. While the FERC encouraged the parties to observe "a rule of reason" with respect to Weaver's Cove's "bona fide attempts to comply with state and local requirements," it reiterated its conclusion that Section 3 of the NGA preempts "state and local laws [that] prohibit or unreasonably delay the construction of facilities approved by the Commission." *Weaver's Cove Energy, LLC*, 114 FERC at 61,186.

Neither the CRMC nor Rhode Island petitioned the court to review the FERC's ruling on this preemption issue. Rhode Island co-filed a petition for judicial review raising a number of issues, but preemption was not among them.

### 3. *The CRMC Cannot Collaterally Attack The FERC's Decision In This Case*

The CRMC neither petitioned for rehearing nor petitioned for judicial review of the FERC's decision regarding the preemptive scope of the NGA *vis-à-vis* Rhode Island regulation of operation of the Weaver's Cove terminal. Thus, the CRMC is *barred* by the NGA from advancing in this Court a position contrary to the unchallenged FERC orders on the subject of preemption.

It is well-established that the NGA requires that parties wishing to challenge the decision of the FERC in a matter such as the Weaver's Cove proceedings must satisfy specific jurisdictional requirements: they must request rehearing of the

FERC's initial decision, 15 U.S.C. § 717r(a), and then they must petition for judicial review of the FERC's decision of the issue, *id.* § 717r(b). Any attempts to overturn the FERC's decision by a means outside of that statutory process is an unlawful collateral attack on the FERC's order, which the NGA squarely prohibits. *Georgia Indus. Group v. FERC*, 137 F.3d 1358, 1363-64 (D.C. Cir. 1998) (citing 15 U.S.C. § 717r(b)). The CRMC had an opportunity to challenge the FERC orders on this point — indeed, it participated in those proceedings in order to affect the FERC's decision regarding the CZMA[20] — and it chose not to challenge those orders there and then. Accordingly, the CRMC is barred from collaterally attacking them here and now, in this Court.

#### 4. *The FERC's Decision Was Consistent With Its Long-Standing Position On Preemption*

The FERC's decision with respect to preemption of laws affecting Weaver's Cove was not the first of its kind; rather, it merely represented the latest example of the FERC's longstanding legal position. Even prior to the 2005 enactment of the NGA amendment committing to the FERC's "exclusive authority" the regulation of siting, operation, construction, and expansion of LNG terminals, the FERC asserted its preemptive authority over natural gas facilities and pipelines.

[20] *See* CRMC Memorandum of Law, FERC Docket Nos. CP04-36 *et al.* (Sept. 29, 2005) (JA Tab 28).

That FERC policy on this point was most succinctly restated in the 2004 *Sound Energy Solutions* proceedings. In that case, the California Public Utilities Commission ("CPUC") attempted to assert jurisdiction over a California coastal LNG import terminal. Rejecting the CPUC's claim of jurisdiction, the Commission defined the scope and effect of its jurisdiction in the broadest terms, prohibiting *any* regulation of the terminal by the state.

> Because FERC has authority to consider environmental issues, *states may not engage in concurrent site-specific environmental review.* Allowing all the sites and all the specifics to be regulated by agencies with only local constituencies would delay or prevent construction that has won approval after federal consideration of environmental factors and interstate need, with the increased costs or lack of gas to be borne by utility consumers in other states.

*Sound Energy Solutions*, 106 FERC ¶ 61,279, at 62,018 (2004) (*"SES I"*) (emphasis added) (quoting *Nat'l Fuel Gas Supply Corp. v. Pub. Serv. Comm'n of N.Y.*, 894 F.2d 269, 274 (2d Cir. 1990)). Describing its jurisdiction over the LNG facility as "exclusive," the Commission concluded that "the LNG facilities proposed by [Sound Energy Solutions] *cannot be regulated by the State.*" *Id.* (emphasis added). The FERC reiterated its position in its opinion on rehearing. *Sound Energy Solutions*, 107 FERC ¶ 61,263, at 62,168-69 (2004).

The Commission's view of the preemptive scope of the NGA, as embodied in those orders, has been affirmed not merely by the Second Circuit in *National Fuel Gas Supply*, but also by the Eighth Circuit. *Northern Natural Gas Co. v.*

*Iowa Utilities Bd.* 377 F.3d 817, 823 (8th Cir. 2004) (emphasis in original) (quoting *Maritimes & Northeast Pipeline, L.L.C. et al.*, 81 FERC ¶ 61,166, at 61,730 (1997)).

Similarly, this Court held that where "federal and state law conflict as to whether [a pipeline project subject to FERC jurisdiction under Section 7 of the NGA] should be allowed to proceed," the NGA preempts state laws having a direct effect on the pipeline project. *Algonquin LNG v. Loqa*, 79 F. Supp. 2d 49, 52-53 (D.R.I. 2000). *See also Islander East Pipeline Co., L.L.C. v. Blumenthal*, 478 F. Supp. 2d 289, 295 (D. Conn. Mar. 22, 2007).

Most recently, in a case applying Section 3's express "exclusive authority" provision, 15 U.S.C. § 717b(e)(1), the U.S. District Court for the District of Maryland, even prior to any FERC approval of an LNG terminal proposed to be constructed in Baltimore County, Maryland, held that Section 3 of the NGA preempted local zoning laws prohibiting the project. According to that Court, "the words 'exclusive authority' unambiguously leave state and local governments *no* residual power to take actions that would effectively approve or deny proposals for the siting of LNG terminals." *AES Sparrows Point LNG, LLC v. Smith*, 470 F. Supp. 2d 586, 598 (D. Md. 2007) (emphasis in original), *appeal dismissed*, No. 07-1114 (4th Cir. Aug. 8, 2007).

