**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **WEAVER'S COVE ENERGY, LLC** | : | |
| | : | |
| **v.** | : | **CA. No. 07-246S** |
| | : | |
| **RHODE ISLAND C.R.M.C., *ET AL.*** | : | |

STATE'S MEMORANDUM ON MOTIONS FOR SUMMARY JUDGMENT

## I. THE CASE IS MOOT—THE INITIAL PROPOSAL HAS BEEN ABANDONED

The following illustrates the drastic changes the proposal has undergone:

| | **Old Proposal** | **New Proposal** |
|---|---|---|
| | | |
| | *Quantitative Dredging Specifications* | |
| Destination of spoils | Upland brownfields site in Fall River | RI Sound Disposal Site (8 miles off Block Island) |
| Volume of spoils transported through RI | 0.23 million cubic yards | > 2.5 million cubic yards |
| Number of spoil-laden scow transits through RI based on 3.000 cy/scow | 77 transits | 833 transits |
| Distance of transport of spoils through RI | 2.4 miles | 23.0 miles |
| Aggregate distance of spoil-laden barge transits thru RI | 184 miles | 19,159 miles |
| | | |
| | *Qualitative Dredging Specifications* | |
| Volume of relatively contaminated spoils possibly to be transported through, and disposed of near, RI | 0 | 60,000 cubic yards |

| | **Old Proposal** (cont'd) | **New Proposal** (cont'd) |
|---|---|---|
| | | |
| | *Shipping specifications* | |
| LNG tanker transits per year | 120 transits | ≥ 240 transits |
| Hours per year of rolling closure of waterways based on a 5.2 hr. (2.7 hr. incoming, and 2.5 hr. outgoing) transit thru RI | 624 hours | ≥ 1,248 hours |
| Number of RI bridge closings per year based on two affected bridges | 240 closings | ≥ 480 closings |

The above chart, which is fully documented in the next two sub-sections of this Memorandum, exemplifies the gross disparities between Weaver's Cove Energy, LLC's (hereinafter, "Weaver's Cove") so-called application of 2004 and Weaver's Cove's current notion of a project. The proposal project has changed in terms of impacts on the State's coastal zone (*i.e.*, now proposing a new in-water dredge spoil location immediately off the Rhode Island coast *versus* the Massachusetts upland site originally proposed; now proposing numerous transits through the length of Rhode Island to deposit the dredge spoils *versus* shipments a few short miles directly out-of-state as originally proposed; now proposing a minimum of 120 roundtrip tanker visits per year *versus* the 60 originally proposed).

But, instead of re-filing with the Rhode Island Coastal Resources Management Council ("CRMC") after it made substantial changes to its proposal, Weaver's Cove insists on maintaining its obsolete initial submission against the advice of both federal and state authorities. That submission, as well as this suit itself, is now mooted. In other words, Weaver's Cove, not the CRMC, created the alleged "regulatory 'no man's land'," *see* Compl. at ¶ 6, Docket # 1, by failing to simply make a new filing based upon the substantial changes in the project.

## A. THE DREDGING DISPOSAL PLAN HAS CHANGED.

### 1. The Change in Disposal.

The central set of documents of this whole case – the original purported application to the CRMC (July, 2004) – laid a defective cornerstone for all of Weaver Cove's subsequent efforts. With respect to the originally-proposed destination of the dredged material, also known as "spoils," that submission related:

> The project developer has a contractual right to purchase a Brownfields site in Fall River, Massachusetts, on which dredge material will be used as engineered fill, and therefore has control over the dredge material placement site. The permitting process for handling the dredge material at the Fall River site is well under way with the relevant Massachusetts permitting agencies. Details regarding existing and proposed conditions on the Fall River site are subject to the jurisdiction of Massachusetts for review and permitting. Accordingly, no authorization for our Massachusetts activities can be sought from the RIDEM/CRMC.

J.A. Tab 11, p. 3 (Form entitled "State of Rhode Island Dredging Application Checklist," submitted on July 16, 2004, from Weaver's Cove to CRMC). Moreover, the filing further stated:

> Dredged material will be used to as engineered fill to create landforms on the LNG Terminal site in Fall River, Massachusetts.

J.A. Tab 10, p. 2 (Cover letter dated July 16, 2004, from Epsilon Associates, on behalf of Weaver's Cove, to CRMC). In other words, the filing with CRMC proposed that all spoils were to be disposed on the site located in Massachusetts with all Rhode Island spoils being transported to that location.

By contrast, with respect to the currently proposed (but never applied-for) destination of the spoils, Weaver's Cove's own later submission to the U.S. Army Corps of Engineers (Army Corps), of March 17, 2005, related:

> [W]e respectfully request that the USACE formally consider open ocean disposal as a back-up option.

J.A. Tab 19, p. 2. The ACOE then deemed that new hearings were needed and published a new notice, starkly drawing the contrast:

> The applicant filed its December 2003 FERC application, its Corps permit application and other documents with on-site placement of stabilized dredged material as its preferred dredged material management option. . . ..
>
> However, . . . the Project is now proposing to place the suitable dredged material in a designated ocean disposal site(s).

J.A. Tab 31, p. 2 (Notice dated November 1, 2005, from the ACOE). "[O]ffshore disposal" was now cited as the applicant's "preferred alternative." Id. It has become clear that (although never stated on the record before the CRMC) upland disposal is cancelled and in-water disposal is sought.

**2. The Effects of the Dredging Disposal Plan Change.**

At the outset, it is acknowledged that this change has not yet manifested itself as a change in Weaver's Cove's plans with respect to the overall volume of spoils or, for that matter, the portion coming from Rhode Island's submerged lands. These numbers remain constant in Weaver's Cove's submission. Nevertheless, the change in destination alone has several consequences for Rhode Island. As a net result of the acknowledged change, instead of a small amount of relatively clean dredged spoils being transported a short distance in Rhode Island, a large amount of relatively contaminated dredged spoils are now to be transported a long distance through Rhode Island. Indeed, this transport impact will increase a hundred fold. The detail ensues.

The original proposal to CRMC had the total volume of dredged material allegedly being disposed on the site in Massachusetts with all transport into Massachusetts waters. The impacts

to RI Coastal resources would be limited to the actual dredging in R.I. provided Weaver's Cove obtained a permitted upland disposal site.

The new proposal – conveyed to CRMC by the ACOE and not the applicant – has all the dredge material going to an open water site, the Rhode Island Sound Disposal Site. This material includes the original R.I. material and most of the Massachusetts dredge material. Under this new proposal, all the scows (dredge transport barges) will transit through R.I. coastal waters and will impact R.I. coastal resources. Weaver's Cove has provided no information to CRMC that details the analysis of this proposal or a discussion of the alternatives.

As Danni Goulet has stated in his expert affidavit, Ex. D at ¶ 19, the overall transport impact would be over a 100 times greater factoring in both the greater number of trips and the greater distance. Even if the volume and capacity estimates are wrong, this would not affect the overall coefficient of approximately 100, since if those inputs are incorrect it affects the baseline conditions as well as the resultant conditions. Mr. Goulet's affidavit, Ex. D, details the inputs and calculations in the chart above introductory at ¶¶ 12-22 of his affidavit. That means a hundred times the risk of spillage, air pollution from the diesel engines of the tugs and barges, water pollution from bilge discharges, collisions, and congestion. The impacts of dumping into a fluid environment (the ocean) rather than a solid site (the original upland site) also merit a hard look.

**B. THE SHIPPING PLAN HAS CHANGED.**

**1. The Shipping Change.**

The definitive documentation of the shipping plan revision is the Coast Guard Recommendation Against Waterway Suitability dated October 24, 2007, which features a comparative chart that specifically displays the data. *See* Ex. A to Motion to Stay, Docket # 19,

p. 28 (Coast Guard Recommendation). The earlier proposal's specifications are set forth as follows: "Frequency of shipments (annual): 60-70 port visits." Id. The Coast Guard itself translates this into 120 transits. Id.

By contrast, the same chart in the Coast Guard Recommendation (which will become a final agency action upon conclusion of the appeals) specifies that Weaver's Cove's new transit plan dated February 2, 2006 would now double the annual round trips to a minimum of 120. Id. *See also* id. at pp. 19-20 ("annual frequency of shipments" now to be "120-130 port visits (240-260 transits of the waterway)"); id. at p. 24 ("[t]his 'locking through' under this smaller tank proposal would occur up to 260 times per year"); id. at p. 26 ("[t]his maneuvering would be attempted 240 to 260 times per annually"); id. at p. 28 ("260 . . . transits").[1]

The background for these changes is, that, on August 10, 2005, the President signed into law the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), Pub. L. No. 109-59, § 1948, 119 Stat. 1144 (2005). § 1948 of this law expressly reflects the intent of the President and Congress that the existing Brightman Street Bridge, in Fall River, Massachusetts, shall be "maintained . . . as an emergency service route." J.A. Tab 26 (SAFETEA-LU § 1948). In particular, the law prohibits use of federal funds for demolition of the Brightman Street bridge and, as a consequence, prevents large LNG tanker passage to Weaver's Cove proposed terminal.

According to Congress, the bridge currently serves as a critically important transportation route for police, firefighters, and other first responders, as well as a vital link between population

[1] As an aside, a revelation regarding the persistence of ambiguity is provided by page 21 of the above-referenced Coast Guard Recommendation. That page has language describing the "ambiguity regarding the exact dimensions of the proposed tanker," noting the draft (underwater depth of the keel) of the "new" vessel modeled was 33.8 feet, the original draft was 37.5 feet, and the amended letter of intent filed in 2/07 referred to "a range of ship sizes." This uncertainty creates the potential for future additional changes in dredging depths thereby compounding the mootness problem.

centers and area hospitals. *See* J.A Tab 26. In addition, it serves as an available emergency evacuation route for tens of thousands of residents of the City of Fall River, Massachusetts. Indeed, the continued existence and availability of this emergency service and evacuation route would become even more critical if the proposed Weaver's Cove LNG terminal were to become operational.

Thus, the Brightman Street Bridge, which was earlier slated for demolition, is now a federally-protected structure. Indeed, when Weaver's attempted to do an end-run around the statute, by having the Coast Guard declare the old bridge an obstruction and slate it for demolition, the Coast Guard refused. Dutifully, that service would not short-circuit the only process available to Weaver's Cove, an effort to repeal the statute. *See* Ex. F (District Director's Letter of Oct. 4, 2007).[2]

Now that the originally-proposed ships cannot pass through that protected bridge, the project that was submitted to the CRMC in 2004 can no longer be implemented. The original project depended on removal of a bridge that Congress has now decided to retain. The upshot is that federal legislation now effectively blocks the Weaver's Cove Project in the form originally proposed and, probably, in any form at all.

Thus, the Coast Guard has recognized that the earlier-conceived proposal is now a nullity. Specifically, the Commanding Officer of the United States Coast Guard for the Southeast New England Sector, possesses jurisdiction over the portion of the coast called the "Narragansett Bay Regulated Navigation Area," pursuant to the Ports & Waterways Safety Act of 1972, 33 USC § 1221 *et seq.*, to determine whether to allow the proposed transit of LNG vessels to Weaver's Cove's proposed terminal location. On October 24, 2007, he issued a

[2] Indeed, a provision which would have repealed SAFETEA § 1948 was embodied in Senate Bill 2006-2755, § 3021, but that provision failed.

recommendation. This document concluded that the waterway is not suitable for the intended LNG vessel operations. *See* Exhibit A. to Motion to Stay, Docket # 19. Since this Court reviewed the stay motion, that decision has been affirmed.[3] The events that led up to this incipient agency action are set forth in the footnote.[4]

In the final analysis, a definitive vessel transit plan must be submitted to the CRMC prior to any meaningful assessment with respect to the effects of the project's operations on the State's coastal zone (i.e., with respect to the consistency certification). But no new plan at all has been submitted and the CRMC has been left to guess as to developments and to gather the above information by second-hand means. Weaver's Cove never directly apprised the CRMC of any of

[3] On December 7, 2007, Captain Roy Nash, the Captain of the Port for USCG Sector Southeast New England, rejected Weaver's appeal. *See* Ex. F. Weaver's has represented that it will pursue an appeal to the First District in Boston, and, if it is unsuccessful there, would then proceed to appeal to the Commandant in Washington, D.C. If and when these appeals are exhausted to no avail, the State would refile a Motion to Stay these proceedings.

[4] In response to the Congressional enactment preserving the bridge, Weaver's Cove provided a "Change of Information" it filed with the United States Coast Guard on February 2, 2006, announcing an intent to use smaller vessels and a dramatically increased number of transits. In other words, on February 2, 2006, following the Congressional action that precluded implementation of the project that Weaver's Cove had proposed and the Commission had approved, and following the denial of rehearing of the authorization, Weaver's Cove submitted a substantially different proposal, approximately doubling the number of trips (using smaller vessels). (J.A. Tab 40).

Thus, in early February 2006, more than six months after the Commission authorized its proposal, Weaver's Cove advised certain agencies (but not the CRMC) of its intention to implement a substantially revised project that would now require a doubling of tanker transits (from 50 to 70 to a minimum of 120). Weaver's Cove's own expert described newly anticipated transits as challenging and fraught with risk, including the need to maneuver for "a significant period of time when tug power is not available to control the bow" during travel through the narrow span of the Brightman Street Bridge abutments. By letter of March 13, 2006, the Coast Guard responded to the project modification, concluding that "extraordinary maneuvers" would be required, leaving "no margin for navigational error, and [the transit plan] appears unsuitable in its current state, when considering the intended vessel size, cargo, and number of transits in your proposal." Accordingly, the Coast Guard continued, "a revised waterway suitability assessment and environmental impact review may be required, prior to issuance of a Letter of Recommendation." (J.A. Tab 43). Independently, the Army Corps of Engineers wrote the Commission to "specifically request" the FERC to review the revised proposal and "determine whether the EIS addresses the effect of these changes." On March 27, 2006, in response to navigational concerns raised by the Coast Guard and Weaver's Cove's own assessment that safe transit could not be assured, Weaver's Cove announced that it will be developing yet another new shipping plan. (J.A. Tab 45).

This culminated in the Coast Guard recommendation referred to in the text and the ensuing affirmation, also referred to.

these developments. *See* Ex. C, (Affidavit of Grover Fugate, at ¶ 4). And this omission occurred despite the fact that these modifications have very large implications as will be shown now.

**2. The Effects of the Shipping Plan Change.**

The above discussion of the shipping plan signifies the following: Subsequent to the preparation by FERC of a Draft Environmental Impact Statement ("DEIS") and Final Environmental Impact Statement ("FEIS") for a project purportedly involving 50-70 annual deliveries of LNG, and the enactment of SAFETEA's "emergency service route" requirement, the applicant drastically altered its proposal. As mentioned in a footnote, on February 2, 2006, the applicant filed with the U.S. Coast Guard a notification entitled "Change of Information in Letter of Intent to Operate a Newly Constructed Waterfront Facility Handling LNG." JA Tab 40. In its notification, the applicant belatedly acknowledged for the first time that as a result of enactment of SAFETEA "utilization of smaller size LNG vessels will be required." The notification asserted that the need to utilize smaller-sized vessels than those originally proposed to FERC (upon which FERC's DEIS and FEIS were based), "will result in more frequent shipments to the proposed terminal than was envisioned" in its original Letter of Intent submitted to the Coast Guard. Instead of 60-70 roundtrip transits per year, Weaver's offered a new vessel transit plan that would require 120-130 roundtrip tanker transits per year (as discussed earlier).

There is ample evidence that the transit of dangerous and highly volatile cargoes, through Rhode Island's coastal zone, will create significant effects. In the post-September 11, 2001 environment, LNG is one few substances that has been deemed to be a "high interest cargo" requiring extensive security protocols by federal, state and local law enforcement resources. *See*

33 C.F.R. § 165.121.[5] A deliberate attack on a LNG vessel has been confirmed and documented as "credible" by a U.S. Department of Energy sponsored study.[6] Such an event could pose serious public health hazards to people more than one mile away from a "pool fire" occurring on the surface of the water in the event of a breach of a LNG holding compartment(s).[7] As a result, federal regulations specify that the Captain of the Port for the particular "regulated navigation area" (in this case the Narragansett Bay RNA) will employ security zones that extend 2 miles off the bow, one mile off the stern, and 3000 feet one either side of any LNG vessel transiting through the 23 mile section of waterway contained within the coastal zone.

For the more than 60,000 boaters that annually use Narragansett Bay, Mount Hope Bay and the adjoining tributaries, the effects of security zones are considerable. *FEIS, at 4-168.* LNG tanker safety and security zones will dominate much of the East Passage, temporarily blocking recreational and commercial marine traffic, ferry operations, tourist cruises, and lifeline ferry service and emergency runs to Prudence and Hog Islands. Additionally, delays to boaters could exceed 30 minutes in the Newport Harbor area, including areas to the north and south as a

---

[5] The existing regulation was promulgated weeks after the 9/11 attacks and was deemed to be necessary in the interest of securing much smaller, and much less frequent, shipments of LPG to the Port of Providence.[5] In promulgating the emergency regulation, the Coast Guard explained the need as follows:

> On September 11, 2001, two commercial aircraft were hijacked from Logan Airport in Boston, Massachusetts and flown into the World Trade Center in New York, inflicting catastrophic human casualties and property damage. A similar attack was conducted on the Pentagon on the same day. National security and intelligence officials warn that future terrorist attacks against civilian targets may be anticipated. Due to the highly volatile nature of the high interest vessels covered by this rule and the potential catastrophic impact of an attack on a high interest vessel, this rulemaking is urgently required to prevent possible terrorist strikes against high interest vessels within and adjacent to Rhode Island Sound, Narragansett Bay and the Providence and Taunton Rivers. * * * The sizes of the zones are the minimum necessary to provide adequate protection for high interest vessels and their crews, other vessels operating in the vicinity of high interest vessels and the crews, adjoining areas, and the public.

