**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **WEAVER'S COVE ENERGY, LLC** | : | |
| | : | |
| **v.** | : | **CA. No. 07-246S** |
| | : | |
| **RHODE ISLAND COASTAL RESOURCES MANAGEMENT COUNCIL, *ET AL.*** | : | |

**STATE'S STATEMENT OF UNDISPUTED FACTS**

1. The original purported application to the CRMC (July, 2004) related:

> The project developer has a contractual right to purchase a Brownfields site in Fall River, Massachusetts, on which dredge material will be used as engineered fill, and therefore has control over the dredge material placement site. The permitting process for handling the dredge material at the Fall River site is well under way with the relevant Massachusetts permitting agencies. Details regarding existing and proposed conditions on the Fall River site are subject to the jurisdiction of Massachusetts for review and permitting. Accordingly, no authorization for our Massachusetts activities can be sought from the RIDEM/CRMC.

J.A. Tab 11, p. 3 (Form entitled "State of Rhode Island Dredging Application Checklist," sent on July 16, 2004, from Weaver's Cove to CRMC, received July 19).

2. That filing further stated:

> Dredged material will be used to as engineered fill to create landforms on the LNG Terminal site in Fall River, Massachusetts.

J.A. Tab 10, p. 2 (Cover letter dated July 16, 2004, from Epsilon Associates, on behalf of Weaver's Cove, to CRMC).

3. With respect to the currently proposed destination of the spoils, Weaver's Cove's own later submission to the U.S. Army Corps of Engineers (Army Corps), of March 17, 2005, related:

> [W]e respectfully request that the USACE formally consider open ocean disposal as a back-up option.

PDF created with pdfFactory trial version www.pdffactory.com

J.A. Tab 19, p. 2.

4. The ACOE then deemed that new hearings were needed and published a new notice:

> The applicant filed its December 2003 FERC application, its Corps permit application and other documents with on-site placement of stabilized dredged material as its preferred dredged material management option. . . ..
>
> However, . . . the Project is now proposing to place the suitable dredged material in a designated ocean disposal site(s).

J.A. Tab 31, p. 2 (Notice dated November 1, 2005, from the ACOE).

5. "[O]ffshore disposal" was now cited as the applicant's "preferred alternative." Id. It has become clear that (although never stated on the record before the CRMC) upland disposal is cancelled and in-water disposal is sought.

6. The overall transport impact would be over a 100 times greater factoring in both the greater number of trips and the greater distance. See Danni Goulet affidavit, Ex. D at ¶ 18, ¶¶ 12-22.

7. The initial proposal's specifications are as follows: Frequency of shipments (annual): 60-70 port visits. *See* Ex. A to Motion to Stay, Docket # 19, p. 28 (Coast Guard Recommendation Coast Guard Recommendation Against Waterway Suitability dated October 24, 2007)

8. This (see immediately preceding paragraph) translates this into 120 transits. Id.

9. On August 10, 2005, the President signed into law the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), Pub. L. No. 109-59, § 1948, 119 Stat. 1144 (2005).

PDF created with pdfFactory trial version www.pdffactory.com

10. § 1948 of this law expressly reflects the intent of the President and Congress that the existing Brightman Street Bridge, in Fall River, Massachusetts, shall be "maintained . . . as an emergency service route." J.A. Tab 26 (SAFETEA-LU § 1948).

11. On February 2, 2006, the applicant filed with the U.S. Coast Guard a notification entitled "Change of Information in Letter of Intent to Operate a Newly Constructed Waterfront Facility Handling LNG." JA Tab 40.

12. Weaver's Cove's new transit plan dated February 2, 2006 would now double the annual round trips to a minimum of 120. Id. *See also* id. at pp. 19-20; id. at p. 24; id. at p. 26; id. at p. 28.

13. Weaver's attempted to have the Coast Guard declare the old bridge an obstruction and slate it for demolition, but the Coast Guard refused. *See* Ex. F (District Director's Letter of Oct. 4, 2007)

14. The Commanding Officer of the United States Coast Guard for the Southeast New England Sector, possesses jurisdiction over the portion of the coast called the "Narragansett Bay Regulated Navigation Area," pursuant to the Ports & Waterways Safety Act of 1972, 33 USC § 1221 *et seq.*, to determine whether to allow the proposed transit of LNG vessels to Weaver's Cove's proposed terminal location.

15. On October 24, 2007, he issued a recommendation. This document concluded that the waterway is not suitable for the intended LNG vessel operations. *See* Exhibit A. to Motion to Stay, Docket # 19.

