UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| WEAVER'S COVE ENERGY, LLC | : | |
| | : | |
| v. | : | CA. No. 07-246S |
| | : | |
| RHODE ISLAND COASTAL RESOURCES MANAGEMENT COUNCIL, *ET AL.* | : | |

**AFFIDAVIT OF GROVER FUGATE**

The undersigned, being first duly sworn, hereby deposes and says as follows:

1. I am the executive director of the Coastal Resources Management Council having held that position since 1986.

2. My duties include supervising all the operations of the agency, which includes supervising all federal consistency reviews performed pursuant to 16 U.S.C. § 1451 *et seq.* ("CZMA"). In particular, under the rules and regulations of the CRMC, I am the person who has been delegated the authority to conduct all federal consistency reviews performed by CRMC pursuant to the CZMA. The number of applications, including CZMA applications, that I have presided over is alluded to below.

3. I am aware of the changes in proposed dredging disposal (as documented in the affidavit of Danni Goulet and the documents he cites and through the ACOE renotice of November 1, 2005) and shipping plan (as documented in the Coast Guard decision of October 24, 2007 and the documents giving rise to that decision) made by Weaver's Cove during the time period of the pendency of its purported application. In my opinion, based on my experience as a senior coastal manager for over twenty years, these changes are significant and substantial and would result in increased impacts to Rhode Island's coastal resources.

4. During my tenure, the agency has processed to completion approximately 20,000 applications. Many of these applications also implicated the CZMA. However, only several hundred of these applications were for *direct* federal activities. These are applications where the applicant is the federal government itself. The remainder of the CZMA-related applications were applications for *indirect* federal activities. These are applications where the applicant is not the federal government itself but where the applicant has obtained, or will need, a federal permit to conduct the activity in question. Although these applications *do* entail a consistency review under the CZMA, traditionally these applications have not typically been referred to as "consistency review" determinations by staff or applicants. In typical day-to-day usage, the term "federal consistency" has been reserved for those projects where the federal government itself is the applicant. This is common usage in the agency. It was in this sense that the term "federal consistency" or a like term was used in our regulations.

5. Thus, any exemption for a water quality certification in the CRMP for Federal consistency projects always has been interpreted to relate only to projects applied for by the Federal government itself.

6. In other words, the exception contained within CRMP Section 300.9(c) 2 for "federal consistency reviews" has been interpreted by CRMC to except only direct federal activities such as those performed by the Army Corp of Engineers or the United States Navy.

7. Thus, during my tenure, Section 300.9(c) 2 of the Coastal Resources Management Program ("CRMP") always has been interpreted *not* to exempt indirect federal applications.

8. In other words, that section, section 300.9(c) 2 of the Coastal Resources Management Program ("CRMP"), always has been interpreted to require an applicant for a federal license or permit activity to obtain a Section 401 (Clean Water Act) Water Quality Certification ("WQC") from the Rhode Island Department of Environmental Management (RIDEM) before the CRMC can consider granting approval for the project in cases involving dredging or discharges. No applicant for a federal license or permit activity has ever been allowed to avoid this prerequisite to CRMC review.

9. There have been between 1,000 and 2,000 instances during my tenure where an applicant other than the federal government sought approval for an activity that involved dredging or a discharge for a project which required a federal permit. In all of these instances a WQC has been required before the CRMC would accept the application. This is so even though these applications implicated the CZMA.

10. A member of my staff, Danni Goulet, P.E., notified Weaver's Cove Energy, LLC (Weaver's Cove"), of this requirement immediately after they filed their papers in relation to state assent and federal consistency determination on or about July 19, 2004, which was within the 30-day notification period provided for by the CZMA.

11. Additionally, when Weaver's Cove resubmitted a new application on or about August 12, 2004, I notified Weaver's Cove on August 26, 2004, that the application still lacked necessary data and information and that the agency's review would not begin until that necessary data and information was submitted to the agency. Specifically, on August 26, 2004, I, in my capacity as the CRMC consistency certification official sent a letter to Weaver's Cove notifying Weaver's Cove that its purported application could not be accepted. This letter notified Weaver's Cove that this was due to its lack of a prerequisite: a "Section 401 Water Quality Certificate," *i.e.*, a certificate issued pursuant to Section 401 of the Clean Water Act, 33 U.S.C. § 1341(a). It is through the Water Quality Certification process that dredge material is tested and classified for disposal options. Thus this is needed for the CRMC process so that the CRMC can determine what are the appropriate dredge disposal options.

12. In late September 2004 or early October 2004, I, on behalf of the CRMC, notified Weaver's Cove, by verbal communication with Mr. Beenhert, that the purported application was still incomplete for two reasons: (1) it was deficient in that there was no information as to the

location of an approved and viable upland site where the dredged spoils would be deposited; and (2) it lacked a prerequisite in that there had been no water quality certification issued.

13. Specifically, with respect to the preceding paragraph, in late September 2004 or early October 2004, I notified Mr. Boenhert, an attorney acting on behalf of Weaver's Cove, that the purported application lacked necessary data and information required by Rhode Island's Federally-approved Coastal Resources Management Plan ("CRMP"), as outlined above, and that the CRMC's review had not begun, and could not begin, until all the necessary data and information required by the CRMP was received by the agency.

14. On October 12, 2006, I, on behalf of the CRMC, by verbal communication with representatives of Weaver's Cove in the course of a meeting, notified Weaver's Cove that the purported application was still incomplete for two reasons: (1) it was deficient in that there was no information as to the location of an approved and viable upland site where the dredged spoils would be deposited; and (2) it lacked a prerequisite in that there had been no water quality certification issued.

15. On or about, November 2, 2006, I, on behalf of the CRMC, sent to Weaver's Cove a letter (later lodged before the FERC) taking the position that it could not accept or process the purported application because: (1) it was deficient in that there was no information as to the location of an approved and viable upland site where the dredged spoils would be deposited; and (2) it lacked a prerequisise in that there had been no water quality certification issued. This was just one of a number of written transmittal to that effect as documented in the Joint appendix filed in this case.

16. As of this date, the agency has still not received this necessary data and information to begin its review.

17. As of the date of this pleading, the CRMC has not yet accepted, deemed complete for processing, approved or objected to the purported application.

18. Weaver's Cove own papers filed with the CRMC sought to obtain a Category B Assent, a state permit requirement, pursuant to the CRMP for the Weaver's Cove project that in itself entails dredging in Rhode Island waters.

Grover J. Fugate

Subscribed and sworn to before me on this 10th day of January, 2008.

Notary Public
My commission expires 12/29/2010