**AFFIDAVIT OF DANNI GOULET**

The undersigned, being first duly sworn, hereby deposes and says as follows:

1. I am the Dredging Coordinator (that is my specific job title as well as a description of my function) for the State of Rhode Island Coastal Resources Management Council, the state agency that has the primary responsibility for dredging in the State. I have held this position for over 5 years. I am a professional engineer registered in both Rhode Island and Massachusetts. Although there are two classifications of operational positions at CRMC -- policy staff and permitting staff -- I operate in both categories. My immediate supervisor is Mr. Grover Fugate. My job requires me to coordinate dredging activities for the state and develop policy for the state in regards to dredging. In the former role, I make recommendations as to approval of applications for dredging during the application process based upon my review and evaluation of the applicant's dredging information, soundings, and attempted showing as to conformance with State policy. Also, subsequently, after any resulting approval, I monitor the dredging. For example, I am intimately involved in monitoring the dredging of the commercial channel in Narragansett Bay known as the Providence River project. Prior to coming to the RI Coastal Resources Management Council, I had performed permitting application consulting work on dredge projects in Massachusetts and Rhode Island. I had submitted permit applications on behalf of private clients.

   By virtue of my position, I am generally familiar with the application processes with respect to dredging at my agency, the DEM, and the ACOE.

By virtue of my position, I am specifically familiar with the filings of Weaver's Cove Energy LLC ("Weaver's Cove"), with respect to a proposed terminal in Fall River, at the following agencies insofar as those applications relate to dredging: FERC, ACOE, DEM, and Massachusetts DEP.

By virtue of such familiarity, I am specifically familiar with the documents surrounding those applications insofar as such documents relate to dredging. Thus, by virtue of my position, I have reviewed, among other papers, the following documents:

A. Letter dated November 14, 2003, from Weaver's Cove to the Army Corps of Engineers ("ACOE"). (J.A. Tab 1).

B. Document dated December, 2003, entitled "Dredging Program". (J.A Tab 2).

C. Letter dated December 2, 2003, from Federal Energy Regulatory Commission ("FERC") to Weaver's Cove. (J.A. Tab 3).

D. Cover letter dated December 19, 2003, from Weaver's Cove, to FERC together with portions only of the enclosure. (J.A. Tab 4).

E. Cover letter dated February 5, 2004, from Weaver's Cove to FERC together with the enclosure. (J.A. Tab 5 (portion only)).

F. Letter dated February 23, 2004, from FERC to CRMC. (J.A. Tab 6).

G. Portions of a document dated March18, 2004, partly entitled "JOINT SECTION 10/404 INDIVIDUAL PERMIT APPLICATION." (J.A. Tab 7).

H. Letter dated May 28, 2004, from Weaver's Cove to the United States ACOE. (J.A. Tab 9).

I. Cover letter dated July 16, 2004 (received by CRMC on July 19, 2004), from Epsilon Associates, on behalf of Weaver's Cove, to the CRMC and the Department of Environmental Management (DEM), transmitting certain papers. (J.A. Tab 10).

J. Form entitled "State of Rhode Island Dredging Application Checklist", submitted on the same date (see preceding paragraph), as part of the same transmittal (see preceding paragraph), with notations by Weaver's Cove. (J.A. Tab 11).

K. Letter dated August 2, 2004, from John Boenhert, Esq., on behalf of Weaver's Cove to the CRMC, et al.. (J.A. Tab 12).

L. Cover letter dated August 9, 2004, from a Weaver's Cove consultant to Weaver's Cove with enclosure. (J.A. Tab 13).

M. Letter dated August 12, 2004, from Epsilon on behalf of Weaver's Cove to the CRMC. (J.A. Tab 14).

N. Letter dated August 26, 2004, from the CRMC, through its consistency certification official, Grover Fugate, to Weaver's Cove. (J.A. Tab 15).

