IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| WEAVER'S COVE ENERGY, LLC, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| vs. ) | Case No. 07-246-S |
| ) | |
| RHODE ISLAND COASTAL ) | |
| RESOURCES MANAGEMENT ) | |
| COUNCIL, *et al.*, ) | |
| ) | |
| *Defendants*. ) | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**

**PLAINTIFF WEAVER'S COVE ENERGY, LLC'S
MOTION FOR SUMMARY JUDGMENT**

**AND IN SUPPORT OF**

**PLAINTIFF'S OBJECTION TO
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................. i

INTRODUCTION ...................................................................................1

REQUEST FOR IMMEDIATE RELIEF ..................................................5

ARGUMENT ..........................................................................................5

I.     By Failing To Act On Weaver's Cove's Consistency Certification Within Six Months, The CRMC's Concurrence Is Conclusively Presumed ...............................................................................5

      A.     Under The CZMA, The CRMC's Concurrence With The Consistency Certification Was "Conclusively Presumed" Six Months After Weaver's Cove Filed All Necessary Data And Information...............................................................5

           1.     Approval From An Upland Disposal Site Is Not "Necessary Data And Information"..................................9

           2.     A Water Quality Certification Is Not "Necessary Data and Information"...........................................................12

           3.     The CRMC's Concurrence Shall Be Conclusively Presumed.......................................................................17

      B.     The CRMC Cannot Expand Its Review Beyond The "Listed Activities" In Its NOAA-Approved Coastal Management Program ....................................................................18

           1.     The CZMA And The Regulations Promulgated Thereunder Limit The Scope Of The CRMC's Review To Only "Listed Activities"............................................19

           2.     The CRMC's Listed Activities Do Not Include LNG Vessel Transits, The LNG Terminal, Or The Other Matters Identified In The CRMC's Brief ......................22

3.     The CRMC Misapprehends The "Effects Test," Which Does Not Expand Its Jurisdiction Beyond The Listed Activities ..........................................................................29

C.     No "New or Supplemental" Consistency Certification Is "Required" By The CZMA .....................................................36

D.     This Case Is Not Moot ............................................................39

1.     The Disposal Plan Does Not Moot The Case ................42

2.     U.S. Coast Guard Proceedings Do Not Moot The Case.43

3.     Federal Legislation Pertaining To The Old Brightman Street Bridge Does Not Moot This Case ......................45

E.     Res Judicata Does Not Affect This Case ...................................46

II.     The CRMC's Application of Category B Assent To Block Operation Of The LNG Terminal Is Unconstitutional ..........................................51

A.     Imposition Of The Category B Assent Requirement To Block The Weaver's Cove Project Violates The Dormant Commerce Clause .......................................................................................52

1.     The CRMC Did Not Dispute Weaver's Cove's Statements Of Fact And Law, And Has Waived The Opportunity To Do So ....................................................52

2.     The CRMC's Preemption-Related State-Ownership Arguments Would Not Have Defeated Weaver's Cove's Dormant Commerce Clause Claims, Even If The CRMC Had Attempted To Raise Such Arguments Against Those Claims ...........................................................................53

B.     Rhode Island's Category B Assent Requirement Is Preempted By Section 3 Of The Natural Gas Act In This Case .................61

1.     FERC's Authority Under Section 3 Of The Natural Gas Act Preempts Category B Assent ...................................62

2.   The CRMC's "Regulatory/Proprietary" Distinction Is A Red Herring; The Natural Gas Act's Preemption of Category B Assent Supercedes All CRMC Control Of The Use Of The Submerged Land...................................74

3.   The Federal Limitations On Category B Assent Are Not Limited To The Federal Navigation Servitude And The Natural Gas Act's Eminent Domain Provision ..............86

C.   In Focusing On The Submerged Lands Act And The Federal Navigation Servitude, The CRMC Responds To Arguments Not Raised In This Case ................................................................89

III.   Summary Judgment Is Appropriate On Weaver's Cove's Motion, Because There Is No Genuine Issue Of Material Fact.......................91

CONCLUSION .......................................................................................93

Plaintiff Weaver's Cove Energy, LLC ("Weaver's Cove"), by and through its attorneys, Bruce Kiely, Baker Botts L.L.P., and Gregory Benik, submits this reply memorandum in support of its Motion for Summary Judgment and in opposition to the cross-motion for summary judgment and memorandum of law submitted in support thereof ("CRMC Memo.") (Doc. 28) filed by Defendants Coastal Resources Management Council, *et al.* ("CRMC").

## INTRODUCTION

Weaver's Cove's raises very narrow issues for this Court's review.  It does not ask the Court to rescind the powers granted to the CRMC by the Coastal Zone Management Act ("CZMA"), 16 U.S.C. §§ 1451-1464.  Instead, it merely asks the Court to enforce the specific statutory and regulatory provisions that define the CRMC's role in the CZMA.

Nor does Weaver's Cove ask the Court to endorse wholly-unregulated dredging activities in Rhode Island waters.  Instead, it merely asks the Court to enforce Congress's definition of the limits between the authority of federal regulators and the CRMC, with respect to dredging that is subject to extensive regulation by the Federal Energy Regulatory Commission ("FERC") and U.S. Army Corps of Engineers ("USACE").

Nor does Weaver's Cove ask the Court to extinguish the State of Rhode Island's public-trust ownership of submerged lands.  Instead, it merely asks the

1

Court to enjoin the CRMC from regulating the use of such lands in a way that places an unconstitutional burden on interstate commerce.

Weaver's Cove's Amended Complaint ("Am. Compl.") (Doc. 8) set forth a few precisely-defined claims for relief under federal law: specifically, that this Court declare that Rhode Island's concurrence with Weaver's Cove's "consistency certification" under the CZMA, 16 U.S.C. § 1456(c)(3)(A), is "conclusively presumed" because Rhode Island failed to act within the six-month statutory deadline (Counts I & II); that this Court hold that application of Rhode Island's "Category B Assent" regulations to Weaver's Cove unconstitutionally burdens interstate and international commerce in violation of the Dormant Commerce Clause (Counts III & V); and that this Court hold Rhode Island's Category B Assent regulations to be preempted by Section 3 of the Natural Gas Act of 1938 ("Natural Gas Act"), as amended, 15 U.S.C. § 717b (Counts IV & V). Weaver's Cove demonstrated the legal and factual sufficiency of its claims in the memorandum of law submitted in support of its motion for summary judgment. ("WCE Memo.") (Doc. 16). The CRMC's responses to these claims — where it chose to respond at all — simply failed to demonstrate that Weaver's Cove is not entitled to the relief requested:

*First*, with respect to Weaver's Cove's CZMA claims, Rhode Island attempted to excuse its failure to satisfy the CZMA's strict six-month deadline by

invoking myriad reasons that fall outside of the narrowly-defined scope of the CRMC's jurisdiction under the CZMA.   Similarly, the developments that the CRMC cites to suggest the "mootness" of Weaver's Cove's consistency certification and of this case all relate only to matters outside of the CRMC's jurisdiction; thus, Weaver's Cove's consistency certification is active, and all Weaver's Cove's claims all are justiciable.

*Second*, with respect to Weaver's Cove's position that imposition of Category B Assent requirements on Weaver's Cove's proposed dredging activities would violate the Dormant Commerce Clause, the CRMC simply failed to respond. Thus, the CRMC failed to demonstrate a genuine issue of material fact rendering this matter unfit for summary judgment, and it waived its opportunity to contest Weaver's Cove's legal arguments.  The CRMC cannot argue Dormant Commerce Clause issues in its upcoming reply brief, because it did not do so in its opening brief. Weaver's Cove is entitled to judgment on its Dormant Commerce Clause claims by Rhode Island's default.

*Finally*, the CRMC attempts to evade the preemptive effect of FERC's orders by re-litigating matters already decided by FERC and outside of this Court's jurisdiction, and it asserts that its regulation of the use of state land via Category B Assent is categorically exempt from the preemptive authority of FERC.  The

former violates the limits of this Court's jurisdiction, and the latter is utterly unsupported by the governing law.

Simply stated, the CRMC asks this Court to do nothing less than (1) convert the CRMC's narrow, expressly-defined jurisdiction under the CZMA into untrammeled authority to undertake *ad hoc* review of all aspects of the Weaver's Cove project; and (2) endorse its claim that its regulation of state land use embodied in Category B Assent is inherently immune to the Supremacy Clause of the U.S. Constitution, giving the CRMC full discretion to block the operation of a liquefied natural gas ("LNG") terminal already approved by FERC.

For the reasons set forth below and in Weaver's Cove's initial memorandum of law, the CRMC's assertions of such unbounded authority are supported by neither law nor fact.  Thus, Weaver's Cove respectfully reiterates its request for summary judgment on all of the claims contained in its Amended Complaint.[1]

---

[1] This case raises only pure questions of law; there are no genuine issues of material fact.  Nevertheless, in the interest of not leaving unsupported factual assertions unopposed (even when those assertions are immaterial), Weaver's Cove files herewith a Statement of Disputed Facts (in response to the CRMC's Statement of Undisputed Facts), a second Declaration of Ted Gehrig, and the Declaration of Lester Smith, in order to specifically rebut the incorrect and immaterial statements of fact submitted by the CRMC.  The Court need not resolve these disputes of immaterial fact in order to grant Weaver's Cove's motion for summary judgment on all claims contained in its Amended Complaint.

## REQUEST FOR IMMEDIATE RELIEF

As Weaver's Cove explains in detail in Part II.A of this memorandum, the CRMC has chosen not to respond to Weaver's Cove's arguments of law in support of its Motion for Summary Judgment on Count IV of the Amended Complaint (*i.e.*, that imposition of Category B Assent requirements on Weaver's Cove's proposed dredging would violate the Dormant Commerce Clause).  Furthermore, the CRMC has not created a genuine issue of material fact with respect to that claim.

Thus, Weaver's Cove requests declaratory relief in its favor on Count IV of the Amended Complaint.   Furthermore, Weaver's Cove asks for immediate injunctive relief, under Count V of the Amended Complaint, in enforcement of a grant of declaratory relief on Count IV.

## ARGUMENT

I. **By Failing To Act On Weaver's Cove's Consistency Certification Within Six Months, The CRMC's Concurrence Is Conclusively Presumed**

A. **Under The CZMA, The CRMC's Concurrence With The Consistency Certification Was "Conclusively Presumed" Six Months After Weaver's Cove Filed All Necessary Data And Information**

Under the CZMA, a state is authorized to review a proposed activity requiring a federal permit, and which is an activity that the National Oceanic and Atmospheric Administration ("NOAA") has decided may have an effect on the state's coastal zone, to determine whether that activity is consistent with the state's

federally-approved coastal zone management program.[2]  16 U.S.C. § 456(c)(3)(A); 15 C.F.R. § 930.53.  This review process, known as federal consistency review, is initiated when the applicant submits a certification of the activity's consistency with the state's coastal zone management program.  Weaver's Cove, as the CRMC acknowledges, filed an application with the CRMC for such a federal consistency decision on or about July 19, 2004, in which Weaver's Cove certified the consistency of its proposed dredging of the Rhode Island portion of the Mount Hope Bay - Fall River Harbor Federal Navigation Channel with the enforceable policies of the Rhode Island Coastal Resources Management Program ("CRMP").  The proposed dredging activities themselves will be the subject of a USACE permit pursuant to Section 10 of the Rivers and Harbors Act of 1899 ("Rivers and Harbors Act"), 33 U.S.C. § 403.

The CZMA does not give the state an unlimited period of time to review the consistency certification.  Significantly, under the CZMA, Congress gave a state only six months after receipt of the applicant's consistency certification to render a federal consistency determination, or else the state's concurrence with the

---

[2] Coastal management programs and amendments thereto must be approved by NOAA.  The text of the CZMA gives the Secretary of Commerce responsibility for reviewing state coastal zone management programs and proposed amendments thereto.  *See* 16 U.S.C. §§ 1454, 1455(b).  The Secretary has delegated that power to NOAA.  *See* Dep't of Commerce Organizational Order 10-15, § 3.01(u) (May 28, 2004).

applicant's consistency certification "shall be *conclusively presumed*."  16 U.S.C. § 1456(c)(3)(A) (emphasis added).  In other words, if a state fails to issue a consistency determination within the six-month review period, the state waives its right to review the project under the CZMA.  *See Mountain Rhythm Res. v. FERC*, 302 F.3d 958, 960 (9th Cir. 2002).

As the CRMC acknowledges in its memorandum of law, this statutory six-month review period commences once the state agency receives (1) a copy of the applicant's consistency certification, and (2) the information and data required pursuant to Section 930.58 of the federal regulations promulgated by NOAA to implement the CZMA, 15 C.F.R. § 930.60(a) (2005).  *See* CRMC Memo. 32. Section 930.58 of those regulations, in turn, provides that the "applicant shall furnish the State agency with *necessary data and information* along with the consistency certification." 15 C.F.R. § 930.58(a) (2005) (emphasis added). "Necessary data and information" is a defined term in the NOAA regulations, meaning that information that is "specifically identified" in the state's NOAA-approved coastal zone management program as required necessary data and information for the applicant's consistency certification.  15 C.F.R. § 930.58(a)(2) (2005).  Accordingly, the six-month review clock begins to run once the applicant has submitted its consistency certification and "necessary data and information" as provided for in the federal regulations.

Here, after Weaver's Cove's submission of the consistency certification on or about July 19, 2004, the CRMC notified Weaver's Cove that the site plans submitted with the certification should be stamped by a Rhode Island professional engineer. *See* CRMC Memo. 33-34. On August 12, 2004, Weaver's Cove re-submitted to the CRMC site plans stamped by a Rhode Island engineer[3] to the satisfaction of the CRMC. *See* CRMC Memo. 36. Even assuming that this submission constituted a "new application" under the CZMA as the CRMC suggests, CRMC Memo. 36, the CRMC's statutory six-month review period would have expired on February 12, 2005. Because the CRMC failed to furnish a consistency determination by that date, the CRMC's concurrence with Weaver's Cove's certification of the proposed dredging activities "shall be conclusively presumed." 16 U.S.C. § 1456(c)(3)(A). This Court should so rule.

In an attempt to excuse its failure to act in six months, the CRMC maintains that the six-month consistency review never commenced because Weaver's Cove's application did not contain: (1) information "regarding a viable disposal location for the proposed dredge material/spoils" and (2) a Water Quality Certification

---

[3] While the CRMC claims that the stamp of a "Registered Professional Engineer" is "necessary data and information," the CRMC has never shown that the "State of Rhode Island Dredging Application Checklist" — the alleged basis for the stamp requirement (CRMC Memo. 35) — is part of the CRMP such that the stamp is appropriately considered "necessary data and information" within the meaning of the NOAA regulations. Nevertheless, Weaver's Cove complied with the request for the stamp.

under Section 401 of the federal Clean Water Act, 33 U.S.C. § 1341.  CRMC Memo. 36.  This attempt, however, fails because the CRMC is mistaken as to the law: Once an applicant submits a consistency certification, the commencement of the statutory six-month review period can only be tolled if the applicant has failed to provide "necessary data and information" within the meaning of the NOAA regulations, and the state agency notifies the applicant of the deficiency within 30 days of receipt of the consistency certification.  15 C.F.R. § 930.60(a)(2) (2005). Regardless of when the CRMC requested such information from Weaver's Cove or whether the CRMC asked for it verbally or in writing, neither information about upland disposal sites nor a Water Quality Certification is "necessary data and information;" therefore, the lack of either cannot serve to toll the commencement of the six-month review period.

     **1.**     *Approval From An Upland Disposal Site Is Not "Necessary Data And Information"*

It is of no relevance that "the CRMC [has] always maintained an approved and properly permitted upland dredge disposal site whether in Rhode Island or elsewhere, was 'necessary data and information.'" CRMC Memo. 32 (emphasis added).  In order to constitute "necessary data and information," information must be "specifically identified" in the state's NOAA-approved management program. 15 C.F.R. § 930.58(a)(2) (emphasis added).  The CRMC has no authority to unilaterally deem information to be "necessary data and information" when that

data or information has not been specifically identified as such in the state's CRMP.

