IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| WEAVER'S COVE ENERGY, LLC,<br><br>*Plaintiff*,<br><br>vs.<br><br>RHODE ISLAND COASTAL RESOURCES MANAGEMENT COUNCIL, *et al.*,<br><br>*Defendants*. | Case No. 07-246-S |

**WEAVER'S COVE'S STATEMENT OF DISPUTED FACTS**
**IN RESPONSE TO STATE'S STATEMENT OF UNDISPUTED FACTS**

In support of its Objection to Defendants' ("CRMC's") Motion for Summary Judgment, and in accordance with Rule 56 of the Federal Rules of Civil Procedure and Local Rule Cv 56(a)(4), Plaintiff Weaver's Cove Energy, LLC ("Weaver's Cove") hereby submits its Statement of Disputed Facts in response to the CRMC's Statement of Undisputed Facts ("CRMC SUF").

**1.** Disputed insofar as the document quoted, with attachments referenced therein, speaks for itself. Because the JA includes only a portion of the filed document, Weaver's Cove attaches the entire "CRMC Application" hereto as Exhibit A.

*Further disputed* insofar as the CRMC-SUF-quoted document is characterized as endorsing the CRMC's legal position that the CRMC had jurisdiction to review non-Rhode-Island disposal sites pursuant to its jurisdiction under the Coastal Zone Management Act, 16 U.S.C. §§ 1451 *et seq*. ("CZMA"). In fact, the quoted document repeatedly reflected Weaver's Cove's position that the CRMC does not have jurisdiction over the disposal of dredge material outside of the Rhode Island territory identified by Rhode Island's Coastal Resources Management Program. *See* Exh. A (CRMC Federal Consistency Determination Application), at Attachment A, p. 18 ("The Project will not include disposal of dredged materials in the State of Rhode Island, and there [the CRMC's stated requirement regarding dredge disposal] does not apply.").

**2.** Disputed insofar as the quoted document speaks for itself.

**3.** Disputed insofar as the quoted document speaks for itself.

*Further disputed* to the extent that the CRMC SUF suggests that Weaver's Cove had not identified ocean disposal as an alternative disposal plan prior to the events giving rise to the referenced Army Corps of Engineers notice: Weaver's Cove had identified ocean disposal as an alternative at least as early as December 2003, when it published a "Dredging Program" which identified ocean disposal as an alternative plan (JA Tab 2 at 56) and stated that "[a] number of these disposal alternatives remain under consideration by Weaver's Cove," and that "Weaver's Cove may choose to supplement the Proposed Action accordingly" (*id.* at 55).

**4.** Disputed insofar as the quoted document speaks for itself.

**5.** Disputed insofar as the quoted document speaks for itself.

*Further disputed*, because the CRMC identifies no evidentiary basis for its factual assertion that "[i]t has become clear that (although never stated on the record before the CRMC) upland disposal is cancelled and in-water disposal is sought.

**6.** Disputed. The calculations contained in the CRMC SUF are premised upon the analysis contained in the Affidavit of Danni Goulet, which itself relies on unfounded assumptions. *See* Declaration of Ted Gehrig at ¶¶ 6 - 23 (filed Feb. 8, 2008).

**7.** Disputed insofar as the CRMC SUF's use of the term "proposal" is intended to suggest that Weaver's Cove's application before the CRMC application guaranteed a specific number of LNG tanker transits, or that the CRMC's review of Weave's Cove's applications under the CZMA or Rhode Island's Category B Assent program gave the CRMC jurisdiction to approve or disapprove LNG tanker transits.

**8.** Disputed for the reasons set forth in Paragraph 7.

**9.** Disputed insofar as that federal legislative enactment speaks for itself.

**10.** Disputed insofar as that federal legislative enactment speaks for itself.

**11.** Disputed insofar as the document speaks for itself.

**12.** Disputed insofar as the document speaks for itself.

*Further disputed* on the grounds that, contrary to the CRMC SUF's assertion, the two-page document found at JA Tab 40 does not include any pages numbered 19-20, 24, 26, or 28.

*Further disputed* insofar as the document at JA Tab 40 does not state that Weaver's Cove proposed to "double the annual round trips to a minimum of 120."

*Further disputed* to the extent that the CRMC SUF intends to reference the "Change of Information" filed by Weaver's Cove at the U.S. Coast Guard on February 2, 2006: The CRMC SUF suggests that Weaver's Cove's revised proposal to the Coast Guard "would now double the annual round trips to *a minimum of 120*." CRMC SUF ¶ 12 (emphasis added). In fact, the February 2, 2006 document filed by Weaver's Cove at the Coast Guard stated that "[i]t is anticipated that one vessel will arrive about every three days giving *an average of about 120 deliveries per annum*." *See* Change of Information (2/2/2006) at Attachment 1, page 1 (emphasis added) (excerpts attached as Exh. B hereto). The "minimum" number of deliveries that could be made to the proposed Weaver's Cove LNG terminal in a given year is zero.

