**BAKER BOTTS** L.L.P.

THE WARNER
1299 PENNSYLVANIA AVE., NW
WASHINGTON, D.C.
20004-2400

TEL +1 202.639.7700
FAX +1 202.639.7890
www.bakerbotts.com

AUSTIN
BEIJING
DALLAS
DUBAI
HONG KONG
HOUSTON
LONDON
MOSCOW
NEW YORK
RIYADH
**WASHINGTON**

August 17, 2007

Bruce F. Kiely
TEL +1 202.639.7711
FAX +1 202.639.1035
bruce.kiely@bakerbotts.com

Mr. Nick Mpras, Chief
Office of Bridge Administration (CG-3PWB)
2100 Second Street, SW
Room 3500
Washington, DC 20593-0001

RE: Request for Initiation of a Detailed Investigation under 33 C.F.R. § 116.20

Dear Mr. Mpras:

Weaver's Cove Energy, LLC ("Weaver's Cove") hereby requests a Detailed Investigation be undertaken pursuant to 33 C.F.R. Part 116 of the unreasonable obstruction to navigation posed by the existing Brightman Street Bridge crossing the Taunton River in Fall River, Massachusetts. Weaver's Cove has proposed to construct and operate an LNG receiving terminal on the Taunton River in Fall River, Massachusetts. This proposal was found to be in the public interest and approved by the Federal Energy Regulatory Commission ("FERC") on July 15, 2005.[1] To facilitate the transportation of LNG from various international suppliers to the LNG receiving terminal, Weaver's Cove proposed the use of typical-sized LNG tankers with a beam of approximately 148 feet. Alternatively, the use of LNG tankers with a reduced beam of up to 85 feet has also been proposed.

Weaver's Cove submits that an unreasonable obstruction to navigation exists on the Federal Navigation Channel in the lower reaches of the Taunton River in Fall River, Massachusetts, specifically, caused by the existing Brightman Street Bridge crossing the Taunton River ("old Bridge") and exacerbated by the proximity of the new replacement Brightman Street Bridge that is presently under construction ("new Bridge"). Recent correspondence from the Captain of the Port ("COTP") Sector Southeastern New England to Weaver's Cove on May 9, 2007, enumerates numerous concerns that the COTP likewise has with this segment of the waterway as it relates to the operability of the old Bridge and the safe navigation through and between the two bridges.[2]

---

[1] *Weaver's Cove Energy, LLC*, 112 F.E.R.C. ¶ 61,070 (2005).

[2] Letter from Roy A. Nash, Captain, U.S. Coast Guard, to Gordon Shearer, Chief Executive Officer, Weaver's Cove Energy, LLC (May 9, 2007) ("May 9 Letter"). A copy of the May 9 Letter is attached as Exhibit A.

On April 6, 2006, the Commandant of the U.S. Coast Guard ("Coast Guard") authorized a "Preliminary Investigation" of the old Bridge.[3] Based on the results of the Coast Guard's Preliminary Investigation styled "Navigation Review,"[4] Weaver's Cove submits that good cause exists for the Coast Guard to: (1) initiate a "Detailed Investigation" under 33 C.F.R. Part 116 of the obstruction to navigation posed by the old Bridge and, (2) after appropriate hearings, issue an order to modify the old Bridge sufficient to render navigation through or under the old Bridge and between the old and new Bridges "reasonably free, easy, and unobstructed." 33 C.F.R. § 116.01(e).

In support of its request, Weaver's Cove states as follows:

## I. Introduction and Summary

### A. The Old Bridge Constitutes an Unreasonable Obstruction to Navigation

The old Bridge is a double-leaf bascule bridge constructed almost one hundred years ago that is designated U.S. Route 6 and Massachusetts Route 138 and spans the Taunton River between Fall River and Somerset, Massachusetts. The old Bridge has a 98 foot wide draw bridge opening that obstructs the transit in the Federal Navigation Channel of any vessel with a beam in excess of 98 feet. And, to exacerbate the old Bridge's interference with navigability, the center of the bascule opening is not centered on the Federal Navigation Channel but is offset to the western edge of the channel center.

The old Bridge has a long history of obstructing marine navigation.[5] For example, about twenty years ago, an Engineering Study prepared by the U.S. Department of

---

[3] Memorandum from Commandant (G-PWB), United States Coast Guard, to Commander, First Coast Guard District (dpb) (Apr. 6, 2006) ("Commandant Order"). See Commandant Order attached as Exhibit B.

[4] See Navigation Review, "Brightman Street Bridge Across the Taunton River, Mile 1.8 Between Fall River and Somerset, Massachusetts" (May 8, 2007). The Navigation Review was the result of a Preliminary Investigation undertaken pursuant to the Coast Guard's regulations at 33 C.F.R. Part 116. A copy of the Navigation Review is attached as Exhibit C. A letter from the Commander, First Coast Guard District (dpb), to Commandant (G-PWB), Coast Guard Headquarters, Washington, D.C. (Apr. 3, 2006) detailed several indicia of obstruction to navigation caused by the old Bridge and requested authority to begin the 33 C.F.R. Part 116 process regarding the old Bridge ("April 3 Request"). A copy of the April 3 Request is attached as Exhibit D. The Commandant Order authorized the Preliminary Investigation noting that "it appears that the subject bridge may constitute an unreasonable obstruction to navigation." Commandant Order attached as Exhibit B. The Preliminary Investigation is referenced in Notice of Proposed Rulemaking ("NOPR"): Regulated Navigation Area: Narragansett Bay, RI and Mount Hope Bay, MA, Including the Providence and Taunton Rivers, 71 Fed. Reg. 30108, 30109 (May 25, 2006). A copy of the NOPR is attached as Exhibit E.

[5] One of the earliest references to the obstructive nature of the old Bridge dates back to a report published by the United States Army Corps of Engineers in 1967. See "Fall River Harbor, Massachusetts and Rhode Island, Survey (Review of Reports)", Department of the Army, New England Division, Corps of Engineers Waltham, MA (Jan. 1967). This report concluded, among other things, that the opening of the old Bridge should be widened to 300 feet. The report is attached as Exhibit F.

