rorist attack cannot be effectively measured. Instead, says the report, security risk management methodology should examine five factors: intent, capabilities, vulnerabilities, consequences, and recovery. The net assessment of the report is that while there is no adequate way to determine the probability of an attack on a proposed urban LNG facility and inland waterway transit, there are adequate grounds to judge that such an attack would be consistent with terrorists' demonstrated intent and capability. The report states further that there is also a basis to judge that likely enhanced security measures would not significantly reduce the risk, and to conclude a high risk of catastrophic damage. The report makes a general finding that siting the LNG facility in a non-urban setting would reduce the incentive for a terrorist attack. We have reviewed the Clarke Report carefully, but find, as discussed below, that it does not warrant a change in our conclusions that the Weaver's Cove project will be well protected.

88. Section 1 of the Clarke Report, a background and threat analysis, reviews a wide selection of articles published in journals, newspapers, and books stating that terrorists intend to kill large numbers of Americans, disrupt the U.S. economy and infrastructure, and damage oil and gas infrastructure. According to the report, reasons for a terrorist attack on an LNG tanker or facility include the potential for high civilian casualties and substantial damage to the American economy. As LNG imports become a more important sector of the economy, the report posits, terrorist organizations will be more interested in attacking them.

89. The concerns expressed in Section 1 of the Clarke Report are not unique to LNG but could equally apply to many other liquid or gaseous fuels and chemicals. The Clarke Report does not identify specific evidence of LNG threats. Indeed the Department of Homeland Security document, *National Planning Scenarios*, referenced on page 26 of the report, presents a number of high-casualty scenarios for attacks on other industry sectors. Regardless of what terrorist intent can be deduced from news articles and publications, the Coast Guard security workshops referenced above considered a terrorist attack, and devised methods to protect the LNG vessel from credible scenarios. There also is no support in the Clarke Report for the conclusion that terrorist organizations will be more interested in attacking LNG terminals as LNG imports become a more important sector of the economy. In fact, additional terminals and LNG vessels would provide redundancy in case a ship or terminal were out of service and thereby lessen the potential economic impact.

90. Section 2 of the Clarke Report examined seven attack scenarios on an LNG tanker in Narragansett Bay: aircraft, stand-off weapons, mortars, shaped charges, small boat, divers, and mines. The report found that an LNG vessel transiting the Narragansett Bay is susceptible to a number of potential terrorist threats, with the most probable/most effective to be a small boat attack, followed by a medium rocket and a small rocket. LNG cargo tank hole sizes for the most credible threats, stated the report, have a reasonably expected size of 5 square meters, but ranged from 2 to 12 square meters. The report also found that a pool fire is the most likely scenario to cause major deaths.

91. The Coast Guard's security workshops identified above considered a similar range of credible attack scenarios, including the types of attacks in Section 2 of the Clarke Report. For each credible scenario, procedures were developed with port stakeholders and law enforcement officials to provide suitable afloat, underwater, landside, and aviation security or surveillance capabilities. The outcome of the workshops was the Vessel Transit Security Plan. Although the details of the plan are classified as Security Sensitive Information, the general measures were identified in the FEIS. The finding in the Clarke Report that the likely enhanced security measures would not significantly reduce the high risk of catastrophic damage was made without the benefit of the Coast Guard workshops that led to the Vessel Transit Security Plan.

92. Section 3 of the Clarke Report on consequence management addresses potential injuries, fatalities, and damage to infrastructure that could result from an attack scenario. The Clarke Report states that it considered the flammable vapor and thermal radiation hazards created by an intentional breach of two cargo tanks each with a 5-meter diameter hole and a third tank breached by cascading damage, consistent with the vulnerabilities outlined in Section 2 of the report. However, a three tank breach as described in the preceding sentence is not consistent with the vulnerabilities outlined in Section 2 of the report. The credible threat scenarios identified there would likely result in a single cargo tank breach. Thus, the thermal hazard zones presented in Section 3 of the Clarke Report are overstated, reflecting the consequences of the 5 square meter, 3-tank breach from the Sandia Report.

93. We believe that many of the attack scenarios presented in Section 2 of the report would likely yield damages on the low end of the scale, and even those judged most probable/most effective would have fewer consequences than projected in Section 3. In fact, the Sandia Report found that in most cases intentional breaching scenarios would not result in a hole of more than 5 to 7 square meters, which is a more appropriate range for calculating potential hazards from spills. Nevertheless, the Clarke Report leaves the misimpression that any successful attack will yield a worst case consequence scenario.

94. The FEIS evaluated the 21-mile-long LNG vessel route to the Weaver's Cove facility for areas of development within the transient thermal hazard area for the nominal 5 to 7 square meter intentional breach scenarios. We believe these scenarios are more realistic than the worst case

scenario examined in the Clarke Report; however, we do recognize that they represent a high consequence event for a successful worst case terrorist attack.

95. In response to the DEIS, commentors expressed concern that local communities would have to bear a portion of the costs of ensuring the security of the LNG facility and the LNG vessel while in transit and while unloading at the dock. As a result of its recently completed security workshops, the Coast Guard has designed a robust security plan that requires significant Coast Guard, public, and private resources necessary to implement security measures. While the specific costs to the states and local communities have not been determined, Weaver's Cove has committed to providing funding for direct transit-related security costs.[54] In addition to these direct transit-related state and local security costs, there may be a need to fund additional capital costs associated with security and emergency response, such as equipment and personnel. Environmental Condition 42 requires that Weaver's Cove provide a comprehensive plan identifying the mechanisms for funding all project-specific security and emergency response/management costs that would be imposed on state agencies and local communities, including capital costs.

96. To transit to the proposed LNG terminal site, LNG vessels would pass under or through four well-traveled bridges. A number of commentors expressed concern in response to the DEIS regarding the impact of potential of bridge closures—the impact of traffic backups on local roads and highways, and the impact of bridge closures on the ability of emergency vehicle to access Fall River hospitals.[55] As part of the review of the LNG vessel transit through Narragansett Bay to the terminal on the Taunton River, the Coast Guard considered the closure of one or more of the bridges along the vessel route. While bridge closures are one of the many tools available to the Coast Guard, the security workshop participants have determined it is not necessary to close the bridges unless the threat condition or current intelligence raises a concern about security issues. To ensure emergency vehicle access across the Braga and Brightman Street Bridges to the Fall River hospitals, Environmental Condition 76 requires that at least one of these bridges remain open during the passage of LNG vessels through the federal navigation channel in the Taunton River.

97. A number of organizations and individuals commented on the need to consider evacuation plans and warning systems. In a letter dated April 27, 2005, the Coalition for Responsible Siting of LNG Facilities (the Coalition) questioned whether Weaver's Cove can develop a viable emergency response plan for the project based on: (1) the number of people in close proximity to the proposed facility who could potentially be within the thermal radiation distances reported in the Sandia Report; (2) a National Fire Protection Association's study released in 2004, which indicated that most fire departments in Massachusetts do not have the training, personnel, or equipment to provide adequate emergency response services; and (3) the Coalition's belief that a plan comparable to the current Cove Point LNG Project emergency response plan cannot be developed for the Weaver's Cove LNG Project based on its discussions with emergency response personnel and review of the existing plan. The Coalition concludes that the Commission should require completion of the emergency response plan prior to permitting the facility, if the Commission believes a viable emergency response plan is possible for the project. By doing so, the Coalition indicates that local emergency and city officials could review and comment on the plan.

98. While the preparation of emergency procedures typically occurs at the end of the LNG facility construction phase, the FEIS recognized that there remain a number of issues concerning the viability of emergency evacuation that have not yet been satisfactorily resolved. Therefore, Environmental Condition 34 requires Weaver's Cove to develop emergency evacuation routes for the areas along the route of the LNG vessel transit prior to construction. Emergency evacuation planning with local departments will identify evacuation routes based upon increasing severity of events, as well as the time required for evacuation.

99. In addition, Environmental Condition 67 has been revised to require Weaver's Cove to develop an initial Emergency Response Plan (including evacuation) and coordinate procedures with local emergency planning groups, fire departments, state and local law enforcement prior to initial site preparation. Therefore, it is the responsibility of Weaver's Cove to develop emergency evacuation routes and the initial Emergency Response Plan in coordination with state and local officials to ensure that a viable plan is possible for the project. Weaver's Cove is required to file the evacuation routes and Emergency Response Plan for review and approval by the Director of OEP. These plans, similar to other mitigation plans, can be appropriately developed and implemented following the Commission's approval process, as long as there is a mechanism for review and approval by the Commission.

