"review its SECA policies and take expeditious and appropriate remedial steps." However, this Order does not constitute a review of, or remedy to, our SECA policies. Additionally, this Order threatens to run counter to two other desires expressed by the conferees regarding SECA, namely that the Commission provide a "clear accounting of actual costs or proper allocation" of SECA charges and provide "proper and appropriate procedural protections to all parties" impacted by SECA. Therefore, I dissent from this Order.

SECA charges are currently being recovered from participants in the Midwest Independent Transmission System Operator (MISO) market. These charges will expire in April 2006. The instant case is merely a proceeding to account for the actual costs giving rise to these SECA charges and to provide for the proper allocation of SECA charges. The instant case does not concern itself with the Commission's SECA policies. Therefore, ordering that the decision in this case be issued two months before the date that the Chief Administrative Law Judge has determined is the appropriate procedural deadline will do nothing to "remedy" our SECA policies. On the contrary, it will cause the hearing process set for this case to be truncated.

I believe that arbitrarily interfering with the hearing process in this case runs counter to the conferees' desire that the parties have "proper and appropriate procedural protections." Shortening the hearing process in this case may also impede the ultimate goal of the hearing, *i.e.*, to arrive at a "clear accounting of actual costs [and] proper allocation" of the SECA charges. This too would run counter to the conferees' wishes. Finally, because the Commission has not even sought comment on its decision to shorten the process, the Commission risks denying the parties their due process rights. If that is the result of this Order, the decision in this case will not withstand judicial scrutiny on due process grounds. Then the Commission would have to revisit its decisions in this case, which would delay a resolution of these important issues. Such a delay would be contrary to the conferees' concern that the Commission act in an "expeditious" manner.

Accordingly, for these reasons, I respectfully dissent.

**[¶ 61,058]**

## Weaver's Cove Energy, LLC, Docket No. CP04-36-001

## Mill River Pipeline, LLC, Docket Nos. CP04-41-001, CP04-42-001 and CP04-43-001

## Order on Rehearing

**(Issued January 23, 2006)**

**Before Commissioners: Joseph T. Kelliher, Chairman; Nora Mead Brownell, and Suedeen G. Kelly.**

1. On July 15, 2005, the Commission issued an order authorizing Weaver's Cove Energy, LLC (Weaver's Cove) under Section 3 of the Natural Gas Act (NGA) to site, construct and operate a liquefied natural gas (LNG) terminal in Fall River, Massachusetts.[1] Weaver's Cove's authorization is subject to a number of environmental and other conditions. The Commission also issued a certificate of public convenience and necessity to Mill River Pipeline, LLC (Mill River), an affiliate of Weaver's Cove, under Section 7 of the NGA to construct and operate two short lateral pipelines to connect the LNG terminal to the interstate pipeline system of Algonquin Gas Transmission Company (Algonquin).

2. Timely requests for rehearing and/or clarification of the July 15 Order were filed by Weaver's Cove; the City of Fall River, Massachusetts, jointly with the Attorney General of the Commonwealth of Massachusetts, the Attorney General of the State of Rhode Island, and the Massachusetts Energy Facilities Siting Board (jointly Fall River); the Conservation Law Foundation; Shell Oil Products US (Shell); KeySpan Delivery Companies (KeySpan); and Michael L. Miozza.

3. On rehearing, Fall River asserts, *inter alia*, that the Commission should deny the project based upon recent legislation that prohibits demolition of the old Brightman Street Bridge over the Taunton River. Fall River and the Conservation Law Foundation renew their arguments regarding safety and consideration of alternatives to the Weaver's Cove project, and they question whether the project would be consistent with the Wild and Scenic Rivers Act.

4. Weaver's Cove and Shell raise questions regarding several conditions the July 15 Order places on the Commission's approval of the project. Weaver's Cove argues that the billing determinants the July 15 Order requires for Mill River's rates based on theoretical capacity are too high. KeySpan, a shipper on the Algonquin system, requests the Commission to clarify that the July 15 Order does not address gas quality tariff issues

[1] 112 FERC ¶ 61,070 (2005) (July 15 Order).

relating to introduction of regasified LNG from Mill River into Algonquin.

5. For the reasons set forth below, we are granting Weaver's Cove's request for rehearing of the rate issue and denying the other requests for rehearing.

*Background*

6. On July 11, 2003, the Commission, at Weaver's Cove's request, initiated National Environmental Policy Act of 1969 (NEPA) review of this project under the Commission's pre-filing procedures.[2] The Commission issued a notice of intent to prepare an environmental impact statement (EIS) for this project, inviting comments on environmental aspects of the project from the public.[3]

7. The July 11, 2003 notice explained that Commission staff had already met in Fall River on May 2, 2003, with representatives of Weaver's Cove and key federal and state agencies to discuss the project and the environmental review process. These agencies included the U.S. Army Corps. of Engineers (COE), the U.S. Coast Guard, the Massachusetts Department of Environmental Protection, the Massachusetts Energy Facilities Siting Board, the Massachusetts Executive Office of Environmental Affairs, the Rhode Island Coastal Resources Management Council, and the Rhode Island Department of Environmental Management. The notice invited other federal, state, and local agencies with jurisdiction or special expertise with respect to environmental issues to cooperate in preparing the Commission's environmental impact statement. The notice was also sent to all nearby landowners, elected officials, environmental and public interest groups, and local libraries and newspapers. All interested parties were invited to submit written comments and to attend a public scoping meeting conducted jointly by staff from this Commission and the Massachusetts Executive Office of Environmental Affairs on July 29, 2003.

8. Approximately five months later, on December 19, 2003, Weaver's Cove filed an application proposing to construct an LNG terminal with a peak day sendout capacity of 800 MMcf a day on a site located on the Taunton River in the City of Fall River, Massachusetts. Notice of the proposal was issued on December 12, 2003, and published in the *Federal Register* on January 9, 2004.[4] The proposed facilities include a marine berth, an LNG storage tank, regasification facilities, and an LNG truck distribution facility. The proposed terminal will store LNG that it receives from ocean-going ships. LNG will be transferred into trucks for transportation to peak shaving storage facilities and industrial customers throughout New England, and vaporized (regasified) LNG will be delivered as pipeline quality natural gas into two pipeline laterals to be constructed by Mill River for transportation to separate interconnects with the Algonquin system for further transportation to customers.

9. On July 30, 2004, 2004, the Commission issued a draft environmental impact statement (DEIS) addressing environmental and safety matters associated with the project and invited comments from the public. In accordance with Council on Environmental Quality (CEQ) regulations, we provided a 45-day comment period.[5] In response to our invitation, the Commission received a large number of comments from local, state and federal government agencies, environmental groups, and individuals. The Commission also conducted two public comment meetings in the project area (one in Massachusetts and one in Rhode Island) on September 8 and 9, 2004.

