criteria included thermal exclusion/vapor dispersion exclusion zone values that are the same as for the proposed Fall River site. As a result of numerous comments during the pre-filing and scoping periods, issues were identified with the proposed site that could possibly be reduced or eliminated at a potential alternative site. As a result, *favorable* criteria were developed, including those identified by Fall River, to determine if an environmentally preferred alternative could be identified.

81. The FEIS discusses thermal radiation and flammable vapor exclusion zones at pages 4-247 through 4-251 of the FEIS. The very nature of the zones is to ensure that a hazard does not exist outside the zones, regardless of the population density, whether it be light, moderate or heavy. The public outside the exclusion zones is thus protected from potential harm resulting from a release of LNG from the terminal. Nevertheless, it is not correct, as Fall River asserts, that FERC inappropriately relies on exclusion zones to determine the safety of a proposal. Exclusion zones represent only one of the ten safety categories evaluated in the FEIS.[43]

82. The issue of applying exclusion zones to LNG vessel transit was addressed in the FEIS at page 4-280. As noted above, the Coast Guard is the agency responsible for vessel security, and the FEIS notes that Fall River had petitioned the Coast Guard to promulgate exclusion zone regulations for LNG vessel transits. However, the Coast Guard, in a letter dated December 27, 2005, informed Fall River that it would not be instituting the requested rulemaking proceeding, finding that a flexible approach assessing and managing specific risks is superior to the more rigid exclusion zone approach.

83. Contrary to Dr. Haven's assertions, the Commission has not underestimated the possibilities of a large breach and resulting loss of LNG. The FEIS describes the hazards from four intentional breach scenarios from a 23,000 cubic meter spill (more than 6,000,000 gallons).[44] The FEIS also addresses the potential for multiple cargo tank failures and resulting hazards, including the analysis from the U.S. Department of Energy's December 2004 Sandia Report.[45]

84. The issue of the use of the DOT-established 5 kW/m$^2$ (1,600 Btu/ft$^2$-hr) thermal radiation level was raised and addressed in the FEIS. The incident flux levels that are used to define thermal exclusion zones for onshore LNG facilities were developed by DOT through its rulemaking process and determined to be appropriate after evaluating comments on the levels of exposure. This process supports the incident flux levels for their intended purposes of determining onshore exclusion zones. Further, a 5 kW/m$^2$ thermal radiation level was also identified in the Sandia Report as a commonly used value for establishing fire protection distances for people.

*Vapor Dispersion*

85. Fall River contends that applying the DEGADIS model only to the calculated overflow of the unmixed LNG vapor from an impounding area, rather than the full vapor volume including entrained air, is not consistent with experimental tests or with regulatory requirements. It asserts that the Commission continues to ignore that the vapor coming off an LNG impoundment would mix with air within the impoundment and would not remain at 260 degrees below zero. Further, it contends that if an applicant desires to take into account the effect an impounding area may have on the calculation of flammable vapors, or to account for the additional dilution caused by complex flow patterns induced by a tank or dike structure, it must use FEM3A. Fall River states that the DOT regulation is clear that the only way to take into account the effect of the impounding area is to use FEM3A or the equivalent.

*Commission Response*

86. The DOT regulations at 49 C.F.R. § 193.2059(a) state that flammable vapor-gas dispersion distances *must* be determined using the DEGADIS model described in the Gas Research Institute (GRI) report GRI-89/0242. The regulations also state that FEM3A, as described in GRI report GRI-96/0396.5, *may* be used as an alternative method to account for additional cloud dilution caused by tank and dike structures. As stated in GRI report GRI-96/0396.5, the presence of impoundments and plant structures has been shown to reduce the downwind dispersion of flammable vapors. Conversely, modeling which does not take into account the flow-field obstacles presented by tank and dike structures would yield further dispersion distances. The dispersion modeling described in the Weaver's Cove FEIS using DEGADIS provides a more conservative assessment of the downwind dispersion than would a model which accounts for complex topography and flow-field obstacles.

87. Neither 49 C.F.R. Part 193 nor NFPA 59A references a specific method for the calculation of vapor production rates from an LNG spill into an impoundment. The original 1980 version of 49 C.F.R. § 193.2059(d) specified the method for determining vaporization rates for dispersion calculations. This method was derived by Arthur D. Little, Inc. and outlined in the report "Evaluation of LNG Vapor Control Methods (October 1974)." Subsequently, these equations were developed by GRI into a computer program called SOURCE5. Use of this methodology to calculate the vapor source strength, coupled with DEGADIS to compute dispersion distances, is the commonly-used

[43] *See* FEIS, Section 4.12, *Reliability and Safety*, pages 4-230 *et seq*.

[44] *See* FEIS, pages 4-277-4-279.

[45] U.S. Department of Energy's Sandia National Laboratories, Guidance on Risk Analysis and Safety Implications of a Large Liquefied Natural Gas (LNG) Spill Over Water).

and accepted approach by the LNG industry, while FEM3A is not. Commission staff evaluates each application to ensure that the methodology can be applied within the limitations of the model, *i.e.*, vapor overflow occurs before the effects of warming and entrainment become significant. In performing vapor dispersion analysis, the duration of the LNG spill and the time until vapor overtops the impoundment should not be disproportionate. In the analysis presented in the FEIS, the vapor calculations for a design spill from the five in-tank pumps indicated that the vapor would overtop a deepened concrete sump within the 10-minute duration of the design spill.

*Threats related to possible terrorist attack*

88. Fall River contends that the record compels the conclusion that an LNG terminal and associated traffic in an urban environment offers precisely the target that terrorists prefer. For support, Fall River once again refers to the report prepared by Richard Clarke, *LNG Facilities in Urban Areas* (Clarke Report), as well as a statement from the NATO Committee on the Challenges of Modern Society to the effect that civilian military assets are considered to be attractive targets for terrorists, and that world trade may be disrupted by attacks directed against high-value vessels such as cruise ships, oil and LNG carriers, and nuclear waste ships. As the national dependence on imported LNG grows, avers Fall River, terrorists are likely to appreciate the consequences of a single successful strike that raises the possibility of a nationwide shutdown of LNG.

89. Fall River contends that the Coast Guard workshops never achieved consensus with local safety officials. Referring to the July 2005 comments by Mr. Clarke, City of Fall River police chief John Souza, and Captain John Solomito of Somerset, Massachusetts, Fall River contends that the threat of terrorism is real and the best efforts of the Coast Guard cannot ensure success against such attacks.[46] Because of the characteristics of the shoreline, the large number of marinas and close proximity to several airfields, Clarke asserts that it would not be possible to provide for the secure transit of the LNG vessels. Chief Souza states that it would not be possible to prevent an attack simply through water-based surveillance and protection because of "pinch" points where the vessel transit is within 500 yards of shore and within the range of destructive armament. Land-based protection, Chief Souza asserts, is not feasible. Fall River claims that the Coast Guard's Vessel Transit Security Plan is flawed because it is based on the assumption that LNG vessel traffic *will occur*, not even considering *whether it should occur*.

90. Fall River states that the July 15 Order incorrectly finds that the Weaver's Cove Vessel Transit Security Plan complies with NVIC 05-05[47] in all material respects. It states that a suitability evaluation in consultation with local officials has never been undertaken. Fall River states that in a similar situation the Coast Guard recommended application of NVIC 05-05 to the already approved Cameron LNG project.[48]

*Commission Response*

91. The July 15 Order discusses these issues and the Clarke Report in detail.[49] The Commission explained that the assertion that the facilities would be an especially attractive terrorist target is based on general information in the public domain that can apply equally well to many sectors of our society, rather than identifying specific evidence of threats on LNG facilities or vessels. Moreover, the Commission to date has authorized twelve terminals or expansions, and is currently evaluating an equal number of new applications. As more LNG import terminals are placed in service, the attractiveness of any particular target and the national impact of a single plant outage, whether caused by the forces of nature or malicious intent, will be further reduced.

92. The Commission addressed the consequences of a terrorist attack in the FEIS (pages 4-276 through 4-280) based on the analyses in the Sandia Report (which is also referenced in the Clarke Report), and using its own independent calculations using the methodology set forth in ABSG Study.[50] Further, the FEIS evaluated potential consequences along the 21-mile-long LNG vessel transit through Narragansett Bay and the Taunton River, identifying areas of residential and commercial development within the transient thermal radiation hazard areas for several cargo tank breech scenarios.

