*Final Environmental Impact Statement*

**Volume I**

# Weaver's Cove LNG Project

**Weaver's Cove Energy, L.L.C.**
**Mill River Pipeline, L.L.C.**
Docket Nos. CP04-36-000 and CP04-41-000
FERC/EIS – 0169



**Federal Energy Regulatory Commission**
Office of Energy Projects
Washington, DC 20426

**Cooperating Agencies**

US Army Corps of Engineers

**May 2005**

# TABLE OF CONTENTS

**Weaver's Cove LNG Project**
**Final Environmental Impact Statement**

VOLUME I Page


TABLE OF CONTENTS ..... i
LIST OF APPENDICES ..... v
LIST OF TABLES ..... vi
LIST OF FIGURES ..... ix
ACRONYMS AND ABBREVIATIONS ..... xi

EXECUTIVE SUMMARY ..... ES-1
PROJECT IMPACTS ..... ES-2
ALTERNATIVES CONSIDERED ..... ES-10
PUBLIC INVOLVEMENT AND AREAS OF CONCERN ..... ES-12
MAJOR CONCLUSION ..... ES-14

1.0 INTRODUCTION ..... 1-1
1.1 PURPOSE AND SCOPE OF THIS STATEMENT ..... 1-2
1.2 COORDINATION OF NEPA/MEPA REVIEW ..... 1-3
1.3 PROJECT PURPOSE AND NEED ..... 1-5
1.4 PERMITS, APPROVALS, AND REGULATORY REQUIREMENTS ..... 1-9
1.5 PUBLIC AND AGENCY OUTREACH CONDUCTED BY WEAVER'S COVE ENERGY ..... 1-11
1.6 PUBLIC REVIEW AND COMMENT ..... 1-16
1.7 NONJURISDICTIONAL FACILITIES ..... 1-19

2.0 DESCRIPTION OF PROPOSED ACTION ..... 2-1
2.1 EXISTING FACILITIES ..... 2-1
2.2 PROPOSED PROJECT ..... 2-1
2.2.1 LNG Terminal ..... 2-1
2.2.1.1 Ship Unloading Facility (Marine Terminal) ..... 2-1
2.2.1.2 LNG Storage Tank ..... 2-5
2.2.1.3 Vaporization System ..... 2-7
2.2.1.4 Vapor Handling System ..... 2-7
2.2.1.5 Air Injection System ..... 2-7
2.2.1.6 Truck Loading Stations ..... 2-8
2.2.1.7 Boat Ramp ..... 2-8
2.2.2 LNG Ships ..... 2-8
2.2.3 Pipeline Facilities ..... 2-12
2.3 LAND REQUIREMENTS ..... 2-12
2.3.1 LNG Terminal ..... 2-12
2.3.2 Pipeline Facilities ..... 2-15
2.4 CONSTRUCTION PROCEDURES ..... 2-17
2.4.1 LNG Terminal ..... 2-18
2.4.1.1 LNG Storage and Process Facilities ..... 2-18
2.4.1.2 Ship Unloading Facility ..... 2-25
2.4.1.3 Dredging and Dredge Disposal ..... 2-25

TABLE OF CONTENTS (cont'd)


2.4.2 Pipeline Facilities....................2-29
2.4.2.1 General Construction Techniques....................2-29
2.4.2.2 Special Construction Techniques....................2-32
2.5 CONSTRUCTION SCHEDULE....................2-34
2.6 ENVIRONMENTAL COMPLIANCE, INSPECTION, AND MITIGATION MONITORING....................2-35
2.7 OPERATION AND MAINTENANCE PROCEDURES....................2-35
2.7.1 LNG Terminal....................2-35
2.7.2 Pipeline Facilities....................2-36
2.8 SAFETY CONTROLS....................2-36
2.8.1 LNG Terminal Facilities....................2-36
2.8.1.1 Spill Impoundment System....................2-37
2.8.1.2 Fire and Hazard Detection System....................2-38
2.8.1.3 Fire and Hazard Control System....................2-39
2.8.1.4 Firewater System....................2-40
2.8.1.5 Emergency Shutdown System....................2-41
2.8.2 Pipeline Facilities....................2-41
2.8.2.1 Corrosion Protection and Detection Systems....................2-41
2.8.2.2 Emergency Response Procedures....................2-41
2.9 FUTURE PLANS AND ABANDONMENT....................2-41

3.0 ALTERNATIVES....................3-1
3.1 NO ACTION OR POSTPONED ACTION....................3-1
3.2 SYSTEM ALTERNATIVES....................3-5
3.2.1 Existing and Proposed Onshore LNG Facilities in New England....................3-6
3.2.1.1 Distrigas LNG Facility - Everett, Massachusetts....................3-7
3.2.1.2 KeySpan LNG Facility - Providence, Rhode Island....................3-9
3.2.1.3 Proposed LNG Projects in Maine....................3-11
3.2.2 Proposed Offshore LNG Facilities in New England....................3-11
3.2.2.1 Neptune LNG and Northeast Gateway Projects – Gloucester, Massachusetts....................3-13
3.2.2.2 Broadwater LNG Facility – Long Island Sound....................3-21
3.2.3 Proposed or Existing Sources of Natural Gas Outside of New England....................3-23
3.2.3.1 United States/Gulf Coast Sources of Natural Gas....................3-25
3.2.3.2 Canadian Sources of Natural Gas....................3-26
3.2.4 Existing or Proposed System Alternative Conclusions....................3-27
3.3 LNG TERMINAL SITE ALTERNATIVES....................3-28
3.3.1 Regional Review....................3-28
3.3.2 Port Review....................3-31
3.3.2.1 Coastal Ports....................3-31
3.3.2.2 Offshore Ports....................3-31
3.3.3 Specific Port and Site Review....................3-32
3.4 LNG TERMINAL LAYOUT ALTERNATIVES....................3-50
3.5 PIPELINE ALTERNATIVES....................3-51
3.5.1 G-1 Lateral Interconnect (Eastern Pipeline Alternative)....................3-53
3.5.2 G-4 Lateral Interconnect (Southern Pipeline Alternative)....................3-54
3.5.3 G-20 Lateral Interconnect (Northern Pipeline)....................3-54
3.5.4 G-22 Lateral Interconnect (Western Pipeline)....................3-62
3.6 DREDGING AND DREDGE DISPOSAL ALTERNATIVES....................3-70

### 2.4.1.2 Ship Unloading Facility

After the existing wooden pier and associated structures are removed and the adjacent shoreline stabilized with sheet piling, the berthing area in the vicinity of the mooring structures would be dredged to a depth of 41 feet to allow for LNG ship access. The berthing area would be dredged in conjunction with the dredging of the turning basin. Section 2.4.1.3 provides additional information on the proposed dredging and dredged material reuse activities.

