TABLE 4.2.2-4

**Comparison of Chemical Constituents in Proposed Dredged Sediments from the Dredging Segment Upstream of the Braga Bridge and Cores from the East Channel Segment Sampled by the OZCM**

| | Dredging Segment Sediment Data | | | | East Channel Cores | |
|---|---|---|---|---|---|---|
| Constituent | Detection Limit | Minimum a/ | Maximum | Mean | EC-A | EC-B |
| PAHs (ppb) | | | | | | |
| Naphthalene | 20 | 160 | 390 | 231 | 250 | 140 |
| Acenaphthylene | 20 | 96 | 690 | 224 | 230 | 140 |
| Acenaphthene | 20 | 33 | 82 | 52 | 110 | 50 |
| Anthracene | 20 | 210 | 560 | 299 | 670 | 300 |
| Fluorene | 20 | 52 | 100 | 80 | 150 | 100 |
| Fluoranthene | 20 | 730 | 1300 | 922 | 1000 | 710 |
| Phenanthrene | 20 | 350 | 630 | 491 | 700 | 560 |
| Pyrene | 20 | 1100 | 2900 | 1500 | 1400 | 920 |
| Benzo[a]anthracene | 20 | 450 | 1300 | 609 | 1300 | 900 |
| Chrysene | 20 | 480 | 1500 | 703 | 1300 | 840 |
| Benzo[b]fluoranthene | 20 | 400 | 1300 | 671 | 1600 | 1000 |
| Benzo[k]fluoranthene | 20 | 340 | 1700 | 741 | 420 | 270 |
| Benzo[a]pyrene | 20 | 500 | 1800 | 783 | 1500 | 1000 |
| Indeno[1,2,3-cd]pyrene | 20 | 170 | 330 | 261 | 820 | 590 |
| Dibenz[a,h]anthracene | 20 | 63 | 120 | 91 | 190 | 140 |
| Benzo[g,h,i]perylene | 20 | 150 | 360 | 270 | 750 | 503 |
| Pesticides (ppb) | | | | | | |
| 4,4'-DDD | 20 | 10 | 10 | 10 | 9.8 | 2.1 |
| 4,4'-DDE | 20 | 10 | 24 | 12 | 9.3 | 1.4 |
| 4,4'-DDT | 20 | 10 | 10 | 10 | 0.65 | 0.55 |
| Aldrin | 20 | 10 | 10 | 10 | 0.65 | 0.55 |
| alpha-Chlordane | 20 | 10 | 10 | 10 | 0.65 | 0.55 |
| Dieldrin | 20 | 10 | 10 | 10 | 4.4 | 0.55 |
| Endosulfan I | 20 | 10 | 10 | 10 | 0.65 | 0.55 |
| Endosulfan II | 20 | 10 | 10 | 10 | 0.65 | 0.55 |
| Endosulfan sulfate | 20 | 10 | 10 | 10 | 3.20 | 0.55 |
| Endrin | 20 | 10 | 10 | 10 | 0.53 | 0.24 |
| gamma-Chlordane | 20 | 10 | 10 | 10 | 0.4 | 0.55 |
| Heptachlor | 20 | 10 | 10 | 10 | 0.65 | 0.55 |
| Heptachlor epoxide | 20 | 10 | 10 | 10 | 16 | 0.55 |
| Methoxychlor | 20 | 10 | 10 | 10 | 7.0 | 5.4 |
| trans-Nonachlor | 20 | 10 | 10 | 10 | 4.2 | 1.9 |
| Toxaphene | 20 | 85 | 95 | 92 | 65 | 55 |
| Total PCB (ppb) | | | | | | |
| Sum of Cogeners x 2 | | 32.4 | 210 | 82.1 | 129.8 | 72.8 |
| Metals (ppm) | | | | | | |
| Arsenic | 0.5 | 14.0 | 22 | 16.6 | 14 | 8.4 |
| Cadmium | 0.1 | 0.7 | 1.7 | 1.1 | 0.99 | 1.0 |
| Chromium | 1 | 130 | 420 | 254 | 120 | 58 |

TABLE 4.2.2-4 (cont'd)

**Comparison of Chemical Constituents in Proposed Dredged Sediments from the Dredging Segment Upstream of the Braga Bridge and Cores from the East Channel Segment Sampled by the OZCM**

| | Dredging Segment Sediment Data | | | | East Channel Cores | |
|---|---|---|---|---|---|---|
| Constituent | Detection Limit | Minimum a/ | Maximum | Mean | EC-A | EC-B |
| Copper | 1 | 82.0 | 180 | 129 | 83 | 55 |
| Lead | 1 | 93.0 | 170 | 143 | 120 | 92 |
| Mercury | 0.02 | 2.0 | 4.3 | 2.8 | 2.7 | 1.8 |
| Nickel | 1 | 25.0 | 36.0 | 30.4 | 15 | 11 |
| Zinc | 1 | 220 | 330.0 | 271 | 270 | 180 |

a/ Concentrations for undetected samples are based on one-half the detection limit

As part of the Tier III sediment testing conducted by Weaver's Cove Energy, new sediment cores were collected and analyzed from the East Channel area. The analytical results from these cores allow an additional comparison of the East Channel sediment with sediment from the adjacent dredging segment. Four individual cores collected from the East Channel area were composited to create a single representative sample which was then analyzed (for details see appendix K). The recent Tier III sample also indicates that the East Channel sediments are similar to both the sediments in the adjacent dredging segment and the samples reported by OCZM. The concentration of PAHs ranged from 1.2 to 2.6 times the average values in the dredging segment upstream of the Braga Bridge, and 0.6 to 2.6 times the concentrations reported by OCZM. Metal concentrations ranged from 0.6 to 1.5 times those in the adjacent dredging segment, and 0.8 to 1.9 times those reported by OCZM. The majority (15 of 19) of pesticides analyzed were not detected; however, dichlorodiphenyltrichloroethane (DDT) and its daughter products DDE and dichlorodiphenyldichloroethane (DDD) were detected at relatively low concentrations, similar to those reported by OCZM. The Tier III analysis also identified cis-Nonachlor at very low concentration (about 2 times the detection limit). Total PCBs in the Tier III core were about 1.4 times the concentration reported by OCZM and 1.7 times the average in the adjacent dredging segment. Although the Tier III sediment analyses continue to suggest a moderate degree of variability between the sediments in the East Channel and the adjacent dredging segment, we still believe the sediments are not significantly different from the sediment in the adjacent dredging segment.

**Elutriate Testing Results**

Weaver's Cove Energy conducted a series of elutriate tests in accordance with the guidelines in the Ocean Testing Manual, Inland Testing Manual, Upland Testing Manual, and the Draft Regional Implementation Manual (COE, 2003; EPA and COE, 1991, 1998; EPA-New England and COE-New England, 2002). Elutriate testing simulates the potential transfer of chemicals from the dredged sediments into the water column during dredging or in-water disposal operations. There are two types of elutriate tests, the standard elutriate and the effluent elutriate. Both tests were developed by the COE and are applied in different dredged material disposal situations. In both testing protocols, a volume of dredged material is vigorously mixed with a larger volume of water. The solids are allowed to settle out and the resulting water is then chemically analyzed. If the COCs remain adsorbed (i.e., chemically attached) to the solids, they simply settle out of the water with the solids. However, if the COCs go into solution in the water, they could be transported in the water column.

The analytical results of the elutriate tests were compared to two data sets: the bulk sediment data and the appropriate water quality criteria. When compared to the bulk sediment chemistry, the elutriate results indicated that nearly all of the detected constituents were adsorbed to the sediment particles because the constituent concentrations in the elutriate water were identified at low and often undetectable levels. This implies that most of the constituents identified in the bulk sediments would be expected to remain attached to the sediment particles and would not be released into the water column during dredging operations. A comparison of the elutriate test results with the EPA National Recommended Water Quality Criteria (EPA, 2002b), yielded the following conclusions:

- All PAHs analyzed were not detected and thus were below the published Aquatic Life Criteria Maximum Concentration (AL-CMC), an acute exposure-based screening criteria, and the Aquatic Life Criterion Continuous Concentration (AL-CCC), a chronic exposure-based screening criteria;

- All PCB compounds analyzed, individually and in total, were not detected and thus were below the published AL-CMC and AL-CCC screening criteria;

- All pesticides analyzed were not detected and thus were below the published AL-CMC and AL-CCC screening criteria; and
- Of the 10 metals analyzed, eight were found to have average concentrations below the published AL-CMC and AL-CCC screening criteria. The two exceptions were copper and zinc.

