accordance with Weaver's Cove Energy's proposed plans and our recommendations, would be relatively minor and short term in comparison to available habitats in the Taunton River and Mount Hope Bay.

**Conservation Measures**

The placement of dredged material in an upland area is an important measure proposed by Weaver's Cove Energy to minimize potential impacts on federally managed fish species and EFH. As previously discussed, Weaver's Cove Energy would use the material dredged from the navigation channel and turning basin on the proposed LNG terminal for structural fill. Use of the material in an upland area would avoid the need for offshore disposal and reintroduction of the dredged material into an aquatic environment that may include EFH.

Implementation of additional conservation measures proposed by Weaver's Cove Energy in response to agency concerns or required by the FERC or resource agencies would also avoid or minimize impacts on EFH, including implementing the measures in the FERC Plan and Procedures to minimize impacts on wetlands and waterbodies. As previously mentioned, we recommended that Weaver's Cove Energy prohibit silt-disturbing construction activities in the Taunton River between January 15 and May 31 to avoid impacts on winter flounder eggs. This restriction is in addition to the other mitigative measures Weaver's Cove Energy has proposed to minimize impacts on aquatic resources as described previously in this section.

NOAA Fisheries commented on the draft EIS and expressed concern that potential impacts on aquatic resources were underestimated in the EIS. Based on its review of the draft EIS, NOAA Fisheries also provided conservation recommendations to further avoid, minimize, and mitigate adverse effects on EFH, including:

- prohibiting in-water silt-producing activities between January 15 and May 31 of any year to protect winter flounder spawning and juvenile development;
- requiring mitigation to offset permanent loss of winter flounder spawning and juvenile development habitat resulting from expansion of the turning basin; and
- requiring mitigation to offset the placement of fill within intertidal, salt marsh, and subtidal areas during site development.

We have reviewed these recommendations and agree that implementation of the measures would further reduce potential impacts on EFH and managed species occurring in the project area. Weaver's Cove Energy has prepared a Wetland Mitigation Plan that provides mitigation for impacts on salt marsh and freshwater wetlands (see section 4.4). We have recommended in section 4.4 that Weaver's Cove Energy consult with the COE and NOAA Fisheries regarding the mitigation of wetlands as well as intertidal and subtidal areas and file a COE-approved Wetland Mitigation Plan with the Commission prior to construction. Additionally, we have recommended in this final EIS that Weaver's Cove Energy avoid silt-disturbing construction activities in the Taunton River during the winter flounder spawning period (i.e., January 15 through May 31) and prepare a mitigation plan to offset permanent loss of winter flounder habitat in the turning basin.

**Conclusions of the EFH Assessment**

Dredging associated with the proposed project could affect water column, benthic substrate, and man-made structure EFH in the project area. Activities within the Taunton River and Mount Hope Bay also have the potential to affect anadromous fish and shellfish resources, two primary prey groups for

managed fish species. The temporary resuspension of sediments during dredging could temporarily affect use of the water column by managed species in the area. Deepening of the navigation channel and expansion of the turning basin would result in temporary destruction and permanent alteration of existing benthic habitat within the dredging footprint as well as affect existing benthic habitat outside of the footprint through deposition of suspended sediments. Most notably, without additional revisions to the current proposed dredging program, the modeling conducted by Weaver's Cove Energy has indicated that impacts on managed species as a result of benthic habitat destruction and alteration could include temporary loss of up to 6.2 acres of winter flounder spawning habitat (assuming suitable habitat occurs to a depth of 8 meters) during the flounder spawning period. In addition, a maximum of about 11 acres of winter flounder spawning habitat (also assuming suitable habitat occurs to a depth of 8 meters) would be permanently lost as the result of widening the turning basin. However, implementation of the conservation measures discussed above would likely avoid or minimize impacts on managed fish species and designated EFH.

## 4.7 THREATENED, ENDANGERED, AND OTHER SPECIAL STATUS SPECIES

Federal agencies are required by section 7 of the ESA Act (Title 19 USC Part 1536(c)), as amended (1978, 1979, and 1982), to ensure that any actions authorized, funded, or carried out by the agency do not jeopardize the continued existence of a federally listed endangered or threatened species, or result in the destruction or adverse modification of the designated critical habitat of a federally listed species. The action agency (i.e., the FERC) is required to consult with the FWS and/or NOAA Fisheries to determine whether federally listed endangered or threatened species or designated critical habitat are found in the vicinity of the proposed project, and to determine the proposed action's potential effects on those species or critical habitats. For actions involving major construction activities with the potential to affect listed species or designated critical habitat, the federal agency must prepare a BA for those species that may be affected. The action agency must submit its BA to the FWS and/or NOAA Fisheries and, if it is determined that the action may adversely affect a listed species, the federal agency must submit a request for formal consultation to comply with section 7 of the ESA. In response, the FWS or NOAA Fisheries would issue a Biological Opinion as to whether or not the federal action would likely jeopardize the continued existence of a listed species or result in the destruction or adverse modification of designated critical habitat. In compliance with section 7, the FERC requests that the FWS and NOAA Fisheries consider this final EIS as the BA for the Weaver's Cove LNG Project.

For purposes of this environmental analysis, special status species of plants and animals include:

- species that are listed by the federal government as endangered or threatened; and
- species listed by Massachusetts and Rhode Island as endangered, threatened, or species of concern.

