IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| WEAVER'S COVE ENERGY, LLC,<br><br>*Plaintiff*,<br><br>vs.<br><br>RHODE ISLAND COASTAL RESOURCES MANAGEMENT COUNCIL, *et al.*,<br><br>*Defendants*. | ) | Case No. 07-246-S |

**DECLARATION OF GEORGE F. "TED" GEHRIG**

George F. "Ted" Gehrig, President of Weaver's Cove LNG, LLC ("Weaver's Cove"), hereby declares:

1. In my capacity as President of Weaver's Cove, I have been involved in the filing of applications and supporting documents before the Rhode Island Coastal Management Resources Council ("CRMC") and the U.S. Army Corps of Engineers ("USACE") in proceedings related to the proposal of Weaver's Cove to undertake dredging activities in Rhode Island and Massachusetts waters.

2. I have reviewed two documents filed in the captioned case: the Affidavit of Danni Goulet (dated January 10, 2008) ("Goulet Affidavit") and the State's Statement of Undisputed Facts ("CRMC SUF") (dated January 10, 2008).

3. As discussed in greater detail below, the Goulet Affidavit and the CRMC SUF contain factual misstatements that, although not material to the issues before the Court in the captioned case, merit correction.

4. Contrary to the CRMC SUF's assertion that "[i]t has become clear that (although never stated on the record before the CRMC) upland disposal is cancelled and in-water disposal is sought" (CRMC SUF ¶ 5), Weaver's Cove has not "cancelled" upland disposal. All disposal options remain under consideration.

5. The document cited in CRMC SUF (¶ 5) expressly states that "[t]wo dredge disposal alternatives remain under consideration by Weaver's Cove": namely, offshore disposal and Massachusetts upland disposal. *See* JA Tab 31 at p. 2; *see also* JA Tab 23 at p. 3-73.

6. Contrary to the CRMC SUF's assertion (¶ 12) that Weaver's Cove has proposed to the U.S. Coast Guard a "new [LNG tanker] transit plan . . . [that] would now double the annual round trips to a minimum of 120," Weaver's Cove has not proposed a "minimum" number of LNG tanker transit trips. The minimum number of round trips that could call at the proposed LNG terminal in any given year is zero.

7. The Goulet Affidavit errs when it states (¶ 4) that Weaver's Cove "proposed to perform *at least* 230,000 cubic yards of dredging on a 2.4-mile long stretch of submerged lands underlying Rhode Island waters" (emphasis added). As stated in the document cited by the Goulet Affidavit, Weaver's Cove "plans to dredge approximately 130,000 cubic yards (cy) of in-situ sediment from within the Rhode Island portion of the Federal channel," and that "the volume total inclusive of the overdredge used for upland planning capacity purposes is *approximately* 230,000 cy." JA Tab 10 at 1-2 (emphasis added).

8. Similarly, the Goulet Affidavit errs when it states (¶ 5) that Weaver's Cove "proposed to perform *at least* 2.5 million cubic yards of dredging in the 4.6-mile long stretch of submerged lands underlying Massachusetts waters" (emphasis added). As set forth in the document cited by the Goulet Affidavit, Weaver's Cove "*estimated*" that it would perform 2.35 million cy of in-situ sediment from Massachusetts waters. JA Tab 2 at 9, Table 2.

9. Contrary to Paragraph 6 of the Goulet Affidavit, Weaver's Cove did not propose "to dredge 7 days a week, 365 days per year for three

years with no windows to allow for fish propagation and migration." As explained in the Dredging Program (JA Tab 2, cited at JA Tab 23, p. 3-73), Weaver's Cove stated that "[d]redging operations are anticipated to be a 24 hour per day continuous operation," but acknowledged that "[d]redging operations are influenced by several factors including sediment characteristics, dredge cut, transport/haul distance, project calendar, seasonable weather conditions, and environmental conditions," all of which would be considered in "defin[ing] operating conditions." JA Tab 2 at 39.

10. The Goulet Affidavit suggests (at ¶¶ 13-14) that Weaver's Cove has stated that it "intends to utilize 4,000 CY scows" that could only ~~able to~~ "be filled 3/4-full with material before the free water that exudes from the dredged material that would be placed in a scow would start to overflow." From those assumptions, Goulet extrapolates that "this will limit the volume of the scows used to transport-away dredged material . . . to approximately 3,000 CY per scow per trip." *Id.*

