# Weaver's Cove Energy LNG Project

## NAE #2004-2355

Responses to Comments, Review of Public Interest Factors and Compliance with Section 404(b)(1) Guidelines

Section 10 of the Rivers & Harbors Act of 1899
Section 404 of the U.S. Clean Water Act
Section 103 of the Marine Protection, Research & Sancturaries Act of 1972

Weaver's Cove Energy, LLC & Mill River Pipeline, LLC
One New Street
Fall River, Massachusetts 02720

*Prepared by:*
Epsilon Associates, Inc.
3 Clock Tower Place, Suite 250
Maynard, Massachusetts 01754

*In Association with:*
Baker Botts, LLP
Concept 2 Delivery

*With Technical Assistance from:*
Applied Science Associates, Inc.
Environmental Resources Management, Inc.

May 17, 2006

of less than 135 feet, providing at least 10 feet of safe clearance for the vessels underneath these cables.

The Mount Hope Bay Bridge and the Braga Bridge both have a vertical clearance of 135 feet measured at the mean high water level. Therefore, any vessel passing beneath either bridge will, of necessity, have a minimum clearance beneath the power cables of at least 10 feet.

The existing cables which span the Taunton River south of the Brightman Street Bridge are 115 kV transmission lines. Such lines are typically constructed with approximately 5 foot long insulator strings. These insulator strings are designed to safely isolate the conductors from the transmission towers or structures. Weaver's Cove has discussed this matter with utility personnel, none of whom have indicated that there is any problem with the existing line configuration.

4. *The letter from the Tribal Historic Preservation Officer requests that consultations on impacts to historic resources include the THPO and that the THPO be a signatory to any MOA that is developed for this project. The Federal Energy Regulatory Commission (FERC) is the lead Federal Agency for consultations on compliance with the National Historic Preservation Act and we request that you forward to our office the signed MOA developed by FERC and signed by the State Historical Preservation Officer and consulting parties.*

   The MOA being developed by the FERC Staff will be forwarded to the USACE as soon as it is executed together with the SHPO and Weaver's Cove, which is expected to occur shortly. This orderly review process of historic resources by the FERC Staff will not interfere with the USACE's timely issuance of the dredging permit.

5. *Please provide additional details in response to the letter received from the USFWS dated February 7, 2006 regarding time frames for dredging between October 15 and January 15 of any year, including the maximum number of dredges and scows to be used, the scheduling and sequencing of the dredging work, and time frame for completion of the dredging, and if the transit of dredge scows for ocean disposal operations will require opening of the Brightman Street Bridge.*

   In essence, the USACE is requesting Weaver's Cove to explain how it's dredging program, which requires the removal of approximately 2.6 million cubic yards of material, could be accomplished over three dredging seasons, with each season running two and a half months in the height of the winter season. Accomplishing this aggressive dredging schedule represents a significant challenge, and Weaver's

Cove has not confirmed that it is even feasible in terms of operational practice.[24] Nevertheless, Weaver's Cove briefly addresses below the information requested by the USACE.

A Compressed Dredging Schedule Could Increase the Environmental Impacts

Prior to addressing the dredging schedule, however, it is critical that the USACE recognize that the compressed dredging schedule could increase the environmental effects of the dredging program. Weaver's Cove's initial proposal was a carefully crafted program where dredging proceeded slowly through the entire year with the slowest dredging occurring during the winter flounder spawning period. This approach resulted in a dredging program of relatively long duration, but importantly a program of relatively low impact. In order to minimize impacts, for example, Weaver's Cove proposed to implement a number of mitigating techniques, including use of closed buckets without deliberate scow overflow, as well as various restrictions on equipment use and dredging rates.

In contrast, it is not practicable to have a dredging project that is executed in a very brief period of time while still preserving these low levels of potential impact on the environment. Reasonable compromises must be made and these compromises have been made in other dredging projects around New England and the country. These compromises can result in predictable, manageable, and acceptable environmental impacts that can be reasonably mitigated. For example, in the case of the nearby Providence River dredging project, over 6 million CY of material was moved predominantly by a single very large dredge operating year round.

