**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **WEAVER'S COVE ENERGY, LLC** | : | |
| | : | |
| v. | : | CA. No. 07-246S |
| | : | |
| **RHODE ISLAND C.R.M.C.,** *ET AL.* | : | |

**STATE'S REPLY MEMORANDUM**
**REGARDING SUMMARY JUDGMENT**

I. **WEAVER'S COVE'S ATTEMPT TO EFFECTIVELY AVOID CZMA JURISIDICITON IS TOO BROAD IN ITS READING OF AN INAPPLICABLE DEM REGULATION AND IS TOO NARROW IN ITS READING OF APPLICABLE CRMC REGULATIONS.**

   A. **WEAVER'S COVE CITES A COMPLETELY IRRELEVANT REGULATION – A DEM REGULATION RATHER THAN A CRMC REGULATION – IN ORDER TO OBFUSCATE ITS FAILURE TO PROVIDE NECESSARY DATA.**

Weaver's Cove spends five pages of its brief (Weaver's Cove Reply Brief at 5-10) to lead up to a citation to a regulation that is completely irrelevant. This is crucial because this impertinent citation is the underpinning of the entire edifice of Weaver's Cove's CZMA argument.

The logical links leading to this particular citation are, according to Weaver's Cove, as follows: the CZMA requires a six-month turn-around; such turn-around period starts from the time of the applicant's provision of the necessary data and information; and, most importantly, the term "necessary data and information" does not include information pertaining to the intended dredge disposal site. Thus, the entire syllogism (which unfolds over the space of five pages in Weaver's Cove's Reply Brief) depends on this last-stated element. Without this, the argument for a conclusive presumption of concurrence collapses. And what is Weaver's Cove's

source of this element? Not a CRMC regulation, but instead a regulation promulgated by the DEM! In short, there is a legal void at the heart of the argument.

Weaver's Cove startling resort to a DEM regulation as Weaver's Cove's central element in a CRMC case deserves to be rescued from its obscure location five pages deep into this portion of its argument:

> This requirement refers to upland disposal facilities in the state of Rhode Island. *See* R.I. Dep't of Envtl. Mgmt., Rules and Regulations for Dredging and the Management of Dredged Material § 4.20 (defining "upland areas" as "[a]ll areas *of the state* that are not in the coastal zone" (emphasis added)), *available at* http://www.dem.ri.gov/pubs/ regs/regs/water/dred0203.pdf.

(Weaver's Cove Reply Brief at 10; emphasis added by Weaver's Cove).

Compounding this misleading reference to a sister agency's regulatory material is a mischaracterization of the State's position. Weaver's Cove states:

> The CRMC does not dispute that Rhode Island's *own regulations* indicate that "approved upland facilities" are only those sites located within the state of Rhode Island. Instead, the CRMC merely asserts, without any support or a single citation, that "[a]n approved upland disposal site means wherever located, not just in Rhode Island." CRMC Memo. 39.

(Weaver's Cove Reply Brief at 10; emphasis by Weaver's Cove). This is true insofar as it goes. There is, indeed, such a Rhode Island regulation. But, as shown, that regulation relates to a completely separate program with completely separate goals. Indeed, that other program, the State's Solid Waste program, provides a comparison that heightens an argument in the State's Brief-in-chief. That program, a classic regulatory program, is *not* governed by the crucial, and searching, effects test.

An additional rebuttal argument must be made. Needless to say, inaccurate data and information cannot suffice to fulfill the requirement of "necessary data and information" in any

event. The information regarding an upland site was inaccurate (the actual site ultimately being an off-shore location) and, therefore, could not fulfill the requirement. Regardless of whether the upland location was genuinely proffered, it turned out to be infeasible, confirming, after the fact, the reasonableness of CRMC's demand for further information. Events have since unfolded to vindicate the CRMC's policy and undermine the insinuation of bureaucratic intransigence.

