**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **WEAVER'S COVE ENERGY, LLC** | : | |
| | : | |
| **v.** | : | **CA. No. 07-246S** |
| | : | |
| **RHODE ISLAND COASTAL RESOURCES MANAGEMENT COUNCIL, *ET AL.*** | : | |

**<u>AFFIDAVIT OF GROVER FUGATE</u>**

The undersigned, being first duly sworn, hereby deposes and says as follows:

1. I am the executive director of the Coastal Resources Management Council having held that position since 1986.

2. My duties include supervising all the operations of the agency, which includes supervising all federal consistency reviews performed pursuant to 16 U.S.C. § 1451 *et seq.* ("CZMA"). Under the rules and regulations of the CRMC, I am the person who has been delegated the authority to review all federal consistency determinations. In particular, under the rules and regulations of the CRMC, I am the person who has been delegated the authority to conduct all federal consistency reviews performed by CRMC pursuant to the CZMA.

3. I filed an affidavit in this litigation (*see* Exhibit C to RI's Brief), and based upon my review of Weaver's Cove's submissions to the Court, I hereby provide the following additional information which serves to supplement my previously-submitted affidavit.

4. As I understand Weaver's Cove's position, the company continues to question the legitimacy of the CRMC's long-standing requirement that an applicant for a federal license or permit activity must obtain a Section 401 (Clean Water Act) Water Quality Certification ('WQC') from the Rhode Island Department of Environmental Management (RIDEM) before the CRMC can consider granting consistency concurrence for the project in cases involving dredging or discharges. The following provides an explanation of this issue from the CRMC's standpoint.

5. Under CRMC's consistency program, the water quality certification review process by RIDEM provides essential information relating to the nature and quality of dredged sediments essential for the purposes of federal consistency review. For instance, the fact that dredge spoils are deemed to be of high quality in terms of the absence of contaminants, could affect CRMC's ultimate determination concerning the appropriateness of the proposed disposal location. If it is determined, based on RIDEM's evaluation, that dredged sediments are suitable for beneficial reuse activities such as measures to prevent or reverse beach erosion along the state's coastline (nourishment or replenishing of eroded beaches), then CRMC may direct that some or all of the

dredge spoils not be deposited at Rhode Island Sound Disposal Site, but should, rather, be used to accomplish designated beneficial reuse objectives. On the other hand, for example, if the spoils prove to be contaminated they are ineligible for open water disposal as well as beach nourishment and would have to be disposed of in a confined aquatic cell or a suitable upland site. Moreover, an ACOE assessment of the quality of the spoils is not adequate for these purposes since the DEM is free to impose, and does impose, more stringent standards in the form of its water quality certification. It is for these reasons, and others, that the CRMC always requires a DEM WQC prior to conducting an application for consistency in these circumstances.

6. The CRMC has always exercised federal consistency review over dredge disposal activities, including the movement of dredge scows through Rhode Island waterways. This has always been true even for ocean disposal locations located outside of Rhode Island's three-mile territorial limit. There are a number of affects that CRMC is heavily concerned about. For instance, the tow-line between the barge and the dredge is approximately six to eight (6 to 8) hundred feet long, and poses a significant danger to commercial and recreational vessels along the route of laden dredge scows making their way to the ocean disposal site, and also upon their return to the dredging location. The degree of this effect cannot be ignored, particularly given Weaver's Cove's ongoing efforts to conduct dredging and disposal operations during the peak summer months of boating activity when an estimated 40,000 boaters are actively using the Narragansett Bay watershed area.

7. Outside Newport Harbor in the East Passage area there are several sailing instructional programs for children who lack the navigational knowledge concerning the dangers associated with marine towing operations. During the Providence River Dredging project, in which the same barge towing operations were employed, a sailing vessel collided with a barge tow-line and caused serious damage to the vessel. Such instances present life-threatening consequences. With the Weaver's Cove project, these concerns are not only real, but heightened by the number of dredge scows that will pass through RI waterways for the approximate 23 mile transit distance (as reported in the Goulet affidavit, paragraph 18, which I understand to be Exhibit D to RI's Brief, it would entail 833 scow transits). Simply put, these are real and significant impacts on the waterway that must be evaluated by the State under its NOAA-approved program.

