UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

```
                              )
WEAVER'S COVE ENERGY, LLC,    )
          Plaintiff,          )
                              )
     v.                       )    C.A. No. 07-246 S
                              )
RHODE ISLAND COASTAL RESOURCES)
MANAGEMENT COUNCIL, et al.,   )
          Defendants.         )
                              )
```

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

In this case a developer of liquefied natural gas ("LNG") facilities and the Rhode Island agency that oversees coastal development and resource protection have squared off in a high stakes confrontation involving the transportation of LNG by tanker ship through Rhode Island waters.  Weaver's Cove Energy LLC ("Weaver's Cove") and the Rhode Island Coastal Resources Management Council ("CRMC")[1] reached an impasse after engaging in a protracted and tense dialogue pursuant to a complicated permitting process. At the core of the dispute is the question of whether CRMC has the ability to indefinitely stall its concurrence with or objection to Weaver's Cove's permit application - a process that ordinarily must

---

[1] Weaver's Cove also named in its lawsuit Michael M. Tikoian, the Chair of CRMC; Paul E. Lemont, the Vice-Chair of CRMC; and Thomas Ricci, David Abedon, Donald Gomez, K. Joseph Shekarchi, Neill Gray, W. Michael Sullivan, Raymond C. Coia, Gerald P. Zarrella, and Bruce Dawson, all of whom are Members of CRMC. For clarity, the term "CRMC" denotes all defendants.

be completed within six months. By choosing the tactic of indefinite delay (as opposed to objection), CRMC has succeeded in grounding Weaver's Cove's proposed project, forcing the company to bring this action for relief. CRMC's tactic, however, was a gamble. Whatever the short term benefit of this tactic may have been, in the long run, CRMC's inaction necessarily results in a finding that the agency is legally presumed to have concurred with Weaver's Cove's application. For the reasons stated below, then, Weaver's Cove's motion for summary judgment is granted, and CRMC's cross-motion for summary judgment is denied.

I.    Factual and Procedural Background

A.    The Parties

Weaver's Cove is a limited liability company organized and incorporated under the laws of Delaware, with its principal place of business in Fall River, Massachusetts. CRMC is an agency of the State of Rhode Island created to preserve and protect the coastal resources of Rhode Island. See R.I. Gen. Laws 1956, chapter 23 of Title 46 (entitled "Coastal Resources Management Council"). CRMC's primary responsibility is "the continuing planning for and management of the resources of the state's coastal region." R.I. Gen. Laws § 46-23-6(1)(i). Importantly, it is also the state agency responsible for administering the federal Coastal Zone Management Act ("CZMA"), 16 U.S.C. §§ 1451 et seq.

B.    Weaver's Cove's Proposed LNG Terminal

This dispute centers on Weaver's Cove's proposal to construct and operate a liquefied natural gas ("LNG") terminal in Fall River, Massachusetts.[2]   As envisioned by the proposal, tanker ships carrying LNG would transit Rhode Island and Massachusetts waters, through the federal navigation channel in the Taunton River, on their way to deliver their cargo to the terminal.   The terminal would have the capacity to provide 800 million cubic feet per day ("MMcfd") of natural gas, which is equivalent to an estimated 15% of New England's peak daytime natural gas requirements in 2010. The natural gas imported to the facility would be injected into the existing U.S. natural gas pipeline grid via two lateral pipelines proposed for construction by Mill River Pipeline, LLC ("Mill River"), an affiliate of Weaver's Cove.

On December 19, 2003, Weaver's Cove filed an application with the Federal Energy Regulatory Commission ("FERC") under section 3 of the Natural Gas Act ("NGA"), 15 U.S.C. §§ 717 et seq., requesting authority to site, construct, and operate the proposed

_____

[2] LNG facilities have existed in New England for over thirty years, but increasing consumption of natural gas in the region has motivated the construction of new infrastructure. See City of Fall River, Mass. v. F.E.R.C., 507 F.3d 1, 4 n.3 (1st Cir. 2007).  Peak demand during the winter months can exceed supply by over one billion cubic feet of gas.  Id.; see also Weaver's Cove Energy, LLC, 112 FERC ¶ 61,070, at 61,528 (2005) ("Weaver's Cove I").

terminal.[3]   Also on December 19, 2003, Mill River filed an
application with FERC to construct and operate the two lateral
pipelines to transport the natural gas from the proposed terminal.
In order to facilitate the passage of LNG tanker ships through the
federal navigation channel, Weaver's Cove proposed in its
application to dredge and permanently deepen the channel.   The
proposal would require the dredging of up to about 2.6 million
cubic yards of sediment from the Taunton River and Mount Hope Bay,
disturbing approximately 191 acres of submerged land.   About
230,000 cubic yards of the total would be dredged from Rhode Island
waters.   FERC approved Weaver's Cove's application, subject to
conditions too numerous (and unnecessary) to list here.   See
Weaver's Cove Energy, LLC, 112 FERC ¶ 61,070 (2005) ("Weaver's Cove
I").   The only condition relevant to this proceeding is that
Weaver's Cove obtain CRMC's concurrence that the terminal project
will be consistent with Rhode Island's coastal zone management
program ("CMP").[4]   Id. at 61,546.   Under the CZMA, applicants for

_____

   [3] Because Weaver's Cove's proposed terminal would be used to
import natural gas from a foreign country, the location,
construction, and operation of the facility is subject to FERC
approval under section 3 of the Natural Gas Act.   See 15 U.S.C. §
717b.

   [4] Rhode Island refers to its CMP as the "Rhode Island Coastal
Resources Management Program," or the "Redbook," after its red-
colored cover.   Although Rhode Island's CMP apparently consists of
several interrelated documents, the term "CMP" will be used herein
to refer specifically to the Redbook.   The Redbook is codified at
R.I. Code R. 04 000 010 (2008).

certain federal licenses or permits for activities affecting coastal resources may be required to certify that the proposed activity complies with the affected state's federally approved CMP and that such activity will be conducted in a manner consistent with the CMP. See 16 U.S.C. § 1456(c)(3)(A). This process is known as "consistency certification." See 15 C.F.R. § 930.57.

In addition to FERC approval, Weaver's Cove's proposal to dredge the federal navigation channel requires the approval of the U.S. Army Corps of Engineers ("USACE") under Section 10 of the Rivers and Harbors Act. See 33 U.S.C. § 403. Consequently, on March 18, 2004, Weaver's Cove submitted a "Joint Section 10/404 Individual Permit Application" to the USACE seeking authorization to dredge in United States waters and to discharge fill materials into United States waters.[5] And because Rhode Island has listed Section 10 permits as among the various federal licenses and permits subject to its review under the CMP, Weaver's Cove was required to certify that the Section 10 permit activity — dredging — would be consistent with Rhode Island's CMP.[6] Weaver's Cove

---

[5] Weaver's Cove's joint application covered all USACE-permitted activities for both Weaver's Cove and Mill River. The Section 404 permit referred to in the title of the application is required for the construction of a pipeline in Massachusetts. See 33 U.S.C. § 1344. Only the Section 10 dredging permit applies to activities to be undertaken in Rhode Island, i.e. the Section 404 permit is not at issue here.

[6] Technically, Rhode Island's CMP does not appear to include Section 10 permits as a listed activity subject to consistency review. Instead, a separate document, CRMC's Federal Consistency

subsequently filed its certification with CRMC that the dredging proposed by its Section 10 permit application would be consistent with Rhode Island's CMP.

C.   Weaver's Cove's Consistency Certification

Weaver's Cove filed its consistency certification with CRMC on July 19, 2004.  Later that month, Dan Goulet, a CRMC staff member, telephoned Weaver's Cove and claimed that CRMC could not review the certification until Weaver's Cove provided certain information, purportedly required by the CMP, regarding the ultimate destination of the dredge material, and until Weaver's Cove resubmitted its design drawings for the project stamped by a Rhode Island engineer. In its July 19 submission to CRMC, Weaver's Cove had claimed that its specific dredge disposal plan was outside the jurisdiction of

---

Manual, lists Section 10 permits as a covered federal permit activity.   CRMC, Federal Consistency Manual, at 28, Table 2, available at http://www.crmc.ri.gov/regulations/programs/fedconsist.pdf (last visited on Sept. 18, 2008).  According to the CMP, the Federal Consistency Manual "details the CRMC's federal consistency process and requirements and includes tables of listed activities subject to the federal consistency requirement." CMP § 400(A)(4). The CMP does not expressly provide that the Federal Consistency Manual is part of Rhode Island's federally-approved coastal program. CMP § 400(A)(2) ("The Rhode Island Coastal Resources Management Program (RICRMP), which includes this 'Redbook,' the Council's Special Area Management Plans and Energy Amendments, and adopted State Guide Plan elements together make up Rhode Island's federally approved coastal program.").  It is not necessary at this time, however, to decide whether the manual actually is part of Rhode Island's federally-approved coastal program.  Weaver's Cove submitted its consistency certification on the assumption that it is, and based on the Court's decision herein, CRMC's concurrence with that certification must be presumed.

both CRMC and the Rhode Island Department of Environmental Management ("RIDEM"):

> Notably, Weaver's Cove intends to utilize dredged material as engineered fill on the LNG terminal site, and therefore has control over the proposed dredged material placement site. The permitting process for handling the dredge material at the Fall River site is well under way with the relevant Massachusetts permitting agencies. Details regarding existing and proposed conditions on the Fall River site are subject to the jurisdiction of the FERC and other federal agencies, as well as the pertinent Massachusetts agencies for review and permitting. No authorization for these Massachusetts activities is required from the RI DEM/CRMC.