5. ***Rhode Island's Category B Assent Requirements Are Among The Laws Preempted By Section 3 Of The NGA***

In light of the foregoing orders and case law, then, the question before this Court is *not* whether federal law preempts the "application of state and local laws [that] prohibit or unreasonably delay the construction or operation of" the proposed Weaver's Cove terminal. That has already been decided by the FERC, in orders unchallenged by the CRMC. JA Tab 25, at 61,546. Instead, the *only* question before this Court is whether Category B Assent falls within that set of laws. It certainly does.

**a.** The FERC has made clear its position that the proposed dredging is inherently tied to the operation of the LNG terminal. As noted above, *supra* pp. 30-32, the FERC undertook an extensive evaluation of Weaver's Cove's proposed dredging activities, precisely because such dredging activities would be part and parcel with the operation of the LNG terminal. As the FEIS stated at the outset of its discussion, "Weaver's Cove Energy proposes to dredge select areas within the federal navigation channel and turning basin *to accommodate passage of LNG ships to the facility.*" FEIS at p. 2-25 (emphasis added). The FEIS concluded that it "did not consider it feasible to reduce the volume or extent of dredging and still satisfy the objectives of the project at the proposed site." *Id.* at p. 3-70. In other words, the FERC Staff (in a document wholly incorporated by reference in the

FERC's order approving the project, *see* JA Tab 25, at 61,540), concluded that the proposed dredging was inherently connected to the terminal's operation.

**b.** And it was not the FERC alone that took the position that dredging and terminal operations are directly connected — the State of Rhode Island did, too. Throughout its participation in the FERC's proceedings, Rhode Island treated the regulation of dredging as a matter within the scope of FERC jurisdiction. In Rhode Island Attorney General Lynch's written comments on the FERC Staff's Draft Environmental Impact Statement, Rhode Island treated the dredging as a subject properly within FERC's jurisdiction, never disputing FERC's authority over the subject. (Indeed, while vehemently disputing the *merits* of the dredging proposal, Rhode Island conceded that the FERC did in fact have jurisdiction to "sanction" the dredging proposal.) Comments of Rhode Island Attorney General Lynch, FERC Docket Nos. CP04-36 *et al.*, at 10 (Sept. 20, 2004).

Even more directly to the point, Rhode Island went so far as to wholly incorporate by reference (*see id.*) another party's express statement that dredging operations were part of "the *construction and operation* of the [Weaver's Cove] facility." *See* Comments of Save the Bay, Narragansett Bay, Inc., FERC Docket Nos. CP04-36 *et al.*, at 1 (Sept. 20, 2004) (emphasis added).

In short, Rhode Island persistently has treated dredging operations as pertaining to the operation of the Weaver's Cove terminal. Given that the

operation of the terminal is a matter squarely committed to the FERC's "exclusive authority," 15 U.S.C. § 717b(e)(1), and that withholding Category B Assent approval would unreasonably delay or prevent operation of the Weaver's Cove terminal (*see* JA Tab 25, at 61,546), Rhode Island's regulations are preempted.

**c.** In short, both the FERC and the State of Rhode Island were in full agreement that the prohibition of dredging would directly affect (and perhaps prohibit) the operation of the proposed LNG terminal. Weaver's Cove agrees: The CRMC's attempt to block the project through a withholding of Category B Assent would do precisely what the FERC's orders and well-established law forbid: it would prohibit or unreasonably delay the FERC-approved project. Rhode Island and the CRMC have yet to agree that operation of the LNG terminal in Massachusetts can proceed without the Category B Assent permissions. So long as the CRMC maintains that the terminal cannot proceed without such permission, it cannot simultaneously maintain that such state regulations, which purport to empower CRMC to bar the dredging altogether, do not threaten to unreasonably delay or prohibit the operation of the terminal so as to save those regulations from preemption pursuant to the FERC orders and the NGA.

## CONCLUSION

For the reasons set forth in this memorandum, therefore, Weaver's Cove respectfully prays this Court (1) to declare the CRMC's concurrence with

Weaver's Cove's consistency certification to be conclusively presumed as a matter of law, (2) to declare CRMC's threatened imposition of a "veto" of the proposed dredging pursuant to the Public Trust Doctrine, through application of Category B Assent requirements on Weaver's Cove, to be violative of the Dormant Commerce Clause of the U.S. Constitution and/or preempted by Section 3 of the NGA and therefore unconstitutional, and (3) to enjoin Defendants from taking any actions inconsistent with such declarations.

Respectfully submitted,

/s/ Gregory L. Benik
Gregory L. Benik (#1515)
Benik & Associates P.C.
931 Jefferson Blvd., Suite 2008
Warwick, RI 02886
(phone) 401-454-0054
(fax) 401-732-5054
gbenik@jreri.com
*Attorney for Weaver's Cove Energy, LLC*

Dated: November 1, 2007

Of Counsel:
Bruce F. Kiely
G. Mark Cook
Adam J. White
Jessica A. Fore
Stephanie R. Dourado
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2400
Phone: (202) 639-7700
Fax: (202) 639-7890

**CERTIFICATE OF SERVICE**

I hereby certify that on the 1st day of November, 2007, the foregoing was filed electronically with the Clerk of Court and served upon the following by operation of the Court's electronic filing system:

Brian A. Goldman, Goldlaw@cox.net
Michael Rubin, mrubin@riag.ri.gov
Paul J. Roberti, proberti@riag.ri.gov

/s/ Gregory L. Benik