[6] Sandia National Laboratories Study entitled, "Guidance on Risk Analysis and Safety Implications of a Large Liquefied Natural Gas (LNG) Spill Over Water." See Section 1.2.3; and Table 14 at page 51. Study referenced in Weaver's FEIS at4.12.5 (4-257).

[7] Sandia Report, at page 51 (Table 14).

result of moving security zones that will occur as many as 260 times per year. FEIS § 4.12.5.1. Newport is recognized nationally and internationally as a world-class yachting center, and over 2/3 of the events on Narragansett Bay are scheduled in the waters off Newport. RICRMP § 400, Ex. O. The irregular and unannounced schedule of LNG tanker transits, together with delays to boating associated with passage of LNG tanker security zones, may directly impact Newport's ability to retain major regattas and events such as the Tall Ships, which attract local, national and international participation. *See* Pare Engineering Study, Ex. I.

The adverse impacts of the security zones, and, certainly, the doubling of the number of those security zones, will produce concrete effects on recreational boaters, commercial fishermen, ferries, tour boats, charters, sailing regattas and cruise ships. Id. (*see also* FEIS 4-271-72).

Moreover, the same security concerns also led the State of Rhode Island to adopt an enforceable policy of closing two major bridges within the Rhode Island coastal zone in the event of repeated passage of LNG tankers. On June 14, 2005, the Rhode Island Turnpike and Bridge Authority ("RITBA"), the state agency statutorily charged with control over the Newport/Pell Bridge and the Mount Hope Bridge, passed a resolution indicating the it would, in fact, close the Newport/Pell Bridge every single time an LNG tanker passed under the bridge. Ex. K. As evidenced by RITBA's Resolution, both the Claiborne Pell Newport Bridge *and* the Mount Hope Bridge will each be closed during the projected 120-130 tanker transits because moving such vast quantities of extremely hazardous cargo underneath Rhode Island's vital transportation infrastructure has been deemed to pose unacceptable safety and security risks. Id.

The underlying reasons for the State's decision to employ bridge closures are articulated in the attached affidavit of Peter Janaros, Director of Engineering for RITBA. *See* Ex. J. For

significant security reasons, the bridges will be closed "before, during and after" the tankers transit under the bridges. ***Id.*** Weaver's Cove's new proposal to double the number of LNG transits will have obvious additional effects as a result of the need to conduct as many as 500 bridge closures each year in Rhode Island (incoming and outgoing transits for both bridges) for periods up to 20 minutes.

The types of effects stemming from Weaver's new proposal to double the number of LNG vessel transits through the Rhode Island's coastal zone generates significant, incremental effects that must be presented and reviewed by the CRMC as required by the CZMA. The CZMA affords the State the right to review economic and public safety impacts that bridge closures will cause to the communities of Newport, Jamestown, Bristol, Middletown and Portsmouth. The direct effects include, but are not limited to, the following:

- The length and nature of traffic back-ups, particularly during peak season months from May through September and during the commuter rush hours throughout the year;
- The effects on emergency response/municipal facilities that could be severely restricted by traffic backups;
- The effects of closures of the Mount Hope Bridge, which stands within feet of passing LNG tankers, and the exacerbated delays caused by existing traffic volumes and the lack of capacity on the two-lane roads in proximity of the bridge;
- The effect on the ability of rescue vehicles to transport patients from Jamestown to Newport Hospital, and from Bristol to Newport Hospital, that could require transport to an alternative hospital (an additional 14 minute delay) and thus place patients' health and safety at risk;
- The cumulative economic impact of repeated delays and traffic congestion.

Weaver's Cove will also need to time transits to coincide with high tides ***(see FEIS 4-264)(deep draft ships will utilize "tidal lift")***, thereby further exacerbating the conflict with boaters, and since outgoing tankers will maintain significant quantities of LNG in the vessels (to protect the cryogenic integrity of the steel), outgoing vessels will also require security zones

through the coastal zone, along with bridge closures as well. Maintaining the integrity of security zones for the 26 mile transit will be challenging given the natural actions of boaters, the inability to provide advanced warnings to all boaters (due to security protocols),[8] and the potential need for the use of force in the event of a breach of a security. Furthermore, the need for State and local law enforcement to provide shoreside security for inbound and out bound transits on either side of the 23 mile transit through the Rhode Island coastal zone (as documented in the affidavit of Detective Dennis Canario, Ex. L); the impacts articulated by Bristol Town Manager Diane Medeiros (Ex. P) and the effects on Roger Williams University, which is situated in close proximity to the federal channel (see affidavit of Brendan Doherty, Ex. Q) collectively demonstrate definite, dramatic effects that must be presented to, and considered by, the CRMC under the auspices of State's coastal program.

Indeed, the use of Rhode Island waterways for the new LNG project poses such substantial effects beyond the limits of federal navigation channel, including the unprecedented consequences of an LNG "pool fire," and the need to use federal-style military forces to temporarily exclude access of all other boaters to the public waterway while LNG tankers are in transit. And now, all of these impacts have been ***doubled*** by Weaver's new project, along with the need for the State to now have to ***double*** the number of closures for two of the State's most traveled and vital bridge connections to Aquidneck Island.

When changed bridge closure effects are combined with the change security zone impacts on the waterway, coupled with the other cumulative effects discussed above, LNG tanker transport, ***and more importantly, the proposal to double the frequency of transits***, pose significant impacts and effects within the state's coastal zone that could jeopardize the marine

[8] Notification may only be "minutes" to an hour before the security zone is enforced. FEIS at 4-272. However, most recreational boaters are not actively tuned into mariner radio frequencies, and thus are entirely surprised by the moving security zones.

oriented life of Newport and the surrounding communities of Jamestown, Middletown, Portsmouth, Bristol and other towns along the LNG tanker transit route. These effects are not only considerable, as outline above, but must – as a matter of federal law – be presented to the CRMC as a component of the CZMA consistency review process. Yet, the effects stemming from the proposed doubling of LNG transits has never even been presented to the CRMC. Succinctly stated, the new Weaver's project, which calls for 120-130 roundtrip LNG tanker transits per anum, must be presented to the CRMC for review, as mandated by the CZMA. Weaver's has opted to rely on "stale" information it previously filed with the CRMC, which in turn can only guarantee a "flawed analysis" in terms of the likely coastal effects associated with the latest LNG project. Id. at 12. Such a "cavalier approach" to "critical issues" are legally fatal to Weaver's efforts.

C. **THE CHANGES ARE MATTERS IN THE PURVIEW OF THE CRMC UNDER THE CZMA.**

**1. The CZMA is a broad mandate for state review under the effects test.**

Before delving into the specifics of the administrative process in this case, some background is in order. Specifically, the special delegated status of states under the CZMA and the broad effects test must be understood.

***a. The CZMA is a charter for wide ranging state scrutiny of Federally-permitted projects.***

The Coastal Zone Management Act (CZMA) of 1972 is the congressional plan for managing America's coast. Section 302 of the Act, 16 U.S.C. § 1451, details the problematic lack of wise management that prompted Congress to create the CZMA. Complex, and covering a broad range of issues, the CZMA responded with an approach with several features: the CZMA makes the need for comprehensive management guidance a priority; the CZMA strikes a balance

between a number of potentially competing interests; most importantly, the CZMA represents a unique collaboration between the states and the federal government. From the start, its intent was to change how federal, state, and local officials manage and allocate coastal resources.

The act encourages each coastal state to develop a comprehensive Coastal Zone Management Program (CZMP) to manage and balance competing uses of the coastal zone. Once created, the individual coastal management programs are to be considered for approval by the Secretary of Commerce. 16 U.S.C. § 1455(d) (2000). Section 306 of the CZMA, 16 U.S.C. § 1455, outlines the elements a state program must contain to obtain federal approval.

Because of the flexibility inherent in their design, each state can structure its respective coastal program to meet their unique needs. Flexibility exists in terms of administrative structure and the ways in which the various objectives of the CZMA are accomplished.

Some general mandates always apply, however. Programs are to include comprehensive plans for the use and development of land in areas designated as coastal zones. Such coastal zones extend 3 miles seaward and inland as far as necessary to protect the coast. As part of such plan, each respective state further refines the areas designated as that state's coastal zone. 16 U.S.C. § 1455(d) (2000). As detailed momentarily, each coastal state program provides for a federally-delegated right to ensure that both direct Federal activities and federally-permitted private projects are consistent with the enforceable policies of such program. This right is known as Federal Consistency.

The Federal Consistency requirement of the CZMA (as outlined in § 307, 16 U.S.C. § 1456) mandates that federal actions that are likely to affect any land or water in the coastal zone must be consistent with the state's coastal management program. Federal actions include direct federal projects and, importantly, federal approval activities. Specifically, federal approvals

must be conducted in a manner that is consistent with the enforceable policies of approved state CMPs. The process requires that all federal agencies ensure that their licenses and permits are consistent with a state's approved Coastal Management Plans when working in the coastal zone of that state.

A private individual or business, or a state or local government agency, or any other type of ***non-federal*** entity, applying to the federal government for a required permit or license or any other type of authorization, is subject to the requirements of CZMA § 307(c)(3)(A)(16 U.S.C. § 1456(c)(3)(A)) and 15 C.F.R. part 930, subparts A, B and D.

Thus, in operation, applicants for federal permits affecting the state's coastal zone are required to submit a CZMA consistency certification to the federal permitting agency, stating that the project is consistent with the state's coastal management program. 16 U.S.C. § 1456(c)(3)(A) (2000). The applicant must also submit the certification to the state, and the state has the right to object to the proposed project by finding that the project is inconsistent with the state's coastal management program. Id. This Federal Consistency mandatory mechanism ensures that federally-supported activities are consistent with the state's plan. If a state objects to a project within six months of receiving the necessary data and information (hereinafter "NDI") from the applicant to conduct its review, no federal agency may issue a permit or license for the project unless the Secretary of Commerce overrules the state's objection. If the state fails to concur or object within six months of receiving the applicant's certification, the state's concurrence is presumed unless the state notifies the applicant within thirty days of the submission that it does not have the NDI.

Thus, the CZMA essentially provides states with the power to veto federal permitting activities that affect their coastal zones, but the Secretary is provided limited authority to override a state's veto. CZMA § 307, 16 U.S.C. § 1456(c)(3)(A) (2000).

***b. The CZMA invokes a broad effects test that includes all sources of impacts.***

At the heart of Federal Consistency is the "effects test." A federal action is subject to CZMA federal consistency requirements if the action will affect a coastal use or resource, in accordance with NOAA's regulations. NOAA's regulations, 15 C.F.R. § 930.11(g), define coastal effects as follows:

> The term "effect on any coastal use or resource" means any reasonably foreseeable effect on any coastal use or resource resulting from a Federal agency activity or federal license or permit activity (including all types of activities subject to the federal consistency requirement under subparts C, D, E, F and I of this part.) Effects are not just environmental effects, but include effects on coastal uses. Effects include both direct effects which result from the activity and occur at the same time and place as the activity, and indirect (cumulative and secondary) effects which result from the activity and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects are effects resulting from the incremental impact of the federal action when added to other past, present, and reasonably foreseeable actions, regardless of what person(s) undertake(s) such actions.

As described in the preamble to the 2000 revisions to NOAA's consistency regulations, the definition of the effects test is from the 1990 amendments to the CZMA. These amendments, in part, replaced the phrase "directly affecting the coastal zone," reflecting Congressional intent to expand the ambit of the CZMA by overturning the outcome of Secretary of the Interior v. California, 464 U.S. 312 (1984), which had limited states' reach. *See* 136 Cong. Rec. H 8076 (Sep. 26, 1990). The 1990 CZMA amendments also clarified that all federal agency activities meeting the "effects" standard are subject to CZMA consistency and that there are no exceptions, exclusions or categorical exemptions from the requirement. Conference Report at 970-71; 136

Cong. Rec. H 8076 (Sep. 26, 1990). The Conference Report further informed NOAA's 2000 regulatory revisions by stating that:

> The question of whether a specific federal agency activity may affect any natural resource, land use, or water use in the coastal zone is determined by the federal agency. The conferees intend this determination to include effects in the coastal zone which the federal agency may reasonably anticipate as a result of its action, including cumulative and secondary effects. Therefore, the term "affecting" is to be construed broadly, including direct effects which are caused by the activity and occur at the same time and place, and indirect effects which may be caused by the activity and are later in time or farther removed in distance, but are still reasonably foreseeable.

***c. Congress has specifically preserved the States' CZMA rights.***

Weaver's Cove's thrust is that, in this case, the Federal Consistency mechanism frustrates the intent of Congress. Part of the rejoinder to this argument is that the very statutory authorities Weaver's Cove relies upon make special allowance for state prerogatives under the CZMA.

Weaver's Cove emphasizes that Congress passed, and the President signed, the Energy Policy Act of 2005 ("EPAct 2005"), Pub. L. No. 109-58, 119 Stat. 594, which included LNG-specific sections amending the Natural Gas Act of 1938 ("NGA"), 15 U.S.C. §§ 717-17w (2000). Now, § 3(e) of the NGA specifically contains a pre-emption provision.

But this did not touch (much less, end) the well-established CZMA authority for states to exercise a decisional role related to the construction of LNG terminals. In fact, § 3(d) of the NGA, added by the EPAct 2005, expressly reserves for states those powers Congress has delegated to them under several statutes – most importantly, for present purposes, the CZMA. *See* Energy Policy Act of 2005 § 311(c)(2) ("nothing in this Act affects the rights of States" under the CZMA). In short, EPAct 2005 not only left unscathed, but affirmatively preserved, the states' delegated authority under the CZMA.

In sum, the authority residing in the states under the CZMA creates the opportunity for congressionally-sanctioned state action to stop a project. In such an instance, it is not correct to say that a state's actions frustrate a federal permit decision; rather, properly understood, the state's action becomes an integral part of a composite federal outcome.

Indeed, FERC itself has confirmed the position of state regulatory activities authorized by federal law. *See* Sound Energy Solutions, 108 F.E.R.C. ¶ 61,155 at ¶¶ 8-13 (2004). There, FERC acknowledged that, because the CZMA is a federal requirement, "the CZMA and the NGA are laws of equal dignity and should be read to complement rather than preempt one another." Id. 108 F.E.R.C. ¶ 61,155 at ¶¶ 8-13. In this way, if a state blocks action under its federally-delegated authority, it has not actually blocked a ***federal*** action but instead has blocked a privately-proposed action that had a mere tentative or provisional claim on a federal imprimatur. A defeat of a project carrying conditional FERC approval in the CZMA process is best understood as follows: the state agency decision ***completes***, rather than ***contradicts***, a partial decision from a federal agency.

A procedural feature of the EPAct underscores this substantive framework. As background, EPAct 2005 contains provisions allowing industry the privilege of access to federal forums on an expedited basis in the case of negative state agency decisions under certain delegated authorities. 15 U.S.C. § 717r(d)(1). But, in contrast with this treatment of state agency decisions under other federal laws (such as the CWA), EPAct 2005 eschewed any special or expedited appeals by industry in the case of state CZMA decisions. In other words, the enactment did not prescribe the same appellate review it required for challenges to other state agency decisions similarly issued under other federal authority (again, such as the CWA). Id. (excepting the CZMA from the new judicial review provision).

Overall, the relationship between CZMA approval and the NGA, as well as between the CRMC and the Army Corps is shown on the immediately ensuing table, a table that has relevance to sections throughout this Memorandum.

**Federal & Federally-Delegated Rhode Island Authorizations Required for Weaver's Cove's Current Project**




**Independent Rhode Island Authorizations Required for Weaver's Cove's Current Project**



As shown in the table, Rhode Island's CZMA rights with respect to Weaver's Cove's current LNG project have been triggered in two respects: once for FERC's authorization under Section 3 of the Natural Gas Act, (*see FERC Initial Order (July 15, 2005), Appendix B, Condition No. 24, JA Tab 25)*; and separately for the Corps' approval of dredging in RI waters pursuant to the Rivers and Harbors Act of 1899. *(See ACOE Revised Notice of Public Hearing, JA Tab 31, at 4)*. These two separate triggers of CZMA rights are reflected in Section 400 of the State's NOAA-approved Coastal Zone Management program: "permits to regulate . . alteration of . . . and excavating from . . . material in navigable waters of the US pursuant to sections 9 and 10 of R&H Act of 1899"[9] (the Corps' permitting activity); and also with the following: "permits and approvals related to the construction and operation of LNG import/export terminals pursuant to the NGA,"[10] this latter section obviously covering the construction and operation of a LNG terminal authorization by FERC under Section 3 of the NGA.

To eliminate any doubt about the right of the state to review the effects of LNG tanker operations with Rhode Island's coastal zone, Section 400 also lists the following: "Permits and authorizations for the handling of dangerous cargo by vessel in US ports pursuant to 46 USC 170."[11] Finally, while the LOI process undertaken by the Coast Guard may not be a direct trigger under the CZMA of the State's consistency review, clearly the State has the right, indeed the responsibility, to review the consistency of the other federally permitted activities with respect to the State's coastal zone.

---

[9] RI CRMP § 400.2, Table 2 entitled "Federal License or Permit Activities.

[10] RI CRMP § 400.2, Table 2 entitled "Federal License or Permit Activities.

[11] RI CRMP § 400.2, Table 2 entitled "Federal License or Permit Activities.

***d. Under the effects test, the shipping plan and the dredge disposal are subject to consistency review.***

Applying the effects test, in combination with the savings clause in EPAct, yields the conclusion that Rhode Island has jurisdiction over the drastic changes in dredging and shipping.