16. Since this Court reviewed the stay motion, that recommendation has been affirmed. On December 7, 2007, Captain Roy Nash, the Captain of the Port for USCG Sector Southeast New England, rejected Weaver's appeal. *See* Ex. F.

PDF created with pdfFactory trial version www.pdffactory.com

17. Weaver's Cove never directly apprised the CRMC of any of these developments (see prior paragraphs above regarding changes to shipping and disposal) (*See* Ex. C, Affidavit of Grover Fugate, at ¶ 4).

18. LNG is one few substances that has been deemed to be a "high interest cargo" requiring extensive security protocols by federal, state and local law enforcement resources. *See* 33 C.F.R. § 165.121.

19. Federal regulations specify that the Captain of the Port for the particular "regulated navigation area" (in this case the Narragansett Bay RNA) will employ security zones that extend 2 miles off the bow, one mile off the stern, and 3000 feet one either side of any LNG vessel transiting through the 23 mile section of waterway contained within the coastal zone.

20. The irregular and unannounced schedule of LNG tanker transits, together with delays to boating associated with passage of LNG tanker security zones, may directly impact Newport's ability to retain major regattas and events such as the Tall Ships, which attract local, national and international participation. *See* Pare Engineering Study, Ex. I.

21. On June 14, 2005, the Rhode Island Turnpike and Bridge Authority ("RITBA"), the state agency statutorily charged with control over the Newport/Pell Bridge and the Mount Hope Bridge, passed a resolution indicating the it would, in fact, close the Newport/Pell Bridge every single time an LNG tanker passed under the bridge. Ex. K.

22. As evidenced by RITBA's Resolution, both the Claiborne Pell Newport Bridge *and* the Mount Hope Bridge will each be closed during the projected 120-130 tanker transits. Id.

23. For significant security reasons, the bridges will be closed "before, during and after" the tankers transit under the bridges. Affidavit of Peter Janaros, Director of Engineering for RITBA. *See* Ex. J.

PDF created with pdfFactory trial version www.pdffactory.com

24. Shortly after receiving Weavers Cove's filing, CRMC telephoned Weaver's Cove's agent, Epsilon Associates, and spoke to Lester B. Smith and advised him that the papers lacked necessary data and information required by Rhode Island's Federally-approved Coastal Resources Management Plan ("CRMP") and that the CRMC's review had not begun, and could not begin, until all the necessary data and information required by the CRMP was received by the agency. See Goulet affidavit. *See* Goulet Aff. Ex. D.

25. CRMC advised Mr. Smith there were several items of necessary data and information that had not been submitted to the CRMC and that, until such items were received, the CRMC could not commence its consistency review. *See* Goulet Aff. Ex. D.

26. Specifically, CRMC advised Mr. Smith that the application did not include an identification of a viable disposal location for the dredged materials. Also, the CRMP required that the plans submitted were to be stamped by a Rhode Island professional engineer, and the CRMP required a Water Quality Certificate ("WQC") from the Rhode Island Department of Environmental Management ("RIDEM") as a prerequisite to CRMC review. These were lacking too. *See* Goulet Aff. Ex. D.

27. As of the date of this statement, Weaver's Cove has not submitted the required data and information identifying the new viable disposal location for the dredged material, nor has it submitted the required WQC from the RIDEM. The RIDEM sent us a copy of the WQC denial which would not allow us to issue an assent. Until the necessary data and information is submitted, the CRMC cannot begin its consistency review and/or determination. See Goulet Aff, Ex. D.

PDF created with pdfFactory trial version www.pdffactory.com

Respectfully submitted,

State of Rhode Island,
By its Attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

/s/ Michael Rubin
Michael Rubin, Esq., (Bar #3656)
Assistant Attorney General
150 South Main Street
Providence, R.I. 02903
Tel: (401) 274-4400 Ext. 2116
Fax: (401) 222-3016

/s/ Paul J. Roberti
Paul J. Roberti, Esq., (Bar #4447)
Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 Ext. 2231
Fax: (401) 222-3016

/s/ Brian A. Goldman
Brian A. Goldman, Esq., (Bar #3940)
Counsel for CRMC
681 Smith Street
Providence, RI 02908
Tel: (401) 521-4100

**CERTIFICATION**

I, the undersigned, hereby certify that a true copy of the within document was served by electronic means (ECF) on this 10th day of January, 2007 to the following:

Gregory L. Benik, Esq.
Benik & Associates P.C.
931 Jefferson Blvd., Suite 2008
Warwick, RI 02886

Bruce F. Kiely
Baker Botts, LLP
1299 Pennsylvania Avenue NW
Washington, DC 20004-2400

/s/ Michael Rubin

PDF created with pdfFactory trial version www.pdffactory.com