O. Letter dated September 17, 2004, from ACOE to FERC. (J.A. Tab 16).

P. Letter dated March 17, 2005, from Epsilon, on behalf of Weaver's Cove, to the ACOE. (J.A. Tab 19).

Q. A document dated May 2005, entitled "Environmental Impact Statement." (J.A. Tab 23 "Portions Only)).

R. FERC Order dated July 15, 2005, regarding Weaver's Cove. See Order Granting Authority Under Section 3 Of The Natural Gas Act And Issuing Certificate, Weaver's Cove Energy, LLC et al., 112 F.E.R.C. ¶ 61,070 (2005) ("Initial Order"). (A defective copy is at J.A. Tab 25).

S. Notice dated November 1, 2005, from the ACOE. (J.A. Tab 31).

T. Letter dated December 12, 2005, from CRMC to FERC, a copy of which was sent to Weaver's Cove. (J.A. Tab 33).

U. Letter of the same date, December 12, 2005, from the CRMC to the ACOE. (J.A. Tab 34).

V. Letter dated November 2, 2006, from the CRMC to Weaver's Cove. (J.A Tab 52).

W. Letter dated August 10, 2007, from the DEM to Weaver's Cove (denying W. Q. Cert. (J.A. Tab 64).

2. Necessarily, I am familiar with Weaver's Cove's filing of papers on or about July 19, 2004 with the CRMC. Portions of this filing are found at J.A Tabs 10 & 11. As part of my duties, I conducted the initial review of that filling, which was submitted to CRMC by Epsilon Associates on behalf of Weaver's Cove. Weaver's Cove submitted that filing with the apparent intent that it was to serve as an application to the CRMC for a State assent as well as for a federal consistency review pursuant to the Coastal Zone Management Act ("CZMA"), 16 U.S.C. § 1451 *et seq.*

3. I reviewed the dredging that would be performed on submerged lands in Rhode Island and nearby Massachusetts and the consistency of the same with the enforceable policies of the Rhode Island Coastal Resources Management Program.

4. Under the filing, Weaver's Cove proposed to perform at least 230,000 cubic yards of dredging on a 2.4-mile long stretch of submerged lands underlying Rhode Island waters. (*See* J.A. Tab 10, p.2, Cover letter dated July 16, 2004 (received by CRMC on July 19, 2004), from Epsilon Associates).

5. Under the filing, Weaver's Cove proposed to perform at least 2.5 million cubic yards of dredging in the 4.6-mile long stretch of submerged lands underlying Massachusetts waters. (*See* J.A. Tab 2, p. 9, (Table 2), Document dated December, 2003, entitled "Dredging Program".)

6. The original proposal was to dredge 7 days a week, 365 days per year for three years with no windows to allow for fish propagation and migration. FERC has now imposed some alteration to this schedule with respect to certain locations.

(*See* J.A. Tab 23, p 3-73 to 3-75, a document dated May 2005, entitled "Environmental Impact Statement").

7. Under the latest information Weaver's Cove has made available to CRMC, a 60,000-cubic-yard portion of the anticipated material from Massachusetts is considered not suitable for ocean disposal and had no disposal location identified. Beforehand, under the original proposal, as detailed below in the next paragraphs, all of the dredged material, including this reportedly contaminated portion, was destined to an upland site in Massachusetts. Now, however, the proposal to use the upland disposal site is at best uncertain (see next paragraphs). Therefore, the intended destination of the reportedly contaminated material currently remains uncertain. As of now, the disposal of this material has not been detailed to the CRMC, so its potential impact on the Rhode Island coast cannot be ascertained. While there might be additional developments regarding this material, it is not possible for CRMC to know of these or evaluate them in the absence of any amendment or update from Weaver's Cove. (*See* J.A. Tab 23, a document dated May 2005, entitled "Environmental Impact Statement").

8. Said filing stated, "The project developer has a contractual right to purchase a Brownfields site in Fall River, Massachusetts, on which dredge material will be used as engineered fill, and therefore has control over the dredge material placement site. The permitting process for handling the dredge material at the Fall River site is well under way with the relevant Massachusetts permitting agencies. Details regarding existing and proposed conditions on the Fall River site are subject to the jurisdiction of Massachusetts for review and permitting.