In this case, the CRMP requires that "[w]hen disposal is proposed for *approved upland facilities*, the applicant shall provide a letter of acceptance from that facility . . . ." CRMP § 300.9C.7 (emphasis added). This requirement refers to upland disposal facilities in the state of Rhode Island. *See* R.I. Dep't of Envtl. Mgmt., Rules and Regulations for Dredging and the Management of Dredged Material § 4.20 (defining "upland areas" as "[a]ll areas *of the state* that are not in the coastal zone" (emphasis added)), *available at* http://www.dem.ri.gov/pubs/regs/regs/water/dred0203.pdf. Importantly, the CRMP does not specifically identify the need for a letter of acceptance or other permitting information from disposal facilities outside of Rhode Island.

The CRMC does not dispute that Rhode Island's *own regulations* indicate that "approved upland facilities" are only those sites located within the state of Rhode Island. Instead, the CRMC merely asserts, without any support or a single citation, that "[a]n approved upland disposal site means wherever located, not just in Rhode Island." CRMC Memo. 39. While the CRMC may think it is "meaningful" to "know with certainty the location and conditions attached to any dredge disposal site," *id.*, the fact remains that the only information about disposal sites that is *required* by the CRMP is information pertaining to *Rhode Island*

10

upland disposal sites.  Consequently, under CRMP § 300.9C.7, it is only the lack of a letter of acceptance from a Rhode Island upland disposal facility that can toll the commencement of the six-month consistency review period.

Here, the record shows that there has never been a proposal by Weaver's Cove to dispose of dredge materials at an "upland facility" in Rhode Island. Because the CRMP does not require the applicant to provide out-of-state dredge disposal information, the CRMC does not have any lawful basis to simply decree that such information is "necessary data and information" that is required to make the Weaver's Cove application complete for consistency review purposes.

It is worth noting that the CRMC mischaracterizes Weaver's Cove's argument when it claims that Weaver's Cove is suggesting that the CRMC "turn a blind-eye as to where the dredge material would be deposited," CRMC Memo. 37. Notably, Weaver's Cove never has suggested that the CRMC, or other Rhode Island agencies for that matter, cannot ask for information about the viability of a disposal site during the normal course of their regulatory reviews.  In fact, the NOAA regulations in force when Weaver's Cove's consistency certification was submitted to the CRMC recognized that the CRMC could request information from the applicant *in addition to* that information identified in the CRMP as "necessary data and information."  15 C.F.R. § 930.60(b) (2005).  However, the state's request for such *additional* information could not extend the date of commencement of

state agency review because it is not "necessary data and information."  *Id.* ("A
State agency request for information or data *in addition to* that required by §930.58
shall not extend the date of commencement of State agency review.") (emphasis
added).  In this case, the CRMC's claimed desire for information about an upland
disposal site outside of Rhode Island simply could not toll the commencement of
the CZMA six-month review period because it is not "necessary data and
information."

    **2.**    *A Water Quality Certification Is Not "Necessary Data and
Information"*

    Similarly, contrary to the CRMC's allegations, CRMC Memo. 33, a Water
Quality Certification under Section 401 of the Clean Water Act is not "necessary
data and information" within the meaning of the federal CZMA regulations.  In
asserting that Weaver's Cove must obtain a Water Quality Certification prior to the
CRMC commencing its consistency review, the CRMC's position deviates from
what is otherwise clear language in the NOAA-approved CRMP.  The CRMP
clearly states that:

> *Except for federal consistency reviews*, applicants for dredging or
> open waters disposal of dredged materials shall be required to obtain a
> Section 401 (Clean Water Act) Water Quality Certification from the
> Department of Environmental Management (DEM) before the
> Council can consider granting approval for the project.  The
> application for the Section 401 Water Quality Certification will be
> forwarded to the DEM when all appropriate application forms have
> been completed.

*See* CRMP § 300.9C.2 (2004) (emphasis added).  As explained above, in order to be considered "necessary data and information," the requisite materials must be specifically identified as such in the state's NOAA-approved coastal resources management program. 15 C.F.R. § 930.58(a)(2).  Rather than identifying a Water Quality Certification as necessary data and information that is a prerequisite to the state's consistency review, the CRMP does exactly the opposite; it explicitly *excludes* the Water Quality Certification as a prerequisite for federal consistency review.

Despite this clear statement that, with respect to federal consistency reviews, there is *no* requirement that a Water Quality Certification be obtained prior to the commencement of the CRMC's review, the CRMC argues that it views this exception as applying only to those activities directly undertaken by the federal government rather than by applicants for a federal license or permit.   CRMC Memo. 40.  Faced with the unequivocal language of the CRMP, the CRMC goes on to manufacture the claim that the CRMP's water-quality-certification exception for "federal consistency reviews" implicitly refers only to *certain types* of federal consistency reviews — specifically, federal agency activity consistency reviews, and not the Weaver's Cove consistency review.  *Id.*  The CRMC's claim is devoid of merit and wholly without support.  The CRMP explicitly provides that a Water Quality Certification is not required for *any* federal consistency reviews, not just

certain types of consistency reviews as the CRMC's *post hoc* rationale tries to claim.[4]

The CRMC attempts to evade this inevitable result by arguing that the "language in 300.9 is older CRMP language adopted before the CRMC developed its Federal consistency manual which clarifies the distinction between direct and indirect federal activities," CRMC Memo. 41. This argument is unavailing as the CRMP itself recognizes the distinction between activities subject to federal consistency review that are directly undertaken by the federal government ("direct federal activities") and those that are undertaken by a private applicant for a federal license or permit ("federal license or permit activities," also known as "indirect

---

[4] The CRMC purports to answer the very question of law before this Court — namely, the meaning of the terms contained in the CZMA, NOAA regulations, and CRMP — via the factual assertions of the CRMC's Grover Fugate. Setting aside the CRMC's attempt to convert this legal question into a factual one, Fugate strains credulity when he asserts that, according to the CRMC, federal permit activities "have not typically been referred to as 'consistency review' determinations by staff or applicants . . . the term 'federal consistency' has been reserved for those projects where the federal government itself is the applicant." *See* Fugate Aff. ¶ 4 (attached to CRMC Memo.). Fugate's description is irreconcilably inconsistent with the terminology utilized by the CZMA and the NOAA regulations (pursuant to which the Rhode Island CRMP was approved), which expressly state that *both* "federal license and permit activities" *and* "federal [agency] activities" are the subject of "federal consistency requirements." *See*, *e.g.*, 15 C.F.R. § 923.53 (explaining the "federal consistency requirements" for both federal license/permit activities and federal agency activities); *id.* § 930.1 (explaining that the "federal consistency requirement" applies to both federal license/permit activities and direct federal activities). Fugate's account is further refuted by the fact that the CRMC later amended its CRMP to *actually reflect* what Fugate interprets the CRMP to have *always meant*.

14

federal activities"). Specifically, Section 400 of CRMP, establishing the CRMC's federal consistency regulations, recognizes this distinction, CRMP §§ 400B.2 & 400B.3, and notably, includes "direct federal activities" as a defined term within the CRMP. CRMP § 400B.2. If the CRMC meant to exempt only "direct federal activities," it would have used the term found in its NOAA-approved plan to do so, but such an "intent" is not reflected in the plain language of the CRMP.

The CRMC's efforts to claim that the plain language that says "[e]xcept for federal consistency reviews" should be interpreted as saying "except for direct federal activities," are further undermined by its own recent action. The CRMC recently amended the CRMP to now provide that only direct federal activities are exempt from the requirement of obtaining a Water Quality Certification prior to the commencement of the state's review.[5] That amendment changed the phrase "Except for federal consistency reviews" to "Except for direct federal activities."

_____

[5] That amendment has not, however, received the required NOAA approval under 16 U.S.C. § 1455(e) and 15 C.F.R. §§ 923.80 *et seq.* Thus, even setting aside the fact that it was enacted after the expiration of the CRMC's consistency review of Weaver's Cove's consistency certification, it cannot be enforced in consistency reviews until it receives specific NOAA approval. Moreover, such approval is likely not to be forthcoming because even more recent changes to the NOAA regulations prohibit the issuance of a Water Quality Certification by a state from being categorized as "necessary data and information." *See* 15 C.F.R. § 930.58(a)(2) (2007) ("Necessary data and information . . . shall not include the issued State . . . permits.")

The amendment (including underlines and strikethroughs) was proposed as follows:

> Except for <u>direct</u> federal <u>activities</u> ~~consistency reviews~~, applicants for dredging or open waters disposal of dredged materials shall be required to obtain a <u>Dredging Permit (which contains the</u> Section 401 (Clean Water Act) Water Quality Certification) from the Department of Environmental Management (DEM) before the Council can consider granting approval for the project. ~~The application for the Section 401 Water Quality Certification will be forwarded to the DEM when all appropriate application forms have been completed.~~

In other words, the CRMC has attempted to amend the CRMP to *actually say now* what it claims the CRMP had said *in 2004*, at the time when Weaver's Cove's application was filed and pending during the six-month review period: namely, that Rhode Island's consistency review of dredging activities requires a Water Quality Certification. Therefore, the CRMC's argument is without merit.

Because a Water Quality Certification was not specifically identified in the CRMP as necessary data and information for the CRMC's review of Weaver's Cove's consistency certification, the CRMC had not authority to toll the commencement of the six-month statutory review period on this basis.

And, again, it is worth noting that the CRMC mischaracterizes Weaver's Cove's argument with respect to this requested information. The CRMC says: "If one were to accept the logic put forth by Weaver's Cove that 300.9 exempts dredge activities which are subject to federal consistency from obtaining a 401 certification as a prerequisite, then on its face no dredge project would require a

16

401 certification." CRMC Memo. 41. The CRMC's conclusion does not follow from the logic of Weaver's Cove's argument. Weaver's Cove's argument is simple: The CRMC cannot toll the running of the six-month consistency review period on the basis that Weaver's Cove has not yet received a Water Quality Certification. Weaver's Cove expressed *no opinion* on whether a Section 401 Water Quality Certification is required for a dredge project. When the CRMC's six-month review period under the CZMA commences simply has no bearing on whether a Water Quality Certification is required for a dredging project; the federal prerequisites (such as a Water Quality Certification) for a dredging permit are within the purview of USACE as the federal permitting agency, and it is the CRMC's sister agency, the Rhode Island Department of Environmental Management, and not the CRMC, that issues Water Quality Certifications.

### 3. *The CRMC's Concurrence Shall Be Conclusively Presumed*

Because the CZMA six-month consistency review period commenced when Weaver's Cove submitted its consistency certification and all necessary data and information in July of 2004 or, at the latest, on August 12, 2004 when it submitted the engineer stamps, the CRMC's opportunity to review Weaver's Cove's proposed dredging activities for consistency expired at the latest on February 12, 2005 — almost three years ago. The consequence of the CRMC's failure to act within the statutorily allotted six month period is that its concurrence is

conclusively presumed, as a matter of law.  *See* 16 U.S.C. § 1456(c)(3)(A) ("If the state or its designated agency fails to furnish the required notification within six months after receipt of its copy of the applicant's certification, the state's concurrence with the certification shall be conclusively presumed.").  Therefore, with respect to the CZMA, the USACE can issue the permit for the dredging activities for which Weaver's Cove submitted its consistency certification.  *See id.* ("No license or permit shall be granted by the Federal agency until the state or its designated agency has concurred with the applicant's certification or until, by the state's failure to act, the *concurrence is conclusively presumed*.") (emphasis added).

### B.   The CRMC Cannot Expand Its Review Beyond The "Listed Activities" In Its NOAA-Approved Coastal Management Program

Because the CRMC cannot excuse its failure to act on Weaver's Cove's consistency certification, or undo its conclusively presumed concurrence, it attempts to argue that this case is moot due to other, unrelated developments under different statutes regarding Weaver's Cove's overall proposal to develop an LNG project.  The CRMC's main argument — that this case is moot — stems from a fundamental misunderstanding by the CRMC of the extent of its jurisdiction under the CZMA.  The CRMC's jurisdiction, like that of all states conducting federal consistency reviews, is narrowly circumscribed under the CZMA and NOAA's regulations promulgated under the CZMA.  The state does not review overall

*projects*.   Instead, the state only is authorized to review discrete *activities* underlying those projects that require federal permits or approvals for which the state has sought and received authority from NOAA to review.   *See* 15 C.F.R. § 930.53.   In this case, those activities are limited to the USACE-permitted dredging activities, and Weaver's Cove's proposed dredging activities have not changed since Weaver's Cove submitted its consistency certification to the CRMC in July 2004.  Therefore, the CRMC's conclusive concurrence cannot be undone.

**1.** *The CZMA And The Regulations Promulgated Thereunder Limit The Scope Of The CRMC's Review To Only "Listed Activities"*

The CZMA defines the scope of the jurisdiction of a state agency, such as the CRMC, to conduct a federal consistency review.  The CZMA provides that:

> any applicant for a required Federal license or permit to conduct an activity, in or outside of the coastal zone, affecting any land or water use or natural resource of the coastal zone of that state shall provide . . . a certification that the proposed activity complies with the enforceable policies of the state's approved program and that such activity will be conducted in a manner consistent with the program.

16 U.S.C. § 1456(c)(3)(A).

The determination of whether a federally-permitted activity "affect[s] any land or water use or natural resource of the coastal zone of [a] state" is made *not* by the CRMC at the time the activity is proposed by Weaver's Cove but, rather, by NOAA when the CRMC submits its CRMP for approval.  As NOAA explained in

rulemaking: "Whether a license or permit activity is subject to the consistency requirement . . . is determined by NOAA . . . when the State agency lists a particular federal approval in its management program."   NOAA, *Coastal Zone Management Act Federal Consistency Regulations*, 65 Fed. Reg. 77,124, 77,144 (Dec. 8, 2000).[6]

Once listed in the state's NOAA-approved program, all applications for the listed permits and approvals in the coastal zone are automatically subject to the federal consistency process.  *Coastal Zone Management Act Federal Consistency Regulations; Final Rule*, 71 Fed. Reg. 788, 802 (Jan. 5, 2006).

If a state agency wishes to review a permit activity that is not listed in its coastal zone management program (*i.e.*, an "unlisted activity"), the state agency must notify the federal permitting agency, the applicant, and the Director of the Office of Ocean and Coastal Resource Management ("OCRM") at NOAA *within* 30 days from having received notice that the permit application has been submitted to the federal permitting agency, or *otherwise the state agency waives its right to review the unlisted activity*.  15 C.F.R. § 930.54(a)(1).  Upon timely notice, the Director of OCRM then decides whether the  state agency may review the unlisted

---

[6]   *See also* 15 C.F.R. § 923.53(a)(2) (submission of management program for NOAA approval must include list of Federal license and permit activities subject to review), *id.* § 930.53(a) (Federal license or permit activities that state "wishes to review for consistency" must be included in program), *id.* § 923.60(b) (NOAA approves management program).

activity.   In determining whether to approve the state's request to review an unlisted activity, the Director of OCRM (a NOAA subdivision), not the state agency, evaluates whether the activity has the requisite coastal effects.  *See* 15 C.F.R. § 930.54(c).  *See also Coastal Zone Management Act Federal Consistency Regulations*, 65 Fed. Reg. 77,124, 77,144 (Dec. 8, 2000)

In this case, the CRMC did not file a timely request to review any unlisted activities.  Thus, the CRMC's federal consistency jurisdiction only extends to those activities that Weaver's Cove seeks to undertake that (1) require a federal permit and (2) are included in the CRMP as a "listed activity".  The only listed federal permit activity proposed by Weaver's Cove for Rhode Island is a USACE dredging permit under Section 10 of the Rivers and Harbors Act.[7]  The other activities proposed by Weaver's Cove as part of its proposal to develop an LNG project are outside the scope of the CRMC's jurisdiction, and the CRMC has no legal

---

[7] Weaver's Cove submitted a "Joint Section 10/404 Individual Permit Application" to the USACE on March 18, 2004 (*see* JA Tab 7) seeking USACE authorization for dredging activities in waters of the United States under Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, and the discharge of fill material into waters of the United States under Section 404 of the Clean Water Act, 33 U.S.C. § 1344.   This joint application covered all USACE-permitted activities for both Weaver's Cove, and its affiliate pipeline company, Mill River Pipeline, LLC, in both Rhode Island and Massachusetts.  The Section 404 permit is required for the laying of a pipeline in Massachusetts; the only USACE permit that applies to activities in Rhode Island is the Section 10 permit.

authority to review them for consistency.[8]  Consequently, these unlisted activities

cannot have any effect on the consistency certification related to dredging activities

submitted to the CRMC in July 2004, or the CRMC's concurrence therewith which

was conclusively presumed six months thereafter.