**13.** Disputed insofar as the quoted document speaks for itself.

*Further disputed* on the grounds the CRMC SDF references as Exhibit F a letter dated Oct. 4, 2007 from the "District Director." In fact, Exhibit F to the CRMC's Motion for Summary Judgment is a December 7, 2007 letter from the

Commanding Officer of the U.S. Coast Guard, for Sector Southeastern New England.

*Further disputed* to the extent that the CRMC SUF suggests that the document filed by Weaver's Cove on August 17, 2007 (to which the Coast Guard's October 4, 2007 letter responded) requested no relief other than "to have the Coast Guard declare the old bridge an obstruction and slate it for demolition": in fact, Weaver's Cove requested that the Coast Guard

> (1) initiate a "Detailed Investigation" under 33 C.F.R. Part 116 of the obstruction to navigation posed by the old Bridge and, (2) after appropriate hearings, issue an order to *modify* the old Bridge sufficient to render navigation through or under the old Bridge and between the old and new Bridges "reasonably free, easy, and unobstructed." 33 C.F.R. § 116.01(e).

Weaver's Cove Letter to Mr. Nick Mpras, at 2 (Aug. 17, 2007) (emphasis added) (Exh. C, attached hereto).

**14.** Disputed insofar as the SUF suggests that The Commanding Officer of the U.S. Coast Guard for the Southeast New England Sector possess unreviewable "jurisdiction . . . to determine whether to allow the proposed transit of LNG vessels to Weaver's Cove's proposed terminal location." Under the regulations set forth at 33 C.F.R. part 127, initial authority to issue a "Letter of Recommendation" ("LOR") is vested in the Commanding Officer of the U.S. Coast Guard for Sector Southeastern New England (a/k/a the "Captain of the Port, Southeastern New England") (hereinafter "COTP"). As set forth at 33 C.F.R. Part

127, the COTP's LOR decision is subject to appeal to the District Commander (33 C.F.R. § 127.015(b)), and then to the Assistant Commandant for Prevention (33 C.F.R. § 127.015(c)). The decision of the Assistant Commandant for Prevention is final agency action susceptible to judicial review in U.S. District Court (33 C.F.R. § 127.015(d)).

**15.** Disputed insofar as the document speaks for itself.

**16.** Disputed insofar as the document speaks for itself.

**17.** Disputed to the extent that the CRMC SUF or the Fugate Affidavit referenced therein imply that Weaver's Cove had a duty or obligation to "directly apprise[] the CRMC of any of these developments."

*Further disputed* on the grounds that Paragraph 4 of the Fugate Affidavit, cited by CRMC SUF ¶ 17, does not actually pertain to the subject matter described in the CRMC SUF ¶ 17.

**18.** Disputed to the extent that the terms of 33 C.F.R. § 165.121 speak for themselves.

*Further disputed* on the grounds that "extensive security protocols" are undefined terms of no specific legal meaning with respect to the referenced federal regulation.

**19.** Disputed to the extent that the requirements of the "Federal regulations" referenced by the CRMC SUF speak for themselves.

**20.** Disputed: To the best of Weaver's Cove's understanding upon review of the cited document, the cited document does not state that "[t]he irregular and unannounced schedule of LNG tanker transits, together with delays of boating associated with passage of LNG tanker security zones, may directly impact Newport's ability to retain major regattas and events . . . ."

Weaver's Cove notes that Paragraph 20 of the CRMC SUF does not comply with the terms of Local Rule Cv 56(a)(2), which requires that the CRMC SUF "includ[e] the page and line number of any document to which reference is made"; the CRMC SUF's deficiency with respect to such a voluminous document hampers Weaver's Cove's ability to specifically respond to the factual statement made at Paragraph 20. Nevertheless, pages 23-24 of the referenced document (*i.e.*, the subsection entitled "Regattas and Sailing Events") nowhere state that the transit of Weaver's Cove LNG terminal-related tanker vessels "may directly impact Newport's ability to retain major regattas and events" (emphasis added). Those pages merely describe "local, national, and international competitive events [that] are held on the East Passage and Rhode Island Sound waters off Newport."