Transportation ("USDOT")[6] described the old Bridge, and its interference with navigation, as follows:

> [The old Bridge is] a hazard and an impediment to shipping on the river. . . . Four features of the existing bridge create problems: 1) the narrow horizontal clearance of its drawspan opening; 2) the location of the opening on the side of the channel, rather than in the center of it; 3) the low vertical clearance through the drawspan; and 4) the capacity deficiency of the Routes 6/138 intersection in Somerset. (emphasis added).

The four hazards created by the old Bridge that were identified by the USDOT in its 1988 Engineering Study were highlighted again by the USDOT in 1989 in the Final Environmental Assessment ("USDOT FEA") prepared under the National Environmental Policy Act for the construction of the new Bridge.[7] The USDOT FEA was prepared in connection with a project begun by the owner of the old Bridge, the Massachusetts Highway Department ("MHD"), to replace the old Bridge with the new Bridge.

The USDOT was not alone in its view in the late 1980's that the old Bridge is obstructive to navigation. The Coast Guard concurred in the USDOT's 1988 assessment: In a letter from Gary Kassof, Supervising Bridge Management Specialist of the First Coast Guard District, to the Massachusetts Department of Public Works, the Coast Guard explained that "[t]he existing 98-foot clearance is known to be grossly inadequate for existing and potential navigation on the waterway."[8]

Then, in 1997, in connection with the issuance of a permit for the new Bridge to replace the old Bridge, the Coast Guard issued "Findings of Fact", which again highlighted the old Bridge's interference with navigation. The Findings of Fact noted that there had been "numerous complaints and allisions [that] have occurred at this [old] bridge owing to its minimal horizontal clearance, undesirable siting of channel opening on the wide side of the waterway,

---

[6] See "Replacement of the Brightman Street Bridge Route 6/138 Over The Taunton River, Fall River/ Somerset, Massachusetts, Engineering Study," U.S. Department of Transportation Federal Highways Administration and Commonwealth of Massachusetts Department of Public Works (1988) ("Engineering Study") at 4. A copy of the Engineering Study is attached as Exhibit G.

[7] "Replacement of the Brightman Street Bridge Route 6/138 Over the Taunton River Fall River / Somerset Massachusetts, Environmental Assessment (Revised)," USDOT Federal Highway Administration and Commonwealth of Massachusetts Department of Public Works (May 2, 1989) at 1. The USDOT FEA is included as Exhibit H.

[8] See letter from Gary Kassof, Supervising Bridge Management Specialist, First Coast Guard District, to Mr. Robert H. Johnson, Chief Engineer of the Massachusetts Department of Public Works (Dec. 19, 1988). A copy of the letter is attached as Exhibit I.

and absence of a fender system for several years on the east side of the channel opening."[9] In conclusion, the Coast Guard recommended that the old Bridge be removed within nine months of the opening of the new Bridge to traffic, and indeed conditioned its permitting of the new Bridge on the removal of the old Bridge.

In sum, for nearly twenty years, federal and state agencies have consistently considered the old Bridge to be an obstruction to navigation.

The construction of the new Bridge immediately upstream of the old Bridge has amplified this hazard to navigation. The short distance between the old and new Bridges and the offset channel arrangement associated with the two bridges (discussed below), when combined with the longstanding problems of the old Bridge's narrow opening located at the extreme western edge of the channel, creates an unreasonable obstruction to navigation for large commercial ships. The new Bridge sits approximately 1,500 feet upstream of the old Bridge, but the distance between the bridge protection structures and fenders associated with each bridge makes the separation between the bridge structures from a ship navigation perspective roughly 1,100 feet. In addition, the center line passageways for ships passing through the open bridge spans are offset by 100 feet (the Federal Navigation Channel in the vicinity of the bridges is 400 feet wide).

The restriction on the length and width of vessels able to transit the Taunton River because of the narrow span of the old Bridge, and the close proximity of the old Bridge in relation to the new Bridge, constitutes an unreasonable obstruction to navigation. This concern or issue was well known by the Coast Guard at the time the permits were issued for the new Bridge.[10] The impact, however, was believed to be temporary as the old Bridge was required to be torn down once the new Bridge was completed. Indeed, the impact to navigation of the bridge couplet was deemed to be so severe that the Coast Guard and the USACE explicitly conditioned the issuance of the permits for the construction of the new Bridge on removal of the old Bridge.[11] Subsequent political actions presently have rendered the question of the demolition

---

[9] "Findings of Fact for the Proposed Replacement of the Brightman Street Bridge over the Taunton River," First Coast Guard District, United States Coast Guard (Nov. 3, 1997) at 4. The Findings of Fact are included as Exhibit J.

[10] The transcripts of a public meeting held by the Coast Guard at Somerset High School for the proposed replacement of the old Bridge emphasize the navigational difficulties of the bridge couplet, albeit anticipated to be only temporary until the old Bridge was demolished. See Transcripts from the Public Meeting for the Proposed Replacement of the Brightman Street Bridge between Fall River and Somerset Bristol County, Massachusetts, United States Coast Guard, Sept. 1, 1994 ("Transcripts"). The meeting was held by the Coast Guard Commander, First Coast Guard District with Captain James Smith, Chief of Operations acting as meeting moderator. The Transcripts are attached as Exhibit K.

[11] A copy of the Coast Guard permit dated December 15, 1997 supporting construction of the new Bridge ("USCG Permit") is attached as Exhibit L. Condition 4 of the USCG Permit reads as follows:

of the unsafe old Bridge questionable, and the potential retention of the old Bridge coupled with the existence of the new Bridge has made what was earlier found to be an obstruction to navigation an even greater obstruction and hazard.

B. Efforts to Block Demolition of the Old Bridge

Long after the permits for construction of the new Bridge had been issued with the condition that the old Bridge be removed, Congress enacted legislation requiring the old Bridge to remain standing after the new Bridge is in place. In August 2005, Section 1948 of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), Pub. L. 109-59, prohibited the use of federal funds for the demolition of the old Bridge ("Section 1948"), and required its retention as a pedestrian walkway and bikeway, as well as an "emergency service route."[12] Section 1948, an eleventh hour amendment, was characterized to

---

> 4. All parts of the existing to be replaced bridge across the Taunton River, mile 1.8, not utilized in the new bridge shall be removed down to or below the natural bottom of the waterway, except that all parts of the bridge 200 feet on either side of the centerline of the channel shall be removed down to or below an elevation of 40 feet below Mean Low Water and the waterway cleared to the satisfaction of the District Commander. A period of 270 days subsequent to the opening of traffic on the new bridge, mile 2.1, will be allowed for such removal and clearance. Should the permittee decide to retain the west abutment or any portions of the bridge, for any reason, the permittee must first obtain permission from the U.S. Army Corps of Engineers, or any other authority having cognizance over structures other than bridges in navigable waters of the United States.