100. The proposed import terminal location in Fall River makes use of a 73-acre industrially zoned property which is a contaminated site used

[54] As an indication of these costs, the proposed KeySpan LNG import terminal near Providence, Rhode Island estimated state and local security costs for its LNG deliveries at $40,000 to $50,000 per vessel port call.

[55] After the FEIS was issued the Rhode Island Turnpike and Bridge Authority for the first time submitted comments expressing concern regarding the movement of LNG tankers under or near bridges under its jurisdiction. The issues it raises are addressed in the FEIS and in this order.

historically as a petroleum products storage and distribution facility from the 1920s to the 1990s. The site is located on an existing federal navigation channel and turning basin and is within a designated port area for marine dependent industrial use under Massachusetts law. The FEIS examined alternative site locations and technologies for the project. No existing LNG facilities have the space to add the capacity proposed in this project. The FEIS did not identify any alternative location or technology that would be preferable to the proposed project. Alternatives were eliminated from consideration because they did not meet the purpose of the project, could not be developed in the time frame required by the applicant, involved greater environmental impacts, or the property was not available for development.

101. One particular alternative the FEIS evaluated was siting the proposed LNG import terminal in offshore areas, which included an analysis of the preliminary plans to build LNG facilities offshore of Gloucester, Massachusetts by Neptune LNG, L.L.C. (a subsidiary of Tractabel LNG North America, L.L.C.), and Excelerate Energy, L.L.C. (Excelerate) for the Neptune LNG and Northeast Gateway Deepwater Port Projects, respectively. The FEIS found that if the Neptune LNG or the Northeast Gateway Projects were constructed, either project could potentially meet some of Weaver's Cove's objective of providing a new source of imported LNG in the New England market area; however, the reliability of the supply remains uncertain. To meet peak winter demand in New England, it is essential that an offshore system have the proven reliability to provide both the average baseload and maximum sendout during the most severe offshore weather.

102. The service reliability of this alternative is dependent on a limited supply of specially designed regasification ships because docking and cargo transfers cannot presently be performed by conventional LNG ships. The Neptune and Excelerate LNG Projects would each require three of the specialized regasification vessels to provide continuous baseload gas service. For this reason, the FEIS was unable to determine whether the Neptune LNG or Northeast Gateway Projects would be able to provide the service reliability of a traditional onshore LNG storage facility. Additionally, neither the Neptune LNG Project nor the Northeast Gateway Project could provide an additional source of LNG to meet the needs of existing peakshaving facilities for LNG truck service, which is currently critical in meeting peak winter demand in the New England region. Although the FEIS recognized the potential for offshore docking and LNG regasification ships to have a future role in the gas supply mix in New England as well as other areas, these facilities by themselves would not be a viable alternative that meets all of the objectives of the proposed Weaver's Cove LNG Project.

103. On June 16, 2005, as part of its motion in support of the May 12, 2005 request for hearing by the City of Fall River and the Massachusetts Attorney General, the Massachusetts Energy Facilities Siting Board (Siting Board) filed comments on the alternatives analysis presented in the FEIS. Although the Siting Board concedes that the range of alternatives analyzed in the FEIS is reasonable, it contends that the FEIS does not systematically and comprehensively compare the advantages and disadvantages of proposed project with all the identified alternatives. The Siting Board states that the FEIS failed to evenly address the merits of all alternatives using a complete and common set of comparison criteria, adequately consider safety issues and community impacts in weighing comparison criteria, include gas supply cost and gas supply need as comparison criteria, reach conclusions as to whether the proposed project or an alternative is "preferable," and define how comparison criteria are to be weighed in drawing conclusions regarding alternatives.

104. Under NEPA, the Commission's responsibility is to evaluate the environmental impacts from a proposal before the Commission, including reasonable alternatives to that proposal. That does not require a detailed analysis of every alternative proposed. Once we have determined that a suggested alternative is not viable and have explained our reasoning for this determination, there is no reason to conduct further review of that suggested alternative.[56] In this proceeding, the baseline of the FEIS alternative analysis was the proposed action, and therefore all alternatives were compared to the proposed Weaver's Cove LNG terminal. In considering the range of alternatives that may offer environmental advantage over the proposed action, the FEIS considered criteria such as cost, safety, technical feasibility, community and other environmental impacts. In addition to evaluating whether an alternative was technically and economically feasible, reasonable, and practical, the evaluation criteria for selecting alternatives included whether they meet the proposed project objectives. The FEIS analyzed alternatives to the point where it was clear that an alternative was not reasonable or would result in significantly greater environmental impacts that cannot be readily mitigated. Those alternatives that appeared to be the most reasonable with less than or similar levels of environmental impact were reviewed in the greatest detail.

105. We believe that the FEIS analysis of alternatives adequately weighs the safety and environmental impacts of both locating the proposed LNG terminal at alternative coastal locations and evaluating the existing or proposed natural gas facilities which could potentially meet the stated objectives of the proposed project. The assessment of site

[56] *East Tennessee Natural Gas Company*, 101 FERC ¶ 61,188 at P 94 (2002).

alternatives in the FEIS identified specific criteria and included a table comparing the relative merits of various sites in a systematic and comprehensive manner. The analysis of system alternatives in the FEIS considered specific criteria; however, the lack of information available regarding several of the planned natural gas facilities considered prevented a comparison at the same level of detail. The FEIS found no alternative that is clearly preferable to the proposed action and each alternative presents its own unique set of impacts. Further, the FEIS found that the proposed action can be constructed and operated in an environmentally acceptable manner.

106. In addition to the considerable public opposition to the project, most of the federal and state resource agencies with a permitting or advisory role in the project have significant concern about the project's dredging-related impacts on water quality and fisheries habitat in Narragansett Bay, Mt. Hope Bay, and the Taunton River. These agencies include NOAA Fisheries, EPA, COE, Massachusetts Office of Coastal Zone Management (OCZM), Massachusetts Department of Environmental Protection (DEP), Massachusetts Marine Division of Fisheries (DMF), Rhode Island Coastal Resources Management Council (CRMC), and the Rhode Island Department of Environmental Management.

107. To maintain safe access to the LNG terminal, Weaver's Cove proposes to permanently deepen the existing federal navigation channel and a portion of the east channel to 37 feet.[57] The horizontal limits of the dredging would be confined to the existing 400-foot-wide channel, and the existing turning basin would be permanently enlarged and deepened to 41 feet. The project would require the dredging of up to about 2.6 million cubic yards of sediment from the Taunton River and Mount Hope Bay to facilitate LNG ship transit. This dredging would disturb about 191 acres of the bed of the river and bay.

108. While the FEIS includes a thorough review of Weaver's Cove's dredge modeling data, the resource agencies question the dredge modeling inputs used to assess the proposed dredging effects on aquatic resources and have suggested time of year restrictions more severe than the 228 day dredging window recommended in the FEIS (*see* Environmental Condition 21). Based on consultations with the federal and state resource agencies, the FEIS analyzed the impact of restricting dredging during times of the year when sensitive aquatic organisms (*e.g.*, winter flounder, anadromous species) could be adversely affected, and it considered offshore disposal of dredged materials. Based on the new/existing Brightman Street Bridge construction delays,[58] the FEIS found that the time-of-year restriction to minimize impact on winter flounder (as required by Environmental Condition 21) would not impact the in-service date of the project or necessitate offshore disposal. It is possible that the time of year restrictions ultimately imposed by the agencies would limit Weaver's Cove's annual dredging to a 75-day period between November and January. The FEIS found that such restrictions could necessitate offshore disposal.

109. Additionally, the FEIS found that the offshore, open water disposal alternative would be environmentally acceptable if the COE and EPA determine that a significant volume of sediments are suitable for offshore, open water disposal.[59] However, the FEIS also determined that offshore disposal of suitable dredged material is not without impacts and is not clearly environmentally preferable to Weaver's Cove's proposed reuse of the dredged material as general site fill at the LNG terminal site. This conclusion assumes that Weaver's Cove is able to resolve the regulatory and legal disputes of its proposed sediment reuse plan at the LNG terminal site.