10. On May 20, 2005, we issued a final environmental impact statement (FEIS). The FEIS addressed each comment on the DEIS. In some cases, based on the comments to the DEIS, we requested additional material from Weaver's Cove. The new material was addressed in the FEIS, and where appropriate the FEIS modified earlier recommendations for environmental conditions set forth in the DEIS. The FEIS also discusses a study of LNG safety issued after the DEIS by the U.S. Department of Energy's Sandia National Laboratories, *Guidance on Risk Analysis and Safety Implications of a Large Liquefied Natural Gas (LNG) Spill Over Water* (Sandia Report). The FEIS also discusses comments from the United States Coast Guard regarding ship transit and port security matters.[6]

11. On July 15, 2005, the Commission found that the proposed new LNG terminal will promote the public interest by increasing the availability of natural gas supplies in the New England market, and that the Mill River laterals are required by the public convenience and necessity to connect the proposed LNG facilities to the interstate pipeline system. Pursuant to the July 15 Order, before construction may begin, Weaver's Cove must sat-

---

[2] The purpose of the pre-filing process is to involve interested stakeholders early in project planning and to identify and resolve issues before an application is filed with the Commission. The NEPA pre-filing process does not necessarily shorten the time period that is required for Commission staff to complete its environmental analysis; rather, the pre-filing process allows the Commission to process the application in less time after it is filed because the environmental record is completed closer to the filing date.

[3] See Notice of Intent to Prepare an Environmental Impact Statement for the Proposed Weaver's Cove LNG Project, Request for Comments on Environment Issues, and Notice of Joint Public Scoping Meeting (NOI), 68 Fed.Reg. 42699 (July 18, 2003).

[4] 69 *Fed. Reg.* 1580.

[5] In practice, however, the Commission continued to receive and consider comments it received until it issued the final EIS in May 2005.

[6] During this period, the Coast Guard conducted a series of project-specific security workshops with port stakeholders, and federal, state, and local agencies identifying measures that would be necessary to manage risks associated with LNG vessel traffic.

isfy a number of environmental and safety conditions, including: the approval of emergency response and evacuation plans; concurrence from the states of Massachusetts and Rhode Island that the project is consistent with those states' coastal zone management programs; appropriate state or federal approvals regarding water quality, air quality, and dredging; and evidence that the proposed use of the terminal site is consistent with applicable deed provisions and the Massachusetts Contingency Plan.

*Procedural Matters*

*Filings by Towns in Rhode Island*

12. On September 26, 2005, the City of Newport and the Towns of Bristol, Tiverton, Middletown, and Portsmouth, Rhode Island (the Towns) jointly filed a pleading styled an *amicus* brief to express their opposition to the July 15 Order's authorization of the Weaver's Cove LNG project. Each of the Towns is located along the water route for LNG tankers to and from Fall River. The Towns do not seek late intervention. The Towns state that they did not intervene in the proceeding because their positions were consistent with the opposition to the project advanced by the Governors and Attorneys General of Massachusetts and Rhode Island, and other elected officials. On October 14, 2005, the Town of Jamestown, Rhode Island submitted a similar filing. On October 31, 2005, Weaver's Cove replied to the Towns' pleadings, urging that the Commission reject them because they are untimely and improperly filed by non-parties to the proceeding.

*Commission Response*

13. The Towns acknowledge that they had ample notice of the Weaver's Cove project, but state that they chose not to participate in this proceeding and participate until now because their interests were being well represented by others. The Towns now disagree with the Commission's July 15 Order approving the Weaver's Cove project, and urge that the Commission reverse that approval. The time for filing comments has long passed. Moreover, these pleadings were submitted more than two months after the Commission's July 15 Order was issued. Under Section 19(a) of the NGA and the Commission's Rules of Practice and Procedure, only parties to a proceeding may file requests for rehearing, and such requests must be filed within 30 days of the Commission's order.[7] Accepting the Towns' pleadings for consideration as *amicus* filings would allow the Towns to do indirectly what they cannot do directly in violation of our rules and the statute. Accordingly, the Towns' September 26, 2005 and October 14, 2005 filings will be rejected.[8]

*Comments Filed Prior to the July 15 Order*

*Comments on the FEIS*

14. Several parties to the proceeding submitted comments on the FEIS issued May 20, 2005 too late for us to respond to them in the July 15 Order. Specifically, we received such comments from the U.S. Department of the Interior, Office of Environmental Policy and Compliance (DOI); the U.S. Environmental Protection Agency, Region 1 (EPA); the U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Marine Fisheries Service (NOAA Fisheries); and the Massachusetts Executive Office of Environmental Affairs, Department of Environmental Protection (Mass DEP). The July 15 Order discusses many of the issues raised in these comments. We will address other issues raised in these comments in this order, as appropriate, either in this section of the order or as part of the discussion of rehearing issues raised by other parties.

*DOI*

15. DOI disagrees with the FEIS conclusion that the proposed project is compatible with potential Wild and Scenic River designation for the Taunton River, on which the LNG terminal would be located and under which the Mill River pipelines would run. DOI asserts that the FEIS does not adequately address protection of the outstanding fishery value of the Taunton River, and states that the failure to recommend dredging time-of-year restrictions to protect anadromous fish resources could result in a direct and adverse impact to the values for which any portion of the Taunton River would be designated as wild and scenic. DOI believes that the proposed enlargement of the turning basin and development of the site would result in unavoidable adverse impacts, including damage to 11 acres of winter flounder habitat and 1.15 acres of saltmarsh and intertidal/subtital habitat. DOI further indicates that development of the site appears to be inconsistent with the City of Fall River's goal of obtaining federal Wild and Scenic River designation.

16. We found in the July 15 Order that the FEIS appropriately addressed fishery resource impacts, and we concluded that Weaver's Cove's proposed mitigation and our additional required mitigation will protect fishery resources within the Taunton River. Based on the FEIS analysis of Weaver's Cove's dredging program, we found in the July 15 Order that additional dredging time-of-year restrictions to protect anadromous fish resources are not warranted.[9] It is important to recognize, however, that Weaver's Cove's dredging program falls under the jurisdiction of COE

---

[7] 15 U.S.C. § 717r and 18 C.F.R. § 385.713 (2005).

[8] On August 15, 2005, the Navy Undersea Warfare Center Division (Navy Center), located in Newport, Rhode Island, filed a motion for late intervention, to reopen the record, and to grant rehearing. On January 19, 2006, the Navy Center filed a motion (dated January 13, 2006) withdrawing the August 15, 2005 motion. We grant the Navy Center's request to withdraw its pleading.

[9] *See* FEIS, Section 4.6.2, *Aquatic Resources*, pages 4-97-4-107, and July 15 Order, P 108.

through its permitting process under Section 404 of the Clean Water Act.[10] It is COE that will ultimately issue any dredging permits, and, as we noted in the July 15 Order, COE could impose additional time-of-year restrictions for anadromous fish resources should it find such measures warranted.[11] The July 15 Order also included several environmental mitigation measures that will reduce unavoidable impact on saltmarsh and intertidal/subtidal habitat (Condition 19) and winter flounder habitat losses (Condition 21).

17. The site of the Weaver's Cove project is located within the area described by Massachusetts as the Fall River-Mount Hope Bay Designated Port Area for marine terminals. Further, based on our review of the existing development plans for the City of Fall River as described in the FEIS (page 4-137), we concluded that the proposed project is not inconsistent with existing and planned uses of the site, including Fall River's Harbor and Downtown Economic Development Plan. Whether or not either the state's or Fall River's plans conflict with designation of this portion of the Taunton River as wild and scenic we cannot say; however, the LNG project is not inconsistent with Fall River's existing long range development programs.