93. Under the Marine Transportation Security Act of 2002, the Coast Guard exercises responsibility for the security of LNG facilities and LNG vessels. Under that authority, the Coast Guard prepared a Vessel Transit Security Plan through a series of workshops throughout the winter of 2004-2005 with port stakeholders and federal, state and local law enforcement agencies. The workshops evaluated multiple scenarios, including scenarios identified by Chief Souza, and developed procedures which were incorporated into the Vessel Transit Security Plan. The close proximity to marinas and to airfields was recognized. As explained in the FEIS, the Coast Guard will make the final determination with respect to any additional resources and security measures required to provide suitable afloat, underwater, landside, and aviation security or surveillance capabilities to

46 Chief Souza and Captain Solito participated in the Coast Guard workshops.

47 Navigation and Inspection Circular No. 05-05, Guidance on Assessing the Suitability of a Waterway for Liquefied Natural Gas (LNG) Marine Traffic.

48 Docket No. CP02-374-000, *et al.*

49 *See* July 15 Order at PP 84-94.

50 ABSG Consultants, Consequence Assessment Methods for Incidents Involving Releases from Liquefied Natural Gas Carriers.

protect the LNG vessel and facility. The assertion in the Clarke Report, as restated in the rehearing request, that the Coast Guard cannot ensure success against terrorists was made without the benefit of the results of or reference to the Coast Guard security workshops.

94. With respect to the suggestion that the Vessel Transit Security Plan was improperly based on the assumption that LNG vessel traffic *will occur* rather than *whether it should occur,* the Coast Guard in fact developed the plan, as the Commission evaluated issues associated with this project, in the conditional sense, *i.e.*, that impacts *would* only occur if the project is authorized by the Commission and subsequently constructed and operated in accordance with all conditions in the July 15 Order.

95. As to compliance with the provisions of NVIC 05-05, the Coast Guard workshops identifying the security measures necessary to manage the risks associated with LNG vessel transits through Narragansett Bay and the Taunton River is the same process that was subsequently formalized in NVIC 05-05. The need for a waterway suitability assessment for this category of projects is determined by the Coast Guard on a case-by-case basis. In a July 27, 2005 letter to the City of Fall River, the Coast Guard stated that a waterways safety and security assessment — although not specifically titled WSA — for Weaver's Cove has already been completed and included in the FEIS. Approval of the Cameron project referred to by Fall River, on the other hand, did not include a vessel transit security review.

*Emergency Capabilities of local communities to handle the consequences of a spill*

96. Fall River asserts that local communities do not have evacuation and emergency response resources capable of dealing with an LNG spill, whether accidental or intentional. Fall River's Chief Souza states that approximately 9,000 residents live within a mile of the proposed LNG terminal site, with the closest residence only 1,200 feet away. Also in the area, he points out, is a high rise apartment occupied by elderly and disabled, business establishments. He states that the majority of the population has extremely limited escape routes, many of which are dead end side streets, or which head into the area of paramount danger. Another complexity to evacuation is the need to put on protective gear and evacuate the area in a very short time frame. Evacuation difficulties for shoreline areas along the 5-mile LNG vessel transit in Massachusetts could be even worse, it is suggested.

97. Local fire chiefs Thiboutot of Fall River, and Rivard of Somerset, state that firefighters, even with protective clothing, would be unable to get close enough for effective fire extinguishing. Chief Thiboutot avers that evacuation efforts and emergency response needs would be in conflict, that necessary equipment and protective gear is not available, and that local medical facilities would be not be able to cope with the aftermath of an LNG emergency. Chief Rivard states that the only local hospital facilities for the Town of Somerset are located across the Taunton River in Fall River. He maintains that the need to close the Braga Bridge could extend the time to transport a person from Somerset to a hospital from 5 or 10 minutes to 30 minutes or more. Dr. Bruce Auerbach, an emergency service physician and member of the Bristol County homeland security task force, states that that the ability of local hospitals to address the consequences of an LNG fire are not adequate.

*Commission Response*

98. The Commission recognized the need for evacuation route planning in the July 15 Order. Condition 34 of the order requires Weaver's Cove to develop emergency evacuation routes in conjunction with local emergency and town officials for review and approval by the Director of OEP prior to initial site preparation. Condition 67 requires Weaver's Cove to develop an initial Emergency Response Plan, also for review and approval by the Director of OEP prior to initial site preparation. Condition 42 requires Weaver's Cove to provide a comprehensive plan identifying the mechanisms for funding all project-specific security/emergency management costs imposed on state and local agencies, for our review and approval prior to initial site preparation.

99. The importance of emergency response planning was reinforced by Section 311 of the Energy Policy Act of 2005, which requires that an LNG terminal operator develop an Emergency Response Plan in consultation with the Coast Guard and state and local agencies, and that the plan be approved by the Commission prior to any final approval to begin construction. Section 311 also requires a cost-sharing plan describing any direct cost reimbursements that the applicant agrees to provide to any state and local agencies with the responsibility for security and safety at the LNG terminal and in proximity to vessels that serve the facility. Much of the speculation by Fall River about what cannot be done has been made without the benefit of a plan to evaluate. The July 15 Order requires Weaver's Cove to develop such a plan with input by state and local agencies. The issues raised by Fall River will need to be satisfactorily addressed in the Emergency Response Plan that is filed for our review and approval.

100. The Commission received extensive comments on the DEIS on the effect of bridge closures on the travel of emergency and ambulances across the Taunton River, and the ability of local hospitals to handle large numbers of casualties from an LNG incident. We addressed the issue of bridge availability in the FEIS at page 4-183 and at page 4-271. Condition 76 of the July 15 Order requires that security plans make allowance for at least one bridge (either the Braga or the Brightman Street) to remain open during the passage of an LNG vessel. The issue of hospital re-

sources was addressed in the FEIS at page 4-181. The Commission recognized that in the unlikely event of a high consequence LNG incident exceeding the capabilities of local hospitals other medical facilities throughout the region might need to be called on for assistance.

*Coast Guard Security Zone*

101. Fall River again raises the issue that the safety and security zone proposed for LNG vessels (2 miles ahead, 1 mile behind, and approximately 1,500 feet on either side of the vessel) does not comply with the Coast Guard regulation at 33 C.F.R. § 165.121, which requires a safety and security zone 2 miles ahead, 1 mile behind, and 1,000 yards (*i.e.*, 3,000 feet) on either side for high interest vessels, including LNG vessels in Narragansett Bay, the Providence River, and the Taunton River. Application of this 3,000-foot zone would place a significant number of homes and business within an area that is limited only to authorized persons, avers Fall River. Fall River contends that the FEIS mistakenly assumed that the zone would extend 1,500 feet from either side of the tanker, and suggests that the Commission "invited" the Coast Guard to relax the requirements in 33 C.F.R. § 165.121.

*Commission Response*

102. The FEIS addressed this issue in Section 4.12.5, *Marine Safety,* at page 4-270, which was prepared with the cooperation and assistance of the Coast Guard Marine Safety Office Providence to reflect the results of the Coast Guard security workshops. At no time did Commission staff invite the Coast Guard to relax any requirements. The FEIS explains that the Coast Guard's Vessel Transit Security Plan provides for a safety and security zone for LNG vessels, approximately 1,500 feet on either side of the LNG vessel, based on the Coast Guard's determination that this zone would provide the desired level of security without creating unnecessary restrictions.

103. The Coast Guard has adopted a number of specific safety, security, and regulated navigation areas in 33 C.F.R. Part 165 — *Regulated Navigation Areas and Limited Access Areas.* The regulation at 33 C.F.R. § 165.121 describes a generic-type safety and security zone for all ships of high interest vessels, transiting Narragansett Bay, or the Providence and Taunton Rivers.[51] We expect that in accordance with its usual practice, the Coast Guard will promulgate an LNG-specific regulation for the traffic involved in the Weaver's Cove project.[52]

D. *Compatibility of the Site With Local and Regional Development Plans*

104. Fall River asserts that the proposed project is inconsistent with the regional and local development plans and is incompatible with the demographic characteristics and natural physical aspects of the proposed site. Fall River contends that the Commission did not consider the socio-economic impact of placing an LNG terminal in the middle of Fall River's waterfront redevelopment area or the impacts on recreational boating access resulting from LNG vessel traffic associated with the project.

*Commission Response*

105. We disagree with Fall River. The FEIS describes at great length both the current environment in the vicinity of the LNG terminal site (pages 4-140-4-148) and the existing commercial/ recreational vessel traffic in Narragansett Bay, Mount Hope Bay, and the Taunton River (pages 4-168-4-172). The FEIS further acknowledges that an LNG terminal at the proposed site and the LNG vessel transit traffic will not be without impacts. These impacts are described throughout the FEIS.