Construction of the ship unloading facility would consist of driving steel piles; erecting structures for the mooring and breasting dolphins and the unloading and service platforms on the piles; installing unloading arms, piping, decking, bridges, and other equipment and instrumentation on the dolphins and platforms; and constructing the trestles from the shore to the unloading and service platforms. Concrete elements would include cast-in-place slabs and pile caps and pre-cast planks.

### 2.4.1.3 Dredging and Dredge Disposal

The proposed dredging and dredge disposal activities would include dredging the sediments within the federal navigation channel and turning basin and reusing the dredged material at the LNG terminal site. These dredging and dredged material reuse activities are summarized in this section. A more detailed description of these activities is provided in Weaver's Cove Energy's *Dredging Program Report* (Concept2Delivery (C2D), 2003). An electronic copy of this report is available under the "Proposal" link on Weaver's Cove Energy's website at www.weaverscove.com.

**Dredging Activities**

Weaver's Cove Energy proposes to dredge select areas within the federal navigation channel and turning basin to accommodate passage of LNG ships to the facility. The proposed dredging areas are shown on figure 2.4.1-4. Up to about 2.6 million cubic yards of sediment would be dredged from about 191 acres of the Taunton River and Mount Hope Bay as summarized in table 2.4.1-1.

TABLE 2.4.1-1

**Summary of Dredge Volume and Area Estimates**

| Dredge Segment | State | Dredge Volume (cubic yards) | | | Dredge Area (acres) |
|---|---|---|---|---|---|
| | | Target Depth | Overdredge a/ | Total | |
| Federal Channel – Mount Hope Bay | Rhode Island | 144,012 | 88,494 | 232,506 | 33 |
| | Massachusetts | 312,497 | 133,693 | 446,190 | 55 |
| Federal Channel – Taunton River | Massachusetts | 619,512 | 156,470 | 775,982 | 48 |
| Turning Basin – Taunton River | Massachusetts | 987,464 | 81,577 | 1,069,041 | 54 |
| Construction Access Channel – Taunton River | Massachusetts | 40,052 | 3,548 | 43,600 | 0.8 |
| Western Pipeline Crossing – Taunton River | Massachusetts | 33,000 | 0 | 33,000 | 0.5 |
| TOTALS | | 2,136,537 | 463,782 | 2,600,319 | 191 |

a/ These dredge volume estimates are based on Weaver's Cove Energy's proposed 1 foot of overdredge.

Insert figure

2.4.1-4 Proposed Dredging Areas

The main federal navigation channel would be dredged to a target depth of 37 feet below MLLW. This target depth is 2 feet deeper than the federally authorized depth of 35 feet below MLLW. The horizontal limits of the dredging would be confined to the existing 400-foot-wide channel. A small portion of the East Channel, a channel with a federally authorized depth of 30 feet below MLLW located upstream of the Braga Bridge, would also be dredged to 37 feet below MLLW. This area would be dredged to facilitate ship maneuvering through the channel bends upstream of the bridge. Weaver's Cove Energy is proposing to bring the LNG ships to the proposed LNG terminal during a rising tide. Because the mean tidal range is 4.4 feet, the effective depth of the dredged navigation channel would be about 41 feet. The turning basin would be widened to a width of about 550 to 1,400 feet and deepened to a depth of 41 feet below MLLW to facilitate turning or moving LNG ships under any tidal conditions.

Weaver's Cove Energy has indicated that dredging depths would include a 1-foot allowance for overdredging. However, several agencies have commented that 2 feet is the typical allowance for mechanical dredging projects in this region, including the Providence River and Harbor Maintenance Dredging Project. These agencies believe that it is not practical to maintain 1-foot of overdredge using large excavators or cranes with clamshell buckets in deeper water. Furthermore, these agencies believe that the 1-foot overdredge allowance proposed by Weaver's Cove Energy may underestimate the total dredge volume for the project. Using a 2-foot overdredge allowance, an additional 464,000 cubic yards could be dredged, resulting in a total dredge volume of up to about 3.1 million cubic yards. Overdredge allowances are further discussed in section 4.2.2.

Dredging within the federally authorized limits of the navigation channel (i.e., 35 feet deep and 400 feet wide in the main channel and 30 feet deep in the East Channel) and the permitted limits of the turning basin is considered maintenance dredging. Maintenance of a federal navigation channel is generally the responsibility of the COE. Dredging beyond the federally authorized limits is considered improvement dredging. Of the total amount of dredging required, about 34 percent (by volume) would be maintenance dredging and about 66 percent (by volume) would be improvement dredging (which includes 1 foot of overdredge). Weaver's Cove Energy proposes to conduct and finance both the improvement and maintenance dredging for the project.

The sediments would be dredged mechanically using a spud-secured, barge-mounted crane (or long-arm excavator) with buckets ranging in size from 7 to 26 cubic yards. To minimize impacts on aquatic resources (see section 4.6.2), Weaver's Cove Energy has indicated that it would use closed buckets to dredge the fine-grained depositional sediments and open buckets to dredge the more coarse-grained native materials. Open buckets are open at the top and not sealed at the mouth, which allows dredged material to spill out while the bucket is hoisted through the water column. A closed bucket is sealed and does not allow the material to spill out during dredging. The dredged material would be placed in scows or on barges for transport to the LNG terminal site. As an additional mitigative measure, Weaver's Cove Energy has indicated that it would not allow any significant scow overflow during the dredging operations. Weaver's Cove Energy anticipates that 15 to 20 scows or barges with capacities of 4,000 cubic yards each would be used on the project.

Tugs would be used to position the dredge barge and to haul scows to and from the disposal site. Other equipment used in the dredging operations would include deck barges and work boats to transport fuel, equipment, raw materials, and personnel to the dredge site. At this time, Weaver's Cove Energy anticipates that the dredging operations would need two tugs, two deck barges, two work boats, and a survey vessel. The LNG terminal site and existing piers and ramps in the project area would be used for staging areas, launch facilities, and offices to support the dredging operations.