Average copper concentrations for both the standard and effluent elutriates were greater than both water quality criteria (28 and 20 ppm versus water quality standards of 4.8 and 3.1 ppm for acute and chronic exposure criteria, respectively). However, river water also contained background concentrations of copper greater than both water quality criteria (37 ppm versus water quality standards of 4.8 and 3.1 ppm for acute and chronic exposure criteria, respectively).

Average zinc concentrations for both the standard and effluent elutriates were greater than both water quality criteria. The standard elutriate zinc compliance average was 1.4 times greater than the acute exposure criterion and 1.6 times greater than the chronic exposure criterion. The effluent elutriate zinc compliance average was 1.2 times the AL-CMC and 1.3 times the AL-CCC. Background levels of zinc in the river water were below both water quality criteria (23 ppm versus 90 and 81 ppm for acute and chronic exposure criteria, respectively).

Weaver's Cove Energy conducted additional elutriate testing as part of the Tier III sampling and analysis program; however, the results of this set of elutriate tests were not available when this final EIS was published.

**Dredged Material Reuse and MCP Guidelines**

Dredged material placed in uplands must meet the MCP requirements in 310 CMR 40.0000. Weaver's Cove Energy's plan for handling and stabilizing the dredged material is to increase the bearing capacity and simplify the handling of the sediments by dewatering the dredged material and then mixing with portland cement. The stabilized material then would be placed and compacted in lifts on the LNG terminal site.

In accordance with the MCP requirements, the sediments were comprehensively sampled and analyzed for COCs to evaluate potential risks from the reuse of the sediment on an upland site. We received a comment from the DEP indicating that they did not concur with our statement that the sediments had been comprehensively sampled and analyzed with respect to MCP reuse guidelines. Our review of the samples that were chosen for MCP-related analyses indicates that based on the complete dataset of COE-requested analysis for all 55 sediment core samples, the 14 cores chosen for MCP analyses include the complete range of contaminant concentrations and include sediments from portions of all three proposed dredging segments. As a result, we believe that the analytical results provided by Weaver's Cove Energy for the MCP upland reuse parameters provide a representative range of potential contaminant concentrations and allow an adequate evaluation of the potential impacts of upland reuse of the stabilized dredged material.

In this same comment, the DEP indicated that Weaver's Cove Energy should prepare a conceptual site model to demonstrate that adequate background review was undertaken, and sufficient understanding of the potential sources of sediment contamination exists, to justify the sediment sampling and analysis conducted by Weaver's Cove Energy pursuant to MCP dredged material reuse guidelines. Weaver's Cove Energy's SAP was developed using the tiered process required by the COE and EPA for characterizing proposed dredged sediments. The Tier I review identified the potential sources of point (e.g., direct spills or permitted discharges) and non-point (e.g., runoff from agricultural land and other open spaces) pollution. The Tier I review data were used to assist in the development of the list of

chemicals to be characterized in the sediments, as well as to direct the placement of core locations from which to collect samples. Decisions about the placement of sample cores were also informed by the extensive series of analyses conducted by OCZM. As noted above, our review of the sample locations and analytical results indicates that Weaver's Cove Energy has adequately characterized the sediments with respect to MCP upland reuse guidelines.

Nevertheless, Weaver's Cove Energy in response to comments on the draft EIS and to our data request of October 15, 2004, has indicated that it is preparing a report that will further demonstrate a sufficient understanding of the depositional environment of the Taunton River system and the general types of contaminant sources that were likely contributors of oil and or hazardous materials in the project area. The results of this report were not available as of publication of this final EIS.

Weaver's Cove Energy's LSP evaluated potential risks associated with the use of these sediments in a manner consistent with the August 2001 Method 3 Risk Characterization of the existing site conditions conducted by Shell Oil pursuant to the requirements of the MCP. Weaver's Cove Energy used the same conservative exposure assumptions utilized by Shell Oil to conduct its risk characterization of the site soils. The results of this risk characterization are provided in the *Method 3 Risk Assessment for Upland Placement of Dredged Material as Engineered Fill Report* (ERM, 2003b), which is available under the "Proposal" link on Weaver's Cove Energy's website at www.weaverscove.com.

The suite of analyses that was completed was based on a review of historical, commercial, and industrial practices within the vicinity of the LNG terminal site and upstream of the site. This review is consistent with MCP requirements for comprehensive assessment of contaminated sites in Massachusetts. The exposure pathways evaluated in the risk characterization include:

- incidental ingestion of dredged sediment;
- dermal contact with dredged sediment; and
- inhalation of dredged sediment particulates.

All of these exposure pathways were evaluated for a commercial worker, a utility worker, and a trespasser involved with disturbing the dredged sediment. Exposure of utility workers to VOCs in utility trenches was not analyzed, because no risk for this pathway was concluded from the risk assessment performed by Shell Oil, and VOC concentrations in the proposed dredged sediment were significantly lower than in existing soils on the proposed LNG terminal site (less than 1 percent of existing concentrations in soils at the site). Exposure to groundwater was not assessed because the risk to a utility worker associated with VOCs in groundwater is ten times less than the cumulative site-wide risk for this receptor, indicating the risk from inhalation of VOCs in groundwater is insignificant relative to the other exposure pathways evaluated.

Weaver's Cove Energy's LSP concluded that the concentrations of oils and hazardous material in the proposed dredged sediment would pose no significant risk to human health. The analysis indicates that the non-cancer risks for each receptor considered are less than the risk limit of 1.0 and the cancer risks are less than the risk limit of $1x10^{-5}$. In addition, none of the exposure point concentrations exceed Upper Concentration Limits.

A construction worker scenario was also evaluated using an MCP Method 1 Risk Screening for exposure to dredged sediment and soil during construction on the site. Method 1 was used for the construction worker evaluation for added conservatism and because a number of constituents in the dredged sediment were not included in Shell Oil's earlier analysis of soils on the site. All of the sediment exposure point concentrations were below Method 1 S-3 standards, which indicates that the dredged sediment would not pose a significant risk to a construction worker. However, hotspots for lead and petroleum presently exist in the soils on the proposed LNG terminal site and these would require health

and safety controls to mitigate potential risks to workers on the site (in keeping with the current deed restrictions).

A comparison of Shell Oil's previous risk evaluation with Weaver's Cove Energy's sediment risk evaluation described above indicates the following:

- The sediment does not pose a risk to any of the receptors evaluated in the Shell Oil risk assessment or to construction workers; and
- levels of some contaminants in the sediments are lower than levels of similar contaminants in the soils at the LNG terminal site (see figure 4.2.2-3).

Table 4.2.2-5 provides a comparison of the 90th-percentile concentrations of COCs in the sediment with background concentrations of PAHs and metals in soils, as determined by the DEP (2002), as well as the MCP S-1 (residential) standards for soil constituents. This comparison, which includes data from all 55 samples analyzed for PAHs, indicates that none of the 90th percentile concentrations of PAHs in the sediment exceed the most conservative MCP-defined background concentrations, and only three PAHs exhibited 90th percentile concentrations that exceed the MCP S-1 standard. Although the 90th percentile concentrations of these three PAHs (benzo(a)anthracene, benzo(a)pyrene, and benzo(b)fluoranthene) exceed the MCP S-1 standard, they are still below the most conservative background concentration.

More than half of the metals quantified in the sediment are below background concentrations, as defined by the DEP. The metal COCs in the sediment that exceed DEP-defined background levels are beryllium, total chromium, chromium (VI), mercury, selenium, and silver. Of these six metals, only beryllium was identified at higher concentrations than the MCP-defined residential standard (see table 4.2.2-5). However, beryllium may still be consistent with background conditions based on historical industrial practices upstream, atmospheric deposition, and emissions and/or discharges from nearby power plants and sewer outfalls.

We received comments from Shell Oil during both the scoping process and on the draft EIS that suggested the dredged material does not conform with current use restrictions on the site. Upland placement of stabilized dredged material at the proposed LNG terminal is controlled by both the regulatory authority of the DEP and the use restrictions specified in the Quitclaim Deed for the property.

The DEP has the regulatory authority to decide that materials may be used as a substitute for clean fill. Therefore, the DEP could approve the use of the stabilized dredged material as a substitute for clean fill on the site. However, actual use of the stabilized dredged material on the site would be governed by the additional regulatory guidelines of the MCP and the private contractual provisions of the Quitclaim Deed.