With assistance from Weaver's Cove Energy, we informally consulted with the FWS, NOAA Fisheries, DFW, DMF, and the Natural Heritage and Endangered Species Programs of the DEM and DEP to assess impacts on special status species. These agency consultations resulted in the identification of five federal[16] and three state special status species (one of which is also a candidate for federal protection) that might occur in the project area. In addition to the species identified during informal agencies consultations specific to the Weaver's Cove LNG Project, NOAA Fisheries identified in its comments on the KeySpan LNG Facility Upgrade Project that federally listed whales, in particular the North Atlantic right whale, have a potential to occur in the offshore waters that would be transited by LNG ships. These nine species are listed in table 4.7-1.

The FWS stated that one federally listed species, the bald eagle, could only occur in the project area as a transient. Thus bald eagles would not be expected to regularly occur in the area. If present as transients, eagles could use but would not be dependent on the resources found in the project area. Consequently, bald eagles would not be disturbed by construction or operation activities and the proposed project would have no effect on bald eagles. Therefore, this species does not require consideration in this NEPA analysis.

### 4.7.1 Federally Listed Threatened and Endangered Species

#### Sea Turtles

Four sea turtle species were identified by NOAA Fisheries as having the potential to occur near the project area. The leatherback and Kemp's ridley sea turtles are federally listed (and state-listed) as

[16] All five of the federally listed species are also state-listed in Massachusetts as either endangered or threatened.

activities would be restricted to daytime hours to prevent nighttime noise impacts. The estimated noise levels generated by other construction equipment are provided in table 4.11.2-3.

TABLE 4.11.2-3

**Noise Levels from Various Construction Equipment/Activities**

| Equipment/Activity | Noise Level (dBA) at 50 feet |
|---|---|
| Backhoe a/ | 82 |
| Mobile Crane a/ | 81 |
| Truck a/ | 80 |
| Generator a/ | 79 |
| Clamshell dredge b/ | 67 at 250 feet |
| Tugs b/ | 82 |

a/ Noise level data are based on BBN, 1977
b/ Noise levels based noise estimates from the May 1998 Final Environmental Impact Statement/Environmental Impact Report and Final Feasibility Study prepared by the Port of Oakland and the U.S. Army Corps of Engineers for the Oakland Harbor Navigation Improvement (50-foot) Project
dBA decibels of the A-weighted scale

Dredging and dredge stabilization would occur up to 24 hours per day for the entire 3-year construction period. Dredging would include the use of tugs and excavators while dredged material offloading and stabilization would include conveyors, a pug mill, and two hydraulic excavators. The estimated noise impact from the dredged material offloading and stabilization would be 67 dBA at the nearest residence in Fall River (875 feet away) and 59 dBA at the nearest residence in Somerset (2,250 feet away). This equates to nighttime noise level increases of 16.0 dBA at the nearest residence in Fall River and 8.6 dBA at the nearest residence in Somerset. These noise estimates do not include any reductions from the earthen berm and landform that would be constructed onsite. This berm and landform would be expected to provide a minimum noise reduction of about 10 dBA at noise receptors east of the terminal site. The noise reduction would be dependent on the size and location of the landform relative to the noise receptor and the construction activity. The landform would require approximately 24 months of development before it could sufficiently reduce noise. Therefore, Weaver's Cove Energy may install temporary noise barriers or other mitigation until such time as the landform is sufficient to effectively reduce noise if it is determined that this noise mitigation is necessary to comply with the FERC noise standard of 55 dBA $L_{dn}$. The dredging equipment would be moving periodically; however, the most significant period of time at any one general location would be in the turning basin. The dredging equipment operating in the turning basin would be located as close as 650 feet from residences in Somerset and 1,300 feet from residences in Fall River. Using the noise levels in table 4.11.2-3, we performed an analysis to estimate the maximum noise impact from dredging operations (assuming one dredge and one tug). Based on this analysis, we estimate the maximum noise level attributable to the dredging equipment would be 62.3 dBA at the nearest residence in Somerset and 56.2 dBA at the nearest residence in Fall River. This equates to nighttime noise increases of 11.5 dBA and 6.3 dBA at the nearest residents in Somerset and Fall River, respectively. Because the dredging and dredged material stabilization activities would potentially exceed 55 dBA $L_{dn}$ at the nearest NSA and would potentially occur 24 hours per day for approximately 3 years, **we recommend that:**

- **Weaver's Cove Energy prepare a noise mitigation plan to ensure that the dredging, offloading, and stabilization operations do not contribute more than 55 dBA $L_{dn}$ to the ambient noise level at any noise sensitive area and file the plan with the Secretary <u>prior to construction</u>.**

Stabilized dredged material would be used to raise the overall grade of the LNG site and to create an earthen berm and landform. The dredged material would not be susceptible to liquefaction; however, the slopes of the berm and landform and the shoreline stabilization structures would require final engineering design to ensure their stability. We have recommended that these final engineering designs be submitted for our review and approval before commencing with site construction.

It is unlikely that any tsunami or hurricane storm surge would occur of sufficient magnitude to impact the project. The proposed construction of the LNG terminal would include raising the overall elevation of the site, fortifying the existing sea wall, and constructing a berm around the facility, further reducing the potential for ocean-derived flooding or flash flooding to impact the site. Potential effects associated with high rainfall events would be mitigated by implementing the FERC Plan and Procedures, and Weaver's Cove Energy's Erosion and Sedimentation Control Plan.

**Soils and Sediments**

Construction of the proposed LNG terminal would permanently affect soils on the site and disturb sediments in the federal navigation channel and turning basin. Dredged sediments would be placed on the proposed LNG terminal site to raise the grade above the 100-year floodplain and to create an earthen berm and landform. Due to the generally level topography of the site, runoff and erosion of the native soils on the site would be minimal. The placement of the dredged material on the site would change the existing topography particularly in the area of the berm and landform, which would increase the potential for runoff and erosion. Weaver's Cove Energy would minimize erosion and sedimentation impacts during construction by implementing the mitigation measures specified in our Plan and Procedures as well as the measures specified in its site-specific Erosion and Sedimentation Control Plan. Furthermore, Weaver's Cove Energy would minimize potential soil contamination during construction by implementing the preventative and mitigative measures specified in its onshore and offshore SPCC Plans. The potential for runoff and erosion during operation of the LNG terminal facilities would be minimized by revegetating disturbed soils and implementing a permanent stormwater management system.