11. The Goulet Affidavit's calculations (at Paragraph 14), however, are based on a faulty premise: It cites the 4,000-cy-per-scow capacity for dredge as the calculation of the scow's *maximum* capacity. But in fact, Weaver's Cove has told both the FERC and the USACE that it intends to use scows of varying capacities, such that the average volume of dredge material loaded on to each scow will be 4000 cy. *See*, *e.g.*, Weaver's Cove Energy LNG Project, Responses to Comments at 19 n.27 (filed at the USACE on May 17, 2006) (assuming "that capacity of the scow fleet procured ranges between 3,000 CY and 6,000 CY resulting in an average scow loaded capacity of 4,000 CY) (excerpts attached hereto as Exh. A); *see also* JA Tab 2 at 41 ("Scow/Hopper Barge of varying capacities will be employed, but between 15 to 20 4,000 cyd capacity scows are a reasonable expectation."). Even taking into account the "bulking" of dredged materials upon removal from the submerged land, Weaver's Cove estimated that each scow would carry 3,200 cy of dredged materials. Exh. A at 19. Weaver's Cove estimated that dredging would require a total of 812 laden scows. *Id.*

12. Thus, by underestimating the loaded capacity of the scows, the Goulet Affidavit (¶ 18) overestimated the total number of scow transits (and total mileage thereof) needed to move the dredged material.

13. The Goulet Affidavit (¶¶ 20-22) misdescribes the methodology by which Weaver's Cove has estimated "overdredge volumes" and "total channel depth." Mr. Goulet is correct to state that dredging plans must consider "tolerances" (¶ 20) of dredging equipment, because dredging equipment cannot create a table-top-smooth surface on the river bottom at the precise navigation depth proposed.

14. Thus, in order to ensure that dredging brings the entire surface of the river bottom to at least the navigation depth, some sediment will inevitably be removed below the navigation depth.

15. Thus, to estimate the volume of dredging, including overdredge volume, Weaver's Cove's estimates employed a two-step model. In the first step, as a simplifying assumption (which is accounted for in the second step), the proposal assumed that a dredge could create a table-top-smooth surface at exactly the navigation depth. The volume of dredge material removed from above surface was computed.

16. Then, in the second step, Weaver's Cove estimated the volume of sediment that must be removed in order to ensure that all areas to be dredged are at least as deep as the navigation depth. This second step calculates the so-called "overdredge volume."

17. In this second step, Weaver's Cove estimated that, on average, the dredge would remove a volume of an additional one foot of sediment anywhere the dredge is operated. Again, for planning estimates, the proposal assumed as a part of the calculation procedure that the dredge would create a table-top-smooth surface where the dredge was operated.

18. Thus, the proposal's model calculates the overdredge volume using two table-top-smooth surfaces: one assume to be located at the at the navigation depth, and the other located one foot below the navigation depth. The overdredge volume is calculated assuming 100% of the

material between these two theoretical surfaces is removed. This is not to imply that a table-top-smooth surface will, in fact, be created.

19. Under the model, therefore, the total projected overdredge volume constitutes the sum of (1) the material removed from above the table top surface located at the dredge depth plus (2) an assumption that 100% of the material between the two table top surfaces (one at the dredge depth and another one foot below the dredge depth as described above).

20. In actual practice some material between the two table top flat surfaces will not be removed and some material from below the deeper table top surface will be removed. Thus, it is inaccurate for Mr. Goulet to suggest that Weaver's Cove has assumed that the dredge will have a "tolerance" or "deviation" or accuracy of only one foot. *See* Goulet Aff. ¶ 22.

21. Finally, the Goulet Affidavit errs when it asserts (¶ 20) that the FEIS "estimates that the [total dredge] volume is 3.1 million cubic yards." In fact, the FEIS explains that the 3.1 million cubic yard figure referred only to the "bulked" volume of the dredged materials, after removal from the river floor, during transit on scows. Dredge materials are more tightly packed *in situ* (*i.e.*, prior to dredging). Upon removal, the sediments mix with water and "bulk," taking on a greater volume. Thus, Weaver's Cove calculated that 3.1 million cubic yards of transport capacity is what would accommodate the removal of the planned dredging volume (which was, according to that section of the FEIS, "up to 2.6 million cubic yards"). FEIS at 4-15.

22. Furthermore, Paragraphs 20 and 22 of the Goulet Affidavit assert that Weaver's Cove will achieve a dredging depth 2 feet in excess of the navigable depth of 37 feet. This is simply not true. The dredging will be completed such that the minimum depth in the Channel in RI waters is 37 feet. Weaver's Cove is not dredging to achieve a 39 foot navigable depth.

23. The Goulet Affidavit errs (at Paragraph 7) when it asserts that "a 60,000-cubic-yard portion of the anticipated material from

Massachusetts is considered not suitable for ocean disposal and had no disposal location identified." No material tested by Weaver's Cove has ever tested as not suitable for offshore disposal. Weaver's Cove never has submitted to the CRMC information purporting to indicate that any dredged material was "not suitable" for ocean disposal.

* * *

I declare under penalty of perjury that the foregoing is true and correct. Executed on ~~January~~ February 8, 2008.

Ted Gehrig