The sound scientific evidence that exists in the FEIS record demonstrably shows that the Weaver's Cove dredging program does not require any TOY restrictions in order to mitigate any impacts to aquatic resources. In the FEIS, it is concluded that,

*"Weaver's Cove Energy's modeling results, which are consistent with the results of field studies conducted by Bohlen et al. (1979, 1996), indicate that the sediment plume resulting from dredging would be temporary, linear in nature, and confined*

[24] For example, a number of logistical concerns would need to be addressed. A multiple number of very large dredges would be required. If the equipment broke down the project would face completion deadline uncertainties, resulting in additional disruption to the public. Weather conditions also could jeopardize project completion. Large numbers of scows and tug boats would have to be brought to the site for each short dredging season. However, it is not certain that sufficient equipment could be sourced to do the work. The mobilization and demobilization expenses would significantly increase the cost of the project. There are also questions that must be resolved with regards to restrictions on the timing of ocean disposal of the material at the RISDS (70 nautical miles round trip) and/or the MBDS (280 nautical miles round trip via the Cape Cod Canal, most of these in open ocean conditions).

*primarily to the dredged area. The modeling results also indicate that the concentration of suspended sediments in the water column would be below the minimum threshold concentrations that would result in sublethal or lethal effects on fish, shellfish, or other marine organisms in the project area. These results suggest that no species or lifestage would be exposed to sublethal or lethal suspended sediment concentrations during dredging regardless of time of year or tidal conditions. The results also suggest that organisms inhabiting the water column, including anadromous fishes and the American eel migrating through the area, would not be adversely affected by suspended sediments during the proposed dredging operations."*[25]

Notwithstanding this scientific evidence in support of its position, Weaver's Cove has sought to work with the resource agencies to ensure that their expressed concerns, as verified by the results of their scientific research, can be addressed by reasonable mitigative measures. But the development of TOY restrictions has been a very long process, and in Weaver's Cove's opinion, it has not progressed in a constructive manner based on a legitimate debate of the applicable science. In addition to refusing to support their positions with scientific analysis, these resource agencies are ignoring the reality that moving to an accelerated dredging schedule (assuming it can even be accomplished) could result in increased impacts to the environment. The reality that a compressed dredging schedule could exacerbate impacts on the environment was specifically recognized by the MADEP in its comments on the MEPA FEIR:

*MassDEP remains very concerned about the potential water quality impacts that could result if the project proponent attempts to complete the proposed dredging operations within the time restrictions recommended by the state and federal marine resource protection agencies.*[26]

Examples of these increased impacts are summarized below, in the context of the information requested by the USACE.

<u>Dredges and Dredge Scows Required and Bridge Transits</u>

Assuming a 75 day dredge season each year and a 40% loss to weather, equipment and schedule considerations, production dredging and disposal would need to be completed in 45 production days per season, or 135 days over three seasons. With a project planning volume of up to 2,600,000 CY, production and disposal rates of nearly 20,000 CY per day would need to be maintained. In turn, this would require

---

[25] See FEIS pp.4-101 to 4-102.

[26] See MADEP comments, April 7, 2006, at page 2.

six to seven 4,000 CY scows per day or more than one every 4 hours (assuming a 3,200 CY sediment, in situ basis per load ).