    **B.    THE CHANGE IN SHIPPING AND THE CHANGE IN THE DESTINATION OF DREDGE SPOILS CONCERN THE POTENTIAL IN-STATE EFFECTS OF POTENTIAL IN-STATE ACTIVITIES.**

At the center of the dispute over the effect of Weaver's Cove's changes is the issue of the scope of the CRMC's consistency review. Weaver's Cove states, in its Reply, "In this case, those activities [which are reviewable by the CRMC] are limited to the USACE-permitted dredging activities, and Weaver's Cove's proposed dredging activities have not changed since Weaver's Cove submitted its consistency certification to the CRMC in July 2004." (Weaver's Cove Reply Brief at 19). At another point, Weaver's Cove states: The so-called "changes" cited by the CRMC have nothing to do with Weaver's Cove's consistency review; that is, they have nothing to do with proposed dredging activities permitted under Section 10 of the Rivers and Harbors Act ("Section 10 Activity") for which Weaver's Cove submitted a consistency certification to the CRMC (Weaver's Cove Reply Brief at 36.)

In other words, according to Weaver's Cove, the changes to the proposal concern aspects beyond the CRMC's purview. In support of this position that the CRMC is limited, Weaver's Cove makes essentially two sets of arguments – one technical and one related to supposed extra-territoriality of the proposal in relation to the boundaries of the state. Before responding specifically, some precedential background is in order.

3

Weaver's Cove's reluctance to undergo the effects test in the consistency provisions of the CZMA is not supported by case-law. When the United States Interior Department sought to avoid analysis of a decision to suspend a lease subject to a state's consistency review, the Ninth Circuit ruled against the Department, explaining the importance of examining impacts. California v. Norton, 311 F.3d 1162 (9th Cir. 2002). The court held that the argument against a broad effects test "has been specifically rejected by Congress" in the 1990 Amendments to the CZMA, which were designed "to overturn the decision of the Supreme Court [in Secretary of the Interior v. California, 464 U.S. 312 (1984)] . . . and to make clear that Outer Continental Shelf oil and gas lease sales are subject to the requirements of section 307(c)(1)." Id. at 1172-73 (quoting, in part, H.R. Rep. No. 101-508, at 970 (1990)). Likewise, private interests were met with the same analysis when they appeared before the United States Court of Federal Claims. The court held that the 1990 Amendments to the CZMA materially altered the statutory framework and widened the scope of state consistency review. Amber Res. Co. v. United States, 68 Fed.Cl. 535, 557 (2005). The Court of Federal Claims observed that Congress expressly overruled Secretary of the Interior v. California, 464 U.S. 312 (1984), and that "[t]he amendment of § 307(c)(1) furthered Congress' effort to 'enhance state authority by encouraging and assisting the states to assume planning and regulatory powers over their coastal zone' by widening the array of federal activities subject to consistency review." Amber, 68 Fed. Cl. at 557.

The background is that, in 1990, Congress realized the eviscerating effect that Secretary of the Interior v. California, 464 U.S. 312 (1984), had on the coastal states' ability to execute their CMPs. Congress changed the language from "directly affecting" any land use or water use or natural resource to "affects" any land use or water use or natural resource. *See* 16 U.S.C.

4

§1456(c)(1)(A) (2000); *cf.* Coastal Zone Management Act of 1972, Pub. L. No. 92-583, 86 Stat. 1230 (1972). The legislative history shows that this was done in order to expand the activities covered by the federal consistency provisions. *See*, *generally*, Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, §6201-17 (1990); H.R. Rep. No. 101-964, pt. A, at 970 (1990) (Conf. Rep.). This change appears to have been a major victory for states by greatly increasing the states' ability to influence, and in some cases block, otherwise federally permitted projects that do not comply with state CMPs.

With this background in mind, we can approach the cramped and parsimonious rendition of the listing requirement that Weaver's Cove would impose on the CRMC.