8. For the more than 40,000 boaters that annually use Narragansett Bay, Mount Hope Bay and the adjoining estuaries, the effects of the barge transits and associated tow-lines (as well as the eventual LNG transit security zones themselves) are considerable. The barge transits (as well as the eventual LNG tanker safety and security zones) will dominate much of the East Passage, temporarily blocking recreational and commercial marine traffic, ferry operations, tourist cruises, and lifeline ferry service and emergency runs to Prudence and Hog Islands. Newport is recognized nationally and internationally as a world-class yachting center, and over 2/3 of the events on Narragansett Bay are scheduled in the waters off Newport. The irregular and unannounced schedule of barge transits, together with delays to boating associated with passage of the barges, may directly impact Newport's ability to retain major regattas and events such as the Tall Ships, which attract local, national and international participation.

9. Rhode Island is the only State in the nation that has zoned its coastal waters for various uses. These classified zones are designed to ensure that any allocated use is protected as an enforceable State policies that have been adopted by NOAA as a critical component of the Coastal Zone Management Plan. For instance, in Section 200.5 of the CRMP (attached hereto as Exhibit A), Newport Harbor and the adjacent area has been designated as a "center for tourism" and the CRMC is specifically authorized to "prohibit activities that significantly detract from or interfere with these priority uses." The Weaver's Cove project involves a number of activities that could directly undermine or interfere with the designated uses and goals of the State's enforceable policies, not only with respect to Newport Harbor, but many other areas along the 26 mile transit route of LNG tankers and dredge scows. It is incumbent upon an applicant that the scope and nature of the planned activities are submitted and review by CRMC under the federal consistency program (as discussed more fully in paragraph 8).

10. The State of Rhode Island has a very comprehensive statute on coastal management, and, to my knowledge, it remains one of the most powerful coastal management statutes in the nation. Traditionally, it was the state statute that our office (the CRMC) relied upon to review activities that also happened to be subject to federal licenses and permits applied for by non-federal entities. In common practice, since our state program was, in all respects, more stringent than the CZMA, we could safely achieve all programmatic goals under our state-law program. In common practice, CZMA consistency review of indirect federal activities (activities underlying a federal permit or license) became more or less an afterthought if we considered it all. Up until the last several years, the term "federal consistency review" was reserved solely for direct federal activities. The regulatory exemption reflected the fact that, by federal law, federal agencies discharging into the waterways are obligated to pursue a 401 water quality certification, in any event, independent of the consistency process. Only recently, with the advent of the CRMC's exposure to activities conducted under a new type of permit, that is, a permit that carries some associated preemptive force, did we make the distinction explicit between direct and indirect federal activities with regard to 401 water quality certification prerequisite. For all others applications, including indirect federal actions, the 401 water quality certification has always been required as a prerequisite to the application. From the moment Weaver's Cove filed its application, the company was consistently informed about the agency's interpretation.

11. NOAA diligently supervises CRMC's exercise of federal consistency review activities. Indeed, under the CZMA regulations, this is an obligation of NOAA:

> As part of the responsibility to conduct a continuing review of approved management programs, the Director of the Office of Ocean and Coastal Resource Management (Director) shall review the performance of each State's implementation of the federal consistency requirement. The Director shall evaluate instances where a State agency is believed to have either failed to object to inconsistent federal actions, or improperly objected to consistent federal actions. This evaluation shall be incorporated within the Director's general efforts to ascertain instances where a State has not adhered to its approved management program and such lack of adherence is not justified.

15 C.F.R. § 930.3. In my capacity as the State's federal consistency review officer, I maintain consistent contact with NOAA about the State's federal consistency review activities, including the manner in which the CRMC has processed Weaver's Cove's application. At no time during this process has NOAA ever communicated to me or the agency that the CRMC does not have authority under the approved CRMP to undertake the review that Weaver's Cove challenges before this court, including: (1) coastal affects related to FERC's approval of Weaver's Cove's terminal and LNG vessel activities; (2) the need for a water quality certification from RIDEM associated with the Corps' consideration of a Section 10 permit; and (3) coastal affects related to the movement of dredge scows through RI coastal waterways en route to ocean disposal at the Rhode Island Sound Disposal site.

Grover J. Fugate

Subscribed and sworn to before me on this 29th day of February, 2008.

Notary Public
My commission expires N/A
PAUL ROBERTI
ASSISTANT ATTORNEY GENERAL