Weaver's Cove followed Mr. Goulet's telephone call with two written communications. First, on August 2, 2004, Weaver's Cove sent a letter to CRMC explaining that the dredge material would be disposed of outside Rhode Island, and claiming that the CMP did not require information about such out-of-state disposal. Second, on August 12, 2004, Weaver's Cove resubmitted its design drawings to CRMC stamped by a Rhode Island engineer.

On August 26, 2004, CRMC sent a letter to Weaver's Cove in which it maintained that Weaver's Cove's application was incomplete.[7] This time, CRMC cited Weaver's Cove's failure to

---

[7] Weaver's Cove points out that CRMC's August 26, 2004 notification letter was issued more than thirty days after Weaver's Cove submitted its original consistency certification on July 19, 2004. Under the CZMA, a state has thirty days to notify an applicant that a consistency certification lacks necessary data and information. 15 C.F.R. § 930.60(a)(2). However, the August 26 letter was preceded by Mr. Goulet's telephone call only days after the consistency certification was submitted. The CZMA does not appear to require CRMC to provide written notification that an applicant's consistency certification is incomplete; rather,

provide a RIDEM Water Quality Certification with its application. A RIDEM Water Quality Certification confirms that a proposed activity complies with Rhode Island's water quality standards promulgated pursuant to Section 401 of the Federal Water Pollution Control Act ("Clean Water Act"), 33 U.S.C. §§ 1251 et seq. See R.I. Code R. 12 190 001.  CRMC's August 26, 2004 letter did not refer to the issue of dredge materials disposal.  After this letter, in spite of several additional communications, the parties reached an impasse.  To this day, CRMC has neither concurred with nor objected to Weaver's Cove's consistency certification.  Rather, CRMC has staked out a position that it was not - and still is not - required to act on the application because the six-month time period for doing so does not begin until it (CRMC) deems the application to be complete.

    D.   Subsequent Events

    In the four years since Weaver's Cove filed its consistency certification with CRMC, two events have occurred that may impact the ultimate terminal proposal.  While neither of these events, contrary to CRMC's view, affect either the justiciability of the present dispute or its outcome, they deserve mention in order to

---

written notification is required only if CRMC actually objects to the certification.  It is not necessary to dwell on this issue, however.  Since none of the additional information CRMC requested was necessary data and information, apart from perhaps the engineer's stamp, an issue sidestepped here, CRMC's concurrence must be presumed.

provide additional context and because CRMC raised them.  On March 17, 2005, Weaver's Cove requested that USACE "formally consider open ocean disposal as a back-up option" for disposal of the dredge material.[8]  Joint Appendix ("JA") 19, at 2.  However, although CRMC claims that "[i]t has become clear that . . . upland disposal is canceled," Weaver's Cove disputes that its request to USACE signaled an end to the upland disposal plan.

In August 2005, Congress passed and the President signed the "Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy For Users" ("SAFETEA-LU").  SAFETEA-LU provides that:

> Notwithstanding any Federal law, regulation, or policy to the contrary, no Federal funds shall be obligated or expended for the demolition of the existing Brightman Street Bridge connecting Fall River and Somerset, Massachusetts, and the existing Brightman Street Bridge shall be maintained for pedestrian and bicycle access, and as an emergency service route.

Pub. L. No. 109-59, § 1948, 119 Stat. 1144, 1514 (2005).  In its original proposal, Weaver's Cove anticipated that the Brightman Street Bridge, which traverses the projected path of the ships that would deliver LNG to the terminal in Fall River, would be removed to accommodate the passage of the ships.  After the enactment of SAFETEA-LU, Weaver's Cove investigated other arrangements, and submitted an alternative proposal to use smaller LNG tankers that could navigate under the bridge.  JA 40, at 1.  Because these

---

[8]  As Weaver's Cove points out, open ocean disposal was identified by the company as an alternative disposal plan as early as December 2003.  Joint Appendix ("JA") 2, at 56.

smaller tankers hold a correspondingly smaller amount of LNG, this alternative will require more ship transits to achieve the envisioned quantity of LNG. Id. Any increase in ship transits is problematic because every passage of an LNG tanker ship carries the potential to disrupt other maritime activities in the immediate vicinity. However, while Weaver's Cove and CRMC appear to agree that SFAETEA-LU has required Weaver's Cove to explore alternative shipping arrangements, the parties dispute the number of actual tanker transits that would be required as well as the effect of each transit.

E.   Weaver's Cove's Category B Assent Application

On July 19, 2004, simultaneously with its consistency certification, Weaver's Cove submitted to CRMC an application for a Category B Assent. A Category B Assent is a CRMC approval process, separate and distinct from consistency certification, required for certain alterations or activities that are proposed for tidal waters, shoreline features, or areas that are contiguous to shoreline features. See CMP § 100.1. CRMC has neither approved nor rejected Weaver's Cove's Category B Assent application.

F.   Weaver's Cove's Lawsuit Against CRMC

In response to CRMC's lack of objection or concurrence with its consistency certification, and before filing this action, Weaver's Cove made separate requests to FERC, the Secretary of Commerce (the "Secretary"), and the National Oceanic and

Atmospheric Administration ("NOAA"), for a determination that CRMC's concurrence with Weaver's Cove's consistency certification must be presumed.[9] FERC demurred, claiming it lacked jurisdiction. The Secretary refused to hear Weaver's Cove's appeal on the basis that CRMC had not actually made any objection from which an appeal could be taken.  NOAA gave no response at all.

On June 29, 2007, Weaver's Cove filed a complaint in this Court seeking, <u>inter alia</u>, a declaration that CRMC's concurrence with Weaver's Cove's consistency certification is conclusively presumed by virtue of the agency's inaction.  On September 10, 2007, Weaver's Cove filed an amended complaint seeking the original relief as well as a declaration that the Category B Assent process is preempted by the NGA or otherwise unenforceable under the so-called "dormant" Commerce Clause of the U.S. Constitution.

II.  Legal Background

Before turning to a discussion of the parties' respective positions, it is important to sketch the complicated legal framework within which Weaver's Cove claims must be considered.

A.  Natural Gas Act

The primary federal statute applicable to this dispute is the Natural Gas Act, 15 U.S.C. §§ 717 <u>et seq.</u>  Enacted in the 1930s, the Natural Gas Act was intended to regulate and facilitate the

---

[9] The Secretary is charged with implementing the CZMA, but has delegated much of his authority to NOAA.  <u>See</u> 16 U.S.C. §§ 1453(16), 1456(a); 15 C.F.R. §§ 923.1 <u>et seq.</u>

swiftly growing energy transportation industry in America. It requires a party seeking to construct an LNG terminal to first obtain authorization from FERC. See 15 U.S.C. § 717b(a). Applicants for authorization must comply with the NGA's requirements as well as complete FERC's extensive pre-filing process. See 18 C.F.R. § 157.21. FERC must then consult with a designated state agency on numerous state and local issues. See 15 U.S.C. § 717b-1(b). Although the NGA provides that "[FERC] shall have the exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal," id., the statute also contains a savings clause providing that "nothing in the [NGA] affects the rights of States under" the CZMA, the Clean Air Act, and the Clean Water Act.[10] Id.

B.   Coastal Zone Management Act

The Coastal Zone Management Act, 16 U.S.C. § 1451 et seq., was enacted by Congress in 1972 in an attempt to respond to increasing and competing demands on the nation's coastal resources. See 16 U.S.C. § 1451. Among other things, it was intended to encourage states to develop CMPs that set standards for public and private uses of land and water coastal zone. Id. § 1453(12).

Under the CZMA, the federal government provides each participating state a monetary grant to develop a CMP; in exchange,

_____

[10] Neither the Clean Air Act, 42 U.S.C. §§ 7401, et seq., or the Clean Water Act, 33 U.S.C. §§ 1251, et seq., are relevant to Weaver's Cove's claims here.

-12-

the state must agree to submit its CMP for federal approval.  See id. §§ 1454, 1455, 1455a.  The CZMA vests approval authority with the Secretary of Commerce, who in turn has delegated it to NOAA. See id. §§ 1453(16), 1456(a); 15 C.F.R. §§ 923.1 et seq.  NOAA will approve a state's CMP only if the program satisfies the specific criteria contained in the CZMA.  See 16 U.S.C. §§ 1454-55(b).  In exchange for their participation, states also receive an assurance that any federally permitted or licensed activity will comply with the CMP.  Id. § 1456(c).