## D. THE CHANGES ARE SUBSTANTIAL ENOUGH TO REQUIRE A NEW OR SUPPPLLEMENTAL APPLICATION.

In the next sub-section it will be argued that this case is judicially moot. But, for purposes of dismissal of this case, it is enough that the underlying application is, in effect, administratively obsolete. Such is the net effect of the cases and regulations on the topic of radically changed circumstances with respect to administrative applications.

Where a consistency applicant "failed to include new, pertinent information that reflects significantly-changed circumstances," Blanco v. Burton, 2006 WL 2366046, 11 (E.D. La. 2006), and sought to establish consistency based "upon stale information which does not account for . . . changed circumstances," id. at 12, the Court characterized the applicant's efforts as "rather perfunctory" and "cavalier," id. at 13. In that case, failure to supplement with a new analysis of the coastal effects of proposed off-shore oil drilling in the wake of the intervening Hurricane Katrina disaster led the court to find a substantial probability of a violation of the CZMA.

(E.D.La Aug. 14, 2006). In that case, the "changed circumstances" were not even the result of the CZMA applicant's conduct – an aspect that stands in stark contrast to Weaver's Cove's situation.

Further, that federal district court also stated that a consistency determination must include " a detailed description of the activity . . . and their coastal effects, and comprehensive data and information . . . commensurate with the expected coastal effects of the activity." Blanco v. Burton, at 11.

In the instant case, it was Weaver's Cove that made the unilateral decision to drastically alter its vessel transit plan and to drastically alter its disposal plan. Weaver's Cove's decision to double the number of planned LNG vessel transits through the Rhode Island coastal zone, and to increase the transit miles of dredge scows 100 fold, brings with it "direct, indirect and cumulative impacts" that must be presented to the CRMC as a threshold requirement of the federal consistency review under the CZMA. Blanco, *supra* at 11. Also, at least with the Hurricane Katrina situation, the state officials were in a position to take administrative notice of the changed circumstances, which were generally known. Here, the facts are in the almost exclusive control of the applicant.

Some guidance can also be taken, by analogy, from Marsh v. Oregon Nat. Resources Council, 490 U.S. 360, 378 (1989), dealing with the somewhat similar NEPA statute. There, the U.S. Supreme Court held, with regard to the need to supplement an EIS:

> [I]n the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency's [the submitter's] express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency [the submitter] has made a reasoned decision based on its evaluation of the significance-or lack of significance-of the new information. A contrary approach would not simply render judicial review generally meaningless, but would be contrary to the demand that courts ensure that agency decisions are founded on a reasoned evaluation "of the relevant factors."

Marsh, 490 U.S. at 378. Using this analogy to NEPA, this Court can be further guided by the that opinion in Marsh as to when the maker of a review document must supplement:

> [I]f the new information is sufficient to show that the remaining action will "affec[t] the quality of the human environment" in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared.

Id. at 374. There, however, the claim of deficiency (regarding scrutiny of a proposed dam's potential to hurt fish) was rejected where the circumstances were constant and merely the studies were new. Moreover, in that case, the party preparing the EIS had considered the new studies albeit not under the formal strictures of an EIS. Here, the facts are different: The CRMC is being forced to grope, blind-folded at real changes.

It is for this reason that the regulations provide for a re-filing by treating each major set of changes as a distinct federal license or permit requiring consistency. A whole new process must be initiated. This is set forth in the following interlocking definition of Federal license or permit:

> (a) The term "federal license or permit" means any authorization that an applicant is required by law to obtain in order to conduct activities affecting any land or water use or natural resource of the coastal zone and that any Federal agency is empowered to issue to an applicant. . . ..
>
> (b) The term also includes the following types of renewals and major amendments which affect any coastal use or resource:
>
>> (1) Renewals and major amendments of federal license or permit activities not previously reviewed by the State agency;
>>
>> (2) . . .; and
>>
>> (3) Renewals and major amendments of federal license or permit activities previously reviewed by the State agency which will cause an effect on any coastal use or resource substantially different than those originally reviewed by the State agency.
>
> (c) The term "major amendment" of a federal license or permit activity means any subsequent federal approval that the applicant is required to obtain for modification to the previously reviewed and approved activity and where the activity permitted by issuance of the subsequent approval will affect any coastal use or resource, or, in the case of a major amendment subject to § 930.51(b)(3), affect any coastal use or resource in a way that is substantially

> different than the description or understanding of effects at the time of the original activity.
>
> . . .
>
> (e) The determination of substantially different coastal effects under paragraphs (b)(3), and (c) of this section is made on a case-by-case basis by the Federal agency after consulting with the State agency, and applicant. The Federal agency shall give considerable weight to the opinion of the State agency. The terms "major amendment," "renewals" and "substantially different" shall be construed broadly to ensure that the State agency has the opportunity to review activities and coastal effects not previously reviewed.
>
> (f) This subpart applies to active applications. If an applicant withdraws its application to the Federal agency, then the consistency process is terminated. If the applicant reapplies to the Federal agency, then a new consistency review process will start. If a Federal agency stops or stays the Federal license or permit application process, then the consistency review period will be stopped or stayed for the same amount of time as for the Federal application process.

15 C.F.R. § 930.51. A generally liberal, although not precisely on point, interpretation of this section is provided by California v. Norton, 311 F.3d 1162, 1171 (9th Cir. 2002) (approval of the extension of existing drilling leases is new a federal agency activity requiring submission of a new consistency determination to the state for review pursuant to 16 U.S.C. § 1456(c)(1)(A).

The modifications in this case constitute a "major amendment" which will cause effects on coastal uses and resources, "substantially different" than those originally proposed to CRMC,[12] hence a new consistency certification and application is required to be filed by Weaver's Cove. *See* 15 C.F.R. §930.51(b) & (e), *supra*. While, as the regulation indicates, the determination of "substantially different coastal effects" is made on a case-by-case basis, the

[12] It is noteworthy that CRMC staff always took the position that the consistency certification was incomplete because the upland disposal proposal was, in their view, not practical or permittable. The recent major amendment by Weaver's Cove has confirmed the CRMC staff was correct.

opinion of the CRMC shall be accorded deference and the terms "major amendment" and "substantially different" shall be construed broadly to ensure the RI CRMC has the opportunity to review activities and coastal effects not previously reviewed. 15 C.F.R. §930.51(e), supra.[13]

E. **THE CHANGES ARE SUBSTANTIAL ENOUGH TO RENDER THIS ACTION MOOT.**

Mootness is found where there is no longer a justiciable case or controversy between the parties. In that situation, under Article III of the Constitution, a federal court lacks jurisdiction. Preiser v. Newkirk, 422 U.S. 395, 401, (1975); Tennessee Gas Pipeline Co. v. Federal Power Comm'n, 606 F.2d 1373, 1379 (D.C. Cir. 1979). In Maryland Casualty Co. v. Pacific Co., 312 U.S. 270 (1941), the Supreme Court, noting the difficulty of fashioning a precise test of universal application for determining whether a request for declaratory relief had become moot, held that, basically, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Presier v. Newkirk, 422 U.S. at 402.

Stated differently, the doctrine of mootness is established by Article III of the United States Constitution, which limits the jurisdiction of federal courts to suits that present a real case or controversy. U.S. Const., art. III. There are two conditions a court must consider when determining if a matter is moot. The court must first determine "with assurance that 'there is no reasonable expectation…' that the alleged violation will recur" and secondly that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Environmental Defense Fund v. Gorsuch, 713 F.2d 802, 819 (D.C. Cir. 1983), *quoting* Doe v. Harris, 696 F.2d 109, 111 (D.C. Cir. 1982), *quoting* Los Angeles v. Davis, 440 U.S. 625 (1979).

[13] CRMC is aware there have been changes to the CFR's not affecting the quoted section. In any event the issues at hand arose prior to those amendments.

These conditions are met here as there is no evidence that the CRMC would fail to act on a renewed application and the intervening changes have erased any consequence from CRMC's conduct. The supposed declaration of consistency that Weaver's Cove seeks is meaningless: it would pertain to a bygone project.

In other words, in the case before this Court, there is no longer any dispute over the subject of the complaint – the original proposal for upland disposal. By canceling upland disposal, the plaintiff has obviated the need for the specific relief sought by it. This Court can render no further relief concerning this application for dredging involving that means of disposal because there is no longer a controversy "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." ***See*** Illsley v. United States Parole and Probation Dept., 636 F.2d 1, 2 (1st Cir.1980).

Effectively, then, this is a case where the Court loses its jurisdiction because "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation" which, in this case, is failure to proceed on the now defunct upland disposal consistency proceeding. County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979); Free v. Landrieu, 666 F.2d 698, 704 (1st Cir. 1981); *see also* Ashcroft v. Mattis, 431 U.S. 171, 173, 97 S.Ct. 1739, 1740, 52 L.Ed.2d 219 (1977) (emotional involvement is not enough to meet case-or-controversy requirement); Ruotolo v. Ruotolo, 572 F.2d 336, 338 (1st Cir. 1978) (desirability of advisory opinion is not a substitute for justiciability); Denver v. Matsch, 635 F.2d 804, 808 (10th Cir. 1980) (as issue is one of power, practical importance of review cannot control); Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3533 (remedies must be justified by continuing present effect or probable future effect, more substantial than naked desire for vindication).

## II. THE CASE IS NOT RIPE – THE INITIAL SO-CALLED APPLICATION WAS DEFICIENT AND INCOMPLETE

### A. THE INITIAL SO-CALLED APPLICATION IS DEFICIENT IN FORM AND CONTENT.

#### 1. Background.

Weaver's Cove first filed a purported application with the CRMC requesting Rhode Island's assent on July 19, 2004. *See* J.A. Tab 10 & Tab 11. CRMC notified Weaver's Cove within thirty days of receiving the application that review would not begin until additional NDI was provided. *See* Ex. D. (Goulet Affidavit at ¶ 23). Weaver's Cove promptly resubmitted its application in early August, addressing one of the three alleged inadequacies, but insisting that the remaining two items of information – a dredge disposal plan and a water permit under the CWA – were not necessary. *See* J.A. Tab 12. The CRMC again responded by indicating that the application remained incomplete. *See* J.A. Tab 15.

Almost one year later, on July 15, 2005, the FERC issued an order authorizing the construction of the Weaver's Cove terminal, subject to a panoply of conditions, one of which necessarily required (pursuant to the precepts indicated above) that Weaver's Cove receive a positive consistency concurrence from Rhode Island. *See* J.A Tab 25. In a request for rehearing, Weaver's Cove asked the FERC to remove the condition, arguing that Rhode Island is presumed to have assented because it failed to take action on the consistency application within six months of Weaver's Cove's so-called application. *See* J.A. Tab 27. The CRMC filed comments opposing the requested removal. *See* J.A. Tab 28. The FERC refused to remove the condition, concluding that "[t]he Commission's only responsibility under the CZMA is to withhold construction authorization for a project until the state finds that the project is consistent with [its coastal management plan]." *See* J.A. Tab 39. Although the FERC is willing to

conclude that CZMA consistency has been presumed when the state's acquiescence is undisputed, the FERC described the disputed consistency determination as "a matter for the [CRMC], the NOAA, and the Department of Commerce, not this Commission." *See* J.A. Tab 39.

In October 2005, while the FERC was considering Weaver's Cove's request for rehearing, Weaver's Cove filed with the Secretary a notice of appeal supposedly pursuant to NOAA regulations. *See* J.A. Tab 30. The company's appeal asked the Secretary to treat the CRMC's comments in the FERC proceeding as an objection, *see* J.A. Tab 30, but the Secretary refused. *See* J.A. Tab 32. The Secretary dismissed the appeal, explaining that "[a]bsent an objection by Rhode Island, there is no basis for an appeal to the Secretary of Commerce . . .." *See* J.A. Tab 32.

Having been rebuffed by the FERC and denied review by the Secretary, Weaver's Cove turned to NOAA in December 2005, requesting an "authoritative interpretation" of NOAA's regulations under the CZMA and asking NOAA to determine that because the CRMC's failure to act is "unexcused as a matter of law, Rhode Island's concurrence with the Consistency Certification is conclusively presumed." *See* J.A. Tab 35. Anticipating an unfavorable result, Weaver's Cove filed an "appeal" to the Secretary on June 22, 2006, supposedly brought under the CZMA itself rather than under the NOAA regulations invoked in its October 2005 "appeal." *See* J.A. Tab 48. Weaver's Cove tried to distinguish this "appeal" from the earlier attempt. Weaver's Cove noted that, while the regulations require a state to object before an applicant may appeal, one could draw a distinction between the regulations and the statute itself. In Weaver's Cove's view, the statute dispenses with an administrative finality requirement. According to Weaver's Cove's submission to the Secretary, the CZMA states only that approval by the state is

required unless the Secretary finds that the proposed activity "is consistent with the objectives of [the CZMA] . . . [or is] otherwise necessary in the interest of national security." *See* J.A Tab 48. In other words, the company wished to do away with administrative finality under the statute. According to Weaver's Cove, the project could move forward regardless of the CRMC's consistency determination (or lack thereof) if the Secretary determines that the project is consistent with the objectives of the Act or otherwise necessary in the interest of national security.

In a July 24, 2006, letter to Weaver's Cove, the Secretary dismissed Weaver's Cove's second "appeal," implicitly rejecting the argument that the applicant's regulatory limbo was the fault of the CRMC. *See* J.A. Tab 51. The Secretary refused to entertain the appeal, explaining "[t]he plain meaning of the term 'appeal' requires a state objection as a necessary predicate for an appeal to the Secretary." *See* J.A. Tab 51. Therefore, "[i]n the context of the CZMA, absent a state objection, there would be nothing for an applicant to 'appeal.'" *See* J.A. Tab 51.

As will soon be argued, with this dismissal, Weaver's Cove is in a stalemate of its own making. In any event, as pointed out in a later section, if there were to be litigation over this, it should have been via an appeal of the Secretary's order in federal court under the APA, not through a petition for a declaratory order in this Court.

**2. The Deficiencies.**

Even before it became moot, the original proposal submitted to CRMC was deficient. As detailed *supra*, it proposed to deposit the dredged material/spoils at a tentative upland site in Massachusetts. Although Weaver's Cove has not and could not obtain a state or local permitted dredge disposal site in Massachusetts, which is a Coastal Resources Management Program ("CRMP") prerequisite, the company nevertheless contended their consistency certification

contained all necessary data and information from which CRMC should conduct a consistency review.

Through this process, the CRMC always maintained an approved and properly permitted upland dredge disposal site whether in Rhode Island or elsewhere, was "necessary data and information" required by the CRMC's program. Thus, the application was unactionable even before it became moot. This was compounded by the neglect of the Water Quality Certification, as detailed in the Executive Director's Affidavit, Ex. C, ¶¶ 5-12.

The relevant regulations promulgated pursuant to the Federal Coastal Zone Management Act ("CZMA"), 16 U.S.C. §1451 *et seq.*, are set forth in 15 C.F.R. § 930.58 and § 930.60. Pursuant to § 930.58(a), the applicant shall furnish the State agency with all necessary data and information along with the consistency certification. Among other things, the necessary information and data shall include the following:

> 2. Information specifically identified in the management program as required necessary data and information for an applicant's consistency certification. The management program as originally approved or amended (pursuant to 15 CFR part 923, subpart H) may describe data and information necessary to assess the consistency of Federal license or permit activities. Necessary data and information may include State or local government permits or permit applications which are required for the proposed activity. Required data and information may not include confidential and proprietary material.

15 C.F.R § 930.58 (a) 2 (2005)

State agency review of an applicant's consistency certification begins at the time the State agency receives a copy of the consistency certification, and the information and data required pursuant to § 930.58. If an applicant fails to submit necessary data and information required pursuant to § 930.58, the State agency shall, within 30 days of receipt of the incomplete

information, notify the applicant and the Federal agency of the missing information and that the State agency's review has not yet begun and that its review will commence once the necessary information deficiencies have been cured, or alternatively, that the State agency's review has begun, but the information deficiencies must be cured by the applicant during the State's review period. 15 C.F.R. § 930.58(a) (2005).

In the instant matter, Weaver's Cove filed both a purported application for State Category B Assent and a purported application for Federal consistency determination with the CRMC on or about July 19, 2004. Shortly thereafter, and during the month of July, a CRMC staff member, Danni Goulet telephoned Weaver's Cove agent Epsilon Associates and advised them the application was incomplete because it lacked necessary data and information and that the CRMC would not begin its consistency review until these deficiencies were cured. ***See*** Affidavit of Danni Goulet attached as Exhibit D [14]

Danni Goulet, P.E., was the CRMC staff member charged with conducting the initial review of the application and to determine if all necessary data and information required by the CRMP had been provided. As set forth in Goulet's attached Affidavit he notified Weaver's Cove agent Lester B. Smith the application lacked at least (3) three prerequisites to CRMC review. Specifically, he advised Mr. Smith that the application did not include a viable disposal location for the dredge materials/spoils which is a CRMC prerequisite. Also, the CRMP required the plans submitted to be stamped by a Rhode Island professional engineer, and the CRMP required a Water quality Certificate ("WQC") from the Rhode Island Department of Environmental Management ("RIDEM") as a prerequisite to CRMC review. Id.

[14] Weaver's Cove has acknowledged this telephone conversation in one of its filings. Further, it is implicit that concession that the conversation took place after Weaver's Cove filed its application and consistency determination and within the 30 day period required by § 930.60.

Rhode Island's Federally approved CRMP section 300.9 (C) entitled "Prerequisites" require applications for dredging or dredged material disposal to include the following:

> 3. All materials to be dredged for either open water disposal or upland disposal must be classified by the Department of Environmental Management (DEM) based upon an approved analysis process prior to the Council acting on an application of either dredging or dredged materials disposal.
>
> * * *
>
> 6. Upland disposal of dredged materials must comply with all applicable local zoning ordinances.
>
> 7. When disposal is proposed for approved upland facilities, the applicant shall provide a letter of acceptance from that facility, unless the disposal is approved for the central landfill.