Accordingly, no authorization for our Massachusetts activities can be sought from the RIDEM/CRMC." (J.A. Tab 11, p.1 Fn 1, form entitled "State of Rhode Island Dredging Application Checklist", submitted on the same date (see preceding paragraph), as part of the same transmittal (see preceding paragraph), with notations by Weaver's Cove).

9. Said filing also stated "Dredged material will be used as engineered fill to create landforms on the LNG Terminal site in Fall River, Massachusetts." (J.A. Tab 10, p. 2, cover letter dated July 16, 2005 (received by CRMC on July 19, 2004), from Epsilon Associates, on behalf of Weaver's Cove, to the CRMC and the Department of Environmental Management (DEM, transmitting certain papers).

10. In other words, the filing with CRMC proposed that all dredged materials were to be disposed on the site in Massachusetts with all Rhode Island dredge materials being transported to a Massachusetts upland site.

11. Under this original filing, the use of RI waters for the transport of the dredged material would have been limited to the impacts from the transport of approximately 230,000 cubic yards of dredged material over a maximum of 2.4 miles in Rhode Island waters (from lower Mount Hope Bay more-or-less northward to the Massachusetts border).

12. I am familiar with the approval WC received from FERC, including the FEIS that is incorporated into that approval. (*See* J.A. Tab 1, p.2, letter dated November 14, 2003, from Weaver's Cove to the Army Corps of Engineers ("ACOE")).

13. The FEIS states that Weaver's Cove will not allow any significant overflow of the dredge material scows as an additional mitigative measure to prevent impacts to

winter flounder. The FEIS also states that Weaver's Cove intends to utilize 4,000 CY scows (dredge material transport barges). *See* FEIS 2.4 1.3. In my professional monitoring of the dredging of the Providence River, parts of which dredging was conducted under a similar stipulation with respect to scow over-flow prevention, I observed that scows were only able to be filled ¾-full with material before the free water that exudes from the dredged material that would be placed in a scow would start to overflow. Based on that experience and my own professional judgment, this will limit the volume of the scows used to transport-away dredged material form the Weaver's Cove dredging project to approximately 3,000 CY of material per scow per trip. (*See* J.A. Tab 23, p. 2-27, a document dated May 2005, entitled "Environmental Impact Statement").

14. I have performed certain calculations based on this capacity limit. The original filing, obeying this capacity limit, would entail 77 laden barge transits through less than 2.4 miles of Rhode Island waters. This equates to a maximum of 184 total laden barge miles (368 round-trip miles) in Rhode Island waters.

15. As of March 17, 2005, Weaver's Cove had an application pending with the ACOE regarding the same proposal that formed the basis of the filing with the CRMC. (*See* J.A. Tab 19 letter dated March 17, 2005 from Epsilon, on behalf of Weaver's Cove, to the ACOE)

16. On March 17, 2005, Weaver's Cove revised its application to the ACOE to change its proposal. Instead of exclusively disposing of dredge material on an upland site, Weaver's Cove now proposed an alternative, which was to dispose of the dredge material in an open-water site, the Rhode Island Sound Disposal Site

(8 miles off Block Island). (*See* J.A. Tab 19, p. 2, ¶ 4, letter dated March 17, 2005, from Epsilon, on behalf of Weaver's Cove).

17 Copies of this change were never provided by Weaver's Cove to CRMC nor was notice provided. I do not know if there have been additional refinements to this change since Weaver's Cove has not kept the CRMC updated with its dredging plans.

18. Under this change, the direct impacts to R.I. coastal resources from the transport of the material include impacts from the transport of all of the dredge material (at least 2.5 million cubic yards) approximately 23 miles in Rhode Island waters (from lower Mount Hope Bay to the outer border of Rhode Island's territorial sea) The distance of 23 miles is based on my own measurements using recognized nautical charts. Weaver's Cove would again be limited to 3,000 cubic yards per barge. By calculation this would entail 833 laden barge transits through approximately 23 miles of Rhode Island waters. By further calculation, this equates with 19,159 laden barge miles (slightly over 38,000 round trip miles) in Rhode Island.