>    **2.    *The CRMC's Listed Activities Do Not Include LNG Vessel Transits, The LNG Terminal, Or The Other Matters Identified In The CRMC's Brief***

>    **a.    *LNG Vessel Transits Are Outside Of The Scope Of The CRMC's Review***

Despite its claims to the contrary, CRMC Memo. 22, the CRMC has no

authority to review the LNG vessel transit plan proposed by Weaver's Cove.

CRMC first claims that it has the "right . . . to review the effects of LNG tanker

operations within Rhode Island's coastal zone" based upon its listing of "[p]ermits

and authorizations for the handling of dangerous cargo by vessels in U.S. ports

---

[8] Weaver's Cove proceeded with the CRMC's consistency review for the Section 10 permit, even though the CRMP does not appear to include the Section 10 permit as a listed activity subject to consistency review.  Instead, the Section 10 permit is a "listed activity" in the CRMC's *Federal Consistency Manual* (attached to CRMC Memo. as Exh. N), a supplemental document that includes a list of permit activities purportedly requiring a consistency certification.  *See Federal Consistency Manual,* Table 2, *see also* CRMC Memo. 22 nn.9-11 (citing *Federal Consistency Manual* list).  But the NOAA-approved CRMP includes no such list; nor has the CRMC established that its *Federal Consistency Manual* was ever approved by NOAA as part of the CRMP.  Without a NOAA-approved list of activities to review, the CRMC can only conduct consistency reviews pursuant to the procedures for review of unlisted activities.  *See New Jersey v. Long Island Power Authority*, 30 F.3d 403, 419-20 (3d Cir. 1994).

pursuant to 46 USC 170" in Table 2 of its *Federal Consistency Manual*.   CRMC Memo. 28.   Further, while the CRMC concedes that "the LOI process[9] undertaken by the Coast Guard may not be a direct trigger under the CZMA of the state's consistency review," it also inexplicably claims that "clearly the state has the right . . . to review the consistency of the other federally permitted activities with respect to the State's coastal zone."   *Id.*   The CRMC is flatly wrong with respect to both claims.

The CRMC's inclusion of permits and authorizations pursuant to 46 U.S.C. § 170 in its list of permits in the *Federal Consistency Manual* does not give the CRMC the jurisdiction to review Weaver's Cove's LNG vessel transit plan for two reasons.   *First*, 46 U.S.C. § 170 is no longer in force as a provision of the United States Code, rendering its listing in the CRMC's *Federal Consistency Manual* of null effect.[10]

*Second*, and understandably, Weaver's Cove has never applied for any permit or authorization pursuant to that statutory provision.   The only federal approval that Weaver's Cove is required to obtain for its LNG vessel transit plan is

---

[9]  A Letter of Intent ("LOI") is the designation for an application to the U.S. Coast Guard for a Letter of Recommendation as to the suitability of the waterway for marine traffic.   *See* 33 C.F.R. §§ 127.007 & 127.009.

[10] *See Partial Revision of Title 46, United States Code, Shipping*, Pub. L. No. 98-89, 94 Stat. 599, 604 (Aug. 26, 1983) (identifying 46 U.S.C. § 170, popularly known as the Dangerous Cargo Act, as Statutes at Large, Vol. 54, Pg. 1023 & Vol. 93-633 in the repealment chart).

a Letter of Recommendation ("LOR") from the U.S. Coast Guard pursuant to the Port and Waterways Safety Act, 33 U.S.C. § 1321, and related regulations, 33 C.F.R. Part 127.  Because the LOR is not a listed activity in the NOAA-approved CRMP, the CRMC has no authority to use the now-defunct 46 U.S.C. § 170 as a bootstrap to review the activities underlying the LOR being sought under an *entirely different statutory regime*.

The CRMC also claims that it can review Weaver's Cove's LNG vessel transit plan merely because it is an activity that will occur in Rhode Island waters for which Weaver's Cove has sought a U.S. Coast Guard LOR on the suitability of the waterway for vessel transits.  The CRMC again is incorrect.  As noted above, an LOR is not a listed activity in the CRMP, and the CRMC never sought NOAA approval to review Weaver's Cove's LOR activity as an unlisted activity.  The CRMC admits as much in its brief, recognizing that the LOR process is "not . . . a direct trigger under the CZMA of the State's consistency review . . . ." CRMC Memo. 22.  Nevertheless, the CRMC still attempts to argue, without citation, that it has some unspecified "right" or "responsibility" to "review the consistency of other federally permitted activities with respect to the State's coastal zone."  *Id.* The fact that the CRMC provides no authority for its claim is telling — no such authority exists.  The CRMC cannot overcome the fact that a state is legally authorized only to review federally permitted activities that (1) are listed in the

state's NOAA-approved plan, or (2) that the state seeks authority from NOAA to review as unlisted activities. Because the LOR process, and therefore the underlying LNG vessel transit activities, fall into neither category, they fall outside of the CRMC's federal consistency review jurisdiction under the CZMA.

**b.**    ***The LNG Terminal Is Outside Of The Scope Of The CRMC's Review***

The CRMC claims that the scope of the CRMC's federal consistency review includes the activities in another state authorized by FERC under Section 3 of the Natural Gas Act—namely, the construction and operation of an LNG terminal located in Fall River, Massachusetts. CRMC Memo. 22. Again, the CRMC is wrong on the law. While the CZMA regulations contemplate a state being able to request approval to undertake a consistency review of activities taking place in another state, there are certain procedures specified in the federal regulations which must be met before the state can do so. Rhode Island has not satisfied any of the appropriate requirements.

In order to review interstate activities for consistency, a state must submit to OCRM (at NOAA) a list of those out-of-state activities that the state intends to review, as well as a description of the geographic location of coastal zone. 15 C.F.R. § 930.154(d). Rhode Island has not submitted such a list for Director approval. *See http://coastalmanagement.noaa.gov/consistency/interstate.html* (listing states that may conduct interstate consistency reviews). A coastal state that

25

fails to list federal activities subject to interstate review may not exercise its right to review activities occurring in other states.  15 C.F.R. § 930.154(e).  Because Rhode Island has not sought approval for interstate consistency review, it has no jurisdiction to review any federally-permitted activities taking place in Massachusetts, including the construction and operation of the LNG terminal under Section 3 of the Natural Gas Act.

Despite not having NOAA approval for interstate consistency reviews, the CRMC invokes, as a source of authority to review the LNG terminal, Condition No. 24 of the FERC approval order, which requires Weaver's Cove to obtain a consistency determination from the CRMC.  *See* CRMC Memo. 22.  This condition, however, does not itself authorize the CRMC to review the Natural Gas Act-permitted activities for consistency.  *See Weaver's Cove Energy, LLC*, 112 FERC ¶ 61,070, at 61,550-51 (2005) ("*Initial Order*") (attached hereto as Exh. A, in light of JA's omission of pages). Instead, it merely recognizes that Weaver's Cove had submitted a consistency certification to the CRMC with respect to dredging-related activities; it certainly does not, and the FERC obviously cannot, confer jurisdiction upon the CRMC.  *Weaver's Cove Energy, LLC*, 114 FERC ¶ 61,058, at 61,183-84 (2006) ("*Order on Reh'g*") (attached hereto as Exh. B).

        **c.**    ***Barge Transits and Offshore Disposal of Dredged Material Are Outside Of The Scope Of The CRMC's Review***

Nor does the CRMC have jurisdiction to undertake consistency review of the transit of barges carrying dredge material.  Weaver's Cove has applied for a permit with the USACE under Section 103 of the Marine Protection, Research and Sanctuaries Act, 33 U.S.C. § 1401, *et seq.* ("Ocean Dumping Act") which authorizes the Secretary of the Army to issue permits "for the transportation of dredged material for the purpose of dumping it into ocean waters, where the Secretary determines that the dumping will not unreasonably degrade or endanger human health, welfare, or amenities, or the marine environment, ecological systems, or economic potentialities."  33 U.S.C. § 1413(a).  Pursuant to the USACE regulations, the term "ocean waters" means those waters of the open seas lying seaward of the base line from which the territorial sea is measured, as provided for in the Convention on the Territorial Sea and the Contiguous Zone (15 UST 1606: TIAS 5639).  33 C.F.R. § 324.2.

The CRMC's *Federal Consistency Manual* provides that "permits and licenses to regulate transportation of dredged material *for the purpose of dumping it in navigable waters* pursuant to Sec. 103 of the Marine Protection, Research and Sanctuaries Act of 1972" are subject to the CRMC's federal consistency review. *Federal Consistency Manual*, Table 2 (emphasis added).  In other words, the

CRMC has *limited* its federal consistency review of Ocean Dumping Act permits to those permits approving disposal in *navigable waters*.[11]  Weaver's Cove has not sought approval for disposal of dredged material in navigable waters.

The USACE regulations define term "navigable waters of the United States."  33 C.F.R. § 329.1.  As to oceanic and tidal waters, this definition is clarified: the "navigable waters of the United States . . . include all ocean and coastal waters within a zone three geographic (nautical) miles seaward from the baseline (The Territorial Seas)."[12]  33 C.F.R. § 329.12(a).

Weaver's Cove's intended offshore disposal location, the Rhode Island Sound Disposal Site ("RISDS"), which was designated by the Environmental Protection Agency as an ocean disposal site, is not within this three nautical mile zone, or in other words, is not located in "navigable waters."  The RISDS is located approximately nine (9) nautical miles south of Point Judith, Rhode Island and six-point-five (6.5) nautical miles east of Block Island, Rhode

---

[11] The term "ocean waters" as used in the Ocean Dumping Act includes both "navigable waters," *i.e.* those waters from the baseline to three nautical miles out seaward, as well as those open seas beyond the "navigable waters" zone. Accordingly, while an applicant would be required to obtain a USACE Section 103 permit if it were to transport materials for disposal to any point seaward of the shore, the CRMC can only review disposal in those waters between the baseline and three miles seaward for consistency because it chose, as noted above, to limit its review of disposal activities permitted pursuant to Section 103 to those involving disposal in "navigable waters."

[12] Wider zones are recognized for special regulatory powers exercised over the outer continental shelf, which are not applicable here.

Island.  *Ocean Disposal: Designation of a Dredged Material Disposal Site in Rhode Island Sound*, 69 Fed. Reg. 75,256, 75,259 (Dec. 16, 2004).  This disposal location is therefore *not* within "navigable waters" as defined above.  33 C.F.R. § 329.12(a).  For the foregoing reasons, Weaver's Cove's proposed federal-permit activity — transportation of dredge material for purposes of dumping it in ocean waters — is not a listed activity subject to CRMC review, nor is it an unlisted activity for which CRMC sought and received NOAA approval to review.  Consequently, it is not within the CRMC's federal consistency jurisdiction.

### 3.  *The CRMC Misapprehends The "Effects Test," Which Does Not Expand Its Jurisdiction Beyond The Listed Activities*

In an attempt to shrug aside the express limits of its listed activities and instead assert broad *ad hoc* jurisdiction over unlisted activities, the CRMC invokes the "effects test."  *See* CRMC Memo. 17-18, 23.  But the CRMC's argument is based on a misunderstanding of the way in which the CZMA and NOAA apply the "effects test" under the applicable federal consistency review regulations.  Simply put, the "effects test" requires that the CRMC limit its Weaver's Cove consistency review to those activities "listed" for review in its CRMP.

### a.  *The "Effects Test": An Overview*

Under the CZMA, the "effects test" is a determination of whether an activity will have "reasonably foreseeable coastal effects" such that a consistency review

29

may be necessary.[13]   As explained above, *supra* pp. 19-21, NOAA determines whether a federal license or permit activity will have "reasonably foreseeable coastal effects" when it approves an activity for listing in the state's coastal management program or when it approves the state's request to review an unlisted activity.

The "effects test," however, is not a monolith — it applies differently to activities undertaken by federal agencies (*i.e.*, "direct federal activities") than it does to activities undertaken by private parties pursuant to permits issued by federal agencies (*i.e.*, "federal license or permit activities").

### b.   *The "Effects Test" Applies To Private Entities Only Through NOAA's "Listed Activities" Requirement*

When a private entity — such as Weaver's Cove — applies for a federal license or permit activity, the "effects test" does not, as the CRMC suggests, provide the CRMC with additional jurisdiction to review unlisted activities. Instead, the "effects test" is applied through NOAA approval of the state's proposed *listing* of activities that may have coastal effects, or through NOAA approval of a state's request to review an *unlisted* activity.  OCRM, the NOAA subdivision responsible for approving the listing of activities in coastal

---

[13] *See* Office of Ocean and Coastal Resource Management, *Federal Consistency Overview* (Aug. 10, 2007) at 8 (attached as Exh. C).  *See also* 16 U.S.C. § 1456(c)(3)(A) (consistency review applies to activities "affecting any land or water use or natural resource of the coastal zone").

management programs, explained this in a guidance document, the *Federal Consistency Overview*:

> For federal license or permit activities . . . , state[s] propose to review activities that will have coastal effects and OCRM makes the determination of effects by approving the *lists* of federal authorizations and financial assistance programs that a state wishes to include in its [coastal zone management program].
>
> In order to be on the list, the types of activities covered by the federal authorization . . . should have reasonably foreseeable coastal effects on a regular basis. Federal agencies and other interested parties have input into OCRM's approval of such lists and additions to the lists.
>
> If a state wishes to review an *unlisted* federal license or permit activity, it notifies the applicant and the Federal agency and seeks OCRM approval to review the activity. OCRM's decision is based on whether the state has shown that an unlisted activity will have reasonably foreseeable coastal effects and, again, Federal agencies and the applicant have an opportunity to comment to OCRM.[14]

*Federal Consistency Overview* at 9 (emphasis in original; paragraph breaks inserted).

Accordingly, it is *NOAA* that decides — in its review of a proposed coastal management program — whether a state-identified federal permit activity has coastal "effects" such that the state can review that activity in a consistency review. 15 C.F.R. §§ 923.53(a)(2) (submission of management program for

---

[14] Because there is (and can be) no dispute that the CRMC has not invoked the NOAA's procedures for review of unlisted activities, 15 C.F.R. § 923.54, Weaver's Cove does not examine the specifics of that process in this memorandum.

NOAA approval must include list of Federal license and permit activities subject to review); *id.* § 923.60(b) (NOAA approves program).  In this case there can be no dispute: With respect to each of the activities cited by the CRMC as having coastal "effects," *none* of them has been approved by NOAA for inclusion in the CRMP as a "listed activity."

NOAA, too, has explained, in a formal rulemaking, that the "effects test" is implemented not *ad hoc* by the states but, rather, *through the NOAA-directed activity-listing process*:

> Whether a license or permit activity is subject to the consistency requirement does depend on whether coastal effects are reasonably foreseeable and which is determined by NOAA either when the State agency lists (see section 930.53) a particular federal approval in its management program or when a State agency seeks to review an unlisted activity (see section 930.54).

NOAA, *Coastal Zone Management Act Federal Consistency Regulations*, 65 Fed. Reg. 77,124, 77,144 (Dec. 8, 2000) (emphasis added).

In short, far from giving the states unlimited authority to assert consistency-review authority over every activity that allegedly has coastal effects, the "effects test" merely gives Rhode Island authority to review activities that have coastal effects once they are approved by NOAA for inclusion as listed activities in Rhode Island's CRMP.

c.   *The "Effects Test" Applies To Federal Agencies In A Completely Different Manner*

The *Federal Consistency Overview* explains how the "effects test" is implemented when it is a Federal *agency* undertaking an activity directly (*e.g.*, when the USACE undertakes its own dredging project), as opposed to the privately-undertaken federal-permit activities described above:

> For Federal agency activities, a Federal agency makes this determination of whether its activity will have coastal effects. Under NOAA's regulations, a "function" by a Federal agency refers to a *proposal for action* that has reasonably foreseeable coastal effects, and not to all tasks, ministerial activities, meetings, discussions, exchanges of views, and interim or preliminary activities incidental or related to a proposed action.

*Federal Consistency Overview* at 8-9 (emphasis in original).