**21.** Disputed insofar as the document speaks for itself.

*Further disputed* insofar as the CRMC SUF suggests (by use of the term "would") that the referenced document identifies a legal obligation on the part of the Rhode Island Turnpike and Bridge Authority to "close the Newport/Pell Bridge

every singe time an LNG tanker passed under the bridge." The referenced document identifies controlling legal authority requiring such bridge closures.

*Further disputed* on the grounds that the referenced document does not support the CRMC SUF's statement. The CRMC SUF states that the bridge would close "every single time an LNG tanker passed under the bridge," but the referenced document merely states that the closure of the bridge would be "require[d]" by "the movement of tankers carrying *large amounts of*" LNG. *See* CRMC Memorandum of Law, Exh. L, at 3 (emphasis added) (Doc. 29). The CRMC nowhere cites evidence indicating that every LNG tanker ship (including those returning from the terminal after delivering LNG) would be carrying "large amounts of" LNG.

*Further disputed* on the grounds that the referenced document relies on the term "large amounts of LNG," which is not a defined term.

**22.** Disputed for the reasons set forth in Paragraph 21, above.

**23.** Disputed for the reasons set forth in Paragraph 22. The Janaros Affidavit, which bases its analysis on the document referenced in CRMC SUF ¶ 22, nowhere suggests that bridge closures would be necessitated by the return trips of empty LNG tanker vessels; instead, the Janaros Affidavit describes the referenced June 14, 2005 resolutions as "determin[ing]" that "the movement of tankers *carrying large amounts of LNG* under or in proximity to the bridges will

require the . . . [referenced bridges] to be closed to vehicular traffic . . . ." Janaros Affidavit ¶ 17 (emphasis added).

**24.** Disputed. The statement draws a legal conclusion: The term "necessary data and information" is defined by federal law at 15 C.F.R. § 930.58, and the question of whether Weaver's Cove has supplied the CRMC with all "necessary data and information" under 15 C.F.R. § 930.58 is a legal issue to be determined by this Court. *See* Weaver's Cove's Memorandum of Law in Support of its Motion for Summary Judgment at 15-26 (Doc. 16); State's Memorandum on Motions for Summary Judgment at 31-39 (Doc. 28).

*Further disputed* on the grounds of vagueness: The affidavit describes an alleged phone call, but fails to indicate the date on which (or even range of dates within which) the phone call occurred. To the best of Mr. Smith's knowledge and recollection, Mr. Goulet did not indicate to him by phone that Weaver's Cove's "papers lacked necessary data and information" to the extent that such "necessary data and information" included (as described in the referenced Goulet Affidavit at Paragraphs 23-24) "a Water Quality Certificate . . . from the Rhode Island Department of Environmental Management . . . as a prerequisite to CRMC review." *See* Affidavit of Lester Smith, ¶¶ 5-10 (filed Feb. 8, 2007).

**25.** Disputed for the reasons set forth in Paragraph 24, above.

**26.** Disputed for the reasons set forth in Paragraph 24, above.

**27.** Disputed. The statement draws a legal conclusion: The term "necessary data and information" is defined by federal law at 15 C.F.R. § 930.58, and the question of whether Weaver's Cove has supplied the CRMC with all "necessary data and information" under 15 C.F.R. § 930.58 is a legal issue to be determined by this Court. *See* Weaver's Cove's Memorandum of Law in Support of its Motion for Summary Judgment at 15-26 (Doc. 16); State's Memorandum on Motions for Summary Judgment at 31-39 (Doc. 28).

*Further disputed* to the extent that the CRMC SUF's statement that, "[t]he RIDEM sent us a copy of the WQC denial which would not allow us to issue an assent," is intended to constitute the legal conclusion that the CRMC could not proceed with a consistency review of dredging activities, prior to expiration of the six-month deadline set forth at 16 U.S.C. § 1456(c)(3)(A), absent a RIDEM-issued Water Quality Certificate.

Respectfully submitted,

/s/ Gregory L. Benik
Gregory L. Benik (#1515)
Benik & Associates P.C.
931 Jefferson Blvd., Suite 2008
Warwick, RI 02886
(phone) 401-454-0054
(fax) 401-732-5054
gbenik@jreri.com

*Attorney for Weaver's Cove Energy, LLC*

Dated: February 8, 2008

Of Counsel:

Bruce F. Kiely
G. Mark Cook
Adam J. White
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2400
Phone: (202) 639-7700
Fax: (202) 639-7890

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of February, 2008, the foregoing was filed electronically with the Clerk of Court and served upon the following by operation of the Court's electronic filing system:

Brian A. Goldman, goldlaw@cox.net

Michael Rubin, mrubin@riag.ri.gov

Paul J. Roberti, proberti@riag.ri.gov

/s/ Gregory L. Benik