The "west abutment" is one of the bridge approach structures and is well outside the navigation channel.

Similarly, Special Condition 7 of the USACE permit dated May 22, 1998 supporting construction of the new Bridge ("USACE permit") reads as follows:

> 7. Dredging @ Existing Bridge Site
> In order to assure that the Federal navigation project in the Taunton River can be adequately maintained and that the purpose of the project is not compromised, the following shall be accomplished:
>
> > a. Existing bridge piers # 2, 3 & 4 shall be removed to an elevation at least 40' below mean low water (MLW) . . .

Piers 2, 3, and 4 are the old Bridge piers that fall in the footprint of the 400 foot wide channel that would exist if the old Bridge were removed. Forty feet was the authorized depth of the federal navigation channel at the time the permit was issued (the current authorized depth is 35 feet). A copy of the USACE permit is included as Exhibit M.

[12] Pub. L. 109-59 § 1948, 119 Stat. 1143, 1514. Section 1948 provides:

> Notwithstanding any Federal law, regulation, or policy to the contrary, no Federal funds shall be obligated or expended for the demolition of the existing Brightman Street Bridge connecting Fall River and Somerset, Massachusetts, and the existing Brightman Street Bridge shall be maintained for pedestrian and bicycle access, and as an emergency service route.

the press by its sponsor as designed to create a permanent navigational obstacle to standard-size LNG tankers transiting the Taunton River from Narragansett Bay to the LNG terminal.[13]

C. Section 1948 Did Not Eliminate All Citizen Rights and Coast Guard Responsibilities as to Removal of Unreasonable Obstructions to Navigation

It long has been the law of the United States that unreasonable obstructions to navigation are proscribed. See Bridge Act of 1906, 33 U.S.C. § 494, Rivers and Harbors Appropriations Act of 1899, 33 U.S.C. § 502, and Truman-Hobbs Act, 33 U.S.C. § 513 (1940). The law also has been that such unreasonable obstructions to navigation must be removed, altered or modified to allow navigation to move "reasonably free, easy, and unobstructed." Id. The Coast Guard has promulgated regulations designed to administer the statutory provisions prohibiting unreasonable obstructions to navigation.[14] See 33 C.F.R. Part 116 ("Part 116 regulations"). The Part 116 regulations describe "the general procedures by which the U.S. Coast Guard determines a bridge to be an unreasonable obstruction to navigation and issues an Order to Alter" the obstruction. 33 C.F.R. § 116.01(b).

The Part 116 regulations provide:

> A bridge constructed across a navigable water of the United States shall not unreasonably obstruct the free navigation of the water over which it was constructed, either due to insufficient height or width of the navigation span, or because of difficulty in passing through the draw opening. If any bridge unreasonably obstructs navigation, the Commandant, U.S. Coast Guard, will order the alteration of that bridge. Alterations may include structural changes, replacement or removal of the bridge.

33 C.F.R. § 116.01(c) (emphasis added).

By mandating that the old Bridge remain in place despite the Coast Guard's determination that the old Bridge was required to be demolished, Section 1948 of SAFETEA-LU

---

[13] See Kathleen Durrand, "Brightman Plan Key in Fight," Herald News, Aug. 4, 2005. The article is attached as Exhibit N.

[14] Because the old Bridge is currently a publicly-owned highway bridge, the Truman-Hobbs Act arguably controls this request for an Order to Alter. However, Weaver's Cove understands that once the new Bridge is completed, the highway traffic from the old Bridge will be re-routed to the new Bridge and, pursuant to Section 1948, the old Bridge will only be used as a pedestrian walkway, bike path, and an emergency service route. Moreover, recent press reports indicate that the draw bridge portion, due to its dilapidated condition, will be left open and in an upright position. See Michael Holtzman, "Bridge activity ramps up", Herald News, Aug. 1, 2007, at A6, attached as Exhibit O. As a result, at the time an Order to Alter would be implemented, the old Bridge would not be functioning as a public highway bridge such that the Truman-Hobbs Act likely would not be applicable. Weaver's Cove therefore cites all relevant statutory authority herein with the understanding that the Part 116 regulations would be applicable regardless of which statute controls.

negates one of the remedies contained in the provisions of the Coast Guard's Part 116 regulations when a structure is found to be unreasonably obstructive to navigation, *i.e.* removal of the obstruction. Section 1948, however, does not remove a citizen's rights or the Coast Guard's responsibility to have unreasonable obstructions to navigation altered "to render navigation through or under it reasonably free, easy and unobstructed." 33 C.F.R. § 116.01(e). Nor does Section 1948 take away a citizen's rights and the Coast Guard's responsibilities to initiate and execute, respectively, the process under 33 C.F.R. Part 116 that can lead to an order requiring alterations ("Order to Alter") to the old Bridge to assure free, easy, and unobstructed navigation.