110. In addition to the resource agencies' concern associated with the proposed dredging, there are several other unresolved issues which are discussed in the FEIS which require resolution prior to any project construction. To date, the Massachusetts DEP has not made a final determination regarding whether: the proposed placement of the stabilized dredged sediment on the LNG terminal site complies with the anti-degradation provision of the Massachusetts Contingency Plan (MCP); the material could be placed on site without adversely affecting Shell's existing remediation activities; or that all the material constitutes a beneficial reuse and is necessary for site development under the MCP. A negative determination on any of these issues could prohibit or affect the proposed use of the site. Environmental Condition 18 requires that Weaver's Cove file documentation with the Commission prior to construction to verify that placement of the stabilized dredge material on the LNG terminal site is consistent with the MCP. If Weaver's Cove is unable to verify consistency of the proposed use of the sediment with the MCP, it must file a revised sediment placement plan that identifies alternative location(s) for use of the dredged sediments.

111. There remains a legal question of whether or not Weaver's Cove can obtain control

[57] The existing channel has a federally authorized depth of 35 feet mean lower low water (MLLW).

[58] The Massachusetts Highway Department has verified that the new Brightman Street Bridge construction will delay Weaver's Cove's proposed schedule for the LNG terminal operations by at least 2 to 3 years until 2010.

[59] Weaver's Cove conducted Tier III testing of the sediments to determine their suitability for open water disposal. Weaver's Cove's analysis of these results indicates that most of the proposed dredged material would be suitable for open water disposal. However, the COE and EPA are currently reviewing the Tier III testing results and have not concurred with Weaver's Cove's determination regarding the suitability of the material for offshore disposal.

of the LNG terminal site due to both the ongoing remediation work at the site and the existing deed restrictions attached to the property. As explained above, and as set forth in Environmental Condition 77, Weaver's Cove will need to resolve this issue prior to construction of the LNG facility. Further, Weaver's Cove has not received to date concurrence from the OCZM or the CRMC regarding the project's consistency with the Massachusetts and Rhode Island Coastal Zone Management Plans. Environmental Conditions 23 and 24 require that Weaver's Cove file documentation of these concurrences prior to construction.

112. We have reviewed the information and analysis contained in the FEIS regarding the potential environmental effect of the project. Based on our consideration of this information, we agree with the conclusions presented in the FEIS that, although the proposed LNG terminal would introduce a new risk to the public, the project would meet federal safety standards, could be operated safely, and would have limited adverse environmental impact. Further, we are ensuring the LNG facilities will be subject to Commission staff technical review and site inspections on at least an annual basis. The implementation of the Coast Guard's security plan that would control the LNG vessels operating through Narragansett Bay to and from the proposed terminal would further ensure the public's safety. These conclusions are based on the construction and operation of the project in accordance with Weaver's Cove's proposed mitigation and the environmental mitigation measures recommended the FEIS. Accordingly, we are including as Appendix B the environmental mitigation measures recommended in the FEIS as conditions to the authorization issued to Weaver's Cove in this order.

113. Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions in this order. We encourage cooperation between Weaver's Cove, Mill River, and local authorities. However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[60]

114. Weaver's Cove or Mill River, as pertinent, shall notify the Commission's environmental staff by telephone or facsimile of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies Weaver's Cove or Mill River. Weaver's Cove or Mill River shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

115. The Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application and exhibits thereto, submitted in support of the authorization sought herein, and upon consideration of the record,

*The Commission orders:*

(A) In Docket No. CP04-36-000, Weaver's Cove is authorized under Section 3 of the Natural Gas Act to site, construct, and operate its proposed LNG terminal at Fall River, Massachusetts, as more fully described in this order and in the application.

(B) In Docket No. CP04-41-000, a certificate of public convenience and necessity is issued to Mill River under Section 7(c) of the Natural Gas Act authorizing it to construct and operate its proposed pipeline facilities, as more fully described in the order and in the application.

(C) In Docket No. CP04-42-000, a blanket transportation certificate is issued to Mill River under Subpart G of Part 284 of the Commission's regulations.

(D) In Docket No. CP04-43-000, a blanket construction certificate is issued to Mill River under Subpart F of Part 157 of the Commission's regulations.

(E) The authorizations in the above paragraphs are conditioned on Mill River's compliance with Part 154 and Paragraphs (a), (c), (e), and (f) of Section 157.20 of the Commission's regulations.

(F) In Docket No. CP04-41-000, Mill River shall adhere to the AFUDC requirements discussed in the body of this order.

(G) Mill River's *pro forma* tariff is accepted, subject to Mill River's filing a narrative explaining how the tariff conforms to Order No. 637 and each NAESB standard, including a chart identifying each NAESB standard and definition and the location of the NAESB standards as incorporated verbatim or by reference in Mill River's tariff.

(H) Construction of the facilities authorized herein shall be completed within five years from the date of a final order in this proceeding in accordance with Section 157.20(b) of the Commission's regulations.

(I) Mill River must execute a firm contract equal to the level of service and in accordance with the terms of service represented in its precedent agreement prior to commencement of construction.

(J) Within three years after its in-service date, as discussed herein, Mill River must make a filing to justify its existing rates or propose alternative rates.

---

[60] *See, e.g., Schneidewind v. ANR pipeline Co.*, 485 U.S. 293; *National Fuel Gas Supply v. Public Service Commission*, 894 F.2d 571 (2nd Cir. 1990); *Iroquois Gas Transmission System, L.P., et al.*, 52 FERC ¶ 61,091 (1990) and 59 FERC ¶ 61,094 (1992).

(K) Weaver's Cove and Mill River shall comply with the environmental conditions contained in Appendix B to this order.

(L) The requests for evidentiary hearing, for consolidation, for delay in processing the application, and for a supplemental draft environmental impact statement, are denied. The written materials jointly submitted as testimony in the requested hearing by the City of Fall River and the Attorney General of the Commonwealth of Massachusetts are rejected.

Commissioner Kelly dissenting with a separate statement attached.

**Appendix A—Intervenors**

Algonquin Gas Transmission Company

Amerada Hess Corporation

BP Energy Company

Calpine Corporation

Cheniere LNG, Inc.

Conoco Phillips Company

Conservation Law Foundation

Distrigas of Massachusetts LLC

Duke Energy Trading and Marketing, L.L.C.

Ducharme, Frederick J. Jr.

ExxonMobil Gas & Power Marketing Company

FPL Group Resources, LLC

Freeport LNG Development, L.P.

Green Futures

KeySpan LNG, L.P.

The KeySpan Delivery Companies

Massachusetts, Attorney General of the Commonwealth of

Massachusetts Division of Energy Resources

Massachusetts Energy Facilities Siting Board

Merchants Mills Limited Partnership

Miozza, Michael L.

National Grid USA

New England Gas Company

Project Technical Liaison Associates, Inc.

Rhode Island, Attorney General of the State of

Save the Bay, Narragansett Bay, Inc.

Sempra Energy LNG

Shell Oil Products US

Southern LNG Inc.

Statoil ASA and Statoil Natural Gas LLC

Thomas, Clement E.

Total Gas & Power North America, Inc.

Trunkline LNG Company, LLC

**Appendix B**

*Environmental Conditions for the Weaver's Cove/Mill River Project*

As recommended in the EIS, this authorization includes the following condition(s):

1. Weaver's Cove and Mill River[61] shall follow the construction procedures and mitigation measures described in its application, supplemental filings (including responses to staff data requests), and as identified in the environmental impact statement (EIS), unless modified by the Federal Energy Regulatory Commission's (FERC or Commission) Order. Weaver's Cove must:
   a. request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);
   b. justify each modification relative to site-specific conditions;
   c. explain how that modification provides an equal or greater level of environmental protection than the original measure; and
   d. receive approval in writing from the Director of the Office of Energy Projects (OEP) **before using that modification.**
2. For pipeline facilities, the Director of OEP has delegation authority to take whatever steps are necessary to ensure the protection of all environmental resources during construction and operation of the project. This authority shall allow:
   a. the modification of conditions of the Commission's order; and
   b. the design and implementation of any additional measures deemed necessary (including stop work authority) to assure continued compliance with the intent of the environmental conditions as well as the avoidance or mitigation of adverse environmental impact resulting from project construction and operation.
3. For LNG facilities, the Director of OEP has delegated authority to take all steps necessary to ensure the protection of life, health, property, and the environment during construction and operation of the project. This authority shall include:
   a. stop-work authority and authority to cease operation; and

[61] Hereafter, Weaver's Cove is used in measures applicable to both Weaver's Cove and Mill River.

b. the design and implementation of any additional measures deemed necessary to assure continued compliance with the intent of the conditions of this order.

4. **Prior to any construction**, Weaver's Cove shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, environmental inspectors (EIs), and contractor personnel will be informed of the EI's authority and have been or will be trained on the implementation of the environmental mitigation measures appropriate to their jobs before becoming involved with construction and restoration activities.