*EPA, NOAA Fisheries, and Massachusetts DEP*

18. As in their prior comments to the DEIS, the primary concern of EPA, NOAA Fisheries, and the Massachusetts DEP with the project is the proposed dredging, which they believe will result in substantial and unacceptable impacts on water quality and fisheries habitat in Narragansett Bay, Mt. Hope Bay, and the Taunton River. While these agencies generally support the dredge window condition we included in the July 15 Order to protect winter flounder spawning, they aver that the FEIS underestimates the effects of dredging activities on fishery resources and habitats. As a result, these agencies assert that a more comprehensive restriction is warranted to fully protect the anadromous fish migration within the Taunton River and Mount Hope Bay, and they recommend additional protective measures, such as the use of environmental buckets and dredge sequencing. The EPA states that the only sure way to avoid an impact to inward and outward fish migration is to expand our recommended dredge restriction window in the FEIS.

19. We continue to believe that the FEIS properly analyzed dredging related impacts and that the July 15 Order imposed appropriate conditions to protect fish resources and other potential aquatic impacts. As discussed above, however, Weaver's Cove must obtain the necessary dredging permits from COE, and COE can impose additional time-of-year restrictions for anadromous fish resources if COE finds that additional restrictions are needed.

20. The Massachusetts DEP states that there are uncertainties regarding the management of dredge spoils (on-site or offshore), which would have major consequences on the project's impacts and scheduling. The Massachusetts DEP avers that additional dredge time-of-year restrictions that it believes will ultimately be required will have a significant impact on the project's construction schedule and may necessitate offshore disposal. As noted in the July 15 Order, the FEIS found that the offshore, open water disposal alternative would be environmentally acceptable if the COE and EPA determine that a significant volume of sediments are suitable for offshore, open water disposal. The FEIS also determined that offshore disposal of suitable dredged material is not without impacts and is not clearly environmentally preferable to Weaver's Cove's proposed reuse of the dredged material as general site fill at the LNG terminal site.

21. In response to agency comments on the DEIS, Weaver's Cove Energy conducted a sediment analysis to evaluate the feasibility of disposing a portion of the dredged material at an offshore location. Although offshore disposal has not yet been proposed under its dredging plan before the Commission, Weaver's Cove initiated a Tier III analysis program in accordance with the COE and EPA approved protocols to determine the suitability of the materials for offshore disposal at the Rhode Island Sound Disposal Site (RISDS) formerly referred to as Site W or Site 69b and the Massachusetts Bay Disposal Site (MBDS).[12] Weaver's Cove filed the results of the Tier III testing with the EPA and COE on April 12, 2005. The EPA and COE subsequently reviewed the test results and found that the dredged materials would be suitable for offshore ocean disposal at the RISDS and MBDS.

22. In a letter to the Commission dated November 2, 2005, Weaver's Cove stated that it is now in the process of pursuing the offshore ocean disposal alternative for over 95 percent of the dredged material. As noted above, we have already analyzed, as part of our resource agency consultation, the offshore, open water disposal alternative in the FEIS, the potential for additional dredging restrictions, and regulatory issues associated with the proposed onshore disposal (pages 3-69 through 3-82). Offshore disposal was not previously considered a viable alternative during preparation of the FEIS until the COE and the EPA determined that the dredge sediments were

[10] COE must also issue related permits under Section 10 of the River and Harbors Act of 1899 and Section 103 of the Marine Protection, Research and Sanctuaries Act.

[11] On November 1, 2005, COE issued a public notice announcing public hearings on December 14 and 15, 2005 and inviting written comments by January 3, 2006.

[12] Tier III testing involves the assessment of contaminants in the dredged material on appropriately sensitive and benchmark organisms to determine if there is the potential for an unacceptable toxicity or bioaccumulation impact at the proposed site.

in fact suitable for ocean disposal. As stated in the FEIS, additional environmental review and Commission approval will be required if Weaver's Cove ultimately goes forward with any offshore disposal proposal or changes its proposed LNG terminal site design (page 2-29). We note, however, that the offshore ocean disposal alternative would help facilitate compliance with any further time-of-year restrictions imposed by the resource agencies for the protection of anadromous fish migration.

23. The existing plan still before the Commission for disposing of dredge materials is for depositing them on the proposed LNG terminal site. The Massachusetts DEP expresses concern with project impacts associated with the quality and volume of dredge material proposed to be deposited on the project site. The Massachusetts DEP asserts that Weaver's Cove has not demonstrated reasonably necessary on-site reuse of the total volume of dredge spoils estimated to be dredged. The Massachusetts DEP further disagrees with a statement in the FEIS that the dredge spoil processing and placement on the site as "fill material" exempts the material from the regulatory definition of solid waste. The Massachusetts DEP argues that the Commission's approval of the project on the basis that all the dredge spoil can be deposited on-site under the current proposal is misplaced.

24. The July 15 Order addressed the Massachusetts DEP's concerns and notes that there are several unresolved issues that are addressed in the FEIS but require resolution prior to any project construction. The July 15 Order acknowledges that the Massachusetts DEP has not made a final determination regarding: whether the proposed placement of the stabilized dredged sediment on the LNG terminal site complies with the anti-degradation provision of the Massachusetts Contingency Plan (MCP); whether the material could be placed on site without adversely affecting Shell's existing remediation activities; or whether all the material constitutes a beneficial reuse and is necessary for site development under the MCP. The July 15 Order further acknowledged that a negative determination on any of these issues could prohibit or affect the proposed use of the site.

25. Condition 18 of the July 15 Order requires Weaver's Cove to file documentation with the Commission prior to construction to verify that placement of the stabilized dredge material on the LNG terminal site is consistent with the MCP. If Weaver's Cove is unable to verify consistency of the proposed use of the sediment with the MCP, Condition 18 requires that Weaver's Cove file a revised sediment placement plan that identifies alternative location(s) for use of the dredged sediments. We find that the FEIS and the July 15 Order's Condition 18 adequately address the Massachusetts DEP's concerns. In addition, Weaver's Cove Energy's November 2, 2005 filing indicates that it is now pursuing the offshore disposal alternative, which will help avoid the Massachusetts DEP's concerns regarding the upland placement of stabilized dredge material on the LNG terminal site.

26. EPA comments that the FEIS water usage estimate does not include cooling water used for the ship boilers that will power the propulsion systems of vessels moving through Narragansett Bay, Mount Hope Bay and the Taunton River. While EPA acknowledges that the projected level of entrainment may be small in comparison to the current levels in the project area, ships' cooling water usage would introduce a new source of entrainment that adds to the cumulative burden on the ecosystem.

27. We note that this issue was not raised during the lengthy pre-filing process, at interagency meetings, public scoping meetings, nor in comments on the DEIS. Therefore, the issue was not addressed by staff in its environmental analysis. However, this issue is not the result of a new technological development, as steam powered LNG vessels, with their associated cooling water usage, have been visiting U.S. ports for more than 30 years. As noted throughout the FEIS, LNG vessel transits to the terminal site in Fall River will occur once per week and the unloading process at the site is anticipated to take about 24 hours. While the cooling water needed for the ship boilers was not specifically addressed in the FEIS, the limited LNG ship traffic at the site will not result in any appreciative impingement and entrainment impacts beyond what is described in the FEIS.

28. EPA remains concerned that Mount Hope Bay and the Taunton River may be particularly vulnerable to invasive species due to the stressed nature of both ecosystems and the low numbers of many of the resident species. In response to the FEIS statement that the risk of invasive species will not be significantly increased because Fall River is an existing port, EPA avers that receiving ships from new ports of origin increases risk at an existing port, and it remains unclear whether Fall River currently receives vessels from the origination points of LNG that will be transported by tankers to Fall River. While we do not disagree that receiving ships from additional origination ports will increase to some extent the risk of introducing invasive species, we agree with the conclusion in the FEIS that any increased risk due to LNG vessel transit will be low because ballast water will not be discharged in Mount Hope Bay or the Taunton River.