106. The FEIS also includes an analysis of the existing local and regional plans for the City of Fall River (pages 4-133-4-140). The FEIS concluded that the proposed project is generally consistent with the historical uses, current zoning, and planned marine-industrial uses at the site. As described in the FEIS, the proposed terminal site would make use of an existing industrially zoned property that was previously used as a petroleum products facility. The proposed site for the terminal is located within the Fall River-Mount Hope Bay Designated Port Area, which is designated by the state for the purposes of promoting and protecting marine industrial activities and supporting uses. The LNG vessels would transit to the site along an existing federal navigational channel. In addition, the LNG terminal is immediately across the Taunton River from the Montaup Power Plant, which currently receives coal ship deliveries.

E. *Deferring Issues to Other Agencies or to a Later Time*

107. Fall River contends that the Commission erred in finding that the project is in the public interest while important issues, such as development of security, evacuation, and emergency response plans, and responses to environmental issues (including the disposal of dredge material) remain unresolved. The Commission also erred, contends Fall River, in delegating the ultimate outcome of these matters either to other government agencies or Commission staff. As examples,

[51] The regulation defines high interest vessels as including barges or ships carrying LNG, LPG, chlorine, anhydrous ammonia, or any other cargo deemed to be of high interest by the Captain of the Port, Providence. 33 C.F.R. § 165.121(b) (2006).

[52] *See, e.g.*, 33 C.F.R. §§ 165.110 (Boston Harbor, Boston, Massachusetts), and 165.502 (Cove Point, Chesapeake Bay, Maryland).

Fall River argues that the Commission should have imposed more stringent safety standards than provided for in DOT regulations, and that it was improper for the Commission to defer issues relating to vessel transit to the Coast Guard. Fall River acknowledges that in a typical case it is not "unprecedented" to leave some matters for future determination and approval, but asserts that the importance of these issues is so central to this proceeding that they must be resolved before the Commission can find that the project is in the public interest. Fall River suggests that the Commission is in this proceeding permitting Weaver's Cove projected in-service date to drive the time available for the development of the necessary record, thereby making a "mockery" of informed decision-making.

*Commission Response*

108. We disagree that we acted prematurely in approving the Weaver's Cove project. As we have explained in other cases, the practical reality of large projects such as this is that they take considerable time and effort to develop. Perhaps more importantly, their development is subject to many significant variables whose outcomes cannot be predetermined. Accordingly, consistent with longstanding practice, and as authorized by NGA Section 7(e), the Commission typically issues certificates under its NGA jurisdiction subject to conditions that must be satisfied by an applicant or others before the grant of a certificate can be effectuated by constructing and operating the project.[53] As is the case in virtually every certificate issued by the Commission that authorizes construction of facilities, the approval in the July 15 Order is subject to Weaver's Cove's compliance with the environmental conditions set forth in the order. In this proceeding there are 77 such conditions.

109. We have found that the Weaver's Cove project will be in the public interest and be environmentally acceptable only if Weaver's Cove complies with the conditions set forth in the July 15 Order. We have conditioned Weaver's Cove's authorization so that it cannot commence construction until the other agencies have completed their review of matters within their particular expertise and responsibility, thereby ensuring that the project will not proceed until there is satisfactory resolution of any remaining factors that could alter our finding that the project will not have significant environmental impacts. We have before us in this proceeding sufficient information regarding the proposed action to be able to fashion adequate mitigation measures to support a determination that the Weaver's Cove project will cause no significant environmental impacts upon compliance with those mitigation measures.

110. This approach was approved in *City of Grapevine, Texas v. DOT*.[54] In that case, the Federal Aviation Administration (FAA) approved a proposed runway before completion of the review process required by the National Historic Preservation Act (NHPA). To ensure compliance with the NHPA, the FAA conditioned its approval of the runway upon completion of the NHPA review. The court rejected a challenge to the validity of this approach, concluding that, "because the FAA's approval of the West Runway was expressly conditioned upon completion of the Section 106 process, we find here no violation of the NHPA."[55]

111. Our approach here is also in accordance with the interagency agreement between FERC, the Coast Guard, and the DOT to coordinate the review of safety and security issues, including NEPA review.[56] The agreement clarifies that the Commission is responsible for authorizing the siting and construction of onshore LNG facilities and conducting environmental, safety, and security reviews of LNG plants and related pipeline facilities in its role as the lead agency responsible for preparation of analysis and decisions required under NEPA for the authorization of new facilities. The agreement explains that DOT regulations provide siting and safety requirements, which the Commission, as lead agency in the NEPA review process, ensures will be satisfied by any proposed project, and notes that the Commission has the authority to impose more stringent safety requirements when warranted by special circumstances. The Coast Guard, states the agreement, exercises regulatory authority over LNG facilities that affect the safety and security of port areas and navigable waterways.

112. In this proceeding, we have ensured that all DOT siting and safety regulations will apply. We have reviewed DOT's siting regulations, and for reasons spelled out in the FEIS and in our July 15 Order, as further clarified in this order, find its exclusion zone provisions sufficient to provide a high level of protection to the public. We have, however, adopted a number of conditions designed to improve the safety and reliability of the LNG terminal facility itself. Moreover, we have not improperly delegated responsibilities to the Coast Guard. We adopted several conditions ensuring the Coast Guard's adoption of security, vessel operation, and emergency operation plans, and coordination of security responsibilities relating to personnel and protecting the ships in the terminal area. This Commission gives considerable deference to the Coast Guard in vessel security matters because of its considerable expertise and given that the Coast Guard has authority over navigation

[53] *East Tennessee Natural Gas Company*, 102 FERC ¶ 61,225 at P 23 (2003), *aff'd sub nom. Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323 (D.C. Cir. 2004).

[54] 17 F.3d 1502 (D.C. Cir. 1994).

[55] *Id.* 1509.

[56] Interagency Agreement Among the Federal Energy Regulatory Commission, United States Coast Guard, and Research Programs Administration for the Safety and Security Review of Waterfront Import/Export Liquefied Natural Gas Facilities (Feb.11, 2004).

safety, vessel engineering and safety standards, and all matters pertaining to the safety of facilities or equipment located in or adjacent to navigable waters. The Weaver's Cove LNG terminal cannot be placed in service without the approval and operational oversight of the Coast Guard.

113. We do not view this approach as an impermissible delegation of our responsibilities. In a recent proceeding we explained that, contrary to Fall River's assertion here, the Commission undertakes its own independent assessment of the other agencies' studies and results prior to accepting or rejecting their recommendations.[57] To the extent any of the pending consultations or studies in this case indicate a need for further review, or indicate a potential for significant adverse environmental impacts, the Director of the Commission's Office of Energy Projects (OEP) will not provide the necessary clearances for commencement of construction.

114. Likewise, we have not improperly delegated authority to the Director of OEP to determine appropriate compliance with the conditions attached to our approval of the project. In accordance with our longstanding and usual practice in construction proceedings, the Commission has determined what conditions should apply for construction and operation of the proposed facilities, and have delegated authority in certain circumstances to determine whether those conditions have been met. The matters delegated to the Director of OEP are matters within the particular technical expertise of the Director and his staff. We have not, however, given the Director "unfettered discretion" over these matters, as Fall River asserts. Rather, determinations by the Director of OEP are subject themselves to a request for rehearing under the Commission's regulations.

115. Also, a number of permits or approvals must be obtained from other government agencies before any approval for construction can be granted. For example, as conditioned in the July 15 Order, Weaver's Cove must obtain clean water and dredging permits from the state and COE, respectively.

F. *Wild and Scenic Rivers Act*

116. Under the Wild and Scenic Rivers Act of 1968, as amended,[58] the Commission may not approve a project that would have an adverse effect on a river that is either formally designated as a wild and scenic river or has been designated for such consideration by Congress. The "upper" Taunton River north of Fall River has been designated a "study area" under Section 5 of the act[59] by Congress. Upon the request of municipalities located along the "lower" Taunton River, the National Park Service expanded its study area to include that segment of the Taunton River from Fall River (including The City of Fall River) to Mount Hope Bay. If the Department of the Interior (National Park Service or DOI) recommends the inclusion of the Taunton River in the Wild and Scenic River program, Congress would then decide whether to approve some, all, or none of the river as a component of the Wild and Scenic River system. DOI has stated that it expected to complete its study and report to Congress some time in 2005.[60] Until Congress acts on the forthcoming final report, however, the lower Taunton River in the vicinity of the proposed project is not currently a Congressionally authorized study river segment and is not under Interior's jurisdiction.