Based on studies conducted to characterize the sediments and model the fate and transport of resuspended sediments in the channel and on consultations with state and federal agencies regarding the

dredging operations (see sections 4.3.2 and 4.6.2), Weaver's Cove Energy proposes to use the following bucket types and operating limits:

- Within the federal navigation channel downstream of the Braga Bridge which includes all of the dredging required in Rhode Island waters, Weaver's Cove Energy proposes to use a maximum 15 cubic yard bucket year round;

- Within the federal navigation channel upstream of the Braga Bridge, Weaver's Cove Energy proposes to use a maximum 26 cubic yard bucket year round; and

- Within the turning basin, Weaver's Cove Energy proposes to use a maximum 26 cubic yard closed bucket for dredging the fine-grained depositional sediments and a maximum 15 cubic yard open bucket for dredging the native materials. To minimize impacts on aquatic organisms, no dredging would be conducted in the turning basin during the months of February, March, and April.

Weaver's Cove Energy proposes to optimize the dredge production rates in the federal navigation channel and turning basin with the dredged material stabilization and placement production rates on the terminal site to the extent practicable. These production rates would vary depending on the dredging area, the types of sediments, and the dredged material placement area. Weaver's Cove Energy estimates that optimum production rates would range from about 2,000 cubic yards per day for dredging the navigation channel downstream of the Braga Bridge and placing the dredged material near the top of the earthen landform to about 8,000 to 10,000 cubic yards per day for dredging the turning basin and placing the dredged material to about 40 feet above MSL on the terminal site. Dredging and stabilization operations would be conducted up to 24 hours a day and placement of the material on the site would be conducted during daylight hours.

**Dredged Material Reuse Activities**

The dredged material would be transported in the scows or barges to the LNG terminal site for upland reuse. Once the barges and scows are transported to the site, any excess water would be removed by pumping into an upland settling basin for further clarification or directly into the Taunton River. The discharge method would be determined based on testing of the discharge water and the discharge limits for total suspended solids specified in the permits for the dredging activities. The portland cement would be added to the dewatered dredged material and then the stabilized material would be placed on the terminal site in earthen lifts and compacted to specifications (see section 2.4.1.1).

Weaver's Cove Energy proposes to place most of the stabilized dredged material on the southern parcel of the LNG terminal site. Some stabilized dredged material would be placed on the northern parcel and used as engineered fill material to establish the final grade. As discussed previously, a large landform would be constructed on the southern parcel, using some of the stabilized dredged material, to facilitate the placement of all the material on the site (see figure 2.4.1-3). Using Weaver's Cove Energy's estimated dredge volume (2.6 million cubic yards, which includes 1 foot of overdredge), the addition of 8 percent (by mass) of portland cement and a sediment reduction factor of 0.80, we have estimated that the volume of stabilized dredged material to be placed on the site would be about 2.1 million cubic yards (see section 4.2.2). Using preliminary grading plans provided by Weaver's Cove Energy, we estimated that the southern parcel could accommodate over 3 million cubic yards of stabilized dredged material. Our analysis is supported by Weaver's Cove Energy's comments on the draft EIS, which documented that the entire LNG terminal site could accommodate up to 3.3 million cubic yards of stabilized dredged material. Therefore, it appears that all of the proposed dredged material could be reused on the site, even if the proposed overdredge allowance of 1 foot is exceeded by an additional 1 foot.

In response to agency comments, Weaver's Cove Energy conducted a Tier III sediment analysis to evaluate the feasibility of disposing a portion of the dredged material at an offshore location (see section 4.2.2). Based on the results of this analysis, Weaver's Cove Energy determined that the dredged material would be suitable for offshore disposal. If the COE and EPA concur with this determination, the dredged material could be disposed of at an offshore site and thus less dredged material would need to be reused on the LNG terminal site. Any future offshore disposal proposal or change in the proposed project design would require an additional review and approval process from the FERC.

### 2.4.2 Pipeline Facilities

Construction of the Northern and Western Pipelines would primarily involve standard cross-country pipeline construction techniques as described in section 2.4.2.1. Due to constraints which limit the work area and the width of the construction right-of-way (e.g., residences and structures within 25 feet of the proposed construction right-of-way), a special construction technique referred to as stovepipe construction would be used to install portions of the pipelines. Special construction techniques would also be used when constructing the pipelines across waterbodies, wetlands, residential areas, roads, and railroads. These special construction techniques are described in section 2.4.2.2.

#### 2.4.2.1 General Construction Techniques

Figure 2.4.2-1 shows the typical steps of cross-country pipeline construction. Standard pipeline construction proceeds in the manner of an outdoor assembly line composed of specific activities that make up the linear construction sequence. These operations collectively include survey and staking of the right-of-way, clearing and grading, trenching, pipe stringing and bending, welding and coating, lowering-in and backfilling, hydrostatic testing, and cleanup.

**Survey and Staking**

Before construction, Weaver's Cove Energy crews would survey and stake the centerline and exterior boundaries of the construction right-of-way. The exterior boundary stakes would mark the limit of approved disturbance areas and would be maintained throughout the construction period. Utility lines would be located and marked to prevent accidental damage during pipeline construction. During this period, equipment involved in pipeline construction would be moved onto the right-of-way using existing roads for access wherever practicable.

**Clearing and Grading**

Weaver's Cove Energy would clear the right-of-way of shrubs and trees, treating timber in accordance with agency regulations or the preferences of private landowners. Trees would be stockpiled to the side or removed from the right-of-way before any soil disturbance activities in order to prevent soil mixing with cut timber. Because Weaver's Cove Energy has indicated that it would follow the FERC Plan, a maximum of 12 inches of topsoil would be required to be stripped from the trench and spoil storage area and placed at the edge of the right-of-way in residential areas. If there is inadequate space for segregating topsoil, the FERC Plan would allow for the importation of topsoil in residential areas.

proceeds west generally adjacent to Ferncroft and Dwelly Roads. The variation continues west beyond the ends of the roads and crosses a narrow forested area before interconnecting with Algonquin's G-22 lateral about 1,450 feet south of where the Western Pipeline route interconnects with the G-22 lateral.

With a length of about 2,600 feet, the Ferncroft/Dwelly Road Variation is about 425 feet shorter than the corresponding segment of the proposed route. The variation would also disturb less land, and cross about 1,675 feet less forest land than the corresponding segment of the proposed route.