Shell Oil further indicated that the presence of arsenic and mercury in the sediment samples was a potential concern. However, the highest concentrations observed for these metals are below MCP S-1 standards (meaning soils with the same concentrations of these metals would be suitable for use in residential settings). Shell Oil also commented about the potential impact of upland placement of dredged sediments on the existing groundwater remediation system. Weaver's Cove Energy would implement modifications to the existing groundwater remediation system necessary to maintain the present site remediation program. These modifications would minimize any impacts on light non-aqueous phase liquid (LNAPL) recovery and site remediation (see section 4.3.1 for further discussion of groundwater remediation issues).

TABLE 4.2.2-5

**Background Concentrations and MCP Residential Standards for PAHs and Metals Relative to the Dredged Sediment**

| | Dredged Sediment | DEP Background Concentrations a/ | | |
|---|---|---|---|---|
| | 90th Percentile Concentrations | Natural Soil | Soils Associated with Fill | DEP S-1 Standard b/ |
| PAHs (concentrations in ppb) | | | | |
| Acenaphthene | 110 | 500 | 2,000 | 20,000 |
| Acenaphthylene | 225 | 500 | 1,000 | 100,000 |
| Anthracene | 365 | 1,000 | 4,000 | 1,000,000 |
| Benzo(a)anthracene | 775 | 2,000 | 9,000 | 700 |
| Benzo(a)pyrene | 900 | 2,000 | 7,000 | 700 |
| Benzo(b)fluoranthene | 835 | 2,000 | 8,000 | 700 |
| Benzo(g,h,i)perylene | 340 | 1,000 | 3,000 | 100,000 |
| Benzo(k)fluoranthene | 900 | 1,000 | 4,000 | 7000 |
| Chrysene | 845 | 2,000 | 7,000 | 7000 |
| Dibenz(a,h)anthracene | 118 | 500 | 1,000 | 700 |
| Fluoranthene | 1050 | 4,000 | 10,000 | 600,000 |
| Fluorene | 113 | 1,000 | 2,000 | 400 |
| Indeno(1,2,3-cd)pyrene | 325 | 1,000 | 3,000 | 700 |
| Naphthalene | 275 | 500 | 1,000 | 700 |
| Phenanthrene | 655 | 3,000 | 20,000 | 100,000 |
| Pyrene | 1,800 | 4,000 | 20,000 | 500,000 |
| Metals (concentrations in ppm) | | | | |
| **Antimony** c/ | 0.3 | 1 | 7 | 10 |
| Arsenic | 19 | 20 | 20 | 30 |
| **Barium** | 46 | 50 | 50 | 1000 |
| **Beryllium** | 1.2 | 0.4 | 0.9 | 0.7 |
| Cadmium | 1.2 | 2 | 3 | 30 |
| Chromium (total) | 302 | 30 | 40 | 1000 |
| **Chromium (VI)** | 166 | 30 | 40 | 200 |
| Copper | 136 | 40 | 200 | None Listed d/ |
| Lead | 150 | 100 | 600 | 300 |
| Mercury | 3.1 | 0.3 | 1 | 20 |
| Nickel | 30 | 20 | 30 | 300 |
| **Selenium** | 2.1 | 0.5 | 1 | 400 |
| **Silver** | 6.7 | 0.6 | 5 | 100 |
| **Thallium** | 0.2 | 0.6 | 5 | 8 |
| Zinc | 280 | 100 | 300 | 2500 |

a/ Values from DEP Technical Update: *Background Levels of Polycyclic Aromatic Hydrocarbons and Metals in Soil.* *http://www.state.ma.us/dep/ors/files/backtu.pdf*

b/ DEP standard based on S-1/GW-1 values listed in 310 CMR 40.0975(6)(a).

c/ Concentrations for metals indicated in bold-face type were calculated from the 14 MCP core samples. All other metals are based on the 55 COE-parameter core samples.

d/ DEP currently has no standard for copper.

The placement and reuse of dredged sediment at the proposed LNG terminal site could potentially improve the current site conditions by effectively isolating any soil hot spots for lead and LNAPL from potential receptors. In its comments on the draft EIS, the DEP indicated that the volume of sediment

necessary to isolate potential receptors from LNAPL and hotspots of lead contamination should be discussed along with requisite calculations.

As indicated in table 4.2.2-6, the maximum concentration of lead in the dredged materials is 360 mg/kg (62 times less than the highest lead concentration in the existing site soils). The maximum concentration in the dredged sediments is below the RCS-2 reportable concentration of 600 mg/kg and below the DEP background level of lead in soils associated with fill (table 4.2.2-6). Therefore, the risk from exposure to the stabilized dredged sediments would be significantly lower than the risk from the existing site soils.

The proposed LNG terminal site would be covered by between 5 and 25 feet of stabilized dredged material (see figure 2.4.1-1). The LNG spill containment area would be covered by about 5 feet of stabilized sediment. Because access to this area would be restricted to occasional maintenance of stormwater control and LNG spill control pumping equipment, and because excavation below the depth of emplaced fill would be minimal, the volume of stabilized fill present in this area would generally isolate any lead contamination from potential receptors. However, this thickness of fill may not be adequate to isolate potential receptors from LNAPL vapor contact. The remainder of the site would be covered by between 15 and 25 feet of stabilized fill material. This thickness of fill would isolate potential receptors from all hotspots for lead, and would likely isolate all potential receptors from LNAPL contaminants. However, because the calculations necessary to make a final determination of the potential for isolation of hotspots for lead and LNAPL must be carried out by an LSP, **we recommend that**

- **Weaver's Cove Energy provide all appropriate grading plans, cross section drawings, and risk assessments required to demonstrate the degree of isolation provided by the upland reuse of stabilized dredged materials. The required documentation should be filed with the Secretary for review and approval by the Director of the OEP <u>prior to construction</u>.**

Based on our analysis, we believe the upland placement of the dredged sediment on the LNG terminal site could be accomplished without impeding current LNAPL recovery efforts (also see section 4.3.1). However, the MCP at 310 CMR 40.0032 (3)b prohibits the disposal or reuse of soils containing oil or hazardous materials "at locations where existing concentrations of oil and/or hazardous material at the receiving site are significantly lower than levels of those oil and/or hazardous materials present in the soil being disposed or reused." This is in keeping with the statutory preference contained in Chapter 21E to maintain or achieve background levels of oil or hazardous materials at sites proposed for placement or reuse of soils or sediments from offsite sources. In order to make a final determination of compliance with the MCP, a complete comparison of all constituents identified in the dredged material and the soils at the proposed LNG terminal site needs to be completed. Based on comments we received from the DEP (DEP, 2004), we indicated in the draft EIS that additional testing of the soils at the proposed LNG terminal site was necessary to complete the comparison of the dredged sediment and existing site soils.

Weaver's Cove Energy maintains that the above provision of the MCP does not apply to sediment and, therefore, does not apply to the project. Nevertheless, in September 2004, Weaver's Cove Energy conducted sampling and analysis of soils at the proposed LNG terminal site to supplement the data previously collected by Shell Oil. Ten cores were collected from locations in the northern half of the southern parcel and one location in the southern portion of the northern parcel (figure 4.2.2-4). The cores were collected by continuous split spoon sampling from the ground surface down to the water table. All cores were field screened for contamination using visual inspection and instrumental photo-ionization detector analysis. One sample from each core was submitted for analysis of some or all of the following compounds: VOCs, PAHs, PCBs, MCP-required metals, and physiologically available cyanide.