An existing federal navigation channel and turning basin would require maintenance and improvement dredging to accommodate the deep-draft LNG ships. Dredging operations conducted to meet the navigational requirements of the project would disturb about 2.6 million cubic yards of sediment. The dredged sediment would be loaded onto barges or scows and then transported to the LNG terminal site. The sediment would be stabilized with portland cement and used as engineered fill material on the LNG terminal site. We determined and Weaver's Cove Energy documented that the site could accommodate the reuse of all the dredged sediments (including 2-feet of overdredged sediment).

In contrast to our original review of the dredged materials, the revised analysis indicates the presence of a hotspot of various contaminants. Core TB-10 in the turning basin contains concentrations of a number of contaminants that are considerably higher than those same constituents in nearby cores. Based on our identification of this core as a hotspot for a number of contaminants, we believe that the sediment from this core and its immediate surroundings may need to be excavated separately from the remaining sediments in the turning basin, if the dredging is approved. However, because the dredging and management of contaminated sediments is largely an issue under the COE's jurisdiction, we have recommended that Weaver's Cove Energy consult with the COE regarding the appropriate method(s) for dredging and managing the sediment from turning basin core 10 and its immediate vicinity.

In accordance with the MCP requirements (310 CMR 40.0000), the sediment was comprehensively sampled and analyzed for COCs to evaluate potential risks from the reuse of the sediment on an upland site. Our analysis indicates that the concentrations of oils and other hazardous material in the proposed dredged sediment would pose no significant risk to human health. The analysis

indicates that the non-cancer risks for each receptor are less than the risk limit of 1.0 and the cancer risks are less than the risk limit of $1x10^{-5}$. In addition, none of the exposure point concentrations exceed Upper Concentration Limits.

A comparison of the 90th-percentile concentrations of PAHs and metals in the dredged sediments with background concentrations of PAHs and metals in soils (as determined by the DEP) indicates that none of the PAH concentrations exceed the most conservative DEP-defined background concentrations and many of the metals quantified in the dredged sediment may be attributable to background conditions as defined by the DEP. The COCs in dredged sediment that exceeded background levels were beryllium, chromium, lead, mercury, selenium, and silver. Although these six metals exceed DEP-defined background concentrations, only the concentration of beryllium exceeds the MCP S-1 soil standard. Based on additional testing conducted by Weaver's Cove Energy, the maximum concentration of beryllium in the existing site soils was comparable to those in the dredged sediment, indicating that the proposed reuse of the stabilized sediment would not introduce a contaminant to the site that is not already present.

As requested by the DEP, Weaver's Cove Energy conducted additional testing of the soils at the LNG terminal site to provide a further basis for compliance with the anti-degradation provision of the MCP. A revised Method 3 Risk Assessment based on the existing soil data from Shell Oil and the additional soil data generated by Weaver's Cove Energy indicates that upland placement of the dredged material at the LNG terminal site would pose no significant risk to human health or the environment. Our analysis of the upland reuse of the dredged sediments relative to the anti-degradation provision of the MCP indicates that upland reuse of the sediments would generally not create a reportable concentration (except for those constituents already present on the site that exceed their MCP reporting concentrations). Reuse of the sediments would result in increased concentrations of most metals at the site. However, these increases would not result in the exceedance of a reportable concentration for any metal except beryllium. As noted above, beryllium is present in the site soils; therefore, upland reuse of the sediments would not introduce a new contaminant to the site. In addition, the local background level of beryllium is likely to be higher than the DEP-published value of 0.9 mg/kg due to stack emissions from the two coal-fired power plants in Somerset.

The DEP has not yet made a final determination regarding the proposed upland reuse of the dredged material at the LNG terminal site. If the DEP does not determine that Weaver's Cove Energy's proposed upland reuse of the dredged sediments complies with the anti-degradation provision of the MCP, Weaver's Cove Energy would not be able to use the proposed site for upland placement of the dredged material. If this occurs, Weaver's Cove Energy would need to identify an alternative disposal site. For this reason, we have recommended that Weaver's Cove Energy provide a revised sediment placement plan if it is unable to verify the consistency of the proposed sediment reuse plan with the MCP.

Weaver's Cove Energy conducted Tier III testing of the sediments to determine their suitability for open water disposal. Weaver's Cove Energy's analysis of these results indicates that most of the proposed dredged material would be suitable for open water disposal. However, the COE and EPA are currently reviewing the Tier III testing results and have not concurred with Weaver's Cove Energy's determination regarding the suitability of the material for offshore disposal. Any alternative disposal options, including open water disposal, identified by Weaver's Cove Energy would require additional environmental review and FERC approval prior to dredging or construction of any of the proposed facilities.

The placement and reuse of dredged sediment at the proposed LNG terminal site could potentially improve the current site conditions by effectively isolating any soil hot spots for lead and LNAPL from potential receptors. The proposed LNG terminal site would be covered by between 5 and 25 feet of

stabilized dredged material. Our preliminary analysis indicates that this volume of stabilized fill would generally isolate any hot spots for lead contamination from potential receptors. However, those areas with the smallest thickness of fill (e.g., the area inside the LNG containment berm) may not completely isolate all potential receptors from LNAPL vapor contact. Because the calculations necessary to make a final determination of the potential for isolation of hotspots for lead and LNAPL must be carried out by an LSP, we have recommended that Weaver's Cove Energy provide the appropriate grading plans, cross section drawings, and risk assessments required to demonstrate the degree of isolation provided by the upland reuse of stabilized dredged materials.