The Brightman Street Bridge crosses the Federal Channel downstream of the Turning Basin. Approximately 44 percent of the dredged material is located upstream of the bridge, with 56 percent located downstream. Regardless of the dredging calendar (year-round vs. 2 ½ months), scow fleet capacity (3,000 CY - 6,000 CY), or disposal method (upland or offshore), the bridge is required to be opened to enable the tug maneuvering the scow to pass. Therefore, whether Weaver's Cove transports the dredged material upstream to the LNG Terminal for upland placement or downstream to the offshore disposal site, the bridge has to be opened. Roughly 800[27] scows are required to move the full 2.6 million cubic yards of sediment. If the dredged material is taken offshore, roughly 350 loaded barges would pass through the bridge moving downstream (and 350 empty barges would return). If the material is taken upland then roughly 450 scows would pass through the bridge moving upstream (and 450 empty scows would return). Conservatively assuming single scow tows through the bridge opening, there would be roughly 700 bridge openings associated with the offshore disposal option and 900 bridge openings associated with upland placement. The number of bridge openings under the offshore disposal alternative would be 22 percent less than for the upland placement alternative.

These transits will result in increased frequency of bridge closures during the limited dredging season. Whenever practicable, Weaver's Cove would undertake to avoid transits through the existing Brightman Street Bridge during the heaviest bridge traffic periods on weekday mornings and late afternoons.

Reasonable TOY Restrictions Are Acceptable to Weaver's Cove

The two and a half month dredging window advocated by the USFWS is not only unsupported by science and subject to some operational challenges that would need to be overcome, it could result in increased impacts to the environment. While Weaver's Cove continues to believe that no TOY restrictions are required to

---

[27] This number assumes that capacity of the scow fleet procured ranges between 3,000 CY and 6,000 CY resulting in an average scow loaded capacity of 4,000 CY. It is further assumed that 2.6 million CY (measured in situ) of dredged material is transported during the entire dredging project. Furthermore it is assumed that the in situ dredged material volume bulks up when removed from the bay/river bottom after it is placed in the barge. Therefore each 4,000 CY scow actually transports roughly 3,200 CY of sediment based on in situ volume measurements. Hence the total number of scows required to move 2.6 million CY of in situ sediment is (2,600,000 CY in situ)/ (3,200 CY in situ) = 812 scows. Within the accuracy of these estimates this can be rounded to roughly 800 loaded scows.

protect the environment when the mitigation steps proposed by the Project are implemented (see Section 5.1.7 of this report), it nevertheless submits that the following restrictions would represent a reasonable balance of the need to address the concerns that have been raised while allowing the dredging to be accomplished on a feasible basis:

- South (downstream) of the Braga Bridge (Route 195): dredging allowed June 16 – January 14 (7 month dredging season)
- S-Bend: dredging allowed August 1 – January 14 (5 ½ month dredging season)
- Turning Basin: dredging allowed August 1 – January 14 (5 ½ month dredging season)

The above dredging windows represent a new position taken by Weaver's Cove, and reflect a sequencing approach as advocated by NOAA Fisheries, USFWS and USEPA.

6. *The Environmental Protection Agency and National Marine Fisheries Service have requested additional compensatory mitigation for the projects adverse environmental impacts. Weaver's Cove Energy originally proposed a plan to harvest shellfish and re-locate them prior to dredging, to create a salt marsh area and provide mitigation for loss of Essential Fish Habitat for winter flounder. Several meetings have been held with the Federal Agencies and WCE to discuss potential mitigation for EFH impacts, such as establishing a trust fund that would develop mitigation projects as recommended by the agencies or development of a program that would assist in separation of combined sewer and drainage systems in order to improve WQC. The agencies did not accept these concepts and NMFS also specifically requested mitigation for loss of intertidal area where the bulkhead will be constructed. Further coordination meetings will be arranged to finalize the mitigation plans.*

Weaver's Cove is available for meetings to discuss mitigation issues.

As the USACE is aware, Weaver's Cove submitted the following mitigation plans for agency review in response to project related impacts associated with dredging and terminal development activities.

Shellfish Mitigation Plan

Approximately 84 acres of the approximately 160 acre dredge footprint in Massachusetts has been mapped by the Massachusetts Division of Marine Fisheries ("MADMF") as potential habitat for northern quahog (*Mercenaria mercenaria*). While not mapped, an additional 11.5 acres of potential northern quahog habitat