### 1. The Listings Are Adequate.

Contrary to these case authorities, Weaver's Cove attempts to undercut Rhode Island's CZMA rights by arguing that the State has no authority to review the effects of LNG tanker operations associated with FERC's approval of the construction and operation of an LNG terminal located in the State of Massachusetts. Weaver's Cove first makes much of the fact that, "46 U.S.C. § 170 is no longer in force as a provision of the United States Code, rendering its listing in the CRMC's *Federal Consistency Manual* of null effect." (Weaver's Cove Reply Brief at 23; emphasis supplied by Weaver's Cove). The argument erroneously suggests that the alleged automatic de-listing of the activity in the CRMP associated with "permits and authorizations for the handling of dangerous cargo by vessels in U.S. ports pursuant to 46 U.S.C. § 170," (*see* Ex N to RI Brief, "CRMC Consistency Manual," Table 2, p. 28) destroys the validity of another, separate, listing of an activity – "permits and approvals related to the construction **and operation** of LNG import/export marine terminals pursuant to the Natural Gas

Act (15 USC 717f(c))." *See* Ex N to RI Brief, "CRMC Consistency Manual," Table 2, p. 29 (emphasis added).[1]

Moreover, one should not by-pass another CRMC listing in the manual: "Permits related the regulation of gas pipelines, licensing of import or export of gas pursuant to the Natural Gas Act (15 USC 717, 717(b))." *See* Ex N to RI Brief, "CRMC Consistency Manual," Table 2, p. 29. This specifically references § 3.

And, if this were not enough, we have the catch-all language. To eliminate any doubt about the right of the state to review the effects of LNG tanker operations within Rhode Island's coastal zone, the manual also lists the following: "This list is not exhaustive and does not obviate the responsibility of applicants for federal approvals to submit a consistency certification

---

[1] Weaver's Cove might assert a hyper-technical challenge on the following basis: The fact that the listing's parenthetical statutory reference is to § 7 of the NGA (15 USC 717f(c)), while Weaver's Cove's FERC-granted conditional authorization is under § 3 of the NGA. Such a claim would be petty. This is of no meaningful consequence in light of the history of LNG terminal jurisdiction on the part of FERC, and FERC's predecessor, the Federal Power Commission. The history is that, in its attempt to process the application of a particular LNG terminal, the Distrigas terminal in Everett, Massachusetts, the FPC shifted the track of such application to § 3 from § 7. In <u>Distrigas Corp. v. Federal Power Comm'n</u>, 495 F.2d 1057 (D.C. Circ. 1974), the D.C. Circuit upheld this shift. The passage of EPAct 2005, which the President signed into law on August 8, 2005, confirmed this shift and made it mandatory. EPAct 2005 amended § 3 of the NGA to place FERC jurisdiction over LNG terminals exclusively in the latter section. Energy Policy Act of 2005, §§ 311, 313.

The upshot is that the coverage of the CRMP Consistency Manual's listing would follow over to the new enactment. The listing obviously covers the construction and operation of a LNG terminal authorization by FERC under § 3 of the NGA.

All that is required is fair notice of what activity is being reviewed, *i.e.*, FERC's licensing of LNG terminals, and it doesn't matter what particular section is cited. At the time the activity was listed, FERC's licensing authority was generally considered to be under § 7. A State is not required to amend its CZMP every time there is a tweak in the subsections under an act. It is clear that FERC's licensing of LNG terminals under the NGA was the listed activity. Any other reading is not only hyper-technical, but places an undue burden on State's to constantly monitor minute changes in permitting statutory schemes. Specifically, if no section was identified, only the NGA was identified by name, then the result would be the same.

for any activity reasonably likely to affect any coastal use or resource to the CRMC." *See* RI Brief, Ex N, "CRMC Consistency Manual," Table 2, p. 28.