When an applicant seeks a federal license or permit for an activity listed in the state's approved CMP, the applicant must certify that the activity "complies with the enforceable policies of the state's [CMP] and that such activity will be conducted in a manner consistent with the program."  16 U.S.C. § 1456(c)(3)(A). As part of its review and approval process, NOAA determines whether a particular activity that is proposed for listing in a state's CMP will be subject to consistency review.  See 15 C.F.R. § 923.53(a)(2) ("A State must include in its management program submission . . . [a] list of Federal license and permit activities that will be subject to review."); id. § 930.53(a) ("State agencies shall develop a list of federal license or permit activities which affect any coastal use or resource, including reasonably foreseeable effects, and which the State agency wishes to review for consistency with the management program.").  Listed activities

-13-

must be described in the CMP in terms of the specific federal license or permit involved, e.g. "Corps of Engineers 404 permits, Coast Guard bridge permits." 15 C.F.R. § 930.53(a). Once NOAA approves a state's CMP, all applications for listed licenses and permits are subject to the consistency review process. See Coastal Zone Mgmt. Act Fed. Consistency Regulations, Final Rule, 71 Fed. Reg. 788, 802 (Jan. 5, 2006). In sum, the CZMA gives states a conditional veto over federally licensed or permitted projects that are not consistent with "the enforceable policies of the state's approved [CMP]," subject to a final override by the Secretary. 16 U.S.C. § 1456(c)(3)(A) (Secretary may override state objection if proposed activity "is consistent with [CZMA] objectives . . . or is otherwise necessary in the interest of national security"); see also California Coastal Comm'n v. Granite Rock Co., 480 U.S. 572, 590-91 (1987) (generally describing consistency review process).

A state is not necessarily precluded from reviewing a federal license or permit activity that is not listed in its approved CMP. If it wishes to review an unlisted activity, the state must notify the federal agency issuing the license or permit, the applicant, and the Director of NOAA's Office of Ocean and Coastal Resource Management ("OCRM") within thirty days after the state receives notice of an application for a federal license or permit. 15 C.F.R. § 930.54(a)(1). Otherwise, the state waives its right to

review any unlisted activity.   Id.   But even if the state provides timely notice, authority to review an unlisted activity is not assured.   The Director of OCRM will evaluate the state's request, as well as any responses from the applicant and the relevant federal agency, and decide whether to allow the state to review the unlisted activity based solely on whether it engenders reasonably foreseeable coastal effects.   Id. § 930.54(c).

Once an applicant certifies to the relevant state agency that its proposed activity will be consistent with the state's CMP, the state agency has six months to concur with or object to the applicant's certification.   See 16 U.S.C. § 1456(c)(3)(A).   If no objection or concurrence is made within six months, the state's concurrence with the applicant's certification "shall be conclusively presumed."   Id.   The six-month review period begins when the state "receives the consistency certification . . . and all the necessary data and information required by [15 C.F.R.] § 930.58(a)."   15 C.F.R. § 930.60(a).   If an applicant fails to submit all necessary data and information, the state "shall notify the applicant and the Federal agency, within 30 days of receipt of the incomplete submission, that necessary data and information . . . was not received and that the State agency's six-month review period will commence on the date of receipt of the missing necessary data and information."   Id. § 930.60(a)(2).

If an applicant submits all necessary data and information, then a state's assertion that the submitted information is "substantively deficient," or a state's request for clarification of the information provided, or for information or data requested in addition to that required by 15 C.F.R. § 930.58 "shall not extend the date of commencement of State agency review." Id. § 930.60(c). In other words, a state's request for additional, as opposed to "necessary," data and information does not stop the six-month clock from running, but it may provide the basis for an objection to the certification if the state believes it cannot concur without first reviewing the additional information. Id.

C.   Other Federal Statutes

Beyond FERC approval and CZMA consistency review, Weaver's Cove's project must receive approvals under various other federal statutes. As already mentioned, section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401 et seq., prohibits the dredging of a navigable waterway unless approval is obtained from the USACE. See id. § 403. Section 404 of the Federal Water Pollution Control Act ("Clean Water Act"), 33 U.S.C. §§ 1251 et seq., authorizes the USACE to issue permits for the discharge of dredged or fill material into waters of the United States. See id. § 1344. Section 103 of the Marine Protection, Research and Sanctuaries Act ("Ocean Dumping Act"), 33 U.S.C. §§ 1401 et seq., authorizes the USACE to issue permits "for the transportation of

dredged material for the purpose of dumping it into ocean waters, where the Secretary [of the Army] determines that the dumping will not unreasonably degrade or endanger human health, welfare, or amenities, or the marine environment, ecological systems, or economic potentialities." Id. § 1413(a). The Port and Waterways Safety Act, 33 U.S.C. §§ 1221 et seq., requires certain parties to obtain a Letter of Recommendation ("LOR") from the U.S. Coast Guard ("USCG") as to the suitability of a waterway for a particular type of marine traffic. 33 C.F.R. §§ 127.007-127.009.

D.   Public Trust Doctrine and CRMC Category B Assent

In addition to the above federal requirements, Weaver's Cove's claims also implicate the common law Public Trust Doctrine and its state statutory expression, CRMC's Category B Assent process. The Public Trust Doctrine is an ancient legal doctrine inherited from English law. See generally Joseph D. Kearney & Thomas W. Merrill, The Origins of the American Public Trust Doctrine: What Really Happened in Illinois Central, 71 U. Chi. L. Rev. 799 (2004) (tracing history of public trust doctrine in United States). It provides, in essence, that certain resources are subject to a perpetual public trust foreclosing private exclusion rights. See Ill. Cent. R. Co. v. State of Illinois, 146 U.S. 387, 456 (1892). In the context of this case, the Public Trust Doctrine provides that Rhode Island holds in trust for its citizens the submerged lands beneath the navigable waters within the state's boundaries.

See Phillips Petroleum Co. v. Mississippi, 484 U.S. 469, 479 (1988); see also Greater Providence Chamber of Commerce v. Rhode Island, 657 A.2d 1038, 1041-42 (R.I. 1995).[11]

Pursuant to its claimed authority under the Public Trust Doctrine, Rhode Island, through CRMC, requires an applicant for any alterations or activities that are proposed for tidal waters, shoreline features, or areas that are contiguous to shoreline features, to obtain a permit - known as an "Assent" - from CRMC.[12] CMP § 100.1(A). With some exceptions, an Assent will either be a "Category A Assent" or a "Category B Assent." Category A Assent is typically reserved for those activities that may be approved administratively without a hearing. Id. §§ 110, 110.1. These tend to be of minor impact and may include activities such as construction of residential docks or minor dredging. Id. § 110(B). Category B Assents, on the other hand, are required for complex projects that do not meet the criteria for a Category A Assent, or

---

[11] Congress "effectively confirmed to the States the ownership of submerged lands within three miles of their coastlines" when it enacted the Submerged Lands Act ("SLA"), 67 Stat. 29 (1953), 43 U.S.C. §§ 1301-15. United States v. Alaska, 422 U.S. 184, 188 (1975).

[12] Although the Category B Assent process is detailed in Rhode Island's CMP, it is separate from Rhode Island's CZMA consistency review authority. See CRMC Federal Consistency Manual, at 7 ("[T]he issuance of a CRMC Assent and the certification or determination of federal consistency remain distinct, even when the two processes overlap.").

that receive a substantive objection from an interested party.   Id. § 110.1(C).

The Category B Assent process is considerably more stringent than its easier going brother.  Applications must be heard by the full CRMC, and the applicant must demonstrate in writing that it has met all the requirements enumerated in CMP § 300.1:

1. demonstrate the need for the proposed activity or alteration;

2. demonstrate that all applicable local zoning ordinances, building codes, flood hazard standards, and all safety codes, fire codes, and environmental requirements have or will be met; . . .;

3. describe the boundaries of the coastal waters and land area that are anticipated to be affected;

4. demonstrate that the alteration or activity will not result in significant impacts on erosion and/or deposition processes along the shore and in tidal waters;

5. demonstrate that the alteration or activity will not result in significant impacts on the abundance and diversity of plant and animal life;

6. demonstrate that the alteration will not unreasonably interfere with, impair, or significantly impact existing public access to, or use of, tidal waters and/or the shore;

7. demonstrate that the alteration will not result in significant impacts to water circulation, flushing, turbidity, and sedimentation;

8. demonstrate that there will be no significant deterioration in the quality of the water in the immediate vicinity as defined by [R.I. Department of Environmental Management];

9. demonstrate that the alteration or activity will not result in significant impacts to areas of historic and archaeological significance;

-19-

> 10. demonstrate that the alteration or activity will not
> result in significant conflicts with water-dependent uses
> and activities such as recreational boating, fishing,
> swimming, navigation, and commerce, and;
>
> 11. demonstrate that measures have been taken to minimize
> any adverse scenic impact . . . .

Depending on the circumstances of a particular application, additional requirements may apply.  CMP § 300.1.

III.  Standard of Review

Summary judgment is appropriately granted where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it has the "potential to affect the outcome of the suit." Velazquez-Garcia v. Horizon Lines of P. R., Inc., 473 F.3d 11, 15 (1st Cir. 2007) (citations omitted).

Once the movant has made the requisite showing, the opposing party "may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  The court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party.  See Torrech-Hernandez v. Gen. Elec. Co., 519 F.3d 41, 46 (1st Cir. 2008).  Cross motions for summary judgment do not change the standard, see Specialty Nat'l

Ins. Co. v. OneBeacon Ins. Co., 486 F.3d 727, 732 (1st Cir. 2007),
but rather require courts to determine whether either of the
parties deserves judgment as a matter of law on facts that are not
disputed.   See Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241
F.3d 103, 107 (1st Cir. 2001).