*See* CRMP Section 300.9 (C) 3, 6, 7

CRMP Section 300.1 requires that all category B Assent applications are required to:

> (2) demonstrate that all applicable local zoning ordinances, building codes, flood hazard standards, and all safety codes, fire codes, and environmental requirements have or will be met; local approvals are required for activities as specifically prescribed for nontidal portions of a project in Sections 300.2, 300.3, 300.6, 300.8, 300.9, 300.11, 300.13, 300.15 and 300.17; for projects on state land, the state building official, for the purposes of this section, is the building official, . . ..

See CRMP Section 300.1 (2)

Additionally, the CRMC Management Procedures ("Management Procedures") require that:

> (5) Applicants shall be required to obtain and certify that they have in their possession current approvals from municipal bodies which are otherwise required for the proposed action. Municipal approval shall be construed to mean compliance and conformity with all applicable

> comprehensive plans and zoning ordinances and/or the necessary variance, exception and other special relief therefrom (see RICRMP Section 300.1).
>
> (6) Applicants shall further be required to obtain and certify that they have in their possession current approvals from all other agencies which are otherwise required for the proposed action.
>
> (7) The above required municipal and state approvals shall be construed as a prerequisite for any application before the Council considers the application.

CRMC Management Procedure §4.2.

Rhode Island's CRMP also requires as a prerequisite, in its "State of Rhode Island Dredging Application Checklist," the following:

> All site plans that propose work within 25 feet of ANY structure, involve dredging, excavation or grading, propose new structures or are for structural rehabilitation must be prepared by a Registered Professional Engineer and must contain the stamp affixed to each sheet along with the date and the signature of the professional. All other proposals may be prepared by a Registered Land Surveyor.

Although not a major point, the context is not complete with reference to the engineering plans problem. In order for plans to be considered stamped by a "Registered Professional Engineer", Rhode Island statutes (like all other states) require the Engineer to be licensed to practice in Rhode Island. The plans submitted by Weaver's Cove did not meet that requirement. Hence the application was incomplete when it was filed in July 2004.

Notwithstanding the CRMC's prerequisite requirements that Weaver's Cove give detailed information, and acquire permits from relevant agencies, whether in R.I. or Massachusetts, that it had an approved upland disposal site, Weaver's Cove in its CRMC filing submitted the following statement:

> The project developer has a contractual right to purchase a Brownfield's site in Fall River, Massachusetts, on which dredge material will be used as engineered fill, and therefore has control over the dredge material placement site. The permitting process for handling the dredge material at the Fall River site is well under way with the relevant Massachusetts permitting agencies. Details regarding existing and proposed conditions on the Fall River site are subject to the jurisdiction of Massachusetts for review and permitting. Accordingly, no authorization for our Massachusetts activities can be sought from the RIDEM/CRMC. [15]

In response to Danni Goulet's notice regarding incompleteness, on or about August 12, 2004, Weaver's Cove filed a new application which included plans stamped by a Rhode Island professional engineer.[16] However, the application and consistency certification still lacked information regarding a viable disposal location for the proposed dredge material/spoils as well as the WQC, thereby continuing to be an incomplete application precluding CRMC from beginning its review.

On August 26, 2004 CRMC Executive Director, Grover J. Fugate notified Weaver's Cove by letter that the new application still lacked necessary data and information and that the agency's review would not begin until the necessary data and information was submitted to the agency. *See* Affidavit of Grover J. Fugate attached as Exhibit C. Further, Dani Goulet advised Epsilon that the new proposal still lacked a viable dredge disposal site. As set forth *supra*, the CRMC still does not have the necessary information to evaluate a proposed dredge disposal site nor does it have a WQC, despite the fact that Weaver's Cove said they would obtain permits.

[15] In fact, as set forth *infra*, the Massachusetts permitting staff shared the skepticism of the CRMC staff that the upland site proposal was not feasible, nor was a permit from any approving entity possible. Massachusetts permitting staff advised CRMC staff accordingly.

[16] In filings with FERC and the CRMC, Weaver's Cove acknowledged the August 12, 2004 filing was a new application.

The fact that Weaver's Cove hoped they would obtain a permit in Massachusetts does not equate to having approval for an upland disposal facility.[17]

In its filings in this matter, Weaver's Cove argues that although it had not received approval from any permitting authority for upland disposal of dredged material the CRMP pre-requisite is inapplicable because at the time they intended to dispose of the material outside of Rhode Island and as a result, the CRMC should turn a blind-eye as to where the dredge material would be deposited. They essentially said to CRMC, "trust us, we'll find somewhere to deposit the material upland in Massachusetts".

The short answer is, the location of disposal was important necessary data and information. It would be irresponsible for CRMC to assume Weaver's Cove would get approval in Massachusetts when in fact the Massachusetts permitting agencies were advising CRMC staff the proposal was problematic and in fact turned out to be infeasible. The fact that Weaver's Cove thought they could get a permit in Massachusetts does not relieve the CRMC of its duty and requirement to ensure any dredge material deposited on an upland site goes to an approved location.

Weaver's Cove relies on an August 2, 2004 letter from its Rhode Island attorney, John Boenhert, for the proposition that because they hoped upland disposal would be permitted in Massachusetts, CRMC was under an obligation to ignore the CRMP requirement for an approved upland disposal site. They argued since they "controlled" the upland disposal site through a purchase and sales agreement, CRMC must equate that to an approved site. In fact, MACZM had stated in their comments to the DEIS in March 2004, that there were "significant issues" regarding the upland dredge disposal because the site was contaminated, and further, that

[17] "Labeling a cat a dog certainly will not cause a cat to bark" Cohen v. Harrington, 722 A.2d 1191, 1195 (R.I. 1999).

the actual owner of the site, Shell Oil Company, did not approve of the use of the site for dredge material disposal. These and other concerns were relayed to the CRMC staff which is why they insisted on an approved upland site as a prerequisite to commencing review.

Additionally, the CRMC staff was aware that Weaver's Cove was pursuing an in-water disposal site which indicated to CRMC that Weaver's Cove itself realized the upland disposal proposal was not viable.

For instance, the Sample Plan for Offshore Testing was approved in September 2004. The samples were taken in October 2004. The final testing results were provided to the ACOE and EPA on April 11, 2005. This demonstrated to CRMC staff that even as the FEIS was going to print with the on-land disposal, there was no intention of using that option. The material was found suitable for off-shore disposal on September 22, 2005. There was nothing submitted to RIDEM or CRMC by the applicant nor any attempt to revise either application.

The final EIS is dated May 2005. In it, the material is still being "reused" on the contracted land in Massachusetts, the disposal of which has been questioned all along by CRMC and Massachusetts regulators. In fact, the new proposal noticed by the ACOE demonstrates the upland proposal was not a viable option as contended by the CRMC staff.

The argument made by Weaver's Cove in its August 2, 2004 letter was a red herring. They argue because the material is "proposed" to be deposited at a site in Massachusetts, CRMC should not care whether it is approved or not.[18] This also ignores the issue that a disposal location in Massachusetts could impact Rhode Island coastal resources invoking interstate federal consistency on the disposal location. Weaver's Cove is essentially saying, leave that to Massachusetts. As set forth *supra*, and as events have demonstrated, Weaver's Cove position was incorrect and irresponsible. It is essential for any meaningful CRMC review to know with

[18] Albeit, while Weaver's Cove was actively, pursuing the in-water option which was known to CRMC staff.

certainty the location and conditions attached to any dredge disposal site. An approved upland disposal site means wherever located, not just in Rhode Island.[19] Where an applicant fails to respond to a timely request by a State agency for necessary information and data, the applicant may not then claim, because it feels the information is not "necessary," that the State agency's refusal to begin review on the application constitutes a waiver of the six-month review period. *See* Mountain Rhythm Resources v. FERC, 302 F.3d 958 (9th Cir. 2000). Such is the effect and purpose of the August 2, 2004 letter.

CRMC staff both before and after the August 2, 2004 letter advised Epsilon Associates an approved upland disposal site was a prerequisite to begin review, therefore Weaver's Cove argument regarding waiver are without merit.

Finally, Weaver's Cove argues that although they were orally told the application was incomplete, 15 C.F.R. §930.60 requires CRMC must notify the applicant in writing of this fact. There is no such requirement in §930.60 that notification be in writing.

To support its argument, Weaver's Cove refers to the writing requirement set forth in § 930.63. The CRMC understands the requirement of written notification in § 930.63 applies to **objections** to consistency certifications based upon failure to submit necessary data and information. CRMC has not and is not at this time objecting to the consistency certification. The agency is merely seeking the information relative to an approved dredge disposal site so that it can conduct a meaningful review of the proposal.

**3. The Notice of the Deficiencies was adequate.**

Regarding the original filing, despite being notified by the CRMC within the 30 day notification period set forth within 15 C.F.R. §930.60(a)(1) that its certification lacked necessary

[19] Under Weaver's Cove logic, if they advised CRMC they were preparing to deposit the dredged material on the moon, CRMC must consider that a viable site because it is outside of CRMC's jurisdiction.

data and information sufficient to allow CRMC to begin its review, Weaver's Cove has failed to submit the necessary data and information to the CRMC. Consequently, the CRMC's review has yet to begin and the six month clock has yet to start. Therefore, there can be no presumption or waiver of CRMC concurrence or objection. This is documented in the preceding portion.

The CRMP requires as a prerequisite to dredging that:

> 2. Except for Federal consistency reviews, applicants for dredging or open waters disposal of dredged materials shall be required to obtain a Section 401 (Clean Water Act) Water Quality Certification from the Department of Environmental Management (DEM) before the Council can consider granting approval for the project. The application for the Section 401 Water Quality Certification will be forwarded to the DEM when all appropriate application forms have been completed.

*See* CRMP Section 300.9 (C) 2.

As set forth in the Affidavit of CRMC Executive Director, Grover Fugate, the exemption from this prerequisite for Federal consistency review applies only to direct federal activities and not applicants for a federal license or permit activity. The CRMC has consistently interpreted its regulation in this manner.

The reason for the prerequisite of a 401 certification is due to the fact that RIDEM as the solid waste agency is responsible for classifying the dredge material. Once classified, it is through the certification process that suitable disposal options can be chosen. Without this classification, it is impossible to determine what disposal option is permissible. Further, the CRMP which as a federally approved program must, by Federal statute, implement its CRMP consistent with the Clean Water Act. Direct Federal navigation projects (dredging) are bound by the Clean Water Act as a mater of Federal statute and thus a consistency determination can proceed in the absence of a 401 permit because it must be obtained. The only way the CRMC

has to ensure that dredge projects which are private in nature are consistent with the act, is to require them to obtain a 401 certification prior to issuance of a CRMC assent. In this way the CRMC ensures its own compliance with the CZMA.

The language in 300.9 is older CRMP language adopted before the CRMC developed its Federal consistency manual which clarifies the distinction between direct and indirect federal activities. The 300.9 language referred only to direct federal activities and indirect federal activities were processed as Category B applications. The basis for the terminology is detailed at length in the Fugate Affidavit, Ex. C. Consistent with this procedure, Weaver's Cove has filed both a category B Assent request and a Federal consistency certification. There can be no question that a 401 certification is a prerequisite for a Category B proposal. Pursuant to CRMC procedure one application is filed and both are processed and considered on one track. The CRMC in practice has been consistent in its application of consistency for direct federal activities versus indirect federal activities. All indirect Federal activities have always required a WQC as a prerequisite.

If one were to accept the logic put forth by Weaver's Cove that 300.9 exempts dredge activities which are subject to federal consistency from obtaining a 401 certification as a prerequisite, then on its face no dredge project would require a 401 certification. All dredge projects must obtain ACOE permits. All ACOE permits are subject to CRMC federal consistency review. Therefore, according to their theory they are exempt from obtaining a 401 certification. The fact of the matter is that every non-federal dredge project permitted in R.I. has had to obtain a 401 certification as a prerequisite to CRMC review.

In response to Weaver's Cove argument that CRMC was required to notify them in writing within 30 days of the deficiency, the answer is CRMC did, although as set forth *supra*,

this is not a requirement of the CFR's. Weaver's Cove by its own admission re-filed a new application on or about August 12, 2004. On or about August 26, 2004, the CRMC Executive Director advised them in writing the application was incomplete and consistency review could not commence until CRMC received the necessary data and information. [20]

**4. Weaver's Cove has caused its own predicament.**

Although the CZMA provides for its own federal review process, the law provides no cure for the self-imposed dilemma that has arisen in the specific LNG project at hand. Because the CZMA requires a positive consistency determination in order for the project to proceed, and because only state objections can be appealed to the Secretary, the statute does not provide a remedy where the promoter refuses to provide the state with the NDI. In such a situation, the pertinent agency can neither approve nor object to a consistency certification. The CZMA provides for a presumption of concurrence, but only if the state fails to act on a completed application or fails to notify the applicant of missing NDI. 16 U.S.C. § 1456(c)(3)(A) (2000). Under the statute, if a state justifiably rejects a consistency application as incomplete, the applicant will find itself in regulatory limbo: it needs the state in order to advance the process before the Secretary will consider overruling an objection.

Indeed, this assessment of the law is the position of the two relevant federal administrative bodies — FERC and the Department of Commerce. We know of this because of activity in this very case. This was already detailed in the sub-section, *supra*, setting forth the background. To briefly recapitulate, in 2005, Weaver's Cove's attempted to solicit a favorable interpretation of the law from the supervisory federal agencies. This back-fired when each

[20] Additionally, Weaver's Cove suggests that, since CRMC has since clarified its longstanding regulatory interpretation of Section 300.9, the CRMC recognizes the WQC does not apply in this case. Making explicit that which was implicit does not constitute an abuse of discretion or invalidate that which was implicit. Mountain Rhythm Res. v. FERC, 302 F.3d at 966-967.

respectively rendered an opinion agreeing with the above recitation of the statutory scheme. *See* J.A. Tab 32, Letter from Conrad C. Lautenbacher, Jr., Vice Admiral, U.S. Navy (ret.), Under-Secretary of Commerce for Oceans and Atmosphere, to Bruce F. Kiely, Counsel for Weaver's Cove Energy, LLC, Dismissing of the Consistency Appeal of Weaver's Cove Energy, LLC (Oct. 10, 2005); J.A. Tab 25, Weaver's Cove Energy, LLC, 112 F.E.R.C. ¶ 61,070 (2005) (dismissing Weaver's Cove's consistency appeal, explaining that the appeal was not ripe because Rhode Island had not objected). Both of these interpreters of the CZMA recognize that if the stalemate is to be broken, it must be broken by the promoter's provision of the NDI. Otherwise, according to the federal officials, a state should refuse to evaluate a project on the merits even though the state is thereby preventing ultimate federal approval.

Stated differently, the CZMA and its implementing regulations do not provide a means to overcome a state's inaction where an applicant has failed to provide the NDI to evaluate its consistency certification. Under the implementing rules promulgated by the National Oceanic and Atmospheric Administration (NOAA), the state determines when the NDI has been provided. 15 C.F.R. § 930.60(a) (2006). Because the CZMA allows state's inaction based on a lack of NDI, the State has done nothing wrong or illegal. Thus, to the extent that the CZMA confers on Weaver's Cove a private cause-of-action, Weaver's Cove sole legal avenue of redress is to challenge the determinations of the Secretary pursuant to the Federal Administrative Procedure Act. *See* 5 USC §§ 50, *et. seq.*.

### B. *RES JUDICATA* AND RELATED PRINCIPLES RENDER THE SECRETARY'S UNAPPEALED DECISION BINDING.

Weaver's Cove dead-ended its own efforts to seek review of CRMC's position by failing to appeal from the rejections it received from the Secretary and from FERC. This lapse constitutes a neglect of the available recourse found in the APA. That statute that allows "[a]

person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute" to seek judicial review of such action. ***See*** 5 U.S.C. §§ 702, 704; Norton v. So. Utah Wilderness Alliance,, 542 U.S. 55, 61 (2004). Agency actions subject to review under the APA are not only those that are made reviewable by statute, but also those that constitute "final agency action[s] for which there is no other adequate remedy in a court." ***See*** 5 U.S.C. § 704. ***See also*** Akiak Native Community v. United States Postal Serv., 213 F.3d 1140, 1144 (9th Cir.2000) (stating that "[j]udicial review of actions under CZMA ... ordinarily is governed by the APA").

The result is an election that collaterally estops Weaver's Cove from pursuing the state in this forum.

## III. SECTION 3 OF THE NGA DOES NOT AFFECT STATE OWNERSHIP OF SUBMERGED LANDS; STATE PERMISSION TO DREDGE IS STILL REQUIRED

Naturally, Weaver's Cove is asserting a ***regulatory*** pre-emptive effect that flows from its FERC approval. But, traditional pre-emption arguments are for naught in the context of state ownership of property – in this instance, the State's ownership of the sea-bed. Thus, whatever the preemptive effect on the state's ordinary ***regulation*** might be, such effect is irrelevant to the State's prevention of the dredging of its bottom lands based on ownership of ***property***.[21]

In reality, there are essentially only two ways the Federal government can force a state to allow a long-term activity on such state's own submerged lands: (1) eminent domain; and (2) a component of the paramount Federal navigational power called the Federal Navigational Servitude. Weaver's Cove has neither. Indeed, Weaver's Cove makes no pretense to the former; but it ***does*** grasp at the latter, claiming a form of navigational power trumping State property. This position is based on the thin reed of its conditional approval from FERC under NGA § 3, a provision having nothing to do with ***either*** promoting navigation ***or*** taking property.