19. By comparison with the original filing, under this change, the impact of the transport alone would be numerically over 100 times greater. Thus, even if my estimates as to overall volume of materials and scow capacity are wrong, there would still be over a hundred-fold increase in impacts from dredge material transit.

20. All estimates in this statement as to volumes are based on Weaver's Cove's representation that the target depth for the channel is 37 feet with a one foot over-

dredge allowance for a total channel depth of 38 feet. However, all indications are that the volume would be even higher. It is typical practice to allow 2 feet of over-dredge due to the size of the equipment -- buckets ranging from 7 to 26 CY -- and due to the resulting difficultly in precisely controlling these to tight tolerances. Weaver's Cove acknowledges this in the FEIS and estimates that the volume is 3.1 million cubic yards. This would also extend the channel from its authorized depth of 35' MLLW to 39' MLLW.

21. With respect to the channel portion of the dredging, Weaver's Cove has proposed to extend the channel depth to a 37-foot target depth, but the turning basin portion, located north of the Braga Bridge in Fall River, is proposed to be a 41-foot target depth.

22. In my observation, judgment, experience and expertise it is impossible to refine a dredging project at these depths with this type of equipment so that it has merely 1 foot tolerance (deviation) from the targeted depth since the coarseness of the equipment and other factors contributing to imprecision makes it necessary to allow for a two foot tolerance (deviation), know as an over-dredge. With a target depth of 37 feet for the channel, Weaver's Cove can be expected to realize an actual dredged depth of approximately 39 feet.

23. Shortly after receiving Weavers Cove's filing, I telephoned Weaver's Cove's agent, Epsilon Associates, and spoke to Lester B. Smith and advised him that the papers lacked necessary data and information required by Rhode Island's Federally-approved Coastal Resources Management Plan ("CRMP") and that the

CRMC's review had not begun, and could not begin, until all the necessary data and information required by the CRMP was received by the agency.

I advised Mr. Smith there were several items of necessary data and information that had not been submitted to the CRMC and that, until such items were received, the CRMC could not commence its consistency review.

24. Specifically, I advised Mr. Smith that the application did not include an identification of a viable disposal location for the dredged materials. Also, the CRMP required that the plans submitted were to be stamped by a Rhode Island professional engineer, and the CRMP required a Water Quality Certificate ("WQC") from the Rhode Island Department of Environmental Management ("RIDEM") as a prerequisite to CRMC review. These were lacking too.

25. On or about August 12, 2004, Mr. Smith, on behalf of Weaver's Cove, resubmitted the filing, this time with the inclusion of plans stamped by a Rhode Island professional engineer; however, the filing still lacked the identification of a viable disposal location for the proposed dredge material as well as the WQC, which is a prerequisite and necessary data and information required by Rhode Island's federally approved CRMP.

26. As I am familiar with the CRMC file on this matter, I know from my own personal knowledge that, on or about August 26, 2004, the CRMC's Executive Director again notified Weaver's Cove that the application was incomplete because it still lacked necessary data and information and that the CRMC could not begin its consistency review until all the required data and information were submitted. (J.A. Tab 15, letter dated August 26, 2004, from CRMC, through its

consistency certification official, Grover Fugate, to Weaver's Cove).

27. As of the date of this Affidavit, Weaver's Cove has not submitted the required data and information identifying the new viable disposal location for the dredged material, nor has it submitted the required WQC from the RIDEM. The RIDEM sent us a copy of the WQC denial which would not allow us to issue an assent. Until the necessary data and information is submitted, the CRMC cannot begin its consistency review and/or determination.

DANNI GOULET

Subscribed and sworn to before me on this 10th day of January, 2008.

Notary Public
My commission expires
12/29/2010