Thus, under NOAA's regulations, a federal agency proposing to undertake a federal agency activity is responsible for determining whether the proposed activity would "affect any coastal use or resource of states with approved management programs," 15 C.F.R. § 930.33(a).  If, *inter alia*, the federal agency determines that "there are no effects on any coastal use or resources," then the agency need not submit to a federal consistency review for that activity.  *Id.* § 930.33(b).[15]

---

[15]   *See also* NOAA, Final Rule, *Coastal Zone Management Act Federal Consistency Requirements*, 65 Fed. Reg. 77124, 77137 (Dec. 8, 2000) ("The determination of coastal effects is made by the Federal agency [undertaking the

> **d.**   ***In Describing The "Effects Test," The CRMC Conflates Federal <u>Agency</u> Activities With Federal <u>Permit</u> Activities***

In an effort to support its view that the "effects test" provides for a far-reaching analysis by a state of all activities with an effect on the coastal zone, the CRMC quotes extensively (but without attribution) from the *Federal Consistency Overview. See Federal Consistency Overview*, at 4-5. *Compare id. with* CRMC Memo. 17-18.

For all of its reliance on the *Federal Consistency Overview*, however, the CRMC fails to recognize that it relies on the wrong part of the document: specifically, the CRMC's "effects test" excerpts pertain not to "federal license or permit activities" — such as Weaver's Cove's proposed dredging activities — but instead to "direct agency activities," those activities being *undertaken directly by a federal agency*. The legal standards cited by the CRMC have no application to Weaver's Cove. *See* CRMC Memo. 17-18. The CRMC's suggestion that the effects test "trigger[s]" consistency review in the same manner regardless of whether the activity is proposed by a federal agency or by a private entity is contrary to NOAA's regulation.

As described above, both the governing regulations and the *Federal Consistency Overview* make clear that the "effects test" is implemented quite

---

activity] and even if a State objects, the Federal agency may still rely on its no effects determination and proceed with the activity.")

differently between the two types of activities, and it does not abrogate the "listed activities" restriction on CRMC's review of private applicants, like Weave's Cove.

Thus, contrary to assertions made by the CRMC — both in its Memorandum of Law and in a prior hearing before this Court[16] — that it can review all aspects of the Weaver's Cove project that affect the coastal zone, the "effects test" plainly does not give Rhode Island broad *ad hoc* jurisdiction over all proposed permitting activities that could conceivably "affect" the Rhode Island coast. Quite the contrary: the CZMA and governing regulations implement the "effects test" for federal permit activities through the process of listing activities, or through the unlisted activities process which has never been pursued by CRMC for the activities it identifies in this case. Accordingly, the CRMC has no authority to undertake its proposed far-reaching analysis of whether an activity will have some effect on the coastal zone; instead, it is bound by the procedures for the review of listed and unlisted activities.

---

[16] The CRMC similarly mischaracterized "the effects test" at this Court's hearing on the CRMC's motion to stay all proceedings. *See*, *e.g.*, Transcript at 10-11 (Nov. 26, 2007) ("[T]he CZMA uses an effects test . . . . The CZMA is more of a . . . program where you look at the effects and you look at the weighing and you look at general State policy type issues.") (Doc. 26). Weaver's Cove responded by explaining that the CRMC's review is restricted only to the activities actually listed in the CRMP. *Id.* at 34-36.

### C.   No "New or Supplemental" Consistency Certification Is "Required" By The CZMA

The CRMC tries to make an end-run around the statutory six-month deadline by arguing that Weaver's Cove's "unilateral decision to alter drastically its vessel transit plan and to drastically alter its disposal plan" render its consistency application to the CRMC "administratively obsolete" and "mooted" due to "radically changed circumstances."  CRMC Memo. 23-24.  The CRMC's attempt to avoid the lawful consequences of its inaction does not withstand scrutiny.

The so-called "changes" cited by the CRMC have nothing to do with Weaver's Cove's consistency review; that is, they have nothing to do with proposed dredging activities permitted under Section 10 of the Rivers and Harbors Act ("Section 10 Activity") for which Weaver's Cove submitted a consistency certification to the CRMC.  Instead, these so-called changes concern only *other* aspects of Weaver's Cove's proposed LNG project which, as discussed above, are *outside* of the scope of the CRMC's jurisdiction under the CZMA.  Therefore, nothing before the CRMC has changed that could upset or undo the CRMC's conclusively presumed concurrence, or require a new consistency certification.

Again, the CRMC's error is rooted in its mistaken premise that it has jurisdiction to review not only certain discrete activities, but also the entire Weaver's Cove project.  *See, e.g.,* CRMC Memo. 2.  As explained in Sections I.B.2.a and I.B.2.c, the LOR process, and Weaver's Cove's plan to transport

dredged materials for disposal under review by USACE under Section 103 of the Ocean Dumping Act ("Section 103 Activity"), are unlisted activities not within the CRMC's consistency-review jurisdiction. Consequently, the CRMC cannot now try to turn back the clock and review these unlisted activities by lumping them together with the discrete Section 10 Activity that was before the CRMC in 2004. Nor can the CRMC undo the consequences of its failure to meet the statutory six month deadline on the Section 10 Activity by lumping it together with unlisted and unreviewable activities which may or may not have undergone changes.

The CRMC also argues that Weaver's Cove's "decision to double the number of LNG vessel transits through the Rhode Island coastal zone and to increase the transit miles of dredge scows 100 fold" are "major amendments" to its consistency certification that require Weaver's Cove to seek a new consistency concurrence from the CRMC. CRMC Memo. 23-26. The CRMC is incorrect. The CRMC's conclusively presumed concurrence to Weaver's Cove's proposed Section 10 Activity remains valid, and despite the CRMC's claim to the contrary, no "supplemental" consistency certification is required for this activity.

To be a "major amendment" such that a new consistency certification is required, there must be a "modification to the previously reviewed and approved activity." 15 C.F.R. § 930.51(c). Any changes to Weaver's Cove's LNG vessel transit plan or to its Section 103 Activity are not "major amendments" within the

meaning of the NOAA regulations for the simple reason that they have no effect whatsoever on the Section 10 Activity that was on review before the CRMC, and accordingly cannot serve to modify the Section 10 Activity.[17]  This point is further supported by the fact that Weaver's Cove has not made or been required to make any changes to its application before the USACE for approval of the Section 10 Activity.  Therefore, with respect to the LNG vessel plan and the Section 103 Activity, the "major amendment" provisions of the NOAA regulations, *see* 15 C.F.R. §§ 930.51(b),(c) & (e), are inapplicable because these other activities and any changes made thereto have not in any way changed or impacted Weaver's Cove's Section 10 Activity.

In support of its arguments for a supplemental consistency certification, the CRMC relies on *Blanco v. Burton*, 2006 WL 2366046 (E.D. La. 2006), but its reliance is misplaced.  There, the court did not, as the CRMC suggests, require the

---

[17] Changes to Weaver's Cove's LNG vessel transit plan only implicate "LNG marine traffic" activity.  33 C.F.R. § 127.1 (describing the activity on review in the LOR process as "LNG marine traffic").  Changes to Weaver's Cove's vessel disposal plan only concern the activity of "transport[ing]. . . dredged material by vessel or other vehicle for the purpose of dumping it into ocean waters at [certain] dumping sites . . . ."  33 C.F.R. § 324.1 (stating that the activity underlying a Section 103 permit is "the transportation of dredged material by vessel or other vehicle for the purpose of dumping it into ocean waters at [certain] dumping sites").  On the other hand, the dredging activities at issue in this case are those that involve "work in or affecting navigable waters of the United States" including "any dredging."  33 C.F.R. Part 322 (stating that the activities underlying Section 10 permits are "work in or affecting navigable waters of the United States" including "any dredging.")

federal agency to supplement its consistency determination[18] because of changed circumstances. Instead, the court found that the federal agency's consistency determination was deficient because, rather than being tailored to the project at issue, it was simply recycled from a *previous* consistency determination for a similar project and, therefore, relied on "stale information" when it was submitted initially. *Id.* at *12. The case has no relevance to whether developments subsequent to the issuance of a consistency certification require the applicant to re-submit or supplement a consistency certification. Furthermore, it has no relevance in this case because the changed circumstances CRMC points to here are *wholly unrelated* to the discrete activity — namely, the Section 10 Activity — that was before CRMC for federal consistency review.

### D.     This Case Is Not Moot

The CRMC argues that this case is moot because Weaver's Cove has decided to dispose of dredged materials at an offshore location outside of Rhode Island, instead of at an upland site in Massachusetts. The CRMC wrongly believes that there is nothing for this Court to act on because "there is no evidence that the CRMC would fail to act on a renewed application and the intervening changes

---

[18] In *Blanco*, it was a federal agency that undertook the activity subject to consistency review. As noted above, when it is a federal agency undertaking an activity directly, the federal agency submits a consistency determination (rather than a consistency certification) indicating whether the proposed activity will be undertaken in a manner consistent to the maximum extent practicable with the enforceable policies of the management program. 15 C.F.R. § 930.39(a) (2007).

have erased any consequence from CRMC's conduct."[19]   CRMC Memo. 28.   The CRMC's argument is unavailing because it misapprehends the doctrine of mootness, and again conflates the dredging activities that were before it for consistency review during the six-month statutory review period with other, completely irrelevant aspects of Weaver's Cove's project not within the CRMC's CZMA jurisdiction.[20]

A "case is moot . . . when the issues presented are no longer live or when the parties lack a legally cognizable interest in the outcome."   *Cruz v. Farquharson*, 252 F.3d 530, 533 (1st Cir. 2001).   Specifically, "[a] party can have no legally cognizable interest in the outcome of a case if the court is not capable of providing any relief which will redress the alleged injury.   Thus, 'if an event occurs while a case is pending . . . that makes it *impossible* for the court to grant *any* effectual relief whatever to a prevailing party, the [action] must be dismissed.'" *Gulf of Maine Fisherman's Alliance v. Daley*, 292 F.3d 84, 88 (1st Cir. 2002) (emphasis added) (quoting *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)).   A

---

[19] The CRMC's suggestion that it would act on a renewed application is beside the point since, as explained in Section I.C above, there is no basis for Weaver's Cove to submit a renewed application.

[20] As set forth in this Memorandum, *none* of the activities cited in the column on page one of the CRMC's memorandum actually falls within its jurisdiction under the CZMA.   Alleged "changes" to those activities cannot "moot" this case. Furthermore, for the reasons set forth in the Declaration of Ted Gehrig and Statement of Disputed Facts, submitted herewith, the factual assertions contained in that table are as baseless as they are immaterial to the issues before this Court.

defendant raising the doctrine of mootness faces a substantial hurdle: "[t]he burden of establishing mootness rests squarely on the party raising it, and the burden is a heavy one." *Mangual v. Rotger-Sabat*, 317 F.3d 45, 60 (1st Cir. 2003).

Here, the CRMC has not met its heavy burden because it cannot point to a single event that has occurred that would make it *impossible* for this Court to grant "effectual relief" to Weaver's Cove.  Weaver's Cove has asked this Court to declare that the CRMC, as a matter of law, conclusively concurred with Weaver's Cove's consistency certification by failing to act within the six-month statutory period.   Such a declaration would allow the USACE to proceed with issuing the Section 10 permit to Weaver's Cove in response to Weaver's Cove's still-active permit application before the USACE.  Without a declaratory judgment that the CRMC has presumptively concurred, the statutory bar remains in place: "No license or permit shall be granted by [the USACE] until the [CRMC] has concurred with the applicant's certification or until, by the state's failure to act, the concurrence is conclusively presumed." 16 U.S.C. § 1456(c)(3)(A).  Moreover, such a declaratory judgment will satisfy the condition in the FERC order approving Weaver's Cove's proposed LNG terminal.  That order states "Weaver's Cove shall file with the Secretary prior to construction documentation of concurrence from the Coastal Resources Management Council that the project is consistent with the

Rhode Island Coastal Resources Management Program." *Initial Order* at Appx. B, Condition 24.

###### 1.     *The Disposal Plan Does Not Moot The Case*

In an attempt to avoid this inevitable conclusion, the CRMC creates a straw man to argue that this case is moot; the CRMC asserts that the subject of Weaver's Cove's complaint and the underlying federal consistency application was a proposal for upland disposal.  However, as explained in Section I.B, the activity on review that was before the CRMC in this case is not "upland disposal," or for that matter any kind of disposal, but the dredging activities themselves that are the subject of the permit application filed with USACE pursuant to Section 10 of the Rivers and Harbors Act.  Changes to the dredged material disposal plan, including scow transits, are permitted under a different statute — the Ocean Dumping Act, and did not result in any change to Weaver's Cove's Section 10 permit application before the USACE.  And that disposal plan is not (and never has been) before the CRMC for consistency review because CRMC did not list such an activity in the CRMP, nor did it choose to seek to review it as an unlisted activity.  These changes, then, to *another aspect* of the Weaver's Cove project to develop an LNG terminal have not, contrary to the CRMC claims, "erased any consequence from CRMC's conduct."  CRMC Memo. 28.  They have *no bearing* on its conduct and on the conclusive presumption of the CRMC's concurrence with Weaver's Cove's

consistency certification.    Therefore, because the proposed dredging activities before the USACE have not changed in any respect, no event has occurred that would could make it impossible for this Court to grant Weaver's Cove's requested relief of a declaration of conclusively presumed concurrence.

### 2.    *U.S. Coast Guard Proceedings Do Not Moot The Case*

The CRMC also intimates that this case may be judicially moot because of developments regarding the U.S. Coast Guard LOR process discussed in Section I.B.2.b, *supra*.   CRMC Memo. 5-14.   As explained below, ongoing U.S. Coast Guard proceedings do render this case moot.   The CRMC has not carried its heavy burden of showing that it would be "impossible for the court to grant any effectual relief whatever" to Weaver's Cove.   *Gulf of Maine Fisherman's Alliance*, 292 F.3d at 88 (emphasis added) (internal quotation marks omitted).

The only developments in the LOR process that have taken place since this Court ruled on the CRMC's Motion to Stay All Proceedings are: (1) on December 7, 2007, Captain Roy Nash, Captain of the Port for Southeast New England, declined to reconsider the LOR he issued on October 25, 2007, and (2) on January 9, 2008, Weaver's Cove exercised its right to appeal the LOR to the U.S. Coast Guard Commander, First Coast Guard District pursuant to 33 C.F.R. § 127.015. Additionally, Weaver's Cove is preparing to file a new LOI to address Captain

Nash's LOR, which would commence a new LOR process.  Therefore, the LOR process for Weaver's Cove's LNG vessel transits continues forward on two tracks.

None of these developments would undermine the effectiveness of the relief that Weaver's Cove has requested in this case, nor would they affect the dispute between Weaver's Cove and the CRMC such that it could no longer be considered live.  As discussed above, a declaration by this Court of the CRMC's conclusively presumed concurrence would allow the USACE to proceed with issuing the Section 10 permit to Weaver's Cove.  It would also satisfy the condition in the FERC's order approving Weaver's Cove's proposed LNG terminal.  This "effectual relief" would not be undermined by the developments in the LOR process, which, as explained in Section I.B.2. were never before the CRMC for consistency review.  Granting Weaver's Cove's requested declaratory relief, then, would move Weaver's Cove's project forward, vindicating Weaver's Cove's "right to have [its] application considered by all of the various agencies on the merits of the application."  Transcript at 53, lines 21-23 (Doc. 26).  Thus, because this Court still can grant Weaver's Cove "effectual relief," the case is not moot, and CRMC makes no attempt to meet its heavy burden by demonstrating anything to the contrary.

### 3. *Federal Legislation Pertaining To The Old Brightman Street Bridge Does Not Moot This Case*

Finally the CRMC erroneously intimates that this case is mooted by enactment of Section 1948 of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), Pub. L. No. 109-59, 119 Stat. 1144 (2005). See CRMC Memo. 6-7. This provision states, *inter alia*, that "no Federal funds shall be obligated or expended for the demolition of the existing Brightman Street Bridge connecting Fall River and Somerset, Massachusetts, and the existing Brightman Street Bridge shall be maintained for pedestrian and bicycle access, and as an emergency service route."

The CRMC argues that the effect of this provision is that it "effectively blocks the Weaver's Cove Project in the form originally proposed and probably, in any form at all" because it prohibits the demolition of the Brightman Street Bridge. CRMC Memo. 7.

Weaver's Cove's revised LOI, which was the application underlying the LOR, responded to Section 1948 by proposing the use of smaller LNG vessels that could navigate the existing Brightman Street Bridge. As discussed above, Weaver's Cove is still pursuing this particular vessel transit plan through the U.S. Coast Guard LOR appeals process, and is also preparing a new LOI that likewise would enable LNG vessels to transit safely unaffected by the existing Brightman Street Bridge. Accordingly, the same reason that the developments in the LOR

process do not render this case moot apply here too: this Court can grant Weaver's Cove "effectual relief."                   .