## II. The Coast Guard Preliminary Investigation Under Part 116 Is Complete

The Coast Guard recently conducted and completed the Preliminary Investigation of the old Bridge's effect on navigation under the Part 116 regulations styled as a "Navigation Review."[15] On April 3, 2006, the Commander of the First Coast Guard District recommended to the Commandant that "[g]iven the history of allisions and the obstructive nature of the [old] Bridge presently and in the future" an investigation of the old Bridge be conducted.[16] In response, on April 6, 2006, the Commandant authorized a "preliminary investigation" of the obstructive nature of the old Bridge as contemplated by Part 116.[17] On May 8, 2007, the Coast Guard issued its Preliminary Investigation Report, *i.e.* the Navigation Review.[18]

Pursuant to the Part 116 regulations, once the Preliminary Investigation is completed, the Coast Guard is obligated to consider whether a more detailed investigation ("Detailed Investigation") of the obstruction is warranted. 33 C.F.R. § 116.115(c). A few of the observations by the Coast Guard's experts in the Navigation Review confirm the need for undertaking a Detailed Investigation, the next step in the process leading to an Order to Alter:

1. Two structural factors make the old Bridge difficult to navigate. One is a narrow navigation span of only 98 feet of horizontal clearance. The second is the location of the bridge navigation opening along the extreme right descending edge of the channel which precludes vessels from using the center of the channel. These factors are exacerbated by the effects of wind. Id. at 4

2. "The adverse impacts to navigation caused by a 98 foot navigation span not aligned with the navigation channel were exacerbated by locating another bridge 1,500 feet upstream. The new bridge was designed to improve navigation as well as land traffic by aligning the navigation span with the channel and increasing the horizontal clearance to be more

---

[15] See n.4 supra.
[16] See April 3 Request attached as Exhibit D.
[17] See Commandant Order attached as Exhibit B.
[18] See the Navigation Review attached as Exhibit C.

consistent with the channel. Retaining the old Brightman Street Bridge not only nullifies the navigation improvements intended with the new bridge but makes navigation more difficult." Id. at 7 (emphasis added).

3. When the permit for the new bridge was issued, it was understood that the off-set of the navigation spans would "significantly add to the difficult bridge transit." However, the "hardship" of the off-set bridge spans was to be tolerated during construction of the new Bridge with the expectation that the waterway would be much improved when the old Bridge was removed. Id. at 6.

4. The "compounded bridge problems" associated with the bridge couplet include: (a) a 98 foot horizontal clearance in a waterway that otherwise provides a 400-foot navigation channel; (b) a navigation span that is toward the right descending side of the navigation channel; and (c) navigation spans within 1,500 feet of one another that are not aligned and require mariners to move laterally between the bridges. Id. at 6.

5. "Maximum intended waterway improvement will only be possible with removal of the old Brightman Street Bridge." Id. at 7.

## III. Request For Detailed Investigation

Based on the Coast Guard's findings in the Navigation Review,[19] and the uncontroverted evidence of the obstruction to navigation posed by the old Bridge, Weaver's Cove hereby requests that the Coast Guard now conduct the Detailed Investigation that is a prerequisite to the issuance of an Order to Alter. 33 C.F.R. § 116.20. Sections 494, 502, 513 of Title 33, and 33 C.F.R. §116, provide that if, after notice and hearing, the Coast Guard determines that a bridge is an unreasonable obstruction to navigation and alterations to the bridge are necessary to eliminate the obstruction to navigation, the Commandant is to issue an Order to Alter. In issuing an Order to Alter, the Commandant has authority to require the bridge owner to make structural changes, replace all or a portion of the bridge creating the obstruction, or remove the bridge. 33 C.F.R. §§ 116.01(c) and 116.01(e). An Order to Alter that does not require removal of the old Bridge would not conflict with Section 1948 of SAFETEA-LU.

---

[19] The Preliminary Investigation authorized by the Commandant, while styled a "Navigation Review" (See Exhibits B, C and D) is in substance a Preliminary Investigation Report under 33 C.F.R. § 116.15. Moreover, the need to proceed promptly under Part 116 is compelling as all the facts as to the old Bridge being an obstruction to navigation have been known since the 1980's, and have only become worse in the intervening 20 years. Any effort by any party to claim the "Navigation Review" is not a Preliminary Investigation would exalt form over substance, would be contrary to the Commandant's authorization and would be inconsistent with the Coast Guard's announcement in its NOPR: "part [116] describes the procedures by which the Coast Guard determines a bridge to be an unreasonable obstruction to navigation. Consequently, the Commander, First Guard District (dpb) forwarded a letter on April 3, 2006, to Commandant (G-PWB), Coast Guard Headquarters, Washington, DC, to begin the 33 CFR part 116 process regarding the Old Brightman Street Bridge." NOPR, 71 Fed. Reg. at 30109.

In support of its request, Weaver's Cove states as follows:

A. The Old Bridge is an Unreasonable Obstruction to Navigation

Section 4 of the Bridge Act of 1906, 33 U.S.C. § 494, Section 18 of the Rivers and Harbors Appropriations Act of 1899, 33 U.S.C. § 502, the Truman-Hobbs Act of 1940, as amended, 33 U.S.C. §§ 511-524, and the Coast Guard regulations at 33 C.F.R. § 116.01(c), together provide that a bridge constructed across a navigable water of the United States shall not unreasonably obstruct the free navigation of the water over which it was constructed. The criteria for determining an unreasonable obstruction are:

1. insufficient height of the navigation span,

2. insufficient width of the navigation span, or

3. difficulty in passing through the draw opening.

33 C.F.R. § 116.01(c). In the Final Environmental Assessment developed by the USDOT 18 years ago for the permitting of the new Bridge, the USDOT emphasized the problems with the old Bridge[20] which aptly demonstrate that the old Bridge meets the criteria for an unreasonable obstruction:

> Narrow horizontal clearance: The most dangerous of these features is the old Bridge's narrow draw span. With a clear width of only 98 feet (see Figure 1), the opening restricts the size of vessels that can pass. This forces upstream industries to use smaller, less economical vessels than would be possible with a wider opening (i.e., barges must be used instead of tankers).
>
> The narrow passageway is a hazard to those vessels, which are involved in the transport of fossil fuels to the Montaup Electric Company plant in Somerset and the Shell Oil Company/Algonquin SNG terminal in Fall River. Many of the barges and ships on the river squeeze through the bridge with only 10 to 15 feet to spare on either side, a very small safety margin for such large vessels (some more than 300 feet long). Frequent, destructive barge collisions with the bridge have demonstrated that it is a threat to navigational safety. Barges and their tugs have struck the span more than twenty times in the last five years, shortening its lifespan. In 1979 and again in 1981, the bridge was severely damaged by a colliding barge and had to be closed to auto traffic for several months of costly repairs. None of

---

[20] See USDOT FEA attached as Exhibit H.

these issues or navigational measures would exist if the old Bridge were altered to remove the obstruction to navigation.