5. The authorized facility locations shall be as shown in the EIS, as supplemented by filed alignment sheets, and shall include the staff's recommended facility locations. **As soon as they are available, and before the start of construction**, Weaver's Cove shall file with the Secretary revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by this order. All requests for modifications of environmental conditions of this order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

6. Weaver's Cove shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage yards, new access roads, and other areas that will be used or disturbed and have not been previously identified in filings with the Secretary. Approval for each of these areas must be explicitly requested in writing. For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps/sheets/aerial photographs. Each area must be approved in writing by the Director of OEP **before construction** in or near that area.

   This requirement does not apply to route variations recommended herein or minor field realignments per landowner needs and requirements that do not affect other landowners or sensitive environmental areas such as wetlands.

   Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

   a. implementation of cultural resources mitigation measures;

   b. implementation of endangered, threatened, or special concern species mitigation measures;

   c. recommendations by state regulatory authorities; and

   d. agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

7. **At least 60 days before the start of construction,** Weaver's Cove shall file an initial Implementation Plan with the Secretary for the review and written approval by the Director of OEP describing how Weaver's Cove will implement the mitigation measures required by this order. Weaver's Cove must file revisions to the plan as schedules change. The plan shall identify:

   a. how Weaver's Cove will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to onsite construction and inspection personnel;

   b. the number of EIs assigned per spread, and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;

   c. company personnel, including EIs and contractors, who will receive copies of the appropriate material;

   d. what training and instructions Weaver's Cove will give to all personnel involved with construction and restoration (initial and refresher training as the project progresses and personnel change), with the opportunity for OEP staff to participate in the training session(s);

   e. the company personnel (if known) and specific portion of Weaver's Cove's organization having responsibility for compliance;

   f. the procedures (including use of contract penalties) Weaver's Cove will follow if noncompliance occurs; and

   g. for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

      i. the completion of all required surveys and reports;

      ii. the mitigation training of onsite personnel;

      iii. the start of construction; and

      iv. the start and completion of restoration.

8. Weaver's Cove shall develop and implement an environmental complaint resolution procedure. The procedure shall provide land-

owners with clear and simple directions for identifying and resolving their environmental mitigation problems/concerns during construction of the project and restoration of the right-of-way. **Prior to construction,** Weaver's Cove shall mail the complaint resolution procedures to each landowner whose property would be crossed by the project and to those landowners whose property is within ½ mile of the LNG terminal site.

a. In its letter to affected landowners, Weaver's Cove shall:

i. provide a contact that the landowners shall call first with their concerns; the letter shall indicate how soon a landowner shall expect a response;

ii. instruct the landowners that, if they are not satisfied with the response, they shall call Weaver's Cove's hotline; the letter shall indicate how soon to expect a response; and

iii. instruct the landowner that, if they are still not satisfied with the response from Weaver's Cove, they shall contact the Commission's Enforcement Hotline at (888) 889-8030.

b. In addition, Weaver's Cove shall include in its weekly status report a copy of a table that contains the following information for each problem/concern:

i. the date of the call;

ii. the identification number from the certified alignment sheets of the affected property;

iii. the description of the problem/concern; and

iv. an explanation of how and when the problem was resolved, will be resolved, or why it has not been resolved.

9. Weaver's Cove shall employ a team of EIs. The EIs shall be:

a. responsible for monitoring and ensuring compliance with all mitigation measures required by this order and other grants, permits, certificates, or other authorizing documents;

b. responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (*see* condition 6 above) and any other authorizing document;

c. empowered to order correction of acts that violate the environmental conditions of this order, and any other authorizing document;

d. a full-time position, separate from all other activity inspectors;

e. responsible for documenting compliance with the environmental conditions of this order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

f. responsible for maintaining status reports.

10. Weaver's Cove shall file updated status reports prepared by the EI with the Secretary on a weekly basis until all construction and restoration activities are complete. On request, these status reports shall also be provided to other federal and state agencies with permitting responsibilities. Status reports shall include:

a. the current construction status of the project, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally sensitive areas;

b. a listing of all problems encountered and each instance of noncompliance observed by the environmental inspector(s) during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

c. corrective actions implemented in response to all instances of noncompliance, and their cost;

d. the effectiveness of all corrective actions implemented;

e. a description of any landowner/resident complaints which may relate to compliance with the requirements of this order, and measures taken to satisfy their concerns; and

f. copies of any correspondence received by Weaver's Cove from other federal, state, or local permitting agencies concerning instances of noncompliance, and Weaver's Cove's response.

11. Weaver's Cove must receive written authorization from the Director of OEP before commencing service of the project. Such authorization will only be granted following a determination that rehabilitation and restoration of the right-of-way is proceeding satisfactorily.

12. **Within 30 days of placing the certificated facilities in service**, Weaver's Cove shall file an affirmative statement with the Secretary, certified by a senior company official:

a. that the facilities have been constructed in compliance with all applicable conditions, and that continuing activities will

be consistent with all applicable conditions; or

b. identifying which of the certificate conditions Weaver's Cove has complied with or will comply with. This statement shall also identify any areas along the right-of-way where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

13. Weaver's Cove shall develop a site-specific plan for construction of the adopted River Street Variation that includes a description of any special construction techniques that would be used (*e.g.*, stove-pipe or drag-section techniques) and other steps taken to minimize impacts on local residences and commercial facilities. This plan shall be filed with the Secretary for review and approval by the Director of OEP **prior to construction.**

14. Weaver's Cove shall prepare final engineering design plans ensuring the stability of all site grades and the waterfront walls and file these plans with the Secretary for review and approval by the Director of OEP **prior to construction.**

15. Weaver's Cove shall prepare a plan for the discovery and management of contaminated soils and ground water. This plan shall comply with applicable state and federal regulations and shall provide for management of contaminants at known sites and include procedures for the identification and management of unknown contaminants in other locations. The plan shall be filed with the Secretary for review and approval by the Director of OEP **prior to construction.**

16. Weaver's Cove shall consult with the COE regarding the appropriate method(s) for dredging and managing the sediment from the immediate vicinity of turning basin core 10. Weaver's Cove shall file copies of all correspondence and any final plan for managing dredged sediment associated with core TB-10 with the Secretary for review and approval by the Director of OEP **prior to dredging.**

17. Weaver's Cove shall provide all appropriate grading plans, cross section drawings, and risk assessments required to demonstrate the degree of isolation provided by the upland reuse of stabilized dredged materials. The required documentation shall be filed with the Secretary for review and approval by the Director of OEP **prior to construction.**

18. Weaver's Cove shall file documentation with the Secretary **prior to construction** to verify that placement of the stabilized dredged material on the LNG terminal site is consistent with the Massachusetts Contingency Plan (MCP). If Weaver's Cove is unable to verify the consistency of the proposed use of the sediment with the MCP, it shall file a revised sediment placement plan that identifies alternative location(s) for use of the sediments. The alternative use plan, if necessary, shall be developed in consultation with the relevant agencies and include a detailed assessment of the environmental impacts associated with the alternative location(s) and demonstrate that the alternative location(s) are in compliance with applicable regulations. Weaver's Cove shall file the plan, if necessary, with the Secretary for review and approval by the Director of OEP **prior to construction.**

19. Weaver's Cove shall consult with the COE and NOAA Fisheries regarding mitigation of wetlands as well as intertidal and subtidal habitats and shall file with the Secretary the results of these consultations and the COE-approved Wetland Mitigation Plan **prior to construction.**

20. Weaver's Cove shall complete the coordination with applicable federal and state resource agencies regarding development and funding of mitigation measures to offset impacts on quahogs resulting from dredging of the turning basin and file the results of that coordination, including copies of agency approval, with Secretary **prior to dredging.**

21. Weaver's Cove shall modify its proposed dredging program and pipeline construction plans within the Taunton River to prohibit any silt-disturbing construction activities during the winter flounder spawning period (January 15 through May 31). In addition, Weaver's Cove shall continue to consult with federal and state agencies and develop a mitigation plan to offset permanent loss of winter flounder spawning and juvenile development habitat resulting from expansion of the turning basin. The revised dredging plan and the winter flounder habitat mitigation plan shall be filed with the Secretary **prior to dredging.**

22. Weaver's Cove shall coordinate with NOAA Fisheries to determine appropriate speed and seasonal restrictions, or other applicable measures, to avoid or minimize impacts on right whales. Results of the coordination, including a discussion of restrictions to be implemented, shall be filed with the Secretary, **prior to commencing operation of the LNG terminal.**

23. Weaver's Cove shall file with the Secretary **prior to construction** documentation of concurrence from the Office of Coastal Zone Management that the project is consistent with the Massachusetts Coastal Zone Management Program Plan.