29. We do not agree with the EPA statement that the FEIS does not adequately address compensatory mitigation efforts regarding salt marsh and shellfish impacts. To ensure that these resources are adequately mitigated, the FEIS recommended, and Condition 19 in the July 15 Order requires, that Weaver's Cove consult with the COE and NOAA Fisheries to ensure that those resource agencies have an opportunity to address the adequacy of Weaver's Cove's wetland mitigation plan. In addition, Weaver's Cove has indicated in its November 2, 2005 letter noted above, that it

intends to propose minor modifications to the LNG terminal site layout to further reduce impact on salt marsh areas, shellfish habitat, and a coastal dune site.

30. The EPA remains concerned that project dredging and stormwater discharges from the construction site may not meet state water quality standards in Mount Hope Bay and the Taunton River, since those waterbodies are currently impaired. The EPA disagrees with the FEIS analysis of existing water quality conditions in the project area, and states its particular concern with elevated copper concentrations in the Taunton River. The EPA questions the FEIS' assertion that organisms have adapted to the degraded environment, and that sensitive marine organisms are already at risk of lethal and sublethal effects. The EPA further indicates that any National Pollutant Discharge Elimination System permit for dewatering discharges from onsite processing of the dredged material at the disposal site would need to contain limits which may significantly limit net increases in copper.

31. The FEIS analysis of the existing water quality conditions demonstrated that the high levels were representative of background conditions and that organisms have adapted to these levels. As indicated in the FEIS, Weaver's Cove must meet the states' water discharge requirements under Section 402 of the Clean Water Act and as specified in its forthcoming National Pollutant Discharge Elimination System permit. Weaver's Cove's analysis of the dredged sediments has undergone extensive physical, chemical, and biological testing, and the agencies, including EPA, have determined that the majority of the material is acceptable for unrestricted ocean disposal. The sediment testing results further supports our findings in the FEIS that toxicity levels should not cause undesirable environmental effects on the existing water quality conditions in the project area. For example, the Tier III chemical constituent concentration results demonstrate that copper, zinc, and silver levels were below the EPA aquatic life guidelines in both the elutriate results and background river water results. Therefore, the Tier III results further support the FEIS' conclusions that contaminants remain absorbed to the sediments with little release to the water column and that the proposed dredging program will not result in significant water quality impacts.

32. EPA states that there is not enough information in the FEIS to support a conclusion that aquatic resources will not be adversely affected by project activities. The FEIS addresses the cumulative impacts extensively[13] and concludes that while construction and operation of the Weaver's Cove LNG project could contribute cumulatively to impacts on aquatic resources and water quality in the Taunton River, Mount Hope Bay, and Narragansett Bay, these impacts would be relatively short term and/or minor in comparison to those from other sources. The FEIS explained that implementation of Weaver's Cove's proposed mitigation measures and the conditions adopted in the FEIS will reduce impacts. Further, as stated in the July 15 Order, we have determined, subject to appropriate mitigation conditions set forth in Appendix B of the July 15 Order, that the Weaver's Cove project should have limited environmental impact.

33. Regarding the general air quality conformity discussion in the FEIS, EPA states that, for a maximum of 70 ships per year, the facility's total potential to emit nitrogen oxides ($NO_x$) is only a fraction of a ton below the limit that would require a nonattainment New Source Review. EPA therefore encourages Weaver's Cove to work closely with the Massachusetts DEP to ensure the emission estimates are accurate and practically enforceable. Weaver's Cove has stated that a federally enforceable permit condition will be included in the facility's air plan approval (air permit) to confirm that the combined emissions from the facility and the tankers, are less than 50 tons per year of $NO_x$ to prevent triggering the nonattainment New Source Review.

34. The EPA also urges the implementation of additional pollution control measures on tugs, such as engine retrofitting and early engine remanufacturing. As discussed in the FEIS (see page 4-218), the tugs would either be units currently on order for tug owners/operators or they would be ordered specifically for service at the LNG terminal. For either scenario, the tugs will be subject to the International Maritime Marine Pollution (IM MARPOL) Annex VI regulation for $NO_x$ emissions and 40 C.F.R. Part 94 of the EPA regulations for criteria pollutant emissions from marine engines. Any servicing needed to maintain compliance with these regulations will be performed.

*Comments by Fall River Regarding DOT/FERC Correspondence*

*Design spills*

35. On June 23, 2005, Fall River filed comments regarding an exchange of correspondence between FERC staff and the DOT's Office of Pipeline Safety staff (dated April 19 and May 6, respectively) that was placed in the docket on June 15, 2005 regarding the application of certain DOT regulations regarding the sizing of impoundment zones for LNG spills. Fall River asserts that the correspondence reflects a significant misreading of the applicable DOT requirements and that the Commission staff has consistently erred in its interpretation and implementation of the regulations. Fall River contends that the correspondence reflects staff's understanding that there is a single "design spill" that the regulations require to be used for sizing of impoundments. Fall River contends that the regulations do not dictate that the "design spill" be used for calculating either the

[13] *See* FEIS, *Cumulative Impacts*, pages 4-297-4-305.

thermal exclusion or flammable vapor exclusion zone. Further, Fall River contends that only one paragraph of the four thermal radiation exclusion zones in the DOT regulations is based on the "design spill," while the other three refer to a fire over an impounding area containing a volume, V.

*Commission Response*

36. The correspondence reflected in the April 19, 2005 and May 6, 2005 letters concerns a single technical issue: the selection of the single accidental leakage source used to calculate spills from piping at LNG import terminals. The letters are not related to any specific project, but rather the approach staff applies to each of the proposals currently before the Commission. Although the correspondence focuses on design spills for marine transfer lines, Fall River has misinterpreted this as staff's understanding that there is a single "design spill" that the regulations require to be used for sizing of impoundments. This assertion is wrong as shown in Table 4.12.4-1 of the FEIS which presents four design spills in addition to the impoundment for the LNG storage. Further, Table 4.12.4-2 presents four thermal exclusion zone distances; one for the "design spill" and three for the LNG storage tank impoundment, *i.e.*, a fire over an impounding area containing a volume, V.

*Spill duration*

37. Fall River contends that the suggestion in DOT's response that ". . . spill duration of 30 seconds or less from leaking flanges instead of guillotine breaks may be used for spill rate criteria . . . " has the air of rulemaking by letter. It also states that although FERC has the authority to select a duration shorter than 10 minutes, any such selection must be based on a specific evaluation of a facility.

*Commission Response*

38. DOT regulations provide that design spills be evaluated on the basis of flow from any single accidental leakage source for 10 minutes, or for a shorter duration based on demonstrable surveillance and shutdown provisions acceptable to the authority having jurisdiction. While the staff recognizes that the regulations provide a means to approve spills of a shorter duration, such as 30 seconds or less, all design spills evaluated by Commission staff on pages 4-245 and 4-246 of the FEIS are based on the 10-minute duration.

*Source of Possible Leak*

39. Fall River asserts that the assumption expressed in the correspondence by both FERC and DOT staff that the only possible accidental leak from a transfer operation would involve a flange or small diameter attachment, not a full pipe rupture, ignores history.