117. The FEIS addressed the Wild and Scenic River Program and the impact of the LNG terminal and the western lateral pipeline that would run beneath the Taunton River, and concluded that construction and operation of the proposed project would not have an adverse effect on the Taunton's River's potential designation as a wild and scenic river.[61] Nevertheless, recognizing DOI's primary role in this procedure, we conditioned construction of the Weaver's Cove project (Condition 25) on Weaver's Cove's filing documentation that DOI concurs that the project would not have a substantial adverse effect on the designation of the Taunton River as a wild and scenic river and that the project would be consistent with the Wild and Scenic Rivers Act.[62]

118. Both Fall River and the Conservation Law Foundation contend that the Commission did not go far enough. They point to the DOI's July 12 comments to the FEIS pointing to concerns regarding the impact on fish resources (especially with respect to impact from dredging) and the impact on waterfront development. The Conservation Law Foundation states that, given DOI's concerns, the Commission's condition cannot be met, and the Commission cannot therefore approve the project. For its part, Fall River states that, while it might be possible to address concerns regarding the impact on fish resources through the adoption of expanded restrictions on dredging, there is no way to make the project compatible with Fall River's goals for its waterfront. Fall River also argues that, regardless of whether the river receives wild and scenic river designation, the Commission must independently assess preservation as part of its Section 3 public interest analysis.

---

[57] *See, Cameron LNG, LLC,* 112 FERC ¶ 61,146 (2005), *citing, e.g., Steamboaters v. FERC,* 759 F.2d 1382, 1393 (9th Cir. 1985), describing the Commission's obligation to take a hard look at the potential environment impacts of a proposed action, and to not axiomatically adopt other agencies' recommendations.

[58] 16 U.S.C. § § 1278*et seq.* (2005).

[59] 16 U.S.C. § 1276(a) (2005).

[60] Thus far, however, we have received no information that DOI has completed its study.

[61] *See* FEIS, Section 4.8.6.1, Designated Recreation and Public Interest Areas, pages 4-166-4-168.

[62] The FEIS also noted that COE would provide the National Park Service with a draft of its dredging permits, and that if the National Park Service objected to the permits under the Wild and Scenic Rivers Act, the COE would not issue the permits.

119. Weaver's Cove requests that the Commission clarify that the DOI has no jurisdiction to review the Weaver's Cove project under the Wild and Scenic Rivers Act. Weaver's Cove asserts that DOI does not have direct jurisdiction to protect the "lower" Taunton River from potential impacts because that segment, unlike the "upper" Taunton River, has not been designated by Congress for study under the act. If a river or river segment has not been designated by Congress under Section 5(a), states Weaver's Cove, it enjoys no special protection under the Wild and Scenic Rivers Act. Weaver's Cove also contends that DOI likewise holds no indirect authority to regulate the Weaver's Cove project in order to protect the "upper" Taunton River. While acknowledging that DOI may make a determination of adverse impact with respect to a water resource project or development sited above or below a Congressionally designated river if that project will have an impact on the scenic, recreational, or fish and wildlife values of the designated study river, it argues that the Weaver's Cove project is not a "water resources project" or a "development" within the meaning of the Wild and Scenic Rivers Act because its dredging activities will not affect the free-flow characteristics of the Taunton River. For these reasons, it contends that DOI has no jurisdiction to review the impact of Weaver's Cove's dredging activities, and it requests that the Commission delete Condition 25 from the July 15 Order.

*Commission Response*

120. Congress has entrusted DOI with implementation of matters related to the Wild and Scenic Rivers Act. We recognized this in the FEIS, and in the order we conditioned our approval upon a positive determination by DOI that the Weaver's Cove project will be consistent with the objectives of the act. The issues raised by Weaver's Cove relating to the types of activities covered by the Wild and Scenic Rivers Act are within the province of DOI to resolve. DOI has the jurisdiction and the expertise to address these matters. Weaver's Cove should pursue its arguments with DOI, not this Commission. Accordingly, we will not remove Condition 25 from our approval of this project.

121. We disagree with Fall River and the Conservation Law Foundation, however, that that there is no possibility that DOI will make a positive finding regarding the impact of the Weaver's Cove project under the Wild and Scenic Rivers program. The FEIS examined this aspect of the project and found that the Weaver's Cove project should not adversely affect the free flow of the river, and that the proposed LNG terminal would be consistent with the historical industrial use of the site so that it would not impair the values of the river to any greater extent than other facilities currently located along the lower Taunton River. We remain hopeful that, in reaching its determination, DOI may well come to the same conclusions, and that dredging and other remaining issues may be successfully settled.

G. *Rhode Island CZMA Concurrence*

122. Under Section 307(c)(3)(A) of the Coastal Zone Management Act (CZMA)[63] a federal agency cannot issue a license for a project affecting any land or water use or natural resource of a state's coastal zone unless the state certifying agency concurs with the applicant's certification of the project's consistency with the state's federally approved coastal zone management program. Section 307 further provides that a state must either concur with or object within six months "after receipt of its copy of the applicant's certification" or the state's concurrence with the certification "shall be conclusively presumed." The CZMA implementing regulations provide that the six-month review period does not begin until the state has received "necessary data and information," including information identified in the state's coastal zone management program.[64] If a state notifies the applicant and this Commission within 30 days of receipt of the application that the application is incomplete, the state may toll the six-month decision period until the deficiencies are corrected.[65] What constitutes necessary data and information is set forth in the implementing regulations,[66] and a request by a state for additional, as opposed to required, information, does not stop the six-month clock.[67] If the state objects to the applicant's proposal, the applicant may appeal to the Secretary of Commerce for an override of the state's objection.[68]

123. Weaver's Cove requests that the Commission remove its condition that Weaver's Cove obtain consistency concurrence from the Rhode Island Coastal Resources Management Council (Rhode Island Council) under the CZMA (Condition 24) from the July 15 Order because the Rhode Island Council, it asserts, has failed to follow the deadlines established for review of Weaver's Cove's consistency with the Rhode Island coastal zone management plan. Weaver's Cove contends that concurrence is thus conclusively presumed as a matter of law.

124. Weaver's Cove submitted an application with the Rhode Island Council for a federal consistency certification on July 19, 2004. According to a sworn affidavit submitted by the Rhode Island Council, Weaver's Cove was informed by telephone that the application lacked certain necessary data and information required by Rhode Island's coastal zone management plan, and that

[63] 16 U.S.C. § 1456(c)(3)(A) (2005).

[64] 15 C.F.R. § 930.60 (2005).

[65] *Id.*

[66] *Id.*

[67] 15 C.F.R. § 930.60(b); and *Mountain Rhythm Resources v. FERC,* 302 F.3d 958 (9th Cir. 2002).

[68] CZMA matters are administered by NOAA, an agency of the Department of Commerce.

the state's review would not begin until all the necessary material was received by the state. Specifically, according to the affidavit, Weaver's Cove was told in the telephone conversation that the application did not include a viable disposal location for dredged materials, that the engineering plan submitted required a stamp from a Rhode Island certified professional engineer, and that Weaver's Cove must submit a water quality certificate from the Rhode Island Department of Environmental Management. Weaver's Cove states that in a letter dated August 2, 2004 it responded to the request for information regarding the disposal site, and stated that it would provide additional information and clarification found necessary by the Rhode Island Council. On August 12, Weaver's Cove resubmitted the engineering plan with a Rhode Island professional engineer's stamp. On August 26, 38 days after Weaver's Cove filed the original application, Rhode Island sent Weaver's Cove a letter stating that the application was incomplete because Weaver's Cove had not yet obtained a Clean Water Act quality certification.

125. Weaver's Cove contends that the statutory six-month review period began on July 19, 2004, when Weaver's Cove originally submitted the application. Weaver's Cove asserts that telephone notification that the application was incomplete did not toll the six-month review period because both the CZMA implementing regulations and the Rhode Island Council's own *Federal Consistency Manual* require that such notification be in writing. Weaver's Cove asserts that the August 26 letter from the state to Weaver's Cove has no legal effect because it was sent beyond the required 30-day period (computed from July 19), and thus failed to toll the six-month review period. Even if the August 26 letter is considered timely, the review period was not tolled, contends Weaver's Cove, because under the Rhode Island coastal zone management plan, an applicant for federal consistency review is not required to obtain a Section 401 water quality permit for Rhode Island's review of the project, and thus that information is not necessary data and information that would render its application incomplete. Weaver's Cove avers that the statutory six months for CZMA review has long since elapsed.