A significant disadvantage of the variation is that it would involve substantially more disturbance to residential areas during construction. The construction right-of-way for the Ferncroft/Dwelly Road Variation would be within 50 feet of 23 additional homes when compared to the corresponding segment of the proposed route. Construction near these homes would increase impacts on nearby residents, which would include increased noise, dust, traffic, visual impacts associated with tree clearing, and other inconveniences. Additionally, construction and restoration costs of this route variation would be greater than for the corresponding segment of the Western Pipeline due to the need to repair and repave streets and driveways as well as to replace residential landscaping. We do not believe that the reduction in the length of forest land crossing outweighs the increased residential impacts of the Ferncroft/Dwelly Road Variation and do not recommend it be adopted as part of the proposed route.

## 3.6 DREDGING AND DREDGE DISPOSAL ALTERNATIVES

As discussed in section 2.4.1.3, Weaver's Cove Energy would dredge up to about 2.6 million cubic yards of sediment from the Mount Hope Bay/Taunton River federal navigation channel and a turning basin to enable LNG ships to transit, dock, and turn in the Taunton River. This volume was determined based on the minimum volumes needed to safely accommodate LNG ships. Alternatives requiring more dredging could be identified. However, alternatives requiring less dredging would not be able to safely accommodate LNG ships. As such, we did not consider it feasible to reduce the volume or extent of dredging and still satisfy the objectives of the project at the proposed site.

Dredging and related activities would be conducted in accordance with applicable federal, state, and local permit stipulations. To avoid or minimize impacts on water quality or biological resources associated with these activities, alternative dredging methods and dredge disposal alternatives were considered.

### 3.6.1 Alternative Dredging Methods

Large-scale dredging operations in the region typically utilize mechanical dredging equipment for maintenance and improvement dredging of the harbors and channels. Mechanical dredging involves equipment such as clamshell dredges, dipper dredges, draglines, grab buckets, and barge-mounted excavators for the removal of bottom sediments and other materials. The dredged material removed by mechanical methods is typically high in solids content and lower in mixed waters that are more common with hydraulic dredge methods. Mechanical dredging equipment involves the use of a bucket to place dredged materials in scows or on barges for transport to a disposal area. Various bucket designs are available that are able to reduce the amount of solids suspended in the water column. Two types of buckets considered for this project include the open bucket and the closed bucket (or occasionally referred to as the environmental bucket). The open bucket involves dredging material at almost in-situ concentrations. Excess material and water are allowed to spill off the top so that little excess water is dumped into the scow. The closed bucket reduces turbidity at the dredge site but entrains more water.

Insert Figure

3.5.4-3 Ferncroft / Dwelly Road Variation

Mechanical dredges are rugged, highly reliable, and capable of removing a broad range of materials. Such equipment is also able to operate in an open channel as well as confined berth spaces. Barge and scow transport of dredged material is efficient over long-haul distances, although mechanical dredging productivity is generally slow compared to hydraulic dredging operations due to the scow loading process. Additionally, such operations are subject to spillage and splashing, which allows sediments to resuspend in the water. In the draft EIS, we recommended that, in consultation with NOAA Fisheries and applicable state resource agencies, Weaver's Cove Energy identify measures (e.g., changes in dredging equipment, dredging procedures, and/or dredging schedules) to avoid or minimize potential dredging impacts on fishery resources in the project area. Subsequent to the draft EIS, Weaver's Cove Energy adopted several measures, including closed buckets in certain sediments types and restricted dredging windows and no scow overflow in certain areas, to minimize aquatic impacts (see sections 2.4.1.3 and 4.6.2).

Hydraulic dredging equipment is an alternative that could be used for this project. Hydraulic dredges operate using a centrifugal pump capable of handling solids to transport a slurry of dredged sediments and water through a pipeline. The slurry containing the dredged materials is hydraulically transported through the pipeline from the dredged area to a disposal site. For long distance transport, the slurry can also be placed in barges for removal to the disposal site. Hydraulic dredges are able to excavate a broad range of materials. An advantage of the hydraulic dredge is that it typically generates somewhat lower levels of turbidity throughout the water column at the dredge site compared to mechanical dredging methods. Turbidity is managed by controlling the cutterhead rotation speed and the swing speed of the dredge and by implementing operational controls.

There are also several disadvantages associated with the use of hydraulic dredge equipment. The hydraulic dredge typically requires a long, temporary pipeline system, which could potentially become an obstruction to navigation and or vessel movement within the harbor. Moreover, hydraulic pipeline transport of dredged materials typically requires in-line booster pumps to extend pumping distances and thus are restricted by practical and economic constraints. Hydraulic dredging also draws in significant amounts of water during the dredging process. This intake of water has the potential to entrain significant numbers of fish eggs and larvae as well as other benthic organisms. Hydraulic dredging also requires a much larger disposal area and longer drying times. If barges are used to transport the dredged material, it requires more barge movements between the dredge site and the disposal area than would be necessary if mechanical dredging were used. There are sometimes water quality issues associated with overflow off of the barge. Given these disadvantages we do not believe hydraulic dredging methods are a practical alternative to mechanical dredging equipment for this project.

Hopper dredges are another type of dredging equipment. Hopper dredges are self-propelled ships that include an integral suction pipe or several suction pipes, which are dragged along the channel bottom. The bottom materials are drawn through a suction head, pass through the suction pipe and pump, and are deposited as a slurry in a large onboard hopper. Once full, the hopper dredge can travel to an offshore or other designated dumpsite, open its bottom doors, and discharge the dredged material. Some hopper dredges also can offload the dredged material by pumping. An advantage of hopper dredges is that they have minimal interference on other vessel operations and can efficiently transport materials over short haul distances. However, the use of the hopper dredge to dispose of dredged materials requires that the dredging process be suspended while the dredged material is transported to the disposal site. Hopper dredges are also not effective in restricted areas, such as berths and docking facilities. In addition, when used to dredge very fine silts that do not readily settle, the dredge generally can carry only partial loads, with relatively high water content, to the disposal site, which generally makes it inefficient for dredging in areas with these sediment types.

All three of these dredge types were assessed in detail for the Providence River and Harbor Maintenance Dredging Project, which involved sediment conditions similar to the proposed project. The COE concluded that hydraulic and hopper dredge equipment, while physically capable of conducting the work, were not preferable because they entrain significant amounts of water and result in fairly unconsolidated material. The COE (2001) identified the following disadvantages of these dredging methods:

- both hydraulic and hopper dredges require a larger dewatering site and longer drying times;
- the hydraulic dredge requires a long pipeline system that could interfere with other vessel's navigation; and
- the hopper dredge is not suited for operating in restricted areas or long haul disposal due to long cycle times for the dredging operations.