TABLE 4.2.2-6

**Comparison of Proposed Dredged Sediment with Existing Soils at the Proposed LNG Terminal Site and DEP Reportable Concentrations and Accepted Background Concentrations for Urban Fill Material**

| | Dredged Sediment | | Site Soils | | Site Soils | | Massachusetts DEP | |
|---|---|---|---|---|---|---|---|---|
| | Tier II Data | | Shell Data | | September 2004 Data | | Reportable Concentration RCS-2 | Back-ground Fills |
| | Mean | Max | Mean | Max | Mean | Max | | |
| | mg/kg | mg/kg | mg/kg | mg/kg | mg/kg | mg/kg | mg/kg | mg/kg |
| **Volatile Organics** | | | | | | | | |
| 2-Butanone (MEK) | 0.15 | 0.22 | NA | NA | 4.1* | 29* | 40 | NS |
| Acetone | 0.20 | 0.33 | 2.6 | 55 | 4.1* | 29* | 60 | NS |
| Benzene | 0.038* | 0.055* | 0.7 | 54 | 0.50* | 2.9* | 60 | NS |
| Bromomethane | 0.05 | 0.12 | NA | NA | 0.83* | 6.0* | 3 | NS |
| Carbon disulfide | 0.07 | 0.42 | NA | NA | 4.1* | 29* | 1,000 | NS |
| Ethyl benzene | 0.038* | 0.055* | 7.2 | 430 | 17 | 160 | 500 | NS |
| p/m-Xylene | 0.076* | 0.105* | 25 | 527 | 24 | 250 | 500 | NS |
| Methyl tert-butyl ether (MTBE) | 0.038* | 0.055* | 0.26 | 0.837 | 0.83* | 6.0* | 200 | NS |
| o-Xylene | 0.038* | 0.055* | 6 | 245 | 0.42* | 2.9* | 500 | NS |
| Tetrahydrofuran | 0.09 | 0.14 | NA | NA | 8.3* | 60* | 5,000 | NS |
| Toluene | 0.038* | 0.055* | 4.51 | 350 | 0.61* | 4.3* | 500 | NS |
| Total Xylenes | NA | NA | 27 | 1700 | NA | NA | 500 | NS |
| **Semi-Volatile Organics** | | | | | | | | |
| 1,2,4-Trichlorobenzene | 0.12 | 0.22 | NA | NA | 2.2* | 10* | 500 | NS |
| 1,4 Dichlorobenzene | 0.10 | 0.12 | NA | NA | 2.2* | 10* | 60 | NS |
| 1-Methylnaphthalene | NA | NA | 1.6 | 55 | 2.2* | 10* | NS | NS |
| 2-Methylnaphthalene | 0.16 | 0.64 | 7.6 | 597 | 2.2* | 110 | 1,000 | NS |
| 4-Methylphenol | 0.12 | 0.23 | NA | NA | 2.2* | 10* | NS | NS |
| Acenaphthene | 0.05 | 0.38 | 0.8 | 90 | 2.2* | 10* | 2,500 | 2 |
| Acenaphthylene | 0.12 | 0.69 | 0.3 | 26 | 2.2* | 10* | 1,000 | 1 |
| Anthracene | 0.17 | 0.86 | 0.2 | 15 | 2.2* | 10* | 1,000 | 4 |
| Benzo[a]anthracene | 0.38 | 3.3 | 0.2 | 7 | 2.2* | 10* | 1 | 9 |
| Benzo[a]pyrene | 0.44 | 2.5 | 0.2 | 5 | 2.2* | 10* | 0.7 | 7 |
| Benzo[b]fluoranthene | 0.39 | 2.8 | 0.1 | 3 | 2.2* | 10* | 1 | 8 |
| Benzo[k]fluoranthene | 0.41 | 2.9 | 0.1 | 2 | 2.2* | 10* | 2,500 | 3 |
| Benzo[g,h,i]perylene | 0.14 | 0.47 | 0.2 | 2 | 2.2* | 10* | 10 | 4 |
| Benzoic Acid | 0.11 | 0.17 | NA | NA | 2.2* | 10* | 10,000 | NS |
| Biphenyl | 0.10 | 0.12 | NA | NA | 2.2* | 10* | 100 | NS |
| bis(2-Ethylhexyl)phthalate | 0.63 | 1.4 | NA | NA | 2.2* | 10* | 300 | NS |
| Carbazole | 0.10 | 0.12 | NA | NA | 2.2* | 10* | NS | NS |
| Chrysene | 0.41 | 3.3 | 0.24 | 11 | 2.2* | 10* | 10 | 7 |
| Dibenzo[a,h]anthracene | 0.06 | 0.19 | 0.08 | 0.25 | 2.2* | 10* | 0.7 | 1 |
| Dibenzofuran | 0.11 | 0.18 | NA | NA | 2.2* | 10* | NS | NS |
| Dibutyl phthalate | NA | NA | 1.4 | 1.7 | 2.2* | 10* | 500 | NS |
| Fluoranthene | 0.51 | 2.7 | 0.3 | 12 | 2.2* | 10* | 1,000 | 10 |
| Fluorene | 0.06 | 0.41 | 1.6 | 121 | 2.5* | 4.2 | 2,000 | 2 |
| Indeno[1,2,3-cd]pyrene | 0.15 | 0.51 | 0.12 | 1.6 | 2.2* | 10 | 1 | 3 |
| Naphthalene | 0.23 | 5.7 | 6.66 | 216 | 6.4* | 48 | 1,000 | 1 |

TABLE 4.2.2-6 (cont'd)

**Comparison of Proposed Dredged Sediment with Existing Soils at the Proposed LNG Terminal Site and DEP Reportable Concentrations and Accepted Background Concentrations for Urban Fill Material**

| | Dredged Sediment | | Site Soils | | Site Soils | | Massachusetts DEP | |
|---|---|---|---|---|---|---|---|---|
| | Tier II Data | | Shell Data | | September 2004 Data | | Reportable Concentration RCS-2 | Back-ground Fills |
| | Mean | Max | Mean | Max | Mean | Max | | |
| | mg/kg | mg/kg | mg/kg | mg/kg | mg/kg | mg/kg | mg/kg | mg/kg |
| Phenanthrene | 0.28 | 1.3 | 1.36 | 102 | 2.6* | 2.6 | 100 | 20 |
| Phenol | 0.10 | 0.15 | NA | NA | 2.3* | 10* | 500 | NS |
| Pyrene | 0.84 | 7.1 | 0.54 | 9.8 | 2.2* | 10* | 2,000 | 20 |
| **Total PCBs** | 0.13 | 0.30 | NA | NA | 0.5 | 1.8 | 2,000 | NS |
| **Metals** | | | | | | | | |
| Arsenic | 12 | 28 | NA | NA | 8 | 53 | 30 | 20 |
| Barium | 35 | 52 | NA | NA | 7 | 14 | 2,500 | 50 |
| Beryllium | 1.0 | 1.2 | NA | NA | 0.2 | 1.0 | 0.8 | 0.9 |
| Chromium | 123 | 420 | NA | NA | 5 | 10 | 2,500 | 40 |
| Copper | 65 | 180 | NA | NA | 11 | 48 | 10,000 | 200 |
| Lead | 80 | 360 | 221 | 22,500 | 138 | 1,300 | 600 | 600 |
| Mercury | 1.3 | 4.3 | NA | NA | 0.1 | 0.2 | 60 | 1 |
| Nickel | 21 | 36 | NA | NA | 7 | 14 | 700 | 30 |
| Selenium | 1.5 | 2.2 | NA | NA | 1.1* | 1.2* | 2,500 | 1 |
| Silver | 3.5 | 8.3 | NA | NA | 0.3 | 1.1 | 200 | 5 |
| Zinc | 157 | 330 | NA | NA | 23 | 99 | 2,500 | 300 |
| **Physiologically Available Cyanide** | 3 | 8 | NA | NA | 0.5 | 0.6 | 100 | NS |
| **Volatile Petroleum Hydrocarbons** | | | | | | | | |
| C10-C22 | NA | NA | 40 | 950 | NA | NA | NS | NS |
| C5-C8 Aliphatics | 5.6* | 7.5* | 205 | 4,820 | NA | NA | 500 | NS |
| C9-C10 Aromatics | 3.8* | 5.0* | 141 | 2,800 | NA | NA | 500 | NS |
| C9-C12 Aliphatics | 5.6* | 7.5* | 313 | 6,300 | NA | NA | 2,500 | NS |
| **Extractable Petroleum Hydrocarbons** | | | | | | | | NS |
| C9-C18 Aliphatics | 7 | 46 | 999 | 53,800 | NA | NA | 2,500 | NS |
| C19-C36 Aliphatics | 39 | 210 | 386 | 30,800 | NA | NA | 5,000 | NS |
| C11-C22 Aromatics | 19 | 55 | 958 | 23,700 | NA | NA | 2,000 | NS |

* Value is based on one half the detection limit

NA = Not Analyzed
NS = No Standard

As shown on figure 4.2.2-3 for total VOCs, all individual VOCs in the existing site soils occur at higher concentrations than in the proposed dredged sediments. This is also true for all SVOCs except benzo(k)fluoranthene (table 4.2.2-6). The maximum concentration of benzo(k)fluoranthene in the dredged sediments is 2.9 mg/kg, whereas the maximum detectable concentration observed in the existing site soils is 2 mg/kg. Therefore, upland reuse of the stabilized dredged sediments could result in a slight increase in the concentration of benzo(k)fluoranthene in the site soils but it would not result in a reportable concentration. Also, it would be unlikely to result in a final concentration in site soils that exceeds DEP-defined background levels for this compound in soils associated with fill materials. The maximum concentrations of four SVOCs in the existing site soils currently exceed the RCS-2 reportable concentrations (table 4.2.2-6). However, the mean concentrations of these compounds are well below the RCS-2 criteria. Additionally, the maximum concentrations of these compounds are less than the DEP-defined background level, and upland reuse of the stabilized dredged sediment would not result in a reportable concentration, nor would it be likely to create new concentrations of these compounds that exceed DEP-defined background levels.