Construction of the proposed pipelines would disturb soils and increase the potential for soil erosion and loss of soil productivity. Weaver's Cove Energy would control erosion and sedimentation during construction of the pipelines and ensure restoration of soil productivity by implementing the mitigation measures specified in our Plan and Procedures.

**Water Resources**

Groundwater

Construction and operation of the project would not have a significant impact on public or private drinking water supplies, or availability. No public or private drinking water wells or springs are known to be located within 150 feet of the project, and there are no federal or state sole-source aquifers, protected aquifers, or wellhead protection areas in the project area.

Soil and groundwater at the LNG terminal site are contaminated with petroleum from prior petroleum storage and distribution activities. LNAPL has been identified on the water table and active groundwater remediation is being performed in accordance with the MCP. The primary purpose of the groundwater remediation system is to recover LNAPL and prevent free product and contaminated groundwater from entering the Taunton River.

We have determined that placement of stabilized dredged material on the site, the installation of stone columns beneath the storage tank and the modification to the existing timber bulkhead would have minimal impacts on groundwater quality, the groundwater and contaminant flow regime, and the on-going remediation efforts. We also do not believe that use of the dredged material would further degrade existing site conditions. However, in accordance with the MCP, Weaver's Cove Energy must monitor groundwater levels and the effectiveness of the remediation system during project construction, and implement measures to prevent LNAPL or other contaminant migration to the Taunton River, shall monitoring indicate that it may occur. The DEP has stated that the construction of this facility requires Weaver's Cove Energy to conduct a response action and to be included on the Tier 1B Permit as a responsible party, potentially responsible party, or other party. Modifications to the existing remediation system may require that a revised Phase IV Remediation Plan, Phase V Operations and Maintenance Plan, and Remedial Operation Status Plan be submitted to the DEP.

Construction of the proposed pipelines could temporarily affect groundwater along the pipeline routes by increasing turbidity, causing fluctuations in ground water flow, and disrupting groundwater discharge. These effects would be mitigated by Weaver's Cove Energy's plan to backfill the trench with native material and restore natural contours and drainage patterns in accordance with our Plan.

The pipeline routes would pass near at least two known contaminated sites. Groundwater could be affected if contaminated soils or groundwater associated with these sites are encountered during construction. Groundwater could also be impacted by a spill of hazardous material during construction of both the LNG facilities and the proposed pipelines. Weaver's Cove Energy would implement their SPCC

Plan that would mitigate the potential for and impact of any spills of hazardous materials. We have also recommended that prior to construction, Weaver's Cove Energy prepare a plan for the discovery and management of contaminated soils or groundwater to address potential impacts if contaminated soils or groundwater are encountered during construction.

Surface Water

The proposed dredging of the federal navigation channel and turning basin would result in the excavation and removal of up to about 2.6 million cubic yards of sediment from the Taunton River and Mount Hope Bay. The primary impact on water quality associated with this dredging would be the resuspension of sediment in the water column. The suspended sediment could reduce light penetration and lower the rate of photosynthesis and aquatic productivity of an area; introduce organic material and/or nutrients which could lead to an increase in biological oxygen demand and reduce dissolved oxygen; and release chemical constituents. Water quality could also be impacted if there is a spill of hazardous material into the water during construction.

Sediment fate and transport modeling indicates that suspended sediment impacts associated with proposed dredging activities would be temporary and primarily localized to the dredging areas. Our analysis indicates that contaminants associated with the dredged sediment would not likely pose a significant hazard. Elutriate tests indicate that most chemicals would remain tightly bound to the sediments and would not be released in significant quantities into the water column. Elutriate testing suggests that only copper and zinc in the sediments would be released into the water in concentrations that exceed EPA-published acute and chronic exposure-based screening criteria. We believe both of these metals would be quickly diluted by the surrounding river water and would not pose a substantial risk to the aquatic environment. Additionally, the DEP has indicated that Weaver's Cove Energy would need to develop a water quality monitoring program to evaluate the amount and extent of suspended sediment in the water column; determine if elevated levels of suspended sediments extend beyond the mixing zone; and ensure that Massachusetts' state surface water quality standards and criteria are met at the edge of the mixing zone.

Construction activities at the LNG terminal site could also affect the water quality of the Taunton River. Sediment dewatering and silt-laden stormwater runoff from the construction site could increase suspended sediment and turbidity levels in the river. Weaver's Cove Energy would minimize impacts of construction activities on water quality by implementing the erosion control measures in our Plan and Procedures, developing and adhering to a site-specific Erosion and Sedimentation Control Plan and a SPCC Plan, and complying with the requirements of its NPDES permits. Impacts on the Taunton River would also be minimized by Weaver's Cove Energy's implementation of a Stormwater Management Plan.

Construction of the Northern and Western Pipelines would require the crossing of 4 perennial and 11 intermittent streams. The largest of the perennial waterbodies is the Taunton River, which is approximately 2,200 feet wide at the proposed crossing location. Weaver's Cove Energy proposes to open-cut the river using the same dredging equipment that would used to excavate the federal navigation channel and turning basin. The material dredged from the pipeline trench would be placed on the LNG terminal site. Following installation of the pipeline, the trench would be backfilled with coarse-grained native sediments. We evaluated the potential to use the HDD technique to minimize impacts on the Taunton River but determined that an HDD crossing is not a practical alternative that provides a clear environmental advantage over the open-cut crossing method. Subsurface conditions at the proposed crossing locations appear to be unsuitable for the HDD technique and the presence of roads and a railroad adjacent to the river would interfere with fabrication of the pipe segment required for a HDD crossing.