Finally, while Weaver's Cove is correct that FERC's NGA § 3 approval of the project, which includes an original projection of 50-70 round-trip LNG tanker transits through Rhode Island's coastal zone, is subject to a veto by the Coast Guard pursuant to Ports and Waterways Safety Act, 33 U.S.C. § 1321, such veto right by another federal agency is completely irrelevant in the context of discerning the State's CZMA rights to separately review (and veto, subject to the Secretary's review, if necessary) the LNG project authorized by FERC under the NGA.

### 2. The Listings Apply To Weaver's Cove's Changes As The Changes Are In-State.

#### a. The Changed Shipping Plan.

With these technical objections out of the way, we come to the heart of Weaver's Cove's argument regarding the inapplicability of the CRMC's consistency review to the changed shipping plan. Weaver's Cove indicates that the FERC approval is extra-territorial *vis-à-vis* Rhode Island, *i.e.*, outside of Rhode Island's reach. But FERC itself conditioned its approval of the LNG project on the requirement that Weaver's Cove "file with the Secretary documentation of concurrence from the [RICRMC] that the project is consistent with the [RICRMP]." *See* Ex. E to Rhode Island's Brief (FERC Order dated July 15, 2005, p. 61,551, condition #24). Weaver's Cove sought rehearing of FERC's determination, JA Tab 39, and was flatly rejected by FERC, since the "Commission's only responsibility under the CZMA is to withhold construction authorization for the project" until the state finds that the project is consistent with the NOAA-approved CRMP. JA Tab 39.

Most notably, FERC never suggests or even hints that the LNG project's effects are isolated to dredging activities. Indeed, the strong implication is to the absolute contrary. If only

7

dredging triggered CZMA review, there would have been no need for FERC to allude to such process. Those activities are subject to an *entirely different statutory scheme* involving the Army Corps of Engineers, which also formally notified Weaver's Cove and the public at large that those distinct activities were subject to the CZMA concurrence by the States of Massachusetts and Rhode Island. JA Tab 38 (ACOE revised public notice). In other words, the dredging triggers the CZMA process in any event under the Army Corps of Engineers § 10 program. FERC must have been thinking of something aside from dredging; otherwise, its language would constitute mere gratuitous surplusage. It is not be imagined that the FERC trigger is duplicative of the ACOE trigger.

Now, Weaver's Cove would like the decisional record to be recast in its favor; that is, in Weaver's Cove's view, FERC's withholding of final approval for construction of the LNG terminal, and, by logical extension, its withholding of final approval for concomitant operations, no longer constitutes an accommodation of Rhode Island's CZMA rights. This is so, according to Weaver's Cove, even though those rights are associated with "approvals related to the construction and operation of LNG terminal import/export marine terminals pursuant to the Natural Gas Act." *See* Ex N to RI Brief, "CRMC Consistency Manual," Table 2, p. 29. Weaver's Cove definitively lost this argument before FERC, and it never appealed FERC's decision. Indeed, Weaver's Cove waived this argument in the first instance by not challenging FERC's decision that ruled implicitly that the State maintained a right to review the coastal zone "effects" of FERC's NGA authorization as well as the tanker operations that are detailed throughout its orders.

In other words, if Weaver's Cove is correct that there is no FERC-authorized activity in the Rhode Island coastal zone, then Weaver's Cove would have had no reason for arguing to

FERC that Rhode Island forfeited its consistency review since, according to Weaver's Cove, Rhode Island's CZMA right (other than with respect to dredging) never legally existed in the first instance. Such an argument is simply untenable, and Weaver's Cove's failure to pursue such an argument is telling.

The conclusion produced by this textual and procedural analysis is supported by common sense. While the terminal itself might present issues of inter-state jurisdictional conflict, the associated shipping plan (now radically changed) is to be largely executed right here in Rhode Island.