IV.  Discussion

    A.   Weaver's Cove's Consistency Certification

       1.   Necessary Data and Information

CRMC maintains that its concurrence with Weaver's Cove's
consistency certification cannot be presumed because Weaver's Cove
failed to provide necessary data and information, and thus the CZMA
review period never commenced.   As relevant here, the necessary
data and information includes "[i]nformation _specifically_
_identified_ in the [Rhode Island CMP] as required necessary data and
information for an applicant's consistency certification."[13]   15
C.F.R. § 930.58(a)(2) (emphasis added).   Weaver's Cove's
consistency certification, originally filed on July 19, 2004, was
claimed by CRMC to be incomplete because it lacked three elements
the CMP purportedly required: (1) a letter of acceptance from the
facility that would be receiving the dredge materials; (2) the
stamp of a Rhode Island engineer on the project's design drawings;

_____

    [13] A complete consistency certification will contain other
information, such as a copy of the application for the federal
license or permit.   See 15 C.F.R. § 930.58(a).   None of the other
enumerated categories of necessary data and information are
relevant to the present motions.

and (3) a Water Quality Certification from RIDEM. It is unnecessary to decide whether the stamp of a Rhode Island engineer is necessary data and information because Weaver's Cove resubmitted the drawings on August 12, 2004, with such a stamp included. Even if the six month review date commenced on this later date it has expired, leaving the core dispute unchanged.

With respect to the letter of acceptance, the CMP provides that "[w]hen disposal [of dredged materials] is proposed <u>for approved upland facilities</u>, the applicant shall provide a letter of acceptance from that facility, unless the disposal is approved for the central landfill." CMP § 300.9(C)(7) (emphasis added). Weaver's Cove did not include any letter of acceptance with its consistency certification because, it argues, the term "approved upland facilities" does not (and indeed cannot) include disposal sites outside Rhode Island. CRMC disagrees with this interpretation, and so notified Weaver's Cove by telephone shortly after Weaver's Cove submitted its consistency certification.

It is with respect to this question - whether inclusion of a letter or notice of acceptance regarding out-of-state dredge disposal is necessary data and information - that the line in the sand was drawn. CRMC argues that in its dealings with Weaver's Cove it has "always maintained an approved and properly permitted upland dredge disposal site whether in Rhode Island or elsewhere, was 'necessary data and information' required by the CRMC's

-22-

program." Docket 29, at 32. Weaver's Cove, in contrast, contends that the CMP is very specific, requiring a letter of acceptance _only_ when disposal is proposed for "approved upland facilities." CMP § 300.9(C)(7).

Unfortunately, the CMP does not provide a definition for "approved upland facilities" within its four corners; however, Weaver's Cove claims that a definition is found in the Rhode Island Rules and Regulations for Dredging and the Management of Dredged Material ("Dredging Regulations"). These regulations define "upland areas" as "[a]ll areas of _the state_ that are not in the coastal zone." R.I. Dept. of Envtl. Mgmt., Rules and Regulations for Dredging and the Management of Dredged Material § 4.20 (emphasis added), available at http://www.dem.ri.gov/pubs/regs/regs/water/dred0203.pdf (last visited on Sept. 18, 2008). Weaver's Cove argues that the CMP, when read through the prism of the Dredging Regulations, implicitly provides that no letter of acceptance is required where disposal of dredged materials is proposed for an out-of-state disposal site (including open ocean disposal sites). Since such a letter is not required by the CMP, Weaver's Cove contends, CRMC has no authority to declare it to be necessary data and information under the CZMA.

CRMC argues that the Dredging Regulations are "completely irrelevant" because they relate to a "completely separate program with completely separate goals." But while it is true that the

-23-

Dredging Regulations are not among those documents listed in the CMP as comprising Rhode Island's federally-approved coastal program, see CMP § 400(A)(2), the two regulatory schemes are not nearly as distinct as CRMC contends.  Under Rhode Island's Marine Waterways and Boating Facilities Act, R.I. Gen. Laws §§ 46-6.1-1 et seq., it is RIDEM, not CRMC, that is charged with approving "upland sites and types of areas suitable for beneficial use and disposal of dredged materials."  R.I. Gen. Laws § 46-6.1-5(b).  The statute provides that RIDEM's list of approved sites is to be incorporated by CRMC into its plan for dredged material management.  Id.  In other words, RIDEM's regulatory definition of "upland areas" is connected by a direct statutory link to the CMP's requirement for a letter of acceptance from an "approved upland facility."

The Dredging Regulations themselves also belie CRMC's claim. First, the Dredging Regulations provide that they "are . . . intended to be consistent with the . . . the Coastal Resources Management Council Act, R.I. General Laws Chapter 46-23 (1956); [and] the federal Coastal Zone Management Act 16 U.S.C. § 1454 et seq." Dredging Regulations § 2.  Second, they specifically provide that they "apply to all aspects of dredging proposed in marine waters of the State of Rhode Island," id. § 3 (emphasis added), and "shall be implemented in accordance with a written protocol, adopted jointly by [RIDEM] and [CRMC] for purposes of further coordinating and streamlining the interagency review of

-24-

applications." Id.  This language leaves little doubt that CRMC's enforcement of its CMP must be consistent with the Dredging Regulations when the issue is dredging.  To hold otherwise would be to say that CRMC may apply ad hoc definitions and interpretations at odds with its own governing statutes and regulations.

It follows from this that a letter of acceptance from an out-of-state disposal facility is not necessary data and information under the CMP.  The Dredging Regulations, which "apply to all aspects of dredging proposed in marine waters of the State of Rhode Island," Dredging Regulations § 3, define "upland areas" as "[a]ll areas of the state that are not in the coastal zone." Id. § 4.20 (emphasis added).  If nothing else, an "approved upland facility" must be by definition a facility that is located in an area of the state (that is, Rhode Island) that is not in the coastal zone.  To hold otherwise would render the CMP's specific language a nullity.[14]

_____

[14] To be sure, there is some tension between RIDEM's Dredging Regulations and the Marine Waterways and Boating Facilities Act. The statute defines "upland areas" as "areas that are not in the coastal zone."  R.I. Gen. Laws § 46-6.1-4(16).  As noted, the Dredging Regulations provide more narrowly that "upland areas" are "[a]ll areas of the state that are not in the coastal zone." Dredging Regulations § 4.20.  While not controlling, the interpretation given a statute by the administering agency is entitled to great weight. Berkshire Cablevision of R. I., Inc. v. Burke, 488 A.2d 676, 679 (1985).  When an administrative agency interprets a statute within its regulatory purview, a court reviewing the agency's interpretation must accord that interpretation "weight and deference as long as that construction is not clearly erroneous or unauthorized . . . even when other reasonable constructions of the statute are possible." Labor Ready Ne., Inc. v. McConaghy, 849 A.2d 340, 344-45 (2004).  Here, the statute is aimed at managing dredging and the disposal of dredge

-25-

Because a letter of acceptance from an out-of-state disposal facility cannot be necessary data and information, the failure to provide such a letter cannot serve to toll the commencement of the six-month review period provided by the CZMA. CRMC's apparent belief that information regarding the location of disposal is always "necessary," Docket 29, at 37, reflects either a misunderstanding of the issue, or a misguided tactical gamble. To be clear, the issue is <u>not</u> whether CRMC may request that an applicant for a federal consistency determination provide information related to out-of-state disposal. As Weaver's Cove concedes, the regulations in force when it originally submitted its consistency certification to CRMC unquestionably allowed state agencies to request information beyond necessary data and information. <u>See</u> 15 C.F.R. § 930.60(b) (2005). Failure of an applicant to provide such additional information did not, however, toll the date of commencement of the agency's review because it was not necessary data and information. <u>Id.</u> ("A State agency request for information or data in addition to that required by § 930.58 shall not extend the date of commencement of State agency review."). This is carried over in the current regulation, which provides that "[i]f an applicant has submitted all necessary data

---

material <u>within Rhode Island</u>. <u>See</u>, <u>e.g.</u>, R.I. Gen. Laws. § 46-6.1-2 (listing legislative findings). RIDEM's regulatory definition of "upland areas," which also has been implicitly if not explicitly adopted by CRMC, is therefore appropriate.

and information required by § 930.58, then a State agency's . . . request for clarification of the information provided, or information or data requested that is in addition to that required by § 930.58 shall not extend the date of commencement of State agency review." 15 C.F.R. 930.60(c) (2006); <u>see also</u> <u>Coastal Zone Mgmt. Act Fed. Consistency Regulations: Final Rule</u>, 71 Fed. Reg. 788, 796, ("If a State wants to require information in addition to that required by NOAA in § 930.58(a) prior to starting the six-month review period, the only way the State can do so is to amend its management program to identify specific 'necessary data and information' pursuant to § 930.58(a)(2).").[15]

Although the failure to provide such additional information does not toll the commencement of the six month review period, it can be grounds for <u>objecting</u> to a consistency certification. When Weaver's Cove refused to provide the requested information regarding out-of-state dredge disposal, CRMC was required to choose between objecting to or concurring with the certification within six months or else forfeit its right to do either.