Without the additional federal authority of (1) the power of eminent domain ***or*** (2) the navigational power, Weaver Cove's attempt to force Rhode Island to allow the dredging of Rhode Island's own land (in contraction of a fee simple owner's absolute right to exclude occupancy by others) is in vein. In other words, the power that Weaver's Cove in fact ***does*** possess is unequal to the task.

### A. *REGULATORY* PRE-EMPTION DOES NOT APPLY TO STATE REAL ESTATE *OWNERSHIP*.

None of the admittedly preemptive force behind FERC approvals affects the states' traditional property law systems even though those systems could affect natural gas terminal

[21] The threshold proposition that the state owns the land and has concomitant control of dredging thereon several sub-sections hence. In the interim, this Memorandum relies upon the Court's intuition.

siting. To illustrate, FERC approval obviously does *not* excuse Weaver's Cove from obtaining a deed to the site of its intended terminal. Even Weaver's Cove would likely concede that, for example, in order to break ground, it must obtain title for its Fall River location under state law – in that instance, the law of Massachusetts.

Once this separation between state regulatory schemes and state-law property rights is understood, the situation becomes clear. Congress has done nothing that is applicable here that takes property held under the law of the several states away from ***any*** entity including, to say the least, from the states themselves. Nor, indeed, could Congress have done so except by providing for payment of just compensation or by providing for a direct Federal navigation project. As will now be shown, Weaver's Cove invokes no federal authority that changes the balance of power between the federal government and the State insofar as the State is relying on proprietary rights (nor could Weaver's Cove do so without having resorted to the NGA's eminent domain provisions or having solicited a Congressional waterway appropriation).

**1. Rhode Island does not dispute NGA Section 3's paramount power over ordinary state police power *regulation* of terminal siting.**

It is readily acknowledged that a valid federal law will preempt any state police power regulation that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67 (1941). Obviously, this applies in the natural gas context just like all other contexts.

In this vein, independent non-delegated state ***regulatory*** laws have long been preempted by FERC authorizations to the extent that such ***regulatory*** laws attempt to "engage in concurrent site-specific environmental review," or the like. Northern Natural Gas Co. v. Iowa Utilities Bd., 377 F.3d 817 (8th Cir. 2004) (preempting Iowa land restoration rules in relation to FERC-approved construction of natural gas facilities because the "provisions **regulate** in an occupied

field"). In other words, FERC's preemptive authority displaces those state and local laws enacted under *police powers* traditionally reserved to the states, such as zoning laws, building permits, and regulations regarding public safety. *See* Schneidewind v. ANR Pipeline Co., 485 U.S. 293 (1988) (NGA preempted attempt to require natural gas companies to receive state approval to issue long-term securities; "[the state act] seeks to **regulate** a field that the NGA has occupied" (emphasis added)); National Fuel Gas Supply Corp. v. Pub. Serv. Comm'n, 894 F.2d 571, 579 (2nd Cir. 1990) (prohibiting concurrent, site-specific environmental review by state; "[NGA] **[r]egulations** . . . preempt similar state **regulations**"); ANR Pipeline Co. v. Iowa State Commerce Com'n, 828 F.2d 465, 470 (8th Cir. 1987) (state statute attempting to impose safety **regulations** on gas facilities pre-empted); Kern River Gas Transm'n v. Clark County, 757 F.Supp. 1110, 1114 (D. Nev. 1990) (local **regulations** attempting to impose safe construction requirements on gas lines pre-empted); Northern Tanks, Inc. v. Public Utilities Comm'n, 697 A.2d 1313, 1316 (Me. 1997) (state safety and environmental mandates for tank facilities over-ridden; "[a] state attempt to **regulate** [is] pre-empted").

Indeed, one needs to look no further than the decisions of this District Court to find an example. *See* Algonquin LNG v. Loqa, 79 F. Supp. 2d 49 (D.R.I. 2000) (preempting zoning laws and building permits because the FERC process subsumes land use concerns; "federal regulatory scheme comprehensively **regulates** . . . location" (emphasis added)).

Further, Rhode Island forthrightly accepts that such holdings were reinforced by the recent EPAct 2005 amendments, discussed earlier, that expressly give the FERC exclusive *regulatory* jurisdiction over the siting, construction, and operation of LNG terminals (subject, of course, to other federal laws, such as the CZMA, under which the states exercise delegated authority). In particular, as Weaver's Cove summarizes (*See* Plaintiff's Brief, p. 5), in EPAct

2005, *supra*, Congress added to the NGA a Section 3(e)(l), which reaffirms the pre-existing: "The Commission shall have the exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal." 15 U.S.C. § 7l7b(e)(1).

**2. Nonetheless, NGA § 3 confers absolutely no paramount power over land titles.**

None of the above background, however, detracts from a fundamental axiom: Neither conventional supremacy principles, nor § 3 of the Natural Gas Act, nor the EPAct 2005 alter the rights derived from ***real estate titles*** held under state law. Classic preemption principles simply do not relate to land titles held under state law, especially those titles held by the states themselves.

To elaborate, none of the above-cited opinions calls for pre-emption of state-law land *ownership.* Nor does the underlying statute (except the single eminent domain provision which is not involved here), which those cases invoke, attempt to displace state *ownership*.[22] In other words (and subject to same exception), nothing in the Natural Gas Act ("NGA"), 15 U.S.C. § 717 *et seq*., operates against the strong tradition of state seisin-in-fee of bottom lands, discussed below. Moreover, the clarification tacked onto the NGA by Congress in the EPAct 2005 did nothing to alter this analysis. The language in that bill to the effect that § 3 of the NGA clearly preempts states on matters of approving and siting certain LNG infrastructure does not speak to state *ownership*. Rather, all of these sources of law deal with mere *regulation*.

As discussed below, there is a rich body of case law holding that vested property rights held under state law are *not* displaced by ordinary federal enactments (including some of the enactments that under-gird FERC) even when those enactments are otherwise preemptive.

[22] Those cases apply the NGA, 15 U.S.C. §§ 717 *et seq*., or the recodified federal Natural Gas Pipeline Safety Act ("NGPSA"), 49 U.S.C. §§ 60101 *et seq*. In particular, many of these authorities concern § 3 of the NGA, 15 U.S.C. § 717b(a).

Those cases, and the statutes they construe, are discussed in the next sub-section because they are most readily understood by a comparison with those rare (and presently inapplicable) enactments that *do* accomplish such displacement.

**B. THERE ARE TWO MEANS BY WHICH CONGRESS COULD OVERRIDE STATE OWNERSHIP, BUT IT HAS DONE NEITHER HERE.**

Rhode Island cheerfully concedes that the Federal government, for the sake of the Nation, ***could*** supercede Rhode Island's property rights. There are two methods by which the national government ***could*** easily trump the State's title. Importantly, neither of these two powers has been extended to Weaver's Cove. Indeed, the curious absence of the employment of either of those two methods is extremely telling here. When one considers the two powerful tools at the command of Congress (and its delagees) when Congress genuinely desires to push a state's land-tenure aside, the novel method implicitly asserted by Weaver's Cove (the supposed indirect regulatory pre-emption of the rights inherent in the State's real estate title) takes on an air of desperation.

In other words, the negative proposition asserted above – that state property rights are ***not*** affected by Congress' ordinary regulation of commerce – comes into sharp focus when one considers a certain positive proposition. That positive proposition is that state property rights ***are*** affected by two types of legislation: (1) Congress' exercise of the eminent domain power and (2) Congress' exercise of the positive component of the Federal navigational power, known as the Federal Navigation Servitude, by means of direct public water projects. The existence of these two potentialities of the national government sets up a stark contrast with the NGA regime now at hand. These two forceful powers at Congress' disposal (which lie dormant in the matter ***sub judice***), underscore that the power actually invoked here (the power of ordinary regulatory permitting embodied in an NGA § 3 approval) is limited.

Thus, an understanding of what Congress *granted* to Weaver's Cove turns on an understanding of what Congress *withheld*. Therefore, this Memorandum now turns its energy to the two sleeping giants of Congressional power that are significantly missing from the FERC approval: eminent domain and the Federal Navigational Servitude. (To be precise and comprehensive, there is a third conceivable means for the national government to trump state titles: the reserved powers doctrine of federal land law. As will be briefly discussed, *infra*, this absolutely could *not* be applicable to these facts and, therefore, does not affect this argument.)

**1. Congress has not delegated eminent domain power to FERC in the statutory section that Weaver's Cove invokes although, by contrast, it has done so elsewhere.**

***a. Section 3 of the NGA conspicuously omits eminent domain authority, which, by contrast, is available under § 7.***

Of course, if FERC or Weaver's Cove had been granted the power of eminent domain in this situation they could put it to good use: "Because . . . the United States' power of eminent domain is supreme to the State's power to maintain tidal lands for the public trust, . . . condemnation of these lands extinguishes the State's public trust . . .." U.S. v. 11.037 Acres of Land, 685 F.Supp. 214, 216 (N.D. Calif. 1988).

In this regard, a comparison between § 3 (the section under which Weaver's Cove holds an approval) and § 7 of the NGA is instructive. A juxtaposition of these two texts reveals that, while simple legislation can pre-empt state *regulation*, only an exercise of eminent domain can supercede land *titles*.

Section 3 of the NGA treats applications liberally. It requires the FERC to authorize any proposal from any person to import or export natural gas to or from the United States unless the FERC "finds that the proposed exportation or importation will not be consistent with the public interest." The burden is on the FERC to deny the approval. NGA § 3(a), 15 U.S.C.. The FERC

may condition and supplement its authorization under § 3 as it "may find necessary or appropriate." Id.. This ability to condition authorization has led the D.C. Circuit to describe FERC's § 3 authority as "plenary and elastic." Distrigas Corp. v. FPC, 495 F.2d 1057, 1064 (D.C. Cir. 1974). This approach, the Court explained, would allow the Federal Power Commissions (FERC's predecessor) "flexibility far greater than would be the case were we to hold that imports are interstate commerce, automatically and compulsorily subject to the entire panoply of § 7's requirements." Id.

By contrast, § 7 of the NGA is much more restrictive. It authorizes the FERC to issue "certificate[s] of public convenience and necessity" for the construction and operation of natural gas facilities for the transportation of gas in "interstate commerce." NGA § 7, 15 U.S.C. 717f(c)(1) ("No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas . . . unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity"); Id.; *see also* NGA § 1, 15 U.S.C. § 717a(6) (defining "natural-gas company" as "a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale"). The standard for evaluating an application for a certificate of public convenience and necessity is more stringent than the standard required for § 3 authorization: FERC must positively find that the proposed project is "necessary or desirable in the public interest." NGA §7, 15 U.S.C. § 717f(a). The burden is on the applicant. To find that an action is necessary or desirable, the FERC must determine that the applicant is willing and able to satisfy a panoply of requirements enumerated in § 7, and that the action "is or will be required by the present or future public convenience and necessity." Id. § 717f(e).

What is the crucial distinction that led Congress to allow for greater flexibility under § 3 (the type of approval Weaver's Cove holds)? In other words, why did Congress make it so that § 7 certificates are more difficult to come by? The answer is: ***eminent domain***. This higher standard is consistent with the extraordinary power of ***eminent domain*** that accompanies a certificate of public convenience and necessity under § 7. NGA § 7, 15 U.S.C. § 717f(h). Specifically, that last-cited subsection, § 7(h) of the Act, confers on natural gas facility builders who are FERC-certified the power of eminent domain to acquire rights-of-way as well as "other stations or equipment necessary to the proper operation of the certified project." NGA § 7, 15 U.S.C. § 717f(h).

In sum, the flexibility available under § 3 and the exacting requirements of § 7, are respectively consistent with Congress' delegation of the power of eminent domain. For example, in its pre-EPAct order authorizing a particular facility, the Hackberry LNG terminal, under § 3, FERC changed its policy for LNG import facilities, abandoning the open-access requirement necessary under § 7 in favor of less regulatory oversight. *See In re* Hackberry LNG Terminal, L.L.C., 101 F.E.R.C. ¶ 61,294 at ¶ 3 (2002). In that administrative decision, the FERC justified a less restrictive regulatory regime for LNG terminals under § 3 in part based on the fact that § 3 authorizations do *not* include the power of eminent domain. *Accord* Cameron LNG, LLC, 104 F.E.R.C. ¶ 61,269 at paragraph 12 (2003).

It is for this reason that commentators have observed:

> Opponents may find solace in the use of § 3 of the NGA rather than § 7 because **§ 3 authorizations do not include the power of eminent domain**. Therefore, a proposal will fail if a developer is unable to acquire control over the property necessary to construct the terminal.

Jacob Dweck, David Wochner, Michael Brooks, "Liquefied Natural Gas (LNG) Litigation After The Energy Policy Act of 2005: State Powers In LNG Terminal Siting," 27 Energy Law Journal 473 (2006).

One need look no further than the central document in Weaver's Cove's own arsenal, the initial FERC order, for affirmation of this logic:

> When the Commission issues a certificate under § 7 of the NGA to construct pipeline facilities, the certificate provides the right for the pipeline company to acquire property for an easement for the pipeline, either through negotiation with the landowner, or through eminent domain procedures should negotiation not result in an agreement. **Authorizations of projects under NGA § 3 do not convey such rights to acquire [by] eminent domain.**

J.A. Tab 25 (Weaver's Cove Energy, LLC Mill River Pipeline, LLC, 112 FERC ¶ 61070, 61547 (2005) (emphasis added)).

***b. The absence of eminent domain authority has already played a role in Weaver's Cove's proposals.***

This quotation immediately above, in the FERC conditional order, brings to the fore a peculiar fact in this case. It seems that Weaver's Cove and another property owner have a conventional real estate dispute as to the meaning of a particular deed for the land on which Weaver's Cove plans to build. *See* J.A. Tab 25, *In re* Weaver's Cove Energy, LLC, 112 F.E.R.C. ¶ 61,070 at ¶ 111 (2005). One of the conditions of the FERC order was that Weaver's Cove had to resolve this dispute through traditional private means. Id. ("We will condition any construction on the proposed site, however, upon resolution of this issue, either by an agreement of the parties, or by a decision of a court of appropriate jurisdiction."); *see also* id. at ¶ 77. This was revisited when FERC responded to Weaver's Cove petition for rehearing. *See* J.A. Tab 39 (*In re* Weaver's Cove Energy, LLC, 114 F.E.R.C. ¶ 61,058 at ¶ 133 (Jan. 23, 2006)). In that decision, FERC explained that the earlier condition, condition 77, serves the following purpose:

"[it] reminds Weaver's Cove of its responsibility to obtain undisputed right **under the deed** to use the property . . .". Id. (emphasis added).

Why did this need exist? Why this need to resolve a conventional property dispute by the conventional means of private negotiation or private litigation in a state land court? There are two intimately related reasons. ***First***, as FERC itself expresses, Weaver's Cove lacks eminent domain authority. And, ***second***, as FERC itself implies, without eminent domain, no paramount power of FERC is available to trump a state-law title problem. Otherwise, FERC itself could have simply vitiated the vexatious deed restriction. Under a theory that state land titles give way to federal pre-emption, FERC could have done away with the property rights of the other owner with a stroke of the bureaucratic pen. But the concept of preemption does not extend that far. Only eminent domain can produce that result.

Alas, Weaver's Cove does not have the backing of Congress with respect to that power — the power of eminent domain — and actually finds itself in a relatively ***dis***favored status. By contrast, other classes of beneficiaries of the Natural Gas Act are in a much stronger position. We have seen that facility promoters who are eligible for, and successfully invoke, § 7 receive the benefit of a delegation of eminent domain authority. Indeed, Weaver's Cove's own affiliate, Mill River Pipeline, having been in a position to apply through § 7, does enjoy that power.

This Memorandum hastens to add that it is not suggesting that Weaver's Cove could have availed itself of § 7. Regardless of the inapplicability of § 7 to this project, the large point stands: when Congress wanted to confer on a natural gas company the power of eminent domain, it certainly knew how to do so.

The result is that Weaver's Cove is bereft of the authority to compel the necessary land rights from the State of Rhode Island in order to construct a channel within the submerged lands of Mount Hope Bay.

**2. Congress has not delegated the exercise of the navigational power, especially the Federal Navigational Servitude, to FERC or to Weaver's Cove.**

As has been held by numerous Supreme Court cases, the paramount navigational power is an alternative mechanism for trumping states' rights derived from ownership of tide-lands.[23] But a crucial distinction makes it impossible for Weaver's Cove to benefit from this right in a manner that would allow for its dredging.

A careful reading of these cases reveals that the paramount right in navigable waters has two distinct components: ***First***, the negative ***regulatory*** power to prevent obstructions; and, ***second***, the positive ***proprietary*** power to construct improvements. This thesis – the dual nature of the navigational right – is advanced by none other than Weaver's Cove's own submission. That brief contains the following passage that refers to the two branches of the paramount right, albeit in reverse order:

> *See* Phillips Petroleum Co. v. Mississippi, 484 U.S. 469, 479 (1988). The states' power under the Public Trust Doctrine is not unlimited, however: As the Supreme Court long ago recognized, the States' authority under the Public Trust Doctrine is "subject to the federal navigation easement **and** the Power of Congress to

[23] ***See*** U.S. v. Cherokee Nation of Okla., 480 U.S. 700, 704 (1987) ("[w]hether . . . the title to the bed of the stream is retained by the State or . . . the riparian owner . . . the rights of the title holder are subject to the dominant power of the federal Government") (internal quotation marks and citations omitted); Montana v. U.S., 450 U.S. 544, 551 (1981) (citing US v. Oregon, 295 U.S. 1, 14 (1935); "[t]he State's power over the beds of navigable waters remains subject to only one limitation: the paramount power of the United States to ensure that such waters remain free to interstate and foreign commerce"); Lewis Blue Point Oyster Cultivation Co. v. Briggs, 229 U.S. 82, 88 (1913) ("title to such submerged lands is acquired and held subject to the power of Congress to deepen the water over such lands, or to use them for any structure which the interest of navigation, in its judgment, may require"); Philadelphia Co. v. Stimson, 223 U.S. 605, 635 (1912) ("although the title to the . . . submerged soil is in the various states . . ., it is always subject to the servitude in respect of navigation . . . in favor of the Federal government"); Scranton v. Wheeler, 179 U.S. 141, 163 (1900) (quoting Webber v. Pere Morquette Boom Co., 30 N.W. 469 (Mich. 1886); "whether the title to the submerged lands of navigable waters is in the state or in the riparian owners, it was acquired subject" to the Federal Navigational Servitude).