### E.     Res Judicata Does Not Affect This Case

Res judicata and collateral estoppel do not bar this Court from rendering a decision on the merits of this case.   The CRMC appears to argue that these doctrines should prevent Weaver's Cove "from pursuing the state in this forum," CRMC Memo. 43-44, because Weaver's Cove (1) twice appealed the Secretary of Commerce ("Secretary") to find that CRMC conclusively concurred with Weaver's Cove's consistency certification on the grounds that the six-month statutory review period had run, (2) requested that the FERC remove its condition pertaining to CRMC's concurrence from the FERC order authorizing the Weaver's Cove project, and (3) did not seek judicial review of the subsequent, separate rulings of the Secretary and the FERC.   However, this argument by CRMC fails for the following reasons.

### 1.     *Res Judicata Is Inapplicable To This Case*

The doctrine of res judicata "bars all parties . . . from relitigating issues which were raised or could have been raised in a previous action, once a court has entered a final judgment on the merits in the previous action. The essential elements of res judicata, or claim preclusion, are (1) a final judgment on the merits in an earlier action; (2) an identity of parties or privies in the two suits; and (3) an

identity of the cause of action in both the earlier and later suits." *Aunyx Corp. v. Canon U.S.A., Inc.*, 978 F.2d 3, 6 (1st Cir. 1992) (internal citations omitted).  With respect to whether element (1) is met, "[a] matter is 'adjudicated on the merits' if there is a 'decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground.'" *Teti v. Bender*, 507 F.3d 50, 56 (1st Cir. 2007).

Res judicata is inapplicable to this case because the Secretary and the FERC did not decide Weaver's Cove's requests on the merits of the questions before them.  In response to Weaver's Cove's petitions, the Secretary held twice that "[a]bsent an objection by Rhode Island, there is *no basis for an appeal* to the Secretary of Commerce.  To date, Rhode Island has not objected to [Weaver's Cove's] consistency certification.  Accordingly, [Weaver's Cove's] appeal is dismissed for good cause pursuant to 15 C.F.R. § 930.129(a)."  Letter from the Under Secretary of Commerce for Oceans and Atmosphere to Weaver's Cove Energy, LLC (July 25, 2006) (JA Tab 51) (emphasis added).  *See also* Letter from the Under Secretary of Commerce for Oceans and Atmosphere to Weaver's Cove Energy, LLC (Nov. 10, 2005, but erroneously dated on original) (JA Tab 32).[21]

---

[21] The CRMC asserts that Weaver's Cove filed its second appeal to the Secretary of Commerce without awaiting a response from NOAA (to whom Weaver's Cove also had sent a request to decide the matter) because Weaver's Cove "[a]nticipat[ed] an unfavorable result."  CRMC Memo. 30.  In fact, Weaver's Cove filed its second appeal to Commerce before receiving NOAA's decision because

In a similar vein, in its order on rehearing, the FERC found that Weaver's Cove's request could not be addressed because "[t]his Commission is not in a position to interpret regulations of other agencies or otherwise resolve the issues raised by the parties.  This issue is a matter for the [CRMC], the NOAA, and the Department of Commerce, not this Commission."  *Order on Reh'g* at ¶ 128.

Therefore, the doctrine of res judicata has no effect on this case because neither of these agency decisions was "based on the substance of the claim advanced," but rather instead they were based "on a procedural, or other, ground." *Teti*, 507 F.3d at 56. *See also Computer Assocs. Intl, Inc. v. Altai, Inc.*, 126 F.3d 365, 370 (2nd. Cir. 1997) ("[R]es judicata is inapplicable if formal jurisdictional or statutory barriers precluded the plaintiff from asserting its claims in the first action.").

## 2.    *Collateral Estoppel Is Inapplicable To This Case*

For similar reasons, collateral estoppel has no application in this case.  For collateral estoppel to apply, the following elements must be met: "(1) both the . . . proceedings involved the *same issue* of law or fact; (2) the parties *actually litigated* the issue in the [prior] proceeding[ ]; (3) the [first] court *actually resolved* the issue in a final and binding judgment . . .; and (4) its resolution of that issue of law or

---

Weaver's Cove concluded that NOAA simply was not going to respond.  Weaver's Cove's prediction proved correct: NOAA never responded to Weaver's Cove's request for an authoritative interpretation of the CZMA.

fact was essential to its judgment (i.e., necessary to its holding)." *Global Naps, Inc. v. Massachusetts Dept. of Telecomm. and Energy*, 427 F.3d 34, 44 (1st Cir. 2005) (edits in original) (quoting *Monarch Life Insurance Co. v. Ropes & Gra*y, 65 F.3d 973 (1st Cir. 1995)).

Under that standard, it is clear that collateral estoppel does not foreclose this action.  As discussed above, the Secretary and the FERC dismissed Weaver's Cove's requests on jurisdictional grounds.  Accordingly, Weaver's Cove did not litigate the issues that are before this Court either before the Secretary or the FERC, and nor did either the Secretary or the FERC issue a "final and binding judgment" with respect to whether the CRMC's concurrence could be conclusively presumed because the consistency review clock ran out.

### 3.    *Certain Decisions By The Secretary Of Commerce And The FERC Do Not Affect This Case*

In the same section of its Memorandum of Law where it addresses res judicata and collateral estoppel, the CRMC also appears to argue that Weaver's Cove is prevented from bringing this action because it did not seek review of the decisions of the Secretary and FERC pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, et seq.  *See* CRMC Memo. 43-44 ("[F]ailing to appeal the rejections it received from the Secretary and from FERC . . . constitutes a neglect of the available recourse found in the APA.").  This argument is also devoid of merit.

It is well-settled that even if a party could seek relief under the APA, this would not operate as a bar to seeking declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.  *See* FED. R. CIV. P. 57 ("The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate.").  *See also Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1559 (Fed. Cir. 1994) (Declaratory relief "is an additional form of relief, readily available even when it would be cumulative of other requested relief.").   Therefore, regardless of what other remedies may be or may have been available to Weaver's Cove, this Court is not precluded from granting Weaver's Cove the declaratory relief it requests.

Moreover, the CRMC does not point to, and cannot point to, any statutory provision that would require Weaver's Cove to bring an APA action in a federal court before bringing this action against the CRMC.  The authorities the CRMC refers to in its Memorandum of Law simply recite the well-known judicial review provisions of the APA, which do contain any such requirement.  CRMC Memo. 44.   And, in fact, *Akiak Native Community v. United States Postal Service*, implicitly recognizes that judicial review of actions under the CZMA can take place under other statutes by stating that such review is not exclusively but only "*ordinarily* governed by the [APA]."   213 F.3d 1140, 1144 (9th Cir. 2000) (emphasis added).

Finally, like its res judicata and collateral estoppel arguments, the CRMC's argument here also independently fails because of its absurdity: Weaver's Cove is not asking for relief contrary to the orders of FERC or the Secretary of Commerce. Each disclaimed authority to review the questions presented by Weaver's Cove; thus, Weaver's Cove has brought the legal issues to this Court for resolution, entirely consistent with those orders.

## II. The CRMC's Application of Category B Assent To Block Operation Of The LNG Terminal Is Unconstitutional

For the reasons set forth in Weaver's Cove's first memorandum, application of Rhode Island's "Category B Assent" regulations to Weaver's Cove's proposed dredging activities would be unconstitutional for two reasons: First, application of such regulations to delay or block operation of the Weaver's Cove LNG terminal would violate the Dormant Commerce Clause. Second, such application also would be preempted by Section 3 of the Natural Gas Act, which reserves to FERC "exclusive authority" over the operation of the terminal — including the proposed dredging activities — except for certain exceptions not applicable here.

In its own memorandum of law, the CRMC spends more time responding to arguments Weaver's Cove *did not make* than to arguments it *did make*. The CRMC offers not a single sentence in response to Weaver's Cove's Dormant Commerce Clause argument, thereby waiving its opportunity to contest the facts or

law of that claim.   And with respect to Weaver's Cove's Natural Gas Act preemption claims, the CRMC's responses lack merit.

### A.   Imposition Of The Category B Assent Requirement To Block The Weaver's Cove Project Violates The Dormant Commerce Clause

#### 1.   *The CRMC Did Not Dispute Weaver's Cove's Statements Of Fact And Law, And Has Waived The Opportunity To Do So*

For the reasons set forth in Weaver's Cove's Amended Complaint (Am. Compl. ¶¶ 73-76, 78-79) and Memorandum of Law (WCE Memo. 27-32),[22] enforcement of Category B Assent requirements to block operation of the LNG terminal would violate the Dormant Commerce Clause of the U.S. Constitution. Weaver's Cove respectfully requests summary judgment on that claim, as well as declaratory and injunctive relief.  Am. Compl. ¶¶ 107-115.

Although Weaver's Cove argued its points in detail in the Amended Complaint and Memorandum of Law, WCE Memo. 27-32, the CRMC's Memorandum of Law included neither a single dispute of material fact on the subject, nor a single argument in response to Weaver's Cove.

Thus, because the CRMC failed to demonstrate that there exists a genuine issue of material fact on this claim, it cannot dispute that summary judgment is appropriate.  *See*, *e.g.*, Local Rule Cv 56(a)(3)-(4).

---

[22] *See also* Stmt. of Undisputed Facts ¶¶ 17-24 (Doc. 17); Gehrig Decl. ¶¶ 1-9 (Doc. 18).

Furthermore, because the CRMC failed to offer any argument in response to Weaver's Cove's claims and arguments, the CRMC has waived its opportunity to argue in response.  Accordingly, the Court can treat Weaver's Cove's unanswered Commerce Clause claims as conceded by the CRMC, and immediately grant Weaver's Cove's motion for summary judgment on these claims.  *See*, *e.g.*,  *U.S. v. Fairway Capital Corp.*, 433 F. Supp. 2d 226, 243 n.4 (D.R.I. 2006) (failure to assert argument in objection to motion rendered the response waived); *see also Stephenson v. Cox*, 223 F. Supp. 2d 119, 121 (D.D.C. 2002) (court may treat unanswered argument as conceded "even when the result is dismissal of the entire case").

Because of its silence, the CRMC also is foreclosed from arguing this issue on reply in support of its own Motion for Summary Judgment, because it did not raise the issue in its first Memorandum of Law in Support of its Motion for Summary Judgment.   Local Rule Cv 7(b)(2); *see also Waldon v. City of Providence*, 495 F. Supp. 2d 245, 258 n.16 (D.R.I. 2007) (an argument raised for the first time in a reply brief was not "appropriately raised.").

### 2.  *The CRMC's Preemption-Related State-Ownership Arguments Would Not Have Defeated Weaver's Cove's Dormant Commerce Clause Claims, Even If The CRMC Had Attempted To Raise Such Arguments Against Those Claims*

**a.**   Weaver's Cove notes that the CRMC's preemption-related arguments as to Rhode Island's rights as "owner" (in public trust) of the riverbed, even if

53

taken at face value, do not affect the Commerce Clause analysis.[23]  The Supreme Court has expressly and unequivocally rejected a prior state's suggestion that state ownership of land defeats the Dormant Commerce Clause's limitations on the state's use of that land.

In *West, Att'y Gen. of the State of Oklahoma v. Kansas Nat. Gas. Co.*, 221 U.S. 229 (1911),[24] a natural gas company challenged an Oklahoma statute that barred the construction of interstate natural gas pipelines under state-owned highways.  *See id.* at 239.  There, the state raised the very arguments raised here by the CRMC with respect to preemption, and the Supreme Court rejected them all:

**i.**     There the state argued — precisely as the CRMC asserts here with respect to preemption — that it was empowered to prevent the construction of such pipelines merely because it owned the land under the highways.  *See id.* at 232 ("The act is valid as an exercise of the State's police power in its control over the

---

[23] The CRMC did not argue that its state-ownership arguments pertained to Weaver's Cove's Dormant Commerce Clause claims.  Weaver's Cove examines the state-ownership argument's irrelevance to Weaver's Cove's Dormant Commerce Clause claims merely for the purpose of fully apprising the Court of the legal issues pertinent to the claims set forth in Weaver's Cove's Motion for Summary Judgment and Memorandum of Law.

[24] The first portions of the reported decision, describing Appellant's and Appellee's arguments, were not published in the *Supreme Court Reporter*, but they are available in the Supreme Court's official reporter volume, the *United States Reports*.

use of its highways for transportation purposes.  The State's highways are its public property.").

    **ii.**    There the state argued — precisely as the CRMC asserts here with respect to preemption — that the plaintiff could secure the right to pass under the highways only by a grant of authority from the property-owning state.  *See id.* ("The right to use the highways in maintaining a gas pipe line, — a permanent plant, — is a franchise. . . .  This being true the right must either be acquired by grant or by condemnation. . . .  The right has not been granted by the State, and the appellees do not assert any right by grant.").

    **iii.**    And there the state argued — precisely as the CRMC asserts here with respect to preemption — that constitutional limits on the state's use of its property could not be imposed by the court, because such limitations would be the equivalent of eminent domain, a power that the federal government could have expressly given the pipeline but did not.  *Id.* at 233.[25]

    The Supreme Court rejected all of those arguments and held that the state's ownership of land under the highways could not be leveraged in such a manner as

---

[25] The federal government subsequently granted the power of eminent domain to interstate pipelines in 1938, when it enacted the NGA.  But in *West*, which preceded the enactment of the NGA by several decades, both the state and the Court noted that the pipeline had not received eminent domain authority from the federal government.  221 U.S. at 233 (state's argument); *id.* at 247 (Court observes that "[t]he business of gas transportation is a public business in interstate trade, over which Congress has never legislated").

to unconstitutionally burden interstate commerce and block the laying of the pipeline. *See id.* at 261-62. Rejecting the state's claim of inviolable power over public land, the Court endorsed and applied a lower court's rule: "No State by the exercise of, or by the refusal to exercise, any of its powers, may prevent or unreasonably burden interstate commerce within its borders in any sound article thereof." *Id.* at 261. The Court stressed that the Federal government's superior power over interstate commerce supercedes state laws both where Congress regulates *and* where (as in *West*) Congress is silent (*i.e.*, via the Dormant Commerce Clause). *Id.* Finally, the Court expressly rejected the state's absolutist theory of state power over state land, holding that the Constitution precluded the state from asserting "a power practically absolute . . . making the highways impassable barriers to the pipelines of appellees." *Id*.

In short, while the CRMC memorandum of law did not actually respond to Weaver's Cove's Dormant Commerce Clause claims, its state-ownership-of-property arguments advanced against the preemption claims could not have defeated Weaver's Cove's Dormant Commerce Clause claims, in light of the controlling Supreme Court precedent, *West*.

**b.**    The *West* case is but one specific example of the Supreme Court's general rule that states cannot use state-owned property in such a way as to unconstitutionally burden interstate and international commerce, just as states

56

cannot enforce police power regulations that unconstitutionally burden interstate and international commerce.  *See*, *e.g.*, *Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1, 11-14 (1928) (holding that although Louisiana owns all title to salt water shrimp in the public trust, it cannot regulate the use of such shrimp in a manner that violates the Dormant Commerce Clause); *Johnson v. Haydel*, 278 U.S. 16, 17 (1928) (same, as regards oysters).

The Supreme Court summarized this point succinctly in *Hughes v. Oklahoma*, 441 U.S. 322 (1979), where it held that Oklahoma's limitations on use of minnows — which had been justified below on the basis that the minnows were "owned by the state in its sovereign capacity for the common benefit of all its people," *id.* at 324-25 — were unconstitutional under the Dormant Commerce Clause.  *Id.* at 336-338.  In so doing, the Court expressly overruled a previous case in which the Court held that state-owned property was categorically immune from the limitations of the Dormant Commerce Clause.  *See id.* at 327 (explaining *Geer v. Connecticut*, 161 U.S. 519, 522-30 (1896)).  The *Hughes* court explained:

We now conclude that challenges under the Commerce Clause to state regulations of wild animals should be considered according to the same general rule applied to state regulations of other natural resources, and therefore expressly overrule *Geer*. We thus bring our analytical framework into conformity with practical realities. Overruling *Geer* also eliminates the anomaly . . . that statutes imposing the most extreme burdens on interstate commerce (essentially total embargoes) were the most immune from challenge. At the same time, the general rule we adopt in this case makes ample allowance for preserving, *in ways not inconsistent with the Commerce Clause*, the legitimate state concerns for conservation and protection of wild animals underlying the 19th-century legal fiction of state ownership.