Location of the opening: The difficulty of guiding a vessel through the small opening is magnified by the location of the opening on the side of the channel, rather than in the center of it. A vessel's wake and river current create forces that tend to hold it in the channel's center. When approaching the old Bridge a pilot must overcome these forces to guide the vessel to the west side of the channel and align it with the narrow opening (see Figure 2). This is particularly difficult for barges because they have no motor and must be guided by tug boats, and it is clearly a factor in their high rate of collisions with the bridge. None of these navigational maneuvers would be necessary if the old Bridge were altered to remove the obstruction.

Low vertical clearance: The third feature of the old Bridge that creates problems is the low vertical clearance it provides to boats and ships on the river (see Figure 1). When closed, the bridge is only 27 feet above mean high water (M.H.W.). As a result, the draw span must be raised frequently to allow the passage of vessels exceeding that height. In 1986 the old Bridge was opened 1,506 times, the most of any year in its history.

Similarly, the Massachusetts Southeastern Regional Planning and Economic Development District ("SRPEDD"), in its "Regional Transportation Plan 2000", identified the following problems with the old Bridge that are relevant to Weaver's Cove's request for a Detailed Investigation: "1) it is structurally deficient; 2) the narrow horizontal clearance of its draw span opening is only 98 feet; 3) the location of the opening is on the side of the channel, rather than in the center of it; [and] 4) the vertical clearance of the draw span is only 27 feet above mean high water."[21] Significant to the instant request, the SRPEDD Plan concludes that the old Bridge "is in desperate need of replacement".[22]

The very same problems with the old Bridge that were identified by the USDOT almost 20 years ago and by the SRPEDD more recently, were, as discussed above, also recognized by the Coast Guard in its preliminary investigation resulting in the Navigation Review. Each of these problems and obstructions to navigation will remain unless and until the old Bridge is altered to remove them.

---

[21] See SRPEDD, "Regional Transportation Plan 2000", attached as Exhibit P.

[22] Id. at 68.

B. A Recent Report by the Northeast Marine Pilots, Inc. Confirms the Old Bridge is an Obstruction To Navigation

A report received by Weaver's Cove from Northeast Marine Pilots, Inc._("Pilots Report") underscores the obstruction created by the narrow horizontal opening of the old Bridge to "reasonably free, easy and obstructed" marine use of the Federal Navigational Channel.[23] The Pilots Report:

- Indicates a reluctance to take vessels with a beam of 90 feet through the old Bridge. The maximum beam the pilots are transiting is 80 feet. (¶ 4b)

- Finds that the new and old Bridges do not line up and are "significantly in close proximity to each other." (¶ 4b)

- Finds that the fendering of the old Bridge has not been maintained properly for "the last twenty-five years." (¶ 4b)

- Identifies numerous costly requirements of specialized vessels and tugs in order to navigate safely between the old and new Bridges and through the old Bridge on a repeated basis.

C. Cost-Benefit Analysis

In conducting the Detailed Investigation of the obstruction to navigation posed by the old Bridge and determining whether to issue an Order to Alter, the Coast Guard should perform a Benefit/Cost Analysis in accordance with paragraph 2 of the Commandant Order authorizing a preliminary investigation of the old Bridge, and with 33 C.F.R. §§ 116.30(a)-(b). In particular, the Coast Guard should divide the "annualized navigation benefit of the proposed bridge alteration by the annualized government share of the cost of the alteration."[24] If the navigation benefit derived from the alteration equals or exceeds the cost of the alteration, the Coast Guard should issue an Order to Alter the old Bridge.[25] In the case of Weaver's Cove alone, the future navigation benefit from alteration of the old Bridge is estimated to be in excess

---

[23] See "Report on the Feasibility Study of the Proposed Weaver's Cove LNG Ship to transit from sea to the proposed LNG terminal in Fall River," Northeast Marine Pilots, Inc. attached as Exhibit Q.

[24] 33 C.F.R. § 116.30(b). Weaver's Cove notes that the proponents of retaining the old Bridge now indicate that they plan to keep the draw bridge open such that the old Bridge would cease being a publicly owned highway bridge. Hence, the Coast Guard will have no cost-sharing responsibility for altering the old Bridge. 33 C.F.R. § 116.01(e)(2) ("For all other bridges . . . [t]he bridge owner is responsible for the entire cost of the required alterations.")

[25] See Commandant Order attached as Exhibit B at ¶ 2; see also 33 C.F.R. § 116.30(c).

of $1 billion.[26] Hence, the benefits to navigation associated with the alteration of the old Bridge are significant.

D. Key Considerations Mandating Detailed Investigation

1. Relevant History: The relevant history as to (1) plans for removal of the old Bridge as a navigational obstruction once the new Bridge was completed, and (2) recent plans to retain the old Bridge in place once the new Bridge is completed, is significant for the Coast Guard's consideration of Weaver's Cove's request for a Detailed Investigation.

a. Since the 1960's, federal, state and local officials have recognized a need to replace the old Bridge and have recognized the obstructive nature of the bridge.[27]

b. On May 27, 1994, the MHD formally began the process for permitting the construction of the new Bridge as a replacement for the old Bridge. As gleaned from the USDOT FEA, the stated goals relevant to the replacement of the old Bridge were to:

- improve navigational safety (by widening the opening and centering the bridge in the Federal Navigation Channel);
- eliminate navigational hazards caused by the old Bridge by removing the old Bridge and dredging the Federal Navigation Channel sufficiently to maintain a 400-foot width and a 35-foot depth;[28]
- eliminate maintenance and reliability problems associated with the substantially deteriorated old Bridge;
- improve highway traffic by a wider roadway, improved approach roads and new draw bridge mechanism;

---

[26] Indeed, SRPEDD acknowledged that while the proposed Weaver's Cove project is consistent with regional land use goals and that "continued sea port industrial use of the [terminal] site is what was planned for when the U.S. Coast Guard required a 200 foot wide horizontal clearance of the bridge opening for the new Brightman Street Bridge, the old Bridge "has been shown to be a hazard to navigation" and would affect the ability of Weaver's Cove to ship product to the LNG terminal site in typical-sized LNG vessels. See Letter from Stephanie C. Smith, Executive Director, SRPEDD, to Ellen Roy Herzfelder, Secretary, Massachusetts Executive Office of Environmental Affairs (Aug. 7, 2003), attached as Exhibit R.