24. Weaver's Cove shall file with the Secretary **prior to construction** documentation of

concurrence from the Coastal Resources Management Council that the project is consistent with the Rhode Island Coastal Resources Management Program.

25. **Prior to construction,** Weaver's Cove shall file with the Secretary documentation of concurrence from the U.S. Department of the Interior that the project would not have a substantial adverse affect on the Taunton River's potential designation as a Wild and Scenic River (WSR) and that the project would be consistent with the Wild and Scenic River Act if the Taunton River were designated a Wild and Scenic River.

26. Weaver's Cove shall prepare a landscaping plan showing how the northern and southern parcels of the LNG terminal site would be restored and revegetated. The plan shall include the locations and descriptions of specific measures and plantings to screen views of the LNG facilities from nearby residences. The landscaping plan shall be filed with the Secretary for review and written approval by the Director of OEP **prior to construction.**

27. Weaver's Cove shall file with the Secretary for the review and written approval of the Director of OEP **prior to construction,** a visual screening plan developed in consultation with and approved by Somerset Power, L.L.C. that includes measures to replace screening vegetation removed from the temporary construction right-of-way between MPs 0.49 and 0.54 of the Western Pipeline route.

28. Weaver's Cove shall defer construction of the LNG terminal and Northern and Western Pipelines and associated aboveground facilities **until:**

    a. Weaver's Cove provides the Massachusetts State Historic Preservation Office (SHPO) with the appropriate plans, drawings, and photographic simulations for the meter station and pipeyard in relation to the Winslow Burial Ground, and provides the SHPO's comments on this information;

    b. Weaver's Cove conducts the recommended site examination surveys at the CSX#1, CSX#2, ISP#1, ISP#2, and the Taunton River Marsh sites, and files with the Secretary the evaluation reports and the SHPO's comments on the reports;

    c. Weaver's Cove conducts additional site examination at the Barnaby Swamp 2 Site, and files with the Secretary the report and the SHPO's comments on the report;

    d. Weaver's Cove files with the Secretary an avoidance plan for the Slade Farmstead and Cemetery and the SHPO's comments on the plan;

    e. Weaver's Cove files with the Secretary and the SHPO any additional required survey and evaluation reports, and any required treatment or avoidance plans, and the SHPO's comments on all reports and plans; and

    f. The Director of OEP reviews and approves all cultural resources reports and plans, and notifies Weaver's Cove in writing that it may proceed with treatment measures or construction.

    All material filed with the Secretary containing location, character, and ownership information about cultural resources must have the cover and any relevant pages therein clearly labeled in bold lettering: **"CONTAINS PRIVILEGED INFORMATION—DO NOT RELEASE."**

29. Weaver's Cove shall use transportation grade (0.05 weight percent sulfur) or better diesel fuel in all construction equipment, including dredging equipment, for the proposed project and evaluate the feasibility of using catalysts and diesel particulate filters on this equipment and placing idling limits on the construction vehicles to further reduce particulate matter less than 10 microns in diameter, carbon monoxide, and volatile organic compound emissions.

30. Weaver's Cove shall develop a nuisance odor complaint and abatement plan to investigate and address complaints related to odor emissions from the dewatered and stabilized dredged sediments. The plan shall include procedures for adjacent landowners to contact a Weaver's Cove representative regarding objectionable odors, a process for investigating and addressing the complaints, and a description of mitigative measures that would be implemented to abate the problem. The nuisance odor complaint and abatement plan shall be filed with the Secretary **prior to construction.** In addition, Weaver's Cove shall include any odor complaints in the weekly status reports filed with the FERC. The report shall include a discussion of how odor complaints were resolved.

31. Weaver's Cove shall prepare a noise mitigation plan to ensure that the dredging, offloading, and stabilization operations do not contribute more than 55 decibels of the A-weighted scale (dBA) day-night sound level ($L_{dn}$) to the ambient noise level at any noise sensitive area (NSA). Weaver's Cove shall file the plan with the Secretary for the review and written approval of the Director of OEP **prior to the initiation of any construction activities at the LNG terminal.**

32. Weaver's Cove shall make all reasonable efforts to assure its predicted noise levels from the LNG terminal are not exceeded at the NSAs and file noise surveys showing

this with the Secretary **no later than 60 days after placing the LNG terminal in service.** However, if the noise attributable to the operation of the LNG terminal exceeds 55 dBA $L_{dn}$ at an NSA or the noise increase exceeds 10 dBA sound level that is exceeded more than 90 percent of the time ($L_{90}$) at an NSA, Weaver's Cove shall file a report on what changes are needed and shall install additional noise controls to meet the level within 1 year of the in-service date. Weaver's Cove shall confirm compliance with these requirements by filing a second noise survey with the Secretary no later than 60 days after it installs the additional noise controls.

**The following measures apply to the LNG terminal design and construction details. Information pertaining to these specific recommendations 33 through 61, unless otherwise noted, shall be filed with the Secretary for review and approval by the Director of OEP either: prior to initial site preparation; prior to construction of final design; prior to commissioning; or prior to commencement of service. This information shall be submitted a minimum of 30 days before approval to proceed is required.**

33. Weaver's Cove shall examine provisions to retain any vapor produced along the transfer line trenches and other areas serving to direct LNG spills to associated impoundments. Measures to be considered may include, but are not limited to: vapor fencing, intermediate sump locations, or trench surface area reduction. Weaver's Cove shall file final drawings, including cross sections, and specifications for these measures with the Secretary **prior to initial site preparation** for review and approval by the Director of OEP.

34. Weaver's Cove shall develop emergency evacuation routes for the areas along the route of the LNG vessel transit in conjunction with the local emergency and town officials and file the routes with the Secretary for review and approval by the Director of OEP **prior to initial site preparation.**

35. Weaver's Cove shall provide a technical review of its facility design that:

    a. Identifies all combustion/ventilation air intake equipment and the distance(s) to any possible hydrocarbon release (LNG, flammable refrigerants, flammable liquids, and flammable gases).

    b. Demonstrates that these areas would be adequately covered by hazard detection devices and indicate how these devices would isolate or shutdown any combustion equipment whose continued operation could add to or sustain an emergency. Fired heaters shall be shut down in the event of an LNG spill, or presence of a flammable vapor cloud.

    Weaver's Cove shall file this review **prior to initial site preparation.**

36. **Prior to initial site preparation**, Weaver's Cove shall provide documentation, or a limited waiver from the Department of Transportation, on how the LNG tank would meet National Fire Protection Association (NFPA) 59A Table 2-2.4.1, which requires the distance from the edge of the impoundment to the property line to be not less than 0.7 times the container diameter. The separation distance from the LNG tank impoundment wall to the property boundaries on the southwestern area of the site where the proposed plant property line abuts the shoreline of the Taunton River does not appear to meet the 0.7 criteria.

37. **Prior to initial site preparation**, Weaver's Cove shall file a firewater system design that provides for fire water flow to be maintained for a minimum of two hours, in accordance with code requirements. The fire water tank shall be automatically filled from the city mains supply and the city mains pressure continuously monitored and alarmed at low pressure. As an alternative, river water may be evaluated for use in the firewater system.

38. The portion of the planned retaining wall on the riverbank, which is opposite the tanks, shall be designed to ensure the stability of the LNG storage tank in a Safe Shutdown Earthquake (SSE) event. A slope stability analysis shall be conducted in order to ascertain the adequacy of the proposed retaining wall structures. The LNG tank shall be designed to withstand the SSE event as required by 49 C.F.R. Part 193 and NFPA 59A (2001). All other structures shall be designed to withstand the effects of an Operating Basis Earthquake, as required by 49 C.F.R. Part 193 and NFPA 59A (2001), and, further, the condition of these structures shall not adversely affect the stability and integrity of the tank in the SSE event. **Prior to initial site preparation**, Weaver's Cove shall file the results of the hydraulic test and stone column field test, and the final LNG storage tank design for seismic review and approval by the Director of OEP.

39. Weaver's Cove shall revise the design of the impoundment sump to accommodate a design spill from the LNG storage tank in-tank pump discharge header with five pumps operating at maximum capacity. **At least 30 days prior to initial site preparation,** Weaver's Cove shall submit revised calculations showing the 1,600 Btu/ft$^2$-hr exclusion zone for the altered impoundment sump would meet the requirements of Title 49 C.F.R. Part 193.