*Commission Response*

40. Rather than ignoring history, the operational experience of LNG facilities supports this selection of spill criteria in that full pipe ruptures have not occurred at LNG facilities. Nevertheless, the Commission requires that impoundment sizing be based on full-rupture volumes as an additional measure of conservatism, while recognizing that the design spill criteria is appropriate for the exclusion zones required by 49 C.F.R. Part 193.

*Calculation of flammable vapor exclusion zones*

41. Fall River contends that the Commission has consistently misapplied the DOT regulations by applying the DEGADIS (Dense Gas Dispersion) model (to calculate flammable vapor exclusion zones) only to the calculated overflow of unmixed LNG vapor from an impounding area, rather than to the full vapor volume, including entrained air. If the effect of the impounding area is considered, it says, the Commission must then use the FEM3A or some equivalent model.

*Commission Response*

42. First it is important to note that the input to DEGADIS is neither a volume of unmixed LNG vapor nor a full vapor volume including entrained air, but rather a *mass* of LNG vapor per unit time. Although 49 C.F.R. Part 193 references the DEGADIS and FEM3A dispersion models, the mass source strength input for either model is not specified. As a result, the Commission uses commonly accepted methodology that can be applied within the limitations of the model, *i.e.*, vapor overflow occurs before the effects of warming and entrainment become significant. Second, we received similar comments on the DEIS concerning the mixing of air with LNG vapor in an impounding area and the use of FEM3A to account for these phenomenon. Based on the comments, the staff revised its calculations in the FEIS and addressed the specific issues in the document.[14]

*Brightman Street Bridge*

43. In their requests for rehearing Fall River and Mr. Miozza point out that that recently enacted federal law prohibits the use of federal funds for demolition of the existing Brightman Street Bridge across the Taunton River connecting Fall River with Somerset, Massachusetts. The law also appropriates funds for maintenance of the bridge for pedestrian and bicycle access and as an emergency service route.[15] Because the continued existence of the bridge will not permit operation of the LNG terminal, they assert, the Commission should dismiss the Weaver's Cove application as moot.

---

[14] *See* FEIS, Section 4.12.4, Siting Requirements — Thermal and Dispersion Exclusion Zones, pages 4-250-4-251.

[15] *See* The Safe, Accountable, Flexible, Efficient Transportation Equity Act, Pub. L. No. 109-59 § § 1702 and 1948 (2005).

*Commission Response*

44. The site of the Weaver's Cove LNG terminal would be located on the Taunton River above the existing nearly 100-year old Brightman Street Bridge. The existing Brightman Street Bridge was, until passage of the legislation described above, scheduled for demolition upon completion of a new Brightman Street Bridge that would replace the old bridge. The existing bridge has a horizontal clearance of only 98 feet, which will not accommodate the 150-foot wide LNG tankers Weaver's Cove plans to employ to transport LNG to the new terminal. Fall River is correct that if the existing Brightman Street Bridge is not removed, as had been planned, the large LNG vessels described in the application will not be able to access the proposed upstream LNG terminal. The July 15 Order includes a condition requiring Weaver's Cove to review its waterway suitability assessment on an annual basis in consultation with the Coast Guard. This annual update to the Commission will need to address the continuing status of the Brightman Street Bridge, and thus, the viability of the Weaver's Cove project. The July 15 Order, however, did not condition approval of the project on removal of the bridge, and it would be premature at this time to find that the project is moot.

*Requests for Rehearing and/or Clarification*

A. *Evidentiary Hearing*

45. Fall River contends that the procedures the Commission followed in reaching its decision did not allow informed decision making. Fall River argues that the Commission should have conducted an oral evidentiary hearing to address disputed material facts, that the Commission arbitrarily and without notice established a cut-off date for submitting evidence, that it thus did not consider sworn testimony that Fall River submitted to the Commission as an example of the testimony it would offer at an oral evidentiary hearing, and that the Commission improperly delegated to other agencies and to its own staff judgments that are the Commission's alone to make. Fall River also requests that we schedule its rehearing request for oral argument.

46. Fall River continues to assert that there are a number of material facts in dispute that require cross examination in a trial-type, evidentiary hearing. The complexity of the issues, the importance of being able to evaluate the depth of knowledge and the credibility of those offering conflicting viewpoints, asserts Fall River, demand the fullest possible adjudicatory process. The areas alleged to require such oral testimony are the following: the threat of terrorist attack; the adequacy of the safety analysis and of safety standards; the feasibility of evacuation and emergency response; the impacts on local planning, economic well-being, and environmental justice; and environmental effects and the consideration of alternatives. Fall River contends that the Commission has not offered a reasoned explanation for its refusal to follow what Fall River claims has been a long-standing practice of holding oral evidentiary hearings.

*Commission Response*

47. As we explained in the July 15 Order, trial-type evidentiary hearings are required only where there are material issues of fact that cannot be resolved on the basis of the written record. Where the Commission provides interested parties an opportunity to participate through evidentiary submission in written form, it need not provide an opportunity for cross-examination or examination under oath of other parties who have made submissions.[16] Contrary to Fall River's assertion, the Commission routinely decides complex and controversial cases on the basis of the record in a paper hearing.[17]

48. The July 15 Order at paragraph 25 demonstrates in detail that interested parties had ample opportunity to present their views through the submission of written comments. All areas identified by Fall River as demanding evidentiary hearing were carefully discussed either in the FEIS or the July 15 Order, which adopted the analysis and recommendations contained in the FEIS. The Commission remains confident that we had ample information to make a reasoned decision resolving all issues, and that cross examination of witnesses would not have assisted our deliberations.

49. Fall River claims that the Commission arbitrarily and without notice cut off submissions by issuing the FEIS. Instead, as the facts demonstrate, the Commission analyzed the comments in a deliberate and orderly manner as it continued to consider all late-filed comments as long as physically possible until it issued the FEIS. Although comments on the DEIS were due on September 24, 2004, we continued to accept and consider all materials submitted to the Commission until we issued the FEIS in May 2005, nearly 8 months after the comment due date. Where possible, we considered comments on the FEIS in the July 15 Order. In this order we consider comments on the FEIS that we received too late to include in the July 15 Order. We are also considering in this order, either as comments on the FEIS or as rehearing argument, material Fall River submitted on June 9, 2005, which Fall River identified at that time as sample evidentiary hearing testimony Fall River would introduce at a hearing.[18]

[16] *See Moreau v. FERC*, 982 F. 2d 556, 568 (D.C. Cir. 1993); *Cascade Natural Gas Corp. v. FERC*, 955 F. 2d 1412, 1425 (10th Cir. 1992).

[17] *See Sound Energy Solutions*, 107 FERC ¶ 61,263 at P 78 (2004).

[18] We previously rejected this material in the July 15 Order because it was submitted as sample testimony as part of a request for evidentiary hearing that we denied in the July 15 Order.

50. We will likewise deny Fall River's request for oral argument of its rehearing request. As noted, Fall River has had ample opportunity to present its arguments through written submissions at public hearings. Fall River has not shown how oral argument would aid the Commission in its resolution of the issues. Based on the present record, we are able to address the issues raised from the information filed and disagree that an oral argument at this stage of the proceeding would shed light on these matters.