126. The Rhode Island Council disagrees that it has waived its right to assess the consistency of the Weaver's Cove project.[69] It avers that it informed Weaver's Cove within the 30 days allowed by regulation that the application was deficient, and that it informed Weaver's Cove that the application was still incomplete after it resubmitted the application with the Rhode Island professional engineer's stamp. These notifications tolled the six-month determination period, contends Rhode Island. The Rhode Island Council further states that Weaver's Cove has yet to submit the specified information necessary for evaluation of the project. The Rhode Island Council states that it has complied with the CZMA notification requirements, and that it is Weaver's Cove that is either unwilling or unable to provide the necessary information for the Rhode Island Council to begin its review. Moreover, avers the Rhode Island Council, it is the role of the Department of Commerce, not this Commission, to make determinations regarding application of CZMA requirements.

*Commission Response*

127. The Commission's CZMA role is very limited. The Commission's only responsibility under the CZMA is to withhold construction authorization for a project until the state finds that the project is consistent with the state's NOAA-approved coastal zone management plan. The Commission has found in other proceedings that CZMA consistency can be presumed because the state has not issued its consistency determination in a timely manner. In those situations, however, it was not disputed that the state did not meet the 30-day notification requirement for informing the applicant that the application was missing information, or that the state did not issue a consistency determination within six months from submission of the application.[70] Here, on the other hand, these matters are intensely disputed. Weaver's Cove argues that it did not receive proper or timely notice from the Rhode Island Council regarding any perceived deficiencies in its application, and that, in fact, some of the material the Rhode Island Council did request is not required for CZMA consistency concurrence. Rhode Island, for its part, contends that it has met all regulatory requirements and deadlines.

128. We cannot resolve on this record the complex issues raised by Weaver's Cove and the Rhode Island Council with regard to whether consistency of the Weaver's Cove project with Rhode Island's federally approved coastal zone management program should be presumed as a matter of law. To reach this determination, Weaver's Cove asks this Commission to interpret and apply regulations issued by the State of Rhode Island to find that information Rhode Island has requested from Weaver's Cove is not required under its coastal zone management program. It also asks this Commission to interpret and apply regulations issued by NOAA to determine that Rhode Island has not met the statutory and regulatory deadlines addressed in those NOAA regulations. This Commission is not in a position to interpret regulations of other agencies or otherwise to resolve the issues raised by the parties. This issue is a matter

[69] The Rhode Island Council is not a party to this proceeding. Nevertheless, it submitted what it calls a "Memorandum of Law" opposing Weaver's Cove's contention regarding the Rhode Island Council's CZMA consistency determination approach. Weaver's Cove filed a reply to the Rhode Island Council's pleading. Although our rules of procedure do not provide for either submission, we will accept them so that we may have a full understanding of their positions.

[70] *See, e.g., Georgia Strait Crossing Pipeline, LP*, 108 FERC ¶ 61,053 (2004); *International Paper Company*, 110 FERC ¶ 62,239 (2005).

for the Rhode Island Council, the NOAA, and the Department of Commerce, not this Commission.[71]

H. *Deed Restrictions on the LNG Terminal Site*

129. As discussed in the July 15 Order, Shell and Weaver's Cove have different views on the interpretation of deed provisions regarding future activities on the site of the proposed terminal, and whether the deed permits the placing of dredged material on the site without the approval of Shell and its licensed site professional. Condition 77 in the July 15 Order requires that Shell and Weaver's Cove show that they have reached agreement with regard to deed restrictions relating to future activities and use limitations on the proposed terminal site, or that deed restriction issues regarding future use of the site have been resolved in court.

130. Weavers' Cove contends that the Commission erred in imposing Condition 77 on its approval of the project by requiring Weaver's Cove to resolve what it calls a "contract dispute" with Shell before it begins any construction-related activities on the proposed LNG terminal site. Weaver's Cove asserts the dispute involves a private contractual arrangement between two private parties relating to interpretation of certain restrictive covenants in the deed conveying the site from Shell to its current owner, Jay Cashman, Inc. Weaver's Cove asserts that the Commission should remove Condition 77.

131. Shell, on the other hand, maintains that Condition 77 does not go far enough, and it seeks clarification that the Commission did not intend to limit the scope of the issues that are governed by the deed, and that must be resolved by the parties. Shell states that many matters pertaining to the site are subject to the deed, and that other parties have rights and obligations under the deed.

*Commission Response*

132. The deed conveying the property for the proposed LNG terminal from Shell to Cashman created easements allowing Shell to perform remedial environmental activities required under the MCP, and established provisions restricting future use of the site and governing the rights of Shell, Cashman, and successors to Cashman's interests. The Commission recognized that it could not resolve deed issues regarding use of the site for Weaver's Cove's proposed activity and found that the parties should resolve the disagreement between them or pursue the matter in court. The Commission's Condition 77 in the July 15 order requires resolution of these matters prior to the commencement of any construction-related activities on the proposed site.

133. What Weaver's Cove calls a contract dispute between two private parties outside the Commission's jurisdiction is in reality a threshold issue in this proceeding — whether Weaver's Cove may lawfully use the site for the purpose it intends. Until that question is answered, all other issues in this proceeding are academic. The Commission cannot determine how this matter should be resolved, and it is not attempting to do so. Instead, Condition 77 merely reminds Weaver's Cove of its responsibility to obtain undisputed right under the deed to use the property for its proposed terminal, and assures that no property will be disturbed until Weaver's Cove demonstrates that right to the Commission. Shell's concern that our condition may too narrowly limit potential issues under the deed is unfounded. If the parties cannot agree, either party may bring its particular concerns to the attention of the court in any action brought. Condition 77 is sufficiently broad to accomplish this purpose and will remain unchanged. All provisions under the deed are subject to Massachusetts law.

I. *Compliance with the Massachusetts Contingency Plan*

134. Condition 18 in the July 15 Order requires Weaver's Cove to file documentation prior to construction to verify that placement of stabilized dredged material on the proposed LNG terminal site is consistent with the MCP.[72] Shell contends that the Commission should modify Condition 18 to clarify that the placement of dredged material on the proposed site in accordance with the MCP requirements is a continuing obligation subject to the jurisdiction of the Massachusetts DEP. Because Shell's remediation of the site is governed by the MCP, Condition 18 should also make clear, asserts Shell, that development of the site by Weaver's Cove must comply in all respects with the MCP.

*Commission Response*

135. We find that the requested modifications are not necessary. The purpose of Condition 18 is to assure the Commission, before it authorizes any construction activities to begin at the site, that the Massachusetts DEP has determined that placement of dredged material at the site complies with the MCP.[73] The condition is not intended to describe Weaver's Cove's or Shell's responsibilities under the MCP, and it does not need to do so. Nevertheless, we note that the proposed site is a listed contaminated site under Massachusetts law being regulated under the MCP. Jurisdiction over the site and remediation actions on the site will continue with the Massachusetts DEP

[71] NOAA recently dismissed an appeal by Weaver's Cove that raised similar arguments to those presented here.

[72] In the July 15 Order we explained that the MCP is a comprehensive regulatory program established to implement, as pertinent, remedial actions related to a release or the threat of a release of oil and/or hazardous material. The MCP complements the EPA's National Contingency Plan under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended.

[73] *See* July 15 Order at P 110.

J. *Control of the "Wedge" Lot*

136. Weaver's Cove states that it has an option to purchase all the property within the exclusion zones provided for under DOT safety regulations[74] except for a 1.19-acre triangular shaped piece of property (referred to as the "wedge" lot) formed by its borders with the Taunton River, the proposed LNG facility, and a steep embankment to State Route 79. Weaver's Cove states that legal title to the wedge lot is unclear and may be difficult to establish. Because DOT siting regulations, however, require that the operator of an LNG facility legally control all activities within the exclusion zone,[75] Condition 40 of the July 15 Order requires Weaver's Cove to provide evidence of its ability to exercise legal control over activities on the wedge lot. Acknowledging Weaver's Cove's argument that it may have difficulty establishing title to the property, Condition 40 provides, alternatively, that Weaver's Cove would satisfy the exclusion zone control requirement by obtaining a waiver of this requirement from DOT that spells out alternative mitigation methods that would assure an equal or greater level of thermal protection within the exclusion zone.