### 3.6.2 Dredge Disposal Alternatives

Weaver's Cove Energy proposes to dispose of the sediments that are removed from the federal navigation channel and turning basin by reusing the dredged material as general site fill material at the LNG terminal site (see section 2.4.1.3). Other potential options that were considered for the project include offshore disposal, confined aquatic disposal, confined disposal facility, island/habitat creation, landfill disposal, and other upland disposal sites. Table 3.6.2-1 lists all of the various dredging and disposal options that have been considered and summarizes the material processing requirements and potential advantages and disadvantages of each option. For a more detailed discussion of these options see Weaver's Cove Energy's *Dredging Program Report* (C2D, 2003). An electronic copy of this report is available under the "Proposal" link on Weaver's Cove Energy's website at www.weaverscove.com.

**Effects of Time-of-Year Restrictions on Dredging Plan**

After additional review and consultations with state and federal agencies, we concluded that the dredging program currently proposed by Weaver's Cove Energy could negatively affect biological resources in the Taunton River (see section 4.6.2). As a result, we have recommended that Weaver's Cove Energy modify its proposed dredging program within the Taunton River to prohibit dredging activities during the winter flounder spawning period (January 15 through May 31). Based on our analysis, additional time-of-year restrictions beyond the winter flounder spawning period do not appear warranted. However, the COE is currently considering additional information regarding potential dredging impacts on anadromous fish movements and may require an even longer time-of-year restriction on dredging activities (January 15 through July 31 or January 15 through October 31). These timing restrictions would leave Weaver's Cove Energy with the following time to conduct its dredging operations:

- 228 days per year (January 15 through May 31 restriction);
- 167 days per year (January 15 through July 31 restriction); or
- 75 days per year (January 15 through October 31 restriction).

TABLE 3.6.2-1

**Summary of Dredging and Disposal Alternatives**

| Alternative (Material Placement) | Dredging Methods | Material Processing | Considerations |
|---|---|---|---|
| On-site Upland Reuse (Proposed Action) | Mechanical | Mixing mill, spread and till, or in-barge mixing of cement for stabilization | The proposed site is available and large enough to accommodate dredged materials. Use of the site would require modification of the existing groundwater remediation system as well as resolution of MCP concerns related to the placement of sediments on the site (see section 4.2.2). General costs: $35-55 per cubic yard. |
| Offsite Upland Reuse | Mechanical | Mixing mill, spread and till, or in-barge mixing of cement for stabilization | Weaver's Cove Energy has not been able to obtain access to another property for upland reuse of the dredged materials. Additionally, any site in Massachusetts would have the same MCP concerns related to the placement of sediments as the proposed site. General costs: $35-55 per cubic yard (assuming site is available). |
| Offsite Upland Disposal (Landfill) | Mechanical | Untreated | The dredged material quantity exceeds the capacities of regional landfills. Trucking dredged materials long distances is prohibitively expensive and would result in air quality and traffic impacts. General costs: $75-100 per cubic yard. |
| Offsite Upland Disposal (Dewatering) | Hydraulic | Naturally dewater through settling and consolidation | An upland site that would be capable of storing the dredged material during the dewatering process is not available. Additionally, any site in Massachusetts would have the same MCP concerns related to the placement of sediments as the proposed site. General costs: $20-25 per cubic yard (assuming site is available). |
| Offshore Disposal | Mechanical | Untreated | Offshore disposal would result in short-term (up to 3 years) impacts on water quality, benthic habitats, and fishing industry. Some sites may be permanently impacted. Additional sediment sampling and analysis has been conducted to determine the suitability of the sediments for offshore disposal. General costs: $12-27 per cubic yard. |
| Confined Aquatic Disposal cell (CAD) | Mechanical | Untreated | This alternative involves underwater storage of material after additional dredging is completed. A confined aquatic disposal cell is sometimes considered for isolating contaminated sediments. This alternative requires dredging and disposal of additional materials. General costs: $40-60 per cubic yard. |
| Confined Disposal Facility (CDF) | Mechanical or Hydraulic | Untreated | A confined disposal facility would require the construction of a wall or berms in a nearshore area. Can result in short-term and long-term negative impacts on some resources (e.g., permanent habitat replacement, short term impacts on water quality and benthic habitats). General costs: $20-25 per cubic yard. |
| Island/Habitat Creation | Mechanical | Untreated | Dredged material can be used to create or enhance aquatic habitats. Can result in short-term and long-term negative impacts on some resources (e.g., permanent habitat replacement, short term impacts on water quality and benthic habitats). General costs: $45-100 per cubic yard. |

As described in section 2.4.1.3, the currently proposed dredging program is closely linked to the placement operations whereby the dredged materials would be stabilized and placed on the LNG terminal site. As described, the process of the onshore placement of the stabilized volumes (i.e., stabilization using cement, rate of placement, and compaction) has more impact on the project schedule than the dredging process itself. Timing restrictions, particularly those that overlap the warmer spring and summer months when dredged material stabilization and placement rates would be the highest, would particularly impact the project schedule. Weaver's Cove Energy has estimated that dredging could take approximately 650 operational days. Accounting for expected weather and equipment (moving and maintenance) delays, Weaver's Cove Energy conservatively estimated that the entire dredging and placement program would require about 975 days. Based on our own independent analysis of equipment and cycle times as well as

down time for inclement weather and equipment movement and maintenance, these assumptions seem reasonable.[7]

In response to comments on the draft EIS that we expand the analysis of impacts of various time-of-year restrictions on the proposed project schedule, we have evaluated the effects of three different time-of-year restrictions. The first restriction would prohibit dredging between January 15 and May 31 during the winter flounder spawning period. This time-of-year restriction would permit dredging 228 days a year or 684 days over a 3-year period including the summer months, which would likely be the months when the highest production and placement rates can be achieved. The second restriction would prohibit dredging between January 15 to July 31, which encompasses both the winter flounder spawning period and the anadromous fish upstream migration period. This time-of-year restriction would permit dredging 167 days a year or 501 days over a 3-year period, but would prevent dredging during the late spring and early summer months, which are expected to be when some of the highest production and placement rates can be achieved. The third restriction would prohibit dredging between January 15 and October 31, which would encompass the winter flounder spawning period and both the anadromous fish upstream and downstream migration periods. This time-of-year restriction would permit dredging 75 days a year or 225 days over a 3-year period, but would limit dredging to the coldest months of the year, when production and placement rates would be lowest.