The concentrations of both volatile and extractable petroleum hydrocarbons in the existing site soils currently exceed the MCP reportable concentrations. The mean concentrations of these compounds in the proposed dredged sediments range from 0.7 percent to 10 percent of the mean concentrations in the existing site soils. In addition, the maximum concentrations of these compounds in the dredged sediments are far lower than the mean concentrations in the existing site soils (table 4.2.2-6).

The mean and maximum concentrations of total PCBs in the dredged sediments are much lower than the corresponding concentrations in the existing site soils. In addition, the maximum concentration of total PCBs in the sediment is lower than the mean concentration in the existing site soils. Both the sediments and the site soils are substantially below the RCS-2 reportable concentration of 2,000 ppm.

Upland placement of the stabilized dredged sediment would result in an increase in the concentration of most metals in the existing site soils. However, increases in the concentrations of most metals would not result in the exceedance of a reportable concentration (table 4.2.2-5). The increase in the concentration of beryllium could potentially result in the exceedance of a reportable concentration for that metal. However, it seems probable that the range of beryllium concentrations demonstrated by both the dredged sediments and the existing site soils represents a local background condition given the location of the dredging footprint and the terminal site, directly downwind of two coal-fired power plants. The principal source of atmospheric beryllium dust in the United States is smoke stack emissions from coal- and oil-fired power plants (EPA, 2004c; Agency for Toxic Substances and Disease Registry, 2004). An additional source of beryllium derives from ash waste from coal-fired power plants. The background concentration of beryllium in table 4.2.2-6 is based on published DEP values (DEP, 2002). However, that technical note indicates that the values published therein "… do not obviate the need to establish location-specific background conditions for other purposes, such as compliance with the anti-degradation provisions of the MCP" (DEP, 2002). As a result, the local background concentration of beryllium may be higher in the Fall River area than the published value of 0.9 mg/kg. Furthermore, the presence of beryllium in the existing site soils at maximum concentrations similar to those in the dredged sediment means that the proposed reuse of the stabilized sediment would not introduce a contaminant to the site that is not already present.

Insert figure

4.2.2-3 Comparisons of Average Concentrations in Sediment and Soil Samples

Weaver's Cove Energy conducted a revised Method 3 Risk Assessment using both Shell Oil's existing soil data and the data recently acquired by Weaver's Cove Energy that included the same constituents found in the proposed dredged sediments. The results of this assessment indicated that exposure to the existing site soils does not pose a risk for commercial workers, trespassers, or utility workers, but based on the additional data, the new risks from existing site soils are slightly higher than the original site risk calculated by Shell Oil. The same analysis, including Shell Oil's existing data, the new site soil data, and the data for the dredged sediment, indicates that total site risk is below the MCP carcinogenic risk criterion ($1 \times 10^{-5}$), and the MCP non-carcinogenic risk criterion (i.e., less than 1). Total site risk is below these criteria for commercial workers, trespassers, and utility workers. Our analysis of the risk assessment conducted by Weaver's Cove Energy suggests that it conservatively overestimates the risk to the chosen receptors. Because the data collected in September 2004 do not represent entirely separate exposure points from those used in the original Shell Oil risk assessment, combining separately calculated risks from data collected from the same exposure points overestimates the risk to the chosen receptors, thereby producing a conservative estimate of potential site risk.

The MCP at 310 CMR 40.0032 requires that the DEP evaluate the types and extent of contamination within the proposed dredged sediment compared to the contaminant profile in the soil at the proposed reuse location to prevent the occurrence of a release condition at the site that would require remediation, or significantly increase contamination at the proposed reuse site. Our analysis indicates that except for those contaminants in the existing site soils that currently exceed reportable concentrations, upland reuse of the stabilized dredged sediment would not result in an increase in the concentration of any additional contaminants that would exceed a reportable concentration. For those contaminants that already exceed a reportable concentration, use of the stabilized dredged sediment at the site would not likely result in additional remediation requirements because the incremental increase in these substances would be minimal. Upland reuse of the dredged sediment would result in an increase in the concentration of most metals in the existing site soils; however, none of the increased concentrations would result in a release condition. It does not appear that the increased concentrations of metals would pose a significant environmental impact because all of the metals in the dredged material also occur in the existing site soils (some at higher maximum concentrations), and except for selenium and mercury, the increased metal concentrations would remain below DEP-published background levels. The published background concentration for mercury is 1 mg/kg; however, given the proximity of the site and the dredging footprint to the coal-fired Brayton Point Power Plant, it is likely that the local background level of mercury is higher than 1 mg/kg, and reuse of the sediments may not pose a significant impact on existing site soils. Information in a recent lawsuit against the Brayton Point Power Plant indicates that 240 pounds of mercury per year are emitted from the plant (Conservation Law Foundation, 2005). We note, however, that the DEP has not made a final determination on this issue.

Because the DEP has not made a final determination regarding the upland placement of sediments on the LNG terminal site with respect to either the anti-degradation provisions or potential impacts on the existing remediation system, and because upland reuse of the stabilized dredged sediment is a critical aspect of the proposed project design, **we recommend that:**

- **Weaver's Cove Energy file documentation with the Secretary <u>prior to construction</u> to verify that placement of the stabilized dredged material on the LNG terminal site is consistent with the MCP. If Weaver's Cove Energy is unable to verify the consistency of the proposed use of the sediment with the MCP, it should file a revised sediment placement plan that identifies alternative location(s) for use of the sediments. This alternative use plan, if necessary, should be developed in consultation with the relevant agencies and include a detailed assessment of the environmental impacts associated with the alternative location(s) and demonstrate that the alternative location(s) are in compliance with applicable regulations.**

**Weaver's Cove Energy should file the plan, if necessary, with the Secretary for review and approval by the Director of OEP prior to construction.**

We received a comment from the DEP indicating that the proposed upland reuse of stabilized dredged sediment is regulated under the provisions of 314 CMR 9.00 (Water Quality Certification). The DEP also indicated that to be considered a valid reuse proposal, the amount of material proposed for reuse must be "reasonable and consistent with the project's design, construction, and operation." The volume of material used should be the minimum amount necessary to accomplish the project. Any volume of material larger than the minimum necessary to accomplish the project would be "considered solid waste, if proposed to be disposed upland" and be subject to management under MGL c. 111, §150A and 150A1/2 as well as 310 CMR16.00 and 19.000.

In its comments on the draft EIS, Weaver's Cove Energy provided information regarding the volumes of stabilized sediment required to construct each of the site features. This information shows that a large portion of the fill (41 percent) would be used to bring the site grade from its present elevations (generally 20 to 25 feet above MSL) to 40 feet above MSL. This would bring the entire facility above the 100-year floodplain elevation, a required safety feature. More importantly, this volume of stabilized dredged material would allow the installation of sumps, berms, process piping, drains, and other systems necessary for site operation without disturbing the underlying contaminated site soils. An additional 5 percent of the stabilized fill material would be used to construct auxiliary facilities and the approach berms for the railroad crossing between the southern and northern parcels. The remaining volume would be used to construct a perimeter retaining wall and a landform for visual screening and noise attenuation. Our analysis indicates that the volume of stabilized dredged sediments appears reasonable and consistent with the project's design, construction, and operation. In addition, because the sediments are an environmental media that would be stabilized and reused as engineered fill, and would not be discarded or abandoned, they do not appear to meet the definition of solid waste under 310 CMR 16.00. Therefore, we do not believe that a site assignment would be required for the site.

During the scoping process, we received a comment expressing concern about the potential interaction of an intense fire with the LNAPL contamination in the existing site soils. The LNAPL at the site currently exists as a plume floating on the top of the groundwater. Current groundwater elevations at the site range from 2 to 15 feet below the existing ground surface. Upland placement of dredged sediments would cover the majority of the site with a thick layer of material that would further isolate the LNAPL contaminants from direct exposure to any fire. The use of other forms of structural fill in areas of the site not directly covered by stabilized dredged material would also result in isolation of the LNAPL contaminants. In addition, most of the heat from a fire would be directed up into the atmosphere, minimizing the risk of LNAPL-fire interaction and any potential for a release of LNAPL from the site.