The other 14 waterbodies vary in width from 3 to 12 feet. None of these streams are navigable and one of the perennial waterbodies, Steep Brook, is contained in a culvert at the proposed crossing location and would not be affected by the installation of the Northern Pipeline. The remaining 13 waterbodies would be crossed using the open-cut construction technique.

The potential effects of pipeline construction on waterbodies crossed using open-cut methods would be similar to those described for dredging. Weaver's Cove Energy would mitigate the impact of open-cut construction by implementation of a project-specific SPCC Plan and adherence to our Procedures.

Weaver's Cove Energy is currently planning to obtain water from the City of Fall River for hydrostatic testing of the LNG storage tank, LNG plant piping, and the sendout pipelines. If the City denies the use of its water or otherwise is unable to provide the water, Weaver's Cove Energy indicated that hydrostatic test water would be obtained directly from the Taunton River. After the hydrostatic testing is completed, Weaver's Cove Energy is proposing to discharge the test water directly into the Taunton River over a period of several days. The water would be filtered prior to discharge and would be returned at a rate and location that would minimize bottom disturbance and potential impacts on aquatic resources. The discharge of hydrostatic test water would be conducted in accordance with the FERC Procedures and the NPDES permit(s) issued by the DEP and/or EPA. The discharge of water would also be controlled, as necessary, to prevent erosion or scouring of the banks or bed of the river. Weaver's Cove Energy would coordinate with the City of Fall River to ensure that water requirements for hydrostatic testing from municipal sources would not impact public water availability.

**Wetlands**

Stabilization of the shoreline and construction of the ship unloading facility on the southern parcel would result in the filling of 0.04 acre of estuarine salt marsh, 0.94 acre of other intertidal habitat, and 0.19 acre of subtidal habitat, as well as impact a number of other state regulated wetland resources. Development of the northern parcel would fill 1.9 acres of palustrine emergent/scrub-shrub wetlands. Dredging of the federal navigation channel and turning basin would affect another 191 acres of subtidal habitat and about 0.23 acre of intertidal habitat. Construction activities on the terminal site would also alter the location of the coastal bank and reduce the area subject to coastal storm flowage. The filling of these resource areas would reduce the amount of habitat available to aquatic resources, reduce the amount of sediment available for the replenishment of coastal beaches, and alter sediment transport processes. However, the sheetpile used to armor the shoreline would also provide certain benefits, such as protecting the upland areas from storm damage and flooding.

Construction of the Northern and Western Pipelines would disturb about 2.82 acres of wetlands. Clearing, trenching, and other activities in wetlands could also affect wetland hydrology and water quality. The operation of heavy equipment in these wetlands could also compact wetland soils, create ruts, and result in increased sedimentation and turbidity. In addition, the pipeline trench could act as a conduit for subsurface water flow which could impact wetland hydrology. Following construction, about 0.47 acre of forested and scrub-shrub wetland would be converted to other wetland types; however, there would be no net loss of wetlands resulting from construction and operation of the pipeline facilities. Wetlands within the maintained segments of the permanent easement would re-establish as emergent wetlands, non-maintained areas of the permanent easement would revert to pre-construction wetland conditions, and wetlands within the temporary construction work area would also revert back naturally to their former state.

Weaver's Cove Energy took steps to avoid wetland impacts during the development of the project. For example, the LNG terminal facilities and dredge disposal areas were configured to avoid

several wetlands bordering the river on the southern parcel of the terminal site and the pipelines make use of existing rights-of-way to the maximum extent practical. Weaver's Cove Energy realigned a portion of the Northern Pipeline route since issuance of the draft EIS to increase the distance between the construction right-of-way and the Taunton River to avoid indirect impacts on wetlands bordering the river. Since issuance of the draft EIS, Weaver's Cove Energy has adopted two other route variations into the proposed Northern Pipeline route that would further reduce wetland impacts.

Weaver's Cove Energy proposes to minimize impacts on wetlands that cannot be avoided by implementing the protective measures specified in our Procedures. These measures would include installing sediment barriers where appropriate to contain and control sediment and prevent silt-laden runoff from entering wetlands; using construction mats or other stabilization measures to minimize the disturbance of wetland soils; segregating topsoil from the trench in unsaturated wetland soils; leaving existing root systems in place to the extent practicable to facilitate wetland revegetation; and installing trench breakers as necessary to prevent the draining of wetlands.

Weaver's Cove Energy proposes to compensate for permanent wetland impacts at the LNG terminal site that cannot be avoided or minimized by developing and implementing a Wetland Mitigation Plan. This plan includes the restoration and creation of about 0.74 acre of salt marsh on the site and the creation of about 0.18 acre of freshwater wetland on the site. About 0.13 acre of tidal creek would be constructed in the restored and created salt marsh to connect this area with the Taunton River. Additionally, about 0.18 acre of freshwater wetland would be created in an upland area. We have recommended that Weaver's Cove Energy consult with the COE and NOAA Fisheries regarding mitigation of wetlands as well as intertidal and subtidal habitats and file with the Secretary the results of these consultations and the COE-approved Wetland Mitigation Plan prior to construction.

**Vegetation**

The proposed LNG terminal site is located on industrial/commercial land with some remnant forest land, open land, and intertidal vegetation communities. Development of the LNG terminal would result in the permanent clearing of about 10.7 acres of forest land and the disturbance of 5.1 acres of vegetated open land. Following construction, portions of the site that are not covered by buildings, roads, gravel, or other hard surfaces would be restored and revegetated. Weaver's Cove Energy would also implement a landscape design plan that would include various plantings.