### b.     The Changed Dredge Disposal Transit Plan.

The above argument applies with even greater force to the dredge disposal transit revisions. The increased barge traffic on the bay (*see* Exhibit D to RI's Brief, Goulet Affidavit, paragraph 18, documenting that this traffic would entail 833 scow transits) and the compounding of this traffic by tow-lines (*see* Exhibit A to the instant Sur-Reply Brief, Supplemental Fugate Affidavit, Paragraphs 6-7, documenting that this traffic would entail the hazard of tow-lines)[2] is a changed impact. Most importantly, there is direct nexus between this change and the dredging itself.

### C.    PRINCIPLES RELATED TO ESTOPPEL PREVENT RESORT TO THIS FORUM.

Weaver's Cove ignores the import of Rhode Island's position regarding the need for Weaver's Cove to confront NOAA.

A Court should not allow a collateral attack on one agency's position or conduct to be heard through a challenge to another agency acting in reliance upon it. *See e.g.,* Mountain Rhythm Resources v. FERC, 302 F.3d 958 (9th Cir. 2002) (rejecting an applicant's challenge to

---

[2] If not filed herewith, to be filed shortly hereafter.

the applicability of the Coastal Zone Management Act's consistency review as an impermissible collateral attack on NOAA's previous decision to approve the state's coastal zone map which designates the area so that it is subject to review); Palumbo v. Waste Technologies Indus., 989 F.2d 156, 161 (4th Cir. 1993) (emphasizing that plaintiffs may not collaterally attack permitting decision of federal agency in suit against permit-holders).  In Mountain Rhythm Resources, the court reasoned that if the applicant finds fault with a NOAA decision, "it must challenge the decision in a forum where the agency or its representatives can directly respond."  Mountain Rhythm Resources, 302 F.3d at 964.

    For the reasons explained earlier, the instant cases are impermissible collateral challenges on NOAA's regulations and actions, which Mountain Rhythm Resources instructs may not be heard here in NOAA's absence.

## II. WEAVER'S COVE'S ATTEMPT TO AVOID STATE-LAW JURISDICTION IS A FACIAL CHALLENGE THAT IS TOO NARROW IN ITS INTERPRETATION OF THE SIGNIFICANCE OF STATE OWNERSHIP AND TOO BROAD IN ITS INTERPRETATION OF FERC PREEMPTION.

### A. RHODE ISLAND ADDRESSED AND DEFEATED THE SUBSTANCE OF THE DORMANT COMMERCE CLAUSE ARGUMENT IN ITS BRIEF-IN-CHIEF.

#### 1. The Refutation Of The Dormant Commerce Clause Argument Was Inter-Woven With The Refutation Of The Pre-Emption Argument.

Weaver's Cove's contention that "the CRMC simply failed to respond" (Weaver's Cove Reply Brief at 3) to Weaver's Cove's Dormant Commerce Clause argument, is belied by a reading of Rhode Island's Brief-in-chief itself. In stating that "conventional supremacy principles" (RI Brief at 48) cannot supercede "real estate titles," (RI Brief at 48), and in arguing that the power to do so is limited exclusively to "two methods" (RI Brief at 49), Rhode Island was obviously addressing the full panoply of constitutional authority that could be brought to bear against its dominion over tidelands.

Indeed, Weaver's Cove's original argument (with respect to the state-law so-called "Category B" issue) itself merged the two prongs (dormant and active Commerce Clause) by providing the following combined introduction to both prongs:

> As the U.S. Supreme Court has stated, a state's police power and Public Trust authority is not unlimited; rather, like all state power, it is specifically constrained by the U.S. Constitution's Commerce Clause, which prohibits states from enacting laws that inappropriately burden the flow of interstate and international commerce. Given the burden that Category B Assent restrictions would place on interstate and international commerce in this case, its application to block the operation of the Weaver's Cove LNG terminal is unconstitutional.