The second alleged deficiency in Weaver's Cove's consistency certification is the absence of a Water Quality Certification from RIDEM. But here, again, the information requested by CRMC is not necessary data and information. In fact, quite the opposite. At

---

[15] And, of course, as outlined elsewhere in this decision, such an amendment must be approved by NOAA before it is effective. No such amendment was made to the CMP here.

the time Weaver's Cove submitted its consistency certification, the CMP provided:

> Except for federal consistency reviews, applicants for dredging or open waters disposal of dredged materials shall be required to obtain a Section 401 (Clean Water Act) Water Quality Certification from the Department of Environmental Management (DEM) before the Council can consider granting approval for the project.

CMP § 300.9(C)(2) (emphasis added). Even in the face of this apparently clear language, CRMC argues that the exemption applies only to "direct federal activities and not applicants for a federal license or permit activity." Docket 29, at 39. In other words, CRMC takes the position that only consistency reviews of projects to be conducted by federal agencies (such as the Army Corps of Engineers) are exempt from the Water Quality Certification requirement. CRMC's argument again stretches the plain language of the CMP beyond recognition.

First, the CZMA contemplates that the term "federal consistency review" encompasses both direct federal activities and federal license or permit activities. For example, NOAA's CZMA regulations are intended to "implement the federal consistency requirement" and "describe the obligations of all parties who are required to comply with the federal consistency requirement." 15 C.F.R. § 930.1(a), (b) (2006) (emphasis added). NOAA specifically includes federal license and permit applicants among those parties required to comply with the "federal consistency requirement." Id. § 930.1(b) (emphasis added). The regulations provide that NOAA,

through OCRM, "shall review the performance of each State's implementation of the <u>federal</u> consistency requirement." <u>Id.</u> § 930.3 (emphasis added).   In the event of a conflict between a federal and state agency "regarding whether a listed or unlisted federal license or permit activity is subject to the <u>federal</u> consistency requirement," either party may request NOAA mediation assistance.   <u>Id.</u> § 930.55 (emphasis added).

Second, in July 2005, more than six months <u>after</u> Weaver's Cove submitted its consistency certification, CRMC proposed an amendment which, among other things, substituted "direct federal activities" for "federal consistency reviews," such that the CMP now reads:

> <u>Except for direct federal activities</u>, applicants for dredging or open waters disposal of dredged materials shall be required to obtain a dredging permit (which contains the Section 401 Clean Water Act Water Quality Certification) from the Department of Environmental Management (DEM) before the Council can consider granting approval for the project.

CMP § 300.9(C)(2) (emphasis added).[16] Although CRMC claims that the amended Section 300.9(C)(2) was intended only to clarify what was always implicit - that a Water Quality Certification is required

---

[16] Weaver's Cove suggests that the amended Section 300.9(C)(2) is ineffective because it has not received the approval of NOAA, as required by 16 U.S.C. § 1455(e).   While NOAA's approval is conclusively presumed if it does not approve or disapprove the proposed amendment within thirty days after receiving it from the state, 16 U.S.C. § 1455(e)(2), the Court is not aware of whether CRMC has even submitted the proposed amendment to NOAA.   But there is no need to resolve this question because the amendment was proposed more than six months after Weaver's Cove submitted its consistency certification to CRMC.

for any dredging project other than a direct federal activity, the CMP made use of the term "direct federal activities" even <u>before</u> the amendment was proposed. See <u>id.</u> § 400(B)(2) (defining "direct federal activities" as "activities, including development projects, performed by a federal agency, or contractor on behalf of the federal agency."). If CRMC's intent was always to exempt only direct federal activities from the Water Quality Certification requirement, it could have done so using the terminology - "direct federal activities" - already written into the CMP.

Moreover, even if a Water Quality Certification was necessary data and information at the time Weaver's Cove submitted its original consistency certification, subsequent regulatory changes made by NOAA appear to preclude CRMC from requiring such information. When Weaver's Cove submitted its certification, states were allowed to describe state-issued permits as necessary data and information. See 71 Fed. Reg. 788, 795. NOAA subsequently determined that this indulgence could result in states requiring applicants to obtain state permit approval before the commencement of the six-month CZMA consistency review period, essentially resulting in a state consistency decision before the commencement of the CZMA review period. <u>Id.</u> NOAA believed that the public comment period on federal consistency could be rendered moot because necessary state approvals would already have been obtained. <u>Id.</u> Consequently, the CZMA regulations were amended to

provide that "[n]ecessary data and information may include completed State or local government permit applications which are required for the proposed activity, but shall not include the issued State or local permits." 15 C.F.R. § 930.58(a)(2) (emphasis added). CRMC explicitly conceded the effect of this regulatory change when, at oral argument, it tentatively agreed to process a resubmitted consistency certification without a Water Quality Certification. Apr. 28, 2008 Hrg. Tr., at 52:1-22.

In sum, under the CMP as it existed during the time period relevant to Weaver's Cove's consistency certification, and under current NOAA regulations, a Water Quality Certification was and is not necessary data and information. As with a letter of acceptance for out of state dredge disposal, CRMC could have objected to the consistency certification based on Weaver's Cove's failure to provide the Water Quality Certification (at the risk of being overruled by the Secretary); but that failure could not and did not toll the commencement of CRMC's six month review period.

Because neither a letter of acceptance from an out-of-state facility nor a Water Quality Certification are necessary data and information under Rhode Island's CMP, Weaver's Cove's failure to provide the information when demanded by CRMC did not toll CRMC's six-month review period. CRMC's concurrence with the consistency certification therefore must be conclusively presumed, because it

failed to concur with or object to Weaver's Cove's completed application prior to expiration of the review period.

        2.   Mootness

CRMC argues that, even if Weaver's Cove's consistency certification was complete when filed, this lawsuit is moot because of the purported changes made to the company's dredge scow and LNG tanker transit plans. As conceded by CRMC, these changes, if they are changes, did not materialize until more than six-months _after_ Weaver's Cove submitted its consistency certification. See Apr. 28, 2008 Hrg. Tr., at 28:10-15. Regardless of when these developments arose, they are irrelevant to the specific activity — dredging — for which Weaver's Cove sought CRMC's consistency review.[17]

The CZMA provides CRMC with a narrowly cabined jurisdiction to review whether certain proposed activities are consistent with Rhode Island's CMP. See 15 C.F.R. § 923.53(a)(2). CRMC cannot point to anything in Rhode Island's CMP that even suggests that dredge scow or LNG tanker transits are subject to CRMC's consistency review jurisdiction. Although states may sometimes review activities not listed in their NOAA-approved CMP, as

_____

[17] CRMC appears to recognize that Weaver's Cove's consistency certification has not changed, as evidenced by its statement that "Weaver's Cove insists on maintaining its . . . initial [consistency certification] submission against the advice of both federal and state authorities." Docket 12, at 1.

described above, CRMC does not claim to have filed any timely request to review any unlisted activities.

Despite being constrained by the obvious silence of the CMP, CRMC nonetheless argues that it has open-ended authority under the CZMA to review federal license or permit activities that it believes will affect a coastal use or resource. See, e.g., Apr. 28, 2008 Hrg. Tr., at 34:5-7 ("We have review of anything relating to this project that's taking place in Rhode Island.").[18]  CRMC claims this broad "effects test" vests it with jurisdiction to review the "drastic changes in dredging and shipping" that allegedly accompany Weaver's Cove's current project proposal. Docket 29, at 17-18, 23.  This is incorrect.  Whether a federal license or permit activity will engender coastal "effects" is an inquiry NOAA makes when it either approves the listing of a particular activity in a state's CMP or a state's request to review

_____

[18] CRMC also appears to claim jurisdiction to review activities occurring in another state; here, the construction and operation of an LNG terminal in Massachusetts.  Docket 29, at 22 ("Rhode Island's CZMA rights with respect to Weaver's Cove's current LNG project have been triggered [by] FERC's authorization under Section 3 of the Natural Gas Act.").  In order to review interstate activities for consistency, a state must submit to NOAA's OCRM a list of such activities the state wishes to review, as well as a description of the geographic location for each activity.  15 C.F.R. § 930.154(d).  A state that fails to list activities subject to interstate review, or to describe the geographic location for these activities, may not exercise its right to review activities occurring in other states.  Id. § 930.154(e).  Rhode Island has not submitted any such list of interstate activities.  See http://www.coastalmanagement.noaa.gov/consistency/interstate.html (listing coastal states that have sought interstate consistency review jurisdiction) (last visited on Sept. 18, 2008).

an unlisted activity.  See Coastal Zone Mgmt. Act Fed. Consistency Regulations, Final Rule, 65 Fed. Reg. 77,124, 77,144 (Dec. 8, 2000).  The "effects test" does nothing to expand a state's jurisdiction beyond its NOAA-approved CMP.  Accordingly, CRMC is without jurisdiction to review proposed activities unless it proceeds according to the CZMA's provisions governing review of listed and unlisted activities.  The only activity for which a consistency certification is or was required is Weaver's Cove's proposed Section 10-permitted dredging in Rhode Island waters.[19]

Second, CRMC argues Weaver's Cove's proposed project is a "nullity" because the USCG has not approved Weaver's Cove's LNG tanker transit proposal, and the enactment of SAFETEA-LU means it is unlikely Weaver's Cove could ever obtain approval.  Docket 29, at 7.  But CRMC has not shown that these events would make it impossible for the Court to grant Weaver's Cove the relief sought. An action is properly dismissed for mootness only if an event occurs "that makes it impossible for the court to grant any

---

[19] CRMC claims that certain language in its Federal Consistency Manual "eliminate[s] any doubt about the right of the state to review the effects of LNG tanker operations within Rhode Island's coastal zone."  Docket 39, at 6.  Specifically, the manual provides that its list of activities is "not exhaustive and does not obviate the responsibility of applicants for federal approvals to submit a consistency certification for any activity reasonably likely to affect any coastal use or resource to the CRMC."  Federal Consistency Manual, Table 2, at 28.  Even if the CRMC's Federal Consistency Manual is part of Rhode Island's CMP, however, this provision cannot be given the open-ended effect claimed by CRMC without completely eviscerating the CZMA-mandated listing and consistency review process.

effectual relief whatever." <u>Gulf of Me. Fisherman's Alliance v.</u> <u>Daley</u>, 292 F.3d 84, 88 (1st Cir. 2002) (citation omitted). Weaver's Cove appears to have suffered setbacks, but it cannot be said with certainty it will thus be unable to complete its project, even if in a modified form.