> control navigation on those streams under the Commerce Clause."
> *Id.* (citing Barney v. Keokuk, 94 U.S. 324, 338 (1877)).

Plaintiff's Brief at p. 9 (emphasis added by this State's brief). This Supreme Court quotation, excised by the Plaintiff's Brief, suggests that when the United States asserts its paramount authority over water-beds within a state, it can go beyond ***regulatory*** "control" into an area where it acts purely pursuant to a power that is ***proprietary*** in nature (characterized as an "easement").

The following pages will show: (1) that this particular sub-set of the larger navigational power is referred to as the "Federal Navigation Servitude," (2) that (aside from eminent domain) only an exercise of this Servitude would allow for a project such as dredging to be conducted over the state's objection, and (3) that it is impossible for Congress to have invested Weaver's Cove with the power of this Servitude.

At the outset, the federal judiciary has clearly distinguished, in the navigational context, between instances of ordinary regulatory permitting, on one hand, and full-fledged exercises of the proprietary right (the Federal Navigational Servitude), on the other, holding that the former do not (and, perhaps, *could* not) impose private alterations on the under-water lands themselves. And, time and again, Congress itself has sharpened this contrast as is manifest in three examples, all of which will also be explored here: the Rivers & Harbors Acts, the Submerged Lands Act, and the Federal Power Act (FERC's organic statute).

In total, this juridical context highlights the existence of the vacuum that defines Weaver's Cove's posture: Congress has not delegated the exercise of any power to insist on dredging to FERC or to FERC's permitees.

*a. **The Servitude is the only aspect of the Commerce Power that can secure the physical occupations of state land by another.***

i. Weaver's Cove *correctly* describes the Federal power over navigation but *incorrectly* implies that Weaver's Cove, a private developer, is cloaked with the mantle of this authority so as to compel acceptance of dredging.

Weaver's Cove's submission employs a clever three-part device of argumentation: after starting by affirming a true premise, Weaver's Cove then implies an unstated questionable deduction, before concluding with a falsehood. The intellectual sleight-of-hand takes place in the crucial middle link.

Initially, Weaver's Cove textual introduction of the paramount Congressional power over navigation is sound. *See* Plaintiff's Brief at pp. 9, 28-29. Then, however, Weaver's Cove necessarily implies that Congress delegated this power to Weaver's Cove and did so in a manner that allows Weaver's Cove to permanently invade a land area. Indeed, without this implication its entire argument collapses. Finally, Weaver's Cove concludes that it need not seek State permission under State law.

Tellingly, however, Weaver's Cove never even forthrightly states the middle proposition – that such a delegation has occurred. Moreover, Weaver's Cove certainly never identifies a mechanism for the delegation. And, Weaver's Cove never specifies which of the two types of powers is involved. Rather, with an unrefined invocation of "navigation," and an unexplained incantation of a "paramount right," Weaver's Cove lulls the reader into the imaginative leap that, somewhere in the welter of bureaucratic programs, Congress gave Weaver's Cove the authority to supercede the state-owned right to exclude trespassers and to impose a private physical intrusion. The large implication, never stated, is that the FERC approval transferred to Weaver's Cove on authorization to supplant the State's rights in the sea-bed.

There is a good reason that Weaver's Cove never specifically states this implicit supposition. To state it is to hold it up to the withering light of scrutiny. Common sense alone defeats the notion that Congress would have chosen FERC or a private actor, rather than he Army Corps, to control navigation. *Per force*, common sense alone defeats the notion that Congress would have chosen FERC or a private actor, rather than the Army Corps, to inflict a marine excavation on an unwilling state. But, we need not rely on common sense alone. Logic and precedent both belie Weaver's Cove's implied premise (and, with it, the ultimate conclusion as well). Such logic and precedent are featured in the ensuing discussion.

ii. The Servitude reflects the clear distinction between governmental *regulation* and governmental *ownership of a property interest.*

In considering the effects of any Congressional action on CRMC's power, it is important ***not*** to conflate a government's authority to ***regulate*** a water body with its authority to *own* a property interest in such water body. The two possible prerogatives were sharply distinguished in a particular Supreme Court case comparing Congress' general Commerce Clause authority to the specific Federal Navigational Servitude. *See* Kaiser-Aetna v. U.S., 444 U.S. 164 (1979). The Court held: "All of this Court's cases dealing with the **authority** of Congress **to regulate** navigation **and the** so-called '**navigational servitude**' **cannot simply be lumped into one basket.**" Id. at 170-71 (emphasis added). The Court stated this in the course of distinguishing between the small set of waters that are merely subject to regulation under the Commerce Clause and the larger set of waters that are subject to *both* that power plus the more intrusive Servitude. Id.. In the atypical facts of that case, the Court dealt with a particular waterway that fell into the first grouping due to its peculiar configuration. The government lost to a particular party owning that waterway under state law (Hawaii law in that case) because the national government only

had ***regulatory*** authority and did not have a ***property*** interest (the Servitude) to rely upon. Therefore, in that setting, even the Federal government itself could not supercede rights recognized under that state's background principles of property law.

In both Kaiser-Aetna and in the matter at bar, a lack of proprietorship defeats the claim. In the former case it was because of the nature of the waterway. Here it is because of the nature of the claimant. Weaver's Cove, a mere federal licensee, is in the relatively weak position of holding merely a ***regulatory***, rather than a ***proprietary*** interest. Correspondingly, Rhode Island is in the relatively strong position of holding a ***proprietary***, rather than merely a ***regulatory***, interest.

The distinction is simple. The Constitution confers a unique power upon the Federal Government that is in the nature of ***an interest in land*** in connection with navigable waters and from which Weaver's Cove derives ***no*** authority. This is apart from the ordinary regulation of navigation. It follows that this is apart from the typical power to generally regulate commerce (the Commerce Clause's allowance of ordinary regulation) from which Weaver's Cove ***does*** derive whatever authority it might have.

The Supreme Court, early on, recognized the ***property-like*** nature of this special power (that Weaver's Cove lacks) to affirmatively build upon or dig into water-beds in order to impose improvements – a component of the paramount navigational power "[C]ommerce comprehends . . . all the navigable waters of the United States . . .. For this purpose they are the public **property** of the nation . . .." Gilman v. City of Philadelphia, 70 U.S. [3 Wall.] 713, 724-25 (1866) (emphasis added). In United States v. Virginia Electric Co., 365 U.S. 624 (1961), the Court, quoting older authorities, reinforced this point with real estate analogies:

> **This navigational servitude — sometimes referred to as a "dominant servitude**," Federal Power Com. v. Niagara Mohawk

> Power Corp., 347 U.S. 239, 249, **or a "superior navigation easement,"** United States v. Grand River Dam Authority, 363 U.S. 229, 231 **— is the privilege to appropriate** . . .. A classic description of the scope of the power and of the privilege attending its exercise is to be found in the Court's opinion in United States v. Chicago, M., St. P. & P.R. Co., 312 U.S. 592:
>
> > The dominant power of the federal Government, as has been repeatedly held, extends to the entire bed of a stream, which includes the lands below ordinary high-water mark. The exercise of the power within these limits is not an invasion of any private property right in such lands for which the United States must make compensation. [Citing cases.] The damage sustained results not from a taking of the riparian owner's property in the stream bed, but from lawful exercise of **a power to which** that **property has always been subject**.

United States v. Virginia Electric at 627-28 (quoting the Chicago case) (emphasis added).

Indeed, even Weaver's Cove's own submission contains hints that, when the United States asserts a paramount authority to alter lands lying beneath the navigable waters of the nation, it does so purely pursuant to a power which is ***proprietary*** in nature. Weaver's Cove's brief, quoting Phillips Petroleum Co. v. Mississippi, 484 U.S. 469, 479 (1988), casts a covetous glimpse at the power embodied in the "federal navigation **easement**." Plaintiff's Brief at p. 9 (emphasis added by this State's Brief).

iii. The Servitude is powerful but narrow.

For all its power, the Servitude – the power to physically impose on river-beds, lake-beds and sea-beds – is applicable in only the narrowest class of cases. Thus, the Supreme Court has insisted that a project should aid general navigation in order to qualify as an exercise of the Servitude, warning, in ***dicta***, that the Federal Government's uncompensated interference with state-recognized vested rights for the benefit of private individuals would probably run afoul of these limits:

> [W]e need not ponder whether, by virtue of a highly fictional navigation purpose, the Government could destroy the flow of a navigable stream and carry away its waters for sale to private interests without compensation to those deprived of them. We have never held that or anything like it, and we need not here pass on any question of constitutional power; for we do not find that Congress has attempted to take or authorized the taking, without compensation, of any rights valid under State law.

United States v. Gerlach Live Stock Co., 339 U.S. 725, 737 (1950).

These principles are well illustrated by United States v. 50 Foot Right of Way, 337 F.2d 956 (3d Cir. 1964) (Government's running of a wartime gas pipeline across the bed of a navigable estuary was not a qualifying navigational activity):

> **If the right of way across** . . . [the owner's] **submerged land was taken in aid of navigation, . . . the United States would not be required to pay for such taking**. . . . Within the realm of reason the mere running of a pipeline over the bed of a navigable body of water **cannot** be considered as an aid to navigation or as bearing some positive relation to the control of navigation. . . . Hence, the United States . . . should, therefore, be required to pay . . . [the owner] just compensation for the use of the submerged land.

Id. at 960 (emphasis added). Notably, the state there, the State of New Jersey, had conveyed the bottom-lands site to a private party. The private party prevailed in its claim for Just Compensation. Obviously, the protections of the Constitution would apply with even greater force if a state still owned the land and, therefore, still had the power to exclude others.

iv. Essentially, other than under the Servitude, the Federal Government cannot impose structures or channels on state bottom-lands without compensation.

Of course, bottom-lands located within Government enclaves such as national parks or military bases belong to the United States. As a corollary, bottom lands of water-bodies on state and private lands carved out of such Government holdings, as is common in the western states, might be subject to certain necessarily-implied residual easement-like interests benefiting the

remaining federal enclaves under the reserved powers doctrine (parenthetically mentioned above).

Other than those situations (which are, obviously, not applicable here), and other than eminent domain, only the Servitude will avail. In other words, outside of reserved Federal territory (and associated former holdings), the state ownership right to exclude structures and excavation prevails (unless Just Compensation is paid) except as against a direct federal navigation project or as against an exercise of condemnation. As the Supreme Court (speaking through then-Associate Justice Rehnquist) has observed:

> [T]here are two limitations to the States' exclusive control of its streams — reserved rights so far at least as may be necessary for the beneficial uses of the government property and the navigation servitude. . . . **[E]xcept where the** reserved rights **or navigation servitude** of the United States **are invoked, the State has total authority over internal waters.**

California v. United States, 438 U.S. 645, 662 (1977) (internal citations and quotation marks omitted) (emphasis added). Similarly, in Kansas v. Colorado, 206 U.S. 46 (1907), the United States claimed that it had a right in the Arkansas River superior to that of Kansas and Colorado stemming from its power "to control the whole system of the reclamation of arid lands." Id. at 87. The Court disagreed and held that vested rights under state irrigation law must prevail. The United States, of course, could appropriate water and build projects to reclaim *its own* public lands. Id. at 92. But federal legislation could not "override state laws in respect to the general subject of reclamation." Id.

By comparison, Federal control *was* allowed to override the state's interest in California v. F.E.R.C., 495 U.S. 490, 498 (1990), but *only* after it was specifically found that the regulations at issue (police power ecological regulations aimed at maintaining sufficient in-stream flow to support fish) "neither reflect nor establish '**proprietary rights**.'" (Emphasis in original.)

Interestingly, all of the above cases in this sub-section, plus the Niagara Mohawk case cited below, vindicated state-created rights to merely use the flowing water passing over the water-bed. The real estate beneath the water was not directly implicated. ***Per force***, greater respect for state and state-created ownership is called for in the type of case ***sub judice*** involving subaqueous land itself. The present situation more closely parallels the facts of the 50 Foot Right of Way case, ***supra***, where the Government was forced to pay for bottom-lands; but the facts are even stronger for non-preemption here than in 50 Foot Right of Way. That case involved the Federal Government versus a private grantee. Here, we have a mere private developer ***versus*** the State itself.

v. The Servitude is not at Weaver's Cove's disposal because of the distinction between affirmatively-commissioned public works projects and mere permitted private development.

The Court can take judicial notice of many Federal projects freely built in tidelands (lighthouses, for instance) under Federal authority. Indeed, channels directly commissioned by the Federal government in order to aid public navigation are accomplished under the Federal Navigation Servitude. Weaver's Cove, evidently hoping to play on this familiarity, loosely generalizes in regard to a "paramount right." Plaintiff's Brief at p. 29. This constitutes a resort to vague and indiscriminate notions so that Weaver's Cove can latch onto non-analogous situations with merely superficial resemblances to its position. Only in this manner can Weaver's Cove attempt to position itself so as to dig on the land of another.

Greater specificity would be fatal to Weaver's Cove's claim. If Weaver's Cove were to acknowledge that there are, in fact, a variety of powers within the Federal arsenal, the acknowledgement would allow for subtlety of real reasoned analysis and intelligent distinctions. That would reveal Weaver's Cove posture not as paramount, but as that of a mere pretender.

Indeed, even Weaver's Cove makes no specific express claim to have the power to exercise the Federal Navigational Servitude. It cannot do so because of the distinction between direct navigational public works undertaken by the government itself, on one hand, and the private actions that Federal officials merely tolerate and permit, on the other. As a federal permitee (indeed, as a mere *potential* federal permitee when it comes to dredging — the Army Corps has yet to act), Weaver's Cove is not (and will not be) deputized as some sort of quasi-governmental guardian of inter-state commerce.

Illustrative of this point, a detailed analysis is undertaken below of the agency most responsible for the Federal Navigational Servitude, the Army Corps of Engineers. Suffice it to summarize here that such analysis reveals the sharp distinction between affirmative public works improvements undertaken by the Corps, on one hand, and mere permission-granting to private entities, on the other. Thus, the only tactic for Weaver's Cove is to blur these distinctions.

vi. Congress does not delegate the Federal Navigational Servitude to entities other than Federal agencies.

What emerges is a Congressional reluctance to cloak private parties in the mantle of this special authority. Indeed, Weaver's Cove will search in vain for any provision of the United States Code which might convey the Servitude to Weaver's Cove. This is because Congress virtually ***never*** yields the Servitude to another entity.

For example, in United States v. Cherokee Nation of Okla., 480 U.S. 700 (1987), a treaty had deeded the riverbed of a particular waterway (in that case, the Arkansas River) to an Indian tribe. The tribe, armed with the deed, sued, claiming that the tribe, and not the Government, now had exclusive rights to undertake navigational improvements to the river bottom. The claim pre-supposed that the Government had conveyed to the tribe its easement to enhance navigation (*i.e.*, the Federal Navigational Servitude elaborated *supra*); absent such a conveyance, it was

universally understood that the tribe's property title would ***not*** exclude the Government's riverbed activities. Id. at 704.

The Court – speaking through the Chief Justice Rehnquist and unanimously reversing two lower courts – noted that the treaty (couched in general terms) said nothing specifically about conveying away the Government's Navigational Servitude, ***see*** id. at 706, which the Court deemed to be an aspect of federal sovereignty. This, the Justices said, could be "surrendered [only] in unmistakable terms," id. at 707 (internal question marks omitted), if, indeed, it could be transferred at all.

The Cherokee case is a piece of the decisional road-map for the matter at hand. In many respects, the facts are equivalent. The treaty there, like the expected permit at hand, mentioned the water-body by name and referred to the land underlying that water body. The grantor there, like the Army Corps here, was an arm of the Federal sovereign. The governmental authority at issue there, as here, was the Federal Navigational Servitude. In each case, there is a claim by the recipient that a governmental power of the grantor was surrendered. Indeed, some of the facts were even stronger in favor of the tribe than they now are for Weaver's Cove here. The treaty at issue there contained the language of fee simple conveyance, language that is lacking in, indeed, contradicted by, the Army Corps permit Weaver's Cove hopes for in the matter ***sub judice***. The recipient, unlike Weaver's Cove in the case at hand, was a governmental entity. Yet, the Supreme Court in Cherokee, recognizing that the particular power at issue was an incident of sovereignty, rejected the grantee's claim.

Weaver's Cove is on even weaker footing. Moreover, Weaver's Cove fails to even recognize this fact because it glosses over the sovereign prerogatives involved.

vii Congress does not lightly invoke the any of its powers in a manner inimical to states' underlying ownership rights.