441 U.S. at 335-36 (emphasis added).  The Court quoted with approval its previously-endorsed rule that, for purposes of Commerce Clause review, the distinction between "regulation" and public trust "ownership" is illusory:

The 'ownership' language of cases such as those cited by appellant must be understood as no more than a 19th-century legal fiction expressing 'the importance to its people that a State have power to preserve and regulate the exploitation of an important resource. . . . Under modern analysis, the question is simply whether the State has exercised its police power in conformity with the federal laws and Constitution.

*Id.* at 334-35 (quoting *Douglas v. Seacoast Prods., Inc.*, 431 U.S. 265, 284 (1977)).

The First Circuit, recounting *Hughes*'s overruling of *Geer*, has stated that the states' "regulation and conservation of wildlife and natural resources" may not be undertaken in a manner "inconsistent with the Commerce Clause . . . ." *Commonwealth of P.R. v. SS Zoe Colocotroni*, 628 F.2d 652, 671 (1st Cir. 1980).

The Supreme Court reiterated its reasoning four years later, when it held that Nebraska's "greater ownership interest" in ground water "does not absolutely remove Nebraska ground water from" Commerce Clause scrutiny, because "[Nebraska's] argument is still based on the legal fiction of state ownership." *Sporhase v. Nebraska*, 458 U.S. 941, 951 (1982).  Rather than being (as the CRMC would urge) the conclusive factor in deciding whether Nebraska's control over ground water was an unconstitutional burden on interstate commerce, the fact of state ownership merely "inform[ed] the determination whether the burdens on commerce imposed by state ground water regulation are reasonable or unreasonable." *Id.* at 953.

Other courts, too, have refused to exempt state-owned property from the limitations of the Commerce Clause.  In one case involving a state's ownership over submerged lands, for example, the Ninth Circuit held that although "[t]he State owns and controls tidelands and submerged lands in its sovereign capacity," the Court "reject[s] the State's contention that its leasing activities are not subject to Commerce Clause scrutiny," and held unconstitutional those leasing activities that "permit[ted] the State to erect substantial impediments to the free flow of commerce."  *W. Oil and Gas Ass'n v. Cory*, 726 F.2d 1340, 1342-43 (9th Cir. 1984).

**c.**     Even the cases cited by the CRMC (with respect to preemption and its public trust ownership) demonstrate that the exercise of such purported ownership and regulatory powers are limited by the Dormant Commerce Clause.   For example, while the CRMC cites as evidence of its claimed powers as public-trust owner the decision in *Martin v. Waddell's Lessee*, 41 U.S. 367, 410 (1842), the very passage quoted by the CRMC expressly states a conclusion that *undercuts* the CRMC's position — *i.e.*, the Court stated that although the states "hold the absolute right to all their navigable waters and the soils under them for their own common use," they hold that right "subject only to *the rights since surrendered by the* [*C*]*onstitution to the general government.*"   *Id.* (emphasis added) (quoted in CRMC Memo. 74 n.30).   That limitation directly applies in this case, because the list of rights "surrendered" by the states includes right to burden interstate commerce in violation of the Commerce Clause.   *See*, *e.g.*, *BMW of N.A. v. Gore*, 517 U.S. 559, 571-72 (1996) (citing *Gibbons v. Ogden*, 22 U.S. 1, 194-96 (1826)).

**d.**     In sum, the fact that Rhode Island "owns" the riverbed in the public trust — an issue raised by the CRMC not with respect to the Dormant Commerce Clause, which it did not even address in its brief, but with respect to preemption — does not remove its use of that land from Commerce Clause scrutiny.   To hold otherwise would (to borrow a phrase from *Hughes*) "immunize" even "total

embargoes" on interstate commerce.  The doctrine of public trust ownership requires no such thing, nor does the Commerce Clause allow it.

The CRMC's administration of the Category B Assent requirement regulations, whether as a matter of "regulatory" power or "proprietary" power, cannot impose an unconstitutional burden on interstate and international commerce.  For the reasons set forth in Weaver's Cove's memorandum — which stands unopposed by the CRMC's memorandum — Weaver's Cove respectfully requests summary judgment in its favor on Counts IV and V of the Amended Complaint.

**B.    Rhode Island's Category B Assent Requirement Is Preempted By Section 3 Of The Natural Gas Act In This Case**

As Weaver's Cove demonstrated in its first memorandum, Section 3 of the Natural Gas Act, as applied through FERC's orders conditionally approving the siting, construction, and operation of the proposed Weaver's Cove LNG terminal, preempts the state land use regulations embodied in Category B Assent.  WCE Memo. 32-41.

In response, the CRMC argues that such preemption "does not apply to state real estate *ownership*," CRMC Memo. 45-49, and asserts that the only federal limit on Category B Assent is the eminent domain power set forth in Section 7 of the Natural Gas Act or the Federal Navigational Servitude, *id.* 49-83.  And the CRMC further asserts that, even setting those arguments aside, the Natural Gas Act's

preemptive scope does not cover the dredging that would be regulated by Category B Assent.  *Id.* at 83-85.

The CRMC errs on all counts.  *First*, federal preemption of Category B Assent simply does not affect Rhode Island's title to the submerged lands at issue, as demonstrated by both federal and state law; thus, the CRMC's ownership-regulatory distinction is a red herring.  *Second*, the CRMC's argument contradicts Supreme Court precedent when it suggests that eminent domain and the Federal Navigational Servitude are the only federal limits on the state's power over submerged lands beneath navigable waters.  *Last*, the CRMC's suggestion that dredging falls outside of the FERC's preemptive authority is contradicted not only by the controlling case law, but also by admissions of the State of Rhode Island contained in pleadings filed by the Rhode Island Attorney General at FERC in the Weaver's Cove proceedings.

The flaws in the CRMC's arguments are examined in detail, and in a slightly different order, below.

### 1.    *FERC's Authority Under Section 3 Of The Natural Gas Act Preempts Category B Assent*

#### a.    *Rhode Island Cannot Re-Litigate The Scope Of FERC's Authority In This Case*

The essence of the CRMC's preemption argument is nothing less than a direct attempt to re-litigate an issue decided in a previous FERC order — namely,

the scope of FERC's preemptive authority — by arguing that Section 3 of the Natural Gas Act preempts only (1) regulation of terminal siting, CRMC Memo. 46-48, and (2) "permits . . . *directly* for the project itself," *see id.* at 83-85 (emphasis in original).

Although the CRMC's characterization of FERC's authority is incorrect, *see infra* pp. 65-74, the more pressing deficiency with the CRMC's argument is that that this Court *lacks jurisdiction* to review the scope of the preemptive effect of the FERC orders.

FERC itself decided that issue in its first two orders approving the Weaver's Cove project, and neither the CRMC nor Rhode Island sought judicial review of those orders on the question of preemption.  *See* WCE Memo. 35-36.  Specifically, FERC explicitly held that "a state agency may not regulate matters directly considered by the Commission pursuant to its authority under the NGA [(Natural Gas Act)])."  *Order on Reh'g* ¶ 141 (citing *Nat'l Fuel Gas Supply Corp. v. Pub. Serv. Comm'n of the St. of N.Y.*, 894 F.2d 571 (2d Cir. 1990)).  Furthermore, FERC expressly held that Rhode Island and other government parties may not "prohibit or unreasonably delay the construction or operation of" the LNG terminal and pipelines.  *Initial Order* ¶ 113 (JA Tab 25).  FERC left to be decided only the question of whether a particular state law fits either of those descriptions, thus rendering it preempted.

Because the CRMC and the State of Rhode Island did not petition for review of FERC's determination of the preemptive scope of its orders, they are barred from re-litigating in this Court the scope of FERC's preemptive authority. *See*, *e.g.*, *Georgia Indus. Group v. FERC*, 137 F.3d 1358, 1363-64 (D.C. Cir. 1998) (citing 15 U.S.C. § 717r(b)).

> **b.     *Because FERC's Orders Reviewed And Regulated Dredging, The CRMC Is Barred From Regulating Dredging Through Invocation Of Category B Assent***

Given that FERC already has defined the scope of its preemptive authority, all that remains in this case is to determine whether Category B Assent requirements fall within that preemptive scope.[26]  Specifically, the only question before this Court is whether the subject matter that the CRMC would regulate through Category B Assent (in this case, dredging) was (1) "directly considered by the Commission pursuant to its authority under the NGA [(Natural Gas Act)]," or would (2) "prohibit or unreasonably delay the construction or operation of" the LNG terminal and pipelines.

The answer is beyond dispute:  FERC did, in fact, consider in detail dredging in Rhode Island waters as part of its review of the "construction" of the

---

[26] As FERC noted in its initial order, it is up to a court to determine whether a specific state law falls within the preemptive scope of its orders as defined by its orders. *Initial Order* at 61,546.

"LNG Terminal."[27]   Thus, under Paragraph 141 of FERC's *Order on Rehearing*,

the CRMC's regulation of those matters through Category B Assent is preempted.

> **c.      Even If The Scope Of FERC's Preemptive Authority
> Could Be Re-Litigated Here, The Controlling Case Law
> Shows That FERC's Natural Gas Act Authority
> Preempts State-Law Dredging Restrictions**

FERC's express reiteration of the standards governing the preemptive scope

of its Weaver's Cove orders removes that issue from this Court's jurisdiction.  But

even if the CRMC could re-litigate that issue here, the result would be no different:

The standards set forth in the FERC's orders are based on the well-established case

law defining FERC's preemptive authority under the Natural Gas Act.

> **i.      FERC's Environmental Review, Undertaken
> Pursuant To Its Permitting Power, Preempts
> Concurrent State-Law Environmental Reviews.**

As FERC held in another proceeding involving an LNG project, "[b]ecause

FERC has authority to consider environmental issues, states may not engage in

concurrent site-specific environmental review."   *Sound Energy Solutions*, 106

FERC ¶ 61,279, at 62,018 (2004) (quoting *Nat'l Fuel Gas Supply Corp. v. Pub.*

---

[27] *See*, *e.g.*, *Initial Order* ¶¶ 46, 106-109; *id.* at Appx. B, Conditions 16-22; FEIS pp. 2-25 through 2-29; *id.* at 3-70 through 3-82; *id.* at 4-15 through 4-52; *id.* at 4-62 through 4-72; *id.* at 4-96 through 4-107; *id.* at 4-114 through 4-122; *id.* at 4-226; *id.* at 5-2 through 5-6; *id.* at 5-8 through 5-10; *id.* at 5-18 through 5-19.  For the Court's ease of reference, these FEIS materials (some of which are not including in the JA) are attached as Exh. D.  The FEIS Table of Contents shows that FERC staff reviewed "Dredging and Dredge Disposal" as part of its broader review of the "Construction Procedures" for the "LNG Terminal." FEIS at i.

*Serv. Comm'n of N.Y.*, 894 F.2d 269, 274 (2d Cir. 1990)).[28]  In short, FERC's

environmental reviews undertaken pursuant to its permitting authority preclude

Rhode Island from undertaking environmental review of the same subject matter.

> **ii.** **Because FERC's Exclusive Authority Under Section 3 Of The Natural Gas Act Reaches Not Merely LNG Terminal Operations and Construction, FERC's Environmental Review Of LNG Terminal Operations Preempts Concurrent State-Law Review.**

In the case quoted in the preceding paragraph, *Sound Energy Solutions*,

FERC's preemptive authority was limited to the siting of the LNG terminal; today,

however, Congress has made clear that FERC's preemptive authority reaches

beyond mere LNG terminal site selection to include, *inter alia*, LNG terminal

*operations and construction*.  The preemptive effect of its environmental reviews

of LNG terminal operations is therefore nothing short of that for LNG terminal

siting — namely, complete preemption of concurrent state and local attempts to

regulate.

Following FERC's decision in *Sound Energy Solutions*, Congress enacted

the Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (Aug. 8, 2005),

which codified FERC's "exclusive authority to approve or deny an application for

---

[28]  Because the NGA is committed to FERC's administration, the statutory interpretations contained in its orders are entitled to *Chevron* deference. *Williams Gas Processing — Gulf Coast Co., L.P. v. FERC*, 331 F.3d 1011, 1016 (D.C. Cir. 2003).

the siting, construction, expansion, or operation of an LNG terminal." 15 U.S.C.

§ 717b(e)(1). Thus, there can be no dispute that FERC's preemptive authority

reaches beyond mere site selection (the issue in *Sound Energy Solutions*) and

covers, *inter alia*, LNG terminal operations.

Because FERC's authority over LNG terminal operations and construction is

equal to its authority over LNG terminal site selection, the preemptive effect of its

environmental review of LNG terminal operations is no less than that for site

selection: it preempts concurrent environmental reviews under state law. *See*, *e.g.*,

*N. Natural Gas Co. v. Iowa. Utils. Bd.*, 377 F.3d 817, 823 (8th Cir. 2004) (state

may not "engage in concurrent site-specific environmental review").

### iii. *As Rhode Island Has Argued Elsewhere, Dredging Is A Component Of LNG Terminal Operations Within FERC's Jurisdiction*

As discussed in Weaver's Cove's first memorandum of law in support of its

motion for summary judgment, the CRMC cannot credibly dispute the fact that

dredging pertains to LNG terminal "operations." FERC has made clear that

dredging facilitates the transit of LNG tanker ships, which is a central aspect of

LNG terminal operations. *See*, *e.g.*, FEIS at p. 2-25 ("Weaver's Cove Energy

proposes to dredge select areas within the federal navigation channel and turning

basin to accommodate passage of LNG ships to the facility." (emphasis added)).

Indeed, as Weaver's Cove demonstrated in its first memorandum, the State of Rhode Island, through the Office of the Rhode Island Attorney General, already has *conceded* that dredging operations were part of the "construction and operation" of the LNG terminal, and that FERC had authority to "sanction" the dredging proposal.  WCE Memo. 40-41.

Nevertheless, in this case the CRMC attempts to reverse the State of Rhode Island's previous position, arguing that that "dredging" lacks sufficient nexus to terminal operations.  CRMC Memo. 84-85.  The CRMC's after-the-fact change in position, with counsel's new *post hoc* rationale, does not withstand scrutiny. Indeed, it strains common sense — the CRMC's position would create the absurd situation wherein FERC could approve the siting, construction, and operation of an LNG terminal, yet one state or town could veto FERC's approval by preventing ships from serving the terminal under laws by enforcing laws not expressly saved from preemption by the Natural Gas Act.

As FERC already concluded (and Rhode Island previously agreed), dredging pertains to LNG terminal operations, and the FERC's orders on the subject preempt Category B Assent requirements.

### iv.   *The State Of Rhode Island <u>Defended</u> FERC's Review Of Dredging Before The U.S. Court Of Appeals For The First Circuit*

Rhode Island's previous recognition of FERC's jurisdiction to review terminal-related dredging did not end in the FERC proceedings.  Even when Rhode Island and various other parties challenged the sufficiency of the FERC's orders in the First Circuit, Rhode Island continued to acquiesce to FERC's jurisdiction to review dredging in furtherance of terminal operations.[29]

Most notably, Rhode Island stated in its joint reply brief jointly filed with others:

> *The Commission has looked at the impact of dredging, and developed mitigation measures*, and with implementation of those mitigation measures it has concluded that the dredging would cause no significant environmental impact. While we do not endorse the adequacy of the Commission's consideration of the dredging issue, *it at least proceeded in a procedurally defensible manner* . . . .

Reply. Br. of City of Fall River *et al.*, City of Fall River v. FERC, Case Nos. 06-1203 *et al.*, at 8 n.8 (filed Jan. 19, 2007) (emphasis added).

Thus, not only did Rhode Island not challenge FERC's authority to review and regulate dredging under Section 3 of the Natural Gas Act, but it went so far as to applaud the procedural sufficiency of FERC's review.  For the CRMC now to

---

[29] None of the petitioners in that case challenged FERC's jurisdiction to review dredging in furtherance of terminal operations.  In fact, another petitioner, the Conservation Law Foundation, challenged the merits of FERC's determinations with respect to dredging.  The U.S. Court of Appeals dismissed that challenge as unripe. *City of Fall River v. FERC*, 507 F.3d 1, 6-8 (1st Cir. 2007).

assert that FERC did not have jurisdiction to review dredging on the theory that dredging does not pertain to terminal operations strains credulity.