[27] See USDOT FEA attached as Exhibit H at 1.

[28] The new Bridge would also support any future effort to increase the channel depth to 40 feet.

- reduce substantially the number of draw bridge openings required by increasing the vertical clearance under the new Bridge when the bridge is in the closed position from 27 feet on the old Bridge to 60 feet on the new Bridge; and

- install a pedestrian and bicycle path on the new Bridge.[29]

c. In August of 1994, the Chairman of SRPEDD submitted a letter to the Coast Guard Bridge Branch stating:

- The most important safety issue before us is to eliminate the current 97 foot horizontal opening as expediently as possible. We have strong support for the proposed 150 foot opening, and a pledge from the Mass. Highway Department to prepare the final design for up to 200 feet if possible. There is no existing or projected demand for the 300 foot opening, so let us move ahead with the alternative that has full acceptance and addresses a critical safety and economic issue as soon as possible.[30]

SRPEDD reiterated this view on August 7, 2003 when first commenting in writing on the proposal by Weaver's Cove to build an LNG terminal. SRPEDD stated: "The existing Brightman Street Bridge has a horizontal clearance of only 98 feet and, with the opening at the side of the channel, has been shown to be a hazard to navigation."[31]

d. After much debate as to the width of the bascules of the new Bridge, on December 5, 1997, the MHD received a "Permit to Construct" from the Coast Guard.[32] This Coast Guard permit stipulated the timing for the removal of the old Bridge as follows: "A period of 270 days subsequent to the opening of traffic on the new bridge, mile 2.1, will be allowed for such removal and clearances." MHD also received a "Permit to Construct" from the

---

[29] See generally USDOT FEA attached as Exhibit H at 1-5.

[30] See letter from Constantine "Gus" Yankopoulos, Chairman of the Southeastern Regional Planning and Economic Development District to Gary Kassof, Acting Chief, Bridge Branch, First Coast Guard District (Aug. 31, 1994). The letter is attached as Exhibit S.

[31] A copy of the letter is attached as Exhibit R.
[32] A copy of the USCG Permit is attached as Exhibit L.

USACE on May 22, 1998.[33] On April 27, 2005, the USACE extended the time limit for completion of the work authorized by the May 22, 1998 permit, leaving all requirements unchanged. The Coast Guard also extended the time limit for completion of the construction work and revised several conditions in the permit on August 23, 2006, and took into account Section 1948 of SAFETEA-LU as follows:

> All parts of the existing to-be-replaced bridge across the Taunton River, not utilized in the new bridge shall be removed down to or below the natural bottom of the waterway…and the waterway cleared to the satisfaction of the District Commander. Such removal and clearance shall be accomplished as prescribed by the District Commander at any time there is no Federal law prohibiting the removal of the bridge. Should the permittee decide to retain the west abutment or any portions of the bridge, for any reason, the permittee must first obtain permission from the U. S. Army Corps of Engineers, New England Division, or any other authority having cognizance over structures other than bridges in navigable waters of the United States.[34]

The MHD put out for bid tasks related to replacement of the old Bridge and construction of the new Bridge. Five contracts have been awarded with work completed under four contracts, and work under the fifth and final contract has begun. Total expenditures on the bridge construction based on existing contracts now total over $270 million.[35] Federal and state agencies have consistently recognized that for the anticipated benefits to navigation of the new Bridge to be realized, the old Bridge must be modified so as not to continue an obstruction.

2. Concerns about the Structural Safety of the Old Bridge are Longstanding and Uncontroverted:[36] The old Bridge has a long history of having been declared unsafe and substandard by MHD and the Coast Guard:

[33] A copy of the USACE Permit is attached as Exhibit M.
[34] A copy of the Amendment to the USCG Permit is attached as Exhibit T.
[35] Michael Holtzman, "Bridge project set to resume," Herald News, May 31, 2007.
[36] A review of the Transcripts reveals that all parties, including U.S. Congressmen, support removal of the old Bridge. See generally Transcripts attached as Exhibit K.

a. The MHD, via a referral from the Coast Guard, rejected a request by an individual to keep a portion of the old Bridge in place to serve as a fishing pier after the new Bridge is completed.[37] The MHD stated:

> MassHighway does not consider this proposal advisable for a number of reasons. First, the existing structure is considered structurally deficient and has undergone substantial deterioration over its nearly one hundred year life. Saving one span would still require a significant amount of rehabilitation work to reverse this deterioration just to be able to preserve it.

b. A substantial repair effort for the old Bridge was undertaken in 1981. At that time, the MHD found that those repairs to the old Bridge would only be adequate for 10 to 15 years. During a September 1, 1994 Public Meeting, MHD stated: "It is quite possible that while we have a safe structure right now at the present time and it can be maintained for the five years, any further delay would necessitate this rehabilitation option. It is estimated that this could cost upwards of forty million dollars . . . ."[38]

3. Concerns about the Old Bridge being a Navigational Hazard are Longstanding and Uncontroverted:

a. During the deliberations from the 1960's through the 1990's as to the need for the new Bridge, evidence was submitted as to the number of allisions and collisions marine vessels had with the narrow bascules of the old Bridge, and the obstructive nature of the old Bridge was documented.

b. In 1989, the USDOT FEA identified the following three problems with the old Bridge, that are relevant here: 1) the narrow horizontal clearance of its draw span opening; 2) the location of the opening on the side of the channel, rather than in the center of it; and 3) the low vertical clearance through the draw span. Each problem identified 18 years ago remains today.

---

[37] Letter from Thomas F. Broderick, Massachusetts Highway Department, to Ronald R. Lassonde (Apr. 27, 2001) (rejecting the proposal to keep a portion of old Bridge in place as a fishing pier). A copy of the letter is attached as Exhibit U.

[38] See Transcripts attached as Exhibit K at 7.