40. Weaver's Cove shall provide evidence of its ability to exercise control over the activities that occur within the portions of the thermal exclusion zones that fall outside the site property line. Alternatively, Weaver's Cove may apply to the Department of Transportation for approval of a waiver, from its Title 49 C.F.R. Part 193 regulation, that specifies what alternative mitigation measures or plan Weaver's Cove may provide that would afford an equal or greater level of thermal radiation protection as the requirement for control over activities within the modeled exclusion zones. Weaver's Cove shall file this evidence or waiver **prior to initial site preparation.**

41. Weaver's Cove shall revise the design of the impoundment sump to accommodate a design spill from the LNG storage tank in-tank pump discharge header with five pumps operating at maximum capacity. **At least 30 days prior to initial site preparation,** Weaver's Cove shall submit revised calculations demonstrating that the flammable vapor dispersion exclusion zone for the altered impoundment sump would meet the requirements of Title 49 C.F.R. Part 193.

42. Weaver's Cove shall provide a comprehensive plan identifying the mechanisms for funding all project-specific security/emergency management costs that would be imposed on state and local agencies. In addition to the funding of direct transit-related security/emergency management costs, this comprehensive plan shall include funding mechanisms for the capital costs associated with any necessary security/emergency management equipment and personnel base. This plan shall be filed with the Secretary **prior to initial site preparation** for review and approval by the Director of OEP.

43. The **final design** shall include a re-evaluation of the use of butterfly valves for high pressure isolation.

44. The **final design** of the hazard detection equipment shall include redundancy and fault detection and fault alarm monitoring in all potentially hazardous areas and enclosures.

45. The **final design** of the hazard detection equipment shall provide flammable gas and ultraviolet/infrared (UV/IR) hazard detectors with local instrument status indication as an additional safety feature.

46. The **final design** shall include a boil-off gas flow measurement system for the LNG storage tank.

47. The **final design** shall include a reliable measurement system to monitor deflections during the hydraulic test. At a minimum, this system shall include two slope indicator ducts which bisect the tank in mutually perpendicular directions, monitoring points at the terminals of these ducts, and other monitoring points along the perimeter of the concrete shell, so that sag, warping, tilt, and settlement can be monitored. Tolerances for sag, tilt, and shell warping shall meet or exceed the limits specified by the tank manufacturer.

48. The **final design** of the LNG tank carbon steel piping support plates and connections to piping supports shall provide adequate corrosion protection. Provisions for corrosion monitoring and maintenance of carbon steel attachments shall be included in the design and maintenance procedures.

49. The **final design** of the LNG pumps shall include discharge flow measurement for minimum flow recycle control.

50. The **final design** shall include provisions to ensure that hot glycol/water circulation is operable at all times when LNG is present in the LNG booster pump discharge piping or when the temperature in the LNG inlet channel to any vaporizer is below 0° Fahrenheit (F).

51. The **final design** shall include detection instrumentation and shut down procedures for vaporizer tube leak, shell side overpressure, or bursting disc failure.

52. The **final design** shall include temperature measurement of the vaporizer common discharge header which shall alarm the low temperature condition.

53. The **final design** shall include provisions to recover boil-off gas, under all conditions, in the event that the send out vaporization system is not in operation.

54. The **final design** shall include automatic isolation valves at the suction and discharge of screw compressors and reciprocating boil-off compressors.

55. The **final design** shall ensure that air gaps are installed downstream of all seals or isolations installed at the interface between a flammable fluid system and an electrical conduit or wiring system. Each air gap shall vent to a safe location and be equipped with a leak detection device that: would continuously monitor for the presence of a flammable fluid; would alarm the hazardous condition; and would shutdown the appropriate systems.

56. The **final design** of the relief vent stacks shall include Resistance Temperature Detectors capable of measuring low and high temperature.

57. The **final design** shall ensure that dry nitrogen be supplied for purging cold systems.

58. The **final design** shall include safeguards to protect above ground fire water piping, including post indicator valves, from inadvertent damage.

59. The **final design** shall include a fire protection evaluation carried out in accordance with the requirements of NFPA 59A, Chapter 9.1.2.

60. The **final design** shall include procedures for offsite contractors' responsibilities, restrictions, limitations, and supervision of the contractors by Weaver's Cove staff.

61. Security personnel requirements for prior to and during LNG vessel unloading shall be filed **prior to commissioning.**

62. Operation and maintenance procedures and manuals, as well as emergency plans, emergency evacuation plan, and safety procedure manuals, shall be filed **prior to commissioning.**

63. The contingency plan for failure of the outer LNG tank containment shall be filed **prior to commissioning.**

64. Copies of the Coast Guard security plan, vessel operation plan, and emergency response plan shall be provided to the FERC staff **prior to commissioning.**

65. Weaver's Cove shall coordinate with the Coast Guard to define the responsibilities of Weaver's Cove's security staff in supplementing other security personnel and in protecting the LNG ships and terminal **prior to commissioning.**

66. A copy of the criteria for horizontal and rotational movement of the inner vessel for use during and after cool down shall be filed **prior to commissioning.**

67. Weaver's Cove shall develop an initial Emergency Response Plan (including evacuation) and coordinate procedures with local emergency planning groups, fire departments, state and local law enforcement, and appropriate federal agencies. **This plan shall include at a minimum:**

    a. designated contacts with state and local emergency response agencies;

    b. scalable procedures for the prompt notification of appropriate local officials and emergency response agencies based on the level and severity of potential incidents;

    c. procedures for notifying residents and recreational users within areas of potential hazard;

    d. evacuation routes for residents along the route of the LNG vessel transit;

    e. locations of permanent sirens and other warning devices; and

    f. an "emergency coordinator" on each LNG vessel to activate sirens and other warning devices.

    The initial Emergency Response Plan shall be filed with the Secretary for review and approval by the Director of OEP **prior to initial site preparation.** Weaver's Cove shall notify FERC staff of all meetings in advance and shall report progress on its Emergency Response Plan at 6-month intervals starting at the commencement of construction.

68. The FERC staff shall be notified of any proposed revisions to the security plan and physical security of the facility **prior to commencement of service.**

69. Progress on the construction of the LNG terminal shall be reported in **monthly** reports filed with the Secretary. Details shall include a summary of activities, problems encountered and remedial actions taken. Problems of significant magnitude shall be reported to the FERC **within 24 hours.**

**The following measures apply throughout the operation life of the LNG facility.**

70. The facility shall be subject to regular FERC staff technical reviews and site inspections on an **annual** basis, or more frequently as circumstances indicate. Prior to each FERC staff technical review and site inspection, Weaver's Cove shall respond to a specific data request including information relating to possible design and operating conditions that may have been imposed by other agencies or organizations. Weaver's Cove shall also provide up-to-date detailed piping and instrumentation diagrams reflecting facility modifications and provision of other pertinent information not included in the semi-annual reports described below, including facility events that have taken place since the previously submitted annual report.

71. Weaver's Cove shall file **semi-annual** operational reports with the Secretary to identify changes in facility design and operating conditions, abnormal operating experiences, activities (including ship arrivals, quantity and composition of imported LNG, vaporization quantities, boil-off/flash gas, *etc.*), plant modifications including future plans and progress thereof. Abnormalities shall include, but not be limited to: unloading/shipping problems, potential hazardous conditions from offsite vessels, storage tank stratification or rollover, geysering, storage tank pressure excursions, cold spots on the storage tanks, storage tank vibrations and/or vibrations in associated cryogenic piping, storage tank settlement, significant equipment or instrumentation malfunctions or failures, non-scheduled maintenance or repair (and reasons therefore), relative movement of storage tank inner vessels, vapor or liquid

releases, fires involving natural gas and/or from other sources, negative pressure (vacuum) within a storage tank and higher than predicted boil-off rates. Adverse weather conditions and the effect on the facility also shall be reported. Reports shall be submitted **within 45 days** after each period ending June 30 and December 31. In addition to the above items, a section entitled "Significant plant modifications proposed for the next 12 months (dates)" also shall be included in the semi-annual operational reports. Such information would provide the FERC staff with early notice of anticipated future construction/maintenance projects at the LNG facility.

72. In the event the temperature of any region of any secondary containment, including imbedded pipe supports, becomes less than the minimum specified operating temperature for the material, Weaver's Cove shall notify the Commission **within 24 hours** and shall specify the procedures for corrective action.