B. *Alternatives*

51. Fall River and the Conservation Law Foundation argue that the Commission did not give proper consideration to alternatives to the Weaver's Cove project because it unreasonably narrowed the appropriate objectives of the project and thus eliminated from consideration projects that could help satisfy New England's acknowledged need for new gas supplies. Specifically, it states that the Commission focused overly on the delivery of LNG by truck to peakshaving facilities and did not give sufficient attention to other alternatives that would help satisfy the ability of the region to meet peak gas demands. Fall River avers that while careful consideration should be given to a project sponsor's stated objective for the project, it is the Commission's responsibility to define necessary characteristics of alternatives, and that it is not necessary that any one alternative satisfy all intended objectives, particularly where in combination with other options even the objectives specified by the project sponsor may be fulfilled. The Conservation Law Foundation states that the Commission must consider alternatives that even partially meet the proposal's goal.

52. Truck delivery of LNG, Fall River states, is but one option. Fall River concedes that truck deliveries of LNG are an important component of reliable gas supply for New England, but it states that there is no suggestion that the need for truck deliveries is not currently being met or that the current supplier could not increase shipments. Expanded base load supplies and expanded pipeline capacity would clearly contribute to the ability to meet peak demand, asserts Fall River. Offshore projects proposed for New England and pipeline expansions from Canada would likewise contribute to meet this need without security and safety risks, it says. Fall River suggests also that the Commission should have looked at the capability of satellite facilities to liquefy natural gas off the pipeline system for storage, or the possibility that power plant use could not be moderated during peak demand periods through fuel switching.

53. The Conservation Law Foundation asserts that the Commission should have conducted a "programmatic" environmental analysis to address the larger context for LNG terminal siting decisions in the region in order to develop a regional strategic plan assessing the need for and siting of LNG marine terminals in the New England region, the availability of alternatives to LNG deliveries by ship, and public safety and security concerns. This wider analysis is necessary, avers the Conservation Law Foundation, because the decision to license an individual facility is in essence a siting decision for the region that will likely foreclose other potentially less environmentally harmful options for meeting the region's natural gas needs.

54. Fall River and the Conservation Law Foundation both contend that the alleged deficiencies in the Commission's alternatives analysis have led to a flawed NGA Section 3 public interest determination. Fall River maintains that the only suggested benefit of truck deliveries is the introduction of a competitive supply, but that this economic benefit should have been compared with the potential risks and economic costs of the project to the public. Where there are risks to the public from a project, argues Fall River, it is incumbent upon the Commission, as part of its NGA Section 3 analysis, to ascertain whether any alternative or combination of alternatives can satisfy the need at a lesser cost to the human and natural environment. Both Fall River and the Conservation Law Foundation allege that the Commission is deferring environmental evaluation to market forces. The Conservation Law Foundation asserts that the Section 3 public interest analysis requires that the Commission address overall power supply needs in the New England region and alternative means for addressing those needs, including analyzing the effect of energy efficiency, which, it states, could dramatically reduce the demand for natural gas.

55. Fall River also states that the Commission's analysis of alternatives is flawed because it lacked a consistent or systematic approach to analyzing different alternatives. While identifying a broad range of possible system alternatives, states Fall River, the FEIS did not evenly address the merits of all alternatives using a complete and common set of issues. Fall River argues that the FEIS should have made issue by issue findings on the merits of the proposed project and alternatives to assess whether the advantages or disadvantages of the proposed project outweighed the advantages or disadvantages of the alternatives.

*Commission Response*

56. The FEIS set forth the criteria it employed for evaluating potentially reasonable and environmentally preferable alternatives to the project proposed by Weaver's Cove. Those criteria were whether they: were technically and economically feasible, reasonable, and practical; offer significant advantage over the proposed project; and meet project objectives. The project objectives were identified as providing: (a) a new LNG import storage terminal as a new source of supply for natural gas for New England; (b) access to natural gas reserves from production areas throughout the world; the ability to deliver LNG by truck to

LNG storage facilities throughout the region.[19] The FEIS noted that not all conceivable alternatives are technically and economically feasible or practical, because, for example, they are unavailable and/or incapable of being implemented. The FEIS explained that each alternative was considered to a point at which it was clear that the alternative was not reasonable or would result in significantly greater environmental impacts or could not be readily mitigated, and that those alternatives that appeared to be the most reasonable with less than or similar levels of environmental impact were reviewed in the greatest detail.[20]

57. The FEIS evaluated a number of alternatives to the proposed project.[21] These alternatives included the no action or postponed action alternatives (including conservation and other sources of energy), system alternatives, alternative LNG sites, and LNG terminal layout alternatives. The FEIS examined existing and proposed onshore LNG facilities, including the existing Distrigas LNG terminal in Everett, Massachusetts just outside Boston, the existing and proposed expansion facilities of KeySpan in Providence, Rhode Island, and possible new LNG import facilities in Maine. The FEIS also evaluated the potential Neptune LNG and Northeast Gateway LNG facilities that would be located in the Atlantic Ocean off the coast of Massachusetts, and the Broadwater LNG project proposed for Long Island Sound between New York and Connecticut. The FEIS discussed the potential availability of additional supplies of natural gas from outside New England. Other potential locations for an LNG terminal to serve the New England market were also studied, including Boston Harbor, sites in Narragansett Bay, Rhode Island, and New London and New Haven, Connecticut.[22]

58. Fall River and the Conservation Law Foundation contend that the Commission gave improper consideration to the role of LNG transportation by truck to peakshaving facilities in considering appropriate alternatives. We disagree. In identifying and defining a project's objective and goal for NEPA purposes, the Commission generally adopts the project sponsor's proposal in the NGA application that implicates the need to conduct the environmental review.[23] A federal appellate court explained that:

> The federal government's consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor of the siting and design of the project. In formulating the EIS requirement, the Congress did not expect agencies to determine for an applicant pipeline what the goals of its proposal should be.[24]

This general principle, however, is subject to the admonition that the goals of a project may not be so narrowly defined as to preclude consideration of what may actually be reasonable choices.[25] Thus, objectives must be reasonably identified and defined.

59. In its broadest sense, the goal of the Weaver's Cove project is to provide an additional supply of natural gas to the New England region to help meet that area's increasing need for natural gas. Both the FEIS and the July 15 Order explicitly recognize that there are other potential projects, such as offshore LNG facilities, onshore LNG terminals in Canada or Maine, and/or increased pipeline infrastructure to transport natural gas from more remote locations, that can play an important role in meeting this overall need.

60. The FEIS and the July 15 Order explain, however, that New England relies heavily on the transportation of LNG by truck to above-ground peakshaving storage facilities located at nearly 50 sites across New England. The FEIS explained that LNG storage is critical to meeting New England's winter peak needs for gas because there are no underground storage facilities in the area and the pipeline system is already operating at close to capacity.[26] At the present time, these LNG storage facilities are served by truck shipments of LNG from a single source, the Distrigas LNG facility in Everett, Massachusetts. The FEIS reports that in 2003 trucks from Distrigas provided approximately 14 Bcf of LNG to these facilities, which are relied upon to supply as much as 30 percent of the region's peak day needs. The FEIS pointed out that the March 2005 Governor's Conference Report recognized the importance of stored natural gas by "allowing for an economic means to meet winter peak day requirements . . . [and] also contributes to the diversity of the regional gas portfolio and reduces our reliance on the availability and price-competitiveness of any individual supply source."[27] The FEIS also referred to the Commission's December 2003 New England Gas Infrastructure Report that concluded that additional peakshaving LNG facilities would help to ensure more reliable service until additional pipeline capacity is constructed. Based on

---

[19] FEIS, Section 3.0, *Alternatives*, page 3-1.