137. Weaver's Cove asserts that Condition 40 is unwarranted and that the Commission should remove the condition from its authorization of the project. Weaver's Cove argues that, while it may not be in technical compliance with this DOT exclusion zone provision because it does not hold legal title to the wedge lot, its proposal meets the intent of that requirement because it effectively can control public access to the wedge lot. The unique location of the wedge, it states, makes it unusable as there is no public access and no structures can be built on the property.

*Commission Response*

138. Weaver's Cove is requesting that this Commission waive a safety requirement duly adopted by another federal agency. Congress delegated the responsibility for developing safety standards for the siting of LNG facilities to DOT. As discussed in the FEIS,[76] we agree that it is unlikely that prohibited activities can reasonably occur on the wedge lot; however, while this Commission may impose additional requirements more strict than those adopted by DOT if the circumstances warrant, we may not waive or apply requirements weaker than those found necessary by DOT to insure public safety. Accordingly, the July 15 Order properly requires Weaver's Cove to comply with the DOT site control requirement or obtain a waiver of that requirement from DOT. Condition 40 will remain.[77]

K. *State and Local Permits*

139. The July 15 Order stated that any state or local permits issued with respect to the jurisdictional facilities authorized must be consistent with the conditions of the certificate. It explained that the Commission encourages cooperation between interstate pipelines and local authorities. However, the Commission pointed out that state and local agencies, through application of state or local laws, may not prohibit or unreasonably delay the construction or operation of facilities approved by the Commission.

140. Fall River asserts that the Commission's statement regarding its preemption authority is overly broad. Fall River states that "to the extent that this language purports to assert sweeping and unbounded Commission jurisdiction over valid exercises of state or local authority to regulate environmental and land-use issues implicated by this project, it is legally untenable." Neither the Commission's enabling legislation nor the NGA, claims Fall River, gives the Commission jurisdiction over disputes arising from a state or local entity's exercise of its valid statutory or regulatory authority. Rather, such disputes must be resolved in accordance with standard procedures and remedies available under state law. Fall River states that approvals Weaver's Cove would need to obtain from state or local governments involve compliance with generally applicable state laws and regulations directed at the protection of the environment, natural resources, and the public health, safety, and welfare. They would not be laws or regulations directed at natural gas companies or at the siting or operation of LNG terminals, it avers.

*Commission Response*

141. In *Schneidewind v. ANR Pipeline Co.* (*Schneidewind*), the Supreme Court held that because the Commission has exclusive jurisdiction over the rates and facilities of natural gas companies, a state agency may not regulate matters directly considered by the Commission pursuant to its authority under the NGA.[78] Subsequently, in *National Fuel Gas Supply Corporation v. Public Service Commission of the State of New York* (*National Fuel*),[79] the U.S. Court of Appeals for the Second Circuit specifically addressed the issue of a state's ability to impose additional requirements on a pipeline construction project authorized by the Commission. The court held that a New York statute requiring an interstate pipeline to apply for and obtain a certificate of environmental compatibility from the New York PSC was preempted by the NGA on the grounds that either the NGA explicitly vested exclusive jurisdiction in the Commission to regulate interstate pipeline facilities or Congress had so occupied the field of regulation

---

[74] 49 C.F.R. § 193.2057 (2005).

[75] 49 C.F.R. § 193.2007 (2005).

[76] *See* FEIS, Section 4.12.4, Siting Requirements — Thermal and Dispersion Exclusion Zone, pages 4-248-4-249.

[77] The FEIS noted that Weaver's Cove requested waiver on September 20, 2004. That request is still pending.

[78] 485 U.S. 293 (1988).

[79] 894 F.2d 571 (2nd Cir. 1990).

of interstate pipelines by enactment of the NGA that there was no room for the states to regulate.[80] Accordingly, the court held that the pipeline did not have to comply with New York's regulatory scheme.

142. With regard to a local authority's denial of a permit to a pipeline to conduct regulated activities within the town because the local agency thought another route was superior to the Commission-approved route, the Commission has explained that the NGA "preempts state and local law to the extent the enforcement of such laws or regulations would conflict with the Commission's exercise of its jurisdiction under the federal statute."[81] The Commission further explained:

> [a] state or local agency may challenge a Commission decision by filing a timely request for rehearing and appealing a Commission decision to the courts. A state or local agency may not use its regulatory power to challenge a decision by this Commission.[82]

In sum, as held by the court in *National Fuel*, the NGA preempts state and local agencies from regulating the construction and operation of interstate pipeline facilities.[83]

143. Citing the Supreme Court's ruling in *Schneidewind*, the Commission for many years has included language in virtually every order in which a construction certificate is issued, including in the July 15 Order issued here at paragraph 113, explaining its policy requiring applicants to cooperate with state and local agencies, but noting that such agencies may not, through the application of state and local laws, . . . prohibit or unreasonably delay the construction of facilities approved by the Commission.

144. That a state or local authority requires something more or different from the Commission, however, does not necessarily make it unreasonable for an applicant to comply with both the Commission's and another agency's requirements. It is true that additional state and local procedures or requirements could impose more costs on an applicant or cause some delays in constructing a pipeline. However, not all additional costs or delays are unreasonable in light of the Commission's goal to include state and local authorities to the extent possible in the planning and construction activities of pipeline applicants. A rule of reason must govern both the state's and local authorities' exercise of their power and an applicant's bona fide attempts to comply with state and local requirements.[84]

145. If a conflict arises, however, between the requirements of a state or local agency and the Commission's certificate conditions, the principles of preemption will apply and the federal authorization will preempt the state or local requirements. The Commission cannot act as a referee, on an ongoing basis, between applicants and state and local authorities regarding each and every procedure or condition imposed by such agencies. In the event compliance with a state or local condition conflicts with a Commission certificate, parties may bring the matter before a federal court for resolution.[85]

L. *Environmental Justice*

146. In its comments the EPA avers that the FEIS did not sufficiently assess the potential for disproportionate impacts from the project on low income or minority communities, and suggests that the Commission should conduct additional analysis. It states that it is particularly concerned with potential impacts to air quality during construction. In its rehearing request, Fall River also alleges that the Commission did not adequately assess environmental justice issues. We disagree. The FEIS fully and appropriately addresses the environmental justice implications pertinent to this project.

*Commission Response*

147. Executive Order 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low Income Populations,*[86] requires that specified federal agencies shall make achieving environmental justice part of their missions by identifying and addressing, as appropriate, disproportionately high and adverse human or environmental health effects of their programs, policies, and activities on minorities and low income populations. Executive Order 12898 applies to the agencies specified in Section 1-102 of the order.[87] This Commission is not one of the specified agencies and the provisions of Executive Order 12898 are not binding on this Commission. Nonetheless, in accordance with our usual practice, as part of the FEIS, the Commission has examined the Weaver's Cove project to insure that it does not have disproportionately high and adverse human health or

---

[80] The court noted that Congress established the Commission as "a federal body that can make choices in the interests of energy consumers nationally," and reasoned that because the Commission "has authority to consider environmental issues, states may not engage in concurrent site-specific environmental review. Allowing all the sites and all the specifics to be regulated by agencies with only local constituencies would delay or prevent construction that has won approval after federal consideration of environmental factors and interstate need, with the increased costs or lack of gas to be borne by utility consumers in other states." *National Fuel*, 894 F.2d at 579.

[81] *Id.* at p. 61,360. *See also Maritimes & Northeast Pipeline, L.L.C.* (*Maritimes*), 81 FERC ¶ 61,166, at pp. 61,728-31 (1997).

[82] *Id.*

[83] 894 F.2d at 575-76 (setting forth circumstances under which the Supremacy Clause of the Constitution, Article VI, clause 2, provides for preemption of state and local law).

[84] *Maritimes*, 81 FERC at pp. 61,730-31.

[85] Id.

[86] 59 *Fed. Reg.* 7629 (Feb. 11, 1994).

[87] *See Millenium Pipeline Company, L.P.*, 97 FERC ¶ 61,292 (2001).

environmental effects on minority or low income communities.