It seems unlikely that the dredging program could be completed in 3 years under the January 15 to May 31 time-of-year restriction unless numerous barges could be filled and moored for an indefinite period. It is more likely that this restriction would add between 1 and 2 years to the proposed schedule. The January 15 to July 31 time-of-year restriction would add between 2 and 4 years to the proposed project schedule. The January 15 to October 31 time-of-year restriction would likely add up to 6 years to the proposed project schedule. Based on these timing restrictions and the onshore placement of dredged material, we believe it is reasonable to assume that time-of-year restrictions would likely lengthen the project schedule for onshore disposal a minimum of 1 to 2 years to as long as 6 years beyond the currently proposed 3-year project schedule. The significance of the time-of-year restrictions on the project schedule is reduced based on the MassHighway's anticipated completion of the new Brightman Street Bridge and demolition of the existing bridge until some time in 2010, which may add up to 2 years to Weaver's Cove Energy's currently proposed project completion date of 2008.

**Offshore Disposal Alternatives**

Based on consultations with state and federal agencies, there is a general consensus among most agencies that disposal of the dredged material in an upland location is preferred and could reduce water quality impacts. The DEP, however, has expressed concerns about the regulatory feasibility of placing the dredged sediment on the proposed site without some additional testing of the existing site soils and the effects of the dredged material on the existing remediation system (see section 4.2.2). If these concerns can not be reconciled, it may not be possible to place the dredged material on the proposed site. In addition, the time-of-year restrictions described above may also unduly delay the schedule for the proposed onshore placement of the entire dredged volumes. Because other onshore disposal sites are not currently available or would be prohibitively expensive, offshore disposal of the dredged material may be an alternative method for disposing of some or all of the dredged material.

Offshore disposal of the dredged material may be possible but also may involve additional water quality impacts and new regulatory issues. Although offshore disposal is not part of its proposed

7 We estimated that based on 1 foot of overdredge, average projected production rates, and 100 percent efficiency, dredging would take approximately 560 days. With expected delays, which we assumed could result in only 50 percent efficiency, the entire dredging and placement program would take approximately 1,120 days.

dredging plan, Weaver's Cove Energy initiated a Tier III analysis program[8] in accordance with the COE- and EPA-approved protocols to determine the suitability of the materials for offshore disposal at the Rhode Island Sound Disposal Site (RISDS) formerly referred to as Site W or Site 69b and the Massachusetts Bay Disposal Site (MBDS). The results of the Tier III testing were filed with the EPA and COE on April 12, 2005. Preliminary indications provided by Weaver's Cove Energy are that the majority of the dredged material would be suitable for offshore disposal. The EPA and COE will subsequently review the Tier III testing results and make a suitability determination for offshore disposal. As of the publication of this final EIS, the EPA and COE have not made a final determination regarding the suitability of the proposed dredged sediment for offshore disposal. If the COE and EPA concur with Weaver's Cove Energy's determination that most of the dredged material is suitable for offshore disposal, Weaver's Cove Energy would likely be able to avoid dredging during the winter flounder spawning period without adversely affecting the 3-year project schedule by using multiple dredges and disposing of the dredged material at an offshore site. Thus the offshore disposal of sediments could potentially avoid impacts on winter flounder eggs and some other sensitive aquatic organism in Mount Hope Bay and the Taunton River. Another potential advantage of offshore disposal is that it would avoid the issues raised by the DEP about the regulatory feasibility of placing the dredged sediment on the proposed site and the effects of the sediments on the existing remediation system. If the dredged material is not considered suitable for offshore disposal, however, Weaver's Cove Energy has indicated that imposing the more restrictive time-of-year windows with its proposed sediment placement plan at the LNG terminal site could impact the financial viability of the project. Although we currently do not know whether the COE and EPA will determine whether the dredged material would be suitable for offshore disposal, we have conducted the following analysis of the impacts associated with offshore disposal.

Effects of Offshore Disposal and Multiple Dredges on the Project Schedule

Offshore disposal, unlike onshore disposal, would enable Weaver's Cove Energy to potentially use multiple dredges, primarily because this disposal option does not have the constraints associated with the proposed onshore dredged material stabilization and placement process. The effect offshore disposal of sediments has on the construction schedule depends on how much of the sediment qualifies for offshore disposal and how many dredges are employed. As discussed above, a final determination regarding offshore disposal based on the Tier III tests results has not yet been made. However, it appears likely based on the results of the Tier II testing, if any sediment qualifies for offshore disposal, one of two offshore disposal scenarios are probable. One scenario would be that only the native sediments (about 0.6 million cubic yards) are determined to be suitable for offshore disposal. The other scenario would be that all (2.6 million cubic yards) of the sediments are determined to be suitable for offshore disposal. Our review indicates that the first scenario (offshore disposal of only the native sediments) would have little effect on the project schedule and costs regardless of the number of dredges used. This is because the volume of native sediments relative to non-native sediments is relatively small and the stabilization and placement of the native sediments would be easier, faster, and less expensive than the stabilization of non-native sediments. Weaver's Cove Energy has estimated that under the current onshore management plan, it would take between 90 and 120 days to excavate, stabilize, and place the native sediments on the site. Weaver's Cove Energy has suggested that it might be possible to double the dredging rate if the native sediments are disposed of offshore, which would reduce the time required to dredge and dispose of the native sediments by about 50 percent. However, the overall effect of this change would only shorten the dredging schedule by about 45 to 60 days.

We then assessed the potential impacts on the schedule assuming all of the sediments are disposed of offshore. Based on the areas to be dredged, we assumed it might be possible to use two and

[8] Tier III testing involves the assessment of contaminants in the dredged material on appropriately sensitive and benchmark organisms to determine if there is the potential for an unacceptable toxicity or bioaccumulation impact at the disposal site.

perhaps three dredges effectively if some or all of the dredged material could be placed at an offshore disposal site. We then looked at the potential of using multiple dredges to accelerate the dredging schedule if certain time-of-year restrictions are imposed. Table 3.6.2-2 shows the results of our analysis of potential effects of using multiple dredges on the proposed schedule assuming various time-of-year restrictions. Based on the results of our analysis, it appears that two dredges would minimize the impact on the proposed 3-year schedule if a January 15 to May 31 time-of-year restriction is imposed. Three dredges could effectively shorten the proposed 3-year schedule if a January 15 to May 31 time-of-year restriction is imposed or minimize the impact on the proposed schedule if a January 15 to July 31 time-of-year restriction is imposed.