**Sediment Stabilization Testing**

The physical characterization of the bulk sediment indicated that the dredged material is predominantly fine-grained with a highly plastic behavior. These physical characteristics are not optimal for time-efficient material handling and offloading, drying, and upland placement as structural fill. To improve the material handling and mechanical properties of the dredged material, some form of stabilization would be required.

Weaver's Cove Energy conducted a laboratory testing program to evaluate the application of several admixtures, in differing percentages and under differing conditions, to identify a soil stabilization method that could produce improved physical characteristics (additional details on the testing can be found in the *Dredging Program Report* under the "Proposal" link on Weaver's Cove Energy's website at www.weaverscove.com). The objective of the dredged material admixture testing program was to obtain

a general understanding of the behavior of typical fine-grained sediments when treated with varying percentages of lime, portland cement, and a combination of both lime and cement. This program did not evaluate the effects of admixtures on the more coarse-grained 'parent material' sediments found in distinct areas within the turning basin. It is anticipated that these coarse-grained materials would be easier to dewater and stabilize than the fine-grained materials that were tested.

Based on the results of the sediment stabilization testing program, the addition of lime, portland cement, and mixtures of lime and cement in combination improved the strength of the fine-grained dredged material. The magnitude of strength gained, however, varied significantly with respect to the type and percentage of admixture used. The addition of an 8 percent (mass basis) portland cement admixture to the fine-grained dredged material yielded the greatest short-term (1 day) and long-term (28 day) gains in material compressive strengths. The resulting product was a material with improved workability and handling characteristics and suitable for structural applications.

In addition to the mechanical properties of the stabilized dredged material, the permeability of samples from the two cement admixtures was measured to evaluate the potential movement of water, and therefore potential contaminants, through the stabilized materials after on site placement as structural fill. The results for both cement admixtures were similar. When compacted to 90 percent of maximum dry density, both 4 and 8 percent cement-stabilized sediment had a saturated permeability of 0.03 inch per day. Similarly, both 4 and 8 percent cement-stabilized sediment compacted to 95 percent of maximum dry density had saturated permeabilities of 0.02 inch per day. By comparison, a natural soil such as heavy clay, with very slow permeability (as described by the NRCS) has a saturated permeability of about 1.4 inches per day, which is nearly 50 times faster than the fastest permeability measured for the stabilized dredged material.

The saturated permeabilities measured for the stabilized dredged material represent the fastest flow rate for water moving through this material. These permeabilities assume that the entire mass of sediment is saturated and that a constant source of ponded water exists at the ground surface. Neither of these assumptions would be valid for the stabilized sediments placed at the LNG terminal site, thus our analysis is highly conservative. Rainfall reaching the surface of the LNG terminal site would run off the steeply sloping portions of the land surface and be contained in sedimentation ponds constructed for stormwater management. Much of the water standing in these ponds would be lost to evaporation before it could recharge the groundwater. Rainwater that soaked into those portions of the site with low slope gradients would largely be evapotranspired by vegetation, further limiting groundwater recharge. The limited amount of water that would be available for groundwater recharge would have to move through a minimum of 15 feet of stabilized material before reaching the preconstruction land surface. Existing groundwater at the site is generally 2 to 15 feet below that elevation. Assuming the permeabilities measured for the stabilized sediment could be realized, it would take between 16 and 25 years for water moving through the stabilized sediments to reach the preconstruction land surface. By comparison, water moving through 15 feet of low permeability natural soil (as described above) would move through that distance in 129 days.

The primary impact from construction of the LNG terminal site would result from erosion and sedimentation of stabilized dredged material during placement and grading of the sediments. The low permeability of the stabilized dredged material could result in large amounts of runoff from rainfall during construction. High runoff rates are also likely during operation of the LNG terminal due to the low permeability of the stabilized fill. To mitigate the impacts associated with erosion and sedimentation during construction and operation of the LNG terminal site, Weaver's Cove Energy would implement both a site-specific erosion and sedimentation control plan pursuant to its application for a section 401 Water Quality certification and section 404 and Massachusetts Wetland Protection Act (WPA) wetlands permits, and a stormwater management plan pursuant to EPA and DEP stormwater management policies and regulations. A summary of the measures contained in these plans is presented in section 4.3.2.

contained in Weaver's Cove Energy's SPCC Plan. Specific methods and measures would include discharging groundwater removed during trench dewatering in the immediate vicinity of where it is removed to allow for localized resource recharge; backfilling the trench with native material to promote aquifer equilibrium and minimize preferential groundwater flow along the trench; reestablishing preconstruction surface contours and drainage; as well as measures to minimize the risk of spills and procedures to contain, clean up, and report any spills that may occur. Implementation of these measures would ensure to the extent practicable that the potential impacts to groundwater quality along the proposed pipeline routes are localized to the immediate area of the disturbance and do not have a significant impact on overall groundwater quality in the area.

### 4.3.2 Surface Water

**Regulatory Permits**

Pipeline installation, LNG terminal construction, and dredging in waters of the United States would be regulated by the COE under section 10 of the Rivers and Harbors Act and section 404 of the CWA. Section 10 of the Rivers and Harbors Act prohibits the creation of any obstruction to the navigable capacity of any waters of the United States without specific approval of the COE. Section 404 of the CWA regulates the discharge of dredged or fill material into waters of the United States.

In addition to the COE permitting requirements, Weaver's Cove Energy's proposed pipeline installation, LNG terminal development, and dredging activities would need to comply with section 401 of the CWA and the CZMA. Weaver's Cove Energy would be required to obtain a section 401 water quality certificate from Rhode Island and Massachusetts demonstrating that the proposed discharge of dredged material complies with each state's water quality standards. Weaver's Cove Energy would also need to certify that its project is consistent with the enforceable policies of Rhode Island's and Massachusetts' CZMPs.

Massachusetts also regulates activities located within flowed tidelands, filled tidelands, and non-tidal rivers and streams through its Chapter 91 licensing requirements. Specific activities regulated under the Chapter 91 licensing program include:

- <u>Structures</u> - Placement or construction of any structure, regardless of size, whether permanent or seasonal. Examples of typical structures include, but are not limited to piers, wharves, dams, seawalls, weirs, booms, breakwaters, bulkheads, ripraps, revetments, jetties, piles, lines, groins, roads, culverts, bridges, buildings, parking lots, cables, pipes, conduits, tunnels, wires, floats, etc.

- <u>Filling</u> - Placement of any unconsolidated materials that is confined or expected to remain in place in a waterway, except for material placed by natural processes. Such placement includes material placed for the purposes of shoreline protection, beach nourishment, or subaqueous disposal of dredged material.

- <u>Dredging</u> - Removal of materials, including, but not limited to, rocks, bottom sediments, debris, sand, refuse, plant or animal matter, in any excavating, cleaning, deepening, widening, or lengthening of any waters in the Commonwealth. The DEP must also know the location where the removed material would be disposed.

- <u>Change in Use</u> - Any use of the authorized premises or structures for a purpose unrelated to the authorized use, whether express or implied. An example of such a change in use would be the conversion of a commercial fishing establishment to an office building.

- Structural Alteration - Any change in the dimensions of a structure or fill from the specifications contained in the existing authorization.

- Demolition/Removal of Structures - Approval is required for removal of any unauthorized structure or fill that was previously not authorized or for which there is not a current and valid grant or license.

**Watershed Descriptions**

The LNG terminal, Northern Pipeline, and most of the Western Pipeline (between MPs 0.0 and 1.8) would be located within the Taunton River drainage basin, which drains approximately 530 square miles of southeastern Massachusetts. The remainder of the Western Pipeline, from MP 1.8 to its terminus, would be located within the Narragansett Bay and Mount Hope Bay drainage basin, which is approximately 112 square miles in size (USGS, 1992).

**Waterbody Classifications**

The project would require dredging of the federal navigation channel and turning basin in the Taunton River and Mount Hope Bay. The ship unloading facility would also be constructed in the Taunton River. The Northern and Western Pipelines would cross 15 waterbodies, including the Taunton River. The other 14 waterbodies crossed by the pipeline routes include 3 perennial and 11 intermittent streams. Table 4.3.2-1 lists the location (by milepost), waterbody name, flow regime, approximate crossing width, surface water classification, fishery type, and proposed crossing method for each waterbody. Descriptions of the fishery resources in the waterbodies are provided in section 4.6.2.

**Outstanding Resource Waters**

The Taunton River and the other waterbodies crossed by the pipeline routes are not classified as Outstanding Resource Waters (Massachusetts Surface Water Quality Standards Program, 1995).[5] However, the Taunton River is currently being evaluated by the National Park Service (NPS) for inclusion into the Wild and Scenic Rivers System (see section 4.8.6.1).