Construction of the Northern and Western Pipelines would disturb about 56.6 acres of vegetation consisting of 5.4 acres of upland forests, 39.6 acres of upland shrub lands, 6.6 acres of upland fields, 2.8 acres of wetlands, and 2.2 acres of landscaped lawns. Impacts on fields, lawns, and emergent wetlands would be temporary and short term. Impacts on trees and other woody vegetation would be longer term and about 3.9 acres of forest land on the permanent right-of-way and meter and regulation station sites would be permanently cleared. Weaver's Cove Energy has minimized the amount of woody vegetation that would be affected along the pipeline routes by colocating the proposed pipelines with existing, previously cleared rights-of-way.

Following construction, the portions of the construction rights-of-way that are not required for pipeline operations would be seeded with grasses and allowed to revert to their previous preconstruction condition through natural succession. The permanent right-of-way would also be restored with grasses, and operational impacts on vegetation would be minimized by the vegetation maintenance practices specified in our Plan and Procedures.

**Wildlife and Aquatic Resources**

Construction activities associated with the proposed LNG terminal and sendout pipelines could affect wildlife habitat through the cutting, clearing, and/or removal of existing vegetation within the construction work area. Wildlife would be temporarily displaced during construction and the limited removal of forest vegetation would have a localized, but long-term impact on wildlife. Weaver's Cove Energy would minimize these impacts by colocating the pipelines with other existing rights-of-way where possible, which would minimize the amount of forest clearing needed for the project.

The proposed maintenance and improvement dredging and shoreline modifications would have both direct and indirect impacts on aquatic resources including fish, shellfish, and benthic organisms. Direct alteration of the benthic substrate via dredging would remove the existing benthic community and may adversely affect prey species, suitable cover, settlement structure, and/or nursery and spawning habitat. Dredging would also directly impact an estimated 21 acres of suitable quahog habitat in the proposed turning basin. To mitigate impacts on quahogs and other shellfish from the development of the turning basin, Weaver's Cove Energy has indicated that it would coordinate with federal and state agencies to harvest and relay quahogs from the proposed dredging footprint prior to commencement of dredging activities and to develop and fund a plan to reseed quahogs in those areas where quahogs were harvested. In response to comments regarding the appropriateness of Weaver's Cove Energy's proposed quahog mitigation measures, we have recommended that Weaver's Cove Energy complete the coordination with applicable federal and state agencies regarding development and funding of mitigation measures to offset impacts on quahogs resulting from dredging of the proposed turning basin expansion.

Dredging and construction of the ship unloading facility and proposed shoreline modifications would also suspend sediment in the water column. These effects would mostly result in the temporary disturbance and displacement of aquatic organisms during construction. In addition, site runoff during project operations and prop wash associated with the transit of LNG ships could affect aquatic organisms.

Weaver's Cove Energy conducted elutriate tests and computer simulation modeling to investigate potential impacts of dredging on aquatic resources. As mentioned above, elutriate testing suggests that although some chemicals could be released into the water, the concentrations of these chemicals is unlikely to pose a significant hazard. Our analysis indicates that no species or life stage would be exposed to sublethal or lethal suspended sediment concentration levels during dredging.

Modeling results indicated that based on the proposed dredging plan, no life history stage of any species, other than winter flounder eggs, would be exposed to the minimum effects threshold during dredging. According to the results of the modeling, the redeposition of sediments from the proposed dredging could impact about 6.2 acres of winter flounder egg habitat. In addition, the dredging to expand the existing turning basin could directly affect another 11 acres of winter flounder egg habitat. To address agency concerns regarding these potential impacts, we have recommended that Weaver's Cove Energy prohibit in-water silt disturbing construction activities in the Taunton River and Mount Hope Bay during the winter flounder spawning period (January 15 through May 31) and mitigate the permanent loss of winter flounder habitat in the proposed turning basin expansion. Our recommendation requiring the time-of-year restriction to avoid adverse impacts on winter flounder would also apply to the proposed open-cut crossing of the Taunton River.

In addition to potential dredging-related impacts, pipeline construction could directly affect aquatic resources present in the waterbodies crossed by the project. An inadvertent chemical or fuel spill in or near a waterbody could release contaminants, which could adversely affect fish and other aquatic organisms. Implementation of our Procedures and Weaver's Cove Energy's SPCC Plan would minimize the potential for adverse impacts on aquatic resources.

As mentioned above, Weaver's Cove Energy may withdraw water from the Taunton River for hydrostatic testing of the LNG tank and pipelines. If so, the intake pipe would be set at a depth of 5 feet below MLLW and would be fitted with a fine mesh screen to minimize potential entrainment and impingement of aquatic organisms. As such, we believe that hydrostatic test water withdrawal would not result in adverse impacts on aquatic species.

Operational impacts of the LNG terminal would be associated primarily with the LNG ships and could include entrainment or impingement of fish during water withdrawals for ship ballast and impacts from increased turbidity generated by prop wash during ship transit. Based on available ichthyoplankton density data and the maximum anticipated ballast water intake of 14 million gallons per LNG ship, we estimate that the number of fish eggs or larvae that could be affected by water withdrawals by LNG ships could be 12,349,970 eggs and 1,900,000 larvae annually depending on the time of year and the distribution of ichthyoplankton within the water column in relation to the ballast water intakes. Based on survival rates for eggs and larvae adopted from studies conducted for the Brayton Point Power Plant, we estimate that the entrainment of impingement of eggs and larvae could result in the annual loss of about 3,325 age-1 equivalent fish, of which about 86 percent would be winter flounder.