(Weaver's Cove Brief-in-chief at 26). It is obvious that Rhode Island's resistance to (to be precise, Rhode Island's attempt to limit the scope of) federal supremacy applied *per force* to all

11

sources of federal power other than (to repeat the argument in Rhode Island's original submission) the two conspicuously absent powers of eminent domain and the federal navigational servitude. (RI Brief at 50). To parse the State's words and to insist that the State conform its response to the framework and rubrics unilaterally imposed by Weaver's Cove is the type of "gotcha" tactic courts eschew.

### 2. Since Weaver's Cove Makes A "Facial Challenge," Rather Than An "As Applied" Challenge, It Was Not Necessary Or Possible For Rhode Island To Justify A Specific Outcome In Terms Of The Dormant Commerce Clause.

Weaver's Cove never met its initial burden of going forward with a specification of a discriminatory implementation of the CRMC program. Nor could it have done so since this is necessarily a facial challenge (the CRMC having not acted yet). Weaver's Cove cannot now complain of the state's failure to rebut an allegation never made.

At the outset, CRMC has yet to implement its program with respect to the Weaver's Cove application. Necessarily, Weaver's Cove brought its claim as a purely facial challenge. Thus, Weaver's Cove has moved for summary judgment on the ground that the CRMC Act is unconstitutional *on its face* because it violates the dormant Commerce Clause of the United States Constitution. As a result, Weaver's Cove is required to meet a strict standard:

> A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully . . .. The fact that . . .[an] Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, . . ..

U.S. v. Salerno, 481 U.S. 739, 745 (1987). The Court's late opinion in Janklow v. Planned Parenthood, Sioux Falls Clinic, 517 U.S. 1174, 1175 (1996), endorsed this statement as one that "correctly summarized a long established principle of our jurisprudence" (although limiting other language in Salerno as a "rhetorical flourish").

This precise set of facts was presented to the United States Supreme Court in the <u>Granite Rock</u> litigation concerning a state coastal program:

> Granite Rock does not argue that the Coastal Commission has placed any particular conditions on the issuance of a permit that conflict with federal statutes or regulations. Indeed, the record does not disclose what conditions the Coastal Commission will place on the issuance of a permit. Rather, Granite Rock argues, as it must given the posture of the case, that there is no possible set of conditions the Coastal Commission could place on its permit that would not conflict with federal law – that any state permit requirement is *per se* pre-empted. The only issue in this case is this purely facial challenge to the Coastal Commission permit requirement.
>
> Granite Rock suggests that the Coastal Commission's true purpose in enforcing a permit requirement is to prohibit Granite Rock's mining entirely. By choosing to seek injunctive and declaratory relief against the permit requirement before discovering what conditions the Coastal Commission would have placed on the permit, Granite Rock has lost the possibility of making this argument in this litigation. Granite Rock's case must stand or fall on the question whether *any possible* set of conditions attached to the Coastal Commission's permit requirement would be pre-empted.

<u>California Coastal Com'n v. Granite Rock Co.</u>, 480 U.S. 572, 594 (1987).

The CRMC Act is facially neutral. Weaver's Cove is thus relegated to a position of impermissibly speculating as to how the CRMC might conduct itself if the CRMC is allowed to go forward. But both the insinuations of parochialism in the administration of the program and the speculation of any adverse outcome must be rejected as unfounded supposition. The case-law assigns to Weaver's Cove a task that, at this point in time, is an exercise in sheer conjecture.

In other words, by complaining of the state's alleged default, Weaver's Cove impermissibly seeks to shift the burden. It is incumbent on Weaver's Cove to identify an outcome that is discriminatory (at least in practical effect). It is not incumbent on the State to forecast an outcome that is non-discriminatory. It follows that the allegations in Weaver's

Cove's initial submission were so insufficient that the state's earlier response was all that was required.

### B. THE 50-FOOT RIGHT OF WAY CASE IS MERELY ONE COUNTER-EXAMPLE TO WEAVER'S COVE ABSOLUTE DECLARATION THAT FEDERAL COURTS ALWAYS ALLOW EXCAVATION WITHOUT EMINENT DOMAIN.