> 3.    CRMC's Request For Supplemental Certification

In addition to arguing that Weaver's Cove's certification is moot, CRMC argues that Weaver's Cove must submit a new or supplemental consistency certification because Weaver's Cove's "decision to double the number of LNG vessel transits . . . and to increase the transit miles of dredge scows 100 fold" are "major amendments" to the original certification. Docket 29, at 23-27. Under the CZMA, the term "major amendment" means

> any subsequent federal approval that the applicant is required to obtain for modification to the <u>previously</u> <u>reviewed and approved activity</u> and where the activity permitted by issuance of the subsequent approval will affect any coastal use or resource, or, in the case of a major amendment subject to § 930.51(b)(3), affect any coastal use or resource in a way that is substantially different than the description or understanding of effects at the time of the original activity.

15 C.F.R. § 930.51(c) (emphasis added). Here, the alleged changes identified by CRMC, even if presumed to be accurately stated, do not constitute "major amendments."

Changes to Weaver's Cove's LNG vessel transit plan relate to marine traffic activity, not to dredging. In order to implement its transit plan, Weaver's Cove must obtain a Letter of

Recommendation from the USCG pursuant to the Port and Waterways Safety Act, as to the suitability of a waterway for a particular type of marine traffic. See 33 C.F.R. §§ 127.007, 127.009 (2008). A party seeking to obtain an LOR must submit an application referred to as a Letter of Intent ("LOI"). See id. § 127.007. Based on Weaver's Cove's LOI, the relevant USCG official, known as the Captain of the Port ("COTP"), must issue an LOR "as to the suitability of the waterway for [liquefied hazardous gas] or LNG marine traffic." Id. § 127.009 (emphasis added). In addition to relating to marine traffic rather than dredging, the LOI is not a federal license or permit activity listed in Rhode Island's CMP. See Docket 29, at 22 ("the LOI process . . . may not be a direct trigger under the CZMA of the State's consistency review").[20]

Similarly, changes to the dredge disposal plan relate to the "transportation of dredged material by vessel or other vehicle for the purpose of dumping it in ocean waters at [designated] dumping sites," not to the dredging activity itself. 33 C.F.R. § 324.1. Moreover, CRMC actually limited its review jurisdiction over open ocean disposal. CRMC's Federal Consistency Manual provides that the agency may review "permits and licenses to regulate

---

[20] CRMC also argues that it may review the transit plan because the CMP lists "Permits and authorizations for the handling of dangerous cargo by vessel in US ports pursuant to 46 USC 170." Docket 29, at 22. But Weaver's Cove has not filed any application for a permit or license issued under that provision. And, in any event, 46 U.S.C. § 170 has been repealed and replaced by a revised title. See 46 U.S.C. § 2106.

-36-

transportation of dredged material for the purpose of dumping it in navigable waters pursuant to Sec. 103 of the Marine Protection, Research and Sanctuaries Act of 1972." CRMC, Federal Consistency Manual, at Table 2 (emphasis added), available at http://www.crmc.ri.gov/regulations/programs/fedconsist.pdf (Last visited on Dept. 18, 2008). "Navigable waters" include ocean and coastal waters "within a zone three geographic (nautical) miles seaward from the baseline (The Territorial Seas)." 33 C.F.R. § 329.12(a) (emphasis added). Weaver's Cove has not proposed to use any disposal site within three nautical miles from any shore of Rhode Island. As required by Section 103 of the Ocean Dumping Act, Weaver's Cove applied to the Secretary of the Army for a permit "for the transportation of dredged material for the purpose of dumping it into ocean waters." 33 U.S.C. § 1413(a). The term "ocean waters" means "those waters of the open seas lying seaward of the base line from which the territorial sea is measured, as provided for in the Convention on the Territorial Sea and the Contiguous Zone (15 UST 1606: TIAS 5639)." 33 C.F.R. § 324.2(a). The offshore disposal location that has been explored by Weaver's Cove, the Rhode Island Sound Disposal Site, "is located approximately nine [nautical miles] south of Point Judith, Rhode Island and approximately 6.5 nmi east of Block Island, Rhode

Island."[21]  Ocean Disposal; Designation of a Dredged Material Disposal Site in Rhode Island Sound, 69 Fed. Reg. 75,256-01, 75,259 (Dec. 16, 2004).  Thus, under its own regulations, CRMC has no jurisdiction to review Weaver's Cove's proposal, such as it is, to dispose of dredge materials at the Rhode Island Sound Disposal Site.

In addition to being contrary to law, CRMC's assertion of review jurisdiction over ocean disposal does not square with its own representations to the Court.  CRMC argues in its memorandum of law that "[i]t is essential for any meaningful CRMC review to know with certainty the location and conditions attached to any dredge disposal site," Docket 29, at 38-39, but at oral argument CRMC counsel conceded that CRMC would not require Weaver's Cove to provide a letter of acceptance from a disposal facility if CRMC had "official notice" that Weaver's Cove was going to use an open water disposal site.  See, e.g., Apr. 28, 2008 Hrg. Trn., at 52:23-53:3.

In contrast to tanker transit and dredge disposal activities, Weaver's Cove's proposed Section 10-permitted dredging activities relate to actual dredging in the navigable waters off Rhode Island's coast.  See 33 C.F.R. §§ 322.1, 322.2(c).  Weaver's Cove

---

[21] Regardless of whether Weaver's Cove ultimately relies on open water disposal, the parties do not dispute that the ocean disposal site envisioned by Weaver's Cove is the Rhode Island Sound Disposal Site.  Docket 29, at 5; Docket 32, at 28.

has proposed no alteration to <u>this</u> activity — the dredging activity — which is the activity subject to consistency review by CRMC.

4.   Res Judicata And/Or Collateral Estoppel

CRMC additionally argues that res judicata and/or collateral estoppel bar Weaver's Cove's claims because Weaver's Cove failed to "appeal from the rejections it received from the Secretary [of Commerce] and FERC." Docket 29, at 43.   The doctrine of res judicata bars "relitigating issues which were raised or could have been raised in a previous action, once a court has entered a final judgment on the merits in the previous action." <u>Aunyx Corp. v. Canon U.S.A., Inc.</u>, 978 F.2d 3, 6 (1st Cir. 1992).   A matter is adjudicated when there is a "decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." <u>Teti v. Bender</u>, 507 F.3d 50, 56 (1st Cir. 2007) (internal quotation omitted).

Res judicata has no application to this case because the Secretary and FERC did not decide the merits of Weaver's Cove's claims.   Instead, the Secretary twice held that Weaver's Cove's appeals were premature: "[A]bsent an objection by Rhode Island, there is no basis for an appeal to the Secretary of Commerce.   To date, Rhode Island has not objected to [Weaver's Cove's] consistency certification.   Accordingly, [Weaver's Cove's] appeal is dismissed for good cause." JA 51; <u>see also</u> JA 32.   FERC

disclaimed jurisdiction altogether, writing that "[t]his Commission is not in a position to interpret regulations of other agencies or otherwise resolve the issues raised by the parties.  This issue is a matter for the [CRMC], the NOAA, and the Department of Commerce, not this Commission."  Weaver's Cove Energy, LLC, 114 FERC ¶ 61,058, at 61,182-83 (2006) ("Weaver's Cove II").  Neither the Secretary nor FERC rendered a decision on the merits of Weaver's Cove's claims.  Instead, the decisions turned on procedural grounds.  This is not an appropriate basis on which to apply res judicata.  See Teti, 507 F.3d at 56.

Similarly, Weaver's Cove's claims are not barred by collateral estoppel.  Collateral estoppel may be raised where "(1) both the . . . proceedings involved the same issue of law or fact; (2) the parties actually litigated the issue in the [prior] proceeding[ ]; (3) the [first] court actually resolved the issue in a final and binding judgment . . .; and (4) its resolution of that issue of law or fact was essential to its judgment (i.e., necessary to its holding)."  Global Naps, Inc. v. Massachusetts Dept. of Telecomm. & Energy, 427 F.3d 34, 44 (1st Cir. 2005) (alterations in original) (quoting Monarch Life Ins. Co. v. Ropes & Gray, 65 F.3d 973, 978 (1st Cir. 1995)).