The decision by the United States Supreme Court in the Coeur d'Alene case emphasized the connection between state ownership of submerged lands and state sovereignty. More importantly, the Court emphasized that the United States government is unlikely to ever seek to impair such state sovereignty. Idaho v. Coeur d'Alene Tribe, 521 U.S. 261 (1997), involving a dispute over a state's title to a lake bottom that was alleged to have been deeded away by Federal authorities to an Indian tribe, deserves quotation at length:

> As we stressed in Utah Div. of State Lands v. United States, lands underlying navigable waters have historically been considered "sovereign lands." State ownership of them has been "considered an essential attribute of sovereignty." The Court from an early date has acknowledged that the people of each of the Thirteen Colonies at the time of independence "became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the Constitution to the general government." Martin v. Lessee of Waddell. . . . The importance of these lands to state sovereignty explains our longstanding commitment to the principle that the United States is presumed to have held navigable waters in acquired territory for the ultimate benefit of future States and **that disposals by the United States** during the territorial period **are not lightly to be inferred,** and should **not be regarded as intended unless the intention was definitely declared or otherwise made very plain.** . . .
>
> The principle which underlies . . . **the strong presumption of state ownership** is that navigable waters uniquely implicate sovereign interests.

Coeur d'Alene at 283-84 (emphasis added; some internal citations and quotation marks omitted). In short, the national government is deemed to be (and has proven to be) circumspect in respect to honoring each state's ownership of its respective submerged lands – ownership that the naturally includes the right to exclude major occupations by others.

Given the fact that Rhode Island, unlike Idaho, was one of the original thirteen states, and given the fact that Weaver's Cove has less of a putative claim to submerged lands than a governmental unit of local Native Americans, the underlying thrust of the Coeur d'Alene case is especially forceful here. *Per force*, the Federal government has had even less motive and even less opportunity to interfere with the sea-bed title in the instant situation: in Rhode Island's Mount Hope Bay, aboriginal rights are not at stake and this state was not carved out of Federal lands. At the very least, an unmistakable, overt, specific expression of an intent to override such proprietorship would have to be manifest in an Act of Congress. As elaborated below, none has been cited or found.

*b.* ***The Rivers & Harbors Act clearly distinguishes between the Federal Navigation Servitude and ordinary regulatory permitting; Army Corps permits do not displace states' property rights.***

Imagine, for the sake of argument, that Congress wished to subordinate state submerged lands. It would be odd, indeed, if Congress chose to locate such subordination in the Natural Gas Act, a statute which implicates waterways only tangentially and incidentally (other than setting rates, the Natural Gas Act of 1938 essentially regulates the construction of new natural gas pipelines and related facilities). The statute makes little express reference to waterways.

The NGA's silence with respect to water rights does, however, give rise to one point that the parties emphatically agree upon: As stated by Weaver's Cove, "If, as is the case here, an applicant's project requires dredging in Federal waters, it must also comply with Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, which empowers the U.S. Army Corps of Engineers to approve proposals to dredge navigable waters . . .." *See* Plaintiff's Brief at p. 8. In other words, when Congress wrote the NGA, it was aware of the routine exercise of Federal physical jurisdiction over water-ways which had been manifested in Victorian-era statutes (the

1899 law was one in a series) with, arguably, Federal common-law antecedents dating back to the birth of the Republic. Congress chose not to displace that regime.

Reason dictates that if one were to look for the delegation of the Servitude to Weaver's Cove, one would look to that statute. But that statute establishes a regime that, as will be highlighted now, has historically worked in tandem with state submerged lands ownership and control. Ironically, the very statute one would look at in order to find a source of any subordination of states' rights actually vindicates of those rights.[24]

These principles are well illustrated by Congress' delegation of Federal Navigational Servitude in the Rivers & Harbors Acts to the Army Corps of Engineers. Significantly, that delegation infuses only some, and not all, of the Corps' work.

Thus, as alluded to above, a sharp distinction must be made between affirmative public works improvements undertaken by the Corps' Navigation Section (which *are* done pursuant to the Servitude) and mere permission-granting actions undertaken by the Corps' Permitting Branch. In the *former* capacity, the Corps plans and constructs projects to improve rivers and harbors and to control floods.[25] This is unrelated to Weaver's Cove's situation. By contrast, in the *latter* capacity, the Army Corps permits a private project and thereby merely expresses toleration, not an active delegation. Acquiescence in a particular activity to be conducted by a particular entity is not tantamount to a delegation of an affirmative power against others. Thus, in this latter capacity, the Corps grants permits that have no bearing on the State's title or on the State's concomitant right to stop private permanent physical alterations on the lands in question.

---

[24] Indeed, as an aside, Congress has reinforced that cooperative approach in the CZMA – the Federal consistency review process is triggered by the Army Corps applications as well as by FERC applications, thus providing an additional layer of deference to states' rights.

But there is yet another layer of deference on top of this. When the Corps itself undertakes a public works project as a navigational improvement, that too triggers state consistency review under the CMZA.

[25] 33 U.S.C. §§ 540 to 633.

But the Corps' granting of such a permit constitutes the only type of Corps action that Weaver's Cove has (or could have) applied for.

As background, in its role as guardian of the navigability of the waters of this country, the Army Corps regulates myriads of activities, including obstructions to, structures in, and alterations or modifications of navigable waters,[26] and the deposit of refuse in such waters.[27] As the footnoting indicates, central to these roles is the venerable and powerful § 10 of the River & Harbor Act of 1899 (the section under which Weaver's Cove would be permitted). ***See, e.g.***, United States v. Republic Steel Corp., 362 U.S. 482, 488-92 (1960) (using the adjective "broad" four times, as well the terms "not narrow[]," "[not] cramped," "great design," and "[to be] read . . . charitably," in describing the Corps' powers); United States v. Alaska, 503 U.S. 569, 578 (1992) (unanimously adopting the language of the Republic Steel opinion).

Soon after its adoption in 1899, the courts made short work of the notion that § 10, which provides for federal permits for building or alterations in navigable waters, can supercede the submerged land property rights vested in the states:

> Whether Congress may, against or without the expressed will of a state, give affirmative authority to private parties to erect structures in such waters, it is not necessary in this case to decide. It is only necessary to say that the act of 1899 does not manifest the purpose of Congress to go to that extent under the power to regulate foreign and interstate commerce and thereby to supersede the original authority of the states. The effect of that act, reasonably interpreted, is to make the erection of a structure in a navigable river, within the limits of a state, depend **upon the concurrent or joint assent of *both* the national government and the state government.** The Secretary of War, acting under the authority conferred by Congress, may assent to the erection by private parties of such a structure. Without such assent the structure cannot be erected by them. But under existing legislation they

[26] Section 10 of the Rivers & Harbors Act of 1899, 33 U.S.C. § 403.

[27] Section 13 of the Rivers & Harbors Act of 1899, 33 U.S.C. § 407.

> must, before proceeding under such an authority**, obtain *also* the assent of the state** acting by its constituted agencies.

Cummings v. City of Chicago, 188 U.S. 410, 430-31 (1903) (emphasis added). The Cummings opinion distinguished between the Corps' possessory powers over waterways and its mere toleration of private works:

> In a sense, but only in a limited sense, the United States has taken possession of Calumet river, by improving it, by causing it to be surveyed, and by establishing lines beyond which no dock or other structure shall be erected in the river without the approval or consent of the Secretary of War, to whom has been committed the determination of such questions. **But Congress has not passed any act under which parties**, having simply the consent of the Secretary, **may erect structures** in Calumet river **without reference to the wishes of the stat**e of Illinois on the subject.

Id. at 426-27 (1903) (emphasis added). Cummings' specific holding with respect to § 10 is now well-entrenched in Supreme Court jurisprudence[28] and, of course, that of the lower courts.[29]

---

[28] Organized Village of Kake v. Egan, 369 U.S. 60, 63-64 (1962) ("permit[ ] granted by the Army Corps of Engineers . . . is simply acknowledgment that the activity does not violate federal law, and **not an exemption from state licensing**"); Wisconsin v. Illinois, 278 U.S. 367, 412 (1929) ("[§ 10] was **not intended to override the authority of the state to put its veto** upon the placing of obstructing structures in navigable waters within a state, and both state and federal approval were made necessary in such case"); Greenleaf-Johnson Lumber Co. v. Garrison, 237 U.S. 251, 262 (1915) ("exercise of power by [one sovereign] does **not preclude** another exercise" by the other sovereign); North Shore Boom & Driving Co. v. Nicomen Boom Co., 212 U.S. 406, 412 (1909) ("there is a **concurrent** or joint **jurisdiction** of the state and national governments over the erection of a structure which obstructs navigation"). (Emphasis added on all quotations.).

[29] Norfolk Dredging Co. v. Radcliff Materials, Inc., 264 F. Supp. 399, 402 (E.D. Va. 1967) ("the federal government had no property interest in the harbor bottom which it could convey, since title to **the bottom is clearly vested in** the Commonwealth of **Virginia**"); Eagle Intern., Inc. v. Crossett Port Authority, 766 S.W.2d 28, 31 (Ark.App. 1989) ("the permit herein is only a finding that appellant's proposed mooring dolphins and floating dock **will not interfere** with or be detrimental to navigation, and it is **not equivalent to a declaration that the appellant may proceed** . . . without first obtaining the consent of the Port Authority"); County of Marin v. Roberts, 84 Cal. Rptr. 425, 429 (1970) ("paramount right applies only to the regulation . . . of the . . . waters . . . but does **not** include **proprietary rights** of ownership"); Cobb v. Lincoln Park Com'rs, 202 Ill. 427, 439-40 (1903) ("the permission of the general government to build a wharf in navigable waters is necessary[;] [b]ut such permission is **not** given to **override** the rights of **the owners** of the submerged lands"); Pierson v Coffey, 706 S.W.2d 409, 413 (Ky. App. 1985) ("[t]he requirement that a person must obtain a permit before he or she may place obstructions in the river **does not** confer any interest in riparian **property** upon the recipient of the permit"); Kliebert Educational Trust v. Watson Marines Services, Inc., 454 So.2d 855, 859 (La.App. 5 Cir. 1984) ("a permit issued by the Federal Government merely expresses the assent of the Federal Government so far as concerns the public rights of navigation but **in no way obviates** the necessity of obtaining **state assent** to the work authorized"); Wilson v. Hudson County Water Co., 76 A. 560, 567 (N.J. Eq. 1910) ("section [10] as worded clearly contemplates that the consent of the Secretary [of the Army] shall **merely be permissive** of the doing of work for which authority already exists"); Carrithers v. Terramar

Indeed, one must look no further than the language of the Army Corps' own regulations for the current language embodying the rule of Cummings: "Authorization of work or structures by the [Army Corps] does not convey a property right, nor authorize any injury to property or invasion of other rights." 33 C.F.R, § 320.4(g) (1980). This is elaborated in 33 C.F.R. § 320.4(g)(6):

> A [Corps] permit does not convey any property rights, either in real estate or material, or any exclusive privileges. Furthermore, a [Department of the Army] permit does not authorize any injury to property or invasion of rights or any infringement of Federal, state or local laws or regulations. The applicant's signature on an application is an affirmation that the applicant possesses or will possess the requisite property interest to undertake the activity proposed in the application.

In fact, the Corps goes so far as to explicitly deny the conveyance of property rights in the language of the permit itself:

> a. This permit does not obviate the need to obtain other Federal, state, or local authorizations required by law.
> b. This permit does not grant any property rights or exclusive privileges.
> c. This permit does not authorize any injury to the property or rights of others.

Permit Form & Special Conditions, 33 CFR § 325, App. A. Another endorsement states:

> The permittee understands and agrees that, if future operations by the United States require the removal, relocation, or other alteration, of the structure or work herein authorized, or if, in the opinion of the Secretary of the Army or his authorized representative, said structure or work shall cause unreasonable obstruction to the free navigation of the navigable waters, the permittee will be required, upon due notice from the Corps of Engineers, to remove, relocate, or alter the structural work or obstructions caused thereby, without expense to the United States. No claim shall be made against the United States on account of any such removal or alteration.

---

Beach Community Improvement Assoc., 630 S.W.2d 648, 650 (Tex. App. 1981) ("[t]he grant of a permit by the U. S. Army Corps of Engineers to the defendants did **not** bestow upon them any **property rights** with respect to the submerged lands") *rvs'd on other grounds* 645 S.W.2d 772 (Tex. 1983). (Emphasis added on all quotations.)

Id.

Moreover, Cummings stands at the center of a trilogy of cases construing the various powers of the Army Corps with respect to waterways, which, taken together, have a more general implication: Congress is traditionally reluctant to trammel the Public Trust Doctrine.

Cummings was first echoed in Montgomery v. City of Portland, 190 U.S. 89 (1903), which was virtually a companion case. The Army Corps gave approval to a riparian owner to construct wharves, but the local authorities then ordered the owner to cease. The Court stated that, although the case involved § 12 of the Rivers & Harbors Act of 1888, rather than § 10 of the 1899 Act, the case was the same, in principle, as Cummings, and reiterated that "the right of private persons to erect structures in a navigable water . . . cannot be said to be complete and absolute without the concurrent or joint assent of **both** the general and state governments." Id. at 106.

More importantly, the Montgomery Court was careful to note the distinction (repeated throughout the instant Memorandum) between a private action tolerated by the United States government and a direct action by the government itself. By contrast with the right of the United States to engage in mere regulation of private activity, "the right of the [United States] government to erect public structures in a navigable water of the United States rests upon different grounds" and would ***not*** be subject to state or local approval. Id. at 106.

Cummings also inspired International Bridge Co. v. New York, 254 U.S. 126 (1920), which involved a dispute over a bridge constructed from New York State to Canada over the Niagara River; some of the support columns for the bridge sat on state-granted bottom lands. Like Montgomery, this case involved a different Federal statute than in Cummings. But the Court, explicitly following the spirit of Cummings, held that the requirement of "concurrent or

joint assent" of both state and federal governments applied. The Court expanded upon the logic of Cummings by making reference to the foundational nature of state ownership of bottom lands:

> The Act does not make Congress the source of the right to build but assumes that **the right comes from another source, that is, the State.** It merely subjects the right supposed to have been obtained from there to the further condition of getting from Congress consent to action upon the grant.

Id. at 133.

Read narrowly, these three holdings can be seen as isolated technical constructions of particular obscure statutes, some of them obsolete. Taken together, a larger proposition emerges: Dual proprietary control of the Nation's waters has been the affirmative policy of successive Congresses. To conclude, a § 10 permit merely express toleration: such permit merely tolerates an intrusion on the granting sovereign's property rights; it does not authorize an intrusion onto those of the other sovereign.

Translating this to the current situation yields the following proposition: Insofar as the lead agency on waterways is concerned, Rhode Island's sovereign authority to make determinations as to whether Weaver's Cove is to enter upon the submerged lands of Mount Hope Bay, with the purpose of excavating a channel therein, is unimpaired.

***c. The Submerged Lands Act clearly distinguishes between the Federal Navigation Servitude and ordinary regulatory permitting; Federal Regulatory activity does not displace states' property rights.***

If any question remains as to whether Congress intended to pre-empt the state's ownership rights, that question is resolved by reference to the Submerged Lands Act ("SLA"). Weaver's Cove's neglect of the SLA is a telling omission in its brief. A quotation of the complete text of SLA § 6, 43 U.S.C. § 1314(a), ensues:

> (a) The United States retains all its **navigational servitude *and*** rights in and powers of **regulation** and control of said lands and navigable waters for the constitutional purposes of commerce,

> navigation, national defense, and international affairs, all of which shall be paramount to, **but** shall **not** be deemed to include, **proprietary rights of ownership,** or the rights of management, administration, leasing, use, and development of the lands and natural resources which are specifically recognized, confirmed, established, and **vested in** and assigned to **the respective States** and others by section 1311 of this title.

SLA § 6, 67 Stat. 32, 43 U.S.C. § 1314(a) (emphasis added).

The passage towards the end of the sub-section, where Congress manifests, in elaborate terms, its deference to the states' fee ownership, is a convenient restatement of the long-settled rule[30] that the states respectively hold title. Much more important, however, is the language at the beginning of the text that separately refers to the dominant navigational servitude of the United States, on one hand, and the general Congressional power to regulate commerce, on the other hand. Congress was careful to distinctly list the proprietary corollary of the federal power to regulate commerce and, then, to list that more general power itself. Suffice it to quote at length just one particularly thoughtful lower-court synthesis:

> [The Submerged Lands Act of 1953, 43 U.S.C., § 1314] specifically confirms the state's title to submerged tidelands. The state holds this title not by virtue of a federal grant, but as an incident of the transfer to the state of local sovereignty at the time of admission to the Union. The state's title is subject only to the paramount power of the United States to control such waters for the purpose of navigation in interstate and foreign commerce.

---

[30] Historically, the judiciary has been likewise solicitous of the states' tenure of under-water lands:

> For when the Revolution took place the people of **each State** became themselves sovereign; and in that character **hold the absolute right to all their navigable waters and the soils under them** for their own common use, subject only to the rights since surrendered by the Constitution to the general government.

<u>Martin v. Waddell's Lessee</u>, 41 U.S. [16 Pet.] 367, 410 (1842) (emphasis added).

> **The character of the state's ownership** in the land and in the waters **is the full proprietary right**.

<u>Port of Seattle v. Oregon & W. R. Co.</u>, 255 U.S. 56, 63 (1921) (emphasis added). *See also* <u>Shively v. Bowlby</u>, 152 U.S. 1 (1893); <u>Pollard's Lessee v. Hagan</u>, 44 U.S. [3 How.] 212 (1845).

> [Defendant] argues that the term 'paramount' indicates that the United States retained title to the lands as well as the navigable waters. In view of the express language of the statute indicating that the **paramount right applies only to** the **regulation** and control of the lands and waters for constitutional purposes of commerce and navigation but **does not include proprietary rights** of ownership or the use and development of the lands, this contention is entirely without merit.

County of Marin v. Roberts, 84 Cal. Rptr. 425, 429 (1970) (emphasis added). This is the ubiquitous distinction. It is precisely in accordance with the arguments presently made by the Defendant State officials.

*d.* ***The Federal Power Act clearly distinguishes between the Federal Navigation Servitude and ordinary regulatory permitting; the FPA is demonstrative of the Congressional reluctance to displace states' property rights.***

This brief has already remarked upon the NGA's silence with respect to vested property rights in connection with water bodies. A comparison was made with the authorizing legislation of the Army Corps, the other major statue at work here.