> **v.** **Because The Natural Gas Act Expressly Preserved The Authority Of The U.S. Army Corps Of Engineers And The Applicability Of The CZMA And Clean Water Act Over Dredging, The State's Independent Authority To Regulate Dredging Clearly Is Subject To Preemption.**

The fact that FERC's "exclusive authority" under EPAct 2005 and the Natural Gas Act preempts state dredging restrictions — including those to be imposed via Category B Assent — is made all the more clear by review of the Natural Gas Act's express statutory exceptions to FERC's exclusive authority. Specifically, FERC's exclusive authority expressly does not affect the jurisdiction of other federal agencies (*e.g.*, the U.S. Army Corps of Engineers), or the "rights of states" under certain hybrid federal-state programs (*e.g.*, the CZMA and the Clean Water Act). *See* 15 U.S.C. § 717b(d) & (e)(1). With respect to those federal agencies and federal-state programs, then, FERC's authority is not exclusive.

The fact that the Natural Gas Act carves out of FERC's exclusive authority those regulations on dredging imposed by the U.S. Army Corps of Engineers or the State of Rhode Island under the CZMA and the Clean Water Act only further demonstrates that other restrictions on dredging, such as Rhode Island's Category B Assent were not excluded from the preemptive effect of FERC's "exclusive authority." Where Congress enacts an overarching rule (*e.g.*, preemption), and

expressly enumerates specific exceptions to that rule (*e.g.*, CZMA, Clean Water Act), the Court should not create additional unstated exceptions to the overarching rule.[30]

The CRMC's own arguments in support of its position illustrate the absurdity of reading additional, unstated exceptions to FERC's preemptive authority in the face of express, specific exceptions set forth in the Natural Gas Act's grant of preemptive authority to FERC.  The Natural Gas Act specifically preserves Rhode Island's authority to review the environmental effects of dredging under the CZMA and the Clean Water Act, under the requisite supervision of the federal agencies administering those statutes.  But the CRMC attempts to seize the additional power to regulate the proposed dredging outside of those joint federal-state programs.   The CRMC's attempt to assert some notion of undefined, independent state power unrecognized by the Natural Gas Act's narrow set of preemption exemptions would render moot the Natural Gas Act's express preservation of CZMA and Clean Water Act.

As noted above, this Court does not have jurisdiction to entertain re-litigation of the scope of FERC's preemptive authority.  But even if it were to

---

[30] *See*, *e.g.*, N. SINGER, 2A SUTHERLAND STATUTORY CONSTRUCTION § 47:23 (2007) (explaining that the enumeration of specific express exceptions disproves the existence of additional implicit exceptions); *see also Constructora Andrade Gutierrez, S.A. v. American Intern. Ins. Co. of Puerto Rico*, 467 F.3d 38, 44 (1st Cir. 2006) (same).

review the merits of that question, the result would not change:   FERC's preemptive authority includes review of LNG terminal operations.   As FERC recognized in its Weaver's Cove proceedings — and as Rhode Island has conceded — the dredging at issue here an integral element of LNG terminal operations. Rhode Island has identified no legal basis that would support it circumventing FERC's Natural Gas Act-recognized "exclusive authority."

> ### vi.   *FERC's Deference To The U.S. Coast Guard's Review Of Waterway Issues Does Not Support The CRMC's Definition Of FERC's Jurisdiction*

The CRMC suggests that because FERC did not modify its orders in light of developments in the Weaver's Cove U.S. Coast Guard proceedings, FERC's exclusive authority over LNG terminal operations does not include "waterway-related matters."   CRMC Memo 83-84.   But the CRMC's invocation of the U.S. Coast Guard proceedings only reiterates its fundamental miscomprehension of the actual terms of the statute defining FERC's "exclusive authority."

FERC defers to the Coast Guard because the very statute giving FERC "exclusive authority" over LNG terminal operations expressly *preserves* the Coast Guard's authority to oversee LNG tanker safety.   *See* 15 U.S.C. § 717b(e)(1) ("nothing in this chapter is intended to affect otherwise applicable law related to any Federal agency's authorities or responsibilities related to LNG terminals").

In fact, far from supporting the CRMC's position, the Natural Gas Act's express preservation of the federal agencies' authority supports Weaver's Cove's explanation of FERC's jurisdiction. If the general definition of FERC's jurisdiction over LNG terminal "operations" were as narrow as the CRMC suggests, then there would have been no need to include a statutory provision expressly preserving the Coast Guard's authority over tanker transits (or the USACE's authority over dredging).

In sharp contrast to the Coast Guard (or the Army Corps of Engineers, or the U.S. Department of the Interior), the State of Rhode Island's jurisdiction was not preserved by Section 3 of the Natural Gas Act, except (as noted above) with respect to Rhode Island's exercise of the limited powers delegated to the state by federal law under the CZMA, Clean Water Act, and Clean Air Act. *See* 15 U.S.C. § 717b(d). The Natural Gas Act expressly preserved the Coast Guard's jurisdiction, but not the CRMC's Category B Assent review jurisdiction.

Similarly, while FERC conditioned its Weaver's Cove approval orders on the ultimate decisions of the Coast Guard, (see *Initial Order* at Appx. B, Conditions 64, 65, 75), as well as the CRMC's consistency review under the CZMA, *id.* at Appx. B, Condition 24, FERC did not condition its orders on the CRMC granting Weaver's Cove a Category B Assent. For the purposes of FERC's

73

review of LNG terminal siting and operations, the Coast Guard's proceedings and Category B Assent could not be more different.

*        *        *

As set forth in the preceding discussion, Rhode Island offers no basis for its assertion that its state-law restrictions on dredging, such as Category B Assent, are categorically immune from limitation by FERC's preemptive authority over LNG terminal operations.  Weaver's Cove requests that this Court give effect to FERC's "exclusive authority" and declare application of Category B Assent to Weaver's Cove be preempted.

> **2.      The CRMC's "Regulatory/Proprietary" Distinction Is A Red Herring; The Natural Gas Act's Preemption of Category B Assent Supercedes All CRMC Control Of The Use Of The Submerged Land**

The CRMC attempts to avoid the preemptive effect of FERC's orders under the Natural Gas Act by arguing that those orders do not "confer[] . . . paramount power over land titles" or "override state ownership."  *See* CRMC Memo. 48-82. But that argument is a red herring:  Category B Assent does not convey title to submerged lands; it merely regulates the use of that land.   Thus, FERC's preemption of Category B Assent does nothing more than prevent the state's enforcement of unconstitutional land use regulations.  FERC's jurisdiction does not

transfer submerged-lands title to Weaver's Cove, nor does FERC-approved dredging transfer title to Weaver's Cove.[31]

### a.    The CRMC's Theory Of "State Ownership Rights" Is Opaque And Incoherent

Weaver's Cove notes at the outset that the CRMC's argument is opaque: the CRMC never expressly states precisely which aspect of "state ownership" would be "override[n]" by preemption, CRMC Memo. 49, nor does the CRMC state precisely how its "regulatory interests" differ from its "proprietary interests" in this case, *id.* at 59.

With respect to the first question, by drawing a distinction between "state police power regulation" and "state ownership," the CRMC's position appears to be that regulating the use of public-trust land is a matter of "state ownership," and that any federal limitation on the state's control of the use of state land "overrides" "state ownership" *per se*.  Simply stated, the CRMC's theory of "state ownership" appears to be nothing less than:  "So long as Rhode Island has title to the land, the federal government cannot tell Rhode Island who may use that land without confiscating the ownership of that land."

---

[31] Because issues of "ownership" are not implicated by Weaver's Cove's requested relief under both the Dormant Commerce Clause and FERC's preemptive authority, the CRMC's extended discussion of Rhode Island property law is entirely immaterial to the issues before this Court.  *See* CRMC Memo. 78-81.

The breadth of CRMC's doctrinal assertion is not matched by the depth of the CRMC's legal analysis on the point: the CRMC cites not a single case to support its broad proposition. Specifically, the CRMC cites no case law holding that federal law preempting the states from undertaking state regulation of a interstate commerce exempts state regulation of activities that affect state property.

Indeed, the CRMC's theory — that state regulation of public trust land is immune from limitation by federal law other than two CRMC-identified exceptions — is directly contradicted by the Dormant Commerce Clause cases cited above, such as *West v. Kansas Natural Gas Co.*, wherein the Court held that the superior power of the Dormant Commerce Clause precluded the state from preventing the laying of a pipeline, despite the fact that the pipeline would directly affect state public-trust property.

With respect to the latter distinction noted above – specifically the CRMC's theory of "regulatory interests" as differing from "proprietary interests" – it is clear that the CRMC's so-called "proprietary interests" are nothing more than "interests in regulating the use of state land." But, again, CRMC cites no case law to support its theory that such regulations are categorically immune from preemption, and such a theory is disproved by *West v. Kansas Natural Gas Co.* and the other Dormant Commerce Clause cases.

  **b.**  *Category B Assent Merely Regulates <u>Use</u> Of Submerged Lands Held By The State In The Public Trust*

  The CRMC's argument that Category B Assent is immune from Natural Gas Act preemption is premised on its assertion that preemption of state regulation of the use of submerged public-trust lands cannot "override state ownership." *See, e.g.*, CRMC Memo. 49. But the CRMC's argument is a red herring, because the CRMC's Category B Assent powers in no way affect Rhode Island's *ownership* of submerged lands. Category B Assent pertains only to the *use* of state-owned land.

  Contrary to the CRMC's broad invocations of "ownership interests" in this case, the limited nature of Category B Assent is plain on the face of the CRMC's Answer to the Amended Complaint. In that Answer, the CRMC stated that "Category B Assent is, *inter alia*, a form of State license to use State-owned real estate, namely State-owned submerged lands," Ans. to Am. Compl. ¶ 159 (Doc. 12) (emphasis added), and that "Weaver's Cove must apply under purely state law, to the CRMC, for a license to *use* state land separate and apart from any Federal determination requirements," *id.* ¶ 162 (emphasis added). Simply put, nowhere does the CRMC's Answer (or the CRMC's memorandum of law) demonstrate that when the CRMC grants a Category B Assent, it *conveys ownership* of the land to the party securing the Assent.

  Looking past the face of the Answer, the CRMC's organic statutes demonstrate Category B Assent cannot credibly be construed as conveying

ownership of submerged lands to the applicant.  The CRMC does not have the power to convey such ownership:

> Permits, licenses, or easements which are issued by the council for the filling of the submerged or submersible lands of the state of Rhode Island remain subject to the public trust, and *no title is conveyed by such documents*. All such permits, licenses, and easements shall clearly state that no title is being conveyed.  . . . If an application is granted, said permit, license and easement may be subject to revocation and/or modification for failure to comply with the conditions and stipulations under which the same was issued or for other good cause.

R.I. Gen. L. § 46-23-16 (emphasis added).

In short, the CRMC's act of granting a Category B Assent to a dredging project does not affect Rhode Island's title to the submerged land.  Thus, it necessarily follows that preemption of Category B Assents for dredging likewise does not affect submerged-lands ownership:  If, on the one hand, Weaver's Cove were to dredge pursuant to a Category B Assent, it would not own the submerged lands; if, on the other hand, Weaver's Cove were to dredge absent a Category B Assent (but instead pursuant to FERC's preemption of that assent or the Dormant Commerce Clause's nullification of that assent), Weaver's Cove still would not own the submerged lands.  Given that the ownership of the submerged lands does not change in either scenario, the CRMC has no basis to claim that FERC's preemption of Category B Assent "overrides" Rhode Island's "ownership" of the land.

In sum, the undertaking of dredging activities in the federal navigational channel does not affect Rhode Island's title to those lands. The CRMC's allusion to the "overriding of state ownership" is merely a red herring. Weaver's Cove's preemption claims involve nothing more than preemption of the CRMC's Category B Assent regulations on the use of submerged lands, based on FERC's "exclusive authority" over the operation of LNG terminals, 15 U.S.C. § 717b(e)(1). That "exclusive authority" preempts the CRMC's authority under the state's Category B Assent requirements. *See* Am. Compl. ¶¶ 102-106.

### c.   *FERC Has Held That Its Preemptive Authority Wholly Defeats A State's Public Trust Powers*

As demonstrated in the preceding subsection, this is a simple issue when distilled to its essence: Category B Assent regulates the use of submerged lands, and FERC's authority under Section 3 of the Natural Gas Act preempts such regulation.

To the extent that there could remain any doubt that FERC's preemptive authority categorically preempts state regulation of land use regardless of whether the state labels its regulations as pertaining to "public trust doctrine," such doubt is erased by the fact that FERC already has held that its preemptive authority trumps state regulation of land use under the public trust doctrine.

**i.**   The issue of whether FERC's preemptive authority supersedes a state's public trust powers arose in *Puget Sound Energy, Inc.*, 110 FERC ¶ 61,200

(2005).   There, FERC issued a new license for the continued operation and maintenance of a hydroelectric power project on the Snoqualmie River pursuant to the Federal Power Act, a statutory framework that, like the Natural Gas Act, preempts contrary state law.[32]   Among the project's critics, an Indian tribe claimed that the project license was inconsistent with "Washington State's public trust doctrine."   *Id.* at 61,748.   The tribe asserted the same type of "property rights" argument asserted by the CRMC here:

> The public trust doctrine, which has always existed in Washington state, reserves a public property interest . . . in tidelands and the waters flowing over them . . . .   By allowing Puget Sound Energy to proceed with activities authorized under the new license, [FERC] is acting contrary to the public trust doctrine.   The Snoqualmie River is burdened by the public trust doctrine and is extensively used for fishing and general recreation and by the Snoqualmie Tribe.   . . . [FERC] cannot ignore the rights afforded under the public trust doctrine.

Request for Rehearing and Request for Stay, *Puget Sound Energy, Inc.*, FERC Docket No. P-2493-006, pp. 42-43 (filed July 29, 2004).

FERC squarely disagreed, and held that "we act under the [Federal Power Act], which preempts state law, so that any obligations that may be imposed by Washington law on Washington entities do not apply to our issuance of a license." 110 FERC at 61,748 (emphasis added).   In other words, FERC held that its

---

[32] *See Iroquois Gas Transmission Sys., L.P.*, 53 FERC ¶ 61,194, at 61,765 & n.228 (1990) ("There are numerous cases affirming the exclusive character of the [FERC] where it applies, both under the NGA [(Natural Gas Act)] and under analogous provisions of the Federal Power Act.") (collecting cases).

regulatory authority under the Federal Power Act preempted Washington State's authority under the public trust doctrine *en toto*, thereby preventing Washington State's power under the public trust doctrine from limiting in any way the efficacy of FERC's order.

The CRMC's view of its public-trust-doctrine powers is squarely at odds with FERC's characterization of the scope of its preemptive authority.  According to the CRMC, FERC's preemptive authority does not defeat the state's power to regulate the use of public trust lands.  *See*, *e.g.*, CRMC Memo. at 45-49.  The CRMC cites no controlling legal authority for that proposition.  By contrast, FERC squarely has held that a state's public trust powers are wholly defeated by FERC's preemptive authority.[33]

**ii.**    Weaver's Cove notes that FERC's decision in *Puget Sound* is particularly relevant to this case in light of the CRMC's attempt to cite the Federal Power Act (in contrast with the Natural Gas Act) as distinguishing "non-proprietary state police power regulations" (which, the CRMC concedes, are subject to preemption) from "proprietary rights" (which, the CRMC asserts, are "exempt from preemption").  *See* CRMC Memo. 75-77.  If the CRMC's premise (*i.e.*, "proprietary" powers are non-preemptable) holds, and given that in *Puget*

---

[33] As with the NGA, FERC's orders interpreting the Federal Power Act receive *Chevron* deference.  *See*, *e.g.*, *Knott v. FERC*, 386 F.3d 368, 372 (1st Cir. 2004).

*Sound* the state's public trust powers were preempted, then it necessarily follows that public trust powers are not "proprietary."

**iii.**    Setting aside the logical implications of CRMC's Federal Power Act argument in light of *Puget Sound*, there is no rational basis for taking the CRMC's description of the Federal Power Act at face value.    In fact, the CRMC mischaracterizes the case law it cites as purportedly supporting non-preemptable public-trust doctrine "property rights."

The CRMC's discussion of the Federal Power Act focuses on a Supreme Court case that recognized that Section 27 of the Federal Power Act removes from FERC's preemptive authority "the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein." *First Iowa Hydro-Electric Coop. v. FPC*, 328 U.S. 152, 175-76 (1946) (quoting 15 U.S.C. § 821).