4. The New Bridge Currently and when Completed Will Exacerbate the Fact that the Old Bridge is an Unreasonable Obstruction to Navigation: Since the old Bridge has been determined to be an unreasonable obstruction to navigation, it follows that the obstruction is exacerbated by leaving the old Bridge, as it currently is configured, in place after the new Bridge is completed.

   a. The obstructive nature of the old Bridge was determined by the Coast Guard over 10 years ago.[39]

   b. If the old Bridge remains in place, the completion of the new Bridge will not lead to a wider Federal Navigation Channel affording the public free, easy and unobstructed navigation by vessels of a beam of 98 feet or more.

   c. The bascules of the old Bridge located on the western side of the Channel are not aligned with the bascules of the new Bridge (which are aligned with the Federal Navigation Channel). This issue is significant as the navigable space between the two bridge openings is only 1,100 feet.

   d. The misalignment of the bascules of the old Bridge with the Federal Navigation Channel and with the bascules of the new Bridge, and the proximity of the two bridges, create undue and unnecessary navigational challenges for vessels on the Taunton River. Transiting upstream, vessels must navigate through the narrow old Bridge, then realign themselves in a confined waterway, taking into account the wind and current, to safely approach and pass through the new Bridge. Transiting downstream, vessels have the navigational challenge in reverse.

      As identified by a recent Marine Safety International study ("MSI Study"), expert pilots, very expensive state-of-the-art vessels and tractor tugs can navigate large commercial vessels (with a beam less than 98 feet) through this problem area.[40] However, as these requirements create great expense to any marine users of the Federal Navigation Channel, the old Bridge continues to be an unreasonable and unnecessary obstruction to navigation.

---

[39] See Section I.A. supra.

[40] See "Brightman Street Bridge Simulation Report," Marine Safety International (June 7, 2007), attached as Exhibit V; see also Pilots Report, attached as Exhibit Q, regarding how the two bridges can be navigated, if necessary.

e. The misalignment of the bascules of the old Bridge and new Bridge results in an inbound vessel transiting the old Bridge heading directly at the fixed portion of the western span of the new Bridge. In order to maintain course during transit, unless equipped with bow and stern thrusters and escorted by powerful and maneuverable tugs, the vessel requires ahead momentum to pass through the old Bridge but must then be stopped in the limited space between the bridges to avoid striking the new Bridge. Transiting downstream, the reverse situation applies with the vessel headed directly at the eastern span of the old Bridge.

f. With the proximity of the two bridges, and if the old Bridge is to be normally operated in the closed position as normal practice, the openings of both bridges must be carefully coordinated to ensure that a vessel is not caught between the bridges with the second bridge in the lowered position. This will lead to extended opening times on the new Bridge, which undermines a declared benefit of the new Bridge of reducing delays to vehicular traffic. While the new Bridge may open less frequently than the old Bridge (due to higher clearance with the span in the down position), the time of each opening will of necessity be extended to ensure safe vessel passage between the two bridges.

g. Once the new Bridge is complete, the old Bridge will serve no legitimate purpose warranting it to remain as an unreasonable obstruction to navigation.[41] All other stated reasons for the old Bridge – bicycle path, pedestrian path, emergency service route – will be rendered redundant after the new Bridge is complete.

---

[41] The stated purpose of the author of Section 1948 was to leave the old Bridge in place to create a perpetual obstruction to navigation to block traditionally-sized LNG vessels or any vessel with a beam in excess of 98 feet. The mere presence of the old Bridge constitutes *per se* grounds for a Detailed Investigation under Part 116. The claimed use of the old Bridge for pedestrians and biking and as an emergency service route is not credible as the new Bridge, roughly 1,500 feet from the old Bridge, is being built with a dedicated bike path and pedestrian walkway that are separate from the roadway surface used by vehicles. The bikeways on the new Bridge are described in some detail in Chapter 14 of the "Regional Transportation Plan 2000" published by SRPEDD, and attached as Exhibit P.

Furthermore, the old Bridge is not structurally able to handle many vehicles due to existing weight restrictions placed on traffic crossing the old Bridge. There is no evidence that MHD intends to modify the old Bridge sufficiently to make it enough to remove the weight restriction. Should a problem arise with traffic crossing the new Bridge, necessitating the need for an emergency service route, there is yet *another* bridge, the Braga Bridge, located some two miles downstream which would provide such service. Indeed the Braga Bridge provides alternative access today when the old Bridge is closed to vehicular traffic due to repairs, malfunctions or while the draw bridge is in the up position.

E. The Prompt Initiation of a Detailed Investigation Is Fully Consistent With Coast Guard Policy

The prompt initiation of a Detailed Investigation pursuant to 33 C.F.R. § 116.20 is fully consistent with the Coast Guard Bridge Administration Mission Statement:

> To administer the various bridge statutes, environmental laws of the United States, pertinent regulations and policies in a timely, courteous, responsive and professional manner. This mission will contribute to the development of a safer, more efficient and convenient marine and land transportation system that will effectively utilize and conserve the nation's resources in a cost efficient manner, while providing for the well-being, general safety, security, and interests of the citizens of the United States.

The prompt initiation of a Detailed Investigation pursuant to 33 C.F.R. § 116.20 is also fully consistent with the Coast Guard Bridge Administration "Goals." The Goals of the Coast Guard Bridge Administration relevant to Weaver's Cove's request for a Detailed Investigation are:

a. To provide reasonably free, safe, and unobstructed passage for waterborne traffic while considering the needs of land transportation.

b. Identify unreasonably obstructive bridges and order their removal or alteration.

## IV. Recent Findings Of The COTP Confirm That The Old Bridge Is An Unreasonable Obstruction To Navigation

A letter recently issued by the COTP on May 9, 2007 ("May 9 Letter") in relation to Weaver's Cove's initial Letter of Intent ("LOI"), and amended LOI, reinforces that the old Bridge is an unreasonable obstruction to navigation in its own right and in co-existence with the new Bridge.[42] Exhibit W highlights the provisions of the May 9 Letter that underscore the obstruction to navigation posed by the old Bridge due to the "proximity of the Brightman Street Bridges to each other," the "[d]imensions and conditions of the old Brightman Street Bridge," and the "[c]hannel offset between the two bridges."[43] In short, if the old Bridge is modified or altered to remove the obstruction, the concerns about navigation safety that were emphasized by the COTP in the May 9 Letter are eliminated.

---

[42] A copy of the May 9 Letter is attached as Exhibit A.
[43] Id. at 1.