73. Weaver's Cove shall make a foundation elevation survey of the LNG tank on an annual basis.

74. Weaver's Cove shall report to FERC staff any significant non-scheduled events, including safety-related incidents (*i.e.*, LNG or natural gas releases, fires, explosions, mechanical failures, unusual overpressurization, and major injuries) and security-related incidents (*i.e.*, attempts to enter site, suspicious activities) **within 24 hours of the event.** In the event an abnormality is of significant magnitude to threaten public or employee safety, cause significant property damage, or interrupt service, notification shall be made immediately, without unduly interfering with any necessary or appropriate emergency repair, alarm, or other emergency procedure. This notification practice shall be incorporated into the LNG facility's emergency plan. Examples of reportable LNG-related incidents include:

   a. fire;

   b. explosion;

   c. estimated property damage of $50,000 or more;

   d. death or personal injury necessitating in-patient hospitalization;

   e. free flow of LNG for five minutes or more that results in pooling;

   f. unintended movement or abnormal loading by environmental causes, such as an earthquake, landslide, or flood, that impairs the serviceability, structural integrity, or reliability of an LNG facility that contains, controls, or processes gas or LNG;

   g. any crack or other material defect that impairs the structural integrity or reliability of an LNG facility that contains, controls, or processes gas or LNG;

   h. any malfunction or operating error that causes the pressure of a pipeline or LNG facility that contains or processes gas or LNG to rise above its maximum allowable operating pressure (or working pressure for LNG facilities) plus the build-up allowed for operation of pressure limiting or control devices;

   i. a leak in an LNG facility that contains or processes gas or LNG that constitutes an emergency;

   j. inner tank leakage, ineffective insulation, or frost heave that impairs the structural integrity of an LNG storage tank;

   k. any safety-related condition that could lead to an imminent hazard and cause (either directly or indirectly by remedial action of the operator), for purposes other than abandonment, a 20 percent reduction in operating pressure or shutdown of operation of a pipeline or an LNG facility that contains or processes gas or LNG;

   l. safety-related incidents to LNG vessels occurring at or en route to and from the LNG facility; or

   m. an event that is significant in the judgment of the operator and/or management even though it did not meet the above criteria or the guidelines set forth in an LNG facility's incident management plan.

   In the event of an incident, the Director of OEP has delegated authority to take whatever steps are necessary to ensure operational reliability and to protect human life, health, property or the environment, including authority to direct the LNG facility to cease operations. Following the initial company notification, FERC staff would determine the need for a separate follow-up report or follow-up in the upcoming semi-annual operational report. All company follow-up reports shall include investigation results and recommendations to minimize a reoccurrence of the incident.

75. Weaver's Cove shall **annually** review its waterway suitability assessment for the project; update the assessment to reflect changing conditions; provide the updated assessment to the cognizant Captain of the Port/Federal Maritime Security Coordinator for review and validation; and provide a copy to the FERC staff.

76. Any security plans shall make allowance to have at least one of the Braga and

Brightman Street bridges remain open during the passage of LNG vessels through the federal navigation channel in the Taunton River and consideration shall be given to scheduling bridge closures to avoid peak traffic periods.

77. Before commencement of any construction-related activities on the site formerly owned by Shell proposed for the LNG facilities approved here, Shell and Weaver's Cove must present appropriate evidence that they have reached agreement regarding deed restrictions with respect to future activities and use limitations on the site, or that a Massachusetts court of appropriate jurisdiction has resolved such deed restriction issues regarding Weaver's Cove's future use of the site.

**Suedeen G. Kelly, Commissioner,** ***dissenting:***

This order authorizes Weaver's Cove Energy, L.L.C. to site, construct and operate an LNG terminal in Fall River, Massachusetts, under Section 3 of the Natural Gas Act. The order finds that the proposed new LNG terminal will promote the public interest by increasing the availability of new natural gas supplies in the New England market. The order emphasizes that New England's demand for natural gas is expected to grow and the region should have adequate delivery infrastructure to meet winter cold peak demands only through 2010.[1]

I agree with the majority that New England needs more infrastructure for greater gas supplies to meet projected demand after 2010. However, I do not believe that the Weaver's Cove project is the way to meet this need. First, there are numerous projects under construction, as well as additional proposed projects, that can meet the region's growing demand for gas. Second, the safety, environmental, and socioeconomic concerns related to the Weaver's Cove project outweigh the benefit of the added natural gas to be supplied by it. Therefore, I find it to be inconsistent with the public interest to authorize the siting, construction and operation of this new LNG terminal in Fall River, Massachusetts.

*Alternatives Exist*

The proposed Weaver's Cove facilities include an LNG terminal and storage facility, which would be able to provide LNG for delivery via truck to peakshaving facilities in the region. Through pipe and truck, Weaver's Cove would transport up to 800 MMcf per day of natural gas to the Northeast market, beginning in 2010.[2] The FEIS concludes that no alternative projects would be able to meet all of the objectives of the Weaver's Cove project, since such projects would not be able to provide a new source of imported LNG for the New England peakshaving market.[3] However, I believe that there are numerous gas infrastructure projects proposed to serve the New England region that present reasonable alternatives to the Weaver's Cove facility. These planned and proposed projects would introduce new sources of natural gas into the New England area by 2010. As the New England Governors' Conference Report finds, "to avoid leaving some customers without space heat in 2010 and after, additional gas supply infrastructure (*either expanded pipeline capacity* or expanded LNG storage capacity) or resources that reduce gas demand would have to have been added to the system" (emphasis added).[4]

There are two already-approved Eastern Canadian LNG terminals that are currently under construction and are expected to start deliveries by 2008. Irving Oil Ltd.'s Canaport LNG Project in New Brunswick will be able to vaporize and send out about 1.0 Bcf per day of natural gas. Anadarko Petroleum Corporation's Bear Head LNG facility in Nova Scotia will be able to vaporize and send out about 750 MMcf per day of natural gas to the Maritimes & Northeast Pipeline system. Anadarko recently announced that it has signed agreements for nominated capacity on a planned expansion of the Maritimes & Northeast Pipeline to accommodate the initial Bear Head sendout capacity to markets in eastern Canada and the Northeast. In addition, Tennessee Gas Pipeline Company, another pipeline that delivers gas into New England, has announced a non-binding open season for its Atlantic Supply Expansion project, which is designed to respond to the development of LNG terminals in eastern Canada and the Northeast. This project could bring an additional 250 MMcf per day into Tennessee Gas Pipeline's system at its Dracut, Massachusetts interconnection with the joint facilities of Maritimes & Northeast Pipeline and Portland Natural Gas Transmission System.

There are other LNG import terminals being planned for the New England region. Neptune LNG and Excelerate Energy L.L.C. have independently proposed to build LNG import facilities off the coast of Massachusetts that would provide a new source of LNG into the New England market area. Neptune LNG's facility would have an average sendout capacity of 400 MMcf per day and a peak capacity of 750 MMcf per day.[5] Excelerate Energy L.L.C.'s Northeast Gateway Project would have a baseload capacity of 400 MMcf per day and

---

[1] Order at P 6 citing The Power Planning Committee of the New England Governors' Conference, Inc., *Meeting New England's Future Gas Demands: Nine Scenarios and Their Impacts*, March 1, 2005 (New England Governors' Conference Report).

[2] The new/existing Brightman Street construction will delay the proposed schedule for the LNG terminal operations by at least two to three years until 2010. *See* Order at P 108 & n.58.

[3] *See* pages 3-27-28.

[4] New England Governors' Conference Report at page viii.

[5] Neptune LNG filed a deepwater port application with the Coast Guard on February 15, 2005.

a peak capacity of 800 MMcf per day.[6] Algonquin Gas Transmission, LLC has filed an application with the Commission to construct and operate a 16-mile pipeline that will connect Algonquin's New England-area natural gas pipeline system to the proposed Northeast Gateway Project.

In addition to these LNG terminals with associated pipeline expansion, Tennessee Gas Pipeline Company has completed a binding open season for its proposed Northeast ConneXion-New England project. This project would provide an additional 136 MMcf per day of natural gas from Texas and Louisiana by increasing compression capacity at existing compressor stations in New York and Massachusetts.

*Significant Safety Issues Are Raised*

In my view, this project raises significant, unresolved safety issues, especially in the event of an intentional breach of an LNG vessel as it passes by densely populated shoreline communities en route to the LNG import terminal in Fall River. The LNG vessels must pass under or through four well-traveled bridges and transit 21 nautical miles from the entrance of Narragansett Bay at Brenton Point through the Mount Hope Bay and up the Taunton River. As detailed below, the vessels will present a potential hazard to the people and buildings located along the passageway during the 4-hour transit to the terminal and the 10 to 12 hours while the vessels are docked and unloading cargo. Further, I believe that the lack of adequate emergency resources[7] and the need for evacuation within a short time interval, in the event of an LNG cargo release, present serious obstacles to creating a viable Emergency Response Plan and evacuation plan.