[20] Id.

[21] FEIS, pages 3-1-3-50.

[22] The FEIS explained at page 3-28 that, based on a separate FERC study, it considered additional alternative LNG terminal sites only south of the Massachusetts/New Hampshire border out of concern that LNG facilities outside this area could not efficiently serve the New England market.

[23] *See Independence Pipeline Company*, 91 FERC ¶ 61,102, at p. 61,345 (2000).

[24] *City of Grapevine, Texas v. DOT*, 17 F3d. 1502, 1506 (D.C. Cir. 1993).

[25] *Simmons v. U.S. Army Corps. of Engineers*, 120 F.3d 664 (7th Cir. 1997); and *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. (1991).

[26] *See* FEIS, Section 1.3, *Project Purpose and Need*, pages 1-5-1-9.

[27] The Power Planning Committee of the New England Governors' Conference, Inc., *Meeting New England's Future Gas Demands: Nine Scenarios and Their Impacts*, March 1, 2005.

this discussion, the FEIS concluded that truck service from the Weaver's Cove LNG terminal would provide a new source of supply to LNG storage facilities, which are critical to maintaining a reliable source of natural gas to the region during peak use periods and to maintaining price stability.

61. Thus, the FEIS explained that LNG truck service is more than simply an option for meeting New England's gas needs. It is, instead, a critical component in meeting those needs. Thus, the ability to provide LNG service by truck from the terminal facility is a legitimate and reasonable objective for this project. We conclude that it was reasonable to accord substantial weight to this goal of the project sponsors in considering the alternatives in the FEIS.

62. The Conservation Law Foundation renews its earlier request for a programmatic environmental analysis addressing LNG siting and other energy issues on a region-wide basis. In rejecting this request, the July 15 Order explained that, as described above, the Commission studied a number of alternative methods for satisfying the objectives to be satisfied, but found none superior to the project before us in this proceeding. Contrary to the assertion of the Conservation Law Foundation, moreover, our approval of the Weaver's Cove project does not foreclose other energy options for the region. We explained that other potential energy projects we examined, both LNG and non-LNG, were not appropriate alternatives to the Weaver's Cove proposal. We also noted that some types of projects are not within this Commission's jurisdiction, such as the offshore LNG projects which are under the regulatory controls of the Coast Guard and the Department of Transportation.[28]

63. A programmatic EIS, as the name implies, reflects the broad environmental consequences attendant upon a wide-ranging federal program.[29] Under CEQ regulations, a single EIS should be prepared if actions are "connected" to other actions, that is they closely enough related so they should be discussed together, if they are "cumulative," or if they are sufficiently "similar" to other reasonably foreseeable or proposed agency actions (such as by geography or timing) that a single EIS is the "best way" to assess the combined impacts.[30] The question of whether to prepare a programmatic EIS is initially that of the federal agency.[31] The D.C. Circuit has explained that in making this determination an agency should consider whether a programmatic EIS would contribute to the decisionmakers' basic planning of the overall program, and whether segmenting the overall program will unreasonably constrict the scope of the environmental consideration.[32]

64. The application here is not part of a coordinated federal program that will involve multiple actions with similar or cumulative environmental consequences that should be discussed together. Instead, as we noted in the July 15 Order we have before us a discrete proposal for an energy project filed under a specific federal statute, the NGA. This project is likewise not connected, within the meaning of the CEQ regulations, to other projects that may or may not be developed, or that may or may not be under this Commission's jurisdiction, except in the sense that there are projects of various kinds being contemplated or proposed that would help meet New England's need for increased energy supplies. A programmatic EIS is neither required nor useful under the circumstances existing here.

65. Fall River and the Conservation Law Foundation's claim that the Commission has deferred environmental concerns to market forces demonstrates a misreading of the July 15 Order and a misunderstanding of the nature of and the relationship between NGA Section 3 and NEPA. Under Section 3 of the NGA the Commission is charged with authorizing the siting, construction, and operation of LNG import facilities. Section 3 provides that the Commission shall approve such a project unless it finds that the proposal will "not be consistent with the public interest." The July 15 Order explained that it has been Commission policy generally to allow the market to decide which projects are best suited to meet the infrastructure needs of an area because that approach best serves the public interest and allows for the most efficient, cost effective, and timely development of energy infrastructure. The July 15 Order found specifically under Section 3 that the LNG terminal proposed by Weaver's Cove would be in the public interest because it would enable the introduction of needed new gas supply into the New England region, because it would provide storage in an area where storage is critical for meeting peak day requirements, because the terminal will be located near major interstate pipeline facilities, and because the facility can facilitate LNG deliveries by motor carrier.

66. As we explained in the recent *KeySpan* order, however, our most important duty in determining the public interest is ensuring that the project that is authorized is safe and secure.[33] We stated that we would not authorize an LNG facility under Section 3 if we continue to have questions about safety. *KeySpan* involved a proposal to construct a new LNG facility that would incorporate an existing LNG facility, the components of which did not meet the current federal safety standards

---

[28] Deepwater Port Act of 1974, as amended, 33 U.S.C. §§ 1501*et seq.* (2003).

[29] *Foundation on Economic Trends v. Heckler*, 756 F.2d 143 (1985).

[30] 40 C.F.R. § 1508.25(a) (2006).

[31] *Kleppe v. Sierra Club*, 427 U.S. 390 (1976).

[32] *Heckler*, 756 F.2d at 159.

[33] *KeySpan LNG, L.P.*, 112 FERC ¶ 61,028 at P 56 (2005).

required of all other new LNG import facilities in the United States. The Commission found that without meeting the Commission's full array of safety requirements the proposal would not be in the public interest and denied KeySpan's application. Here, in contrast, we have found that the Weaver's Cove proposal would meet all federal and state safety standards prior to construction and operation. In the July 15 Order we found that, if built according to Commission requirements, the terminal can be operated safely and that the Coast Guard security plan for LNG vessels will ensure the public's safety.

67. We did not defer environmental matters to market forces under Section 3 as Fall River and the Conservation Law Foundation contend. Rather, we evaluated them under NEPA. NEPA complements Section 3 of the NGA, but it is not a part of Section 3. NEPA is essentially procedural and it does not require the Commission to elevate environmental concerns over other appropriate considerations.[34] NEPA requires that the Commission consider and disclose all significant aspects of the environmental impact of a proposal.[35] The Commission must take a "hard look" at environmental consequences.[36] Although these procedures are almost certain to affect the agency's substantive decision, it is well-settled that NEPA itself does not mandate particular results.[37] As we explained in the July 15 Order, the Commission has conducted a comprehensive review of the project, and has imposed a number of conditions on our approval of the project under Section 3 of the NGA that will appropriately mitigate any adverse effects from the project.