148. Based on available data from various government sources regarding income and ethnicity of the local communities, including environmental justice maps provided by the EPA, the FEIS identified potential environmental justice areas in the vicinity of the project. The FEIS then discussed a number of potential impacts that could affect these areas during construction and operation of the project. Specifically, the FEIS discussed possible visual impacts from the LNG terminal, impacts from vehicle traffic during construction and operation of the terminal, air quality and noise impacts from operation of the terminal, and potential impacts on public safety from possible incidents at the terminal and in the navigation channel. The FEIS concluded, however, that although some of the neighborhoods near the LNG terminal have lower than average income levels, the potential impacts would affect all the communities surrounding the terminal, and not have a disproportionate impact on environmental justice areas.[88]

149. The FEIS did not specifically address the impact on air quality during construction of the project in its environmental justice analysis. Nevertheless, as the FEIS points out on page 4-195, the FEIS provides a more detailed analysis of air quality in Section 4.11 of the FEIS. The FEIS explained that while construction of the LNG terminal and the pipelines would have some adverse impacts on air quality from fugitive dust emissions and from tailpipe emission from construction vehicles, these impacts would be temporary. Furthermore, the FEIS noted that the applicant will take a number of standard steps to minimize fugitive dust emissions, such as covering trucks and spraying water over exposed soils as necessary. The FEIS found that the temporary and intermittent nature of tailpipe emissions would be minimal, but nevertheless recommended a condition requiring the applicant to use high grade diesel fuel in all construction equipment and to evaluate the feasibility of using catalysts and filters on such equipment and placing idling limits on construction vehicles. The Commission adopted this recommendation as Condition 29 in the July 15 Order.

M. *Clarification of Certain Terms Used in Conditions*

150. Weaver's Cove requests the Commission to clarify the differences among the phrases "prior to initial site preparation," "prior to construction," and "before commencement of any construction-related activities," as used in the environmental conditions to the July 15 Order. In particular, Weaver's Cove requests clarification that activities that may be undertaken by the site's current owner prior to Weaver's Cove's obtaining ownership, such as tank clearing, will not be considered initial site preparation. Similarly, Weaver's Cove avers that demolition of existing structures on the site, site clearing or minor site grading activities associated with demolition should not be considered construction related, if they were performed by the current site owner prior to Weaver's Cove's acquiring the site.

*Commission Response*

151. The term "Before commencement of any construction-related activities . . . " is used only in Condition 77, which requires appropriate evidence that issues relating to deed restrictions on future activities on the site have been resolved. The term "prior to initial site preparation" is only used in the conditions related to the design and construction of facilities at the LNG terminal site, while "prior to construction" is used for other resources. These terms have essentially the same meaning and may be used interchangeably. With respect to demolishing existing structures on the site, and clearing or grading activities associated with demolition, the Commission has generally considered these activities to be initial site preparation activities. These conditions apply to Weaver's Cove and Mill River with respect to commencing site work on the LNG project involved in this proceeding. Conversely, the conditions do not apply to the owner of the site, which may perform any of these activities consistent with other applicable laws and regulations.

N. *Rate and Tariff Issues*

*Gas Quality*

152. KeySpan requests that the Commission clarify, (1) that the July 15 Order did not intend to make any finding regarding the impact that deliveries of regasified LNG from the Weaver's Cove and Mill River facilities into the Algonquin system may have on Algonquin's system or on Algonquin's customers, and (2) that the Commission's approval of Mill River's *pro forma* tariff, including its gas quality provisions, will not affect or influence the Commission's consideration of future proposals to modify the quality provisions of Algonquin's tariff. KeySpan argues that the Commission's Certificate Policy requires the Commission to consider the impact of proposed new pipeline projects on other affected pipelines and the captive customers they serve.[89] KeySpan argues that the information supplied by Algonquin is insufficient to support a conclusion that deliveries of regasified LNG from the Weaver's Cove facilities would not adversely affect Algonquin and its captive customers. KeySpan is concerned that the regasified LNG from the Weaver's Cove facility may not have the same quality or interchangeabil-

[88] *See* FEIS, Section 4.9.7, *Environmental Justice*, at pages 4-192-4-197.

[89] *Citing Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227, at p. 61,737 (1999), *order on clarification*, 90 FERC ¶ 61,128, *order on clarification*, 92 FERC ¶ 61,094 (2000).

ity of current gas supplies on Algonquin's system and will adversely affect KeySpan's delivery systems or the customers of those systems. KeySpan seeks clarification that the Commission has not made findings on these issues. In the event that the Commission does not grant the requested clarification, then KeySpan requests rehearing of the July 15 Order.

*Commission Response*

153. The Commission addressed Mill River's *pro forma* tariff in the July 15 Order, and required Mill River to make several changes where the Commission found them necessary to comply with Commission regulations. Mill River's *pro forma* tariff, however, complies with current Commission regulations regarding gas quality standards, which require that pipelines identify heat content and measurement.[90]

154. The issues raised here by KeySpan are beyond the scope of this proceeding. The July 15 Order does make any findings relative to Algonquin's tariff, and it does not address the circumstances under which gas could be introduced by Mill River into the Algonquin system. Specifications relating to gas transported on Algonquin's system are described in Algonquin's tariff. Our orders in this proceeding have no effect on Algonquin's tariff. KeySpan is a shipper on Algonquin's system, and it should pursue matters relating to the quality of the gas transported on that system with Algonquin. The Commission recognizes that there are serious industry concerns regarding the interchangeability of domestic natural gas and imported LNG and has been, along with the industry, exploring how these concerns can best be resolved.[91]

*Billing Determinants*

155. Weaver's Cove asserts that the Commission erred in requiring Mill River to base its rates upon theoretical pipeline capacity of 836,000 Dth per instead of its firm contractual commitments of 400,000 Dth per day. Weaver's Cove states that the Algonquin system, the only pipeline system downstream of the laterals, can physically receive only 400,000 Dth per day from the Mill River laterals on a firm basis at the present time, and there is no possibility that Mill River will be able to find subscribers for firm capacity anywhere near its theoretical 836,000 Dth per day capacity, absent significant new construction by Algonquin. Weaver's Cove states that the two laterals are not over-sized; rather, Mill River proposed to construct two separate laterals each with a design capacity of 400,000 Dth per day for purposes of take-away flexibility. It does not intend to sell firm capacity on both laterals equal to the combined physical capacity of the two lines. While the proposed laterals could handle the larger capacity on peak demand days, peak use would be temporary and uncertain, states Weaver's Cove.

156. The Commission, avers Weaver's Cove, generally requires pipelines to use their total physical capacity in determining their rates to guard against possible cost over-recovery or the over-sizing of facilities, but has employed a more flexible approach where, as here, that policy concern is not implicated. The fact that in the July 15 Order the Commission is requiring Mill River to submit a rate filing after three years of actual operation to justify its recourse rates will serve as an appropriate vehicle for the Commission to determine if there has been cost over-recovery. Weaver's Cove states that Mill River also agrees to credit any additional revenues from interruptible service to firm shippers. For these reasons, Mill River requests that the Commission grant rehearing and permit it to design its Rate Schedule FT reservation rate based on the actual firm capacity that it has subscribed to its shipper, and that it be permitted to design its IT rates as a100 percent load factor derivative of such firm rate.

*Commission Response*

157. Upon further consideration, we agree with Weaver's Cove that the circumstances of this case warrant a departure from the Commission's general policy of requiring a pipeline to base its rates on actual capacity. Because there are physical limitations to Mill River's transporting more than 400,000 Dth per day for a sustained period, there is little likelihood of over-recovery of the pipeline's costs. We are also persuaded that other protections against over-recovery of costs are in place. Under the July 15 Order, Mill River must, after three years of operation, submit either (a) a cost and revenue study justifying its cost-based firm and interruptible recourse rates, or (b) an NGA Section 4 filing to propose alternative rates. Mill River has also stated it will credit any revenues derived from interruptible service to firm shippers.[92] In view of these safeguards against cost over-recovery, the Commission concludes that it is appropriate to grant rehearing and permit Mill River to design its Rate Schedule FT reservation rate based on the actual firm capacity that it has subscribed to its shipper, and is permitted to

[90] 18 C.F.R. § 154.108(e) (2005).

[91] *See* Docket No. PL04-3-000, Natural Gas Interchangeability

[92] At P 62 of the July 15 Order, we directed Mill River to allocate an appropriate level of the estimated cost of service to interruptible services and recalculate its rates, or alternatively, to provide a mechanism to credit 100 percent of IT revenues to its firm and interruptible shippers. This direction was based in part on the use of 836,000 Dth as billing determinants to derive Mill River's rates. These 836,000 Dth included capacity that would be used for interruptible transportation, so any IT revenues would correctly be credited to both firm and interruptible shippers. Inasmuch as we are granting rehearing on the level of billing determinants, the IT revenue crediting must also be reconsidered. The level of 400,000 billing determinants includes only firm transportation. Since the recourse rates are now derived based only on costs allocated to firm transportation, any IT revenues should be credited only to firm shippers.

design its IT rates as a100% load factor derivative of such firm rate.