TABLE 3.6.2-2

**Effects of Multiple Dredges and Time-of-Year Restrictions on the Proposed Dredging Schedule** a/

| Number of Dredges | No Restriction | Jan 15-May 31 Restriction | Jan 15-July 31 Restriction | Jan 15- Oct 31 Restriction |
|---|---|---|---|---|
| 1 | ~3 yrs | ~4-5 yrs | ~5-7 yrs | ~11-14+ yrs |
| 2 | NA | ~3-4 yrs | ~4-5.5 yrs | ~9-12+ yrs |
| 3 | NA | ~2-2.5yrs | ~2.5-3.5 yrs | ~5-7+ yrs |

a/ The figures above assume disposal of 2.6 million cubic yards of sediment and are based on production rates similar to those that would be achieved for the proposed project. Weaver's Cove Energy believes these production rates could be increased, and thus the effect of the timing restrictions on the overall schedule could be reduced if dredge material is disposed of offshore.

To determine the potential costs of dredging and offshore disposal, we reviewed the unit costs provided by Weaver's Cove Energy and estimates of unit costs from the Providence River and Harbor Maintenance Dredging Project and the Rhode Island Regional Long-Term Dredged Material Disposal Site Evaluation Project (adjusted for inflation). Based on these dredging cost estimates, it appears that the costs of dredging and offshore disposal of 2.6 million cubic yards could be in the range of $31 to $70 million (compared to the estimated $91 to $143 million for the upland disposal on the terminal site as proposed). We estimate that a January 15 to May 31 time-of-year restriction on dredging activities would increase these costs by at least $1 to $2 million (not including the costs of additional dredges), a January 15 to July 31 time-of-year restriction would increase costs by at least $2 to $5 million (not including the costs of additional dredges), and a January 15 to October 31 time-of-year restriction would increase the costs of dredging and offshore disposal even more.

Under any of these scenarios, Weaver's Cove Energy's proposed LNG terminal design would not change significantly. As such, the offshore disposal options would require Weaver's Cove Energy to import replacement material (soils or fill material) to support the proposed site grading plan, which includes increasing the elevation of the present site. Weaver's Cove Energy would continue to regrade the site to support the proposed LNG tank, truck loading area, and LNG piping area. In addition, Weaver's Cove Energy has indicated that replacement fill material would also be required to create the proposed landform designed to visually screen the LNG terminal from the adjacent landowners. Although the landform may provide some visual screening of the facilities at the LNG terminal from the east and northeast, the FERC would not necessarily require that this landform be a component of the project. As such, an alternative site layout would not need to include this landform (see section 3.4). The cost associated with bringing any replacement material onsite and the associated offsite trucking to transport these materials would offset some of the cost benefits of offshore disposal.

Impacts of Offshore Disposal

The MBDS Site is located 12 nautical miles southeast of Gales Point, Massachusetts in water depths of about 270 to 300 feet. Because scows/barges would have to transport dredged material from the project site in the Taunton River about 180 nautical miles to this disposal site, we believe this site is economically and logistically impractical and have not considered it further in our analysis. This determination is supported by the findings of a site screening study conducted as part of the Rhode Island Regional Long-Term Dredged Material Site Evaluation Project (Battelle and Maguire Group, Inc., 2002). Consequently, we have only considered potential environmental issues associated with disposal at the RISDS. On December 16, 2004, the EPA designated RISDS as an ocean dredged material disposal site that would provide a long-term disposal option for the COE to maintain deep-draft, international commerce and navigation through authorized federal navigation projects and to ensure safe navigation for public and private entities. Use of RISDS as a disposal site was analyzed in detail in the Providence River and Harbor Maintenance Dredging Project Final EIS (COE, 2001) and the Rhode Island Region Long-Term Dredged Material Disposal Site Evaluation Project Final EIS (EPA, 2004a). Much of the discussion below is based on these documents.

As part of our analysis of offshore disposal to RISDS, we reviewed equipment requirements and potential costs associated with offshore disposal based on using one, two, or three dredges. Our analysis indicates that offshore disposal to RISDS could be accomplished using between four and eight scows (4,000 cubic yard capacity) if one dredge is utilized, between twelve and thirteen scows if two dredges are utilized, and about seventeen scows if three dredges are utilized. These scow estimates are generally consistent with or slightly below the fifteen to twenty scows that Weaver's Cove Energy proposes to use for onshore dredge disposal. We also estimated the number of scow trips that would be required if all of the 2.6 million cubic yards of dredged material is placed at one of the offshore disposed sites. Our analysis indicates that about 1,300 round trips would be required between the dredge areas and RISDS if 4,000 cubic yard scows are used and about 868 round trips would be required if 6,000 cubic yard scows are used.

*Existing Conditions*

The RISDS is located approximately 13 miles (21 kilometers) south of the entrance to Narragansett Bay and approximately 37 miles from the proposed terminal site (see figure 3.6.2-1). The site is located in a topographic depression where water depths range from 120 to 130 feet. Approximately 50 percent of the RISDS is located within an existing historic disposal site (Site 69B). For the purposes of analyzing the RISDS, a majority of the data provided was compiled from existing data on Site 69B.

The surface sediment in the central and western portions of the RISDS has an unconsolidated soft bottom, consisting of very fine sand mixed with silt-clay, suggesting a depositional environment. The northern half of the disposal area is hard bottom (cobbles and gravel) and the eastern side of the site consists of fine, rippled sand.

Currents occur ten times per year or on average once every 35 to 40 days and have the potential to erode sediments. Erosion potential was based upon modeling of representative, loosely consolidated, non-cohesive sediments, which showed initiation of movement when bottom currents reached 20 to 25 cm/sec (7.9 to 9.9 in/sec). This current speed generally occurs during a significant storm surge or when wave heights exceed 10 to 12 feet (3.05 to 3.66 meters) in the 130-foot-deep disposal site. Measurements taken for a full month period showed that peak currents were generally less than 15 cm/sec in Rhode Island Sound. The one exception was when Hurricane Floyd passed over Rhode Island Sound in September 1999 causing peak currents of 34 cm/sec (1.1 ft/sec) at the RISDS.

Insert Figure

3.6.2-1 Rhode Island Sound Disposal Site (Site 69b)

The organism-sediment index for the site was +7 in June 1997 and +6 in November 1999 which indicates the site has a high overall benthic habitat quality. Species expected to occur within the site include the amphipod *Ampelisca* sp., the bivalve *Nucula* sp., and various polychaetes, such as *Nepthys incisa* and *Pholoe minuta*, among others.