**Contaminated Sediments**

Based on contacts with state agencies in Massachusetts and Rhode Island and a review of existing published information (e.g., fish consumption advisories, section 305(b) and section 303(d) water quality reports), none of the waterbodies, except the Taunton River and Mount Hope Bay, are suspected of containing contaminated sediments (see section 4.2.2).

---

5 The DEP defines Outstanding Resource Waters as waterbodies that exhibit outstanding socioeconomic, recreational, ecological, and/or aesthetic values.

TABLE 4.3.2-1

**Waterbodies Crossed by the Northern and Western Pipeline Routes**

| Facility/ Milepost | Waterbody Name | Flow Regime | Crossing Width (feet) | State Water Quality Classification a/ | Fishery Classification | Proposed Crossing Method |
|---|---|---|---|---|---|---|
| Northern Pipeline | | | | | | |
| 0.7 | Steep Brook | Perennial | N/A b/ | B | Warmwater | N/A |
| 0.8 | Unnamed Ditch (Tributary of Taunton River | Intermittent | 3 | B | Warmwater | Open Cut |
| 1.3 | Unnamed Tributary of Taunton River | Intermittent | 3 | B | Warmwater | Open Cut |
| 1.5 | Unnamed Tributary of Taunton River | Intermittent | 6 | B | Warmwater | Open Cut |
| 1.6 | Unnamed Tributary of Taunton River | Intermittent | ≤ 10 | B | Warmwater | Open Cut |
| 2.3 | Unnamed Tributary of Taunton River | Intermittent | 3 | B | Warmwater | Open Cut |
| 2.4 | Unnamed Tributary of Taunton River | Intermittent | ≤ 10 | B | Warmwater | Open Cut |
| 2.8 | Unnamed Tributary of Taunton River | Intermittent | 4 | B | Warmwater | Open Cut |
| 3.3 | Mother Brook | Perennial | 12 | B | Warmwater | Open Cut |
| 3.3 | Unnamed Tributary of Mother Brook | Intermittent | 3 | B | Warmwater | Open Cut |
| 3.6 | Unnamed Tributary of Taunton River | Intermittent | 3 | B | Warmwater | Open Cut |
| Western Pipeline | | | | | | |
| 0.1 | Taunton River | Perennial | 2,200 | SB | Warmwater c/ | Open Cut |
| 1.2 | Unnamed Tributary of Taunton River | Perennial | 6 | B | Warmwater | Open Cut |
| 1.2 | Unnamed Tributary of Taunton River | Intermittent | 4 | B | Warmwater | Open Cut |
| 2.4 | Unnamed Tributary of Lee River | Intermittent | 4 | B | Warmwater | Open Cut |

a/ Class SB - These waters are designated as habitat for fish, other aquatic life and wildlife and for primary and secondary contact recreation. In approved areas they shall be suitable for shellfish harvesting with depuration (Restricted Shellfish Areas). These waters shall have consistently good aesthetic value.
Class B - These waters are designated as habitat for fish, other aquatic life, and wildlife, and for primary and secondary contact recreation. Where designated they shall be suitable as a source of public water supply with appropriate treatment. They shall be suitable for irrigation and other agricultural uses and for compatible industrial cooling and process uses. These waters shall have consistently good aesthetic value.

b/ Steep Brook is contained within a culvert at the proposed crossing location that is below the elevation of the proposed pipeline.

c/ The fisheries in the Taunton River include shellfish and anadromous and catadromous fish.

## Mount Hope Bay and the Taunton River

The Taunton River begins at the confluence of the Matfield and Town Rivers just east of Bridgewater and flows south for approximately 36 miles before it empties into Mount Hope Bay at Fall River. The Taunton River has an average discharge of 1,050 cubic feet per second (cfs), although this flow varies seasonally with monthly mean values ranging from a low of 332 cfs in August to a high of 2,090 cfs in March (Ries, 1990). Approximately 23 miles of the Taunton River is affected by tides, and the lower 8 miles of the river is a tidal estuary (USGS, 1992).

Mount Hope Bay is a shallow estuary located in the northeast corner of Narragansett Bay. The bay is situated in both Rhode Island (to the south and west) and Massachusetts (to the north and east). Mount Hope Bay is connected to the East Passage of Narragansett Bay to the southwest and to Rhode Island Sound through the Sakonnet River to the south. The bay has a total surface area of 13.6 square miles and a total volume of 53 billion gallons at mean low water (Chinman and Nixon, 1985). The average water depth is 18.8 feet and about 70 percent of the bay is less than 20 feet deep at mean low water.

About 90 percent of the freshwater inflow into Mount Hope Bay comes from the Taunton River. In addition to the inflow from the Taunton River, water circulation in Mount Hope Bay is influenced by tidal flow and wind. Tidal currents are generally between 0.3 and 0.8 feet per second (ft/sec) within Mount Hope Bay, but can exceed 6 ft/sec in the narrows at Sakonnet. Tidal fluctuations range from 3.3 feet at neap tide to 5.5 feet at spring tide with a mean tidal range of 4.4 feet (Spaulding and White, 1990). Tides are the primary source of circulation in Mount Hope Bay with 7.9 billion gallons of water being flushed through the bay twice a day (USGen, 2001).

The state water quality classifications for the Taunton River and Mount Hope Bay are shown on figure 4.3.2-1 and described in table 4.3.2-2. Because Mount Hope Bay is located on the state boundary between Rhode Island and Massachusetts, it has a unique water quality classification in each state.

TABLE 4.3.2-2

**Water Quality Classifications of Mount Hope Bay and the Lower Taunton River**

| Waterbody | State Water Quality Classification a/ |
|---|---|
| Taunton River | |
| From mouth to Route 24 bridge (21.2 miles upstream) | MA-SB |
| Mount Hope Bay (MA) | |
| West of line from Brayton Point to Buoy R4 | MA-SA |
| East of line from Brayton Point to Buoy R4 | MA-SB |
| Mount Hope Bay (RI) | |
| South and west of the MA-RI border and north of a line from Borden's Wharf, Tiverton to Buoy R4 and east of a line from Buoy R4 to Brayton Point in Somerset, MA. | RI-SB1 |
| South of a line from Borden's Wharf, Tiverton to Buoy 4 and west of a line from Buoy R4 to Brayton Point, Somerset, MA, and east of a line from the end of Gardiner's Next Road in Swansea to Buoy N2 through Buoy C3 to Common Fence Point, Portsmouth; and north of a line from Portsmouth to Tiverton at the railroad bridge at "The Hummocks" on the northeast point of Portsmouth. | RI-SB |
| West of the SB zone described above to the Narrows at the entrance to the Kickamuit River and east of a line from shore to shore passing through the most westerly points of the two center piers of the Mount Hope Bridge. | RI-SA |

a/ Class MA-SA: These waters are designated as an excellent habitat for fish, other aquatic life and wildlife and for primary and secondary contact recreation. In approved areas they shall be suitable for shellfish harvesting without depuration (Open Shellfish Areas). These waters shall have excellent aesthetic value.

Class MA-SB: These waters are designated as a habitat for fish, other aquatic life and wildlife and for primary and secondary contact recreation. In approved areas they shall be suitable for shellfish harvesting and depuration (Restricted Shellfish Areas). These waters shall have consistently good aesthetic value.

Class RI-SA: These waters are designated for shellfish harvesting for direct human consumption, primary and secondary recreational activities, and fish and wildlife habitat. They shall be suitable for aquacultural uses, navigation and industrial cooling. These waters shall have good aesthetic value.

Class RI-SB: These waters are designated for primary and secondary contact recreational activities; shellfish harvesting for controlled relay and depuration; and fish and wildlife habitat. They shall be suitable for aquacultural uses, navigation, and industrial cooling. These waters shall have good aesthetic value.

Class RI-SB1: These waters are designated for primary and secondary contact recreational activities and fish and wildlife habitat. They shall be suitable for aquacultural uses, navigation, and industrial cooling. These waters shall have good aesthetic value. Primary contact recreational activities may be impacted due to pathogens from approved wastewater discharges. However, all class RI-SB criteria must be met.

Insert figure

4.3.2-1 Lower Taunton River / Mount Hope Bay State Surface Water Quality Classifications

Section 303(d) of the CWA requires states to identify waterbodies that are not expected to meet surface water quality standards. The Taunton River and Mount Hope Bay do not currently meet the designated water quality standards established by Massachusetts or Rhode Island. Table 4.3.2-3 provides a list of the section 303(d) waters in the project area and identifies the cause of impairment within each section of these waters. The segments are depicted on figure 4.3.2-2.