Previous studies in the Boston Harbor indicate that sediments resuspended by ship currents, including LNG ships, settle back to the substrate within a short period of time after being transported relatively short distances. Based on these studies, we expect there would be minimal impact from elevated TSS levels on most pelagic fish eggs and larvae because TSS concentrations shall return to background conditions within 1 hour or less of ship passage. The measured widths of the resuspended sediment plumes in the Boston Harbor studies suggest that the plumes would generally remain within the Taunton River navigation channel and the remobilized sediments would likely have limited impacts on demersal fish eggs and larvae outside this channel.

The potential introduction of invasive species is another possible effect of LNG shipping. Several factors, however, mitigate the potential for LNG ships to introduce invasive species to the project area, including but not limited to the fact that the LNG ships would not discharge ballast water into Mount Hope Bay or the Taunton River. We also note that under a new international convention adopted by the International Maritime Organization the LNG ships would have to carry a Ballast Water Record Book and carry out ballast water management procedures to a specified standard. The Coast Guard has also developed *Mandatory Practices for All Vessels with Ballast Tanks on All Waters of the United States*. Moreover, in February 2005, the Ballast Water Management Act of 2005 was introduced to Congress to amend the Non-indigenous Aquatic Nuisance Prevention and Control Act to establish vessel ballast water management requirements.

NOAA Fisheries reported that the Taunton River and Mount Hope Bay have been designated as EFH for 14 federally managed species including: windowpane flounder, winter flounder, red hake, Atlantic mackerel, black sea bass, bluefish, scup, Atlantic herring, scup, and summer flounder. The draft EIS included an EFH Assessment as necessary for compliance with the MSA. This analysis is also included in this final EIS. As a result of our analysis as presented in the EFH Assessment, we have concluded that dredging associated with the proposed project could affect water column, benthic substrate, and man-made structure EFH in the project area. Activities within the Taunton River and Mount Hope Bay also have the potential to affect anadromous fish and shellfish resources, two primary prey groups for managed fish species. Without revisions to the current proposed dredging program, impacts on managed species as a result of benthic habitat destruction and alteration could include direct and indirect impacts on winter flounder spawning habitat during the flounder spawning period. The draft EIS was sent to NOAA Fisheries along with a letter that initiated consultation under the MSA. Based on its review of the EFH Assessment included in the draft EIS, NOAA Fisheries provided conservation recommendations to further avoid, minimize, and mitigate adverse effects on EFH, including:

- prohibiting in-water silt-producing activities between January 15 and May 31 of any year to protect winter flounder spawning and juvenile development;
- requiring mitigation to offset permanent loss of winter flounder spawning and juvenile development habitat resulting from expansion of the turning basin; and
- requiring mitigation to offset the placement of fill within intertidal, salt marsh, and subtidal areas during site development.

We agree with these conservation recommendations and believe additional measures would be necessary to mitigate for benthic habitat destruction and alteration, including direct and indirect impacts on winter flounder spawning habitat. For this reason, we have recommended that Weaver's Cove Energy avoid in-water, silt disturbing construction activities during the winter flounder spawning period (January 15 through May 31), develop a mitigation plan in consultation with federal and state agencies to offset permanent loss of winter flounder spawning and juvenile habitat, and continue developing its proposed wetland mitigation plan to compensate for permanent impacts on wetlands, including intertidal and subtidal habitats.

**Threatened and Endangered Species**

The FWS reported that one federally listed species under its jurisdiction, the bald eagle, could potentially occur near the proposed project. NOAA Fisheries identified four additional federally listed endangered or threatened turtle species that could potentially occur in the general vicinity of the proposed project. We have determined that the project would have no effect on the bald eagle and is not likely to adversely affect the four turtle species.

In its comments on the draft EIS for another nearby project (*i.e.,* the KeySpan LNG Facility Upgrade Project), NOAA Fisheries stated that an increase in vessel traffic in Narragansett Bay could potentially affect federally listed marine mammals as a result of vessel strikes. Of particular concern is the North Atlantic right whale. NOAA Fisheries has developed a Strategy to Reduce Ship Strikes of Right Whales, which is not yet finalized, but would establish speed restrictions within 20 to 30 miles of the approaches in specific areas. In addition, the Coast Guard has been coordinating with NOAA Fisheries on various measures to reduce vessel strikes. We have determined that these measures are important for the protection of right whales from ship strikes, but because the proposed rule has not yet been finalized or implemented, we have recommended that Weaver's Cove Energy coordinate with NOAA Fisheries to determine appropriate speed and seasonal restrictions or other applicable measures to avoid or minimize impacts on right whales and to file the results of that coordination with the Secretary of the Commission. With the adherence to restrictions developed through coordination with NOAA Fisheries, we conclude that the project is not likely to adversely affect North Atlantic right whale (or other federally listed species) and are requesting NOAA Fisheries' concurrence with this finding.

The draft EIS (which served as a Biological Assessment) was sent to the NOAA Fisheries along with a letter that initiated consultation under section 7 of the ESA. We have not yet received a concurrence letter from the NOAA Fisheries on our determinations.

**Land Use, Recreation, and Visual Resources**

The LNG terminal would be developed on 73 acres of industrially zoned private property (consisting of a 55-acre southern parcel and an 18-acre northern parcel) that Weaver's Cove Energy has an option to purchase from Fall River Marine, L.L.C., who is the current landowner. The 55-acre

maintaining the project storage capacities, could not be reasonably achieved. Additionally, we considered an alternative site layout that would not include the landform created by the disposal of dredged materials on the LNG terminal site.