Weaver's Cove challenges the thoroughness of the State's research in support of its right to exclude others from its submerged lands; i.e., its right to prevent possesory trespasses: "The breadth of CRMC's doctrinal assertion is not matched by the depth of the CRMC's legal analysis on the point: the CRMC cites not a single case to support its broad proposition." Weaver's Cove Reply Brief at 76.

Without rehashing the extensive discussion in the original submission, it is sufficient to refer back to the case of U.S. v. 50 Foot Right of Way, 337 F.2d 956 (3d Cir. 1964). In that case, the United States itself lost to a state grantee (standing in the shoes of the state) who insisted on compensation for the excavation of submerged lands for a project that was even more in the national interest than Weaver's Cove's. In is helpful to quote that precedent at length:

> In an effort to relieve the shortage of petroleum products in the New York City area, which shortage was impeding the war effort, the Reconstruction Finance Corporation in 1943 decided to build a double pipeline from Longview, Texas, to the city of Bayonne, New Jersey, for the transporting of petroleum and allied products.
> .
> When completed the pipeline traversed the bed of Newark Bay, a navigable body of water subject to the ebb and flow of the tide. The lines cut diagonally in an easterly direction across the submerged land in front of Bergen Point's property in the city of Bayonne. . . . The pipelines leave the Bay on the waterfront property of Bergen Point and then run across part of that property above the ordinary highwater line.
>
> After hearing testimony, the district court, sitting without a jury, determined that Bergen Point was entitled to compensation from the United States of $500 only for the right of way taken over the land above the highwater line. . . . In the event that an appellate

14

> court might disagree with it on the determination that Bergen Point was not entitled to compensation for the interference with its riparian rights and its interest in the submerged land, the court found that $5,850 would be just compensation.
>
> . . .
>
> The State of New Jersey may convey submerged tidewater land within its borders to private owners for private use. Bailey v. Driscoll, 19 N.J. 363, 117 A.2d 265 (1955).
>
> Hence, the United States failed to meet its burden on this issue, and should, therefore, be required to pay Bergen Point just compensation for the use of the submerged land . . ., which the court found to be $5,850.
>
> Accordingly, the judgment of the district court will be reversed and the matter will be remanded with direction to enter judgment in favor of Bergen Point Iron Works and against the United States in the amount of $5,850 plus interest from the date of the taking.

U.S. v. 50 Foot Right of Way, 337 F.2d 956 (3d Cir. 1964).

### C.   FERC DID NOT EXERCISE ANY PRE-EMPTIVE JURISDICTION OVER THE DREDGING.

The Court will recall that, in defense of its incipient exercise of state-law permitting (as against the preemption challenge), Rhode Island raised two arguments – while the main thrust was the *proprietary* thesis, traditional non-preempted *regulation* was posited as an alternative. *Compare* RI's Brief, Part III *with* id. Part IV.

In reply to this second rationale, Weaver's Cove's preemption argument contains a fundamental misunderstanding of law with respect to the roles left to states exercising their traditional police powers over incidental matters. In other words, Weaver's Cove exaggerates the scope of preemption. The company mistakenly professes that the State is banned from reviewing any matter that has already been considered by FERC in its orders and that FERC's preemptive authority under the NGA "reaches not merely LNG terminal operations and construction," but also covers "environmental review of LNG terminal operations." (Weaver's

15

Cove's Reply Brief at 66.)  The fact that Weaver's Cove is relying on the NEPA EIS matters to claim an expansive preemptive effect is further exemplified by the following portion of its Brief:

> FERC has made clear that dredging facilitates the transit of LNG tanker ships, which is a central aspect of LNG terminal operations. *See, e.g.,* FEIS at p. 2-25 ("Weaver's Cove Energy proposes to dredge select areas within the federal navigation channel and turning basin to accommodate passage of LNG ships to the facility." (emphasis added)).