As discussed above, the Secretary and FERC dismissed Weaver's Cove's requests on procedural, not substantive, grounds.  Weaver's Cove never litigated the issues it has raised here, nor did the

Secretary or FERC issue a "final and binding judgment" with respect to whether the CRMC's concurrence should be conclusively presumed. Thus, collateral estoppel does not apply.

### 5.   Administrative Procedure Act

Finally, CRMC appears to argue that Weaver's Cove is prevented from bringing this action because it did not seek review of the decisions of the Secretary and FERC pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, et seq.; Docket 29, at 43-44 ("[F]ailing to appeal the rejections it received from the Secretary and from FERC . . . constitutes a neglect of the available recourse found in the APA."). To the extent CRMC is attempting to argue that Weaver's Cove failed to exhaust its administrative remedies, the doctrine of exhaustion provides that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." Woodford v. Ngo, 548 U.S. 81, 88-89 (2006) (emphasis added) (quotation omitted). CRMC has not identified any mandatory administrative remedy that Weaver's Cove failed to pursue.

Moreover, a party is not barred from obtaining declaratory relief simply because it did not seek relief under the APA. See Fed. R. Civ. P. 57 ("The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."); Lovelades Harbor, Inc. v. United States, 27 F.3d 1545, 1559 (Fed. Cir. 1994) (Declaratory relief "is an additional

form of relief, readily available even when it would be cumulative of other requested relief."). In sum, none of the above arguments advanced by CRMC bar Weaver's Cove from bringing its claims in this Court.

B.    Preemption Of Category B Assent

Under the Supremacy Clause of the U.S. Constitution, art. VI, cl. 2, state law that conflicts with federal law is "without effect," Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992) (internal quotation omitted), although there is an "assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purposes of Congress." Id. (internal quotation and citation omitted).

Weaver's Cove contends that the NGA preempts CRMC's attempt to require Weaver's Cove to obtain a Category B Assent in order to undertake the proposed dredging required for the LNG terminal project. CRMC argues that Weaver's Cove must obtain a Category B Assent because Rhode Island owns the submerged lands under the State's coastal waters, and thus "Weaver's Cove must apply under purely state law, to the CRMC, for a license to use state land separate and apart from any Federal determination requirements." Docket 8, ¶ 75; Docket 12, ¶ 75.

The circumstances in which a federal law will have preemptive effect are familiar, if frequently enigmatic. See S. Union Co. v.

Lynch, 321 F. Supp. 2d 328, 337-38 (D.R.I. 2004).  The touchstone is congressional intent.  See Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 299 (1988).  First, Congress may expressly announce an intent to preempt state law.  See Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 95-96 (1983).  Second, Congress implicitly may indicate its intent to occupy a given field to the exclusion of state law.  See Schneidewind, 485 U.S. at 300.  The Court may properly infer such an intent where the pervasiveness of the federal regulation precludes supplementation by the states, where the federal interest in the field is sufficiently dominant, or where "the object sought to be obtained by the federal law and the character of obligations imposed by it . . . reveal the same purpose."  Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947); see also United Parcel Serv., Inc. v. Flores-Galarza, 318 F.3d 323, 336 (1st Cir. 2003) (no presumption against preemption where federal government has had longstanding regulatory presence).  Third and finally, even where Congress has not explicitly or implicitly signaled any such intention, state law may be preempted "'when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.'"  California Coastal Comm'n v. Granite Rock Co., 480 U.S. 572, 581 (1987)

(quoting <u>Silkwood v. Kerr-McGee Corp.</u>, 464 U.S. 238, 248 (1984) (internal citations omitted)).[22]

    1.   Express Preemption

The NGA provides that FERC "shall have the <u>exclusive</u> authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal." 15 U.S.C. § 717b(e)(1)(emphasis added).[23] This grant of exclusive authority to FERC leaves state and local governments with no residual power to site LNG terminals or to take actions that would effectively approve or deny such siting. <u>See AES Sparrows Point LNG, LLC v. Smith</u>, 470 F. Supp. 2d 586, 598 (D. Md. 2007) ("<u>AES I</u>"). Unless a state or local law that would prohibit the siting of an LNG terminal is exempted from § 717b(e)(1)'s preemptive effect by some

_____

    [22] It is sometimes said that there are two species of preemption - express and implied. <u>See</u> <u>Pharm. Research & Mfrs. of Am. v. Concannon</u>, 249 F.3d 66, 74 (1st Cir. 2001). Courts adhering to this duotone construction describe field preemption and conflict preemption as subspecies of implied preemption. <u>See</u> <u>Mass. Ass'n of Health Maint. Orgs. v. Ruthardt</u>, 194 F.3d 176, 179 (1st Cir. 1999).

    [23] In its reply brief, CRMC argued for the first time that 15 U.S.C. § 717b(e)(1), which was added to the NGA by the Energy Policy Act of 2005 ("EPAct"), cannot form the basis of any finding of express preemption because "the FERC conditional approval in this case was issued under the old law, before EPAct was passed." Docket 39, at 17. First, EPAct was in force when Weaver's Cove filed its lawsuit. Second, FERC reaffirmed its original approval of Weaver's Cove's application after EPAct was enacted. <u>See</u> Weaver's Cove Energy, LLC, 114 FERC ¶ 61,058 (2006) ("<u>Weaver's Cove II</u>"). Third, as explained throughout this decision, the preemptive effect of the NGA in the context of this case stems not only from the express language of the statute, but also from the interpretive decisions of FERC and the interplay between the NGA and the Category B Assent regulations.

other provision of federal law, it is unenforceable under the Supremacy Clause.  Indeed, the NGA contains a savings clause that reserves to the states certain authority under the CZMA, the Clean Air Act, and the Clean Water Act.  See 15 U.S.C. § 717b(d).  This demonstrates that Congress intended to preempt all state laws relating to siting of LNG facilities except those enacted pursuant to the states' delegated authority under these three enumerated statutes.

Although the NGA is clear (and that is enough to decide the question), it is instructive that FERC interprets the NGA as vesting it with preemptive authority over LNG projects.  In 2004, for example, FERC considered an application for the siting, construction, and operation of an LNG terminal off the coast of California, for the purpose of importing LNG into the United States.  Sound Energy Solutions, 106 FERC ¶ 61,279, at 62,014 (2004) ("SES I").  The California Public Utilities Commission ("CPUC") contended that it, rather than FERC, had jurisdiction over the siting and operation of the proposed terminal.  Rejecting the CPUC's contention, FERC noted that the Secretary of Energy "specifically delegated responsibility to [FERC] to approve or disapprove applications for the siting, construction, and operation of import/export facilities."  Id. at 62,017.  The scope of this responsibility includes environmental reviews:

> Because FERC has authority to consider environmental
> issues, states may not engage in concurrent site-specific

-45-

environmental review. Allowing all the sites and all the specifics to be regulated by agencies with only local constituencies would delay or prevent construction that has won approval after federal consideration of environmental factors and interstate need, with the increased costs or lack of gas to be borne by utility consumers in other states.

Id. at 62,018 (quoting Nat'l Fuel Gas Supply Corp. v. Pub. Serv. Comm'n of N.Y., 894 F.2d 269, 274 (2d. Cir. 1990)); see also Sound Energy Solutions, 107 FERC ¶ 61,263, at 62,168-69 (2004) ("SES II") (denying request for rehearing). Thus, FERC "assert[ed] exclusive jurisdiction over the proposed project," pursuant to the NGA, foreclosing additional state regulation.[24]   SES I, 106 FERC ¶ 61,279, at 62,014.

    With respect to Weaver's Cove's project, FERC has reaffirmed its preemptive role under the NGA.   In its initial order authorizing Weaver's Cove to site, construct, and operate the proposed Fall River terminal, FERC described the limits of state and local regulation of FERC-approved natural gas facilities:

> Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions in this order.   We encourage cooperation between Weaver's Cove, Mill River, and local authorities.   However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.

_____

    [24] FERC allowed that it would consider safety and environmental factors, as well as input from state agencies and public comments. Sound Energy Solutions, 106 FERC ¶ 61,279, at 62,019-20 (2004) ("SES I").

Weaver's Cove I, 112 FERC ¶ 61,070, at 61,546 (citing Schneidewind,
485 U.S. 293); Nat'l Fuel Gas Supply v. Pub. Serv. Comm'n, 894 F.2d
571 (2nd Cir. 1990); Iroquois Gas Transmission Sys., L.P., 52 FERC
¶ 61,091 and 59 FERC ¶ 61,094 (1992)).  And, in its order on
rehearing, FERC again confirmed that state or local agencies "may
not, through the application of state and local laws, . . .
prohibit or unreasonably delay the construction of facilities
approved by the Commission."[25] Weaver's Cove II, 114 FERC ¶ 61,058,
at 61,185.