Yet another comparison also serves a demonstrative purpose. The silence of the NGA with respect to water rights prompts a contrast with the Federal Power Act of 1920, the cornerstone of the edifice that is now FERC. In contrast with the NGA, that legislation concerns facilities that not only *touch upon* water resources but are literally *in* those resources: that act governs hydro-electric dams.

Thus, if one were to look for an aggressive posture by the Courts with respect to state property law respecting waterways, one would look to litigation under that Act. Yet, curiously, under that landmark legislation, all judicial branch has approached state submerged lands law with trepidation; – using a hands-off approach.

While the judiciary did find ***some*** pre-emption in First Iowa Hydro-Electric Coop. v. FPC, 328 U.S. 152 (1946). (and, then, only over a vigorous dissent by Justice Frankfurter), it did so on the narrowest of grounds – grounds echoed throughout this brief: ***non***-proprietary state police power regulations (in that case regulations of the flowing water itself) must yield, but state (and state-created) "**proprietary rights**" were exempt from preemption. California v. F.E.R.C., 495 U.S. 490, 498 (1990) (quoting First Iowa, 328 U.S. at 175-76) (emphasis added by the California v. F.E.R.C. Court).

To fully understand the breadth of this major ***proprietary rights*** exception, one should examine the context. One must consider that state water law subsumes: (1) state ownership of the beds and banks; (2) state-created private ownership of the same; (3) state ownership of the flowing water itself, at least in some states; (4) state-created vested rights to the same under the appropriation legal systems of arid western states; (5) state-created reasonable-use rights to the same in the riparian legal systems of the relatively high-rainfall eastern states; and (6) police power regulation of the waters. Only this last portion of state dominion was hindered by the FPA under the First Iowa ruling. Thus, only a small fraction of the states' domain was invaded by Congress, and that small fraction is the portion that is the most remote from the doctrine of state ownership of submerged lands.

The narrowness of First Iowa (and the corresponding breadth of the ***proprietary rights*** exception) was brought home by Federal Power Comm'n v. Niagara Mohawk Power Corp., 347 U.S. 239 (1954), authored by none other than Justice Burton who had led the First Iowa majority some eight years beforehand:

> **[R]eal property rights, are determined by state law**. Title to them is acquired in conformity with that law. The Federal Water Power Act merely imposes upon their owners the additional obligation of using them in compliance with that Act.

> The legislative history of the Act discloses no substantial support for the drastic policy which the Commission seeks to read into it**. To convert this Act from a regulatory Act to one automatically abolishing preexisting** water **rights** on a nationwide scale calls for a convincing explanation of that purpose. We find none.

Id. at 252-53, (1954) (footnotes omitted).

Making the very distinction advocated in this Memorandum, Justice Burton, writing for the Court, made the following comparison. The opinion compared the "dominant [Federal Navigational] [S]ervitude," the "exercise [of which] requires clear authorization . . . in explicit terms" if it is to operate as against state-created or state-held rights, on one hand, with "the much more general and regulatory language of the Federal Water Power Act" on the other hand. Speaking of the latter, the Justices continued,

> **Neither it, nor the license issued under it, expressly abolishes any existing proprietary rights** to use the waters of the Niagara River. **Unlike** [a] statute [exercising **the Servitude**], **the** Federal Water Power **Act mentions no specific properties. It makes no express assertion of the paramount right** of the Government to use the flow of the . . . navigable stream to the exclusion of existing users. On the contrary, the plan of **the Act is one of** reasonable **regulation** of the use of navigable waters, coupled with encouragement of their development as power projects by private parties.

Id. at 249-51 (1954) (footnotes omitted; emphasis added).

Weaver's Cove seeks to succeed where the Niagara-Mohawk Power Corporation failed. But, in doing so, it relies on a weaker federal statute against a stronger state right. Its cause is hopeless.

### C. RHODE ISLAND PROPERTY LAW ESTABLISHES STATE OWNERSHIP OF THE SITE; THE CRMC'S PROCESS IMPLEMENTS THIS OWNERSHIP.

We start with the proposition that ownership rights in submerged lands are determined by state law. In Montana v. United States, 450 U.S. 544 (1981), the Court however elaborated that "[a]fter a State enters the Union, title to the land is governed by state law." and that the state's power over submerged lands is subject only to "the paramount power of the United States to ensure that such waters remain free to interstate and foreign commerce." Id. at 551. The Montana decision makes plain that the State's power over these lands is not conferred by federal law, but exists by virtue of the state's sovereign status. All control over the land, except for the power to ensure freedom of commerce, has been retained by the State, and that control has not been circumscribed by federal common law. Since the Montana case involved a state which had been carved out of a territory, the Court spoke of the United States ***conveying*** title to the state when it entered the Union. Because Rhode Island is one of the original thirteen states, however, it ***retained***, rather than ***received***, power over its lands. This factual distinction, however, makes Montana no less applicable to the case at bar.

Let us turn to the body of law governing Rhode Island's submerged lands.

#### 1. Title To Land Below The Mean-High-Tide-Line Is In The State.

It is axiomatic that "in this state, at common law, the fee of the soil in tide waters below high-water mark is in the state." Bailey v. Burges, 11 R.I. 330, 331 (1876).[31]

[31] *Accord*, *e.g.*, Warren v. Thornton-Whitehouse, 740 A.2d 1255, 1259 (R.I. 1999) ("the state holds title to all land below the high water mark in a proprietary capacity for the benefit of the public"); Narragansett Real Estate v. MacKenzie, 34 R.I. 103, 112, 82 A. 804, 806 (1912) ("fee of the land below ordinary high-water mark is in the State").

### 2. Title To Land Below The Mean-High-Tide-Line Does yield to private interests.

Thus, it unusual in Rhode Island history for any individual, other than a littoral (*i.e.*, riparian or shore-front) owner, to gain title to such locations. And even in that class of cases, title only is relinquished sparingly – only when the riparian owner actually takes advantage of his physical adjacency to the water by filling or building; until then, even he has no title to the area to be filled or built upon.[32] As simply stated in J.S. Thorton & Co. v. Smith Grant & Co., 10 R.I. 477, 484 (1873), "the public right is paramount." Thus, while riparian rights (with respect to yet unfilled areas) are very strong as against other private parties, they have little force against the sovereign. *See id.* at 486 (Potter, J., dissenting on other grounds) ("**as against everybody *but* the state**"); Providence v. Comstock, 27 R.I. 537, 544, 65 A. 307, 309 (1906) ("**until forbidden by the State**"); Carr v. Carpenter, 22 R.I. 528, 530, 48 A. 805, 805 (1901) ("**as against all the world *but* [the State]**"); Murphy v. Bullock, 20 R.I. 35, 40, 37 A. 348, 350 (1897) ("**not** recognized **against the State**"); Allen v. Allen, 19 R.I. 114, 115, 32 A. 166 (1895) ("**as against anyone *but* the State**"); Folsom v. Freeborn, 13 R.I. 200, 205 (1881) ("**against everybody *but* the State**") (emphasis added to all above quotations).

### 3. All Filling And Construction Below The Mean-High-Tide-Line Requires State Assent.

Not surprisingly, then, the precedents dealing with coastal filling and marine construction, while recognizing that early public policy in Rhode Island generally encouraged wharfing, also hold that such practice always required at least informal State agreement. "It is

[32] An intertwined line of authority concerns the right of oystermen to enjoy the bed of Narragansett Bay. The same basic rule applies: public rights trump private rights in all tidelands. *See* Rocky Point Oyster Co. v. Standard Oil, 265 F. 379, 383 (D.R.I. 1920) (construing Rhode Island law) (oyster-bed lease revocable by State because "the tide-flowed lands are subject to a continuous public trust, to be administered by the Legislature"); Payne & Butler v. Providence Gas, 31 R.I. 295, 313, 77 A. 145, 152 (1910) ("the right thereby granted [by State leases of the bay to private parties] . . . is merely a license . . . subject to the public's right").

true the riparian proprietor may fill out in front of his land, but, if he does so, he **fills out by the permission or acquiescence** of the state." Bailey v. Burges, 11 R.I. 330, 331 (1876) (emphasis added). This is why language concerning some form of State license or permission is woven through the wharfing cases.[33]

With this background in place, cases such as Gerhard v. Bridge Com'rs, 15 R.I. 334, 5 A. 199 (1886) (denying all private property rights in an offshore location where a structure was to be built), unfold like a syllogism.

The upshot is that Weaver's Cove does not own the area it seeks to build upon and Weaver's Cove certainly cannot resort to the theory of riparian rights. *Prima facie*, the State owns the land where Weaver's Cove's proposed project will be located.

#### 4. The Coastal Council, In Addition To Regulating Public Trust Lands, Also Controls The Disposition Of Such Land As Real Estate.

The agency responsible for implementing Rhode Island's ownership of tide-flowed lands, in the first instance, is the CRMC.[34] The CRMC adopted the Rhode Island Coastal Resources

---

[33] Thompson v. Sullivan, 88 R.I. 305, 315, 148 A.2d 130, 136 (1959) ("contingent upon . . . **permission** from the state"); Dawson v. Broome, 24 R.I. 359, 372, 53 A. 151, 157 (R.I. 1902) ("**under leave of the state**"); New York, N.H. & H. R. R. v. Horgan, 25 R.I. 408, 412, 56 A. 179, 181 (R.I. 1903) ("under the **license** thus given"); Carr v. Carpenter, 22 R.I. 528, 530, 48 A. 805, 805 (1901) ("[the State] may **suffer** the littoral proprietor to acquire"); Walsh v. Hopkins, 22 R.I. 418, 420, 48 A. 390, 391 (1901) ("by **sufferance**, and not by right"); Prior v. Comstock, 17 R.I. 1, 2, 19 A. 1079, 1079 (1889) ("**if permitted** to do so by the State"); Gerhard v. Bridge Com'rs, 15 R.I. 334, 335, 5 A. 199, 200 (1886) ("a **license** to him to fill out and incorporate the flats with the upland"); Brown v. Goddard, 13 R.I. 76, 81 (1880) ("right to fill out **under leave of the State**"); Aborn v. Smith, 12 R.I. 370, 373 (1879) ("the State . . . **permits** the owner of the upland to take by filling"); Providence Steam-Engine Co. v. Providence & S. S.S., 12 R.I. 348, 355 (1879) ("a **license** to him to fill out"); Engs v. Peckham, 11 R.I. 210, 224 (1875) ("a **license** or invitation to the riparian proprietor to fill or wharf out"). (Emphasis added to all above quotations.)

[34] In year 2000, the General Assembly passed P.L. of R.I. 2000, c. 314, "An act Relating to Waters and Navigation – Coastal Resources Management Council," regarding public trust lands. This legislation reaffirmed or established certain positive public trust principles.

More specifically, the enactment clearly differentiates between required regulatory approval of filling activity under environmental statutes and the legal disposition of title. The Act is re-produced at: http://www.rilin.state.ri.us/PublicLaws/law00/law00314.htm. The Act states:

Management Program ("RICRMP") in 1976. The RICRMP is structured as a strategic plan for the State's coastal areas, and is both *regulatory* and *proprietary* in nature (a distinction elaborated upon in the previous footnote and throughout this brief).

In sum, Rhode Island is the true owner and a so-called category B assent is required.

* * *

To recapitulate, Weaver's Cove's claim of "pre-emption" rests on locating a paramount power. But, although the Natural Gas Act approval might pre-empt State *regulation*, it has no bearing on State *ownership*. Eminent Domain is not available under the portion of the NGA being invoked by Weaver's Cove. Turning to the only other relevant power possibly paramount to a State's ownership of the bed of the sea, the Federal Navigational Servitude, exercise of that power is also not available under the NGA. For that matter, as demonstrated above, the exercise of that servitude in order to dredge is not available to Weaver's Cove under *any* statute. At most, Weaver's Cove hopes to obtain a § 10 Army Corps permit that will *not* delegate the servitude.

To conclude this section, the Federal Government has done nothing to alter the basic fact that Rhode Island owns the site and Weaver's Cove does not. Weaver's Cove must apply under

---

> With the exception of any and all projects to fill land of twenty-five (25) acres or more [which require deeding by means of a resolution of the General Assembly itself], the General Assembly hereby recognizes and declares that the CRMC is delegated the sole and exclusive authority for the leasing of submerged and filled lands and giving **licenses for the use** thereof. Accordingly, the CRMC will develop, coordinate and adopt a system for the leasing of submerged and filled lands, and **licenses for the use thereof**, and will ensure that all such leases and **licenses** are consistent with the public trust.

*Id*. at § 3 (emphasis added). After this discussion of the *ownership* interests at the disposal of the State, the statute separately discusses the State's *regulatory* authority:

> [N]othing in this chapter shall be construed to limit or impair the authority of the state, or any duly established agency thereof, to regulate filling or dredging affecting tidal lands owned by the state or any other entity and nothing in this chapter shall be construed to limit or impair the obligation of the applicant to obtain all applicable regulatory approvals.

*Id.*

purely State law to the CRMC for a license to use State land and must do so separate and apart from any Federal requirements.

## IV. EVEN UNDER A CONVENTIONAL PREEMPTION ANALYSIS, THE PRE-EMPTION ARGUMENT FAILS SINCE THE STATE ACTION IS OUTSIDE THE SCOPE OF THE ALLEGEDLY PRE-EMPTIVE SCHEME

Let us assume, for the sake of argument, that the State is acting in a non-proprietary regulatory police power mode.

As noted beforehand, the Natural Gas Act is a statute that implicates waterways only tangentially and incidentally. In fact, the little reference that the NGA does make to waterways is mostly to disclaim jurisdiction. EPAct specifically acknowledges the limits of FERC's jurisdiction over waterway-related matters by defining "LNG terminal" to exclude "**waterborne vessels used to deliver natural gas to or from any such facility.**" 15 U.S.C. § 717a(11)(A) (Emphasis added).

This is reflected in FERC's behavior. FERC, the agency charged with implementing the NGA, has never placed much of a concern on the adequacy of waterways, leaving the project proponent to solve all pertinent matters with other responsible authorities such as Army Corps of Engineers and the Coast Guard.

For instance, let us consider the record in the matter underlying the case before the Court. When Congress mandated that the existing Brightman Street Bridge not be demolished a bridge that Weaver's Cove desperately needed removed in order to accommodate large LNG vessels FERC refused to reconsider the wisdom of its NGA § 3 authorization. The retention of that bridge necessitated the use of much smaller vessels, created significant safety and security issues (ultimately culminating in the Coast Guard recommendation of October 24, 2007), caused a doubling of the number of annual tanker deliveries to the terminal, and thereby dramatically increased the number of bridge closures along the 26-mile route of the LNG vessels. FERC's indifferent response was as follows:

> [T]he Coast Guard could approve the original plan [deep vessel draft], the smaller ship proposal now before the Coast Guard [shallow vessel draft], some other plan that would satisfy Coast Guard responsibilities, **or possibly no plan at all**.

Order Denying Rehearing, 116 F.E.R.C. ¶ 61,041 at ¶ 61,043 (2006) (emphasis supplied). This is hardly the response of an agency that would purport to exercise preemptive jurisdiction over waterway dredging matters. Instead, FERC's statements reflect the actual jurisdictional boundaries concerning the licensing, construction and operation of a "terminal" under the NGA.

One need look no further than the statutory text to find the source of this administrative reticence. The FERC's jurisdiction, although powerful, is carefully circumscribed. Its contours (as exercised in this case) are found in § 3 of the NGA, which provides that the Federal Energy Regulatory Commission has "the exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal." 15 U.S.C. § 717b(e)(1). Quite simply, an agency's regulation of dredging in another state is too tenuous a link to the terminal to support a preemption claim.

Stated differently, the state-law permit in this case is ***not directly*** for the project itself but, instead, is for only peripheral activities that have an ***indirect*** bearing on the project. The logic of this argument stems from the above-quoted text of § 3 itself, which states that the FERC has jurisdiction over "an LNG **terminal**" (Emphasis added). Dredging at remote locations is not "for . . .an LNG terminal."

For instance, to speak hypothetically, if Weaver's Cove were to build new ships for use in connection with this terminal but were to build them at some remote port — say, Newport News Virginia, for example – permits for the dredging at that port, needed in order to enable the initial delivery of the vessels, would not qualify to trigger the statute. The denial of such permits

is legally too remote and incidental with respect to the actual FERC-authorized terminal project *per se*.

Let us apply the lesson of the above hypothetical to the facts at hand. Quite simply, in Rhode Island, the channel is comparably removed from the terminal – pre-emption does not apply.

## V. CONCLUSION

Summary Judgment should be denied to Weaver's Cove and granted to the State.

Respectfully submitted,

State of Rhode Island,
By its Attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

/s/ Michael Rubin
Michael Rubin, Esq., (Bar #3656)
Assistant Attorney General
150 South Main Street
Providence, R.I. 02903
Tel: (401) 274-4400 Ext. 2116

/s/ Paul J. Roberti
Paul J. Roberti, Esq., (Bar #4447)
Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 Ext. 2231

/s/ Brian A. Goldman
Brian A. Goldman, Esq., (Bar #3940)
Counsel for CRMC
681 Smith Street
Providence, RI 02908
Tel: (401) 521-4100

**CERTIFICATION**

I, the undersigned, hereby certify that a true copy of the within document was served by electronic means (ECF) on this 10th day of January, 2008 to the following:

Gregory L. Benik, Esq.
Benik & Associates P.C.
931 Jefferson Blvd., Suite 2008
Warwick, RI 02886

Bruce F. Kiely
Baker Botts, LLP
1299 Pennsylvania Avenue NW
Washington, DC 20004-2400

/s/ Michael Rubin