The CRMC mischaracterizes *First Iowa Hydro*.  CRMC Memo. 76-77.  That decision does not stand for the proposition that state public trust powers are categorically exempt from FERC's preemptive authority.   In fact, *First Iowa Hydro* stands for precisely the *opposite* proposition, such that *First Iowa Hydro* was the very case cited by FERC in *Puget Sound* as justifying FERC's preemption of Washington State's public trust doctrine powers.  *See Puget Sound*, 110 FERC at 61,748 n.41.  FERC expressly concluded that the state's public trust powers

82

were not preemption-exempt "proprietary rights" for the purposes of Section 27 of the Federal Power Act.  FERC held instead that a state's public trust powers are wholly subject to preemption by FERC's statutory authority.

Similarly, the CRMC errs in its apparent assertion that the Supreme Court has categorically saved from preemption state regulations that "neither reflect nor establish 'proprietary rights.'"  CRMC Memo. 61-63 (citing *California v. FERC*, 495 U.S. 490, 498 (1990)) (emphasis omitted).  In *California*, the Court merely held that because the state regulations at issue did not involve "proprietary rights," those regulations were preempted by the Federal Power Act because they did not fit within the Federal Power Act's *express exception* for "propriety rights" with respect to preemption.  *See California*, 495 U.S. at 497 (quoting 16 U.S.C. § 821).  The Natural Gas Act provision having preemptive effect, 15 U.S.C. § 717b(e)(1), includes no such express exception for "proprietary rights," and thus it does not offer the protections invoked by the CRMC by reference to the Federal Power Act..

> **d.   *The Cases Cited By CRMC Do Not Demonstrate That "Ownership Interests" Escape Preemption***

In attempting to draw a purported distinction between "governmental regulation" and "governmental ownership of a property interest," CRMC Memo. 58 (emphasis omitted), the CRMC relies on the case of *Kaiser-Aetna v. U.S.*, 444 U.S. 164 (1979).  CRMC's reliance on that case is misplaced.  There, the Court observed that the mere fact that Congress regulates a segment of navigable waters

under the Commerce Clause does not by itself implicate the Federal Navigational Servitude so as to limit the public's right of access or the federal government's liability for just compensation damages under the Takings Clause. *See id.* at 170-172. Contrary to the CRMC's description of that case, nowhere did the Court draw a bright line between "regulatory interests" and "proprietary interests," nor did it hold that Congress could not enact regulatory legislation that limits a state's power to control the use of state-owned land.

Nevertheless, from *Kaiser-Aetna*'s "navigable waters"/"federal navigation servitude" distinction, the CRMC leaps to its apparent conclusion that no federal laws enacted under the Commerce Clause can have a practical effect comparable to that of the federal navigation servitude, unless the federal government actually authorizes the taking of title to land via eminent domain. CRMC Memo. 50-77. The CRMC's novel position seems to be that because this present controversy does not involve eminent domain or the federal navigational servitude, there is no federal limitation on Rhode Island's use of submerged lands held in the public trust. Again, CRMC's position is fundamentally wrong.

*Kaiser-Aetna*'s distinction between a finding of navigability for the purposes of Commerce Clause legislation on the one hand, and imposition of the federal navigation servitude for the purposes of public access on the other, does not answer the question before the Court in this case: namely, whether FERC's

"exclusive authority" to regulate the operation of LNG terminals displaces Rhode Island's power to control the use of submerged lands with respect dredging necessary to the operation of LNG terminals.

Also, the CRMC quotes at length *California v. United States*, 438 U.S. 645 (1977), for the proposition that "except where the reserved rights or navigation servitude of the United States are invoked, the State has total authority over internal waters." *See* CRMC Memo. 62 (emphasis omitted) (quoting *California*, 438 U.S. at 662). The CRMC fails to apprise the Court that those lines (which were themselves merely the *California* Court's quote from an 1899 case) pertained not to the states' powers over *interstate* waterways (which is the issue before this Court), but to the states' "authority over *intrastate* waterways." 438 U.S. at 662 (emphasis added). That difference cuts to the very core of this case, given that Weaver's Cove's entire challenge to Category B Assent is premised on federal government's superior authority over *interstate* commerce.

Furthermore, in both *California v. United States* and the other CRMC-cited case, *Kansas v. Colorado*, 206 U.S. 46 (1907), the cases pertained to federal and state governments' respective claims to ownership of the water itself; they did not pertain to the federal government's superior power to regulate interstate commerce on these waters pursuant to its authority under the Commerce Clause. Those cases are inapposite: to say that Rhode Island owns water within its state borders is not to

say that Rhode Island can ignore the federal government's regulation of interstate commerce on those waters, including federal law that granted FERC the "exclusive authority" to approve operation of an LNG terminal along an interstate waterway.

### 3. The Federal Limitations On Category B Assent Are Not Limited To The Federal Navigation Servitude And The Natural Gas Act's Eminent Domain Provision

**a.** The CRMC's position appears to be that its undefined "proprietary interests" can be superseded by two and only two sources of federal power: namely, the federal navigation servitude and the FERC's power of eminent domain under Section 7 of the Natural Gas Act. *See* CRMC Memo. 49-78 ("There Are Two Means By Which Congress Could Override State Ownership, But It Has Done Neither Here."). But that statement is squarely contradicted by the controlling case law, including some of the cases cited in the CRMC's own brief.

Far from holding that the federal navigation servitude and eminent domain are the only checks on state regulation of the use of state land, the Supreme Court has declared that the states' authority over the public trust lands beneath the navigable waters were subservient to both the federal navigation servitude and the federal government's powers under the Commerce Clause of the U.S. Constitution:

> It is the settled law of this country that the ownership of and dominion and sovereignty over lands covered by tide waters, within the limits of the several states, belong to the respective states within which they are found . . . *subject always* to the paramount right of congress to control their navigation so far as may be necessary for the regulation of commerce with foreign nations and among the states.

*Illinois Cent. R. Co. v. Illinois*, 146 U.S. 387, 435 (1892) (emphasis added); *see also Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 479 (1988) ("subject to the federal navigation easement and the power of Congress to control navigation on those streams under the Commerce Clause").

Thus, wherever Congress enacts legislation pertaining to the flow of interstate or international commerce on navigable waters – not merely in statutes providing for eminent domain – the states' otherwise applicable authority over such waterways or the lands underneath may stand as no impediment.[34]   This limitation on the state's power inheres in the state's public-trust "title" to submerged lands.  *Lewis Blue Point Oyster Cultivation Co. v. Briggs*, 229 U.S. 82, 88 (1913).

It is true that the eminent domain power included in Section 7 of the Natural Gas Act is one example of an exercise of the federal Commerce Clause power. But nowhere in the Natural Gas Act does Congress state that it is the *only* possible exercise of Commerce Clause power in the Natural Gas Act that limits state power to regulate land use.  The CRMC's assertion to the contrary merely begs the question before this Court — namely, whether the "exclusive authority" provision

_____

[34]  Of course, as demonstrated above, the Constitution's Dormant Commerce Clause itself prevents states from unconstitutionally burdening commerce even absent an express congressional enactment.  *See supra* pp. 53-61.

in Section 3 of the Natural Gas Act is yet *another* Commerce Clause statute that limits state public-trust powers.

**b.** As demonstrated above in *Illinois Central*, *Phillips*, and *Lewis Blue Point Oyster*, the Natural Gas Act's preemption (via FERC's Weaver's Cove orders) of Category B Assent does not take away from Rhode Island's property interests in the submerged lands held in public trust, because that ownership never included the right to contradict federal Commerce Clause enactments such as, in this case, the Natural Gas Act's grant of preemptive "exclusive authority" to FERC.

In sum, the CRMC can identify no authority for its position that Congress's power to preempt state public-trust powers over land use is limited to eminent domain and the federal navigation servitude. Instead, such preemptive federal power is found in any law enacted under the Commerce Clause that limits the states' authority to regulate land use. Section 3 of the Natural Gas Act, which protects FERC's "exclusive authority" to regulate the operation of LNG terminals, certainly fits within that category. And, as FERC demonstrated in *Puget Sound*, *supra*, its preemptive powers supersede the states' public trust powers over land use.

**C.    In Focusing On The Submerged Lands Act And The Federal Navigation Servitude, The CRMC Responds To Arguments Not Raised In This Case**

The CRMC argues at length that Weaver's Cove cannot successfully argue that Category B Assent requirements are preempted by the federal navigational servitude or the Submerged Lands Act.  *See* CRMC Memo. 55-77.  The CRMC's extended treatment of those issues is, at best, puzzling, because Weaver's Cove never has based its preemption claims on either of those two federal laws.

Oddly, the CRMC occasionally admits that Weaver's Cove never invoked such federal authorities as grounds for preemption in this case — but it ascribes Weaver's Cove's silence to a lack of candor.[35]  In the CRMC's extended detour from the claims actually made by Weaver's Cove, it accuses Weaver's Cove of "intellectual sleight-of-hand" and outright "falsehood."  *Id.* a 57.

Setting aside the CRMC's rhetoric, the simple fact is that Weaver's Cove has not invoked the federal navigation servitude or the Submerged Lands Act as preempting Category B Assent — not in the Complaint, Amended Complaint, or Memorandum of Law.  Thus, the Court can safely disregard in its entirety the

---

[35] *See*, *e.g.*, CRMC Memo. 57 ("Tellingly, however, Weaver's Cove never even forthrightly states . . .  that such a delegation [of the Federal Navigational Servitude, by Congress] has occurred.  Moreover, Weaver's Cove certainly never identifies a mechanism for the delegation."); *id.* at 64 ("Indeed, even Weaver's Cove makes no specific express claim to have the power to exercise the Federal Navigational Servitude."); *id.* at 60 ("Weaver's Cove's brief . . . casts a covetous glimpse at the power embodied in the 'federal navigation easement.'").

CRMC's arguments regarding the Submerged Lands Act and the federal navigation servitude.[36]

Indeed, Weaver's Cove could not have raised the CRMC-conjured Submerged Lands Act and federal navigational servitude delegation claims even if it had wanted to raise them.  According to the CRMC's own construction of those nonexistent claims, such arguments – namely, that the federal government could delegate servitudes to Weaver's Cove through federal dredging permits, *see* CRMC Memo. 64-65 — would not yet be ripe.  Weaver's Cove has not yet received a dredging permit from the USACE because, *inter alia*, the CRMC has failed to act on the consistency certification at issue in Counts I and II of the complaint and Part I of this memorandum of law.  Thus, the CRMC's manufactured claims could not be ripe (and are therefore extra-jurisdictional) until Weaver's Cove actually receives an Army Corps permit.  *See*, *e.g.*, *U.S. Telecomm. Ass'n v. FCC*, 359 F.3d 554, 594 (D.C. Cir. 2004) (holding unripe challenges to

---

[36] It may well be that the CRMC's rhetoric is based on confusion over issues in the current case with those raised by an altogether different LNG project in an altogether different case — namely, *KeySpan LNG, L.P. v. R.I. CRMC*, No. 05-091-S.  In fact, a quick comparison of the brief filed by the CRMC in this case and the CRMC's Memorandum in Support of Summary Judgment filed in the *KeySpan* case (on April 18, 2005) ("CRMC *KeySpan* Memo.") shows that the CRMC simply reproduced entire sections of its brief in the *KeySpan* case, with minimal or no modifications, into its brief in this case.  *Compare*, *e.g.*, CRMC Memo. 69-73 *with* CRMC *KeySpan* Memo. 17-22; *compare* CRMC Memo. 64-65 *with* CRMC *KeySpan* Memo. 22-23.

order that allegedly preempted state laws, on the ground that the agency had not yet issued an order that actually claimed to preempt state law).[37]   Thus, the CRMC's extended counter-arguments to claims not raised by Weaver's Cove is all the more inappropriate and specious.

In short, Weaver's Cove respectfully suggests that the Court evaluate only the claims actually raised by Weaver's Cove in the Amended Complaint, Motion for Summary Judgment, and Memoranda of Law, and not claims raised by other parties in other cases not now before this Court.  Weaver's Cove has not and does not take a position on the merits of the CRMC's hypothetical claims, and will not do so unless and until such claims ripen.

For the reasons set forth in Weaver's Cove's previous memorandum of law and in this memorandum, Weaver's Cove respectfully requests summary judgment in its favor on Counts III and V of the Amended Complaint.

## III.   Summary Judgment Is Appropriate On Weaver's Cove's Motion, Because There Is No Genuine Issue Of Material Fact

As noted in Part II.A, *supra*, summary judgment is manifestly appropriate on Counts IV and V of the Amended Complaint (Dormant Commerce Clause),

---

[37] The CRMC itself appears to agree that the claims could not be ripe until the federal government actually conveys the federal navigational servitude.  Under the CRMC's characterization of the governing law, such a conveyance could only occur through a congressional enactment. *See*, *e.g.*, CRMC Memo. 65. Thus, under the CRMC's theory of a servitude-delegation claim, such delegation could not be recognized absent the unambiguous words of a statute or by the USACE's reasonable interpretation of a statute.  Such a claim would not now be ripe.

because the CRMC disputed neither the law nor the facts set forth in Weaver's Cove's motion for summary judgment and supporting documents.

With respect to Weaver's Cove's CZMA-related claims (Counts I and II of the Amended Complaint), summary judgment also is appropriate.  Weaver's Cove raises only pure questions of law — namely, what constitutes "necessary data and information," as defined by the controlling NOAA regulations and the NOAA-approved Rhode Island CRMP, and whether the CRMC received all "necessary data and information" from Weaver's Cove such that the CRMC's six-month opportunity to conduct a consistency review commenced and concluded, rendering the CRMC's concurrence with the consistency certification "conclusively presumed" under 16 U.S.C. § 1456(c)(3)(A).

And with respect to Weaver's Cove's preemption claims (Counts III and V of the Amended Complaint), summary judgment also is appropriate.  Whether federal law preempts state law is a pure question of law.  *See*, *e.g.*, *Global Naps, Inc. v. Verizon N.E., Inc.*, 444 F.3d 59, 69 (1st Cir. 2006).

No genuine issue of material fact exists with respect to Weaver's Cove's motion for summary judgment, as reflected in the papers submitted by the parties on Weaver's Cove's motion for summary judgment.  Factual disputes contained in the papers and declarations submitted in this case are not material to the legal issues on which Weaver's Cove has requested relief pursuant to its Amended

Complaint, Motion for Summary Judgment, or memoranda of law in support thereof.[38]

## CONCLUSION

For the reasons set forth in this memorandum, therefore, Weaver's Cove respectfully prays this Court (1) to declare the CRMC's concurrence with Weaver's Cove's consistency certification to be conclusively presumed as a matter of law, (2) to declare that the CRMC's threatened imposition of a "veto" of the proposed dredging pursuant to the Public Trust Doctrine, through application of Category B Assent requirements on Weaver's Cove, violates the Dormant Commerce Clause of the U.S. Constitution and/or is preempted by Section 3 of the Natural Gas Act, and (3) to enjoin Defendants from taking any actions inconsistent with such declarations.

---

[38] As noted in footnote 1, *supra*, Weaver's Cove has filed factual documents correcting erroneous or unsupported factual claims filed by the CRMC.  Although those factual disputes are not material to the issues raised in Weaver's Cove's Amended Complaint, Motion for Summary Judgment, or memoranda of law filed in support thereof, Weaver's Cove submits its factual materials in order to make clear that it does not concede the accuracy of the CRMC's factual assertions.

Respectfully submitted,

/s/ Gregory L. Benik
Gregory L. Benik (#1515)
Benik & Associates P.C.
931 Jefferson Blvd., Suite 2008
Warwick, RI  02886
(phone) 401-454-0054
(fax) 401-732-5054
gbenik@jreri.com

*Attorney for Weaver's Cove Energy, LLC*

Dated: February 8, 2008

Of Counsel:

Bruce F. Kiely
G. Mark Cook
Adam J. White
Jessica A. Fore
Emil J. Barth
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004-2400
Phone:  (202) 639-7700
Fax:  (202) 639-7890

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of February, 2008, the foregoing was
filed electronically with the Clerk of Court and served upon the following by
operation of the Court's electronic filing system:

Brian A. Goldman, goldlaw@cox.net
Michael Rubin, mrubin@riag.ri.gov
Paul J. Roberti, proberti@riag.ri.gov

.

/s/ Gregory L. Benik

94