## V. Section 1948 Is Not A Bar To The Grant Of The Relief Of An Order To Alter Requested Herein

Weaver's Cove is aware of the possible implications of Section 1948 of SAFETEA-LU for the Coast Guard's traditional remedy of "removal of the bridge" for being an obstruction to navigation. While Section 1948 may raise questions as to the literal removal of the old Bridge, it does not raise any issues as to other remedies available to the Coast Guard under its statutory authority, including replacing or modifying the old Bridge.

## VI. Notices

Communications and correspondence in this matter should be addressed to:

Ted Gehrig
President
Weaver's Cove Energy, LLC
One New Street
Fall River, MA 02720
(508) 675-9470
tgehrig@hesslng.com

and

Bruce F. Kiely
Jessica Fore
Baker Botts L.L.P.
The Warner
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2400
(202) 639-7711
bruce.kiely@bakerbotts.com

## VII. Conclusion

Weaver's Cove is aware that certain members of Congress oppose the proposed LNG receiving terminal in Fall River and are exerting pressure in an attempt to frustrate, delay, or block this much-needed energy project even though the FERC has already found it to be in the public interest.

However, the action requested herein, a Detailed Investigation under 33 C.F.R. § 116.20, is one that no party reasonably or credibly can expect the Coast Guard to ignore as it is one required by law. 33 U.S.C. §§ 494, 502, and 513. Moreover, the action requested, an Order

to Alter the old Bridge in a manner to eliminate it as an unreasonable obstruction to navigation and permit free, easy, and unobstructed navigation to vessels of all sizes up to the width of the fenders on the bascules of the new Bridge, does not run afoul of Section 1948 of SAFETEA-LU.

The combination of:

1. the findings of the Coast Guard Navigation Review;
2. the old Bridge being an impediment to any vessel with a beam in excess of 98 feet;
3. the offset of the center bascule opening on the western end of the channel;
4. the historical record about the old Bridge being deteriorated, decrepit and unsafe;
5. the Coast Guard concerns in 1997 – 10 years ago – about the couplet of the old Bridge and new Bridge and the requirement that the old Bridge be removed;
6. the conclusions of the Pilots Report and MSI Study as to the old Bridge; and
7. the findings of the COTP in his May 9 Letter;

underscore the prompt need for a Detailed Investigation under Part 116.

Respectfully submitted,

Bruce F. Kiely
Jessica A. Fore
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
(202) 639-7711
Attorneys for
**WEAVER'S COVE ENERGY, LLC**

**List of Exhibits**

A. Letter from Roy A. Nash, Captain, U.S. Coast Guard, to Gordon Shearer, Chief Executive Officer, Weaver's Cove Energy, LLC (May 9, 2007)

B. Memorandum from Commandant (G-PWB), United States Coast Guard, to Commander, First Coast Guard District (dpb) (Apr. 6, 2006)

C. Navigation Review, "Brightman Street Bridge Across the Taunton River, Mile 1.8 Between Fall River and Somerset, Massachusetts" (May 8, 2007)

D. Letter from Commander, First Coast Guard District, to Commandant (G-PWB)(April 3, 2006)

E. Regulated Navigation Area: Narragansett Bay, RI and Mount Hope Bay, MA, Including the Providence and Taunton Rivers, 71 Fed. Reg. 30108 (May 25, 2006)

F. "Fall River Harbor, Massachusetts and Rhode Island, Survey (Review of Reports)", Department of the Army, New England Division, Corps of Engineers Waltham, MA (Jan. 1967)

G. "Replacement of the Brightman Street Bridge Route 6/138 Over The Taunton River, Fall River/Somerset, Massachusetts, Engineering Study", U.S. Department of Transportation Federal Highways Administration and Commonwealth of Massachusetts Department of Public Works (1988)

H. "Replacement of the Brightman Street Bridge Route 6/138 Over the Taunton River Fall River / Somerset Massachusetts, Environmental Assessment (Revised)," U.S. Department of Transportation Federal Highway Administration and Commonwealth of Massachusetts Department of Public Works (May 2, 1989)

I. Letter from Gary Kassof, Supervising Bridge Management Specialist, First Coast Guard District, to Mr. Robert H. Johnson, Chief Engineer of the Massachusetts Department of Public Works (Dec. 19, 1988)

J. "Findings of Fact for the Proposed Replacement of the Brightman Street Bridge over the Taunton River," First Coast Guard District, United States Coast Guard (Nov. 3, 1997)

K. Transcripts from the Public Meeting for the Proposed Replacement of the Brightman Street Bridge between Fall River and Somerset Bristol County, Massachusetts, United States Coast Guard, Sept. 1, 1994

L. United States Coast Guard Permit (Dec. 15, 1997)

M. United States Army Corps of Engineers Permit (May 22, 1998)

N. Kathleen Durrand, "Brightman Plan Key in Fight," Herald News, Aug. 4, 2005

O. Michael Holtzman, "Bridge activity ramps up," Herald News

P. Southeastern Regional Planning and Economic Development District, "Regional Transportation Plan 2000"

Q. Northeast Marine Pilots, Inc., "Report on the Feasibility Study of the Proposed Weaver's Cove LNG Ship to transit from sea to the proposed LNG terminal in Fall River"

R. Letter from Stephanie C. Smith, Executive Director, Southeastern Regional Planning and Economic Development District, to Ellen Roy Herzfelder, Secretary, Massachusetts Executive Office of Environmental Affairs (Aug. 7, 2003)

S. Letter from Constantine "Gus" Yankopoulos, Southeastern Regional Planning and Economic Development District, to Gary Kassof, Acting Chief, Bridge Branch, First Coast Guard District (Aug. 31, 1994)

T. United States Coast Guard Permit Amendment (Aug. 23, 2006)

U. Letter from Thomas F. Broderick, Massachusetts Highway Department, to Ronald R. Lassonde (April 27, 2001)

V. Marine Safety International, "Brightman Street Bridge Simulation Report" (June 7, 2007)

W. Excerpts from Letter from Roy A. Nash, Captain, U.S. Coast Guard to, Gordon Shearer, Chief Executive Officer, Weaver's Cove Energy, LLC (May 9, 2007) and Weaver's Cove comments