The inbound transit through the East Passage of Narragansett Bay would pass by Newport, Middletown and Jamestown, Rhode Island. After turning at Sandy Point, the LNG vessels would pass by Bristol, Massachusetts, and in the vicinity of the Mount Hope Bridge. The LNG vessel would then travel within the 400-foot-wide channel through Mount Hope Bay and the Taunton River and would pass by Woodman Street and the south of Fall River, the State Pier near the center of Fall River, the Braga Bridge, and Somerset. The FEIS concludes that "[s]ome areas of development along the shoreline in the path of the LNG vessel transit in Rhode Island and Massachusetts could be within a potential transient hazard area, while parts of North Fall River would be exposed to a potential hazard while the LNG vessel is at the dock and unloading cargo."[8] I agree with this assessment, and it is a significant concern to me.

Specifically, the FEIS states that, assuming an LNG vessel transits the Taunton River at 3 knots while under tug assist, the adjacent communities located within a 4,340 to 4,810-foot distance to the 1,600 Btu/ft$^2$-hr thermal radiation level for a 2.5 and 3-meter diameter hole would be exposed to a potential transient hazard "for less than 30 minutes."[9] While transiting the East Passage to Sandy Point at 10 knots, the transient hazard to shoreside communities would be "less than 10 minutes."[10] A temporary hazard would also exist around the slip during part of the 10– to 12–hour period while the LNG vessel is at the dock and unloading cargo. For a spill in the vicinity of the dock, approximately 1,600 to 2,100 buildings, including single-family residences and multi-family units, would be within the temporary hazardous area.[11] Also located in this area are an elementary school, a rehabilitation and nursing center, a public housing project, an apartment building and a MassHighway facility.[12] I find the length of these exposures to the people along the transit route and the vicinity of the dock to be unacceptable.

The FEIS also evaluates the potential impact of an LNG spill on equipment and infrastructure. A thermal radiation level of 10,000 Btu/ft2-hr could potentially damage equipment and infrastructure. A fire associated with a potential spill in the vicinity of the Weaver's Cove's dock, resulting from a nominal cargo tank hole from an intentional event could expose the Somerset power plant, the proposed LNG storage tank, approximately one-half mile of Route 79 and one-half mile of proposed commuter rail to a thermal radiation level of 10,000 Btu/ft$^2$-hr for 10 to 15 minutes.[13]

For potential spills at the new Brightman Street Bridge and the Braga Bridge, the number of residences, buildings, schools and other facilities located within the 1,600 Btu/ft$^2$-hr transient hazard area would be approximately 1,600 to 2,300 and 1,200 to 1,600, respectively. At Fall River near Woodman Street, approximately 800 to 1,200 residences would be located in the transient hazard area. Approximately 100 to 300 residences and buildings would be located in the transient hazard area at the Mount Hope Bridge. The western-most portions of the U.S. Naval Station in Newport would also lie within a 1,600 Btu/hr-ft$^2$ transient hazard area. The transient hazard area from an LNG vessel spill in the main channel of the East

---

[6] Excelerate Energy, L.L.C. and Algonquin Gas Transmission, LLC filed environmental notification forms for the Northeast Gateway LNG Project and associated pipeline projects with the Secretary of the Massachusetts Executive Office of Environmental Affairs on March 15, 2005. Excelerate Energy, L.L.C. has commenced commercial operations of its Gulf Gateway Project in the Gulf of Mexico, which uses the same technology as the proposed Northeast Gateway Project.

[7] *See, e.g.*, June 9, 2005 comments from Fire Chief David L. Thiboutot, City of Fall River; Fire Chief Stephen Rivard, Town of Somerset; and Dr. Bruce S. Auerbach, the Vice President and Chief of Emergency and Ambulatory Services at Sturdy Memorial Hospital in Attleboro, Massachusetts.

[8] *See* page 4-279.

[9] *See id.*

[10] *See* page 4-280.

[11] *See id.*

[12] *See id.*

[13] *See id.*

Passage in the vicinity of Newport and Jamestown would not affect most shoreside areas. However, potential spill locations in deepwater areas outside the main channel and closer to shore were also evaluated. For a spill outside the normal route, an estimated 660 to 720 and 420 to 610 residences in Jamestown and Newport, respectively, would fall within these potential transient hazard areas.[14] Again, these threats present risks that should not be run, given that alternatives to the Weaver's Cove facility are available.

This order requires Weaver's Cove to develop emergency evacuation routes for the areas along the route of the LNG vessel transit prior to construction and to develop an initial Emergency Response Plan, including evacuation, prior to initial site preparation, in cooperation with local groups.[15] However, in light of the proposed transit of the LNG vessel past densely populated shoreline communities and well-traveled bridges, local officials' concerns about the lack of adequate emergency resources, and the need for evacuation within short time intervals in case of a release of LNG cargo, I believe that there are serious impediments to the development of a viable, effective Emergency Response Plan and evacuation plan in the area.

*Adverse Environmental Impacts Will Occur*

This project would have significant adverse environmental impacts due to dredging and LNG ship ballasting. To allow LNG ships to transit, dock and turn in the Taunton River, the existing navigation channel and a portion of the east channel must be permanently deepened to a depth of 37 feet below Mean Lower Low Water (MLLW). In addition, horizontal dredging would take place within the existing 400-foot wide channel and the turning basin would need to be permanently enlarged and deepened to 41 feet MLLW. The project would require the dredging of up to 2.6 million cubic yards of sediment from the Mount Hope Bay and Taunton River and a turning basin to enable LNG ships to transit, dock and turn in the Taunton River.[16] The dredging would disturb about 191 acres of river and bay bed.[17] At this time, it remains uncertain how Weaver's Cove will dispose of the contaminated dredged sediment from the Taunton River and the New Hope Bay.[18]

The proposed project area serves as an important winter flounder spawning and juvenile development habitat. The project would have adverse effects on this species, including the temporary loss of 6.2 acres of winter flounder spawning habitat and a permanent loss of 11 acres of winter flounder habitat due to the deepening and widening of the turning basin. Further, there would be entrainment or impingement of larvae and eggs during the operation of the LNG terminal when ballast water would be withdrawn from the river by ships during offloading of LNG. A total of 980 million gallons of water could be withdrawn each year from the river for ship ballast, which would entrain and/or impinge larvae and eggs. The cumulative impact of these losses, when combined with the numbers lost as the result of power plant operations in the area, will further stress the fish populations in Mount Hope Bay and Narragansett Bay.[19]

*Socioeconomic Impacts Will Affect the Communities*

This project will also cause socioeconomic impacts on the affected communities. Weaver's Cove estimates the arrival and departure of 50 to 70 LNG ships per year. Vehicle traffic delays resulting from the temporary closure of the Brightman Street Bridge could span 16 minutes per transit. The temporary closures of the Pell Bridge, Mount Hope Bridge, and Braga Bridge during the LNG vessel transit would result in delays ranging from 6 to 8 minutes per transit. The safety and security zone enforced around each LNG ship and around the ship unloading facility while it is docked could result in recreational boating delays of up to 60 minutes. For boaters near or upstream of the facility, there could be an additional 60-minute delay while the LNG ship is berthed or turned. In addition, recreational boaters could be prevented from boating or fishing in the vicinity of a moored LNG ship for approximately 24 hours.

*Conclusion*

In sum, the existence of reasonable alternatives for bringing much-needed natural gas supplies to New England, combined with safety concerns posed by the unique geography of the area and the close proximity of densely populated communities along the LNG vessel transit path and near the dock, the adverse impacts on the environment, and the socioeconomic impacts of this proposed LNG facility, lead me to conclude that the Weaver's Cove project is not consistent with the public interest under NGA Section 3. Therefore, I respectfully dissent from this order.

---

[14] *See id.*

[15] *See* Order at PP 98-99.

[16] *See* FEIS at page 3-70.

[17] *See* page 2-25.

[18] The Massachusetts Department of Environmental Protection is still reviewing Weaver's Cove's proposal to dispose of the dredged sediment on the project site. The U.S. Army Corps of Engineers and the U.S. Environmental Protection Agency are still evaluating whether offshore disposal of some of the dredged sediment is suitable.

[19] *See* page 4-304.