68. In the July 15 Order at paragraphs 103-105 we addressed the assertion that the Commission's analysis of alternatives is deficient because it does not systematically compare all the advantages and disadvantages of the proposed project with all identified alternatives. We explained that NEPA requires us to evaluate the environmental impacts from a proposal before the Commission, including reasonable alternatives to the proposal, but that NEPA does not require a detailed analysis of every alternative proposed. We explained that pursuant to NEPA requirements all alternatives were compared with the Weaver's Cove proposal, and that once we determined that a suggested alternative was not viable, did not meet project objectives, or would result in greater environmental impacts than the proposed action, we did not review an alternative further. As we noted in the July 15 Order, the FEIS identified specific criteria and included a table comparing the relative merits of various sites.[38] The FEIS properly concluded that no alternative was clearly preferable to the proposed action and that each alternative presented its own unique set of impacts.

C. *Safety*

*Breach of Containment*

69. Fall River contends that there have been in the past, and could be in the future, accidental breaches of LNG containment at both terminals and that even a low probability of an accident dictates rejection where the resulting consequences would be highly prejudicial. Fall River states further that there is no relationship between accident experience and the threat of a terrorist attack, so that the low number of past accidents should not be used to assess the possibility of a terrorist attack.

*Commission Response*

70. We affirm our conclusion in the July 15 Order that the risk to the public from accidental causes is negligible. Pages 4-274 and 4-275 of the FEIS identify the eight significant incidents involving LNG ships since the inception of LNG maritime transportation. None of these incidents resulted in rupture of a cargo tank or a breach of containment. The FEIS explained that the only loss of containment of an LNG storage tank occurred in 1944, and was attributed to the lack of an impoundment and improper steel alloys (page 4-230). Since then, with the development and use of superior tank materials for cryogenic service, there have been no breaches of containment. Nevertheless, even though unlikely, the potential for loss of storage tank containment is considered in the design requirements for impoundments and the exclusion zone requirements for LNG storage tanks.[39] The July 15 Order explained also that, based on the extensive operational experience of LNG shipping, the structural design of an LNG vessel, and the operational controls imposed by the Coast Guard and the local pilots, a cargo containment failure and subsequent LNG spill from a vessel casualty — collision, grounding, or allision — is highly unlikely.[40]

71. Fall River's contention that ". . . it is in no way defensible to consider the threat of a terrorist attack as having any relation to measures of accident experience . . ." is not rooted in the FEIS, which states, as reaffirmed in the July 15 Order at paragraph 84, that historical experience with accidents provides little guidance in estimating the probability of a terrorist attack. The July 15 Order explains, however, that the Coast Guard security workshops fully evaluated scenarios involving possible terrorist attacks.

---

[34] *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227-28 (1980).

[35] *Baltimore Gas & Electric Co. v. NRDC*, 462 U.S. 87, 97-98 (1971);

[36] *Kleppe v. Sierra Club*, 427 U.S. 390, 409, n.21 (1976).

[37] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

[38] *See* FEIS, Table 3.2.4-1, page 3-29.

[39] *See* FEIS, Impoundment Systems and Design Spills, pages 4-245-4-251.

[40] *See* July 15 Order at P 83.

*Location of LNG Terminals and Use of Exclusion Zones*

72. Fall River restates its earlier arguments that the Pipeline Safety Act of 1979 directed DOT to consider the need to encourage siting of LNG terminals in remote locations in adopting LNG terminal siting regulations.[41] Once again, Fall River contends that the DOT afforded little attention to this concern of Congress, and instead adopted regulations that only require thermal radiation and flammable vapor exclusion zones around such terminals. Fall River argues that these zones affect the design and size of LNG facilities, but not their location. As neither DOT nor the Commission has set minimum safety standards which would exclude some locations as too dangerous, Fall River contends, the approval of the Weaver's Cove project in an urban location violates the Pipeline Safety Act. Fall River also discounts the Commission's explanation that DOT did not adopt a remote location requirement for LNG terminals because of the difficulty in predicting whether a remote site would remain remote during the operating life of the terminal. The City of Fall River, it notes, has long been an urban area.

73. Fall River contends that the Commission did not apply the same siting criteria to the Weaver's Cove proposal that it applied in evaluating alternative sites. Fall River alleges that the criteria the Commission applied in considering alternative sites are essentially the same as those described in the Pipeline Safety Act, *i.e.*, that they not be placed in close proximity to populations centers, and that they be placed where existing land use zoning, coastal zone management guidelines, or development plans are consistent with an LNG import terminal.

74. Fall River contends that while lightly populated areas beyond an exclusion zone may require no special protections or consideration, heavily populated areas need far more protection because they are more likely targets of an intentional act, and they are far more difficult for authorities to evacuate.

75. Fall River further contends that the thermal protection standards, which apply only to the terminal itself, should also apply to an LNG vessel in transit. There is a far greater probability of an accidental or intentional release relating to the vessel, it avers. If these thermal protection standards are necessary for the LNG terminals, no less is true for the LNG vessel in transit. Fall River refers to testimony from Dr. Jerry Havens alleging that the Commission's analysis of harm from a vessel incident is understated. Rather than allegedly focusing on a half-cargo tank loss of 3,000,000 gallons and an ensuing fire, Dr. Havens suggests that the Commission should have focused more on the loss and burning of an entire ship's cargo.

76. Based on testimony from Dr. Havens, Fall River also contends that the thermal standards themselves are not adequate. It alleges that the use of a thermal radiation flux level of 5 $kW/m^2$ (1,600 $Btu/ft^2$-hr), the criterion defined in the DOT exclusion zone regulations, is too high to protect the public located outdoors and unprotected. The appropriate level should instead be 1.5 $kW/m^2$ (480 $Btu/ft^2$-hr), the level at which continuous exposure results in no thermal radiation damage. Fall River also refers to the standard of 450 $Btu/ft^2$-hr used by the U.S. Department of Housing and Urban Development (HUD) for unprotected facilities or areas of congregation; a level of 800 $Btu/ft^2$-hr recommended by the Society of Fire Protection Engineers as a public tolerance limit; and a 1.5 $kW/m^2$ specified in the European code for critical areas as support for a lower level of thermal radiation.

*Commission Response*

77. Fall River appears to recognize that Congress delegated the authority to DOT to adopt minimum safety standards for siting. DOT has adopted siting standards with which Fall River disagrees, and Fall River, as noted in the July 15 Order, has filed a petition with DOT requesting that it modify its regulations. That petition is still pending before DOT.

78. As we explained in the July 15 Order, rather than requiring remote locations for all LNG facilities, DOT adopted standards that it determined would better provide safe separation distances to protect the public in the vicinity of LNG facilities in the event of a spill. DOT's regulations establish thermal and flammable vapor dispersion exclusion zones, based on standards of the National Fire Protection Association, to protect persons and property from harm caused by heat radiation from fire and by dispersion and delayed ignition of gas vapor.[42]

79. DOT's standards represent the minimum standards that must be observed in siting LNG terminal facilities. The Commission conducted an extensive independent evaluation of all safety issues relating to the Weaver's Cove project, and we adopted a number of requirements relating to construction, design, and operation of the terminal facilities. While the Commission may apply stricter siting standards than adopted by DOT, we found in the July 15 Order that application of DOT's standards was fully sufficient to protect the public. Fall River has presented nothing here that persuades us that this is not the case, and we continue to believe that the public will be well protected if the project is constructed and operated as required in the July 15 Order.

80. We did not apply different locational criteria to the Fall River site and the alternative sites considered, as Fall River alleges. The FEIS used two sets of criteria for selecting and comparing sites as alternatives to the proposed site — required criteria, and favorable criteria. *Required*

[41] *See* 49 U.S.C. § 60103 (2005).

[42] *See* July 15 order at P 38.