O. *Modification to Condition 11*

158. We have revised environmental Condition 11 in Appendix B of the July 15 Order pertaining to the commencement of service of the project. Modifications to the condition are necessary to clarify that in-service authorizations are required for both the LNG terminal and the pipeline facilities. Condition 11 will now read:

> 11. Weaver's Cove must receive written authorization from the Director of OEP before commencing service *from the LNG terminal and other components of the project.* Such authorization will only be granted following a determination that *the facilities have been constructed in accordance with FERC approval and applicable standards, can be expected to operate safely as designed, and the* rehabilitation and restoration of the right-of-way and *other areas affected by the project are* proceeding satisfactorily. [Changes from July 15 Order are in italics.]

*The Commission orders*:

(A) Except as described in the body of this order, the requests for rehearing are denied.

(B) Fall River's request for oral argument of its rehearing request is denied.

(C) The September 26, 2005 pleading filed by the City of Newport and the Towns of Bristol, Tiverton, Middletown, and Portsmouth, Rhode Island is rejected.

(D) The October 14, 2005 pleading by the Town of Jamestown, Rhode Island is rejected.

Commissioner Kelly dissenting with a separate statement attached.

**Suedeen G. KELLY, Commissioner,** *dissenting*:

For the reasons detailed in my dissent from the July 15 Order,[1] I continue to believe that, under the facts and circumstances of this case, it would not be in the public interest to authorize the Weaver's Cove LNG facility under NGA Section 3. In my view, there are reasonable alternatives to this facility for meeting New England's growing demand for natural gas. Given these alternatives, I think that, on balance, the unresolved safety, environmental and socioeconomic concerns raised by this project outweigh the benefit of the additional gas supply that it would provide. In addition, I disagree with this order's failure to substantively address the argument raised on rehearing that Rhode Island failed to timely act on Weaver's Cove's Coastal Zone Management Act (CZMA) certification application.

The Weaver's Cove facility would transport up to 800 MMcf per day of natural gas to the Northeast market by 2010. As I have previously stated, I believe that there are other natural gas infrastructure projects proposed to serve the New England region that present reasonable alternatives to this facility. For example, the Canaport LNG and Bear Head LNG import terminals in Canada are currently under construction and are scheduled to be in service in 2008. The initial capacity of the Canaport LNG facility is 1 Bcf per day. The designed throughput capacity for Bear Head LNG is 1 Bcf per day. An additional storage tank could be added in the future, increasing peak send-out capacity to as much as 1.5 Bcf per day. These LNG import terminals would tie directly into the Maritimes & Northeast Pipeline, which already serves New England. On September 15, 2005, Maritimes & Northeast Pipeline submitted a pre-filing application with the Commission, proposing to expand its existing pipeline system in order to transport a total quantity of approximately 1.5 Bcf per day of gas from these two terminals. 1.5 Bcf per day of gas represents approximately 34 percent of New England's current normal peak day gas demand forecast.[2] Commission staff is currently preparing an environmental impact statement regarding the proposed expansion.

In addition, proposals by Neptune LNG and Excelerate Energy LLC to build LNG import facilities off the coast of Massachusetts are continuing to move forward in the regulatory process. The Neptune LNG facility would have an average sendout capacity of 400 MMcf per day and a peak capacity of 700 MMcf per day. Excelerate Energy L.L.C.'s Northeast Gateway Project would have a baseload capacity of 400 MMcf per day and a peak capacity of 800 MMcf per day.

In light of the reasonable alternatives to the Weaver's Cove project, such as the ones described above, I think the benefit of additional gas supply that this facility would provide does not outweigh the unresolved safety, environmental and socioeconomic concerns that it raises.

Finally, I am troubled that the Commission declined to substantively address Weaver's Cove's argument on rehearing that we determine that Rhode Island failed to timely act within the statutory deadline on Weaver's Cove's CZMA certification application, and therefore "conclusively presume" Rhode Island's concurrence with the certification. Rather than making a call either way, the Commission sidesteps the matter on the grounds that the issues raised are complex and "intensely disputed," and involve interpretation of regulations issued by the state of Rhode Island and the Department of Commerce.

---

[1] 112 FERC ¶ 61,070 (2005).

[2] This percentage is based on the total New England "normal" peak day demand forecast for 2006 of 4.4 Bcf per day. *See* The Power Planning Committee of the New England Governors' Conference, Inc., *Meeting New England's Future Gas Demands: Nine Scenarios and Their Impacts*, March 1, 2005, pp. 20-21.

CZMA Section 307 provides that a state must either concur with or object within six months after it receives its copy of the applicant's CZMA certification, or the state's concurrence with the certification "shall be conclusively presumed."[3] While Weaver's Cove and Rhode Island do indeed "intensely dispute" the facts, I believe that CZMA Section 307 requires the Commission to sort through those facts, and make a call based on the record before it. The Commission has made this type of determination several times before, and I see no reason not to do so in this order.

Accordingly, I respectfully dissent from this order.

## [¶ 61,059]

## H.Q. Energy Services (U.S.), Inc. v. New York Independent System Operator, Inc., Docket No. EL01-19-007

## PSEG Energy Resources & Trade LLC v. New York Independent System Operator, Inc., Docket No. EL02-16-007

## Order Granting Clarification

**(Issued January 23, 2006)**

## Before Commissioners: Joseph T. Kelliher, Chairman; Nora Mead Brownell, and Suedeen G. Kelly.

1. On November 21, 2005, the Commission issued an order setting for hearing and settlement judge proceedings questions relating to prices charged by the New York Independent System Operator (NYISO) for May 2000.[1] KeySpan-Ravenswood, Inc. (Ravenswood) seeks clarification that, pending a final Commission order in this proceeding, refunds already made by NYISO should not be returned or adjusted. The Commission grants the clarification requested by Ravenswood.

*Background*

2. On March 4, 2005, the Commission issued an order on remand, which found that the NYISO owed refunds for May 8 and 9, because it had improperly restated prices during that period of time.[2] The March 4 Order required the NYISO to file a refund report within 30 days of the order, and to pay refunds and collect surcharges designed to reinstate the original market clearing prices for energy for the real-time market determined on May 8, 2000, and May 9, 2000.[3]

3. On June 2, 2005, while rehearing of the March 4 Order was pending, NYISO filed a report setting forth the manner in which it intended to reinstate the May 8 and 9 prices, and stating that refunds could be included in the invoices that NYISO would send to its members on July 8, 2005, with transfer of any refund payments occurring on July 20, 2005.[4]

4. In the November 21Order, the Commission set for settlement judge and hearing proceedings the issues raised by the parties as to the determination of refunds.[5]

*Request for Clarification or Rehearing*

5. On November 29, 2005, Ravenswood filed a motion for clarification that the amounts previously refunded by NYISO should not be returned or adjusted until the Commission has considered the sufficiency and adequacy of the refunds proposed by NYISO and has determined the appropriate amount of refunds to be paid and surcharges to be collected.[6] Ravenswood alleges that NYISO has, in fact, already made refunds by adjusting the invoices it made to customers in July 2005, as it proposed to do in its June 5 report.[7] Ravenswood states that it understands the intent of the Commission's November 21 Rehearing Order was to preserve the *status quo* pending the outcome of the settlement and hearing process. It maintains the best way to effect that intention, considering that certain refunds have already been paid, is to wait until the conclusion of the procedures directed by the Commission in the November 21 Rehearing Order before any additional funds are transferred. While Ravenswood believes that further refunds will likely be ordered after the hearing or settlement, even if repayments are eventually required, the payment of interest should adequately compensate for the time value of money. Furthermore, Ravenswood asserts it would be inefficient and unnecessarily burdensome to require additional transfers of money at this time when further revisions will likely be required upon conclusion of the settlement and

---

[3] 16 U.S.C. § 1456(c) (3) (A).

[1] *H.Q. Energy Services (U.S.), Inc. v. New York Independent System Operator, Inc.*, 113 FERC ¶ 61,184 (2005) (November 21 Order).

[2] *H.Q. Energy Services (U.S.), Inc. v. New York Independent System Operator, Inc.*, 110 FERC ¶ 61,243 (2005) (March 4 Order).

[3] *Id.* at Ordering Paragraph B.

[4] June 2, 2005 NYISO refund report at 1.

[5] November 21 Order at P 54.

[6] Ravenswood asserts its motion was served on all parties to the proceeding.

[7] Ravenswood request for clarification or rehearing at 3. NYISO confirms that it made refunds in this fashion, *see* NYISO response to request for clarification at 1.