The RISDS has the potential to contain several commercially important molluscan species, including ocean quahogs, Atlantic surf clams, sea scallops, whelks, northern quahogs, blue mussels, and razor clams. The most important and abundant of these is the ocean quahog. A study to determine the organisms found at four disposal areas in Rhode Island Sound (Site 16, Site 18, Site 69A, and the RISDS (69B)) was conducted in 1997 in support of the EIS for the Providence River and Harbor Maintenance Dredging Project (COE, 2001). Four tows were conducted just outside of the RISDS to the north and west. These four tows all yielded similar ocean quahog catches (0.66 to 2.28 quahogs/m2). The low ocean quahog densities in these four tows indicate that the potential value of the site as an ocean quahog resource is low.

The American lobster is an important ecological and economic resource throughout the northwest Atlantic Ocean from Labrador to North Carolina. Data from commercial fisheries and site specific surveys were used to determine the abundance of lobsters at the site. According to these data, lobster numbers are on the decline in the Rhode Island Sound. The number of lobsters reported per vessel trip has declined from greater than 800 lbs/trip in 1994 and 1995 to a low of 300 lbs/trip in 2002. Lobster pots were used to sample the lobster population at three disposal locations (Site 18, Site 69A, and the RISDS) in the Rhode Island Sound (COE, 2001). The mean catch-per-unit-effort values from this study suggested that Site 69A had significantly more lobsters (13 lobsters/trap) than either Site 18 (10.3 lobsters/trap) or the RISDS (8.6 lobsters/trap) (COE, 2001). Across all sites, the largest catches of lobsters occurred during August (14.6 lobsters/trap), and the smallest catches during November (7.3 lobsters/trap).

Information from NOAA Fisheries annual spring/fall bottom-trawl surveys was used to determine finfish composition and abundance at the disposal site. According to these data, five species of finfish (skate, sea raven, silver hake, windowpane, and winter flounder) have a high likelihood of occurrence at the RISDS (COE, 2001).

*Effects of Disposal on Biological Resources*

In general, the primary effects of disposal of dredged material in offshore areas are an increase in the concentrations of suspended solids and contaminants in the water column, and burial of aquatic organisms with sediment. Except for changes in bathymetry, resources impacted by offshore disposal generally recover over time.

Disposal of dredged material at RISDS would expose the material to currents, which may have the potential to erode sediments and redeposit them in the surrounding aquatic environment. Eroded material would disperse quickly with deposits no more than 0.5 inches (1.3 cm) deep at a distance of one mile from the mound formed during disposal of the dredged material. With time, the mound would become consolidated and as material erodes, the mound would eventually become self-armored. Once the mound is armored, further erosion would be minimal.

During disposal, a plume would be created containing elevated levels of suspended sediments and associated contaminants. Sediments suspended during disposal can affect aesthetics, light penetration, feeding by benthic organisms and fish, and, at very high levels, can destroy or injure fish and benthic organisms. Toxic chemicals that dissolve when the dredged material is exposed to the water column can kill or impair marine animals if they are exposed to high concentrations over a sufficiently long period of

time. However, since dredged material must meet testing guidelines (see the discussion of Tier III testing above), toxicity levels should not cause undesirable environmental effects.

Sediment losses during disposal would be minimal because the sediment falls to the bottom and dilutes rapidly. Research has shown that disposal losses typically range from 1 to 5 percent of the amount disposed (Truitt, 1986). Recent laboratory studies with material in the size range of fine silt (0.01 mm) to medium sand (0.5 mm) (Ruggaber and Adams, 2000) estimated a loss of less than 1 percent of material.

A frequently expressed concern about offshore disposal is the effect of this material on nearby benthic habitats. A 5 percent loss of sediments during disposal would result in accumulation of less than 0.4 inch (1 cm) of sediment on the bottom, assuming that these sediments all deposited within a 0.5 mile radius of the disposal location. Such a thin layer would be diluted with the ambient sediments and mixed into the bottom by the benthos, thereby minimizing its impact by reducing exposure concentrations. However, dispersion beyond these limits, as expected, would result in even greater dilution further reducing the concern.

Direct impacts to the benthic community would be realized through burial, and potentially at adjacent areas, through increased siltation and burial during the disposal process. It is expected that any newly deposited dredged material at the RISDS would be rapidly recolonized by a pioneering assemblage of benthic organisms, consisting primarily of surface-dwelling tubicolous polychaetes and amphipods. Over time, it is expected that the dredged material would experience a natural advancement of successional stages. The initial recolonization by pioneering species would gradually advance to a more stable, head down deposit-feeding community in the soft, organic rich sediments.

As filter feeders, bivalves (e.g., shellfish) are particularly susceptible to mechanical or abrasive action of suspended sediments (i.e., clogging of gills, irritation of tissues, etc.) (Carnes, 1968). However, the response of organisms to suspended sediments is difficult to determine and may not be due to the actual concentrations of suspended solids, but to the number of particles in suspension, their densities, size distribution, shape, mineralogy, sorptive properties, or presence of organic matter and its form (Sherk et al., 1972).

The potential short-term effects of offshore disposal on lobster resources include burial, exposure to increased concentrations of suspended sediments, temporary loss of refuge habitat, and temporary loss of feeding habitat (i.e., loss of bottom invertebrates, including mussels, polychaetes, and snails). It should be assumed that lobsters would be killed in the area that would be covered by greater than 12 inches (30 cm) of dredged material. Lobsters buried under less than 12 inches (30 cm) of dredged material may be able to burrow up to the surface.

Lobsters generally burrow into soft substrates, including both sand and mud. They are capable of remaining in mud burrows for extended periods of time and have been observed to remain in burrows covered in silt (Cooper and Uzmann, 1980). They exhibit high tolerance to low concentrations of oxygen (as low as 0.2 milligrams per liter (mg/L), even without acclimation (Cooper and Uzmann, 1980), suggesting that, even if increased concentrations of suspended sediments resulted in temporary coating of their gills, lobsters would not become incapacitated. Lobsters exposed to increased total suspended solids during an extended period of repeated disposal activity might move away from the immediate vicinity of the disposal site. It is predicted, however, that periods of highly elevated total suspended solid concentrations would be episodic and the location would vary with the tidal conditions.

It is reasonable to assume that the benthic community at the offshore disposal area, which would eventually provide feeding opportunities for lobsters, would recover to present conditions within about 1 year following final disposal operations. Some benthic resources would be present in the interim, but