TABLE 4.3.2-3

**List of 303(d) Waters in the Project Area**

| State/Waterbody | Segment a/ | Causes of Impairment |
|---|---|---|
| Massachusetts | | |
| Taunton River a/ | 1 | Organic enrichment, low dissolved oxygen, pathogens |
| Taunton River b/ | 4 | Organic enrichment, low dissolved oxygen, pathogens |
| Mount Hope Bay a/ | 2 and 3 | Nutrients, organic enrichment, low dissolved oxygen, pathogens |
| Rhode Island | | |
| Mount Hope Bay | 5 and 6 | Biodiversity impacts, thermal impacts c/<br>Pathogens, hypoxia, nutrients d/ |
| Mount Hope Bay | 7 | Biodiversity impacts, thermal impacts c/<br>Hypoxia, nutrients d/ |

a/ Segments of waterbodies that continue to exhibit impairment of one or more uses and will require additional control measures for point- and/or non-point sources before the waterbody is expected to meet applicable standards (see figure 4.3.2-2).
b/ Segments of waterbodies or pollutants/stressors that have been listed in the past and should be targeted for monitoring or other information gathering to confirm whether they should remain on the section 303(d) list.
c/ Segments of waterbodies not meeting water quality standards where the Total Maximum Daily Load (TMDL) development is currently underway for the cause of impairment.
d/ Segments of waterbodies not meeting water quality standards where the TMDL is planned for the future for the cause of impairment.

## Surface Water Resources Impacts and Mitigation

Construction of the Weaver's Cove LNG Project could adversely affect surface water quality due to activities within Mount Hope Bay and the Taunton River (i.e., dredging, pipeline installation, ship unloading facility construction, and hydrostatic test water discharge) and activities located at the LNG terminal (i.e., clearing, grading, and dredged material reuse).

### Dredging Activities

The primary impact on water quality associated with dredging would be the resuspension of sediment into the water column. The suspended sediment could reduce light penetration and lower the rate of photosynthesis and aquatic productivity of an area; introduce organic material and/or nutrients which could lead to an increase in biological oxygen demand and reduce dissolved oxygen; and release chemical constituents, such as metals, PCBs, pesticides, and PAHs. Surface water quality could also be adversely affected by a spill, leak, or other release of hazardous materials during construction activities. Weaver's Cove Energy would minimize potential impacts associated with spills or releases of hazardous materials by implementing both onshore and offshore SPCC Plans and complying with federal regulations related to fuel transport, handling, and spill response procedures. These measures would minimize impacts of potential spills on surface waters to the extent practicable and reduce the potential degradation of surface waters.

Insert figure

4.3.2-2 Massachusetts and Rhode Island 303(d) Listed Waters

To predict water circulation in the Taunton River and Mount Hope Bay and to determine the potential effects of dredge-induced suspended sediment, Weaver's Cove Energy conducted computer-based modeling of the dredging operations using a three-dimensional, boundary-fitted hydrodynamic (BFHYDRO) model and a Suspended Sediment Fate (SSFATE) model, respectively. The results of these models are discussed below. Weaver's Cove Energy used a Suspended Sediment Dose (SSDOSE) model to assess potential impacts on aquatic organisms that could result from exposure to suspended or deposited sediments. The results of the SSDOSE modeling are discussed in section 4.6.2. Additional details on all of these models are provided in Weaver's Cove Energy's modeling report entitled *Modeling Dredge-induced Suspended Sediment and the Environmental Effects in Mt. Hope Bay and the Taunton River for the Proposed Weaver's Cove Energy, LLC, Liquefied Natural Gas Import Terminal* (Applied Science Associates (ASA), 2003), which is available under the "Proposal" link on Weaver's Cove Energy website (www.weaverscove.com).

The area evaluated using the BFHYDRO model included the Taunton River, Mount Hope Bay, the Sakonnet River, portions of the Providence, Kickamuit, Cole, and Lee Rivers, and Narragansett Bay as far south as Newport, Rhode Island. Parameters that were incorporated into the model to characterize water circulation patterns included:

- bathymetry measurements obtained from historical digitized survey data and recent high resolution surveys;
- surface water elevation at the three entrance locations to Narragansett Bay;
- wind data obtained from the NOAA Physical Oceanographic Real-Time Systems (PORTS) data collection station located at Borden Flats; and
- river flow data from gaging stations located on the Taunton, Threemile, and Segregansett Rivers.

The BFHYDRO model was calibrated to the field measured water level and current data collected from the PORTS stations and run using three tidal conditions (spring, mean, and neap) and three river flow regimes (high, low, and mean river flow, defined further below). The modeling results indicated that the major force driving water circulation in the Taunton River and Mount Hope Bay is the astronomical tides, with the predominant flow occurring along the river channel. The results also indicated that velocities decrease from the water surface to the bottom of the water column for all tidal forcing conditions and that at a given location within the water column, spring tides result in the greatest velocities, while neap tides result in the smallest velocities.

Using the SSFATE model, Weaver's Cove Energy then simulated the distribution and deposition of suspended sediment plumes under the following river flow and tide conditions:

- mean tide with mean river flow (1050 cfs);
- spring tide with high river flow (2090 cfs); and
- spring tide with low river flow (332 cfs).

The SSFATE model was run multiple times to reflect four similarly situated reaches within the dredging limits. Each reach represents a dredging area with similar hydrodynamic conditions, physical sediment characteristics, dredge cut thickness, dredging equipment components, and resulting estimated dredge production rates. The four distinct reaches included:

- Mount Hope Bay Federal Navigation Channel - located at the Rhode Island and Massachusetts state line and characterized by shallow cuts of maintenance silts;

- Taunton River Federal Navigation Channel - located upstream of the Braga Bridge at the "S" bend and characterized as predominantly moderate cuts of maintenance silts;
- Turning Basin (Silt) - characterized as deep cuts of maintenance silts; and
- Turning Basin (Native Material) - characterized as moderate to deep cuts of glacially deposited consolidated parent sediments.

The SSFATE modeling results indicated that the maximum total suspended solids (TSS) concentration would occur near the river bottom in close proximity to the dredging operation and would decrease both upstream and downstream of the dredge operation. This suggests that suspended sediments and increased turbidity associated with dredging would be a short-term effect limited primarily to the time periods and areas when and where dredging would be conducted, which would not impair designated uses assigned under Massachusetts' and Rhode Island's respective surface water quality standards. Based on other studies completed for similar dredging projects, sediment concentrations would be expected to return to background levels within about 1,600 to 2,300 feet of the dredging operations (Bohlen et al., 1979; Bohlen et al., 1996).

We received comments from agencies that the modeling results do not take into account natural background levels of suspended sediment, particularly during peak runoff periods, and consequently may underestimate actual TSS levels during some periods of the proposed 3-year construction period. Our review of the modeling report indicates that the SSFATE modeling used to determine biological effects did take into account a background TSS concentration of 11 milligram/liter. This TSS concentration was derived from an analysis of river water collected on March 24, 2003 at three depths slightly downstream of the Braga Bridge, during slack high tide. Recognizing that data collected on a single day may not represent all background conditions, we agree that background TSS levels may be higher than predicted by the model on some days. However, based on review of monthly TSS concentration data collected within the Taunton River during a study completed between 1988 and 1990, we believe a TSS concentration of 11 mg/L is a reasonable estimate of background conditions. The mean TSS concentration for all of the stations sampled during this study period was 7.7 mg/L. Two of the stations located closest to the turning basin (approximately 5 kilometers and 7 kilometers upstream of the turning basin, respectively) reported a mean TSS concentration of 8.3 mg/L, and minimum and maximum concentrations of 2 mg/L and 19 mg/L, respectively (Boucher, 1991) While the TSS concentrations may vary over the course of the proposed dredging operations, we do not believe this alters the general conclusion that suspended sediments and increased turbidity associated with dredging would be a short-term effect limited primarily to the time periods and areas when and where dredging would be conducted.

To minimize suspended sediment concentrations and the potential impacts on water quality and aquatic species, Weaver's Cove Energy has committed to the following mitigation measures during dredging:

- allowing no significant scow overflow during all seasons and at all dredge locations;
- reducing bucket loss rates by using a closed or "environmental" bucket in areas where depositional sediments would be dredged; and
- minimizing the extent of suspended sediments across the width of the river during the anadromous fish runs by sequencing dredging operations to occur in a line parallel with the river flow (as opposed to across the river channel).