Our alternatives analysis included the evaluation of alternative pipeline routes that would allow delivery of natural gas to the Algonquin natural gas pipeline system. Because of the limited capacity of the Algonquin system laterals, no single pipeline from the LNG terminal would be able to accommodate the project volumes. Alternative pipeline routes to the east and south of the LNG terminal would both result in greater environmental impacts than either the Northern or Western Pipeline. To avoid or minimize environmental impacts from construction of the pipelines, we also examined route variations to the proposed pipelines.

We determined that construction of the Northern Pipeline would remove buffer vegetation between the railroad and the river, which could result in direct and indirect impacts on the Taunton River and bordering salt marsh (i.e., increase risk of sedimentation). As an alternative, we recommended in the draft EIS that Weaver's Cove Energy adopt a minor route variation on the east side of the CSX railroad between MP 0.26 and 0.55 to increase the distance between the construction right-of-way and the river. We also recommended in the draft EIS that Weaver's Cove Energy adopt or evaluate the feasibility of minor route variations between MPs 0.68 and 0.91 and between MPs 1.89 and 2.43 of the Northern Pipeline route to increase the distance between the construction right-of-way and residential structures. In its comments on the draft EIS, Weaver's Cove Energy agreed to adopt our recommended route variations along the Northern Pipeline route as part of its proposed pipeline route. Based on additional discussions with the Fall River Country Club, Weaver's Cove Energy suggested expanding the variation we recommended between MPs 1.89 and 2.43 to include the area between MPs 1.58 and 2.43 to minimize impacts on operation of the golf course. We agree that the modified variation between MPs 1.58 and 1.89 is environmentally preferable to the corresponding segment of the original route.

In the draft EIS, we recommended that Weaver's Cove Energy evaluate the feasibility of a realignment between MPs 1.5 and 1.9 of the Western Pipeline route to minimize visual impacts on residences along Jaffrey Street. In response to this request, Weaver's Cove Energy made adjustments to permanent easements and temporary workspaces to mitigate potential effects on stone walls and trees that are on those properties impacted by the proposed route. We believe these modifications would adequately minimize residential impacts along Jaffrey Street by avoiding vegetation clearing which currently screens the transmission lines. Weaver's Cove Energy's development of site-specific residential plans would include measures to further minimize residential impacts along this segment.

Finally, we reported on dredging and dredge disposal alternatives that might avoid or minimize impacts associated with dredging up to about 2.6 million cubic yards of sediment from the Mount Hope Bay/Taunton River federal navigation channel and turning basin. Alternatives requiring less dredging would not be able to safely accommodate LNG ships. Additionally, we summarized disposal alternatives including offsite upland reuse, offsite upland disposal (landfill or dewatering), offshore disposal, confined aquatic disposal cells, confined disposal facilities, and island/habitat creation. Based on consultations with other agencies, we analyzed the impact of restricting dredging during times of the year when sensitive aquatic organisms (e.g., winter flounder, anadromous species) could be adversely affected and we considered offshore disposal of dredged materials in more detail. Based on the new/existing Brightman Street Bridge construction delays, we believe that our recommended time-of-year restriction to avoid dredging from January 15 to May 31 to minimize impacts on winter flounder would not impact the in-service date of the project or necessitate offshore disposal. Additionally, we believe that the offshore disposal alternative would be environmentally acceptable if the assessment of contaminants in the materials demonstrates that a significant volume of sediments are suitable for offshore disposal. However, we have also determined that offshore disposal of suitable dredged material is not without

impacts and is not clearly environmentally preferable to Weaver's Cove Energy's proposed reuse of the dredged material as general site fill at the LNG terminal site. This conclusion assumes that Weaver's Cove Energy is able to resolve the regulatory and legal disputes of its proposed sediment reuse plan at the LNG terminal site.

## 5.2 FERC STAFF'S RECOMMENDED MITIGATION

If the Commission issues any authorization for the proposed project, we recommend that the Commission's Order include measures 1 through 76. We believe that these measures would further mitigate the environmental impacts associated with construction and operation of the proposed project.

1. Weaver's Cove Energy shall follow the construction procedures and mitigation measures described in its application, supplemental filings (including responses to staff data requests), and as identified in the environmental impact statement (EIS), unless modified by the Federal Energy Regulatory Commission's (FERC or Commission) Order. Weaver's Cove Energy must:

   a. request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);
   b. justify each modification relative to site-specific conditions;
   c. explain how that modification provides an equal or greater level of environmental protection than the original measure; and
   d. receive approval in writing from the Director of the Office of Energy Projects (OEP) **before using that modification.**

2. For pipeline facilities, the Director of OEP has delegation authority to take whatever steps are necessary to ensure the protection of all environmental resources during construction and operation of the project. This authority shall allow:

   a. the modification of conditions of the Commission's Order; and
   b. the design and implementation of any additional measures deemed necessary (including stop work authority) to assure continued compliance with the intent of the environmental conditions as well as the avoidance or mitigation of adverse environmental impact resulting from project construction and operation.

3. For LNG facilities, the Director of OEP has delegated authority to take all steps necessary to ensure the protection of life, health, property, and the environment during construction and operation of the project. This authority shall include:

   a. stop-work authority and authority to cease operation; and
   b. the design and implementation of any additional measures deemed necessary to assure continued compliance with the intent of the conditions of this Order.

4. **Prior to any construction**, Weaver's Cove Energy shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, environmental inspectors (EIs), and contractor personnel will be informed of the EI's authority and have been or will be trained on the implementation of the environmental mitigation measures appropriate to their jobs before becoming involved with construction and restoration activities.

5. The authorized facility locations shall be as shown in the EIS, as supplemented by filed alignment sheets, and shall include the staff's recommended facility locations. **As soon as they are available, and before the start of construction**, Weaver's Cove Energy shall file with the