(Weaver's Cove Reply Brief at 67.)

While it is true that FERC's approval under NGA § 3 triggers environmental review responsibilities under the National Environmental Policy Act, and may also trigger public interest authority to condition such authorization, *see* Distrigas v. FPC, 495 F.2d 1057 (D.C. Circ. 1974), review by FERC over incidental activities that affect Rhode Island cannot eviscerate the State's such inherent police power.  The preemption argument is nonsensical since it assumes that FERC's pre-emptive effect is co-extensive with the scope of its NEPA review.

While FERC's NEPA analysis may consider the impacts of matters ancillary to LNG terminal "construction and operation" and deem them all to be insignificant from a NEPA perspective (as FERC did in this case), such consideration by FERC and such resulting conclusions carry no preemptive effect against state agencies acting pursuant to their inherent police power.  FERC is preemptive only with respect to the terminal itself.

In other words, FERC's review of dredging in the FEIS was solely as its role of lead NEPA agency, with ACOE as a cooperating agency (so that, for administrative efficiency, ACOE would not have to undertake its own NEPA review).  This review did not confer jurisdiction over dredging on FERC.  Indeed, the FERC Rehearing Order confirms that it is the ACOE that will issue dredging permits.  JA Tab 39.  Nothing in the NGA or EPAct gives the FERC certificate preemptive powers over dredging.  To the extent regulation of dredging is a

federal power, it is exercised by the ACOE, which hasn't issued any permit yet carrying the force of federal law and, even if it did, it would be non-preemptive as exhaustively briefed beforehand.

In this same vein, reference is made to Part IV of the earlier Brief where the definition of "LNG terminal" in the EPAct amendments is discussed. The Court will recall that such definition expressly excludes marine transport (and, hence, any dredging necessary for marine transport). That definition defeats Weaver's Cove's expansive reading of FERC's "exclusive jurisdiction."

### D.  WEAVER'S COVE INCORRECTLY ASSUMES THE RETROACTIVITY OF EPACT

The above defect in Weaver's Cove's scope-of-preemption argument is intertwined with another. The additional defect is that Weaver's Cove cannot avail itself of any expanded FERC rights arising under EPAct because the FERC conditional approval in this case was issued under the old law, before EPAct was passed. Otherwise, one would be giving retroactive application to EPAct where such intention was not expressed. Therefore, all of Weaver's Cove's arguments about what rights FERC has under the EPAct are irrelevant because FERC did not act under the EPAct in this case.

              Respectfully submitted,

              State of Rhode Island,
              By its Attorney,

              PATRICK C. LYNCH
              ATTORNEY GENERAL

              <u>/s/ Michael Rubin</u>
              Michael Rubin, Esq., (Bar #3656)
              Assistant Attorney General
              150 South Main Street
              Providence, R.I. 02903
              Tel: (401) 274-4400 Ext. 2116

              <u>/s/ Paul J. Roberti</u>
              Paul J. Roberti, Esq., (Bar #4447)
              Assistant Attorney General
              150 South Main Street
              Providence, RI 02903
              Tel: (401) 274-4400 Ext. 2231

              <u>/s/ Brian A. Goldman</u>
              Brian A. Goldman, Esq., (Bar #3940)
              Counsel for CRMC
              681 Smith Street
              Providence, RI 02908
              Tel: (401) 521-4100

## **CERTIFICATION**

     I, the undersigned, hereby certify that a true copy of the within document was served by electronic means (ECF) on this 27th day of February, 2008 to the following:

| | |
|---|---|
| Gregory L. Benik, Esq. | Bruce F. Kiely |
| Benik & Associates P.C. | Baker Botts, LLP |
| 931 Jefferson Blvd., Suite 2008 | 1299 Pennsylvania Avenue NW |
| Warwick, RI 02886 | Washington, DC 20004-2400 |

              <u>/s/ Michael Rubin</u>