In sum, the NGA gives FERC "plenary and elastic" authority to
approve and regulate LNG terminals, SES II, 107 FERC ¶ 61,263, at
62,161 (quoting Distrigas Corp. v. Fed. Power Comm'n, 495 F.2d
1057, 1064 (D.C. Cir. 1974)), and the statute and its implementing
regulations preempt state and local efforts at regulation.  See
Iroquois Gas Transmission Sys., L.P., 59 FERC ¶ 61,094, at 61,346
("[T]he Natural Gas Act and the regulations promulgated by [FERC]
pursuant to that statute generally preempt state and local law.").

Rhode Island's Category B Assent requirement, despite being
aimed at the proposed dredging rather than at the construction of
the terminal, is among those local regulations that must defer to
the NGA.  In its order approving Weaver's Cove's application, FERC

_____

[25] FERC also observed that "[i]n the event compliance with a
state or local condition conflicts with a [FERC] certificate,
parties may bring the matter before a federal court for
resolution."  Weaver's Cove II, 114 FERC ¶ 61,058, at 61,185.

signaled that the proposed dredging is a necessary constituent of the terminal project. See Weaver's Cove I, 112 FERC ¶ 61,070, at ¶¶ 46, 105-09 & App. B, Conditions 16-22. Moreover, in the FEIS prepared to evaluate the proposed terminal, FERC noted that the purpose of the proposed dredging would be "to accommodate passage of LNG ships" to the terminal. Docket 36, Ex. D, at 2-25. It also stated that it would be infeasible to "reduce the volume or extent of dredging and still satisfy the objectives of the project at the proposed site." Id. at 3-70. The FEIS, which thus recognized the critical importance of the proposed dredging, was incorporated by reference into the order approving Weaver's Cove's application. See Weaver's Cove I, 112 FERC ¶ 61,070, at 61,540 ("The FEIS addresses the environmental and safety aspects of the proposed projects, and we adopt its analysis and its recommendations as our own."). In sum, FERC understood the proposed dredging to be intimately connected to the construction and operation of the LNG terminal, and thus its orders approving the siting, construction, and operation of Weaver's Cove's proposed terminal preempt Rhode Island's attempt to regulate the dredging through the Category B Assent process.

The Public Trust Doctrine, which underlies the Category B Assent process, is no shield against the NGA's preemptive effect. State ownership of submerged lands is subject to the paramount right and power of the United States to regulate and control those

-48-

lands "for the constitutional purposes of commerce." 43 U.S.C. §
1314(a) ("The United States retains all its navigational servitude
and rights in and powers of regulation and control of said lands
and navigable waters for the constitutional purposes of commerce,
navigation, national defense, and international affairs . . . .");
see also Phillips Petroleum, 484 U.S. at 479 (lands within the
public trust are "subject to the federal navigation easement and
the power of Congress to control navigation on those streams under
the Commerce Clause").  Since the nineteenth century, federal
courts have recognized that the paramount federal right to control
navigation and promote interstate commerce extends not only to the
navigable waters, but to such things that promote and serve
navigation in and on those waterways, such as the erection of piers
and construction of bridges.  In the early case of Stockton v
Baltimore & N.Y.R. Co., 32 F. 9 (C.C.D.N.J. 1887), the Federal
Circuit Court (sitting in New Jersey) held that:

> [T[he power to regulate commerce between the states
> extends, not only to the control of the navigable waters
> of the country, and the lands under them, for the
> purposes of navigation, but for the purpose of erecting
> piers, bridges, and all other instrumentalities of
> commerce which, in the judgment of congress, may be
> necessary or expedient.

Id. At 20-21.  When the federal government exercises its paramount
power in this respect, there is no "taking" of land from the state,
since the property was burdened from the beginning by this

reservation of rights.[26]  See United States v. Rands, 389 U.S. 121, 266-67 (1967).

Moreover, even if the issue was whether Weaver's Cove should be allowed to obtain ownership of submerged lands, the Category B Assent process would be irrelevant.  As even CRMC concedes, a Category B Assent is equivalent to a license to use state property - not a transfer of ownership of that property.  Docket 29, at 81-82 ("Weaver's Cove must apply under purely State law to the CRMC for a license to use State land and must do so separate and apart from any Federal requirements.").  In short, CRMC's attempt to leverage Rhode Island's ownership of the submerged land as an alternative means to halt Weaver's Cove's project is unavailing.

### 2.  Field Preemption

The Category B Assent process also is preempted under the so-called field preemption doctrine because Congress clearly intended

---

[26] Referring back to the issue of CRMC jurisdiction to review disposal of dredge material, wherever located, neither party appears to have considered whether the State's ownership of the submerged lands leaves it with an ownership interest in the dredge material.  But even this theory could not support open-ended CRMC jurisdiction to review dredge disposal.  United States v. Cherokee Nation of Oklahoma confirmed that the navigational servitude is a "'dominant servitude' which extends to the entire stream and the stream bed below ordinary highwater mark."  480 U.S. 700, 704 (1987).  Exercise of the rights reserved thereunder "is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject."  Id. (emphasis added); see also United States v. Rands, 389 U.S. 121, 266-67 (1967).

that the NGA occupy the entire field of LNG regulation.
Schneidewind, 485 U.S. at 300.  The NGA broadly applies to "the
transportation of natural gas in interstate commerce, to the sale
in interstate commerce of natural gas for resale for ultimate
public consumption for domestic, commercial, industrial, or any
other use, and to natural-gas companies engaged in such
transportation or sale, and to the importation or exportation of
natural gas in foreign commerce and to persons engaged in such
importation or exportation." 15 U.S.C. § 717(b).  It regulates the
importation and exportation of natural gas, and it vests FERC with
"exclusive authority to approve or deny an application for the
siting, construction, expansion, or operation of an LNG terminal."
Id. §§ 717b(a), (e)(1).  Moreover, the NGA specifically reserves to
the states specific rights and obligations under three enumerated
federal statutes and directs FERC to consult with, but not submit
to, the states on matters of local concern.  Id. §§ 717b(d) &
717b-1.

      Under FERC's regulations, an applicant must, prior to the
submission of a formal application, submit all pertinent
information about the proposed site and building plans, any state
and local agencies with permitting authority, the applicant's plans
to receive input from the public, and additional matters.  18
C.F.R. § 157.21.  Applicants must also comply with the requirements
of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§

-51-

4321 et seq., by examining the impact the facility would have on the environment. 15 U.S.C. § 717b-1(a). After the applicant completes the pre-filing process and submits a formal application, FERC consults with a designated state agency on state and local safety issues, including "(1) the kind and use of the facility; (2) the existing and projected population and demographic characteristics of the location; (3) the existing and proposed land use near the location; (4) the natural and physical aspects of the location; (5) the emergency response capabilities near the facility location; and (6) the need to encourage remote siting." Id. § 717b-1(b).

In short, the NGA and FERC's regulations promulgated thereunder govern virtually every facet of an LNG facility's siting, construction, and operation. See Algonquin LNG v. Loqa, 79 F. Supp. 2d 49, 51 (D.R.I. 2000). Therefore, Congress has occupied the entire field of natural gas regulation and Rhode Island's Category B Assent process is preempted.

3.   Conflict Preemption

Finally, the Category B Assent process is preempted because it conflicts with the NGA's regulation of "the transportation and sale of natural gas in interstate commerce." Schneidewind, 485 U.S. at 301. The NGA "preempts state and local law to the extent the enforcement of such laws or regulations would conflict with the Commission's exercise of its jurisdiction under the federal

statute." Iroquois Gas Transmission, 59 FERC ¶ 61,094, at 61,360.
As noted, the NGA regulatory scheme is comprehensive. See
Schneidewind, 485 U.S. at 300-01. Although CRMC retains a
qualified "veto" over the siting of LNG facilities as a part of the
federal consistency review process, see 16 U.S.C. § 1456(c)(3)(A),
this "veto" is limited in three important ways: first, CRMC has
only six months to review the application, after which time its
concurrence will be presumed; second, CRMC's conclusions with
respect to consistency are subject to reversal by the Secretary;
and finally, should FERC ultimately grant a license under the NGA,
any appeal thereof must be heard in federal court, see 5 U.S.C. §
702. Conversely, if Weaver's Cove is required to submit to a
separate Category B Assent review (in addition to the consistency
review), there would be no time limit placed on the process, and
any appeal of CRMC's action would be brought in state court, see
R.I. Code R. APA § 42-35-15. Because of the potentially limitless
duration of the Category B Assent process, and its relegation to
state court of challenges to CRMC action, the Category B Assent
process frustrates the comprehensive regulatory scheme set forth in
the NGA and is therefore preempted.

   C.   Dormant Commerce Clause

   Because the NGA preempts Rhode Island's Category B Assent
process, there is no need to reach the issue of whether the dormant
Commerce Clause would also preclude CRMC from requiring Weaver's

Cove to obtain a Category B Assent.   See E. Kentucky Res. v. Fiscal Court of Magoffin County, Ky., 127 F.3d 532, 540 (6th Cir. 1997) ("[A]ny state regulation of interstate commerce is subject to scrutiny under the dormant Commerce Clause, unless such regulation has been preempted or expressly authorized by Congress.").

IV.  Conclusion

For the foregoing reasons, Weaver's Cove's motion for summary judgment is GRANTED.   CRMC's cross-motion for summary judgment is DENIED.


IT IS SO ORDERED.


_____
William E. Smith
U.S. District Judge
Date: 10/1/08